## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS; | § | |
| STATE OF ALASKA; | § | |
| STATE OF UTAH; | § | |
| STATE OF WYOMING; | § | |
| K.R., A MINOR, BY SHAWNA | § | |
| ROWLAND, HER MOTHER; | § | Civil Action No. _____ |
| MOMS FOR LIBERTY; | § | |
| YOUNG AMERICA'S FOUNDATION; | § | |
| FEMALE ATHLETES UNITED; | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION; | § | |
| MIGUEL CARDONA, IN HIS OFFICIAL | § | |
| CAPACITY AS UNITED STATES | § | |
| SECRETARY OF EDUCATION; | § | |
| UNITED STATES DEPARTMENT OF | § | |
| JUSTICE; | § | |
| MERRICK GARLAND, IN HIS | | |
| OFFICIAL CAPACITY AS UNITED | | |
| STATES ATTORNEY GENERAL, | | |
| | | |
| *Defendants*. | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

The Defendants, through an unlawful rule (the "Final Rule"), seek to politicize our

country's educational system to conform to the radical ideological views of the Biden

administration and its allies.  Instead of focusing on the true mission of Title IX, which is to

protect women and girls from discrimination in education and to protect and promote women's

and girls' sports, the Defendants attempt to rewrite it entirely to (1) institutionalize the left-wing

fad of transgender ideology in our K-12 system and tie school funding to it, (2) mandate that colleges and universities punish students who refuse to comply with these views through a campus grievance process that is akin to "kangaroo courts," and (3) require schools to provide benefits to students and employees seeking voluntary abortions (even in states where it is outlawed) in direct conflict with Title IX's abortion neutrality provision. None of this has anything to do with Title IX. This is not only wrong, it is unlawful because the Final Rule (1) violates the text of Title IX, the statute it claims to interpret, (2) attempts to unilaterally settle matters subject to profound debate without clear authorization from Title IX or Congress, (3) violates the Constitution's Spending Clause, and the First, Fifth, Tenth, and Fourteenth Amendments, and (4) is arbitrary and capricious.

This unlawful rule also robs girls and women of their opportunity to participate in their school's education programs and activities, especially athletics, by forcing them to compete with biological males. It forces both boys and girls, in their most formative years, to sacrifice their privacy in personal spaces such as restrooms, locker rooms, and even overnight accommodations. Finally, it takes an explicit state function (the creation and administration of public schools) and warps it by conditioning federal education funding on schools violating the constitutional rights of their students and employees. Rather than allow schools to fulfill their educational functions, it transforms them into ideological centers where only the Defendants' views are allowed to be heard. Plaintiffs sue to prevent this from becoming reality.

In 1972, in response to serious concerns about discrimination against women and girls with regard to educational opportunities, Congress passed, and President Nixon signed, Title IX of the Education Amendments of 1972. Title IX specifically prohibits schools that receive federal funding from discriminating on the basis of sex. But the law and its regulations have

always recognized that providing students with sex-separated facilities, such as restrooms, locker rooms, and overnight sleeping accommodations, ensures the dignity and privacy for both boys and girls and is not "discrimination." Title IX guarantees that women and girls have equal access to education programs and activities—especially athletic programs—and other school-related activities. To that end, the law also permits schools to maintain sex-separate activities, including athletics, for students.

Congress charged the Department of Education ("DoEd") with promulgating regulations to ensure this access, opportunity, and privacy. *See, e.g.*, Education Amendments of 1974, Pub. L. No. 93–380, § 844 (1974) (directing the Secretary of Education to promulgate rules "relating to the prohibition of sex discrimination . . . with respect to intercollegiate athletic activities"). DoEd did so, promulgating regulations that include, for example, those that prohibit sex-based discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient" of federal funding. 45 C.F.R. § 86.41. This and other regulations have withstood scrutiny in the federal courts. States, schools, parents, students, volunteers, women, and girls have relied on the plain text of Title IX and on these regulations for decades.

On June 15, 2020, the Supreme Court issued its decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020). In *Bostock*, the Court held that employers violate Title VII's prohibition on sex discrimination by firing homosexual and transgender employees. *Id.* at 682–83. Specifically, the Court held that an employer could not fire a biological male employee for certain conduct while permitting a biological female employee to engage in the same conduct unrestricted. *Id.* at 659. Neither may an employer fire a biological male employee *because* he did not sufficiently adhere to masculine stereotypes. *Id.* But *Bostock* did *not* hold that "sex" includes "gender identity." Rather, the "Court [] explained that 'sex' refers to the biological

distinctions between males and females." *Tennessee v. United States Dep't of Educ.*, 615 F. Supp. 3d 807, 816 (E.D. Tenn. 2022). Nor did *Bostock* equate transgender status, "gender identity," or homosexuality with "sex." In fact, the Court said, "homosexuality and transgender status are distinct concepts from sex," *Bostock*, 590 U.S. at 669, and discrimination based on those traits is not discrimination "because of sex" within the meaning of Title VII unless the discrimination is actually "on the basis of" the person's biological sex. In other words, it is emphatically *not* discrimination within the meaning of Title VII merely to recognize and take account of sex. Additionally, the Court specifically limited its holding to the facts of the case and the text and history of Title VII. *Bostock*, 590 U.S. at 681.

Notwithstanding the limited holding of *Bostock*, in 2021, President Biden ordered federal agencies to rewrite federal law and remove access and protections for women and girls as well as privacy protections for all students to accommodate a new interest in "prevent[ing] and combat[ing] discrimination on the basis of gender identity." Exec. Order No. 13,988, 86 Fed. Reg. 7023-25 (Jan. 20, 2021). DoEd complied, publishing a Notice of Interpretation on June 22, 2021 ("NOI").[1] To solidify the NOI, the DoEd is now attempting to rewrite Title IX to prohibit federally funded schools from separating biological males and females in any educational program, including athletic programs based on the undefined concept of gender identity. DoEd's rewrite enshrines into federal regulations the elimination of the dignity and privacy protections for boys and girls and the equal opportunity protections for girls by unilaterally proclaiming that treating a person according to his or her biological sex rather than his or her "gender identity"

---

[1] This interpretation was enjoined on July 15, 2022 as to several states, including Kansas and Alaska, which are parties to this lawsuit. *Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308 (E.D. Tenn.) (Order entering preliminary injunction filed on July 15, 2022), *appeal pending in Tennessee v. U.S. Dep't of Educ.*, No. 22-5807 (6th Cir.)

constitutes "discrimination on the basis of sex" under Title IX.  This sleight of hand effectively replaces the word "sex" in the statute with "gender identity." And any treatment of a person according to his or her biological sex, rather than his or her "gender identity" is presumed to constitute more than *de minimis* harm.  Causing more than *de minimis* harm opens a school up to investigation by DoEd, which is an onerous process that consumes school resources, energy, and time, and which separately could result in loss of federal funding.  In addition, it opens the school up to a separate civil lawsuit under Title IX's implied cause of action.

The new regulations are contrary to Title IX's text and history.  They prohibit schools from maintaining sex-separate programs for males and females.  They prohibit schools from maintaining sex-separate restrooms or locker rooms.  They open the door for biological males to compete on female-only sports teams by prohibiting schools from making decisions based on "sex-stereotypes," including "stereotypes" based on actual, physiological differences in athletic ability.  And they remove dignity and privacy protections for boys and girls.

Along with the Department of Education, the Department of Justice ("DOJ") enforces Title IX regulations.  Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).  The States of Kansas, Alaska, Utah, and Wyoming (collectively, "the States" or "Plaintiff States")—sue to defend their interest in the continued receipt of federal education funds based on a reliance on biological reality and Title IX, a reliance on the fact that biological males are different from biological females and a reliance on the fact that Title IX was always explicit in its protection of biological females in educational programs and activities, including sports.  The States sue to ensure that women and girls can enjoy the benefits, opportunities, and other rewards from these programs and activities that they are entitled to under the law.  The States also sue to prevent all students, parents, teachers, volunteers, and school staff from having their privacy invaded by

having to share restrooms, locker rooms, and overnight accommodations with those of the opposite sex.  Finally, the States sue to ensure that they are not coerced by DoEd and DOJ into violating the First Amendment rights of students, teachers, and other school employees who disagree with the dictates of the Final Rule.

Plaintiff K.R. has already suffered many of the harms the Final Rule will inflict. K.R. is a 13-year-old female and student at an Oklahoma public school.  She has suffered the embarrassment and indignity of encountering males who identify as females in her school restroom.  To avoid this harm and maintain her privacy, she stopped using the restroom at her school entirely—until an Oklahoma law restored sex-designated restrooms in public schools. After the Oklahoma law was enacted, she resumed using the restroom at school.  But the Final Rule would override that law, requiring schools to admit males who identify as females into girls' locker rooms and restrooms, subjecting her once again to embarrassment and indignity when using the restrooms at school, and causing her to avoid those facilities altogether.

K.R. also wants to continue exercising her right to speak freely.  She wishes to stay true to her religious beliefs and avoid using inaccurate pronouns that contradict someone's sex.  And she wants to express her views about gender identity at school, sharing with her friends that boys cannot become girls (or vice versa), that boys should not access the girls' restrooms, and that girls' privacy from the opposite sex should be respected.  But the Final Rule threatens all these rights and protections, demanding that K.R.'s school punish her for her protected speech and religious exercise.  89 Fed. Reg. 33,888 ("A recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively.") (Final Rule, 34 C.F.R § 106.44(a)(1)).  K.R. challenges the Final Rule to

ensure that she and other girls maintain their rights to privacy, safety, free speech, and religious liberty.

Plaintiff Moms for Liberty is a national organization with chapters across the country, with members whose children attend schools that receive federal funding and are subject to Title IX regulations.  Moms for Liberty seeks to unify, educate, and empower parents to defend their parental rights at all levels of the government.  It is comprised of parents who seek to defend their fundamental right to raise their children in accordance with their values and beliefs, protect their children from indoctrination on social issues in schools, and protect their children from being forced to affirm ideas they do not believe in.

Members of Moms for Liberty have deeply held beliefs on issues involving biological sex, gender identity, sex stereotypes, and sex characteristics.  Included in these beliefs is that an individual's sex is determined at birth and that individuals should use restrooms and locker rooms matching their biological sex.  Moms for Liberty members and the children of Moms for Liberty members have engaged in speech advancing these values and wish to continue doing so. Absent the threat of discipline, their children, within the school setting, plan to continue using pronouns consistent with a transgender individual's biological sex and expressing their views on issues of gender identity and transgenderism, including that there are only two sexes.  If the Final Rule is permitted to take effect, the speech of their members and of their members' children will be chilled and they will be compelled to affirm beliefs and views on sex, sex stereotypes, and gender identity that contradict their beliefs and values.

Plaintiff Young America's Foundation is a national organization devoted to promoting traditional values and providing students on college campuses with resources to advance these values.  Young America's Foundation is a 501(c)(3) organization with thousands of student

members on college campuses across the country, including at Kansas State University, the University of Wyoming, and the University of Utah. Its mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.

Members of Young America's Foundation believe that sex is determined at birth by biology, there are only two genders based on biological sex, and an individual cannot change his or her sex or gender. Young America's Foundation members frequently host speakers on college campuses that discuss topics involving gender identity, transgenderism, and detransitioning. If allowed to go into effect, the Final Rule will impede Young America's Foundation's organizational mission by chilling its members' speech on topics regarding issues involving gender identity and transgenderism and will deter its college chapters from hosting speakers who discuss topics regarding gender identity, transgenderism, and detransitioning. Furthermore, its members will be compelled to affirm individuals' so-called gender identity, contrary to their beliefs and values.

DoEd's new rules also affect female athletes, like members of Plaintiff Female Athletes United ("FAU"). FAU is a nonprofit organization created to protect women's sports, to support fairness and equal opportunity for female athletes, and to ensure that women and girls are not forced to compete against biological males who identify as female. Many FAU members are female athletes who currently compete on girls' sports teams at schools governed by Title IX. And some of these members live in Plaintiff States—including Kansas, Wyoming, and Utah— that have passed laws or regulations designating women's sports as being open to biological women only. Because of these state protections, some of these FAU members have not had to compete against male athletes and have benefited enormously from fairness in sports and equal

athletic opportunity. But the Final Rule threatens to override these laws, taking away the right of FAU members to equal athletic opportunity and subjecting them to future competitions against males with natural physiological advantages. The Final Rule strips these women of their chance to be champions and to compete on a level playing field in their own sports. It also threatens to deny them the very collegiate scholarship opportunities that Title IX created.

These FAU members also want to protect privacy and safety in school restrooms, locker rooms, overnight team trips, and showers. Yet the Final Rule would force these female students to use restrooms, to change in locker rooms, to sleep in hotel rooms, and to share showers with biological males who "identify" as females. In pursuing that goal, the Final Rule purports to preempt state laws (like Utah's) that protect women's privacy in intimate spaces like locker rooms. In this way, the Final Rule exposes these women to embarrassment and humiliation, placing individuals' subjective feelings over the objective biological differences between the sexes. Likewise, some FAU members wish to advocate at school in favor of women's sports and women's privacy and to use pronouns consistent with others' sex. They wish to express the view that males who identify as female are in fact males and that these males should not access women's-only spaces. But the Final Rule punishes and chills this protected speech by branding it harassment. FAU and its members seek to stop the Final Rule so that its members and other women can continue to benefit from Title IX's promise made—equal opportunity in education.

## JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over this case under 28 U.S.C. § 1331 because this case concerns whether the DoEd acted in compliance with the United States Constitution and federal law, including Title IX and the Administrative Procedure Act ("APA").

2. This Court also has jurisdiction pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701–06, and 28 U.S.C. § 1361 (empowering district courts to "compel an

9

officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff").

3.      Venue is proper in this Court under 28 U.S.C. § 1391(1) because: Plaintiff State of Kansas resides in this judicial district and real property is not involved in this action.

4.      There is a present and actual controversy between the parties.

5.      Plaintiffs are challenging a final agency action pursuant to 5 U.S.C. §§ 551(13), and 704.

6.      This Court may grant Plaintiffs the relief they request under the APA, 5 U.S.C. §§ 705-06, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and 28 U.S.C. § 1361.

