**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**TOPEKA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 5:24-cv-4041-JWB-ADM |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION, *ET AL.* | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM IN SUPPORT OF PLANTIFFS' MOTION FOR A**</u>
<u>**STAY/PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

INTRODUCTION ................................................................................................... 1

FACTS ................................................................................................................. 2

  A.  Title IX and related regulations ..................................................................... 2

    1.  Equal opportunity for women ..................................................................... 2

    2.  Neutrality with respect to abortion ............................................................. 6

  B.  The Final Rule ............................................................................................ 8

    1.  "Gender identity" and discrimination ......................................................... 9

    2.  Sex-based harassment and grievance procedures ......................................... 11

    3.  Abortion ................................................................................................. 12

  C.  The Parties ................................................................................................. 13

    1.  Plaintiff States .......................................................................................... 13

    2.  Plaintiff K.R. ........................................................................................... 16

    3.  Plaintiff Female Athletes United ................................................................. 17

    4.  Plaintiff Moms for Liberty ......................................................................... 18

    5.  Plaintiff Young America's Foundation ........................................................ 19

ARGUMENT ........................................................................................................ 20

  A.  Plaintiffs are likely to succeed on the merits ................................................. 21

    1.  The Final Rule is contrary to three federal statutes ...................................... 21

      a.  The Final Rule is contrary to Title IX ..................................................... 21

      b.  The Final Rule is contrary to 20 U.S.C. § 1688 ...................................... 24

      c.  The Final Rule is contrary to RFRA ....................................................... 25

    2.  The Final Rule violates the major questions doctrine ................................... 28

    3.  The Final Rule is contrary to the Constitution ............................................ 30

      a.  The Final Rule violates the First Amendment ......................................... 30

      b.  The Final Rule violates the First, Fifth, and Fourteenth Amendment Due Process Clauses ..................................................................................... 40

      c.  The Final Rule violates the Spending Clause ........................................... 42

      d.  The Spending Clause and the Supremacy Clause require Congress to speak . 45

    4.  The Final Rule is arbitrary and capricious ................................................... 46

      a.  The Final Rule offers an implausible explanation for agency action ........... 47

      b.  The Final Rule is a Sharp Departure from Past Practice ........................... 47

c.      The Final Rule fails to consider reliance interests ................................................ 48

B.    The Plaintiffs will be irreparably harmed ....................................................... 51

1.   Harm to Plaintiff States ...................................................................... 51

2.    Harm to Moms for Liberty and Young America's Foundation ............................ 52

3.   Harm to Female Athletes United ............................................................. 53

4.    Harm to K.R. ..................................................................................... 54

C.    The balance of harms and public interest favors Plaintiffs .......................................... 54

D.    Relief should not be limited to the parties .................................................... 55

CONCLUSION ................................................................................................. 55

CERTIFICATE OF SERVICE ................................................................................. 1

## <u>TABLE OF AUTHORITIES</u>

### Cases

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ...............................................27, 39, 40, 45

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc)........................ 53

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ................................. 52

*Am. Petroleum Inst. v. United States Dep't of Interior*, 81 F.4th 1048 (10th Cir. 2023)................................. 47

*Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219 (10th Cir. 2021)........................................................ 36

*Are You Listening Yet PAC v. Henderson*, No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750 (D.

    Utah Mar. 11, 2024) ........................................................................................... 52

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ........................................43

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ......................................................... 32

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ............................................................... 32

*Boos v. Barry*, 485 U.S. 312 (1988) ...................................................................................... 39

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)...................................................................... 2, 22

*Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023) .................................................. 27

*Burwell v. Hobby Lobby Stores Inc.*, 573 U.S. 682 (2014) ..................................................... 25, 28

*Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs*, 802 F. Supp. 1223 (D.N.J. 1992) ..... 30

*Clark v. Ariz. Interscholastic Ass'n*, 685 F.2d 1126 (9th Cir. 1982).................................................54

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1925) ................................................................. 41

*Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528

    (D. Colo. Oct. 23, 2023).......................................................................31, 33, 36

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)............................................................. 37

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ..................... 47, 49, 50

iv

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) .................................................................24

*Does 1–11 v. Board of Regents, et al.*, Nos. 21-1414 & 22-1027 (10th Cir. May 7, 2024) .............................21

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................... 52, 54

Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117 (2016) .................................................................46

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................................................................46

*First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136 (10th Cir. 2017) .................................................................21

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ................................................................ 41

*Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044 (10th Cir. 2023) .................................................................43

*Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992) .................................................................42

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792 (10th Cir. 2019) ......................................55

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................................ 40, 41

*Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019) .................................................................55

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir. 1989) .................................................................55

*Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539 (1985) .................................................................30

*Hayes v. Marriott*, 70 F.3d 1144 (10th Cir. 1995) .................................................................53

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557 (1995) .......................................27, 35

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ................................................................ 30, 39

*Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931 (D. Colo. Oct. 4, 2007) .................55

*Kansas v. United States*, 214 F.3d 1196 (10th Cir. 2000) ................................................................42, 45

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ................................................................ 52, 55

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ................................................................ 30, 39

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................................ 36, 39

*Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983 (E.D. Mich. 2018) .................................................................54

*Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ....................................................35, 39

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ....................................................................... passim

*Michigan v. EPA*, 576 U.S. 743 (2015) ...................................................................................47

*Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018) ............................................................37

*Moore v. Brown*, 448 U.S. 1335 (1980).....................................................................................54

*N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ............................................................21

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022).................................................................55

*New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236 (10th Cir. 2017) ....51

*New Mexico Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138 (10th Cir. 2019)......46

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) ...........................................................21, 22

*O Centro Espirita Beneficienty Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc) ..54

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)............................... 31, 36

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981) .............................................42, 43

*Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447 (6th Cir. 2014) ....................................... 53

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .....................................................................35

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ...........................................................29

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ....................................................52

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............................................35, 39

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) ...................................................35

*Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344 (1959)......................................... 41

*Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34 (2d Cir. 2023).....................................................54

*Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022)........................................................ 32, 35, 37

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019)........................................................32

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ...................................................... 27, 40

Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807 (E.D. Tenn. 2022) ............................................ 26

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000) .................................................................. 52

*United States v. Broadway*, 1 F.4th 1206 (10th Cir. 2021) ............................................................ 21

*United States v. Williams*, 553 U.S. 285 (2008) .......................................................................... 34

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ...................................... 41

*Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705 (Va. 2023) ...................................................... 27, 31

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ........................................................... 28, 29

*Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807 (8th Cir. 2004) ............................................... 39

*Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274 (2018) ............................................................ 21

*York v. Story*, 324 F.2d 450 (9th Cir. 1963) ................................................................................ 53

## Statutes

20 U.S.C. § 1681 ............................................................................................................... 28

20 U.S.C. § 1681 ............................................................................................................... 12

20 U.S.C. § 1686 ................................................................................................................. 6

20 U.S.C. § 1687 ................................................................................................................. 8

20 U.S.C. § 1688 ............................................................................................................... 24

42 U.S.C. § 2000bb-1 ....................................................................................................... 25

42 U.S.C. § 2000e-2 ........................................................................................................... 2

Alaska Statute 14.18.040 .............................................................................................. 16, 37

Civil Rights Restoration Act of 1987, 102 Stat. 28, Pub. L. 100-259, Mar. 22, 1988 ............................ 8

H. Sub. for S.B. 233 (Kan. 2024) .................................................................................... 37

Kan. Stat. Ann. 60-5603 (Supp. 2023) ............................................................................. 15

Kan. Stat. Ann. 72-6286(a) (Supp. 2023)........................................................................... 15, 37

Kan. Stat. Ann. 77-207(c) .............................................................................................................15

Okla. Stat. 70, § 1-125 ...................................................................................................................17

Religious Freedom Restoration Act of 1993, PL 103–141, November 16, 1993, 107 Stat 1488 ...........12

Sex Discrimination Act of 1974, Pub. L. No. 93-380, § 844, 88 Stat. 484 ....................................... 5

Title IX, Sec. 901 of the Act; Pub. L. No. 92-318 , 86 Stat. 373 (codified at 20 U.S.C. 1681) ............... 4

Utah Code § 53G-6-902 .................................................................................................................18

Utah Code §§ 63G-31-301...............................................................................................................18

Utah Code Ann. § 53G-6-902 .......................................................................................................16

Utah Code Ann. § 63G-31-301 .....................................................................................................16

Utah Code Annotated § 76-7-302(2)(b) .......................................................................................25

Wyo. Stat. Ann. § 21-25-102......................................................................................................... 16, 37

Wyo. Stat. Ann. § 22-25-101.........................................................................................................16

## Other Authorities

118 Cong. Rec. 5803, February 28, 1972........................................................................... 4, 5, 6

BENEFIT, *New American Heritage Dictionary of the English Language*, 123 (1969) ..........................24

Executive Order 11246, Sept. 24, 1965 ......................................................................................... 3

Executive Order 11375, Oct. 13, 1967 ........................................................................................... 3

Fairness for All Act, H.R. 1440, 117th Congress (2021)...............................................................23

Press Release, Kansas Office of the Governor, Governor Kelly Vetoes Bills, Allow One to Become

   Law Without Signature (Apr. 12, 2024) .................................................................................. 37

PROVIDE, *New American Heritage Dictionary of the English Language*, 1053 (1969).......................24

Report of the President's Task force on Women's Rights and Responsibilities, A Matter of

   Simple Justice, 1970 ................................................................................................................... 3

S EX, 9 Oxford English Dictionary 577–78 (1933) ..................................................... 22

S EX, American Heritage Dictionary 1187 (1969) ..................................................... 22

S EX, Merriam Webster Dictionary (2024) ............................................................... 22

S EX, Random House Dictionary of the English Language 1307 (1966) ..................... 22

Testimony by Representative Patsy T. Mink, Special Subcommittee on Education, U.S. House
   Committee on Education and Labor, hearings on discrimination against women in higher
   education (Jun. 24, 1970) ................................................................................... 4

U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A
   Resource for Students and Families* ...................................................................... 26

U.S. Dept. of Justice and DoEd 2016 Dear Colleague Letter on Transgender Students ................... 11

## Regulations

34 C.F.R. § 106.45 ............................................................................................... 12

34 C.F.R. § 106.3 ................................................................................................. 14

34 C.F.R. § 106.30(a) ............................................................................................. 5

34 C.F.R. § 106.31(a) ............................................................................................. 5

34 C.F.R. § 106.32 ............................................................................................... 48

34 C.F.R. § 106.33 ........................................................................................... 6, 48

34 C.F.R. § 106.4 ................................................................................................. 14

34 C.F.R. § 106.41(b) ............................................................................................. 6

34 C.F.R. § 106.41(c) ........................................................................................ 6, 49

34 C.F.R. § 106.42 ............................................................................................... 48

34 C.F.R. § 106.46 ............................................................................................... 12

*Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*

    *Nondiscrimination on the Basis of Sex*, 39 Fed. Reg. 22,228 (Jun. 20, 1974)..................................................7

*Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance*

    *Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24,128 (Jun. 4, 1975) ............................................7, 8

## Consitutions

U.S. Const. Art. VI, cl. 2 .........................................................................................................................46

## Briefs

Brief for the United States as *Amicus Curiae* in Supporting Defendant-Appellee and Urging

    Affirmance at 27–30, *Kluge v. Brownsburg Cmty*. Sch. Corp., 64 F.4th 61 (7th Cir. 2023) ...............26

Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) .......11

## INTRODUCTION

Defendants through this Final Rule seek to destroy both the spirit and the letter of Title IX and turn it into something unrecognizable. Their approach also obliterates a fundamental understanding of biological reality, First Amendment rights, and due process. Defendants seek to utilize the rulemaking process to remake our schools and universities to conform to the radical gender ideology of the Biden administration and its allies. The Final Rule would institutionalize gender ideology in every aspect of K-12 education (including athletics) and tie education funding to it, mandate that colleges and universities punish students who do not comply with these extreme views through a complaint process for "sex-based harassment" that utilizes kangaroo courts, and force schools to provide benefits to students and employees seeking voluntary abortions (even in states where it is outlawed) in direct contravention to Title IX's requirement of abortion neutrality. This Final Rule is unlawful because (1) it implicates the major questions doctrine and nothing in Title IX provides clear authorization for the Final Rule, (2) it is unconstitutional under the Spending Clause as well as the First, Fifth, and Fourteenth Amendments, and (3) it is arbitrary and capricious.

If Defendants were to succeed, schools in America would no longer be recognizable. Individuals who (1) believe in biological reality, (2) have sincerely held religious beliefs, or (3) want fairness in sports will no longer be allowed to have their voices heard and, in some cases, will be required to engage in speech that violates their conscience. Only those who share Defendants' gender ideology will be allowed to speak freely in our schools. Plaintiffs represent a diverse group that includes: (1) four sovereign states (Kansas, Alaska, Utah, and Wyoming) that do not want their laws preempted by executive fiat and their school funding tied to an unlawful rule that requires them to violate other people's constitutional rights, (2) an organization consisting of parents advocating for their children in schools (Moms for Liberty), (3) college students who want to exercise free speech in college (Young America's Foundation), (4) female athletes who believe sports should remain fair (Female Athletes United), and (5) a 13-year-old girl who does not want to sacrifice her privacy rights and religious liberty when she goes to

school (K.R.).  All will suffer unique irreparable harm if this Final Rule goes into effect. Plaintiffs sue to vindicate their rights, and this Court should ensure this unlawful Final Rule never makes its way into any of their schools through granting a preliminary injunction.