7.      Plaintiffs request that a jury trial, if any, will be held in the Topeka Division of the District of Kansas.

## THE PARTIES

**A.  Plaintiffs**

8.      Plaintiff State of Kansas is a sovereign State of the United States of America.

9.      Kansas sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

10.     Kansas law mandates that schools "separate overnight accommodations [] for students of each biological sex during school district sponsored travel that requires overnight stays by students."  Kan. Stat. Ann. 72-6286(a) (Supp. 2023).

11.     Kansas law also mandates sex-separation in sports in its public schools and state-sanctioned athletic programs.  Kan. Stat. Ann. 60-5603 (Supp. 2023).

12.     Finally, Kansas protects its citizens' free speech and religious liberty rights both in its constitution and by statute.  *See* Kan. Const. Bill of Rts. §§ 7, 11; Kan. Stat. Ann. 60-5301–22.

13.     Kansas brings this suit through its attorney general Kris W. Kobach.  He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court.  Kan. Stat. Ann. 75-702(a).

14.     Plaintiff State of Alaska is a sovereign State of the United States of America.

15.     Alaska sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

16.     Alaska law mandates equal opportunity for "both sexes" in athletics and in recreation in a manner that is commensurate with the general interested of the members of "each sex."  It further mandates that schools provide showers, toilets, and training-room facilities "for both sexes."  AS 14.18.040.

17.     Alaska protects its citizens' free speech and religious liberty in its state constitution.  Alaska Const. art. I, §§ 4, 5.

18.     Alaska brings this suit through its attorney general Treg R. Taylor.  He is the legal advisor to the governor and other state officers and has the authority to represent Alaska in all civil actions in which the state is a party.  AS 44.23.020(a), (b)(3).

19.     Plaintiff State of Utah is a sovereign State of the United States of America.

20.     Utah sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interests in protecting its citizens, schools, and interest in federal education funds.

21.     Utah law generally provides that male students may not compete on school athletic teams that are "designated for students of the female sex in an interscholastic athletic activity."  Utah Code Ann. § 53G-6-902.

22.     Finally, Utah protects its citizens' free speech and religious liberty rights both in its state constitution and by statute.  *See* Utah Const. art. I, §§ 1, 4, 15; Utah Code Ann. § 53G-1-203; *see also* S.B. 150 (Utah 2024) (passed both houses of legislature, awaiting governor's signature).

23.     Sean D. Reyes is the Attorney General of Utah.  He is authorized by Utah law to sue on Utah's behalf.

24.     Plaintiff State of Wyoming is a sovereign State of the United States of America.

25.     Wyoming sues to vindicate its sovereign, quasi-sovereign, and proprietary interests, including its interest in protecting its citizens, schools, and interest in federal education funds.

26.     Wyoming law provides that "[a] public school or a private school that competes against a public school shall expressly designate school athletic activities and teams as one (1) of the following based on sex: (i) Designated for students of the male sex; (ii) Designated for students of the female sex; or (iii) Coed or mixed."  Wyo. Stat. Ann. § 21-25-102(a).

27.     Wyoming law also provides that "[a] student of the male sex shall not compete, and a public school shall not allow a student of the male sex to compete, in an athletic activity or team designated for students of the female sex."  Wyo. Stat. Ann. § 21-25-102(b).

28.     "'Sex' means the biological, physical condition of being male or female, determined by an individual's genetics and anatomy at birth."  Wyo. Stat. Ann. § 22-25-101(a)(iv).

29.     Wyoming also protects its citizens' free speech and religious liberty rights in its state constitution.

30.     Wyoming brings this suit through its attorney general Bridget Hill.  She is the chief legal officer of the State of Wyoming and has the authority to represent Wyoming in federal court.  Wyo. Stat. Ann. § 9-1-603(a).

31.     Plaintiff K.R. is a 13-year-old female and resident of Stillwater, Oklahoma in Payne County.  K.R. attends Stillwater Middle School, a public school in Oklahoma for 6th and 7th graders.  Stillwater Middle School is a recipient of Title IX funding.

32.     In the past, K.R. encountered males who identify as females in the girls' restroom at her school.  These encounters made K.R. feel intensely uncomfortable, embarrassed, and unsafe using the restroom at school.  Those restrooms at her school provide minimal privacy protections because the stalls have large cracks between the door and the wall panels.

33.     If K.R. entered the women's restroom and a male was in the restroom, she would turn around and leave.  She eventually decided to stop using the school restrooms altogether to avoid the loss of privacy and feelings of embarrassment.  So, from around 7:00 a.m. when she left home to around 4:00 p.m. when she returned home, K.R. frequently would not use the restroom at school at all.  This was extremely uncomfortable for K.R.

34.     K.R. feels intensely uncomfortable using the bathroom with males regardless of whether they personally identify as male or female.

35.     For a time, K.R. did not even tell her parents about not using the restrooms at school because her school made the situation feel normal and she felt that she could not object.

36.     Eventually, Oklahoma passed a state law requiring every multiple occupancy restroom in K-12 public schools to be designated by sex and accessible only to members of that sex.  *See* Okla. Stat. 70, § 1-125.

37.     Since that law was passed, K.R. has returned to using the female restrooms at her school, and she feels safe doing so because of the state law.

38.     K.R. is also a Christian.  She believes that all people should be treated with dignity and respect, that God created every person male or female, and that people should accept their God-given sex and not seek to reject or change it.  K.R. believes it would be a lie and a violation of her faith for her to falsely affirm that someone is a member of the opposite sex.  For example, it would violate K.R.'s religious beliefs to use inaccurate pronouns of someone else— meaning pronouns that do not accurately reflect the person's sex.

39.     K.R. knows some of her classmates want K.R. to refer to them by pronouns that indicate they are the opposite sex, but K.R. has refused to do so because that would violate her religious beliefs.  Some of K.R.'s classmates have been offended by K.R.'s decision to avoid using inaccurate pronouns.

40.     K.R. has also discussed with her friends at school that having male students in the girls' restroom makes her extremely uncomfortable and anxious.  And she has talked to friends at school about her religious beliefs that there are only two sexes and that people cannot change their sex.

41.     K.R. desires to keep using the restroom without members of the opposite sex present.  She also wants to continue to share her beliefs and not be forced to speak in ways that violate her faith. For example, she wants to continue to share with her friends at school that she believes there are only two sexes and that people cannot change their sex.  And she doesn't want

to be forced to refer to people in a way that violates her religious beliefs by using inaccurate pronouns.  She also wants to express her discomfort and disagreement with males using the girls' restrooms.

42.     Moms for Liberty is a 501(c)(4) nonprofit organization with chapters in forty-eight states and over 130,000 nationwide.  Moms for Liberty is dedicated to organizing, unifying, educating, and empowering parents to defend their parental rights at all levels of government.  The core principles of Moms for Liberty include defending the fundamental right of parents to raise their children in accordance with their values and morals and protecting children from political and social indoctrination by schools.  Moms for Liberty engages in efforts to assure that schools maintain policies that respect these principles.

43.     Young America's Foundation is a 501(c)(3) nonprofit organization with approximately 140 chapters on college campuses across the country.  Young America's Foundation's mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values.  Consistent with its mission, Young America's Foundation provides college students with access to educational resources, campus flyers and tabling materials, and speakers.

44.     Plaintiff Female Athletes United ("FAU") is an Internal Revenue Code Section 501(c)(3) membership organization formed for the purpose of defending women and girls' sports, ensuring that women and girls have equal opportunities, and guaranteeing that women compete on a fair and safe playing field. Simply put, FAU promotes girls' and women's right not to compete against biological males who identify as females on girls' and women's sports teams.

45.     FAU is a coalition of current and former female athletes and anyone, whether male or female, who wants to ensure women's sports remain a place for only women.

46.     FAU has members in states across the county and at least five members located in the Plaintiff States.  These members participate on their girls' and women's sports teams at schools governed by Title IX.  These members compete on their women's teams at their schools and benefit from competing against only women and girls in athletic competitions.  And many of these members attend schools with classmates who identify as transgender or non-binary.

47.     A.B.S. is a 17-year-old female, FAU member, and resident of Topeka, Kansas.  She attended and will soon graduate from Washburn Rural High School where she competed on the girls' powerlifting, volleyball, wrestling, softball, and track and field teams.  Washburn Rural High School is a public school and recipient of Title IX funding.

48.     A.B.S. has a scholarship to play volleyball at MidAmerica Nazarene University in Olathe, Kansas next year.  MidAmerica participates in the National Association of Intercollegiate Athletics, which has a policy that protects female athletes by allowing only biological female athletes onto women's and girls' sports teams.

49.     During her senior year, A.B.S. was invited to compete with the top 24 male and female javelin throwers in all of Kansas.  She broke a school record for the javelin throw that had been in place for 10 years.

50.     A.R.S. is a 13-year-old, FAU member, and resident of Topeka, Kansas.  She attends Washburn Rural Middle School where she competes on the girls' volleyball team.  Washburn Rural Middle School is a public school and recipient of Title IX funding.

51.     A.R.S. is a seventh-grade student and plans to compete in volleyball next year at Rossville Middle School.  She plans to play softball at Rossville High School, and she hopes to play softball in college.

52.     A.R.S. grew up in a sports family and watched her sister, A.B.S., earn a scholarship to play volleyball in college.  She started playing softball when she was four and has played travel softball most of her life.  A.R.S. currently plays softball on a city club team and plans to continue until she can play softball in high school.  She hopes to continue playing in college.

53.     T.P. is a 15-year-old, FAU member, and resident of Park County, Wyoming.  She attends Powell High School where she competes on the junior varsity girls' tennis team.  Powell High is a public school and recipient of Title IX funding.

54.     T.P. is a freshman and plans to play on her school tennis team throughout high school.  She expects to join the varsity team in the coming years.

55.     Elizabeth Zwahlen is an 18-year-old, FAU member, and resident of Summit County, Utah.  She attends Utah Valley University in Orem, Utah, where she just completed her junior year and competes on the girls' track and cross-country teams.  Utah Valley University is a public university and recipient of Title IX funding.

56.     Zwahlen grew up in a family of runners.  Her dad competed in collegiate track, her mom ran in high school, and her grandmother has finished multiple marathons.  Zwahlen has competed on school track and cross-country teams since high school.  She currently competes in the 800 meter and 1500 meter and sometimes in the 5K or 10K.

57.     Zwahlen has a full athletic scholarship and has competed every season since she started college.

58.     T.Z. is a 17-year-old , FAU member, and resident of Summit County, Utah.  She attends North Summit High School where she competes on the girls' cross country and track teams.  North Summit High School is a public school and recipient of Title IX funding.

59.     T.Z. is a high-school junior and plans to continue competing in cross country and track for the remainder of her time at North Summit.

60.     T.Z. grew up in a family that loved sports. Her father and sister both competed in collegiate-level track. T.Z. runs the 3200, 1600, and 800 meter on her high-school track team.

61.     Each of these FAU members identified above uses the women's restrooms and changes in the women's locker rooms at their schools.  Some of them shower in the women's locker rooms, and some go on overnight trips with their schools.

62.     For example, T.Z.'s school team participates in multiple meets throughout the year that require the team to stay overnight.  For these competitions, the students on the team will share a room and often a bed with their teammates.

63.     Zwahlen's track and cross-country teams at Utah Valley go on numerous overnight trips to attend meets.  On these trips, she shares a room and sometimes a bed with her teammates.

64.     None of the FAU members identified above would feel comfortable using the women's restrooms at their schools with a male or using the girls' locker room with a male, or showering with a male nearby, or sharing the same hotel room or bed with a male during an overnight trip.  Doing any of this would make these members feel embarrassed, humiliated, unsafe, exposed, and vulnerable.  The intimate spaces at their schools do not have sufficient privacy protections for them to feel comfortable sharing these spaces with a male.

65.     For example, Zwahlen changes and showers in the locker room area at her school. She does not want to do that in the presence of a male or with a male nearby.

66.     T.Z. also regularly changes in the school locker room for practice and when getting ready for track and cross country meets, and she does not want to do that in the presence of males.

67.     None of the FAU members identified above wants to compete against biological males in their school sports, regardless of how those male competitors personally identity themselves.  These members think that competing against males in their sports would be unfair and would deter and discourage them from pursuing sports and from enjoying the value of participating in competitive sports.  Some of the members identified above also fear being injured if they have to compete against males who are typically bigger, faster, and stronger.

68.     Some of the FAU members identified above want to advocate in favor of fairness in women's sports at their schools to their friends and coaches, express their belief that there are only two sexes, and express their belief that biological males who identify as females are in fact males and should not be allowed to compete on women's sports teams.  As part of this advocacy and to affirm the view that people cannot change their sex, some of the FAU members refuse to use inaccurate pronouns that contradict someone's sex.

69.     For example, A.B.S. and T.P. want to advocate for fairness in women's sports at school and want to share their discomfort with competing against or sharing intimate spaces with males who identify as females.  In addition, T.P. wants to express at school the view that there are only two sexes.  T.P. had a teacher request that she refer to a classmate inaccurately as "they/them," and T.P declined to use those inaccurate pronouns because they did not reflect the classmate's sex.  T.P. believes she will likely have classmates in the future who request to be addressed with inaccurate pronouns like this because some students at her school identify as transgender or non-binary.

70.     T.Z. has also spoken with her friends at school about her belief that only females should compete in girls' sports, that there are only two sexes, and that people cannot change their sex.  She wants to have similar conversations and express her beliefs in the future even though she knows other people may disagree with her.

71.     Many FAU members identified above compete in sports in states with laws that ensure only biological women and girls can join women's sports teams.  Because of these protections, these FAU members have not been forced to compete with or against male athletes.

72.     T.Z. also competes in a state with a law that requires restrooms, locker rooms, showers, and changing rooms in public schools to be designated by sex except in limited circumstances.  Because of these protections, she has not yet encountered a male attempting to utilize these spaces.  She feels safe knowing she can utilize these areas without a male present.

73.     Zwahlen competes in a state with a law that requires locker rooms and attached showers and restrooms in government-owned buildings to be designated by sex in most circumstances.  Because of these protections, she has not yet encountered a male attempting to utilize these spaces.  She feels safe knowing she can utilize these areas without a male present.