## FACTS

A.  **Title IX and related regulations**

1.  **Equal opportunity for women**

The first major civil rights law banning discrimination against women appeared in the 1964 Civil Rights Act. Initially, the bill that would become the Civil Rights Act focused on race; it did not include a prohibition of discrimination on the basis of sex.  For example, Title VI, which prohibited discrimination at federally funded programs, including educational institutions, applied only on the grounds of "race, color, or national origin."  Section 601 of the Act; 42 U.S.C. § 2000d.  Congress added sex discrimination to Title VII of the bill through an amendment introduced by Representative Howard Smith—"Not necessarily because he was interested in rooting out sex discrimination in all its forms," as Justice Gorsuch noted in *Bostock*, "but because he may have hoped to scuttle the whole Civil Rights Act and thought that adding language covering sex discrimination would serve as a poison pill."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 678-79 (2020) (citing C. Whalen & B. Whalen, The Longest Debate: A Legislative History of the 1964 Civil Rights Act 115–118 (1985)).

Nevertheless, Congress passed the bill and enacted Title VII to prohibit sex discrimination in employment.  Title VII of the Act prohibited discrimination in employment, making it illegal for an employer to

> fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . [or] to limit segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.  Educational institutions, as employers, however, were exempt from Title VII's requirements.

Despite the law's express prohibition of discrimination on the basis of sex in employment, generally, federal policy was slow to follow.  President Lyndon Johnson followed the enactment with an Executive Order prohibiting discrimination in federal employment and contracting on the basis of "race, creed, color, or national origin"—but not on the basis of sex.[1]  It would be another two years before President Johnson issued Executive Order 11375, writing that "it is desirable that the equal employment opportunity programs provided for in Executive Order No. 11246 expressly embrace discrimination on account of sex."[2]

But the Civil Rights Act of 1964 and President Johnson's executive orders still did not address women's equality in education because Title VI did not apply to women and Title VII did not apply to educational institutions.  In recognition of the continuing barriers to equality that women faced, President Richard Nixon established the President's Task Force on Women's Rights and Responsibilities on October 1, 1969.  The Task Force produced a report in 1970, "A Matter of Simple Justice," which recognized pervasive discrimination faced by women and recommended a series of measures that would improve the lot of women in the United States.[3]  Particularly, the report noted that "Discrimination in education is one of the most damaging injustices that women suffer.  It denies them equal education and equal employment opportunity, contributing to a second-class self-image."  *Id.* p.7.

At the same time, Congress began to debate legislation that would ban various forms of discrimination against women, especially in education.  In June of 1970, the House of Representatives Special Subcommittee on Education initiated hearings on discrimination

---

[1] Executive Order 11246, Sept. 24, 1965, *available at* https://archives.federalregister.gov/issue_slice/1965/9/28/12315-12325.pdf#page=5

[2] Executive Order 11375, Oct. 13, 1967, *available at* https://archives.federalregister.gov/issue_slice/1967/10/17/14299-14304.pdf#page=5.

[3] Report of the President's Task force on Women's Rights and Responsibilities, A Matter of Simple Justice, 1970, *available at* https://www.nixonfoundation.org/2015/09/a-matter-of-simple-justice/.

against women, in relation to H.R. 16098, which would have amended the Civil Rights Act of 1964 to remove Title VII's exemption of educational institutions and introduce sex as a prohibited basis of discrimination in Title VI, which would have eliminated sex-based discrimination at federally fund education institutions.

In testimony on June 24, 1970, Representative Patsy T. Mink spoke in favor of H.R. 16098: "Discrimination against women in education is one of the most insidious forms of prejudice extant in our nation. Few people realize the extent to which our society is denied full use of our human resources because of this type of discrimination."[4]  Representative Mink also observed that, "Scholarship and other forms of financial assistance are also distributed on a discriminatory basis, making it more difficult for women to afford a higher education."

These hearings led to a series of Congressional attempts to prohibit discrimination against women in educational institutions, culminating in the Education Amendments of 1972. These included Title IX, which said that no person "on the basis of sex" could be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[5]  In support of those Amendments, Senator Birch Bayh, one of the sponsors of the legislation noted that

> one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women. It is clear to me that sex discrimination reaches into all facets of education—admissions, scholarship programs, faculty hiring and promotion, professional staffing, and pay scales... [T]he heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds.

118 Cong. Rec. 5803, February 28, 1972.  Senator Bayh made further comments demonstrating that Title IX was geared exclusively toward the protection of women stating, "Discrimination

---

[4] Testimony by Representative Patsy T. Mink, Special Subcommittee on Education, U.S. House Committee on Education and Labor, hearings on discrimination against women in higher education (Jun. 24, 1970), *available at* https://www.loc.gov/resource/mss84957.00102/?sp=4&st=image.
[5] Title IX, Sec. 901 of the Act; Pub. L. No. 92-318 , 86 Stat. 373 (codified at 20 U.S.C. 1681), *available at* https://www.govinfo.gov/content/pkg/STATUTE-86/pdf/STATUTE-86-Pg235.pdf#page=139.

against women, in contrast to that against minorities, is still overt and socially acceptable within the academic community." *Id.* at 5804. Congress passed the Education Amendments of 1972; and on June 23, 1972, President Nixon signed them into law.

Following the passage of Title IX, some in Congress questioned its application to college athletics. In 1974, Senator John Tower proposed an amendment to the law that would have exempted revenue-producing sports from the requirements of Title IX. This amendment was not adopted, but in response, Senator Jacob Javits proposed an alternative amendment which directed the Department of Health, Education, and Welfare ("HEW") to issue regulations implementing Title IX, "which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." The Javits Amendment made it clear that Title IX's provisions with regard to discrimination on the basis of sex would apply to collegiate athletics; the amendment was adopted and enacted as part of the Sex Discrimination Act of 1974. Pub. L. No. 93-380, § 844, 88 Stat. 484.

Congress charged DoEd with promulgating regulations to effectuate that guarantee, *id.* DoEd enacted regulations guaranteeing that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a). DoEd recognized that discrimination on the basis of sex could come in the form of sexual harassment, which it defined as "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30(a)(2).

Both Congress and DoEd understood that sex-separation or differentiation was not necessarily discrimination. While Title IX generally prohibited discrimination on the basis of sex, the law recognized that essential physiological differences between men and women required different treatment in some situations. These included separate facilities and accommodations for women, when their physical safety and privacy required the exclusion of

biological males.  *See, e.g.*, 20 U.S.C. § 1686 ("Notwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."); 34 C.F.R. § 106.41(c) ("Equal opportunity.  A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes.").  They also included separate sports programs, since competitive fairness required the exclusion of biological males from female sports teams due to the significant athletic advantages typical males possess compared to typical females.  *See* 34 C.F.R. § 106.41(b).

Both Congress and DoEd recognized there are situations where males and females require separate facilities or accommodations.  Senator Bayh noted sex separation is allowed in some "cases where such treatment is absolutely necessary to the success of the program-such as in classes for pregnant girls or emotionally disturbed students, in sports facilities or other instances where personal privacy must be preserved."  118 Cong. Rec. 5807 (emphasis added).  Since that time, Congress and DoEd have recognized a male-female dichotomy.

### 2.  Neutrality with respect to abortion

Title IX was enacted in 1972, the year before the Supreme Court in *Roe v. Wade* found a constitutional right to abortion and struck down state prohibitions on abortion across the country.  Following the passage of the Education Amendments of 1974, which contained an amendment offered by Senator Javits (which extended Title IX to athletics), HEW published regulations implementing Title IX.  HEW's proposed rule required educational institutions to "treat disabilities related to pregnancy, childbirth, miscarriage, abortion, or recovery therefrom in the same manner and under the same policies as any other temporary disability or physical

condition." *Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance Nondiscrimination on the Basis of Sex*, 39 Fed. Reg. 22,228, 22,235 (Jun. 20, 1974).  Further, it made it impermissible for an educational institution to "discriminate against any student, or exclude any student from its education program or activity, including any class or extra-curricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, miscarriage, abortion, or recovery therefrom."  *Id.* at 22,236.  For employees, a similar provision was proposed:

> "A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of pregnancy, or establish or follow any policy or practice which so discriminates or excludes.  For the purpose of this subpart, "pregnancy" means the entire process of pregnancy, childbirth, and recovery therefrom, and includes false pregnancy, miscarriage, and abortion."

*Id.* at 22,237.[6]

The final rule, issued June 4, 1975, changed the language "miscarriage, abortion," to "termination of pregnancy," but without defining "termination of pregnancy."  *Education Programs and Activities Receiving or Benefitting from Federal Financial Assistance Nondiscrimination on the Basis of Sex*, 40 Fed. Reg. 24, 128, 24,130 (Jun. 4, 1975).  Educational institutions were thus prohibited from discriminating against students and employees on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom."  *Id.* at 24,142 (students); *id.* at 24,144 (employees).  Educational institutions were required to treat "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom" in the same way they treated "any other temporary disability," and were required to offer leaves of absence for both students and employees, even where an educational institution "does not maintain a leave policy for its students, or in the case of a student who does not otherwise qualify for leave under such a policy", and where it "does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a

---

[6] *Available* at https://archives.federalregister.gov/issue_slice/1974/6/20/22211-22240.pdf#page=18.

policy." *Id.* at 24,142, 24,144.  Students and employees had to be reinstated to their prior status upon their return, although no other benefits were required.  *Id.* at 24,142, 24,144.[7]

In 1984, the Supreme Court narrowed the application of Title IX to those specific programs of an educational institution that receive federal funding.  *Grove City College v. Bell*, 465 U.S. 555, 572 (1984) ("the fact that federal funds eventually reach the College's general operating budget cannot subject Grove City to institution-wide coverage").  In 1988, in response to *Grove City*, Congress passed the Civil Rights Restoration Act of 1987 ("CRRA") in order to correct "certain aspects of recent decisions and opinions of the Supreme Court [that] have unduly narrowed or cast doubt upon the broad application of title IX." 102 Stat. 28, Pub. L. 100-259, Mar. 22, 1988. It amended Title IX to expand the statutory definition of "program or activity" to cover any entity, any part of which receives federal financial assistance.  20 U.S.C. § 1687.

Because the broadened scope of Title IX created serious issues with the termination of pregnancy provisions of HEW rule, on the motion of Senator John Danforth, the CRRA also added abortion neutrality to Title IX: "Nothing in this title shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." Sec. 3, 102 Stat. 29, Public Law 100—259, Mar. 22, 1988; *codified as* 20 U.S.C. 1688.  Section 8 of the Act added a note to 20 U.S.C. 1688: "No provision of this Act or any amendment made by this Act shall be construed to force or require any individual or hospital or any other institution, program, or activity receiving Federal Funds to perform or pay for an abortion."  The Danforth Amendment passed the Senate on January 28, 1988., and became law with the rest of the CRAA on March 22, 1988.

B.  **The Final Rule**

---

[7] *Available at* https://www.govinfo.gov/content/pkg/FR-1975-06-04/pdf/FR-1975-06-04.pdf.

On April 19, 2024, DoEd published the Final Rule, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 89 Fed. Reg. at 33,474 (Apr. 19, 2024). The Final Rule is set to take effect August 1, 2024. *Id.* at 33,549. However, schools will have to take steps this summer to implement numerous provisions and modify physical facilities in order to comply when the school year begins.

### 1. "Gender identity" and discrimination

The Final Rule redefines "sex" to include "gender identity" in Title IX. The Final Rule claims a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity." 89 Fed. Reg. at 33,818 (emphasis added). DoEd considers "gender identity" to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809.

The Final Rule places limitations on how a school can verify someone's "gender identity." It effectively requires educational institutions to take a person at his or her word as to his or her "gender identity" without documentation or questioning. *Id.* at 33,819. In fact, "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with his or her "gender identity" imposes more than *de minimis* harm." *Id.* at 33,819 (emphasis added). Even requesting a birth certificate can be a "burdensome documentation requirement." *Id.*

The contours of what constitutes "discrimination" based on "gender identity" are broad and can include areas where Title IX permits separation between the sexes. It "clarifies" that a school may be liable for "discrimination" if it "carr[ies] out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than *de minimis* harm, including by adopting a policy or engaging in a practice that prevents a person from

participating in an education program or activity consistent with their gender identity." 89 Fed. Reg. at 33,818 (emphasis added).

The Final Rule declines to define "specific conduct and practices that constitute . . . gender identity discrimination," *id.* at 33,808, but does provide some instances in which a school would likely be found to be discriminating if it treats a person according to his or her biological sex rather than "gender identity." For example, it states that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity." *Id.* at 33,818. Any "such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes." *Id.* at 33,819. The Final Rule also notes that schools can no longer separate students based on biological sex for "classes or portions of classes." *Id.* at 33,819. This would include all gym classes and health and sexual education classes.

Although the Final Rule claims to be silent regarding sports,[8] there is no doubt that it will prevent biological sex separation in athletics. This is evident both in the text of the Final Rule and in the statements of Defendants in related litigation. The Final Rule forbids "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity when that person seeks to participate consistent with their gender identity." *Id.* at 33,818. The Final Rule also says that DoEd considers it a violation of Title IX when a school engages in "impermissible" "sex-stereotyping" by making decisions "based on 'paternalism and stereotypical assumptions about women's interests and abilities,' and a 'remarkably outdated view of women and athletics.'" *Id.* at 33,811 (quoting *Pederson v. La. State Univ.*, 213 F.3d at 858, 880 (5th Cir. 2000)). Finally, Defendants have already taken the position that "the Title IX regulation permitting schools to separate certain athletic teams by sex does not authorize categorical bans on transgender girls'

---

[8] *See, e.g., id.* at 33,834 ("These final regulations do not include any changes to other provisions governing athletics.").

participation in girls' sports."  Brief of Amicus United States of America, *B.P.J. v. West Virginia*, 98 F.4th 542 (4th Cir. 2024) at 21; *cf.* U.S. Dept. of Justice and DoED 2016 Dear Colleague Letter on Transgender Students at 3.  In fact, according to Defendants, any "categorical ban" on biological males' participation in female-only sports "is inconsistent with Title IX's overarching goal of ensuring equal opportunity."  Brief of Amicus United States of America, *B.P.J.*, 98 F.4th 542, at 12. They have said that "prohibiting [biological males] from participating on girls' sports teams because their sex assigned at birth was male" causes "harm" and constitutes discrimination on the basis of sex.  *Id.*  Defendants would likely use the Final Rule to prohibit blanket bans on biological males competing on and against female-only athletics teams, requiring schools to allow men to play on women's teams.