74.     The FAU members identified above felt relieved and safe when their respective states passed laws protecting women's sports.  These FAU members fear that without their states' laws ensuring fairness in women's sports teams, they will have to compete against males who identify as female and lose possible scholarship opportunities to these males.

**B.  Defendants**

75.     The DoEd is an executive agency of the federal government responsible for enforcement and administration of Title IX. 20 U.S.C. §§ 3411, 3441.

76.     Defendant Miguel Cardona is the United States Secretary of Education and is responsible for the operation of DoEd.  20 U.S.C. § 3411.  He is sued in his official capacity.

77.     Defendant DOJ is an executive agency of the United States.  DOJ has the authority to enforce Title IX.  Exec. Order No. 12,250, 28 C.F.R. part 41, app. A (1980).

78.     Defendant Merrick B. Garland is the Attorney General of the United States and is responsible for the operation of the DOJ.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.  Title IX of the Education Amendments of 1972

79.     The fundamental declaration of Title IX of the Education Amendments of 1972 is that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"  20 U.S.C. § 1681(a).

80.     Title IX frequently refers to "sex" and recognizes a biological male-female dichotomy.  *See, e.g.*, *id.* § 1681(a)(7) and (8).

81.     Title IX never refers to "gender identity" (or any similar or related concept).  *See id.* § 1681.

82.     Members of Congress, recognizing that Title IX currently refers to "sex" and not "gender identity," have introduced legislation to change the law so that it includes protections for "gender identity" on more than one occasion.  *See, e.g.*, Fairness for All Act, H.R. 1440, 117th Congress (2021).  All of these attempts have failed.

83.     Congress has recognized that Title IX allows schools to recognize and consider sex in numerous situations. *See, e.g.*, 20 U.S.C. § 1681(a)(6) and (7) (exempting fraternities, sororities, YMCAs, YWCAs, Boy Scouts, Camp Fire Girls, American Legion conferences related to Boys State conferences and Boys Nation conferences, among other examples).

84.     Separately, DoEd promulgates regulations to fulfill the promise of Title IX.  Its

program and activities regulation largely tracks the fundamental declaration:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied
> the benefits of, or be subjected to discrimination under any academic,
> extracurricular, research, occupational training, or other education program or
> activity operated by a recipient which receives Federal financial assistance.

34 C.F.R. § 106.31 (2023).

85.     The prohibition on discrimination on the basis of sex is not a prohibition on

classification or separation on the basis of sex.  To the contrary, DoEd permits educational

institutions to provide separate housing for males and females, provided that the

> [h]ousing provided by a recipient to students of one sex, when compared to that
> provided to students of the other sex, shall be as a whole: (i) Proportionate in
> quantity to the number of students of that sex applying for such housing; and
> (ii) Comparable in quality and cost to the student.

*Id.* § 106.32(a)–(b); *see also* 20 U.S.C. § 1686.

86.     DoEd also permits federal financial assistance recipients to "provide separate

toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for

students of one sex shall be comparable to such facilities provided for students of the other sex."

34 C.F.R. § 106.33.

87.     DoEd's athletics regulation is similar:

> [N]o person shall, on the basis of sex, be excluded from participation in, be denied
> the benefits of, be treated differently from another person or otherwise be
> discriminated against in any interscholastic, intercollegiate, club or intramural
> athletics offered by a recipient, and no recipient shall provide any such athletics
> separately on such basis.

*Id.* § 106.41(a).

88.     DoEd's athletics regulation also allows a federal financial assistance recipient to

separate the sexes in the context of athletics under certain circumstances:

Notwithstanding the requirements of [34 C.F.R. § 106.41(a)], a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.  For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

*Id.* § 106.41(b).

89.     Thus, Title IX authorizes sex-separate sports as long as men and women have equal opportunities.

90.     Overall, DoEd's regulations repeated references to "sex" recognize a male-female dichotomy.  *See, e.g.*, 34 C.F.R. § 106.41(b) (referring to "one sex" and "the other sex").

91.     DoEd did not promulgate formal regulations requiring schools to adopt grievance procedures for students who had been subject to discrimination (which includes hostile environment harassment), whether from an employee of the institution or a fellow student until May of 2020.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (the "2020 Amendments").

92.     Before this, schools could, and often did, base their internal grievance procedures on DoEd's 2001 Guidance and separately on a 2011 Dear Colleague Letter and 2016 Dear Colleague Letter.  None of these guidance documents were formal regulations and none have the force of law.  U.S. Dep't. of Educ., Off. for Civil Rts., *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 FR 12034 (Mar. 13, 1997), https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html#skipnav2; U.S. Dep't. of Educ., Off. for Civil Rts., *Revised Guidance on Sexual Harassment: Harassment of*

*Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001),

https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.; U.S. Dep't. of Educ, Off. for Civil

Rts., Dear Colleague Letter: Sexual Violence (April 4, 2011), https://www2.ed.gov/about/

offices/list/ocr/letters/colleague-201104.pdf, *withdrawn by*, U.S. Dep't. of Educ., Off. for Civil

Rts., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/

colleague-title-ix-201709.pdf; U.S. Dep't. of Educ., Off. for Civil Rts, Dear Colleague Letter:

Sexual Violence (2014), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf,

withdrawn by, U.S. Dep't. of Educ., Off. for Civil Rts., *Dear Colleague Letter* (2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

93.    Among other things, the 2020 Amendments require schools to "[e]stablish

procedural due process protections that must be incorporated into a recipient's grievance process

to ensure a fair and factual determination on when a recipient investigates and adjudicates a

formal complaint of sexual harassment."  85 Fed. Reg. at 30,030.

94.    The 2020 Amendments require, among other things, (a) notice to the accused;

(b) an opportunity for the accused to examine and respond to evidence; (c) an opportunity for

both the accused and accuser to "present expert witnesses and other inculpatory and exculpatory

evidence"; (d) a live hearing with cross-examination of witnesses at colleges and postsecondary

institutions; (e) a neutral decision maker who was not the Title IX coordinator."  85 Fed. Reg. at

30,054.  These procedures are intended to effectuate due process for the accused.

95.    The 2020 Amendments also codify the *Gebser / Davis* framework for determining

what constitutes sexual harassment.  85 Fed. Reg. at 30,033 (citing *Gebser v. Lago Vista Indep.*

*Sch. Dist.*, 524 U.S. 274 (1998) & *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,

526 U.S. 629 (1999)).  DoEd adopted "verbatim" the definition of "sexual harassment" from *Davis*.  85 Fed. Reg. at 30,030.

96.     "Sexual harassment" is currently defined by reference to three standards: (1) *quid pro quo* harassment; (2) sexual violence offenses; and, most prominently, (3) as "conduct that is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to education."  85 Fed. Reg. at 30,030, 30,036; 34 C.F.R. § 106.30 (definitions).

97.     This definition applies to administrative enforcement, when federal funding is put at risk, 85 Fed. Reg. at 30,033, and to enforcement in court proceedings.

98.     Congress also passed a special provision related to abortion.  The provision is often called a neutrality clause.  20 U.S.C. § 1688.

99.     Unlike any other form of disability, illness, pregnancy, or related condition or medical procedure, Congress has specifically clarified that "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion.  Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion."  *Id.*

100.    Schools may, therefore, provide benefits related to an abortion (if otherwise consistent with law), but DoEd cannot condition the receipt of federal funds on the provision of *any* such benefit.

101.    Additionally, by including these provisions in a statue prohibiting sex discrimination, Congress has recognized that pregnancy is inherently tied to biological sex.

### B.  The Proposed Rule

102.    On July 12, 2022, DoEd published a Notice of Proposed Rulemaking titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Proposed Rule").  The Proposed Rule was published in the Federal Register at 87 Fed. Reg. 41,390–579.

103.    The Proposed Rule supposedly "clarified" DoEd's opinion that "sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  87 Fed. Reg. 41,391.

104.    Further, the Proposed Rule prohibited "sex-based harassment," which DoEd asserted included a "broader range of sexual misconduct than that covered under the definition of 'sexual harassment' in the current regulations."  *Id.* at 41,413.

105.    DoED did, however, correctly recognize that its proposed definition was "more similar to the definition of 'hostile environment' under Title VII than the definition of 'sexual harassment' under the current Title IX regulations."  *Id.* at 41,415.

### C.  Comment on the Proposed Rule

106.    DoEd opened the Proposed Rule for public comment to address the scope of the regulation and on whether additional regulations would be required.

107.    The Proposed Rule invited comment on the scope of the regulation and on whether additional regulations would be required.

108.    Plaintiff State of Kansas along with other states timely submitted multiple comment letters on the Proposed Rule via the federal rulemaking portal.  True and correct copies of those comments are attached hereto as Exhibits 2–3.

109.    The comments explained in detail why DoEd should re-adopt the position it took in an enforcement matter on August 31, 2020 that when a school provides separate teams for members of each sex under 34 C.F.R. § 106.41(b), the school should separate those teams on the basis of biological sex, not on the basis of gender identity.  *See generally* Exs. 2 & 3.[2]

110.    FAU's and K.R.'s counsel—Alliance Defending Freedom—submitted numerous comment letters addressing how the Rule violates rights to individual privacy and dignity, jeopardizes fairness in women's sports, and burdens free speech and religious liberty.  True and correct copies of these comments are attached.  *See* Exs. 4–6.

111.    As these comments discuss, students suffer harm when forced to allow members of the opposite sex into their intimate spaces like restrooms, locker rooms, and overnight accommodations.  They explain that having sex-designated intimate spaces protects individuals from exposing their bodies to members of the opposite sex and from being exposed to members of the opposite sex.  The need for privacy and the harm from non-consensual exposure is particularly acute for female students.

112.    These comments also address the Proposed Rule's adverse effect on women's athletics and highlight the scientific basis for designating sports by sex and the physiological advantages that males, including males who identify as female, have over female athletes.

113.    Southeastern Legal Foundation's comment letters asserted that the proposed changes to Title IX "would chip away at parents' rights, making the government their children's ultimate caregiver."  Ex. 7, at 2.  The comment letters went on to contend that the changes

---

[2] DoED's 49-page comprehensive analysis of the Title IX problems with biological males competing in female athletics, issued on August 31, 2020, is available here: https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a2.pdf It was withdrawn, however, by the Biden Administration, on February 23, 2021, see https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01194025-a5.pdf

"would do away with student's freedom of expression" while "impos[ing] a nationwide orthodoxy on all parents, students, and teachers in any school receiving federal funds." *Id*. The comment letters further contended that the rule would "chill" speech for fear of being charged with harassment and being disciplined for making comments on issues such as gender identity, sex stereotypes, and sex characteristics. *Id.* at 4−5.

114.    Mountain States Legal Foundation submitted a comment in opposition to the proposed changes to Title IX.  A true and correct copy of that comment is attached hereto as Exhibit 8.  MSLF's comment letter explained how the then-proposed regulatory changes to the implementation of Title IX would trigger a cascade of negative effects for schools, including damaging due process rights, impairing the right to free speech, and destabilizing what is currently a settled Title IX regime that will have been in place for nearly 4 years.  *Id.* at 1 ("[T]he proposed regulations would confuse stakeholders, cause unneeded expenses for schools and students, and create regulatory whiplash as the regulations are either struck down or rescinded soon after their enactment.").  Most especially, MSLF addressed the severe consequences that would result if schools had a duty to suppress "misgendering" or compel students and teachers to use "preferred pronouns."  *Id.* at 17-18 (describing a host of neo-pronouns that are laid out by colleges such as "xemself" and "per").  Similarly, MSLF is concerned with compelling the use of neo-honorifics for teachers and administrators (spoken by students and parents) such as "Mx." instead of Mr. or Ms.

**D.  The Final Rule**

115.    Despite extensive criticism in the public comments, the Final Rule nevertheless amends 34 C.F.R. § 106 in numerous identical ways to those that the Proposed Rule previously initially proposed.  89 Fed. Reg. at 33,474.  The Final Rule purports to "provide greater clarity

regarding: the definition of 'sex-based harassment'; the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and recipients' obligations to provide an educational environment free from discrimination on the basis of sex." *Id.* at 33,476.

116.    On April 29, 2024, DoEd issued a final administrative rule titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" (the "Final Rule").  The Final Rule was published in the Federal Register at 89 Fed. Reg. 33,474–778.  A true and correct copy of the Final Rule is attached hereto as Exhibit 1.

117.    As is relevant here, this part of the Final Rule makes three major changes, none of which are authorized by Title IX: (1) it essentially changes the definition of "sex" to include "gender identity"; (2) it changes the standard for what constitutes sexual harassment; and (3) it changes the person to whom a school may be liable for discrimination.

118.    First, the Final Rule "interprets" Title IX's prohibition on discrimination on the basis of sex to include discrimination on the basis of "gender identity."  *Id.* at 33,477.

119.    The DoEd considers "gender identity" to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth" and finds it otherwise "unnecessary to articulate a specific definition of 'gender identity.'"  *Id.* at 33,809.

120.    The Final Rule recognizes there is a difference between sex and "gender identity."

121.    The Final Rule assumes that there are more than two "gender identities."  *See id.* at 33,804–05 (removing references to "both sexes").

122.    DoEd included an unexhaustive list of categories that could be considered when determining whether discrimination is "sex-based": "lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way." *Id.* at 33,803.  None of these terms are specifically defined. *Id.*  Even sexual orientation disorders are fairly included within the broad language of the April 29 rule.

123.    Additionally, the Final Rule relies on the World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), which recognizes dozens of "gender identities" including "eunuch," "nonbinary," "transgender," "gender nonconforming," "gender queer or diverse," "gender diverse," "third gender lying beyond the gender binary," "two spirit," and many others that are not widely recognized in the United States.  The Final Rule does not account for, provide guidance concerning, or limit liability with respect to, any "gender identity" outside the "gender binary."

124.    The Final Rule would require educational institutions to take a person at their word as to their "gender identity" without documentation or questioning. *Id.* at 33,819.