### 2.  Sex-based harassment and grievance procedures

The Final Rule also changes how sex-based harassment is defined and, in so doing, extends into many areas of speech.  In support of this, the Final Rule repeatedly refers to prior "Dear Colleague" Letters, including the 2016 Dear Colleague Letter.[9]  While the Final Rule claims to maintain First Amendment protections, *id.* at 33,803 (suggesting nothing in the Final Rule requires an educational institution to violate free-speech rights), DoED has already taken the position that educational institutions are at risk of losing federal funding (and at risk of civil liability) if a teacher does not use a student's "preferred pronouns" for any reason, including if the teacher did not know that the student's "gender identity" differed from his or her biological sex or if the teacher had a free speech or religious liberty objection.  *See* 2016 Dear Colleague Letter at 3.  The Final Rule would lower the standard for harassment to include "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is <u>subjectively</u> and objectively offensive and is so severe <u>or</u> pervasive that it <u>limits</u> or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (emphases added).  While the Final Rule does acknowledge that DoEd cannot interfere

---

[9] *Available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf

with a person's religious liberty rights or rights under the Religious Freedom Restoration Act of 1993, PL 103–141, November 16, 1993, 107 Stat 1488, it does not provide any exemption for religious students, teachers, staff, administrators, coaches, etc., and instead says DoEd "will investigate" all complaints and make individual determinations when a person cannot comply with the Final Rule due to his or her religious belief.  *Id.* at 33,809.

The Final Rule alters the grievance procedures that protect the due-process rights of individuals accused of sex-based harassment.  *See id.* at 33,876–77.  Rather than an opportunity to examine the evidence, the accused is given "an equal opportunity to access either the relevant and not otherwise impermissible evidence," or the same written investigative report that "accurately summarizes the evidence."  34 C.F.R. 106.46(c)(1)(iii) & 106.46(e)(6).  Rather than an opportunity to question and cross-examine witnesses, "[a] recipient must provide a process that enables the decisionmaker to question parties and witnesses."  *Id.* 106.45(g).  In addition, the accused may be denied an attorney ("the postsecondary institution may establish restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties," *id.* 106.46(e)(2); no live hearing is required, *id.* 106.46(e)(6)(2),106.46(g); and the decisionmaker in any grievance may be the same person as the investigator, *id.* 106.45(b)(2)).  The Final Rule even extends beyond the United States. *Id.* at 33,853. *see contra* 20 U.S.C. § 1681(a) ("No person <u>in the United States</u> shall . . .") (emphasis added).

### 3.   Abortion

In addition, the Final Rule requires schools to provide benefits for those seeking voluntary abortions.  The Final Rule requires that educational institutions "treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave; payment of disability income; accrual of seniority and any other benefit or service; and reinstatement; and under any fringe benefit offered to employees by virtue of employment."  *Id.* at 33,796.  The Final Rule defines "pregnancy or related conditions" to mean pregnancy, childbirth, termination of pregnancy."

Termination of pregnancy includes voluntary abortion.  *Id.* at 33,575.  Employees must also be provided the benefit of a leave of absence to obtain an abortion, even when the educational institution does not maintain a leave policy for its employees, as well as "in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy."  *Id.* at 33,798.

The Final Rule also requires educational institutions to provide a female student who has had or who is recovering from an abortion access to all education programs and activities, which could include access to online or homebound instruction during recovery from an abortion and providing a student additional time to complete an exam or coursework if a student travels out of state for the abortion.  *Id.* at 33,777.  The Final Rule requires educational institutions to offer students obtaining abortions "Reasonable Modifications" of policies, practices, and procedures to ensure equal access (i.e. to facilitate their abortions), including "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations."  *Id.*  Students obtaining abortions must also be allowed a voluntary leave of absence, along with reinstatement "to the academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began."  *Id.*  Students obtaining an abortion must be treated "in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity."  *Id.*  The Final Rule requires educational institutions to provide leave, disability, and other benefits in connection with abortions.

C. **The Parties**

1. **Plaintiff States**

20 U.S.C. § 1682 conditions federal funding on compliance with Title IX: "Compliance with any requirement adopted pursuant to this section may be effected by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement."

Federal agencies that provide financial assistance to states are required to adopt regulations "to effectuate the provisions of 1681" (*i.e.* to prevent discrimination on the basis of sex). DoEd has adopted regulations, *see* 34 C.F.R. § 106.4, that condition DoEd funding on "an assurance from the applicant or recipient . . . that the education program or activity . . . will be operated in compliance with this part [106]." Further, such assurance will not be valid if the recipient has not taken the DoEd's recommended "remedial action," *see* 34 C.F.R. § 106.3(a), necessary to cure existing sex-based discrimination.

Plaintiff States operate educational institutions that are subject to Title IX's requirements. As such, when Title IX was enacted and the initial related regulations were promulgated, they complied with the equal opportunity requirements for males and females. State boards of education enact statewide policies to ensure the safety of students, teacher licensure, and school accreditation, which requires Title IX compliance. Local school boards enact specific Title IX policies for their school districts and hire Title IX coordinators to make sure those policies are carried out. *See* Dec. of Amy Cawvey (attached as Ex. 1).; Dec. of Jennie Earl (attached as Ex. 2).

In exchange for complying with Title IX, the States and their schools receive federal funding. In fiscal year 2023, Kansas received approximately $1.6 billion in federal financial

assistance.[10]  Alaska received  $237 million for K-12 schools and $198 million for the University of Alaska (not including Elementary and Secondary School Emergency Relief funds ("ESSER")) in fiscal year 2022 and $225 million for K-12 school and $177 million for the University of Alaska, (again not including ESSER funds) in fiscal year 2023.[11]  In Utah, federal funding is projected to account for approximately 8 percent of the State's total base public education revenue of $7.7 billion.[12]  The Wyoming Legislature has established and maintained a system of public schools open to all children of the State, such as K-12 public schools.  It has further established the state university.  In fiscal years 2022 and 2023, the federal government provided millions of dollars in federal financial assistance for K-12 schools and the University of Wyoming.[13]

In addition to complying with Title IX requirements, the States have enacted their own laws designed to protect all students' privacy and to ensure equal access in athletics for women and girls.  Kansas law mandates that schools "separate overnight accommodations [] for students of each biological sex during school district sponsored travel that requires overnight stays by students," Kan. Stat. Ann. 72-6286(a) (Supp. 2023), and that students are separated by biological sex in sports in its public schools and state-sanctioned athletic programs, Kan. Stat. Ann. 60-5603 (Supp. 2023).  Kansas law also provides that "[a]ny school district, or public school thereof, . . . that collects vital statistics for the purpose of conforming with anti-discrimination laws . . . shall identify each individual who is part of the collected data set as either male or female at birth."  Kan. Stat. Ann. 77-207(c).  Alaska law mandates equal opportunity for "both sexes" in athletics and in recreation in a manner that is commensurate

---

[10] *E.g.*, 2 KAN. LEGIS. RSCH. DEP'T, BUDGET ANALYSIS FISCAL YEAR 2024 at 913, 945, 1003, 1025 (Feb. 2023), available at https://tinyurl.com/bdh6us6v.

[11] *See* Alaska Dep't of Edu, Budgets and Actual Reporting, Operating Fund Reports, https://education.alaska.gov/schoolfinance/budgetsactual, select year and click "Go."

[12] *See* LEGIS. FISCAL ANALYST, MINIMUM SCHOOL PROGRAM: BASIC SCHOOL PROGRAM & PUBLIC EDUCATION BUDGET FRAMEWORK 2024 GS at 2 (Jan. 23, 2024), available at https://le.utah.gov/interim/2024/pdf/00000511.pdf.

[13] *See* Wy. Dep't of Educ., Statistical Report Series No. 3 (School District Financial Profiles (WDE Report Viewer)), p.114;  https://portals.edu.wyoming.gov/Reports/Public/wde-reports-2012/finance/stat-3 reflecting $266,477,085 in federal revenue received for 2021-2022 school year for K-12 schools; *see also* University of Wyoming Financial and Compliance Reports (University of Wyoming – Compliance Report 2023), *available at* https://www.uwyo.edu/budget-finance/financial-affairs/financial-reports.html reflecting $140,202,348 (page 8) in total federal financial assistance (federal awards) expended for fiscal year 2023.

with the general interested of the members of "each sex."  It further mandates that schools provide showers, toilets, and training-room facilities "for both sexes."  AS 14.18.040.  Utah law generally provides that students in public education facilities are to use "sex-designated privacy space[s]," including restrooms and changing rooms, that "correspond[]" to the student's sex.  Utah Code Ann. § 63G-31-301(1).  Utah law generally provides that male students may not compete on school athletic teams that are "designated for students of the female sex in an interscholastic athletic activity."  Utah Code Ann. § 53G-6-902.  Wyoming law provides that "[a] public school or a private school that competes against a public school shall expressly designate school athletic activities and teams as one (1) of the following based on sex: (i) Designated for students of the male sex; (ii) Designated for students of the female sex; or (iii) Coed or mixed."  Wyo. Stat. Ann. § 21-25-102(a).  It also provides that "[a] student of the male sex shall not compete, and a public school shall not allow a student of the male sex to compete, in any athletic activity or team designated for students of the female sex."  Wyo. Stat. Ann. § 21-25-102(b).  "'Sex' means the biological, physical condition of being male or female, determined by an individual's genetics and anatomy at birth."  Wyo. Stat. Ann. § 22-25-101(a)(iv).

 2.  **Plaintiff K.R.**

 K.R. is a 13-year-old girl who lives in Stillwater, Oklahoma and goes to Stillwater Middle School.  Dec. of K.R. ¶¶ 1–2 (attached as Exhibit 3).  Stillwater Middle is a public school that receives federal funding and is subject to Title IX.  *Id.*  Last year, K.R. encountered biological males who identify as females in a girls' restroom at Stillwater Middle.  *Id.* at ¶ 4.  This made her feel intensely uncomfortable, embarrassed, and unsafe. *Id.* at ¶¶ 4–11.  She is not comfortable sharing a private space with males, regardless of their claimed "gender identity."  *Id.*  And the restrooms at Stillwater Middle provide minimal privacy: the stalls have large cracks between the door and wall panels, making it easy for someone to see into the stall. *Id.* at ¶¶ 12–13.

 Following this and other similar incidents, K.R. stopped using the restroom at school altogether, which often required her to avoid using the restroom for nine hours at time. *Id.* at ¶¶ 16–18.  Thankfully, Oklahoma passed a law requiring that multiple occupancy restrooms be

designated by sex and that members of the opposite sex—defined biologically—not be permitted access. Okla. Stat. 70, § 1-125. After that, K.R. was able to return to using the girls' restrooms at school. K.R. Decl. at ¶¶ 19–20. K.R. wants to continue using the girls' restroom without members of the opposite sex. *Id.* at ¶¶ 21–22.

K.R. is also a Christian who believes that God created humans male or female and that humans cannot change their God-given sex. *Id.* at ¶¶ 26–27. Her faith also teaches that she should not lie. *Id.* at ¶ 28. She believes that referring to a male as "she," "her," or any other biologically inaccurate pronoun—or vice-versa for a female—would be a lie and would violate her faith. *Id.* She is aware of students at her school who identify as the opposite sex and who want others to refer to them with inaccurate pronouns. *Id.* K.R. cannot do this consistent with her faith. *Id.*

K.R. sometimes discusses her religious beliefs with her friends at school. *Id.* at ¶ 29. These discussions include her belief that there are only two sexes and that people cannot change their sex. *Id.* They also include her discomfort about using the restroom with members of the opposite sex and her belief that admitting males to the girls' restroom is inappropriate. *Id.* She wants to continue discussing issues concerning "gender identity" in the context of her religious faith. *Id.* ¶¶ 30–31.

### 3. Plaintiff Female Athletes United

Female Athletes United ("FAU") is a membership organization formed to defend equal opportunity, fairness, and safety in women's and girls' sports. Dec. of Burton Brown ¶ 3 (attached as Ex. 4). FAU has members in the Plaintiff States who participate on girls' and women's sports teams at schools governed by Title IX. *Id.* ¶¶ 23–26.

FAU members oppose allowing males to compete in women's sports because males have inherent physical advantages that make competing against them unfair and often unsafe. *Id.* ¶ 6. FAU members will be harmed by having to compete against males if the Final Rule takes effect. *Id.* ¶ 44. At present, state laws and organizational policies protect many FAU members from this harm.

For example, this coming fall, FAU member A.B.S. will start playing women's volleyball at MidAmerican Nazarene University, a school governed by Title IX, but does not have to compete against males because of a National Association of Intercollegiate Athletics ("NAIA") policy protecting her.  Dec. of A.B.S. ¶ 47(attached as Ex. 5).  Likewise, FAU members A.R.S., T.P., and T.Z attend public schools in Kansas, Wyoming, and Utah respectively, play women's sports at those schools, and don't have to play against males because of protective state laws. Decl. of A.R.S. ¶ 28 (attached as Ex. 6); K.R.S. § 60-5603; Dec. of T.P. ¶ 13 (attached as Ex. 7); Wyo. Stat. § 21-25-102; Dec. of T.Z. ¶¶ 20–22 (attached as Ex. 16); Utah Code § 53G-6-902.