125.    The Final Rule provides no guidance for ascertaining a person's "gender identity" if the information is not volunteered.  In fact, "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes *more than de minimis* harm." *Id.* at 33,819 (emphasis added).  The Final Rule considers requesting a birth certificate to be a "burdensome documentation requirement." *Id.*

126.    The Final Rule acknowledges that "gender identity" may not be known or readily knowable.  *Id.* at 33,809.  Nevertheless, the Final Rule states "a recipient must not treat individuals more or less favorably based on their gender identity" and "may not prevent a person from participating in its education program or activity consistent with the person's gender identity," *id.*, which, again, may not be known or readily knowable.  Thus, an educational institution may "discriminate" against a student—risking federal funding and civil liability— without even knowing it is discriminating, especially considering that the Final Rule assumes there are multiple "gender identities."

127.    Currently, a school is not liable for discrimination under Title IX unless the school has *actual notice* of the discrimination.  *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023).  Under the Final Rule, a school could be liable for "discrimination" if it knows it has male-only and female-only restrooms (and knows males cannot use the female restroom and vice versa) even if it does not know if any student, applicant, visiting student, parent, teacher, staff member, or other visitor has a "gender identity" that does not match his or her biological sex.

128.    Second, the Final Rule states that it "clarifies" that a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause *more than de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity."  89 Fed. Reg. at 33,818 (emphasis added).

129.    This would be a change from the courts' current interpretation of "discrimination," which requires a showing of "unwelcome conduct that a reasonable person

would determine is 'so severe, pervasive, and objectively offensive' that it effectively denies a person equal access to education." 85 Fed. Reg. 30,065.  This definition currently applies to both civil liability and administrative enforcement.  *See* 34 C.F.R. § 106.2 (defining "Hostile environment harassment").

130.    The Final Rule acknowledges that, even if the standards for administrative enforcement can be or are different than those used for civil liability, that "does not mean [] that administratively imposed remedial actions can never have financial consequences."  *Id.* at 33,474 n.10.

131.    Third, the Final Rule "clarifies" the definition of "person" to whom the school may be liable for discrimination.  It now "clarifies" that "person" as any student, employee, or any other person who "was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination."  *Id.* at 33,846.

132.    Schools may be liable for "discriminating" against students, parents of students, applicants for admission, parents of applicants, parent chaperones, visiting students, parents of visiting students, teachers, employees, coaches, visiting coaches, independent contractors, guests of the school, and others.  *Id.*

133.    The Final Rule declines to define "specific conduct and practices that constitute . . . gender identity discrimination," *id.* at 33,808, but does provide some instances in which a school would likely be found to be discriminating if it treats a person according to his or her sex rather than "gender identity."  These instances reveal how broad and vague these conduct or practices could be.

134.    For example, the Final Rule acknowledges that students have a "legitimate interest" in "safety and privacy" of sex-separate facilities (such as restrooms, locker rooms, and overnight accommodations).  *Id.* at 33,820.

135.    However, it goes on to state these "concerns" are "unsubstantiated and generalized."  *Id.* at 33,820.  Further, "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities [including restrooms, locker rooms, and overnight accommodations] or activities consistent with their gender identity."  *Id.* at 33,818.  Any "such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes."  *Id.* at 33, 819.

136.    The Final Rule repeatedly refers to prior "Dear Colleague" Letters, including the 2016 Dear Colleague Letter, where DoEd advised recipients that they must treat a transgender female-identifying student the same as a biological female student for the purposes of accommodations on overnight school trips.  2016 Dear Colleague Letter at 4.[3]

137.    Thus, if it is allowed to go into effect, the Final Rule would require that schools permit biological males (including students, visiting students, applicants, their parents, teachers, staff, contractors, visitors, and others) to access female-only facilities (including restrooms, locker rooms, and overnight accommodations) without question (and vice versa), or else the school risks losing its federal funding.

138.    As another example, the Final Rule would make clear that schools can no longer separate students based on biological sex for "classes or portions of classes."  *Id.* at 33,819.  This would include gym class and health and sexual education classes.

---

[3] https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf

139.    As another example, while the Final Rule claims to maintain First Amendment protections, *id.* at 33,803 (suggesting nothing in the Final Rule *requires* an educational institution to violate free speech rights), DoEd has already taken the position that educational institutions are at risk of losing federal funding (and at risk of civil liability) if a teacher does not use a student's "preferred pronouns" for any reason, including if the teacher did not know that the student's "gender identity" differed from his or her biological sex or if the teacher had a free speech or religious liberty objection.  *See* 2016 Dear Colleague Letter at 3.  The Final Rule would likely also apply to completely innocuous speech such as the statement that "there are only two genders."

140.    As evidence of this, the Final Rule would lower the standard for harassment to include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is *subjectively* and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (emphasis added).

141.    This position would chill students' and teachers' speech.  Female students who raise concerns about having to share a locker room with a male athlete or a restroom with a male visiting parent are at risk of facing investigation and disciplinary proceedings for "hostile environment harassment" because their words could be seen as offensive and severe or pervasive and no longer need to meet the current "severe, pervasive, and objectively offensive standard" in order to amount to harassment.

142.    Similarly, the Final Rule is so vague and broad that students would self-censor for fear that their speech on topics such as gender identity, sex stereotypes, and sex characteristics could fall within its new definitions and standards.

143.    The Final Rule would also compel speech from teachers, school employees, parents, and students, in that it would require students to use an individual's "preferred pronouns" and names of choice, forcing students to affirm gender identity and transgender ideology contrary to their personal beliefs and values.

144.    The Final Rule would also compel speech from students and parents, in that it would require students and parents to use teachers' and school staffs' honorifics that do not match their sex, or use "neo-honorifics" such as "Mx."

145.    The Final Rule ostensibly would maintain "current regulations on athletics," which do allow female-only and male-only sport teams.  *Id.* at 33,817.

146.    However, the Final Rule would also apply to all "discrimination" (as the Final Rule now defines it) "except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at [34 C.F.R.] §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation [34 C.F.R.] § 106.32(b)(1), or § 106.41(b)."  *Id.* at 33,817.  The Final Rule would *not* except 34 C.F.R. § 106.41(a), which prohibits discrimination "in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient," and says "no recipient shall provide any such athletics separately on such basis."

147.    Defendants have already taken the position that "the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls' participation in girls' sports."  Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) at 21; *cf.* U.S. Dept. of Justice and DoED 2016 Dear Colleague Letter on Transgender Students at 3.

148.    In fact, according to Defendants, any "categorical ban" on biological males' participation in female-only sports "is inconsistent with Title IX's overarching goal of ensuring

equal opportunity."  Brief of Amicus United States of America, *B.P.J.*, 98 F.4th 542, at 12.  They have said that "prohibiting [biological males] from participating on girls' sports teams because their sex assigned at birth was male" causes "harm" and constitutes discrimination on the basis of sex.  *Id.*

149.    The Final Rule's assertion that a separate regulation will address athletics is a red herring because, "[DoEd] has indicated that it would consider in a forthcoming notice of proposed rulemaking (NPRM) what criteria, *if any*, recipients should be permitted to use to establish students' eligibility to participate on a particular male or female athletic team."  *Id.* at 29.  (emphasis added).

150.    Therefore, DoEd's default position is that *no* separation based on athletics is permitted on the basis of sex but further guidance *may* provide some criteria for limited exceptions to that general rule.  The lack of separate guidance identifying such exceptions naturally means that there are no exceptions based on the Final Rule.

151.    The Final Rule also says that DoEd considers it a violation of Title IX when a school engages in "impermissible" "sex-stereotyping" by making decisions "based on 'paternalism and stereotypical assumptions about women's interests and abilities,' and a 'remarkably outdated view of women and athletics.'"  *Id.* at 33,811 (quoting *Pederson v. La. State Univ.*, 213 F.3d at 858, 880 (5th Cir. 2000)).

152.    The Final Rule does not explain why sports are exempted if the relative difference in boys' and girls' athletic abilities is only a "sex-stereotype" which cannot be relied on to separate students based on biological sex.

153.    Defendants would likely use the Final Rule to prohibit blanket bans on biological males competing on and against female-only athletics teams, requiring schools to allow men to play on women's teams.

154.    The Final Rule does not provide any guidance as to how schools are to decide which men must be permitted to play on women's teams or how to avoid "sex-stereotyping" in this area.

155.    The Final Rule does not provide any guidance as to whether female athletes are permitted to withdraw or otherwise decline to compete against male athletes if they reasonably fear bodily injury, or if such conduct would constitute discrimination.

156.    The Final Rule does not provide any guidance to schools as to how to maintain competitive fairness for female athletes when other schools field male athletes with an obvious competitive advantage.  (Such as a male 18-year old male Senior in High School who abruptly begins to identify as female).

157.    The Final Rule does not provide any guidance to schools as to how to classify "gender-fluid" or "two-spirited" athletes who wish to compete on both male and female teams.

158.    The Final Rule does not provide any guidance to schools as to how to classify, for athletics purposes, "non-binary" students who decline to participate as either male or female, because they insist that they fall into neither category.

159.    Like the Proposed Rule, the Final Rule notes only in passing DoEd's prior contrary position.  *See* 89 Fed. Reg. at 33,804.

160.    The Final Rule acknowledges that DoEd is currently enjoined from enforcing this interpretation against twenty states, including Plaintiff States Kansas and Alaska, but simply says

that DoEd "disagrees" with the Court's reasoning in that case.  *Id.* at 33,804, citing *Tennessee* v. *U.S. Dep't of Educ.,* 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).

161.    While the Final Rule does acknowledge that DoEd cannot interfere with a person's religious liberty rights or rights under the Religious Freedom Restoration Act of 1993,  PL 103–141, November 16, 1993, 107 Stat 1488, it does not provide any exemption for religious students, teachers, staff, administrators, coaches, etc., and instead says DoEd "will investigate" all complaints and make individual determinations when a person cannot comply with the Final Rule due to his or her religious belief.  *Id.* at 33,809.

162.    These changes (and the constitutional concerns they raise) implicate the Spending Clause contract that the States made with the federal government when they accepted federal funding in exchange for providing equal opportunities for women and girls and for ensuring privacy protections for all students.

163.    The Final Rule fails to adequately address comments made by Plaintiff States regarding the Spending Clause and their contract with the federal government.  *See id.* at 33,516–17.

164.    Instead, the Final Rule suggests "Federal agencies have authority to define the contours of the Spending Clause contract with recipients through their regulations."  *See id.* at 33,517.

165.    The Final Rule clashes with other parts of Title IX as well.  The Final Rule requires that educational institutions "treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave; payment of disability income; accrual of seniority and any other benefit or service; and reinstatement; and under any fringe benefit offered to employees by virtue of

employment." *Id.* at 33,796

166.    The Final Rule defines "pregnancy or related conditions" to mean pregnancy, childbirth, termination of pregnancy." Termination of pregnancy includes voluntary abortion. *Id.* at 33,575.

167.    Employees must also be allowed a leave of absence to obtain an abortion, even when the educational institution does not maintain a leave policy for its employees, as well as "in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy." *Id.* at 33,798.

168.    The Final Rule also requires educational institutions to provide a woman who has had or who is recovering from an abortion access to all education programs and activities which could include access to online or homebound instruction during recovery from an abortion, providing a student additional time to complete an exam or coursework if a student travels out of state for the abortion. *Id.* at 33, 777.

169.    The Final Rule requires educational institutions to offer women obtaining abortions "Reasonable Modifications" of policies, practices and procedures to ensure equal access (i.e. to facilitate their abortions), including "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations." *Id.*

170.    Women obtaining abortions must also be allowed a voluntary leave of absence, along with reinstatement "to the academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began." *Id.*

171.    Students obtaining an abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital

benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.  *Id.*

172.    "Fringe benefit offered to employees by virtue of employment," leave—especially mandatory provision of leave when leave is not available under existing policies or when the employee has no accrued leave time available, "payment of disability income," "accrual of seniority," "benefit[s] of service," "access to online or homebound instruction," and "extra time to complete exams" are all benefits provided by the educational institutions.

173.    Thus, the Final Rule requires educational institutions to provide leave, disability, and other benefits in connection with abortions in direct conflict with Title IX's neutrality clause.

174.    In addition to rewriting Title IX to change the definition of "sex" and to requiring schools to provide benefits for abortion, the Final Rule changes current regulations in problematic ways.

175.    The Final Rule eliminates many of the grievance procedure due process protections that were put in place by the 2020 Amendments.  *See id.* at 33,876–77.

176.    Prior to the 2020 Amendments, schools across the country had implemented grievance procedures for sexual harassment complaints in conformance with the procedural recommendations contained in DoEd's 2011 Dear Colleague Letter.

177.    Often, these procedures violated the due process rights of accused students and employees.  "As of August 16, 2019, no fewer than 298 of the post-Dear Colleague letter lawsuits (191 in federal court) have yielded substantive decisions, at various stages of the legal process… Of the 298 decisions in state and federal court, colleges have been on the losing side in 151."  Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial*

*Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49, 65-66 (2019).

178.    As of 2024, more than five hundred state and federal lawsuits are estimated to have been filed challenging procedural due process deficiencies in Title IX grievance procedures.[4]  *See Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1020 (D. Colo. 2019) ("The Tenth Circuit has not so opined, but several district courts have found that a lack of meaningful cross-examination may contribute to a violation of due process rights of an accused student in a disciplinary hearing regarding sexual assault."); *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) [denying motion to dismiss] ("our circuit has made two things clear: (1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination").

179.    The Final Rule would largely revert to the grievance process that was in effect prior to the 2020 Amendments.  Section 106.45 & .46 (involving students at post-secondary institutions), pg. 1540, 1550.

180.    Rather than an opportunity to examine the evidence, the accused is given access to an "an equal opportunity to access either the relevant and not otherwise impermissible, or the same written investigative report that accurately summarizes the evidence " (106.46(c)(1)(iii), 106.46(e)(6)); rather than an opportunity to question and cross-examine witnesses, "[a] recipient must provide a process that enables the decisionmaker to question parties and witnesses" 106.45(g); the accused may be denied an attorney ("the postsecondary institution may establish

---

[4] https://www.chronicle.com/article/were-making-the-same-title-ix-mistakes-again.

restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties") (106.46(e)(2)); no live hearing is required (106.46(e)(6)(2),106.46(g)); and the decisionmaker in any grievance may be the same person as the investigator (106.45(b)(2)).