FAU members also oppose being forced to share intimate spaces like restrooms, locker rooms, showers, and overnight accommodations with males.  Brown Decl. ¶¶ 27–35.  And again, many are protected by state laws that prevents males from having access to female intimate spaces based on their claimed "gender identity."  That is the case for FAU members Elizabeth Zwahlen and T.Z., both students at schools in Utah covered by Title IX.  Both regularly use their school locker rooms to change, and neither would be comfortable doing so in the presence of males.  Zwahlen Dec. ¶¶ 17–22 (attached as Ex. 8); T.Z. Dec. ¶¶ 12–15, 27.  Thankfully, Utah law protects them both from having to do so in most circumstances.  Utah Code §§ 63G-31-301 though 63G-31-302.  But the Final Rule would vitiate that protection.

Consistent with the organization's purpose, FAU members want to advocate for women's sports, to explain the enduring physical differences between males and females, and to express the view that sex is real, binary, and unchangeable.  Brown Dec. ¶¶ 37–46.  Many members will not use inaccurate pronouns that contradict a person's sex.  *Id.* ¶ 40.  For example, A.R.S., T.P., and T.Z. want to speak freely about their views on women's sports, forcing women to share intimate spaces with males, and similar issues related to "gender identity."  A.R.S. Dec. ¶ 34; T.P. Dec. ¶¶ 14–25, 38; T.Z. Dec. ¶¶ 23–24, 29–30.  But the new Title IX regulations threaten them with a sex-based harassment claim if they speak out.

4.  **Plaintiff Moms for Liberty**

Moms for Liberty is an organization with over 130,000 members nationwide.  Its mission is to unify, educate, and empower parents to defend their parental rights, including their fundamental right to raise their children in accordance with their values.  To accomplish this mission, Moms for Liberty, through its membership, seeks to protect children from political and social indoctrination in schools.

Moms for Liberty's membership is composed of parents with children in elementary through high school, primarily schools that receive federal funding and are, thus, subject to Title IX. Members of Moms for Liberty include declarants Merianne Jensen, Tricia Plank, Debbie Lochner, and Rebekah Koznek.  Each of these declarants have children who (1) attend schools at which there are transgender individuals; (2) hold values and have expressed viewpoints on issues of "gender identity" and transgenderism that would trigger the harassment standard in the Final Rule; and (3) attend schools that are all but certain to adopt new rules, policies, and procedures in accord with the Final Rule because the schools receive federal funding. Emblematic of this latter reality are provisions in Ms. Lochner's children's school district policies recognizing the controlling nature of Title IX and stating that "[d]eterminations as to whether conduct or an incident constitutes discrimination and/or harassment will be made consistent with applicable <u>federal</u> and state laws and <u>regulations</u> . . . ".[14]

### 5. Plaintiff Young America's Foundation

Young America's Foundation is an organization with thousands of members on college campuses across the country.  Young America's Foundation promotes free speech and the exchange of ideas on campuses and provides its members access to educational resources, campus flyering and tabling materials, and speakers.  Young America's Foundation's mission is to ensure that young Americans are inspired by ideas including the advancement of traditional

---

[14] Policy 3420 Non-Discrimination and Anti-Harassment in the District, Newark Central School District (Nov. 15, 2023) (emphases added) (available through Featured - Newark Central School District BoardDocs® LT (last visited May 21, 2024)); *see also id.* at Policy 3421 Sex Discrimination & Sexual Harassment Prohibited by Title IX of the Education Amendment of 1972 (Jan. 20, 2021) ("As required by Title IX of the Education Amendments of 1972, the District does not discriminate on the basis of sex in its education programs and activities, admissions or when making employment decisions.")

values.  Some of Young America's Foundation's materials and speakers focus on issues of "gender identity" and transgenderism, advancing the belief that biological sex controls, and a person cannot select his or her sex or gender.  Its membership's distribution of materials across college campuses inspires new individuals to join and promote Young America's Foundation's organization and mission and sparks valuable debate on these issues.

Young America's Foundation has chapters on the campuses of Kansas State University, the University of Utah, and the University of Wyoming.  Each of these universities receive federal funding and are, thus, subject to Title IX.  Young America's Foundation's members at these universities respectively include the declarants Thomas Adcock, Rachel Flynn, and Kailee Verdeyen.  These individuals believe and express viewpoints that sex is determined at birth, there are only two genders, an individual cannot change his or her gender, one should use pronouns consistent with an individual's biological sex, women deserve sex-segregated private spaces on campuses, and a biological male should not use a women's restroom or locker room or play on a women's sports team.  These individuals also have plans to bring speakers to campus to discuss topics in accord with these viewpoints and to engage in other activism and discussion on their views.  If the Final Rule is permitted to take effect, these individuals fear facing investigatory or disciplinary proceedings if they continue to express these views and promoting speakers consistent with these views.  They will also feel compelled to acquiesce to the dictates of the Final Rule and speak in a manner contrary to their beliefs by using a transgender, non-binary, or gender-nonconforming individual's preferred pronouns.  The chilling and compelling of speech on issues of "gender identity" will, in turn, hamper Young America's Foundation's ability to distribute its message and expand its membership base.

<u>ARGUMENT</u>

"Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the

20

injunction would not be adverse to the public interest." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (internal quotation mark omitted).

### A. Plaintiffs are likely to succeed on the merits

"When evaluating likelihood of success on the merits, it is critical to consider all factors that may bear on the probability that the moving party will succeed." *Does 1–11 v. Board of Regents, et al.*, Nos. 21-1414 & 22-1027, slip op. at 25 (10th Cir. May 7, 2024). "If the moving party is likely to succeed on each of several theories, the party's argument for preliminary relief is stronger than if the party has only one claim that is likely to be viable." *Id.* at 26. Here, there are several reasons the Plaintiffs will ultimately succeed, and so an injunction is appropriate because (1) the Final Rule is contrary to three federal statutes, (2) it violates the major questions doctrine, (3) it is unconstitutional, and (4) it is arbitrary and capricious.

#### 1. The Final Rule is contrary to three federal statutes

##### a. The Final Rule is contrary to Title IX

The Final Rule is contrary to Title IX. The Court should begin with the plain language of Title IX. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982). "The plain meaning of a statute is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) (internal quotation mark omitted). The Court should focus on the plain meaning of the statute at the time it was passed. *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." (internal quotation marks and brackets omitted)). Subsequent changes in language are irrelevant. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) ("[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." (internal quotation marks omitted)). Among other things, when agencies or courts

retroactively change the meaning of a word, they "risk [] upsetting reliance interests in the settled meaning of a statute." *Id.*

Title IX prohibits discrimination on the basis of "sex." Sex is defined as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male especially on the basis of their reproductive organs and structures." SEX, Merriam Webster Dictionary (2024).[15] In 1972, it had the same meaning. Sex referred to biological sex as determined by genetics and identifiable by reproductive organs. *See* SEX, American Heritage Dictionary 1187 (1969) ("The property or quality by which organ-isms are classified according to their reproductive functions [and] Either of two divisions, designated male and female, of this classification."); SEX, 9 Oxford English Dictionary 577–78 (1933) ("Either of the two divisions of organic beings distinguished as male and female respectively"); SEX, Random House Dictionary of the English Language 1307 (1966) ("The fact or character of being either male or female: persons of different sex. . . . the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences").

The Supreme Court has held the same. In *Bostock*, the Court discussed the meaning of "sex" in Title VII, a statute passed just a few years before Title IX. The Court accepted that in 1964 "sex" "referred to 'status as either male or female as determined by reproductive biology'" and "only to biological distinctions between male and female." *Bostock*, 590 U.S. at 655 (internal brackets omitted). Title IX does not refer to "gender identity" at all, nor would it, because the point of the law was to equal the playing field for girls and women. As noted above, the road to girls and women receiving equal treatment was a long and arduous one. It started with a crude attempt to include "sex" in Title VII to prevent its passage in 1964 and did not culminate until 10 years later with the Javits Amendment. Throughout that time, women specifically pushed

---

[15] *Available at* https://www.merriam-webster.com/dictionary/sex.

forward to get Title IX to where it is today.  Title IX has succeeded in achieving Congress's purposes of protecting opportunities for biological women and girls in educations and sports.

The Final Rule ignores this and changes Title IX into something that it is not by pretending "sex" is different from the ordinary definition.  In order for Title IX to have the meaning that Defendants say it does, they would have to change the law.  If Congress today wants amend Title IX to include concepts of "gender identity," it may try.  In fact, it has tried.  There have been several unsuccessful attempts over the years to amend the statute to include "gender identity" as its own separate protected class.  *See, e.g.*, Fairness for All Act, H.R. 1440, 117th Congress (2021).  These attempts underscore the fact that Title IX has nothing to do with "gender identity."

Instead of accepting the statutory text, the Final Rule elevates "gender identity" over "sex" by inventing a *de-minimis*-harm standard to achieve what the statute does not.  89 Fed. Reg. at 33,887.  Besides having no basis in the text of Title IX, this standard creates enormous inconsistencies.  According to DoED, sex distinctions always cause more than de minimis harm, but only when applied to persons with certain gender identities.  *See e.g., id.*; *see also id.* at 33,815 (explaining "stigmatic injuries" are *per se* harmful).  So, sex-specific rules for restrooms cause de minimis harm when applied only to men who identify as men but more than *de minimis* harm when applied to men who identify as women.  *Id.* at 33,820.

The real-world effects of this illogic on women and girls are significant.  Under this regime, Title IX would no longer protect a middle-school girl like K.R. who wants to use the restroom outside the presence of biological males, or a high-school athlete like T.Z. who wants to change and shower without biological males looking at her.  K.R. Dec. ¶¶ 3–22; T.Z. Decl. ¶¶ 12–15, 20, 27.  Instead, it would force these women and girls to either endure the embarrassment of sharing intimate spaces with biological males or avoid using the restrooms and locker rooms at school altogether.  That is obviously not what Congress intended, meant, or enacted in 1972 when it prohibited sex discrimination in education. The meaning of Title IX is clear and unambiguous: DoEd cannot replace "sex" with "gender identity," eliminate protections

for women and girls, or require schools to do away with sex-separation.  That should end the question.  The Final Rule cannot stand.

### b. The Final Rule is contrary to 20 U.S.C. § 1688

20 U.S.C. § 1688 states that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."  The Final Rule attempts to get around this by misconstruing the statutory text and limiting § 1688 to the actual provision of abortions.  *See* 89 Fed. Reg. 33,757–58 (discussing how the Final Rule does not require student health centers to provide abortions).  This is wrong.  The Defendants ignore the plain language of § 1688, which prohibits DoEd from requiring schools to "<u>provide</u> or pay for <u>any</u> benefit or service." (emphases added).  The word "provide" means to "supply" or " to make available."  PROVIDE, *New American Heritage Dictionary of the English Language*, 1053 (1969).  In examining the plain meaning of the word "benefit", it means "anything that promotes or enhances well-being" to be helpful or advantageous to."  BENEFIT, *New American Heritage Dictionary of the English Language*, 123 (1969). Basically, supplying a right such as leave is undoubtedly providing benefit.  Defendants try to work around this by "defining" benefit in a narrow manner to exclude leave and reasonable accommodations.  And they would initiate investigations and determine on a "fact-specific" and "case-by-case basis" whether a school violated Title IX by not accommodating a student's abortion.  This not only goes against the plain text of Title IX but also against the reason that abortion neutrality exists in Title IX in the first place. Congress made an explicit decision to amend Title IX to make it neutral toward abortion because they were concerned that post *Roe*, HEW regulations would be interpreted too broadly to force educational institutions to fund abortions.  Defendants try to upend that clear decision by unilaterally erasing that neutrality.

Defendants' attempt to usurp this power also has the effect of effectively preempting state law on abortion.  In *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 302 (2022), the Supreme Court held that "States may regulate abortion for legitimate reasons."  Many states have responded accordingly by establishing their own abortion laws, including Plaintiff Utah.

For instance, shortly after *Dobbs*, Utah Code Annotated § 76-7-302(2)(b), which banned abortion after 18 weeks, went into effect. The Final Rule would require schools in Utah to provide leave and reasonable accommodations for students receiving an abortion even if it was after 18 weeks. It would even require Utah schools provide leave for such students to travel outside the state to seek such an abortion. *See* 89 Fed. Reg. at 33,779 ("Students can legally terminate a pregnancy either in their State or by traveling to another State where the abortion is lawful" and "recipients have no education-related need to access information about how or where a student will obtain medical treatment or for other personal health-related information related to termination of a pregnancy"). This heavy-handed approach to overriding state law on abortion is something that must come through a change of law from Congress. Defendants cannot do it through the rulemaking process. In doing so, the Final Rule is contrary to the abortion neutrality provision of Title IX.

> c.   **The Final Rule is contrary to RFRA**

The Final Rule is also contrary to the Religious Freedom and Restoration Act ("RFRA") of 1993. RFRA provides that the "Government shall not substantially burden a person's exercise of religion <u>even if the burden results from a rule of general applicability</u>." 42 U.S.C. § 2000bb-1(a) (emphasis added). It exists "to ensure broad protection for religious liberty." *Burwell v. Hobby Lobby Stores Inc.*, 573 U.S. 682, 694 (2014). If the Government substantially burdens a person's free exercise of religion, that person is entitled to an exemption unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at 694-95. The Final Rule fails the RFRA test.

The Final Rule substantially burdens religious speech by compelling religious students to use inaccurate pronouns against their beliefs and prohibiting them from sharing their religious views on issues related to gender identity. For example, K.R. is a Christian who believes that God created human beings male and female and that sex is immutable. K.R. Decl. ¶¶ 25-27. She cannot use inaccurate pronouns without violating her religious beliefs. *Id.* ¶ 28.