181.    The Final Rule extends beyond the United States.  *Id.* at 33,853. *see contra* 20 U.S.C. § 1681(a) ("No person *in the United States* shall …") (emphasis added).

**E. "Gender Identity"**

182.    "Gender identity" is not a statutorily cognizable identity category.

183.    "Gender identity" is subjective. *See Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018).

184.    The sole criterion used to determine "gender identity" apparently is whether one says one is transgender.  *See, e.g., Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, S.J., concurring); *B.P.J.*, 2023 WL 111875, at *8; *cf.* Cal. Health & Safety Code § 103426; Wash. Admin. Code § 246-490-075.

185.    Unlike biological sex, "gender identity" is not a static or an immutable characteristic "determined solely by accident of birth."  *Adams ex rel. Kasper v. Sch. Bd.*, 57 F.4th 791, 807 (11th Cir. 2022) (en banc).  And the Final Rule would require schools to take people at their word as to their "gender identity."

186.    There is also "the issue of gender fluidity in which students may switch between genders with which they identify."  *Id.* at 798.

187.    Lastly, "gender identity" is not limited to a male/female dichotomy.  Depending on whom you ask, gender identity covers people who identify with any of the following gender identities: "boygirl," "girlboy," "genderqueer," "eunuch," "bigender," "pangender,"

"androgyne," "genderless," "gender neutral," "neutrosis," "agender," "genderfluid," "third

gender," and others.  *See generally* World Professional Association for Transgender Health,

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l

J. Transgender Health S1 (2022).[5]

188.    Indeed, a third of the respondents to the 2015 National Transgender

Discrimination Survey (a survey in which all respondents "identif[ied] as transgender") reported

their "primary gender identity" as either "part time as one gender, part time as another" or some

gender other than male or female.  Jamie M. Grant et al., *Injustice at Every Turn: A Report of the

National Transgender Discrimination Survey* 16 (2015).  Each and every time a student's

"gender identity" changes, the school is once again at risk of discriminating by treating the

student according to his or her biological sex (or according to his or her former "gender

identity"), regardless of whether the school is aware of the change.

**F. The Rule Irreparably Harms Plaintiffs**

189.    The Final Rule would irreparably harm Plaintiffs.

190.    Plaintiff States operate education programs and activities that are subject to Title

IX's requirements.

191.    The Kansas Legislature has created or authorized educational institutions such as

K–12 public school districts, schools for the blind and deaf, and state universities that

collectively received around $1.5 billion in federal financial assistance for fiscal year 2022 and

are projected to receive around $1.6 billion in federal financial assistance during fiscal year

2023.  *E.g.*, 2 KAN. LEGIS. RSCH. DEP'T, BUDGET ANALYSIS FISCAL YEAR 2024 at 913, 945,

---

[5] Cited by DoEd at 89 Fed. Reg. 33,820 n.90.

1003, 1025 (Feb. 2023), *available at* https://tinyurl.com/bdh6us6v.  On information and belief, these numbers have not been substantially diminished for FY2024.

192.    Plaintiff State of Alaska operates educational programs and activities that are subject to Title IX's requirements.

193.    The Alaska Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools, the state board school, and other special schools. It has further established the state university.  In fiscal year 2022, the federal government provided $237 million for K-12 schools and $198 million for the University of Alaska, not including Elementary and Secondary School Emergency Relief funds.  In fiscal year 2023, the federal government provided $225 million for K-12 school and $177 million for the University of Alaska, again not including ESSER funds.  On information and belief, these numbers have not been substantially diminished for FY2024.

194.    The State of Utah has created or authorized educational institutions such as K–12 public school districts, schools for the blind and deaf, and state universities that receive federal financial assistance.  For FY 2025, federal funding is projected to account for approximately 8 percent of Utah's total base public education revenue of $7.7 billion.  *See* LEGIS. FISCAL ANALYST, MINIMUM SCHOOL PROGRAM: BASIC SCHOOL PROGRAM & PUBLIC EDUCATION BUDGET FRAMEWORK 2024 GS at 2 (Jan. 23, 2024), *available at* https://le.utah.gov/interim/2024/pdf/00000511.pdf.

195.    Plaintiff State of Wyoming operates educational programs and activities that are subject to Title IX's requirements.

196.    The Wyoming Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools. It has further established

the state university.  In fiscal years 2022, 2023, and 2024 the federal government provided millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming. On information and belief, the federal government will provide millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming for fiscal year 2025.

197.    The Final Rule says that DoEd's Office of Civil Rights ("OCR") would address complaints of sex discrimination and discrimination based on "gender identity," consistent with OCR's jurisdiction under Title IX and the final regulations, even in religious institutions.  89 Fed. Reg. 33, 837; *id.* at 33,847–848.

198.    The Final Rule also states that "OCR [will] evaluate and, if appropriate, investigate and resolve consistent with these regulations' requirement that a recipient not discriminate against parties based on sex," including gender identity.  *Id.*

199.    Plaintiff State of Kansas has enacted and maintains laws or policies relating to educational institutions that conflict with the Final Rule, as discussed *supra*.

200.    Other laws and state policies do not apply solely to educational institutions but nonetheless conflict with the Final Rule insofar as they apply to educational situations in certain situations.  For example, the state's Women's Bill of Rights defines the terms "sex," "female," "male," "woman," "girl," "man," "boy," "mother," and "father" strictly in connection with biology and requires school districts, as well as other state and local entities that collect vital statistics for certain purposes, to identify each individual person in the collected data set as either male or female at birth.  K.S.A. 77-207.

201.    Kansas and the federal Constitution protect citizens' right to religious liberty and freedom of expression, which includes protecting those who recognize that there are only two

sexes and who refuse to use a person's "preferred pronouns." *See Green v. Miss U.S.A., LLC*, 52 F.4th 773, 783 (9th Cir. 2022); *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021).

202.    Other Plaintiff States have also enacted and maintain laws (or policies) that also conflict with the Final Rule.  *See* AS 14.18.040; Utah Code Ann. § 53G-6-902; Utah Code Ann. § 63G-31-301(1); Wyo. Stat. Ann. § 21-25-101, *et al.*

203.    Private parties have relied on prior DoEd action to challenge similar laws enacted and maintained by other states.  Private parties would almost certainly rely on the Final Rule to challenge Plaintiff State's laws regarding sex and clubs and organizations (including athletics), locker rooms, restrooms, and overnight travel.

204.    There therefore is a credible threat that private parties would seek to have the DoEd and DOJ enforce, and that DoEd and DOJ would enforce, the Final Rule against Plaintiffs.

205.    Therefore, there is also a credible threat that DoEd and DOJ would enforce the Final Rule against Plaintiff States.

206.    Completed enforcement of the Final Rule could cost Plaintiff States significant federal financial assistance, since the laws of several states prohibit compliance with portions of the Rule.

207.    Plaintiff States adopted their laws and policies, and established sex-separated restrooms, locker rooms, showers, residence halls, and other living facilities, in reliance on their understanding that Title IX does not prohibit such laws, policies, or practices.  This understanding was based on longstanding DoEd regulations and prior guidance, including initial post-*Bostock* guidance from DoEd and DOJ.

208.    The Final Rule undermines Plaintiff States' reliance interests and create regulatory uncertainty for Plaintiffs and other regulated entities.

209.    The Final Rule interferes with Plaintiff States' sovereign right to "create and enforce" their own laws.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Tennessee*, 615 F. Supp. 3d at 821 ("States suffer a cognizable injury for purposes of constitutional standing when they allege an intrusion on their ability to enforce their own legal code, whether by way of direct interference or interference analogous to substantial pressure to change state laws.").

210.    The Final Rule imposes administrative costs and burdens on Plaintiff States and other regulated entities because it forces them to offer training regarding the effect of students' and staffs' "gender identities."

211.    Indeed, the Final Rule estimates that compliance would cost an additional $3,090-$8,986 per year per school.  89 Fed. Reg. at 33,850.

212.    The Final Rule would also require Plaintiff States to redesign or reconfigure the physical facilities they have set up.  Schools today have girls' and boys' (or men's and women's) restrooms, locker rooms, and other facilities.  The Final Rule would require schools to carve out a separate "gender neutral" option.  And a student who identifies as two-spirited, for instance, may contend that a gender-neutral option is inadequate, given that males and females have dedicated intimate facilities such as restrooms. Schools could be forced to create a new restroom for every gender identity, in order to avoid DoED's definition of discrimination.

213.    The Final Rule would also require administrative changes from Plaintiff States, including making changes to application forms for admission or employment, appearance codes, and parental and guardian paperwork.

214.     These changes would be required even if there were no transgender students or staff at the school, because the Final Rule would extend liability to "students, employees, applicants for admission or employment, and other individuals participating in or attempting to participate in the recipient education program or activity, which could also include parents of minor students, students from other institutions participating in events in the resident's campus, visiting lecturers, to other community members whom the recipient invites to campus."

215.     The Final Rule would require Plaintiff States to make these changes even before it takes effect on August 1, 2024, because training and updating forms, codes, and policies take time.

216.     The Final Rule requires administrative changes because educational institutions must update their sexual assault policies (including literature, public policies, fact sheets, internal policies, handouts, etc.), which would cost money.

217.     The Final Rule will lead to an increase in the number of investigations educational institutions must undertake by as much as ten percent. *See* 89 Fed. Reg.  33,474.

218.     The Final Rule requires Plaintiff States to provide leave and other educational and employment benefits to students related to abortions in violation of 20 U.S.C. § 1688.

219.     The Final Rule would require administrative changes from Plaintiff States to update leave policies to allow students and employees to take leave related to abortions.

220.     The Final Rule threatens irreparable harm to K.R, FAU, and FAU members.

221.     The Final Rule threatens irreparable harm to K.R.'s and FAU members' right to privacy because (1) Oklahoma law currently ensures that school restrooms will be designated by biological sex and (2) Utah law ensures, with limited exceptions, that private spaces in k-12 public schools and changing rooms in government-owned buildings will be designated by

biological sex. But the Final Rule says that it preempts these state laws and allows males who identify as females to access these sex-designated spaces.

222.    K.R. and some FAU members want to continue to access girls' restrooms, locker rooms, overnight stays, and showers without the presence of males, but the Final Rule will force their schools to admit biological males who identify as female to girls-only spaces, causing them to feel embarrassment and humiliation. As for K.S. in particular, the Final Rule will cause her to stop using girls' restrooms at school entirely, as she did in the past.

223.    The Final Rule threatens FAU members' right to equal athletic opportunities because FAU has some female members in Kansas, Utah, and Wyoming; those states have laws that require girls' sports teams to be designated by biological sex. But the Final Rule says it preempts these state laws and allows males who identify as females to compete on these women's sports teams, causing FAU members who compete on these teams to lose their state legal protections and to risk competing against males.

224.    The Final Rule also threatens irreparable harm to K.R.'s and some FAU members' right to free speech and religious liberty. K.R., and some FAU members (including T.P.) want to continue to express their views about gender identity at school as they have done in the past, and want to continue to use pronouns that accurately reflect people's sex, but they fear that the Final Rule would cause their school to punish them for speaking consistent with their beliefs, particularly for K.R. because other students at her school have already been offended by her decision not to use inaccurate pronouns that contradict people's sex.  Some FAU members also want to continue to express their views that males who identify as female are in fact males, that there are only two sexes, and that males should not access women's sports and intimate spaces, but they fear that the Final Rule would cause their schools to punish them for speaking

consistent with their beliefs. To avoid punishment, starting August 1, some FAU members (including T.Z. and Zwahlen) will stop expressing at school their views about gender identity, including that there are only two sexes and that men who identify as women are in fact men and should not participate in women's sports.

225.    Final Rule also irreparably harms the organizational plaintiffs: Moms for Liberty and Young America's Foundation.

226.    Moms for Liberty has members across the country whose children currently attend schools that receive federal funding and are subject to Title IX regulations. Transgender individuals also attend these schools.

227.    The Final Rule would result in those schools adopting policies that compel speech contrary to the values and beliefs of Moms for Liberty's members and their children.

228.    For example, Merianne Jensen is a member who lives in Virginia and has four children, D.J., T.J., E.J., and A.J. in public school. Her children are in the 9th, 6th, 6th, and 4th grades respectively.

229.    Ms. Jensen is a member of the Church of Jesus Christ of Latter Day Saints and has raised her children to believe that all human beings—male and female—are created in the image of God and that gender is an essential characteristic of each individual's premortal, mortal, and eternal identity and purpose. Her children believe that biology controls an individual's sex, and that a person's sex is determined at birth.

230.    T.J. and E.J. have a peer at their middle school who is biologically a girl but now self-identifies as a boy. To date, T.J. and E.J. have continued to call their peer by her girl name and continue to use she/her pronouns when referring to their friend.

231.     At T.J.'s and E.J.'s school, the principal has already given an assembly that instructed students on the view that some boys identify as girls and some girls identify as boys. The principal counseled the children that everyone should get used to this and accept it because it is the future. However, to date, neither T.J. nor E.J. have been reprimanded or disciplined for using biologically accurate pronouns and the transgender student's birthname.

232.     Consistent with their beliefs, T.J. and E.J., in the absence of the threat of discipline, would continue to use biologically accurate pronouns and their friend's birthname. Furthermore, T.J. and E.J. do not wish to be forced to affirm that an individual born as a female is a male. However, out of fear of being disciplined because of the changes to Title IX laid out in the Final Rule, T.J. and E.J. are left with the choice of not expressing themselves in accord with their beliefs and affirming something contrary to their beliefs.

233.     Ms. Jensen's children, D.J. and A.J., would also use biologically correct pronouns and speak out about issues related to gender identity, sex stereotypes, and sex characteristics; however, they are afraid of being disciplined if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Jensen's children D.J. and A.J. will self-censor their views.

234.     As a second example, Tricia Plank is a member of Moms for Liberty who lives in Pennsylvania. She has two children, P.M.P. in 9th grade and P.P.P. in 7th grade. She also serves as an elected member on her local school board.