And she wants to exercise her faith by sharing her religious beliefs with her fellow students in appropriate circumstances. *Id.* ¶¶ 29–31.

But this violates the Final Rule, which specifies that any "practice" that does not treat a student "consistent with the person's gender identity" automatically causes "more than de minimis harm." 89 Fed. Reg. at 33,887. And anything a student considers "unwelcome" that "limits" the student's ability to benefit from an educational program constitutes unlawful harassment. 89 Fed. Reg. at 33,884. Likewise, the "unwelcome" conduct must only be "offensive" and either "pervasive" or "severe"—not both—to count. *Id.* The complainant does not have to "demonstrate any particular harm, such as reduced grades or missed classes." *Id.* Any "impact on their ability to participate or benefit from the education program" will do. *Id.*

Pronouns are pervasive. Students use them countless times every day. So, a student declining to use another student's inaccurate pronouns will clearly violate the Final Rule: the conduct will be "unwelcome" to students asserting a gender identity disconsonant with their sex; some will consider it "offensive"; it will be pervasive because pronouns are pervasive; and the student will claim it limits their access to the benefits of the educational program. The same is true for any expression of the religious view that sex is immutable.

This interpretation fits with what the Biden Administration has repeatedly said about pronoun use. It had tried to compel pronoun use under Title IX through guidance documents that a district court enjoined.[16] And it has contended that teachers declining to use inaccurate pronouns can trigger Title IX liability. Brief for the United States as *Amicus Curiae* in Supporting Defendant-Appellee and Urging Affirmance at 27–30, *Kluge v. Brownsburg Cmty.* Sch. Corp., 64 F.4th 61 (7th Cir. 2023) The same would apply to a student declining to use inaccurate pronouns since the Final Rule imposes on schools "a responsibility to protect students against sex-based harassment." 89 Fed. Reg. at 33,516.

---

[16] *See, e.g.,* U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families,* https://perma.cc/KA47-U9LJ; Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022), *appeal docketed* No. 22-5807 (6th Cir. June 13, 2022).

And the Final Rule provides no exceptions for sincerely held religious beliefs.  It only states, "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific." Basically, a person cannot know with certainty whether their religious beliefs violate the Final Rule until they are investigated.  So, under the Final Rule, K.R.'s only option if she wants to continue attending public school and avoid a harassment claim is to "comply wholeheartedly" with regulations she "sees as sinful," by using inaccurate pronouns and keeping silent about her religious beliefs.  *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 938 (5th Cir. 2023); *accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 735 (Va. 2023) (compelling pronoun use violates similar Virginia RFRA).  Coercing people to act against their faith is "precisely what RFRA is designed to prevent." *Braidwood*, 40 F.4th at 938–39.

Defendants cannot show a compelling interest in forcing religious people to speak against their faith or in silencing their religious expression.  "[R]egulating speech because it is [believed to be] discriminatory or offensive is not a compelling state interest." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).  Otherwise, the government could compel or restrict student speech "any time their speech might cause offense." *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021).  The government cannot use "[p]urportedly neutral non-discrimination policies" to enforce its preferred view of hot-button public issues, like "gender identity." *Id.* Likewise, the federal government lacks any legitimate objective "to produce speakers free" from purported bias, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 578–79 (1995), and so any non-discrimination interest is not sufficient to justify compelling speech, *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023).  Far from being "always" a "compelling interest," this interest is "comparatively weak" in the context of education and opposite-sex pronouns. *Meriwether*, 992 F.3d at 509–10.

Nor is compelling and restricting speech the least restrictive means of accomplishing any compelling objective. In fact, there was an easy alternative manner in which the government could have achieved its compelling interest if it had one.  Title IX has an exemption for religious institutions that states it "shall not apply to an educational institution which is controlled by a

27

religious organization if the application of this subsection would not be consistent with the religious tenets of such organization."  20 U.S.C. § 1681(a)(3).  The government could have simply allowed for that language to apply to individuals at non-religious educational institutes that also hold such beliefs.  This is akin to the options available to the government in *Burwell* where, "HHS has already established an accommodation for nonprofit organizations with religious objections."  573 U.S. at 730.  The Court there held that "it does not impinge on the plaintiffs' religious belief that providing insurance coverage for the contraceptives at issue here violates their religion, and it serves HHS's stated interests equally well."  *Id.* at 731.  Similarly, there is an already established accommodation process that does not impinge on the religious beliefs of K.R. or other individuals like her and serves whatever limited government interests exist equally well.  But the Final Rule ignores this option.  Thus, it is contrary to RFRA.

     **2. The Final Rule violates the major questions doctrine**

     The Final Rule invokes (and violates) the major questions doctrine.  The major questions doctrine is a modern phrase to describe the longstanding idea that Congress does not give agencies free rein to make major policy decisions on issues of vast economic or political importance.  It "works in much the same way to protect the Constitution's separation of powers.  In Article I, 'the People" vested '[a]ll' federal 'legislative powers . . . in Congress.' Preamble; Art. I, § 1."  *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (alternations in original).  Separation of powers principles prohibit an agency from deciding an issue of great economic or political significance, or issues traditionally governed by state or local law, absent clear authorization from Congress to do so.  *Id.* at 724 (discussing the "major questions" doctrine); *id.* at 743 (Gorsuch, J., concurring).  "[T]his means that important subjects . . . must be entirely regulated by the legislature itself, even if Congress may leave the Executive to act under such general provisions to fill up the details."  *Id.* at 737 (internal quotation marks omitted).  If an agency claims the power to make these decisions, the Court should consider whether Congress has clearly authorized the agency to do so.

The major questions doctrine clearly applies here.  The Final Rule attempts to fundamentally reorder the education system across the country through (1) enshrining gender ideology into the entire K-12 education system and tying education funding to it, (2) mandating a campus grievance procedure that limits the due process rights of college students accused of sex-based harassment, and (3) requiring schools to provide benefits to students and employees for voluntary abortions.  All of these issues are subject to profound political discussions across the country.  Furthermore, these provisions raise serious issues regarding First, Fifth, and Fourteenth Amendment rights of individuals within schools.  These are the type of "important subjects" that "must be regulated by the legislature itself."  *Id.*  The Final Rule attempts to swing a sledgehammer through the debates continuing around the country on these important subjects and unilaterally end the discussion.  That violates the major questions doctrine.

The Final Rule implicates the major questions doctrine in another equally important manner because Defendants seek to intrude into education, a domain of the state.  "When an agency claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States."  *Id.* (internal citation omitted).  Education has traditionally been in the legal domain of the states.  The Final Rule tramples upon that power reserved to states by imposing a radical ideological framework on sex-based harassment and other matters.  In doing so, it seeks to preempt multiple state laws on matters such as separation of biological males and females in athletics, bathroom laws based on biological sex, and religious liberty.  Federal law does not preempt State law in areas traditionally reserved to the States unless Congress expressed a "clear and manifest" intent to do so.  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).  Therefore, Congress has to express a "clear and manifest" intent to preempt state laws.  At a minimum, the Final Rule has to demonstrate that Congress gave such clear authorization.

The Final Rule certainly invokes the major questions doctrine.  At that point, Defendants have the burden of demonstrating that they have clear authorization to do it.  A colorable or plausible reading of statutory authority is not enough.  This burden is high and Defendants

cannot come close to meeting it.  Indeed, because the Final Rule is contrary to several federal statutes as demonstrated *supra*, Congressional authorization cannot exist.

### 3. The Final Rule is contrary to the Constitution

#### a.  The Final Rule violates the First Amendment

The Final Rule violates the First Amendment in four distinct ways: (1) compelling speech that aligns with the ideology of Defendants, (2) censoring speech that does not align with it through content-based restrictions and viewpoint discrimination, (3) chilling speech through vague and overbroad language, and (4) forcing individuals to engage in speech that violates their sincerely held religious beliefs.  Different types of speech receive different levels of First Amendment protection, "with speech on important social and political topics accorded the highest level of protection." *Citizens United for Free Speech II v. Long Beach Twp. Bd. of Comm'rs*, 802 F. Supp. 1223, 1232 (D.N.J. 1992) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992)).

*Compelled Speech*.  The Supreme Court has long recognized that "freedom of thought and expression 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 559 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2463 (2018).

Thus, the government cannot "force an individual to speak in ways that align with its views but defy her conscience about a matter of major significance." *303 Creative, LLC*, 600 U.S. at 602–03; *see also id.* at 586 ("[T]he government may not compel a person to speak its own preferred messages.").  "To hold differently would be to treat religious [or traditionally conservative] expression as second-class speech and eviscerate [the Supreme Court's] repeated promise that [students] do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2425 (2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 502, 506 (1969)).

"Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508.  And courts have repeatedly held that, in an academic setting, compelling the use of "preferred pronouns" violates this principle and qualifies as viewpoint discrimination because baked into the use of "preferred pronouns" is an acknowledgement that an individual can change his or her biological sex.  *See id.* at 510 (holding that forced pronoun usage violated the First Amendment and stating, "the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view'" (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)); *see also Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023) (school district requiring students to respect a student's "gender identity" contrary to their own beliefs "cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment'"); *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528, at 48-54 (D. Colo. Oct. 23, 2023) (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage); *Vlaming*, 895 S.E.2d at 723-24 (holding, under state constitution, that teacher could proceed on free expression challenge to school district's requirement that he use "preferred pronouns").  So, declining to use inaccurate pronouns is constitutionally protected.

But that is exactly what the Final Rule compels.  The preamble to the Final Rule provided by DoEd identifies "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity" to be part of sex-based harassment.  89 Fed. Reg. at 33,516.  It also strongly suggests that repeatedly "misgendering" an individual—*i.e.*, using pronouns that correspond with an individual's biological sex rather than his or her subjective "gender identity"—qualifies as harassment.  *Id.*  And it favorably cites a district court case finding that a plaintiff could advance a Title IX claim based on harassment where classmates called a transgender individual a "girl" and used a feminine version of the individual's preferred name.  *Id.*

31

(citing *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081. 1092 (D. Minn. 2000)). Lastly, language accompanying the Final Rule concludes that a failure to treat an individual in accord with his or her gender identity creates more than a *de minimis* harm, thus supporting a Title IX claim. *See id.* at 33,818-19.

The Final Rule subjects an individual alleged to have engaged in harassment to investigatory proceedings. *See id.* at 33,898--95. A credible threat of an investigation is impermissibly compulsory, in violation of the First Amendment. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64, 68 (1963) (because "[p]eople do not lightly disregard" threats of enforcement, "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" are impermissibly coercive); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1283, 1290 (10th Cir. 2004) (finding injury where speaker believed, based on school officials' words, that "it was only a matter of time" before she was punished); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019) (threat of report to bias response team and team's ability to refer student to school disciplinary proceedings or police chilled speech); *Speech First v. Cartwright*, 32 F.4th 1110, 1123 (11th Cir. 2022) ("Neither formal punishment not the formal power to impose it is strictly necessary to exert an impermissible chill.").

But the Final Rule does not stop at an investigation or even a verbal reprimand. It goes several steps further, allowing for disciplinary proceedings, which give broad discretion to the hearing officer to impose punishments if an individual is found guilty of hostile-environment harassment. *See* 89 Fed. Reg. 33,895. Thus, under the Final Rule, students might face suspension or expulsion if they hold true to their beliefs and (1) use pronouns in accord with a classmate's biological sex regardless of how the classmate identifies, or (2) use a classmate's birth name rather than assumed name that corresponds with the classmate's assumed gender. Punishments of this nature are undoubtedly sufficient to compel speech.

The threat of investigation and discipline effectively forces individuals to use classmates' "preferred pronouns" when addressing them in a school environment. Aside from it being impossible to engage in routine day-to-day interactions with transgender, non-binary, or

gender-nonconforming persons by artificially avoiding pronoun use, K.R., several members of Young America's Foundation, Moms for Liberty, and FAU have declared that they, or their children, fear being forced to conform to the speech mandated by the Final Rule for fear of being the target of investigatory or disciplinary proceedings. *See* Dec. of Rachel Flynn at 4 (attached as Ex. 9); Dec. of Thomas Adcock at 4 (attached as Ex. 10); Dec. of Merianne Jensen at 3–4 (attached as Ex. 11); Dec. of Rebekah Koznek at 3–4 (attached as Ex. 12); K.R. Dec. ¶¶ 23–31; A.R.S. Dec. ¶ 34; T.P. Dec. ¶¶ 14–25, 38; T.Z. Dec. ¶¶ 23–24, 29–30. So, for K.R., FAU members, Young Americas Foundation members, and Moms for Liberty members, the only option they have is to speak a message with which they disagree.

Compounding this fear, the Final Rule provides no protection against compelled speech. The Final Rule's preamble provides only a single example of speech that would not qualify as hostile environment harassment, stating that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516. Thus, only unintentional and accidental "misgendering" may be protected from the threat of investigation and punishment, though that is unclear in the Final Rule and appears to be within a school's discretion. This puts Moms for Liberty members and their children, as well as Young America's Foundation members, in a situation where the only option they have is to engage in speech that aligns with the ideological preferences of Defendants whether they want to or not. But, as already pointed out, courts have held that requiring individuals to use "preferred pronouns" violates the protection against compelled speech afforded by the First Amendment. *See Meriwether*, 992 F.3d at 510; *see also Roy*, 2023 U.S. Dist. LEXIS 198528, at 48–54.

Finally, as explained above, the Government has no compelling interest in forcing ideological conformity. Nor is forcing teachers and students to use inaccurate pronouns—rather than simply some neutral form of address—the least restrictive means of accomplishing any legitimate objective. Indeed, as the Sixth Circuit noted in *Meriwether*, neutral forms of address are a "win-win" solution. 992 F.3d at 511. So, compelling pronouns fails strict scrutiny.