235.     Ms. Plank's children attend schools where transgender students are also enrolled.

236.     Ms. Plank and her two children believe that biology and God determine an individual's sex and that an individual cannot change his or her sex.

237.    Presently, Ms. Plank's children express views about gender identity and transgenderism while in school. To date, they have received scrutiny from teachers and administration but have not received any reprimands or been disciplined for their speech.

238.    Absent the Final Rule becoming effective, Ms. Plank's children would continue to express views on these matters. However, out of fear of punishment following the effective date of the Final Rule, Ms. Plank's children would stop expressing views on matters of gender identity, sex stereotypes, sex characteristics, and transgenderism.

239.    The impact and irreparable injury of the chill on the First Amendment rights of Ms. Plank's children is heightened by recent events in their community.

240.    Ms. Plank's oldest daughter plays tennis on her school's team. A coach for a team against which Ms. Plank's daughter's team has played and could play again is transgender. This coach, a biological male who seemingly has not undergone transition surgery, has used the women's bathroom and changed in a women's locker room at a tennis tournament that Ms. Plank's daughters attended. He did this in front of young girls.

241.    This puts the key issues of gender identity and school locker room and bathroom policies front and center at Ms. Plank's children's school. Ms. Plank's children have expressed views on these matters and would continue to do so absent the Final Rule taking effect. But, due to a fear of discipline, Ms. Plank's children will stop expressing their views about biological males using female restrooms and locker rooms if the Final Rule takes effect.

242.    As a third example, Debbie Lochner is a chapter chair for Moms for Liberty. She lives in New York and has a daughter K.L. who will be attending 9th grade in the fall.

243.    Ms. Lochner and her daughter hold strong views on gender identity, including on pronoun usage and on an individual using a locker room and a dressing room that aligns with the person's biological sex.

244.    Ms. Lochner's daughter is involved in theater, which would require her to use a dressing room at school. Furthermore, the high school that Ms. Lochner's daughter will be attending has a mandatory swimming class, requiring her daughter to change in a locker room.

245.    Ms. Lochner's daughter would speak out against transgender individuals using dressing rooms and locker rooms of their choosing; however, her daughter is a rule follower and is afraid of being disciplined and receiving a negative mark on her record if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Lochner's daughter would censor her views.

246.    As a fourth example, Rebekah Koznek is a vice chair of a chapter of Moms for Liberty. Ms. Koznek lives in California and is the mother of E.K. and T.K. E.K. is in 8th grade and T.K. is in 5th grade.

247.    Ms. Koznek and her children believe God created men and women and that individuals cannot change their biological sex.

248.    Ms. Koznek's children attend public school. Transgender students are enrolled in the school. One of the transgender students, who is a biological male, used the girls' locker room during the 2023-24 school year.

249.    While doing so, the individual "twerked" in the faces of female students and engaged in other attention seeking behaviors that made female students uncomfortable in the locker room.

250.    E.K. has been diagnosed as being on the Autism spectrum and has speech and developmental limitations.

251.    As a result of E.K.'s disabilities, the presence of a biological male sharing a girls' bathroom or locker room with E.K. would create great confusion for E.K. E.K. is unable to process such a situation and is unable to modify her use of pronouns to conform to the requirement of the Final Rule.

252.    As a result, Ms. Koznek is concerned that a "hostile environment harassment" complaint will be filed against E.K. and that E.K. will face investigatory and disciplinary action if the Final Rule is permitted to take effect

253.    Ms. Kozek's son T.K. would speak out against girls using the boys' locker rooms; however, he is afraid of being disciplined if the Final Rule is permitted to take effect. Thus, because of the Final Rule, Ms. Koznek's son would censor his own speech.

254.    In sum, members of Moms for Liberty and their children would be subject to policies that their schools, which receive federal funding, adopt to conform to the Final Rule. Their children, in turn, out of a reasonable fear that their current speech qualifies as "hostile environment harassment," would self-censor their speech.

255.    Young America's Foundation has chapters with student members on college campuses around the country, including at Kansas State University and the University of Wyoming.

256.    If the Final Rule takes effect, colleges and universities, including Kansas State University and the University of Wyoming, would be forced to adopt policies that chill the First Amendment rights of Young America's Foundation's members.

257.    Through these policies, universities and colleges would compel students to affirm individuals' "preferred pronouns" and preferred names. This, in turn, would force Young America's Foundation's members to espouse and affirm values and beliefs related to issues of gender identity with which they strongly disagree and which contradicts their religious beliefs.

258.    For example, Thomas Adcock is a student at Kansas State University in his Junior year, Mr. Adcock is the Chairman of his university's Young America's Foundation chapter.

259.    Mr. Adcock is also an Army veteran who is attending college with assistance from the G.I. Bill.

260.    As a student at Kansas State University, Mr. Adcock has had numerous interactions with individuals identifying as transgender, including interactions within the classroom setting.

261.    Mr. Adcock is Christian and holds strong views on issues of gender identity, sex stereotypes, and sex characteristics. He believes that a person's sex is determined at birth by biology such that an individual cannot change his sex.

262.    In furtherance of these views, in the classroom setting, Mr. Adcock has refused to identify preferred pronouns for himself and has refused to use preferred pronouns of other students when the preferred pronouns do not match the student's biological sex.

263.    To date, Mr. Adcock has not been investigated, given a reprimand, disciplined, or forced to attend any educational or training session because of his refusal to use preferred pronouns.

264.    Absent the Final Rule taking effect, Mr. Adcock would continue to refuse to use preferred pronouns because using preferred pronouns would run contrary to his deeply held beliefs.

265.    If the Final Rule is permitted to take effect, Mr. Adcock fears discipline and losing his G.I. Bill funding if he refuses to use another individual's "preferred pronouns" and honorifics.

266.    In his role as Chairman of Young America's Foundation, Mr. Adcock has also organized events implicating issues related to gender identity, sex stereotypes, sex characteristics, and de-transitioning. For example, Mr. Adcock organized movie watch parties for his chapter, at which he played movies such as "What is a Woman" and "Lady Ballers." Mr. Adcock plans to host future movie watch parties featuring films on similar topics and plans to hold some of these parties on campus. Mr. Adcock further plans to advertise these parties on his university's grounds. If the Final Rule is permitted to take effect, Mr. Adcock would be deterred from advertising and hosting movie watch parties featuring films touching on gender identity issues out of fear of facing investigatory and disciplinary action.

267.    Mr. Adcock plans to host future movie watch parties featuring films on similar topics. Mr. Adcock further plans to advertise these parties on his university's grounds. If the Final Rule is permitted to take effect, Mr. Adcock would, out of fear of facing investigatory and disciplinary action, refrain from advertising and hosting movie watch parties featuring films touching on gender identity issues.

268.    Mr. Adcock also helped to host a speech by Chloe Cole, an individual who has de-transitioned. Mr. Adcock and other members of Kansas State University's Young America's Foundation's chapter advertised the speech by writing in chalk on school grounds. Some of the messages included, "Men are not women," "Protect real women," "Detransitioner lives matter," and a depiction of the "trans flag" with an x across it.

269.     Mr. Adcock did not receive any reprimand or discipline from Kansas State University for his role in advertising Chloe Cole's speech. To the contrary, when complaints were presented to Kansas State University's Dean of Student Life, the Dean affirmed Mr. Adcock's and other Young America's Foundation members' right to free speech and used the incident as an opportunity to teach complaining individuals about free speech rights.

270.     Mr. Adcock reasonably fears that if the Final Rule is permitted to take effect, his university's administration would be forced to investigate the complaints and bring sex harassment charges against him for writing messages like "Men are not women" in a location on the university's grounds.

271.     Because of this fear, although Mr. Adcock and his chapter want to host similar speakers and events, including a talk by Matt Walsh called "What is a Woman," Mr. Adcock is deterred from engaging in these expressive activities.

272.     Furthermore, because Mr. Adcock and his chapter are deterred from continuing to engage in speech on topics involving gender identity, sex stereotypes, and sex characteristics, he fears that his chapter will not attract as many new members.

273.     As a second example, Kailee Verdeyen is a Freshman at the University of Wyoming. Ms. Verdeyen is a member of her university's Young America's Foundation chapter and a member of the Delta Delta Delta sorority.

274.     Ms. Verdeyen considers herself to be an "old school feminist" and has deeply-held beliefs about women's rights and supports Title IX's intent to protect biological women. While at the University of Wyoming, she has publicly expressed views consistent with these beliefs.

275.     Ms. Verdeyen has expressed views on these matters partially because she has had uncomfortable experiences with sharing a bathroom with a biological male and because she is concerned that a biological male will join her sorority. Ms. Verdeyen's concern about her sorority is validated by the fact that a biological male joined another sorority at the University of Wyoming.

276.     Ms. Verdeyen intends to continue speaking on these issues, including publicly protesting incidents on campus that advance positions contrary to her views and values.

277.     However, Ms. Verdeyen reasonably fears that if the Final Rule takes effect, she would face investigatory and disciplinary proceedings for expressing views of this nature.

278.     Ms. Verdeyen's fear of repercussions for expressing her views is heightened because she anticipates that she would be removed from her position as a student government senator. Accordingly, Ms. Verdeyen plans to engage in self-censorship if the Final Rule takes effect.

279.      Furthermore, Ms. Verdeyen attended her Young America's Foundation's chapter De-Transition Day event this year. Ms. Verdeyen had planned to be an active member in the chapter during the 2024-25 academic year, with the goal of helping to bring speakers such as Chloe Cole, Paula Scanlan, or Abby Roth to campus.

280.     These three speakers are associated with Young America's Foundation's national organization, with Ms. Roth offering a speech entitled "Welcome to 2024: Where Men Suck and Women Don't Exist."

281.     If the Final Rule is permitted to take effect, Ms. Verdeyen is concerned that her university would not permit speakers of this nature on campus and that she would face investigatory and disciplinary proceedings were she to advertise events hosting these speakers.

Accordingly, Ms. Verdeyen would no longer pursue efforts to have her chapter of Young America's Foundation host these speakers.

282.     As a third example, Rachel Flynn is a Freshman at the University of Utah. Ms. Flynn is a member of her university's Young America's Foundation chapter.

283.     Ms. Flynn has had numerous interactions with transgender individuals at her university.

284.     Ms. Flynn is of the Christian faith, which informs her belief in the importance of biological sex. Ms. Flynn believes sex is determined at birth and has refused to use preferred pronouns when in the university setting. Ms. Flynn has not been the subject of any investigatory or disciplinary action for refusing to use preferred pronouns.

285.     Ms. Flynn wishes to continue to refuse to use preferred pronouns because she views the use of preferred pronouns as an endorsement of the idea that sex is fluid and can change. However, if the Final Rule takes effect, Ms. Flynn will feel compelled to use preferred pronouns out of fear of being reported for harassment and facing investigatory and disciplinary proceedings.

286.     Ms. Flynn also believes women deserve private spaces on campus where they do not have to worry about men entering restrooms and locker rooms. Ms. Flynn places great weight on her right to free speech and has voiced opinions on these matters. Additionally, Ms. Flynn might confront a biological male if she encountered one in the women's restroom.

287.     However, if the Final Rule takes effect, Ms. Flynn will feel compelled to stop speaking on these issues for fear of being reported for harassment and facing investigatory and disciplinary proceedings.

288.     As a member of Young America's Foundation, Ms. Flynn attended events hosted by the organization, including a speech by Chloe Cole on detransitioning, a speech by Michael Knowles on transgenderism, and a screening of the movie "Damaged." Ms. Flynn and her Young America's Foundation chapter are considering bringing speakers to campus who would talk about gender identity issues during the 2024-25 academic year, including Matt Walsh, who gives a speech entitled "What is a Woman." If the Final Rule is permitted to take effect, Ms. Flynn is concerned that her university would not permit Mr. Walsh to give his speech and that she would face investigatory and disciplinary proceedings were she to distribute advertisements for Mr. Walsh's speech. Accordingly, Ms. Flynn is deterred from pursuing efforts to host Mr. Walsh.

289.     Also, as a member of her Young America's Foundation chapter, Ms. Flynn has tabled and distributed flyers about gender identity issues, including flyers with the slogans "Men cannot become women." Ms. Flynn planned to engage in these activities during the 2024-25 academic year. However, if the Final Rule takes effect, Ms. Flynn is deterred from engaging in these activities for fear of facing investigatory and disciplinary proceedings.

290.     The injury to Ms. Flynn's First Amendment rights by the chilling of this speech is exacerbated by the fact that proponents of gender identity are very active on her campus. In the past, other students have chalked messages like "Trans lives matter" and "Men can become women."

291.     As a result of the Final Rule, Ms. Flynn reasonably believes that while her message of "Men cannot become women" would qualify as hostile environment harassment, the counter message of "Men can become women" would not qualify as hostile environment harassment.

292.     In sum, members of Young America's Foundation would be subject to policies that their schools, which receive federal funding, adopt to conform to the Final Rule if it takes effect. Their members, in turn, out of a reasonable fear that their current speech qualifies as "hostile environment harassment," would self-censor their speech.

## CLAIMS FOR RELIEF

### COUNT I
### Agency Action That Is Contrary to Law
### 5 U.S.C. § 706

293.     All of the above paragraphs are realleged as if fully set forth herein.

294.     The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) . . . not in accordance with law; . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).

295.     The Final Rule is contrary to law and exceeds DoEd's statutory authority because it violates the plain language of Title IX and because *Bostock*'s interpretation of Title VII of the Civil Rights Act of 1964 is inapplicable to Title IX's materially different language and a materially different purpose.

296.     The Final Rule is contrary to law and exceeds DoEd's statutory authority because *Bostock*'s interpretation of Title VII of the Civil Rights Act of 1964—even if it were somehow instructive—recognizes and rests on two biological sexes, not "gender identity."

297.     The Final Rule is contrary to law because Title IX nowhere refers to "gender identity," the Title IX term "sex" does not include "gender identity," and Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on "gender identity."

298.     The Final Rule is contrary to law because Title IX and longstanding DoEd regulations explicitly permit distinctions based on biological sex in certain circumstances.