*Overbreadth.*  A law is overbroad under the First Amendment "if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008).  Here, the Final Rule chills protected speech related to gender issues by expanding the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes," while also stretching the definition of harassment to prohibit speech that does not meaningfully affect access to education.

Start with expanding the definition of "sex."  According to the Final Rule, "sex" now includes "gender identity," which it says is an individual's inherently subjective "sense of their gender." 89 Fed. Reg. at 33,809.  And it includes "sex stereotypes," which the Final Rule appears to define as any asserted differences between males and females.  89 Fed. Reg. at 33,811 ("not all conduct one might label 'sex stereotyping' necessarily violates Title IX" because, though discriminatory, it "might not impose more than *de minimis* harm on affected students").  With this expansion, the Final Rule brings within its purview nearly any speech about the important public issues of how to treat and understand gender dysphoria, men's participation in women's sports, name and pronoun usage, restroom use, and gender identity generally.

Add to that the Final Rule's "broader standard" for harassment, and students who view sex as immutable cannot speak on the subject without risking a harassment claim.  89 Fed. Reg. at 33,498.  If, for example, a student shared in an informal setting her view that, as a matter of basic biology, there are only two sexes, a fellow student who asserts a non-binary gender identity could claim harassment based on the alleged "unwelcome" and "offensive" nature of the speech.  89 Fed. Reg. at 33,505–06.  One instance of allegedly offensive speech could be enough if considered sufficiently severe.  89 Fed. Reg. at 33,500.  Or if the student repeated herself, the speech could be seen as pervasive "even if no single occurrence of the conduct, taken in isolation, is severe." *Id.*  All the complainant would need to allege is "some impact on their ability to participate or benefit from the education program" from the speech.  89 Fed. Reg. at 33,511. The Final Rule fully contemplates punishing speech that states that sex is binary and unchanging.  It cites *L.M. v. Town of Middleborough*, in which a school punished a student for wearing a t-shirt that

said, "THERE ARE ONLY TWO GENDERS," as an example of appropriately regulating speech that "invades the rights of others." 89 Fed. Reg. at 33,504 (citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023)). So, students are on notice that expressing the view that sex is binary is fair game for a complaint.

Courts regularly hold that policies like the Final Rule that chill speech on controversial subjects are unconstitutionally overbroad. In *Cartwright*, the Eleventh Circuit invalidated a school's hostile-environment harassment policy that mirrors the Final Rule. 32 F.4th at 1114–15. Much like the Final Rule, the *Cartwright* policy prohibited harassment "so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education." *Id.* The Eleventh Circuit enjoined it as "fatally overbroad" because it chilled protected speech like "a man cannot become a woman because he 'feels' like one" and covered "substantially more speech than the First Amendment permits." *Id.* at 1125; *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (invalidating policy covering "any unwelcome verbal" conduct as overbroad). So does the Final Rule.

***Content and Viewpoint Discrimination.*** The Final Rule also impermissibly restricts speech based on content and viewpoint. "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *accord Hurley*, 515 U.S. at 579 (explaining that the government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"). A law is content-based if "on its face [it] draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). A facially neutral law may still regulate content if it cannot be "justified without reference to the content of the regulated speech," or if the government adopted the law because it disagrees with the speaker's message. *Id.* at 164 (cleaned up). A law discriminates based on viewpoint when it allows the expression of some viewpoints but not others. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

35

The Final Rule does just that.  It restricts speech related to certain characteristics like "gender identity" that it considers "offensive."  89 Fed. Reg. at 33,884.  As noted above, both verbal and nonverbal actions geared toward someone's gender identity can qualify as sex-based harassment.  *Id.* at 33,516.  A person who refuses to address someone by his or her "preferred pronouns" and instead by his or her biological sex or who is critical of the Defendants' views on gender ideology would run afoul of the Final Rule and faces a credible threat of enforcement.  So, the Final Rule plainly refers to the content of the speech.  And the Final Rule restricts only certain points of view.  After all, "[g]iving offense is a viewpoint."  *Matal v. Tam*, 582 U.S. 218, 220 (2017).  And it is a "bedrock First Amendment principle" that the government cannot ban speech because "it expresses ideas that offend."  *Id.* at 223.  Indeed, "the premise that gender identity is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."  *Meriwether*, 992 F.3d at 510 (quotation omitted); *see also Roy*, 2023 U.S. Dist. LEXIS 198528, at 48–54  (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage).  As the Eleventh Circuit noted in *Cartwright*, a harassment policy is a viewpoint-based restriction when, as here, it "prohibits only speech that is 'discriminatory.'"  34 F.4th at 1126; *see also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) (holding law regulating speech based on intent to "damage" was viewpoint discriminatory).

The issues and speech regulated by the Final Rule involve important social and political topics.  *See Meriwether*, 992 F.3d at 508 ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."); *Linn Mar*, 83 F.4th at 667 (finding that student speech relating to gender identity topics "'concerns political speech'").  This is evidenced by the growing number of recent court decisions addressing matters such as compelled pronoun usage, the ability of transgender and gender-nonconforming individuals to access restrooms and locker rooms of their choice, and the ability of transgender and gender-nonconforming individuals to play on sports team of their choice.  But the importance of this issue goes beyond court rulings.  For instance, in recent years numerous sports associations, including the National Association of

Intercollegiate Athletics, have enacted policies preventing biological men identifying as women from playing on women's sports teams.[17]  Furthermore, states have enacted laws prohibiting transgender biological men from playing on women's sports teams and using sex-segregated restrooms and locker rooms designated for women.  *See, e.g.*, Kan. Stat. Ann. 72-6286(a) (Supp. 2023); AS § 14.18.040; Utah Code Ann. § 63G-31-301(1); Utah Code Ann. § 53G-6-902; Wyo. Stat. Ann. § 21-25-102(a)-(b).  Finally, and specific to the speech of one of the YAF declarants, Thomas Adcock, the Kansas legislature recently passed a bill prohibiting doctors from performing transition surgeries on minors, only to have the governor veto the bill.  *See* Press Release, Kansas Office of the Governor, Governor Kelly Vetoes Bills, Allow One to Become Law Without Signature (Apr. 12, 2024)[18]; *see also* H. Sub. for S.B. 233 (Kan. 2024).  Thus, debate on issues surrounding gender identity and transgenderism hits close to home for those members of Young America's Foundation and Moms for Liberty in states such as Kansas, as well as other states where similar legislative efforts are ongoing.

Because the Final Rule discriminates based on viewpoint, it is *per se* unconstitutional.  *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) ("[R]estrictions … based on viewpoint are prohibited.").  But even if strict scrutiny were to apply, the Final Rule could not satisfy it.  As noted above, there is no compelling interest in restricting speech simply because it might cause offense.  And the Final Rule's "gestaltish 'totality of known circumstances' approach" to determining if speech offends or limits a student's educational benefits in unspecified ways "is the opposite of narrow tailoring."  *Cartwright*, 32 F.4th at 1125–26.  Indeed, a less restrictive alternative is obvious: simply maintain the stringent student-on-student harassment standard from *Davis v. Monroe County Board of Education*, which applied for more than 20 years without incident.  526 U.S. 629, 633 (1999) (restricting harassment claims to conduct "so severe,

---

[17] *See, e.g.,* National Association of Intercollegiate Athletics, Transgender Participation Policy (Apr. 8, 2024), https://www.naia.org/transgender/files/TG_Policy_for_webpage_v2.pdf (last visited May 22, 2024); World Athletics, Eligibility Regulations for Transgender Athletes at § 3B (Mar. 23, 2023); *see also* World Aquatics, Competition Regulations at § 5 Competition-Regulations-version-1st-January-2024-.pdf (fina.org) (effective date Jan. 1, 2024).
[18] *Available at* https://governor.kansas.gov/governor-kelly-vetoes-bills-allows-one-to-become-law-without-signature.

pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit").

In sum, the Final Rule's restriction of speech on "gender-identity" issues is contrary to the First Amendment and violates Plaintiffs' rights. Members of Young America's Foundation and FAU, and the children of members of Moms for Liberty have deeply held beliefs on an array of issues involving "gender identity," sex stereotypes, sex characteristics, transgenderism, faith, and biology. *See* Adcock Dec. at 2; Flynn Dec. at 2; Dec. of Kailee Verdeyen at 2 (attached as Ex. 13); Jensen Dec. at 2-3; Dec. of Tricia Plank at 2-3 (attached as Ex. 14); Koznek Dec. at 2-3; Dec. of Deborah Lochner at 2 (attached as Ex. 15); K.R. Dec. ¶¶ 2527; Brown Dec. ¶¶ 38–39; T.Z. Dec. ¶ 24; T.P. Dec. ¶ 14; Zwahlen Dec. ¶ 25; A.B.S. Dec. ¶ 43; A.R.S. Decl. ¶ 34. These members and their children have expressed views on these matters within the school setting, including at times while in the presence of individuals identifying as transgender. Adcock Decl. at 3; Flynn Dec. at 3; Verdeyen Dec. at 3; Jensen Dec. at 3; Plank Dec. at 3-4; Koznek Dec. at 4; Lochner Dec. at 2; K.R. Dec. ¶ 29; T.Z. Dec. ¶ 23; T.P. Dec. ¶ 24; Zwahlen Dec. ¶¶ 26–27; A.B.S. Dec. ¶¶ 44. In many cases, the views these individuals have formed and expressed are the result of personal experiences they encountered or are likely to encounter. *See, e.g.*, Plank Dec. at 3; Koznek Dec. at 3; Flynn Dec. at 3; Verdeyen Dec. at 2-3; Lochner Dec. at 3. The members of Young America's Foundation have also organized or participated in public events promoting these views. Adcock Dec. at 3; Flynn Dec. at 3; Verdeyen Dec. at 3. And speaking about women's sports, intimate spaces, and gender-identity issues is important to K.R. and many members of Female Athletes United. K.R. Dec. ¶ 29; T.Z. Dec. ¶¶ 29–30; T.P. Dec. ¶ 38; Zwahlen Dec. ¶ 31; A.B.S. Dec. ¶ 44.

To date, K.R., the members of Young America's Foundation, FAU, and Moms for Liberty and their children have engaged in these speech activities without becoming the subject of any investigatory or disciplinary proceedings. *See* Adcock Dec. at 3; Flynn Dec. at 4; Verdeyen Dec. at 3; Jensen Dec. at 3; Plank Dec. at 4; Koznek Decl. at 4; Lochner Decl. at 3; K.R. Dec. ¶ 30; T.P. Dec. ¶ 25. Absent the Final Rule, these individuals would continue to express views on gender identity issues and organize and promote events advancing biologically-accurate views on these

matters; however, now they are deterred from doing so out of a reasonable fear of being the subject of investigatory and disciplinary proceedings upon the Final Rule taking effect.  *See* Adcock Dec. at 4; Flynn Dec. at 4; Verdeyen Dec. at 4; Jensen Dec. at 4; Plank Dec. at 4; Koznek Dec. at 4; Lochner Dec. at 3; K.R. Dec. ¶ 31; T.Z. Dec. ¶ 30; T.P. Dec. ¶ 38; Zwahlen Dec. ¶ 31. Thus, allowing the Final Rule to take effect will chill the speech of members of Young America's Foundation and the speech of the children of members of Moms for Liberty.

> **The Final Rule does not survive scrutiny.**  Strict scrutiny does not apply to compelled speech or viewpoint discrimination.  *See 303 Creative LLC*, 600 U.S. at 596 (forcing a person to "'utter what is not in [her] mind' about a question of political and religious significance . . . is something the First Amendment does not tolerate." (quoting *Barnette*, 319 U.S. at 634)); *Janus*, 138 S. Ct. at 2473 (Court has "never applied" a balancing test when a public employer "commands that its employees mouth a message on its own behalf"); *Rosenberger*, 515 U.S. at 829-30 (finding viewpoint discrimination without conducting strict scrutiny analysis); *Taxpayers for Vincent*, 466 U.S. at 804; *Wigg v. Sioux Falls Sch. Dist. 49-5*, 382 F.3d 807, 814, 815 n.5 (8th Cir. 2004).  Content-based discrimination, however, is subject to strict scrutiny, where the burden is on the government to show that the restriction is narrowly tailored to serve a compelling interest.  *Boos v. Barry*, 485 U.S. 312, 324 (1988). Defendants will be unable to satisfy any of these standards.

Under strict scrutiny, it is Defendants' burden to show that they have a compelling interest in justifying the restriction on speech and to narrowly tailor it to address that interest. *See Kennedy*, 597 U.S. at 530.  Defendants have no compelling interest in limiting the speech of those who disagree with their stated views on transgender ideology, even if Defendants claim offense at such speech.  *See Matal*, 582 U.S. at 243 ("Giving offense is a viewpoint."); *id.* at 244 (collecting 80 years of cases); *303 Creative*, 600 U.S. at 595 ("Nor, in any event, do the First Amendment's protections belong only to speakers whose motives the government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive.").  Defendants also cannot claim an interest in civil rights enforcement, even if Title IX really did authorize the Final Rule. *303 Creative*, 600 U.S. at 592 (Colorado's anti-

discrimination laws are not "immune from the demands of the Constitution"); *Lucero*, 936 F.3d at 755 ("Even antidiscrimination laws, as critically important as they are, must yield to the Constitution."). The usage of biologically correct pronouns is not discrimination under Title IX. *Meriwether*, 992 F.3d at 511. To the extent that Defendants have any legitimate interest at all, the Final Rule is not narrowly tailored. Instead, the Final Rule goes in the opposite direction. It takes every possible step to ensure that speech that is not favored by Defendants is chilled as it only cites a "stray remark" as an example of something that does not violate the Final Rule. 89 Fed. Reg. at 33,516. At that point, the implication is that someone who engages in more than a "stray remark" about someone's preferred pronoun would face a credible threat of enforcement. This is far from a narrowly tailored approach.