299.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in education, which in 1972 would have been understood to refer to biological women and girls, not a biological male who "identified" as a woman.

300.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in education and the Final Rule deprives some FAU members, K.R., and other students of the equal opportunity to enjoy educational benefits and facilities such as access to sex-specific facilities like restrooms and locker rooms.

301.     The Final Rule is contrary to law because the purpose of Title IX was to protect equal opportunities for women and girls in athletics and the Final Rule erases protections for women and girls in athletics.

302.     20 U.S.C. § 1688 states "Nothing in this section shall be construed to require or prohibit any person, or public or private entity, to provide or pay for *any* benefit, including use of facilities, related to an abortion" (emphasis added).  The Final Rule is contrary to this section because it requires educational institutions to provide leave and other employment or educational benefits in connection with any condition related to pregnancy, which the Final Rule defines to include termination of pregnancy (*i.e.* abortion).

303.     Title IX does not have grant extraterritorial jurisdiction.  It does not authorize DoEd to withhold federal funding from a school just because someone associated with the school did not accommodate any person's "gender identity" anywhere in the world.

304.     The Final Rule is also contrary to law because it violates the Religious Freedom Restoration Act of 1993.

305.     RFRA provides that the "Government shall not substantially burden a person's

exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. 2000bb-1(a). "If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694–95 (2014). RFRA applies to any "department or agency" of the United States, including the DoEd. 42 U.S.C. 2000bb–2(1).

306.    By requiring students like K.R. and school staff to speak or use pronouns in a manner that violates their religious beliefs or restricts their religiously motivated speech about gender identity, the Final Rule violates RFRA. DoEd has no compelling interest in requiring or restricting such speech, and DoEd's construction of "sex-based" harassment is not the least restrictive means of furthering that interest.

307.    The Final Rule is contrary to Title IX and RFRA and therefore is unlawful and should be set aside.

### COUNT II
**Agency Action in Excess of Statutory Jurisdiction and in Violation of Separation of Powers**
**U.S. Const. art. I, § 1**

308.    All of the above paragraphs are realleged as if fully set forth herein.

309.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2)(A)-(D).

310. The Final Rule is final agency action subject to judicial review under the APA. *Id*. § 704.

311. The Final Rule is a "rule[]" under the APA. *Id*. § 701(b)(2).

312. The DoEd and DOJ are "agencies" under the APA. *Id*. § 701(b)(1).

313. Under the constitutional separation of powers, each branch of government has been vested with different powers. "All legislative Powers" granted by the Constitution "shall be vested in . . . Congress." U.S. Const. art. I, § 1. The Constitution does not vest executive agencies with legislative powers.

314. Separation of powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (discussing the "major questions" doctrine); *id.* at 743 (Gorsuch, J., concurring). Departure from longstanding past practice (without new authorization from Congress) is strong evidence the agency is acting without Congressional authorization. *See Nat'l Fed'n Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) [hereinafter *NFIB*].

315. The Final Rule invokes the major questions doctrine because questions regarding the relationship between "gender identity," biological sex, and First Amendment freedoms are issues of vast political significance, subject to "'earnest and profound debate across the country.'" *Id.* at 743 (Gorsuch, J., concurring) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 267–68 (2006)).

316. Parents, teachers, and school boards can all reasonably disagree about how to accommodate students' "gender identities" and how to balance the privacy and dignity needs of all their students, within the confines of state law and the Constitution. The Final Rule removes

all of that discretion.  It effectively turns schools into indoctrination factories that push DoEd's preferred progressive viewpoint.

317.    The Final Rule also greatly departs from DoEd's fifty-year-long interpretation of "sex,."

318.    The role that biological sex plays in educational programs and activities (including women's and girls' sports)—and, indeed, the relative importance of gender identity as opposed to biological sex in many areas of daily life—is likewise an issue of political significance that is subject to extensive debate across the country.

319.    DoEd must therefore show Congress "plainly authorize[d]" the Final Rule.  *NFIB*, 595 U.S. at 117.

320.    Nothing in the Title IX Amendments to the Civil Rights Act clearly authorizes DoEd to resolve this debate by unilaterally deciding "harassment on the basis of sex" now includes "gender identity."

321.    Nothing in Title IX gives DoEd clear authorization to replace "sex" with "gender identity."

322.    The Final Rule harms students by opening up women's locker rooms and restrooms to biological males and men's restrooms and locker rooms to biological females.  It requires schools to place students in rooms consistent with their "gender identity," rather than biological sex, during overnight stays or trips.

323.    Nor does Title IX clearly authorize DoEd to change the conditions on which States have relied for decades (namely, that biological males and biological females should be treated equally).

324.    While Congress is no doubt aware of the issue, it has chosen not to rewrite Title IX's definition of "sex" as DoEd attempts to do.  Members of Congress have introduced legislation that would accomplish this, *see, e.g.*, H.Res. 269 (2023), but Congress has chosen not to act.  By acting unilaterally, Defendants have "seiz[ed]he power of the Legislature."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).

325.    DoEd therefore has no clear authorization to replace the word "sex" with concepts of "gender identity," nor can it reinterpret Title IX in such a broad, unreasonable way.  DoEd exceeded its authority when it issued the Final Rule.

326.    In addition to making these changes, the Final Rule makes major changes to campus sexual assault investigations and to how educational institutions must accommodate students and employees regarding their abortions.

327.    All three of these issues are the subject of national debate, are politically important, and are subjects Congress should debate and decide.  Nothing in Title IX clearly authorizes DoEd to end that debate and decide it for themselves.  The Final Rule, taken as a whole, implicates and violates the major questions doctrine and should be set aside.

328.    The Final Rule also implicates the major questions doctrine because DoEd seeks to intrude into education which is a domain of the state.  *See West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).  "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States."  *Id.* (internal citation omitted).

329.    Education has always been a particular domain of state law and DoEd's power in that domain has traditionally been limited.  This Final Rule seeks to intrude upon "vast swaths of

American life" through trying to remake the American education system. Furthermore, the Final Rule would pre-empt multiple laws in each of the Plaintiff States.

330.    The "longstanding clear-statement rule-the federalism canon-also applies in these situations." *Id.* "To preserve the 'proper balance between the States and the Federal Government' and enforce limits on Congress's Commerce Clause power, courts must 'be certain of Congress's intent' before finding that it 'legislate[d] in areas traditionally regulated by the States.'" *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991)).

331.    Nothing in Title IX (or any other law) gave the Defendants clear authorization to intrude upon this domain of state law through fundamentally remaking the education system and pre-empting state laws along the way.

332.    Even if the Final Rule does not implicate the major questions doctrine, it still violates the separation of powers. DoEd's new interpretation of Title IX is so far afield from any reasonable interpretation of the statute that the Final Rule amounts to an unconstitutional act of legislative power. *See* U.S. Const. art. I, § 1.

333.    Thus, the Final Rule violates separation of powers and should be set aside.

### COUNT III
### Agency Action That Violates the Spending Clause
### 5 U.S.C. § 706, U.S. Const. art. I, § 8

334.    All of the above paragraphs are realleged as if fully set forth herein.

335.    The Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Spending Clause of the U.S. Constitution.

336.    The Spending Clause authorizes Congress to "attach conditions on the receipt of

federal funds," but the "spending power is of course not unlimited." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).

337.    "[I]f Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id*. at 207 (citation omitted).

338.    Any condition placed on the receipt of such funds must relate directly to the central purpose of Congress in creating the spending program. *Id*. at 208-9.

339.    Also, Congress may not use its spending power to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (opinion of Roberts, C.J.).

340.    Defendants' interpretation of Title IX in the Final Rule violates the Spending Clause because it purports to impose obligations on Plaintiff States that Congress did not clearly impose in Title IX, which is contrary to the requirement that Congress must "unambiguously" condition the receipt of federal financial assistance. *Dole*, 483 U.S. at 207.

341.    In addition, the purposes of the Final Rule bear no direct relationship to the purposes of Title IX as outline by Congress. This violates the constitutional limits of the Spending Clause. *Id*.

342.    The Final Rule would change the conditions on which states accepted federal funding.

343.    The Final Rule would change to whom educational institutions are liable for sex-discrimination by incorporating "gender identity" in sex and by including people other than students and staff in the definition of "person."

344.    The Final Rule would change what educational institutions are liable for by

incorporating "gender identity" in sex and by lowering the bar on what constitutes discrimination to include *de minimis* harm.

345.    The Final Rule would require Plaintiff States to set policies (or risk losing federal funding) based on nebulous terms for which DoEd does not provide any definitions.

346.    Even if DoEd could change the conditions attached to receipt of federal funds, the change proposed in the Final Rule is impermissibly vague and contradictory.

347.    A school may run afoul of the Final Rule if it incorrectly assumes a student's "gender identity" (or "perceives" the student as male or female based on the student's appearance), but it may not ask what the student's "gender identity" or biological sex is.

348.    The school may have sex-separate sports' teams, but the separation cannot be based on "sex-stereotypes" about athletic ability.  If the school does away with sex-separation altogether, it may violate women and girls' rights by denying them equal opportunities.  In any scenario, the school would run the risk of losing federal funding because it cannot comply with the Final Rule and Title IX.

349.    The Final Rule violates the Spending Clause because it jeopardizes Plaintiffs' receipt of billions of dollars of education-related federal funding if they were to refuse or otherwise fail to comply with the Final Rule, resulting in Plaintiffs having "no real option but to acquiesce" to the Final Rule.  *NFIB*, 567 U.S. at 582 (opinion of Roberts, C.J.); *see also Tennessee*, 615 F. Supp. 3d at 828.

350.    At a minimum, if it is ambiguous whether the Final Rule comports with Title IX, the Court should find it does not because it raises these serious constitutional concerns.

351.    The Final Rule is unlawful and should be set aside because it violates the constitutional limits on the Spending Clause.

## COUNT IV
**Agency Action That Violates the First Amendment**
**5 U.S.C. § 706, U.S. Const. art. I, § 8, U.S. Const. amend. I**

352.     All of the above paragraphs are realleged as if fully set forth herein.

353.     Defendants' interpretation of Title IX in the Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the First Amendment to the U.S. Constitution and conditions the receipt of federal funds on recipients violating the First Amendment rights of others.

354.     Defendants' interpretation of Title IX in the Final Rule conflicts with the First Amendment's protection of religious liberty.  In *Bostock*, the Court did not consider whether its interpretation of Title VII violated the religious liberty protections of the First Amendment because the employers had not raised the issue.  140 S. Ct. 1731, 1754 (2020).  It left open the possibility that a federal law that required employers to treat employees consistently with their gender identities, rather than their biological sex, could raise free exercise concerns.  *Id.*

355.     The Final Rule would require individual teachers, coaches, and school administrators to acknowledge, affirm, and validate students' "gender identities" regardless of the speakers' own religious beliefs on the matter in violation of the First Amendment.  *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023).  The Final Rule would require schools to adopt policies concerning this.

356.     The Final Rule would require K.R., some FAU members, and students like them to speak Defendants' message on gender identity in violation of their religious liberty and freedom of expression under the First Amendment.  The Final Rule also precludes K.R., some FAU members, and other students from sharing certain beliefs about gender identity in violation

of their religious liberty and freedom of expression under the First Amendment. The Final Rule also chills and deters the protected expression of some FAU members who will stop expressing certain views at school in violation of their religious liberty and freedom of expression under the First Amendment.

357.    Schools and school districts would be required to adopt policies related to "gender identity"—including polices related to restrooms, locker rooms, pronoun, and honorific use—even if there are no transgender students enrolled, because the Final Rule extends to guests of the school or visitors to campus.  Therefore, the Final Rule imposes unconstitutional conditions on Plaintiffs' receipt of federal education-related funds.  *Dole*, 483 U.S. at 210.

358.    Further, Plaintiff States have laws protecting freedom of speech, freedom of conscious, and freedom of religion that arguably conflict with the Final Rule.  They will likely not be able to enforce these laws if the Final Rule takes effect.  *Tennessee*, 615 F. Supp. 3d at 828.

359.    The Final Rule is unlawful and should be set aside because it violates the First Amendment and imposes unconstitutional conditions on the receipt of federal funds.

360.    At a minimum, if it is ambiguous whether the Final Rule comports with Title IX, the Court should find that it does not because DoEd's interpretation of Title IX (if accepted) would raise serious constitutional doubt as to whether Title IX violates the First Amendment.

## COUNT V
### Violation of First Amendment
### (Compelled Speech)

361.    Plaintiffs Moms for Liberty and Young America's Foundation reallege all the above paragraphs as if fully set forth herein.

362.    The Supreme Court has long recognized that "freedom of thought and expression

'includes both the right to speak freely and the right to refrain from speaking at all.'" *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 559 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).

363.     To this end, "[t]here is necessarily, and within suitably defined areas, a . . . freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Id.* (quoting *Estate of Hemingway v. Random House, Inc.*, 244 N.E.2d 250, 255 (N.Y. 1968)).

364.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or *force citizens to confess by word or act their faith therein*." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Id.*

365.     "When speech is compelled . . . additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to-beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Id.* at 2464 (quoting *Barnette*, 319 U.S. at 633).

366.     The Final Rule forces the children of members of Moms for Liberty and members of Young America's Foundation to, at the risk of investigation and discipline upon refusal, affirm a transgender student's selected sex by using preferred pronouns even though the member

or child has a deeply held belief that sex is determined by God and/or biology.

367.    Courts have held that requiring individuals to use preferred pronouns violates the protection against compelled speech afforded by the First Amendment. *See Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021) (holding that forced preferred pronoun usage violated the First Amendment and stating, "the premise that gender identity is and idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view'" (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528, at 48−54 (D. Colo. Oct. 23, 2023) (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage).

368.    It is irrelevant that the Final Rule would not literally force any student to engage in speech. The use of pronouns is a "'virtual necessity'" for engaging in any conversation, especially since Plaintiffs Moms for Liberty and Young America's Foundation have members who have engaged in discussions about gender identity and desire to do so in the future. *Doe 1 v. Marshall*, 367 F. Supp. 3d 1310, 1325 (M.D. Ala. 2019) (quoting *Wooley*, 430 U.S. at 715).