The Final Rule also forces individuals to engage in speech that violates their sincerely held religious beliefs. The Final Rule would require individual teachers, coaches, students, and school administrators to acknowledge, affirm, and validate students' "gender identities" regardless of the speakers' own religious beliefs on the matter in violation of the First Amendment. *303 Creative LLC*, 600 U.S. at 596. Plaintiffs such as K.R. are Christians who have a sincerely held religious belief that God created individuals as male and female at birth, and a person cannot change that. The Final Rule presents a credible threat of enforcement if they do not use someone's preferred pronouns even if that conflicts with their sincerely held beliefs as it does not provide any religious exemptions. Furthermore, the Final Rule restricts their ability to speak freely on these sincerely held religious beliefs in violation of their First Amendment rights.

### b. The Final Rule violates the First, Fifth, and Fourteenth Amendment Due Process Clauses

The First, Fifth and Fourteenth Amendments prohibit restrictions that are unconstitutionally vague. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). This requirement furthers two purposes: (1) to provide fair notice to the citizenry of what is outlawed and (2) to provide standards for enforcement to officials. *Id.* at 108-09.

A restriction is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). And "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.'" *Grayned*, 408 U.S. at 109 (ellipsis and internal quotation marks omitted) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)). Thus, regulations on speech which are vague chill not only protected speech targeted by the regulation but also speech in grey zones outside the intended edges of the regulation. If a restriction "interferes with the right of free speech," then a stringent test for vagueness applies. *Vill. of Hoffman Ests. v. Flipside, Hoffman Est.s, Inc.*, 455 U.S. 489, 499 (1982); *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959) ("Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law.").

The Final Rule is unconstitutionally vague for the same reasons it is overbroad: nearly any statement on a wide range of public issues involving gender identity could reasonably subject a student to a harassment claim. As the regulation admits, simply saying "there are only two genders" is likely enough. 89 Fed. Reg. at 33,504 (citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023)). This view is widely held—including by the private plaintiffs—who want to share it in appropriate settings at school. *See, e.g.*, K.R. Dec. ¶¶ 29–31. But to avoid being labeled a harasser or disciplined, reasonable students will refrain from this kind of speech at the cost of their First Amendment rights. That creates an "impermissible risk of suppression of ideas." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992). And it fails the "more stringent vagueness test" applicable to speech regulations. *Vill. of Hoffman Estates*, 455 U.S. at 499.

The Final Rule also fails to clearly define "gender," adds a "subjective" component to the definition of harassment, and permits a complainant to support his or her complaint without identifying a particular harm suffered. As a result, the Final Rule fails to provide fair notice to

individuals such as the Plaintiffs as to what is outlawed and opens the door to arbitrary enforcement. Multiple members of Young America's Foundation and the children of Moms for Liberty members are being forced to forgo their rights to speech because (1) it is not clear what speech falls within the ambit of the Final Rule and (2) they credibly fear arbitrary enforcement of the Final Rule. *See supra.*

### c. The Final Rule violates the Spending Clause.

Title IX and accompanying regulations implicate Congress's power under the Spending Clause of Article I, section 8, clause 1. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992). The Supreme Court has "long recognized that Congress may fix the terms on which it shall disburse federal money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). However, the power to fix terms is not unlimited. Courts have recognized "four general restrictions on Congress' exercise of power under the Spending Clause." *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("*Kansas I*"). These are (1) "Congress's object must be in pursuit of the general welfare"; (2) "if Congress desires to place conditions on the state's receipt of federal funds, it must do so unambiguously so that states know the consequences of their decision to participate"; (3) "the conditions must be related to the federal interest in the particular program"; and (4) "Congress may not induce the states to engage in activities that would themselves be unconstitutional." *Id.* (internal quotation marks and citations omitted). If DoEd's interpretation of Title IX is correct, it would violate the second, third, and fourth restrictions and would render Title IX unconstitutional.

To begin, the Final Rule is unconstitutional because it imposes conditions on the States to which they did not agree and with which they are unable to comply. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17. The States must therefore be fully aware of the strings to which federal funding is attached before they accept federal funds. "There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Courts

"insist[] that Congress speak with a clear voice," imposing any conditions "unambiguously," so that "States [may] exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* Courts evaluate whether the conditions were "clear" and "unambiguous" by stepping in the shoes of the "state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). They ask whether the state official would "clearly understand" the obligations, such that it had "clear notice" regarding potential liability." *Id.* The answer in this case is a resounding "no."

    As discussed above, it was understood in 1972 and 1975 that "sex" referred to biological sex and that Title IX was intended to provide and protect equal opportunities for women and girls. A state official would have understood that the school would be required to provide equal facilities for men and women—including restrooms, locker rooms, and overnight accommodations—or else incur liability. It was understood that men and women should have equal sports teams—in most cases requiring separate teams—which is why Congress specifically directed DoEd to promulgate regulations affecting such teams. The 1972 or 1975 state official would have understood that, by accepting the funding, the school was open to liability if it did not create equal opportunities for biological women and girls. It would not have understood that accepting Title IX funds opened the school to liability if a student was treated according to their biological sex rather than their internal concept of "gender identity."

    The requirements in the Final Rule are so mercurial that it may be difficult for a state official to comply with the conditions. The Final Rule requires schools to treat students according to their own internal sense of their "gender identities" or else face liability for discrimination and potential loss of federal funding. Currently, liability for "discrimination," is understood to require the school to have actual knowledge of harassment that is "so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023). Under this standard, a school would not be liable for discrimination

if, for example, a teacher directed a female student with a short haircut to the boys' restroom or directed a male student who "identified" as a girl to the boys' restroom.  But if the Final Rule is allowed to take effect, liability could be incurred for as little as directing a biologically male student to the boys' restroom when the boy "identifies" as a girl, regardless of whether the staff member knows of the student's "gender identity."  *See* 89 Fed. Reg. 33,816.

Indeed, the Final Rule acknowledges that "gender identity" may not be readily discernable and is up to the individual student.  89 Fed. Reg. at 33,819–20.  And the Final Rule suggests that schools should not require documentation or other examinations to determine a student's "gender identity."  *Id.*  Add to that the fact that the Final Rule understands there to be many "gender identities" and the fact that a person's' "gender identity" may change.  89 Fed. Reg. 33,819 & n.90 (citing the World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022) ("WPATH Standards)).  The upshot is that schools may not know, and may have no way of knowing, whether any student's "gender identity" is different than his or her biological sex; and so, the only way for the school to truly know it is in compliance is to eliminate sex-separation altogether.  A state official in 1972 and 1975 would have thought this was a violation of the statute, not compliance.

The Final Rule also violates the third restriction.  The federal interest advanced by the creation of the Title IX spending program was the promotion and protection of education and athletic opportunities for biological women and girls.  The Final Rule is not related to, and does not serve, that interest.  Indeed, it undermines that interest.  If the Final Rule takes effect, women and girls' sports will be will be effectively destroyed over time.  Biological females will be denied the schooling opportunities that Title IX funds were intended to create.  And biological females will be placed in unsafe and invasive situations at schools and universities.

The Final Rule also violates the fourth restriction.  Under the Final Rule, a teacher would "discriminate" against a student if the teacher refuses to use the student's "preferred pronouns," even if the basis for the teacher's refusal is a religious objection.  The Final Rule also violates the

44

free speech protections of the First Amendment by compelling teachers, administrators, coaches, and staff to use "preferred pronouns," referring to boys as girls and vice-versa. *See 303 Creative*, 600 U.S. at 588–89. "Congress may not induce the states to engage in activities that would themselves be unconstitutional," *Kansas I*, 214 F.3d at 1199, by interfering with their citizens' free speech, religious liberty, or due process rights.

For example, the Final Rule would require a state university to engage in viewpoint discrimination by investigating and disciplining a student who wrote "men cannot become women" on a sidewalk or drew a trans flag with an "X" across it but places no obligation on the university to investigate a complaint against a student for writing the message that "men can become women" or for drawing a trans flag without an "X" across it. The First Amendment protects all of these messages equally. The Final Rule only restricts messages critical of "gender identity theory."

As another example, if K.R. declined a male student's request to refer to the student as "she" or "her" because K.R.'s faith does not allow her to say things she doesn't believe are true, the other student could file a sex-based harassment complaint against K.R. Under the Final Rule, the school would have little choice but to punish K.R. for exercising her constitutional right to avoid compelled speech: declining to use inaccurate pronouns would be "unwelcome" and "offensive" to the other student, it would be pervasive if this were a student K.R. shared classes with or otherwise interacted with frequently, and the other student would claim a limitation on the student's ability to concentrate and otherwise obtain the benefits of the educational program at issue. 89 Fed. Reg. at 33,498–511. So, the school would face a classic Hobson's choice: violate the Final Rule (risking losing federal funding and civil liability) or violate K.R.'s First Amendment rights (again, risking civil liability).

### d.  The Spending Clause and the Supremacy Clause require Congress to speak

The power of the Spending Clause can only be exercised by "the Congress." U.S. Const. Art. I, sec. 8. Similarly, the power of the Supremacy Clause is one that can only be exercised by

45

Congress; it is "[t]his Constitution and the laws of the United States which shall be made in pursuance thereof" that preempt contrary state laws.  U.S. Const. Art. VI, cl. 2.  As discussed, Defendants' Final Rule would override multiple contrary state laws governing girls' sports, access to facilities, and the manner in which schools classify students according to sex.  It is an exercise of the spending power that is intended to preempt those state laws.  However, only Congress can exercise the spending power, and only Congress can preempt state laws that it intends to displace.  An executive agency has no authority to issue rules that preempt state law. Because the Final Rule goes so far beyond what Congress has enacted with respect to Title IX, and because Defendants cannot point to any act of Congress commanding that the Final Rule be promulgated, Defendants are outside the scope of the Spending Clause and the Supremacy Clause.  Defendants cannot stand in the shoes of Congress.

      4.   **The Final Rule is arbitrary and capricious**

An agency acts arbitrarily and capriciously when it: "(1) entirely fails to consider an important aspect of the problem, (2) offers an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise, (3) fails to base its decision on consideration of the relevant factors, or (4) makes a clear error of judgment."  *New Mexico Health Connections v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1162 (10th Cir. 2019) (internal brackets omitted).  "[O]ne of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). When an agency departs from a prior policy, it must provide a "more detailed justification than what would suffice for a new policy created on a blank slate" whenever "its prior policy has engendered serious reliance interests that must be taken into account . . . It would be arbitrary and capricious to ignore such matters."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Furthermore, while the APA requires agencies to "take into account <u>any</u> serious reliance

interests created by the prior policy," "present and continuing reliance" requires an especially detailed analysis. *Am. Petroleum Inst. v. United States Dep't of Interior*, 81 F.4th 1048, 1060 (10th Cir. 2023) (emphasis added) (internal brackets and quotation marks omitted). Such analysis must consider costs, which are a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752-53 (2015).

### a. The Final Rule offers an implausible explanation for agency action

Defendants offer an explanation for their decision that is so implausible that it could not be ascribed to a difference in view of the product of agency expertise. Defendants state, "the Department has determined that amendments are required to fully effectuate Title IX's sex discrimination prohibition." 89 Fed. Reg. at 33,477. This explanation is implausible because the Final Rule inflicts harm on those Title IX was intended to protect (women) to avoid *more than de minimis* harm to biological males. For example, the Final Rule concludes transgender students face "substantial harm" if "they are excluded from a sex-separate facility consistent with their gender identity." *Id.* at 33,819. But when it comes to girls, DoEd was not concerned about the harm they face when their privacy rights are violated by sharing a bathroom with a biological male, rejecting "that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* at 33,820. The idea that it is "fully effectuating" Title IX by elevating transgender individuals over girls (who Title IX was meant to protect) is implausible. The real answer is the Final Rule exists to effectuate political change which runs counter to the implausible explanation DoEd offered.

### b. The Final Rule is a Sharp Departure from Past Practice

The Final Rule is also arbitrary and capricious because it departs sharply from past practice without reasonable explanation. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("*Regents*"). Throughout Title IX's history, it has never applied to

gender identity.  It was specifically women who fought for what became Title IX and that is who are protected under the statute.  Instead of acknowledging this, the DoEd pretends the mission is simple clarification.  The Final Rule states, "The purpose of these Amendments is to better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate" and that the "amendments clarify the scope and application of Title IX and the obligations of recipients of Federal financial assistance from the Department."  89 Fed. Red. at 33,474.  This case is worse than *Regents* where the agency acknowledged it was changing course.  DoEd pretends it is simply clarifying Title IX.  It is impossible to have a reasonable explanation for an agency action without acknowledging departure from past practice.

### c.   The Final Rule fails to consider reliance interests

When Title IX was enacted in 1972, it prohibited discrimination "on the basis of sex."  At that time, Congress, DoEd, the States, schools, teachers, parents, and students understood the term "sex" to mean biological sex, not gender identity.  The Department maintained this understanding as it interpreted Title IX so as to permit states to discriminate between males and females with respect to "toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, housing, 34 C.F.R. § 106.32, and sports teams, 34 C.F.R. § 106.42.  Over the course of more than fifty years, states have established reliance interests rooted in that understanding, which continue to this day.  Under DoEd established prior policy, the states constructed toilets, locker rooms, shower facilities, and housing that is separated by biological sex and designed with the different biological needs of males and females in mind.