369.    The Final Rule would prohibit students "from speaking in accordance with [their] belief that sex and gender are conclusively linked," and trying not to "use any pronouns" would be "impossible to comply with." *Meriwether*, 992 F.3d at 517. The Final Rule "cannot force [students] to choose between carrying a government message" and remaining silent in another student's presence at school. *Doe 1*, 367 F. Supp. 3d at 1326.

370.    Also, the Final Rule would require students to make statements that they believe to be false and affirm ideologies that violate their deeply-held beliefs. *See also Wooley*, 430 U.S. at 715 (state cannot require message on license plates, even though no one is required to drive);

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 575-76 (1995) (parade organizers cannot be forced to include certain groups in a parade, even though no one is required to hold a parade).

371.    In announcing the Final Rule, Assistant Secretary for Civil Rights in the DoEd affirmatively stated the Office for Civil Rights' view that instances "Deadnaming" or "misgendering" with respect to gender identity would give rise to hostile environment discrimination in some instances.

372.    The Final Rule cannot compel affirmance of Defendants' preferred viewpoint (*e.g.*, that a human can change genders, hold multiple genders, or no gender at all) and ban the opposing viewpoint (*e.g.*, that sex is immutable, and assigned by God). "To hold differently would be to treat religious [or traditionally conservative] expression as second class speech and eviscerate this Court's repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy*, 142 S. Ct. at 2425 (quoting *Tinker*, 393 U.S. at 506).

373.    Allowing the Final Rule to take effect would, therefore, violate the First Amendment's protection against compelled speech.

## COUNT VI
### Violation of First Amendment, Fifth, and Fourteenth Amendment
### (Vagueness and Overbreadth Resulting in Chilled Speech)

374.    Plaintiffs Moms for Liberty and Young America's Foundation reallege Paragraphs 1- _____ as if fully set forth herein.

375.    The First and Fourteenth Amendments prohibit restrictions that are unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly

defined.".) This requirement furthers two purposes: (1) to provide fair notice to the citizenry of what is outlawed and (2) to provide standards for enforcement to officials.

376.    A restriction is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide *explicit standards* for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" (*Grayned*, 408 U.S. at 108-09) (emphasis added).

377.    Vague policies raise due process concerns because they force individuals to guess at their meaning. *Grayned*, 408 U.S. at 108–09. As a result of this vagueness, individuals "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id*. at 109 (internal quotation marks and citations omitted).

378.    "[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (citing *Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965); *Baggett v. Bullitt*, 377 U.S. 360 (1964)).

379.    And when policies by their reach "prohibit[] constitutionally protected conduct" and chill speech as a result, they are unconstitutionally overbroad on their face. *Grayned*, 408 U.S. at 114; *accord Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 129-130 (1992).

380.    Vague and overbroad policies are also unconstitutional because they give officials

unfettered discretion to approve or censor speech based on its viewpoint or content. *Forsyth Cnty.*, 505 U.S. at 130–33.

381.    If a restriction "interferes with the right of free speech," then a stringent test for vagueness applies. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959) ("Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law.").

382.    The Final Rule lacks any precise definitions, detail, context, or notice to students about what constitutes sexual harassment, sex, gender identity, or what sorts of statements are can create sex-based discrimination or hostile environment harassment. This provision fails to deliver adequate notice, guarantees arbitrary enforcement and is therefore unconstitutional.

383.    For this reason, Plaintiffs Moms for Liberty and Young America's Foundation have members who fear penalties for engaging in discussions that that they have had and would continue to have, but for the Final Rule.

384.    Allowing the Final Rule to take effect would, therefore, violate the First and Fourteenth Amendment's protections against vagueness and overbreadth.

## COUNT VII
### Violation of First Amendment
### (Content and Viewpoint Discrimination Resulting in Chilled Speech)

385.    Plaintiffs Moms for Liberty and Young America's Foundation reallege all the above as if fully set forth herein.

386.    The Final Rule's revised definition of harassment is a classic restriction that regulates based on content and viewpoint. *See, e.g., Saxe*, 240 F.3d at 206 (bans on "'harassment'" that include speech impose "'content-based'" and "'viewpoint-discriminatory'"

restrictions on that speech); *Meriwether*, 992 F.3d at 507-09 (requiring affirmance of a person's gender identity that is inconsistent with the person's biological sex is viewpoint discrimination).

387.    Chilled speech is a recognized First Amendment injury. *See Laird*, 408 U.S. at 11 (1972) (citing *Baird*, 401 U.S. 1; *Keyishian*, 385 U.S. 589; *Lamont*, 381 U.S. 301; *Baggett*, 377 U.S. 360).

388.    Both Plaintiffs Moms for Liberty and Young America's Foundation have members who have spoken critically on gender identity, and wish to speak, or hold critical speakers on gender identity in the future.

389.    Both Plaintiffs Moms for Liberty and Young America's Foundation have members who will refrain from speech because they are concerned about a credible threat of enforcement of the Final Rule should they continue speaking.

390.    Because the Final Rule discriminates based on viewpoint, it is presumptively unconstitutional.

391.    Regardless, under any balancing test, the Final Rule violates the First Amendment. Defendants cannot show that they have a compelling interest to justify restricting speech. Even if they did, Defendants cannot show that any such interest is narrowly tailored. *See Kennedy*, 142 S. Ct. at 2421 (Once speech is impinged, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of … case law.").

392.    Allowing the Final Rule to take effect would, therefore, violate the First Amendment.

## COUNT VII
### Agency Action That Violates the Tenth Amendment
### 5 U.S.C. § 706, U.S. Const. amend. X

393.     All of the above paragraphs are realleged as if fully set forth herein.

394.     The Final Rule is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(A)-(C), because it violates the Tenth Amendment to the U.S. Constitution.

395.     The Final Rule interprets and applies Title IX in a way that intrudes on the States' historic and traditional authority to safeguard privacy expectations in educational settings and provides no evidence Congress intended that result.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Federal law does not preempt State law in areas traditionally reserved to the States unless Congress expressed a "clear and manifest" intent to do so.  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

396.     Under the Spending Clause, only Congress, and not an executive agency, has the constitutional power to preempt a contrary state law (U.S. Const. Art. VI, Cl. 2)—and only then in the exercise of a power clearly delegated by the Constitution to Congress.

397.     The "management of public schools" and institution-level decisions are powers traditionally reserved to the States.  *See Tennessee v. United States Dep't of Agric.*, 665 F. Supp. 3d 880, 918 (E.D. Tenn. 2023).

398.     The Rule has no basis in Title IX, so the statute does not evidence a clear and manifest intent of Congress to redefine "sex."  And it goes further than requiring the States to administer a federal program in a uniform way.  It regulates schools at an institution-level (requiring them to change their single-sex restrooms and locker rooms) and at a team level (requiring them to accept certain players).

399.     The Final Rule purports to preempt state laws that protect the privacy of K.R., some FAU members, and other students like them, requiring schools to force students to share restrooms and other intimate spaces with members of the opposite sex.

400.     The Final Rule purports to preempt state laws that protect the equal athletic opportunities of some FAU members and other students like them, requiring schools to force female athletes to compete against members of the opposite sex.

401.     The Rule is unlawful and should be set aside because it violates the Tenth Amendment. Relatedly, it attempts to exercise preemptive power held only by Congress.

## COUNT IX
### Agency Action that is Arbitrary and Capricious
### 5 U.S.C. § 706

402.     All of the above paragraphs are realleged as if fully set forth herein.

403.     The Rule is arbitrary and capricious because it fails to consider the reliance interests of the Plaintiffs and their entities. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

404.     Since the dawn of human history, it has been widely recognized that there are two sexes: male and female, which, in nearly all cases, can be determined at birth.

405.     The Final Rule ignores this, in place codifying new theories on "gender identity."

406.     Since the passage of Title IX, schools have designed their educational programs, activities, sports teams, and very structures with this in mind.  They have invested time, money, staff, and resources in building, developing, and maintaining these programs.

407.     The Final Rule would require Plaintiffs and their entities to completely change these to accommodate this radical new thinking.

408.     The Final Rule would require Plaintiffs and their entities to establish new bathrooms, locker rooms, and other facilities for individuals who do not identity as either male or female, such as separate bathrooms for two-spirited and agender individuals.

409.     With respect to schools' responsibility to investigate claims of sex discrimination and assault, the Final Rule acknowledges that "some reports regarding occurring in a recipient's education program or activity may be handled under these final regulations while other [those that occurred before the August 1, 2024 effective date] will be addressed under the requirements of the 2020 amendments."  89 Fed. Reg. 33,841.

410.     DoEd claims this is not "arbitrary" because overlap occurs "any time regulatory requirements are amended prospectively," but it fails to consider the cost to educational institutions in maintaining dual investigative and quasi-judicial systems.

411.     The Final Rule changes and greatly expands the definition of "sexual harassment" with respect to hostile environment discrimination, drawn from the *Gebser*/*Davis* definition in the 2020 Amendments.

412.     While the Final Rule expresses DoEd's opinion that it can set a different standard for administrative enforcement than for judicial enforcement, 89 Fed. Reg. 33,842, it does not address the State reliance interest on the 2020 definition in the administrative enforcement context.  Failure to address an important concern makes the Final Rule arbitrary and capricious.

413.      The Final Rule does not address the State's reliance interest in the definition of "sexual harassment" from the 2020 Amendments, which applied to administrative enforcement as well as civil liability.

414.     The Final Rule expressly declines to define key terms.

415.    The Final Rule's new "interpretation" of Title IX is so convoluted and implausible it cannot be ascribed to a difference in agency expertise.

416.    The Final Rule is also arbitrary and capricious because it departs sharply from past practice without reasonable explanation and with no legal basis.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1913 (2020).*

417.    Throughout Title IX's history, DoEd enforced Title IX to protect girls and women from discrimination in education.  This makes sense since that is why Title IX exists in the first place.

418.    The Final Rule seeks to upend that prior practice by incorporating a definition of sex-based harassment that includes gender identity.

419.    Rather than provide a reasonable explanation for this sharp departure from past practice, DoEd denies such a departure at all.

420.    Instead the Final Rule states that that its amendments, "clarify the scope and application of Title IX and the obligations of recipients of Federal financial assistant from the Department." 89 Fed. Reg. 33474.

421.    By stating the Final Rule's purpose is to "clarify," DoEd is effectively denying that a sharp departure from past practice is occurring at all.  Consequently, they did not provide a reasonable explanation for such a departure.

422.    The Final Rule is arbitrary and capricious and should be set aside.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)    A declaratory judgment holding the Final Rule unlawful;

(2)    A declaratory judgment holding that Plaintiff States are not bound by the Final Rule;

(3)     A declaratory judgment affirming that Plaintiff States and Title IX recipients located therein may continue to separate students by biological sex in appropriate circumstances in accordance with Title IX's statutory text and longstanding DoEd regulations;

(4)     A declaratory judgment that Title IX does not prohibit Plaintiff States and Title IX recipients located therein from maintaining showers, locker rooms, restrooms, residential facilities, and other living facilities separated by biological sex or from regulating each individual's access to those facilities based on such individual's biological sex;

(5)     A declaratory judgment that Title IX does not require a Title IX recipient's employees or students to use an  individual's preferred pronouns or honorifics;

(6)     A declaratory judgment that Title IX does not prohibit Plaintiff States and Title IX recipients located therein from maintaining athletic teams separated by biological sex or from assigning an individual to a team based on such individual's biological sex;

(7)     A declaratory judgment holding that DoEd lacked authority to issue the Final Rule;

(8)     A judgment setting aside the Final Rule;

(9)     A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule; and

(10)    A stay of the effective date of the Final Rule under 5 U.S.C. § 705 prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Final Rule during the pendency of this litigation.

(11)    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

(12)    Grant Plaintiffs such additional and further relief as the Court may deem just and proper.

Respectfully submitted this fourteenth of May, 2024,

                                        **KRIS W. KOBACH**
                                        Attorney General of Kansas

                                        */s/ Erin B. Gaide*
                                        Abhishek S. Kambli
                                            *Deputy Attorney General*
                                            Kansas Bar No. 29788
                                        Erin B. Gaide
                                            *Assistant Attorney General*
                                            Kansas Bar No. 29691
                                        James Rodriguez
                                            *Assistant Attorney General*
                                            Kansas Bar No. 29172
                                        Memorial Building, 2nd Floor
                                        120 SW 10th Avenue
                                        Topeka, Kansas 66612-1597
                                        Phone: (785) 296-7109
                                        Fax: (785) 291-3767
                                        Email: Abhishek.Kambli@ag.ks.gov
                                               Erin.Gaide@ag.ks.gov
                                               Jay.Rodriguez@ag.ks.gov

                                        *Counsel for Plaintiff State of Kansas*

**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Cori Mills*
Cori Mills*
  *Deputy Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

*Counsel for Plaintiff State of Alaska*

**SEAN REYES**
**Attorney General of Utah**

/s/ *Lance F. Sorenson*
Lance F. Sorenson*
  *Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*

**BRIDGET HILL**
**Attorney General of Wyoming**

*/s/ Ryan Schelhaas*
Ryan Schelhaas*
  *Chief Deputy Attorney General*
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786 Direct line
(307) 777-6869 Fax
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

*/s/ Braden H. Boucek*

Kimberly S. Hermann*
  Ga. Bar No. 646473
Braden H. Boucek*
  Tenn. BPR No. 021399
  Ga. Bar No. 396831
Jordan Miller*
  Michigan Bar. No. P81467
**SOUTHEASTERN LEGAL FOUNDATION**
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

*Counsel for Plaintiffs Moms for Liberty and*
*Young America's Foundation*

*/s/ William E. Trachman*
William E. Trachman*
James L. Kerwin*
**MOUNTAIN STATES LEGAL FOUNDATION**
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org

*Counsel for Plaintiffs Moms for Liberty and*
*Young America's Foundation*

*/s/ Tyson C. Langhofer*

Tyson C. Langhofer
Kansas Bar No. 19241
Rachel A. Rouleau*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*Counsel for Plaintiffs K.R. and FAU*

*\* Pro Hac Vice Forthcoming*