The Final Rule departs from this prior policy.  It "clarifies" that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity causes more than de minimis harm" and is therefore prohibited under Title IX.  89 Fed. Reg. at 33,876.  And DoEd itself (and the sources on which it relies for its justification) assumes there are more than two "gender identities."  89 Fed. Reg. at 33,820 & n.90 (citing the WPATH Standards). The Final Rule requires the States to alter their present arrangements to accommodate males with female gender identities in what had

previously been female spaces, to accommodate females with male gender identities in what had previously been male spaces, and to accommodate individuals with gender identities that are neither male nor female, or which are some indeterminate combination of male and female, in spaces which do not currently exist and which would need to be constructed to accommodate them.  These accommodations, especially for those with non-binary or gender-nonconforming gender identities, cannot be accomplished with schools' existing sex-separated facilities.

Additional changes to state programs would be required due to the fact that sports teams separated by gender identity would still be required to provide equal opportunities for males and females.  34 C.F.R. § 106.41(c).  Under DoEd's equal opportunity policies, the new policy requiring sports teams to provide access on the basis of gender identity would make such equal opportunity either impossible, on the basis of biological sex; or the new policy would require significant and unpredictable adjustments to programs in order to maintain the equal opportunity for males and females that is required by Title IX.  Schools have already relied on DoEd's prior understanding of equal opportunity in order to structure their sports programs, sports budgets, scholarships, publicity, and recruitment operations, such that males and females have equal opportunities for participation.  The Final Rule completely fails to consider how the states' reliance on the prior policy affects the states' present and continuing structuring of their sports programs in these ways.

These changes would require an expenditure of state resources on new and modified facilities, additional equipment, and new organization which the Final Rule does not acknowledge, let alone adequately explain.  The Final Rule states merely that "[c]ompliance with proposed § 106.31(a)(2) may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities or creation of new programs."  89 Fed. Reg. 33,876.  Far from the "more detailed justification" that is required under the APA, the department offers a flat denial of any significant costs as a result of the rule.  DoEd's denial without explanation does not meet the requirements of the APA.  In *Regents*, 140 S. Ct. at 1915, the Supreme Court required agencies to undertake a serious analysis of reliance interests.

49

Agencies that change a longstanding policy, that are not "writing on a blank slate," are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.*

DoEd is obliged to consider reliance interests, determine their significance, and weigh them against competing policy concerns even if it does not believe those reliance interests are legally protectable. In *Regents*, the Department of Homeland Security ("DHS") asserted that the reliance interests at issue were not "legally cognizable" and did not confer "substantive rights." *Id.* at 1913. But the Court stated it did not believe that "such features automatically preclude reliance interests." *Id.* Those factors "are surely pertinent in considering the strength of any reliance interests, but that consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* Because DHS did not consider the reliance interests, the rule was arbitrary and capricious in violation of the APA.

The Final Rule suffers from the same flaws as the DHS rule in *Regents*. It does not acknowledge any reliance interests of the states in continuing to separate their facilities and sports teams on the basis of biological sex, even to deny their importance. And its terse denial of costs to regulated entities rejects many comments submitted by the public, without explaining in any way why educational institutions will not incur significant costs when they are forced to make alterations to their facilities and sports teams in order to comply with the rule. DoEd's failure to explain the effects the rule would have on the States' reliance interests based on fifty years of policy is arbitrary and capricious.

It also ignores the reliance interests of K.R. and members of FAU, Moms for Liberty, and Young Americas Foundation, who have chosen to attend public schools on the long-held understanding that Title IX protects women. Having committed their academic and athletic careers to these schools, the government is now changing the bargain by forcing them to share intimate spaces with males, compete against males in women's sports, speak against their faith and consciences, and stay silent on important social issues involving gender identity. Changing schools is no simple task, particularly since the Final Rule takes all public schools and many

private schools off the table.  These students and their families will have no choice but to expend substantial time, energy, and resources to find educational and athletic opportunities that respect the inherent differences between males and females and their constitutional rights.

### B.  The Plaintiffs will be irreparably harmed

"A showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and therefore the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *New Mexico Dep't of Game & Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1249 (10th Cir. 2017) (internal brackets omitted).  "Although irreparable harm does not readily lend itself to definition, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Id.* at 1250 (internal quotation marks omitted).  All Plaintiffs will suffer irreparable harm.

#### 1.  Harm to Plaintiff States

First, the Final Rule will cause irreparable harm to the States by expending time and money in implementing the Final Rule that cannot be recouped.  In order to comply with the Final Rule, schools would at a minimum need to (1) update their training materials, (2) hire additional Title IX coordinators, and (3) update their handouts on Title IX.  *See* Cawvey Dec.; Earl Dec.  In addition, many schools in plaintiff states require bathrooms/locker rooms to be separated by biological sex and have configured their bathrooms/locker rooms.  *See* Cawvey Dec.; Earl Dec.  These schools would have to reconfigure their bathrooms/locker rooms in order to follow the Final Rule and provide some measure of privacy for their students.  *See* Cawvey Dec.; Earl Dec.  Finally, all the Plaintiff States have sex-separated activities to include sports.  *See* Cawvey Dec.; Earl Dec.  The Final Rule would prevent that separation and schools would have to reconfigure them to comply with the Final Rule.  All of these costs will be incurred prior to the Final Rule going into effect on August 1, 2024, as these policies will need to be in effect prior to the school year beginning.  *See* Cawvey Dec.; Earl Dec.  States cannot sue the Defendants to recover lost funds once the Final Rule is vacated and the costs are not recoverable.

Second, the Final Rule irreparably harms the States by preempting their laws.  The Tenth Circuit is clear that States have sovereign interests in enforcing their laws, and will be irreparably harmed if deprived of those interests without first having a full and fair opportunity to be heard on the merits."  *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (*Kansas II*); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (States have a sovereign interest in the "exercise of sovereign power over individuals and entities within the relevant jurisdiction" which involves "the power to create and enforce a legal code.").  As discussed, Plaintiff States have laws that (1) separate sports teams based on biological sex, (2) require separation of bathrooms/locker rooms based on biological sex, (3) separate overnight accommodations based on biological sex, (4) protect First Amendment/religious liberty, and (5) limit abortions.  Once that sovereignty is trampled upon it cannot be reversed.

Finally, all the Plaintiff States will be put in a position where they are forced to violate the constitutional rights of their students and staff or risk losing federal funding.  As noted above, the Final Rule violates the First, Fifth, and Fourteenth Amendment rights of students and staff that get wrapped up into the broad definition of sex-based harassment.  Not only does this force states to violate the Constitution, it also opens them up to numerous lawsuits.  Once this harm occurs it cannot be undone.

## 2.  Harm to Moms for Liberty and Young America's Foundation

"The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (*per curiam*).  "Courts therefore presume irreparable harm when a plaintiff has demonstrated a likelihood of success on the merits on a First Amendment claim."  *Are You Listening Yet PAC v. Henderson*, No. 2:24-CV-00104-JNP, 2024 U.S. Dist. LEXIS 42750, at 24-25 (D. Utah Mar. 11, 2024); *see also Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) ("[V]iolations of First Amendment rights are presumed irreparable.").  Thus, "the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights."

*Platt v. Bd. of Comm'rs on Grievances & Discipline*, 769 F.3d 447, 454 (6th Cir. 2014) (quoting *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002)).

As is explained above, Moms for Liberty and Young America's Foundation have demonstrated a likelihood of success on the merits of their First Amendment claims. Apart from the presumption of irreparable injury that a likelihood of success creates, the injury is irreparable because the Final Rule places both organizations' members in a Catch-22—hold firm to their beliefs on pressing matters of gender identity and face investigatory and disciplinary proceedings for sexual harassment that may stay on their record forever or compromise their beliefs and by verbally acquiescing to the biologically false proposition that gender is fluid and can change. Further, the harm reverberates beyond the organizations' membership and to the core of Moms for Liberty and Young America's Foundation because it impugns aspects of their respective missions of protecting children from political and social indoctrination by schools and inspiring the ideas of traditional values on college campuses. The harm particularly strikes at Young America's Foundation because it promotes free speech and provides college students with access to educational resources, campus flyers and tabling materials, and speakers focused on issues of gender identity and transgenderism. Thus, allowing the Final Rule to take effect will irreparably harm Young America's Foundation's ability to disseminate its message, through its members, to college students across the country.

### 3. Harm to Female Athletes United

The Final Rule irreparably harms members of FAU by forcing them to share intimate spaces with members of the opposite sex, compelling and restricting their speech on gender-identity issues, and making them compete against male athletes in women's sports. There is no "more basic subject of privacy than the naked body." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963). So, courts around the country recognize the importance of not being required to share intimate spaces or be unclothed in front of the opposite sex. *See, e.g., Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 796 (11th Cir. 2022) (en banc) (school facilities); *c.f., Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995) (strip searches in front of the opposite sex). Nor do athlete-

members of FAU have another viable option: changing and showering in locker rooms is a ubiquitous part of school athletics, so the harm is irreparable. As to compelling and restricting FAU members' speech, it is well-established that violating a person's free-speech rights is per se irreparable. *Elrod*, 427 U.S. at 373.

And having to compete against males in women's sports irreparably harms FAU members because of the inherent athletic advantages that men have. *Clark v. Ariz. Interscholastic Ass'n*, 685 F.2d 1126, 1131 (9th Cir. 1982) ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."). Being displaced by males in athletics is a "concrete injury." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023). Indeed, courts across the country have recognized that the "lost opportunity to participate in . . . athletics" is a form of irreparable harm. *Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 997 (E.D. Mich. 2018) (collecting cases).

### 4. Harm to K.R.

K.R. shares some overlapping harms as members of FAU, with the added harm that the Final Rule forces her to violate her religious beliefs by speaking against them. And substantially burdening a person's religious beliefs—as the Final Rule does—is *per se* irreparable harm. *O Centro Espirita Beneficienty Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1008 (10th Cir. 2004) (en banc).

### C. The balance of harms and public interest favors Plaintiffs

A party requesting a preliminary injunction must also show the balance of equities tips in its favor. *Id.* at 980. The balance of harms overwhelmingly favors the States. If the Final Rule is allowed to take effect, the States will immediately be put in a position of having to choose between enforcing their own laws and following the unlawful Final Rule. They will immediately face risk of lawsuit and loss of federal funding if they do not reorganize programs, teams, student groups, and building facilities to accommodate students' "gender identities." The only way to prevent this harm is to enjoin the Final Rule.

On the other side, a preliminary injunction will cause "little or no harm" to Defendants. *Moore v. Brown*, 448 U.S. 1335, 1339 (1980). Defendants have no interest in enforcing a rule that

54

completely bypasses constitutional separation of powers principles. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). An injunction will not cost Defendants, will not impose financial costs, and will not require them to take any action. *See Kansas II*, 249 F.3d at 1228. For the same reasons an injunction weighs against Defendants, it weighs in favor of the public interest. The public has an interest in making sure the only rules federal agencies are allowed to enact are lawful. *See Free the Nipple-Fort Collins*, 916 F.3d at 806. The public is not harmed by maintaining the *status quo* while the issue is decided. *See Kansas II*, 249 F.3d at 1227.

### D. Relief should not be limited to the parties

The Court should grant a nationwide injunction and prevent Defendants from unlawfully forgiving hundreds of billions in loans pending a decision on merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated-not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C.Cir. 1989). "Courts have, thus, found a nationwide injunction appropriate in such cases." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019); *see also id.* (collecting cases); *Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007).

There are practical reasons to extend the injunction nationwide as well. "[T]ailoring an injunction to address the alleged harms to the [] States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022). The problems are especially apparent in this APA case where there are State, private, and organizational plaintiffs spread throughout the country. Limiting an injunction to only the parties would create an unworkable patchwork of enforcement. The Final Rule should be stayed across the country while the Court examines the legality of Defendants' actions.

<u>CONCLUSION</u>

For these reasons, the Court should set aside or stay the Final Rule, or otherwise enjoin Defendants from enforcing the Final Rule.

Respectfully submitted this 24th of May, 2024.

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli
Deputy Attorney General
Erin B. Gaide
Assistant Attorney General
Jay Rodriguez
Assistant Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
          erin.gaide@ag.ks.gov
          jay.rodriguez@ag.ks.gov

**TREG TAYLOR**
**Attorney General of Alaska**

*/s/ Cori Mills*
Cori Mills**
Deputy Attorney General
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

Counsel for Plaintiff State of Alaska

**SEAN REYES**
**Attorney General of Utah**

*/s/ Lance F. Sorenson*
Lance F. Sorenson**
Assistant Utah Attorney General
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

Counsel for Plaintiff State of Utah

BRIDGET HILL
Attorney General of Wyoming

/s/ Ryan Schelhaas
Ryan Schelhaas**
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786 Direct line
(307) 777-6869 Fax
ryan.schelhaas@wyo.gov


Counsel for Plaintiff State of Wyoming


/s/ William E. Trachman
William E. Trachman**
James L. Kerwin**
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org
Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation


/s/ Braden H. Boucek
Kimberly S. Hermann*
Ga. Bar No. 646473
Braden H. Boucek*
Tenn. BPR No. 021399
Ga. Bar No. 396831
Jordan Miller*
Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation

Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

/s/ Tyson C. Langhofer
Tyson C. Langhofer
Kansas Bar No. 19241

Rachel A. Rouleau*
Virginia Bar No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org


Counsel for Plaintiffs K.R. and FAU


* Pro Hac Vice
* Pro Hac Vice Forthcoming

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on this the 24th day of May, 2024, Plaintiffs' Motion for Leave to File in Excess Pages (ECF #15) was electronically filed with the Clerk of the Court by using the CM/ECF system. Counsel will serve a copy of this motion on the Defendants through the United States Attorney for the District of Kansas in accordance with F.R.C.P. 4(i)(1)(A)(i) as counsel for the Defendants have yet to make an appearance in this matter.

<u>*/s/ Abhishek S. Kambli*</u>

Abhishek S. Kambli