**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

STATE OF KANSAS *et al.*,

      *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION *et al.*,

      *Defendants*.

No. 24-4041-JWB

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

I.    Title IX, Implementing Regulations, and Guidance ......................................... 3

II.   Procedural History ....................................................................................... 6

LEGAL STANDARD .................................................................................................. 6

ARGUMENT ............................................................................................................. 6

I.    Plaintiffs Are Unlikely To Succeed on the Merits .......................................... 6

    A.    The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ............................... 7

    B.    The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts. .......................................................... 10

          1.    Section 106.31(a)(2) Is Consistent with the Statutory Text and Longstanding Regulations. ...................................................... 11

          2.    Section 106.31(a)(2) Is Not Arbitrary or Capricious. ............................. 13

    C.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Lawful Exercise of the Department's Statutory Authority. ....... 16

          1.    Plaintiffs Do Not Dispute that The Department Has the Statutory Authority to Define Hostile Environment Sex-Based Harassment; Plaintiffs Only Take Issue with the Department's Definition As Applied to Harassment Based on Gender Identity................................... 16

          2.    The Rule Does Not Violate the  First Amendment................................... 18

               i.    The Rule Does Not Unlawfully Compel Speech. ......................... 23

               ii.    The Rule Is Not Overbroad or Vague. .......................................... 26

               iii.    Anti-Harassment Provisions, like the Final Rule's, Do Not Impermissibly Regulate Speech Based on Content or Viewpoint and Are Not Subject to Strict Scrutiny....................... 30

          3.    The Rule's Definition of Harassment Also Does Not Violate RFRA, Although Plaintiffs Also Lack Standing to Bring a RFRA Challenge. ................................................................................. 33

          i.     As an initial matter, Plaintiffs' lack standing to bring a
RFRA challenge, and any challenge is unripe. ............................ 34

          ii.    Plaintiffs' RFRA Challenge Would Also Fail on the Merits ........ 35

    D.    The Final Rule Does Not Violate 20 U.S.C. § 1688. ............................ 38

    E.    The Final Rule's Delineation of the Scope of Title IX's Unambiguous
Prohibition on Sex Discrimination Poses No Spending Clause or
Supremacy Clause Issue ............................................................................ 40

    F.    The Rule Does Not Violate the Major Questions Doctrine. ................................ 43

II.    Plaintiffs Have Not Established Irreparable Harm. ........................................ 44

III.   The Equities and Public Interest Weigh Against Preliminary Relief. ............................ 46

IV.   Any Relief Afforded by the Court Should Be Limited in Accordance with the
Administrative Procedure Act and Equitable Principles. .................................. 48

CONCLUSION ............................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023)................................................................................. 21

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ..................................................................... 9

*Abbott Lab'ys v. Gardner*,
  387 U.S. 136 (1967)................................................................................. 35

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)................................................................................. 26

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ..................................................................... 49

*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006)................................................................................. 50

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
  481 U.S. 537 (1987)................................................................................. 31

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) ........................................................... 40, 41

*Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines
  v. CSX Transp., Inc.*,
  522 F.3d 1190 (11th Cir. 2008) ................................................................ 18

*Big Tyme Invs., L.L.C. v. Edwards*,
  985 F.3d 456 (5th Cir. 2021) .................................................................... 47

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)........................................................................... *passim*

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)................................................................................. 27

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)................................................................................. 49

*California v. Texas*,
  593 U.S. 659 (2021)................................................................................. 34

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979) ........................................................................................... 47

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 374 (2023) ........................................... 49

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ........................................................................................... 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................... 34

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) ........................................................................... 47

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
526 U.S. 629 (1999) ................................................................................... 32, 40

*DHS v. New York*,
140 S. Ct. 599 (2020) ................................................................................. 49, 50

*FCC v. Fox Television Stations*,
556 U.S. 502 (2009) ........................................................................................... 14

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................................................... 14

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) ........................................................................................... 14

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ............................................................................... 45

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
503 U.S. 60 (1992) ............................................................................................. 9

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ............................................................................... 21, 22, 33

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ............................................................................... 35, 36, 37

*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*,
245 F.3d 1172 (10th Cir. 2001) ............................................................................... 9

*Grabowski v. Ariz. Bd. of Regents*,
69 F.4th 1110 (9th Cir. 2023) ................................................................................. 9

iv

*Greater Yellowstone Coal. v. Flowers*,
    321 F.3d 1250 (10th Cir. 2003) ........................................................ 46

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)................................. 9, 12

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009)........................................................................ 9

*Hamby v. Jordan*,
    55 F. App'x 885 (10th Cir. 2003) ...................................................... 6

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ................................................................... 16, 28

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) ..................................................... 44, 46

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981)..................................................................... 45

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)................................................................ 3, 41, 42

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ..................................................................... 22

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ........................................................ 45

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022)..................................................................... 22

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..................................................................... 49

*L.A. Police Dep't v. United Reporting Publ'g Corp.*,
    528 U.S. 32 (1999)...................................................................... 27

*Lane v. Franks*,
    573 U.S. 228 (2014)..................................................................... 22

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
    814 F. App'x 125 (6th Cir. 2020) ...................................................... 47

*Maryland v. King*,
    567 U.S. 1301 (2012)................................................................... 45

*Members of City Council of the City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) .......................................................................................... 27

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) .............................................................................................. 9

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ...................................................................... 22, 26

*Motor Vehicle Mfrs. Ass'n*,
    463 U.S. 29 (1983) ............................................................................................ 14

*Muldrow v. City of St. Louis*,
    601 U.S.---, 144 S. Ct. 967 (2024) .................................................................. 11

*Munaf v. Geren*,
    553 U.S. 674 (2008) ............................................................................................ 6

*Nat'l Park Hosp. Ass'n v. DOI*,
    538 U.S. 803 (2003) .......................................................................................... 35

*NetChoice, L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ........................................................................ 26, 27

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................ 6, 46

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) .......................................................................... 43

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) .................................................................... 44, 45

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) .......................................................................................... 29

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) .......................................................................................... 24

*Raines v. Byrd*,
    521 U.S. 811 (1997) .......................................................................................... 34

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .......................................................................................... 31

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...................................................................................... 31, 47

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) ............................................... 46

*Rowles v. Curators of Univ. of Mo.,*
    983 F.3d 345 (8th Cir. 2020) ............................................ 20, 28

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.,*
    547 U.S. 47 (2006) ....................................................... 23, 24

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) ............................................................ 9

*Sampson v. Murray,*
    415 U.S. 61 (1974) ........................................................... 50

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) ................................................. 31

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005) ........................................ 44, 46

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ......................................................... 40

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ........................................ 25, 26

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ......................................................... 34

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ................................................. 21, 22, 33

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ......................................................... 34

*United States v. Salerno,*
    481 U.S. 739 (1987) ......................................................... 19

*United States v. Texas,*
    599 U.S. 670 (2023) ..................................................... 48, 50

*Vill. of Logan v. U.S. Dep't of Interior,*
    577 F. App'x 760 (10th Cir. 2014) ........................................... 6

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ............................................... 26, 27, 28

*Warth v. Seldin,*
   422 U.S. 490 (1975) ..................................................................... 49

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008) ..................................................................... 19

*West v. Derby Unified Sch. Dist. No. 260,*
   206 F.3d 1358 (10th Cir. 2000) .................................................... 27

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................... 43, 44

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
   858 F.3d 1034 (7th Cir. 2017) ...................................................... 12

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990) ..................................................................... 34

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................... 6, 44, 46

*Wyoming v. Zinke,*
   871 F.3d 1133 (10th Cir. 2017) .................................................... 35

*Yellowbear v. Lampert,*
   741 F.3d 48 (10th Cir. 2014) ........................................................ 37

## STATUTES

20 U.S.C. § 1681 ................................................................... *passim*

20 U.S.C. § 1682 ............................................................... 1, 3, 47

20 U.S.C. § 1686 ............................................................................ 3

20 U.S.C. § 1688 ........................................................... 2, 38, 40

42 U.S.C. § 2000e-2 .......................................................... 4, 8, 9

42 U.S.C. § 2000bb–1 .................................................. 35, 37, 38

## REGULATIONS

34 C.F.R. § 106.2 ............................................................... *passim*

34 C.F.R. § 106.6 ......................................................................... 23

34 C.F.R. § 106.10 .......................................................... 1, 8, 10

34 C.F.R. § 106.11 ............................................................................................... 5

34 C.F.R. § 106.12 ............................................................................................. 36

34 C.F.R. § 106.21 ......................................................................................... 38, 39

34 C.F.R. § 106.31 ..................................................................................... *passim*

34 C.F.R. § 106.33 ............................................................................................. 12

34 C.F.R. § 106.40 ......................................................................................... 38, 39

34 C.F.R. § 106.41 ......................................................................................... 5, 12

34 C.F.R. § 106.46 ............................................................................................... 5

34 C.F.R. § 106.57 ......................................................................................... 38, 39

45 C.F.R. § 86.21 ............................................................................................... 38

45 C.F.R. § 86.40 ............................................................................................... 38

45 C.F.R. § 86.57 ............................................................................................... 39

Department of Health, Education, & Welfare, General Administration*,*
    40 Fed. Reg. 24,128 (1975) ........................................................................ 38

Revised Sexual Harassment Guidance: Harassment of Students by School Employees,
    Other Students, or Third Parties,
    66 Fed. Reg. 5512 (Jan. 19, 2001) ............................................................. 29

Nondiscrimination on the Basis of Sex in Education Programs or Activities
    Receiving Federal Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) .................................................. 4, 16, 29

Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex,
    Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021,
    86 Fed. Reg. 13,803 (Mar. 8, 2021) .............................................................. 4

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    87 Fed. Reg. 41,390 (proposed July 12, 2022) ...................................... 4, 11

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams,
    88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ............................................ 6

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
Federal Financial Assistance,
89 Fed. Reg. 33,474 (Apr. 29, 2024) .................................................................... *passim*

## UNITED STATES CONSTITUTION

U.S. Const. art. III, § 2 ............................................................................................... 34

## OTHER AUTHORITIES

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. (1946) ............................ 50

Letter from Kris Kobach to University of Kansas (May 2, 2024),
https://perma.cc/AZ9S-KF3L ................................................................................... 21

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education (Department) is charged with issuing rules effectuating Title IX. *Id.* § 1682. On April 29, 2024, the Department issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the Final Rule or Rule). This case principally focuses on three provisions of the Rule, and Plaintiffs' challenge to the Rule fails on each proffered ground.

First, one provision of the Rule sets forth the scope of "discrimination on the basis of sex," 34 C.F.R. § 106.10, recognizing that it includes discrimination on the basis of, *inter alia*, gender identity. 89 Fed. Reg. at 33,886. The Department's interpretation of discrimination "on the basis of sex" straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). Bostock concluded that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex under Title VII "because it is impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex." *Id.* at 660. That same reasoning applies to the nearly identical text prohibiting sex discrimination in Title IX.

Second, the Final Rule appropriately recognizes distinctions between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination, and other contexts—such as restrooms—in which it has not. Consistent with Supreme Court precedent, the Rule explains that outside those statutorily-mandated exceptions, separate or different treatment based on sex constitutes unlawful discrimination under Title IX if it causes more than de minimis harm. *See* 89 Fed. Reg. at 33,887 (addressing this provision to be codified at 34 C.F.R.

§ 106.31(a)(2)).

Third, the Rule's definition of sex-based harassment, *id.* at 33,884 (to be codified at 34 C.F.R. § 106.2), is consistent with Title IX and the Department's enforcement authority. The Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020 and continues to use a similar standard in its enforcement of Title VI of the Civil Rights Act of 1964 (prohibiting discrimination on the basis of race, color, and national origin including shared ancestry and ethnic characteristics) and Section 504 of the Rehabilitation Act (prohibiting discrimination on the basis of disability). Plaintiffs do not take issue with this provision as a general matter, but rather hypothesize that it will violate individuals' First Amendment rights when used to protect students who are discriminated against based on their gender identity. As a threshold matter, Plaintiffs' theoretical concerns about this particular application are insufficient to support their facial challenge to the Rule. And, in any event, there is no reason to expect that the inclusion of gender identity will raise intractable First Amendment issues, given that schools and the Department have administered a similar harassment standard without issue for decades.

As explained below, Plaintiffs are also wrong in their other constitutional and statutory challenges. The Rule does not violate the Religious Freedom Restoration Act of 1993 (RFRA), because the Rule expressly states that the Department will apply the Rule consistent with RFRA on a case-by-case basis. The Rule does not violate 20 U.S.C. § 1688 because the Rule does not regulate the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. And the Rule does not violate the Spending Clause, Supremacy Clause, or the major questions doctrine because it effectuates Congress's unambiguous prohibition of sex discrimination in Title IX.

In addition to Plaintiffs' lack of a likelihood of success on the merits, Plaintiffs also have not met their high burden to satisfy the other requirements for a stay or preliminary injunction. Plaintiffs' alleged harms are largely speculative and cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motion, as enjoining the Rule would substantially harm the Government's interest in preventing discrimination in federally funded education programs and activities. Accordingly, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.     Title IX, Implementing Regulations, and Guidance

Title IX's nondiscrimination mandate states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)-(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from the nondiscrimination mandate); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which requires the Department to obtain voluntary compliance from (or, failing that, allows the Department to terminate or refuse to grant or continue the federal funds of) a recipient that fails to comply with the statute or the Department's implementing regulations, through a variety of means. *Id.*

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must respond to allegations of sexual harassment. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that discrimination on the basis of gender identity is necessarily covered by the prohibition on discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

After a considerable public engagement process, in July 2022 the Department issued a Notice of Proposed Rulemaking (NPRM). *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022). Following extensive review of more than 240,000 public comments, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

Although the Final Rule includes many provisions, as relevant to this case, the Final Rule (1) clarifies the scope of prohibited sex discrimination under Title IX; (2) clarifies the limits of permissible different or separate treatment on the basis of sex under Title IX; and (3) defines sex-

based harassment under Title IX.[1]

The Rule explicitly does not amend or affect the Department's regulation regarding participation on sex-separate athletic teams, contrary to the assertion in Plaintiffs' background section, Mem. in Supp. of Pls.' Mot. for a Stay/Prelim. Inj. 10-11 (Pls.' Mem.), ECF No. 25. The eligibility criteria a school can use for its male and female athletic teams remain unchanged by the Rule. 89 Fed. Reg. at 33,817. The section of the current athletics regulations that addresses this issue is § 106.41(b), which sets forth an exception to the regulation's general nondiscrimination mandate for athletics in § 106.41(a), and allows "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."

---

[1] Plaintiffs' background section briefly mentions several changes in the Rule to the Department's regulation regarding grievance procedures for complaints of discrimination under Title IX. Pls.' Mem. 12. Plaintiffs do not discuss grievance procedures at all in their argument section, nor do they explain why the Rule's treatment of grievance procedures would be unlawful or arbitrary or capricious. Accordingly, no issues regarding the grievance procedures are before the Court. In any event, Plaintiffs misunderstand many of the provisions they mention (which generally provide multiple options to schools so schools will have greater flexibility), and the Department thoroughly considered the relevant issues. *See, e.g.*, 89 Fed. Reg. at 33,893-94 (to be codified at 34 C.F.R. § 106.46(e)(6)(i) and § 106.46(c)(1)(iii)) (requiring schools to provide access to evidence on request and to provide written notice of this right); *id.* at 33,732-33 (considering feedback from stakeholders and the public in deciding to allow postsecondary institutions to determine whether to use live questioning at a live hearing or through separate meetings with the parties); *id.* at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(2)) (requiring that postsecondary institutions cannot limit an advisor's presence at any meeting or proceeding); *id.* at 33,662 (determining that permitting, but not requiring, a single-investigator model would give recipients reasonable options to structure their grievance procedures in accordance with their own administrative structure and needs).

Similarly, Plaintiffs' background section argues that the Rule "extends beyond the United States." Pls.' Mem. 12. Plaintiffs do not revisit this topic in their argument section or articulate any reason that the Rule is unlawful, and thus no challenge on that issue is before the Court. In any event, Plaintiffs' background section is wrong: Title IX applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. 89 Fed. Reg. at 33,576 (citing § 106.11). Conduct occurring outside a recipient's education program or activity or outside the United States is only implicated by Title IX insofar as it "contributes to a hostile environment in the United States," *id.*, and in the recipient's program or activity, *id.* at 33,528.

34 C.F.R. § 106.41(b). The Rule makes no changes to § 106.41(a) or § 106.41(b). *See* 89 Fed. Reg. at 33,893. Instead, the Department will address sex-separate athletic teams through a separate rulemaking, which is ongoing. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023).

## II.   Procedural History

Plaintiffs filed their complaint on May 14, 2024. Compl. ECF No. 1. Plaintiffs moved for a stay or preliminary injunction on May 24, 2024. Pls.' Mot., ECF No. 24. Plaintiffs are the states of Kansas, Alaska, Utah, and Wyoming, an individual (K.R.), and three advocacy groups. Compl. ¶¶ 8-74.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted); *see also Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary injunction bears the burden to show: "a substantial likelihood of success on the merits," "irreparable injury to the movant if the preliminary injunction is denied," "the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction," and "the injunction [would] not [be] adverse to the public interest." *Hamby v. Jordan*, 55 F. App'x 885 (10th Cir. 2003) (citation omitted). When the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Are Unlikely To Succeed on the Merits.

The Rule's clarification that the scope of discrimination on the basis of sex includes discrimination on the basis of gender identity, which is set forth at § 106.10, reflects a straightforward construction of Title IX's text in accordance with the Supreme Court's analysis in *Bostock*. Plaintiffs' arguments to the contrary lack merit, as explained below in Part I.A.

Plaintiffs' brief conflates § 106.10 with the other challenged provisions of the Rule, but those provisions serve separate functions and are supported by different reasoning. Specifically, Plaintiffs also object to the separate provision to be codified at 34 C.F.R. § 106.31(a)(2), which explains that, where sex separation or sex differentiation is permitted by Title IX and the applicable regulations, that separation or different treatment must not subject a person to more than de minimis harm unless an exception applies. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). As explained in Part I.B below, the Department correctly determined that, because preventing a person from "participating in an education program or activity consistent" with their gender identity causes more than de minimis harm, it therefore violates Title IX unless permitted by congressional direction. *Id.*

Finally, Plaintiffs erroneously argue that the Rule's sexual harassment definition is unconstitutional because of how it might be applied to address discrimination on the basis of gender identity. But that speculation is insufficient to sustain Plaintiffs' facial challenge to the regulation. Indeed, Plaintiffs do not take issue with how the definition applies in most circumstances, and thus their arguments have nothing to say about whether the harassment definition is facially lawful. And, as discussed below in Part I.C, insofar as the harassment standard does apply to discrimination on the basis of gender identity, it is fully consistent with the First Amendment and RFRA.

A. **The Final Rule's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.**

Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Final Rule recognizes that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Plaintiffs argue that the Department's interpretation of Title IX is contrary to the statutory text and is arbitrary and capricious. Pls.' Mem. 21-23, 47-48. In fact, the Department faithfully interpreted the statutory text in light of *Bostock*, which construed Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656-57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of gender identity "because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a

person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even if "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s analysis of Title VII's "because of" language, 42 U.S.C. § 2000e-2(a)(i), applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard, including in *Bostock* itself. *See* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining statutory phrase, "based on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007))). Courts—including the Tenth Circuit—consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g., Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). And as to the specific question at hand, several courts have already held that there is no difference between the two statutes that would permit a different result. *See, e.g., Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). Title IX no more permits a school to bar a student from band practice because the student is transgender than Title

VII permits an employer to fire an employee because the employee is transgender.

Plaintiffs completely fail to engage with the Department's analysis of *Bostock*, which was set out at length in the Final Rule, 89 Fed. Reg. at 33,802-08. Instead, Plaintiffs lean heavily on their view that sex is binary and "biological," Pls.' Mem. 22-23; *see also id.* at 47-48, but fail to acknowledge that *Bostock* "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Regardless of how one defines the word, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. The Final Rule operates equally well under the same assumption; it does not require a determination that sex means anything other than what *Bostock* assumed it to mean. *See* 89 Fed. Reg. at 33,802, 33,804-05, 33,807. As *Bostock* underscores, discriminating against someone based on their gender identity necessarily constitutes discrimination "on the basis of" the sex that they were assigned at birth. *See Bostock*, 590 U.S. at 660-61 (explaining "transgender status [is] inextricably bound up with sex").

As set forth above, the Department properly applied *Bostock*'s straightforward textual analysis in interpreting the plain language of Title IX's anti-discrimination provision. Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination to be codified at 34 C.F.R. § 106.10 is inconsistent with Title IX or exceeded the Department's authority.[2]

---

[2] For the same reasons, Plaintiffs' arguments that the Rule's recognition of discrimination based on gender identity as a form of sex discrimination is arbitrary and capricious, Pls.' Mem. 47-48, fail as a matter of law. Because recognizing that gender-identity discrimination is a form of sex discrimination flowed from the Supreme Court's textual analysis in *Bostock* and from the text of Title IX, it could not be arbitrary or capricious.

**B. The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts.**

As detailed below, a separate provision of the Final Rule recognizes that Congress has specified exceptions to Title IX's prohibition on sex discrimination, and adheres to the limited scope of those exceptions. The Rule explains that outside the context of those limited exceptions, sex separation may be permissible only so long as it does not amount to sex discrimination (i.e., the Department determined that such sex separation may not be carried out in a manner that imposes more than de minimis harm). The Department further determined that preventing a person from "participating in an education program or activity consistent" with their gender identity causes more than de minimis harm. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). The Rule therefore provides that a recipient may not engage in otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). Plaintiffs assert that this provision is contrary to the statute and arbitrary and capricious. Pls.' Mem. 23-24, 48-51. These arguments fail.

1. Section 106.31(a)(2) Is Consistent with the Statutory Text and Longstanding Regulations.

The Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations have also long recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at 34 C.F.R. § 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. In short, the Rule provides, consistent with Supreme

11

Court precedent, that—except in circumstances where Congress provided otherwise—Title IX prohibits "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." *Id.* at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681); *see Muldrow v. City of St. Louis*, 601 U.S.---, 144 S. Ct. 967, 974 (2024) ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock*, 590 U.S. at 681)).

As compelled by that natural reading of the statutory text, which prohibits "discrimination," 20 U.S.C. § 1681(a), the Department explained that, except in limited contexts,[3] a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury (i.e., more than de minimis harm). 89 Fed. Reg. at 33,814. The Department has long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because such sex-separate facilities generally impose no more than de minimis harm on students. *Id.* at 33,818; *see generally* 34 C.F.R. § 106.33. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in a program or activity consistent with their gender identity *does* cause more than de minimis harm—a conclusion that Plaintiffs do not dispute. *See* 89 Fed. Reg. at 33,818 (citing *Grimm*, 972 F.3d at 617-18; *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045-46 (7th Cir. 2017); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a student from using sex-

---

[3] As stated in proposed § 106.31(a)(2), recipients may carry out sex-separate activities or provide sex-separate facilities in a manner that subjects a person to more than de minimis harm "as permitted by 20 U.S.C. [§] 1681(a)(1) through (9) and the corresponding regulations at [34 C.F.R.] §§ 106.12 through 106.15, 20 U.S.C. [§] 1686 and its corresponding regulation [34 C.F.R.] § 106.32(b)(1), or § 106.41(b)." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2).

separate restrooms consistent with their gender identity causes more than de minimis harm on the basis of sex, *id.* at 33,814, it is prohibited by Title IX.

Plaintiffs argue that there are "real-world effects" that would undermine § 106.31(a)(2)—specifically that the provision "would force ... women and girls to either endure the embarrassment of sharing intimate spaces with biological males or avoid using the restrooms and locker rooms at school altogether." *See* Pls.' Mem. 23-24. But the Department addressed these very concerns, explaining that it "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy." 89 Fed. Reg. at 33,820 (explaining that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity"). Based on the administrative record, the Department reasonably concluded that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* The Final Rule notes, for example, that federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." *Id.* (citing cases).

Thus, contrary to Plaintiffs' argument, Pls.' Mem. 23-24, the de minimis harm provision at § 106.31(a)(2) follows directly from the text and structure of Title IX. It explains how Title IX's prohibition of discrimination—which is premised on a concept of harm—places limitations on the sex-based separate or different treatment permitted in certain contexts by Department regulations. That is, in these contexts, separate or different treatment on the basis of sex is permitted to the extent it does not cause more than de minimis harm. And the Department adequately considered the State Plaintiffs' and Private Plaintiffs' relevant reliance interest on past policies and practices

and ultimately concluded that "the final regulations will not impose substantial new burdens that are not justified by the significant benefits the Department expects from implementation of the final regulations." 89 Fed. Reg. at 33,849.

### 2.    Section 106.31(a)(2) Is Not Arbitrary or Capricious.

Plaintiffs argue that § 106.31(a)(2) is arbitrary and capricious because the Department's explanation is implausible and because the Department overlooked reliance interests. Pls.' Mem. 47, 48-51. Review under the arbitrary and capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The question for the Court is whether the agency's decision "was the product of reasoned decisionmaking," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 52 (1983); "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it *is* better than the alternatives," *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016), *as revised* (Jan. 28, 2016). When an agency changes its position, it must "display awareness that it is changing position." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). This "conscious change of course" will itself indicate that the agency "*believes* [the new policy] to be better," which is all that is required. *Id.* This is not an especially searching analysis—the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one" and an agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* The Department clearly met this standard here.

As discussed above, the Department's reasoning is not "implausible"—it follows from carefully considering the structure and text of Title IX. Nor do Plaintiffs demonstrate that the Department failed to adequately address reliance interests, as Plaintiffs suggest. *See* Pls.' Mem. 48-51. Plaintiffs argue that the Rule fails to take into account that schools built communal restrooms and locker rooms, rather than single-occupant facilities based on their understanding of

Title IX's implementing regulations. Pls.' Mem. 48-49. But nothing in the Rule precludes schools from maintaining multiple-occupancy restrooms or locker rooms. *See, e.g.*, 89 Fed. Reg. at 33,876 ("Compliance with final § 106.31(a)(2) may require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs."). The Department reasonably concluded that there are many ways for a recipient to comply with the Rule and provide nondiscriminatory access to its facilities, short of undertaking significant expenditures. *Id.* at 33,818; 33,820. And it was not unreasonable for the Department to assume that most recipients would not choose to incur construction costs, where they are not required to do so by the Rule. Nor did the Rule impose construction requirements related to nonbinary students: "Section 106.31(a)(2) does not specify how a recipient must provide access to sex-separate facilities for students who do not identify as male or female." *Id*. at 33,818.

And Plaintiffs cannot assert a reliance interest (either of their own or students') in the structuring of athletic teams, Pls.' Mem. 49-50. Nothing in the Rule affects any such reliance interest, or athletic teams more generally. The Rule makes explicit that it *does not* address eligibility standards for sex-separate athletic teams—which is a topic to be covered by an entirely separate rulemaking. *See supra* Background; *see, e.g.*, 89 Fed. Reg. at 33,817 (regarding the separate notice of proposed rulemaking about athletics: "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply").

On the topic of privacy concerns in intimate spaces, Pls.' Mem. 50, the Department considered and addressed these concerns as well, as previously explained. The Department noted that recipients have the option to implement other policies to promote safety and privacy without excluding transgender students. 89 Fed. Reg. at 33,820. And the Department determined, based on its review of the case law and administrative record, that it lacked evidence that transgender

students pose a safety risk to cisgender students, or that simply having a transgender student in a single-sex space compromised privacy interests. *Id.* The Final Rule notes, for example, that federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." *Id.* (citing cases). In sum, the Final Rule's application of the de minimis harm standard to address sex separated education programs or activities, including sex-separate facilities, in § 106.31(a)(2) is supported and logical.

**C.     The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Lawful Exercise of the Department's Statutory Authority.**

1.     <u>Plaintiffs Do Not Dispute that The Department Has the Statutory Authority to Define Hostile Environment Sex-Based Harassment; Plaintiffs Only Take Issue with the Department's Definition As Applied to Harassment Based on Gender Identity.</u>

Plaintiffs are also unlikely to succeed on their claim that the Rule's sex-based harassment definition is unlawful. The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2). The definition in the Final Rule is consistent with "relevant judicial precedent, and . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490. In addition, this language "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the EEOC in the Title VII context, *id.* at 33,516.

This definition also differs in only a few ways from the definition of harassment in the 2020 Amendments that Plaintiffs apparently endorse. Specifically, under the Final Rule, conduct that is either "severe or pervasive" and that "limits or denies" access to the education program or

activity can constitute sex-based harassment when the conduct is both subjectively and objectively offensive. *Compare* 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2), *with* 85 Fed. Reg. at 30,574 (defining harassment to include "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity").

Plaintiffs do not dispute that the Department has the authority to define hostile environment sex-based harassment; that it has the authority to make these specific changes at hand; or that it considered the appropriate factors and weighed them reasonably in doing so. Nor does Plaintiffs' motion take issue with the definition set forth in the Rule as a general matter. Indeed, Plaintiffs' primary objection to the new sex-based harassment definition is *solely* that it applies to harassment based on gender identity. *See* Pls.' Mem. 38 ("In sum, the Final Rule's restriction of speech on "gender-identity" issues is contrary to the First Amendment and violates Plaintiffs' rights."); *see also* Pls.' Mem. 30-42 (describing Plaintiffs' concerns about the harassment definition, which are comprised exclusively of hypotheticals involving gender identity[4]). As a result, even if Plaintiffs' constitutional challenge to the Rule were meritorious (which it is not, *infra*), that would at most mean that some specific applications of the Rule were unconstitutional. It would not somehow render the Rules' entire definition of sex-based harassment unlawful, particularly not on a facial challenge.

---

[4] *E.g.*, Pls.' Mem. 31 (concern about whether "misgendering" would constitute harassment); Pls.' Mem. 32 (concern about whether "us[ing] a classmate's birth name rather than assumed name that corresponds with the classmate's assumed gender" would constitute harassment); Pls.' Mem. 34 (concern about whether speech about "how to treat and understand gender dysphoria, men's participation in women's sports, name and pronoun usage, restroom use, and gender identity generally" would constitute harassment); Pls.' Mem. 34 (concern about whether a student expressing that "as a matter of basic biology, there are only two sexes" would constitute harassment); Pls.' Mem. 40 (concern about whether the Rule would require individuals to "acknowledge, affirm, and validate students' 'gender identities'").

But in fact, Plaintiffs' challenge is wrong because the part of the Rule providing that sex discrimination includes discrimination based on gender identity is located at § 106.10, not in the Rule's separate definition of harassment. And, as explained above, *supra* Part I.A, § 106.10 was compelled by applying the Supreme Court's reasoning in *Bostock* to the plain text of Title IX. In other words, with a correct understanding of *Bostock*, even the definition of hostile environment sexual harassment *in the 2020 Amendments* would encompass harassment based on gender identity, presumably raising the same illusory concerns that Plaintiffs allege here. Under these circumstances, this Court should not credit Plaintiffs' suggestion that the application of gender identity here somehow separately renders the Rule's independently-operating sex-based harassment standard unlawful.

And, in fact, the Rule's definition of sex-based harassment is a lawful exercise of the Department's statutory authority. As noted, the changes regarding "severe or pervasive" and "limits or denies" in the Final Rule are consistent with "relevant judicial precedent, . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." 89 Fed. Reg. at 33,490. This language is also in harmony with past case law on sexual harassment, *id.* at 33,494, and aligns with the definition used by the EEOC, *id.* at 33,516. The Department also reasonably chose to include conduct that "limits or denies" participation in the education program or activity based on the text of Title IX. "If Title IX only covered *exclusion* from participation or denial of access, there would have been no reason for Congress to add 'be denied the benefits of,'" because "be excluded from" would have supplied the necessary standard. *Id.* at 33,511. The "limits or denies" standard in the Final Rule gives effect to every word in the statute without rendering any words redundant or superfluous. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX*

*Transp. N. Lines v. CSX Transp., Inc.*, 522 F.3d 1190, 1195 (11th Cir. 2008) (noting "the rules of statutory construction require courts to give meaning to every word and clause in a statute" and that courts must similarly avoid surplusage).

2.     The Rule Does Not Violate the First Amendment.

Plaintiffs incorrectly argue that the Rule's definition of sex-based harassment violates the First Amendment, relying solely on baseless predictions of how the Rule will apply to discrimination based on gender identity. On the contrary, similar harassment standards have existed in many contexts—for example, in Title IX and Title VII—over a long period of time without raising serious First Amendment issues. Just as it has been possible for schools and the Department—over decades of enforcement—to address discriminatory harassment on other bases such as pregnancy, sex stereotypes, or race, while still respecting First Amendment rights and religious views, so too will schools and the Department be able to address harassment based on gender identity while still respecting First Amendment rights.

Plaintiffs' arguments to the contrary fail for at least four separate reasons: (1) Plaintiffs cannot carry their burden for a pre-enforcement, facial challenge to the Rule; (2) Plaintiffs have no answer for why *this* harassment standard presents First Amendment problems when courts have routinely upheld similar harassment standards—both in Title IX cases before the Final Rule's publication, and in analogous contexts like Title VII; (3) Plaintiffs fail to grapple with the many long-standing precedents about the unique context of *student* speech, especially student speech on-campus; and (4) the Rule specifically notes that the Department will enforce the Rule in a manner that is cognizant of and consistent with First Amendment rights, and the Rule likewise instructs schools not to impinge on any First Amendment rights.

*First,* as a threshold matter, Plaintiffs assert a pre-enforcement facial challenge to the Rule, but do not even try to show that the Rule is "unconstitutional in all of its applications." *Wash. State*

*Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Without Plaintiffs making such a showing, this Court should decline to invalidate the Rule based upon Plaintiffs' hypothetical discussion of a Rule that has not yet been applied or enforced.

*Second*, the Final Rule's standard for hostile environment sex-based harassment tracks similar standards that courts have routinely applied for decades without First Amendment issues. The Department explained, by reference to *Harris*, that "it is clear from the case law that narrowly drawn anti-harassment laws are permissible" and that "the First Amendment allows for proscription of a narrow category of speech that, based on the totality of the circumstances, constitutes hostile environment sex-based harassment." 89 Fed. Reg. at 33,504-05; *see also id.* at 33,494 (discussing *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 352 (8th Cir. 2020), where the court upheld a harassment policy barring speech that "create[d] a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interfere[d] with, limit[ed] or denie[d] the ability of an individual to participate in or benefit from educational programs or activities" because that policy "provide[d] adequate notice of what conduct is prohibited").

These precedents upholding the constitutionality of the longstanding sexual harassment definition undermine Plaintiffs' assertion that the Rule is unconstitutional in *any* of its applications. Plaintiffs hypothesize various ways in which the Rule might be applied to their speech regarding gender identity, and they profess confusion about the Rule's sweep. But these protests ring hollow because Plaintiffs cannot and do not argue that existing anti-harassment laws—both in Title IX, and in analogous statutory contexts like Title VII—would, for example, unconstitutionally chill protected speech. There is no meaningful difference in the application of these anti-harassment standards except that the Rule's also applies to gender identity. And Plaintiffs do not challenge the

ability of school administrators and the Department to resolve these situations without violating any First Amendment rights—so long as gender identity is not at issue. Plaintiffs do not even attempt to articulate a principle whereby anti-harassment laws would be constitutionally permissible except as applied to gender identity.

*Third*, Plaintiffs overlook the applicable cases addressing the First Amendment in education. *See* Pls.' Mem. 30. Different First Amendment doctrines apply in the context of education. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("[T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."); *Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006) (although public employees may speak on matters "of public concern," employers may also limit speech where "necessary . . . to operate efficiently and effectively"). Plaintiffs themselves have recognized this distinction in other contexts, *cf.* Letter from Kris Kobach to University of Kansas (May 2, 2024), https://perma.cc/AZ9S-KF3L (condemning recent protests on campus and "encourag[ing] [the University] to enforce all applicable university rules and regulations so that the educational mission of the University is not disrupted"). The question of whether a government may limit or require expressive conduct or speech of adults in the general population is distinct from the question here. The Department explained this key point in its decision not to reopen the comment period on the Final Rule to address one such case—*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)—"because the decision did not address the education context and would not change the final regulations, which already specify that nothing in these regulations requires a recipient to restrict rights protected under the First Amendment." 89 Fed. Reg. at 33,803. Plaintiffs' cited cases thus do not control whether the Department's definition of hostile environment sex-based

harassment is lawful in the distinct context of the Department's administrative enforcement of Title IX's nondiscrimination mandate in federally funded education programs and activities.

The cases Plaintiffs rely on are also distinguishable for additional reasons. Pls.' Mem. 30. *Janus*, for example, presented the question of "speech subsidies in support of third parties." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908 (2018). *Janus* specifically did not apply *Garcetti*, 547 U.S. 410, and other public-employee-speech cases because *Janus*, "by contrast, involves a blanket requirement that all employees subsidize speech with which they may not agree." *Janus*, 585 U.S. at 907. The question here—not addressed in *Janus*—is the constitutionality of anti-harassment hostile environment standards in the educational context. Neither are Plaintiffs correct to rely on *Kennedy v. Bremerton School District*, 597 U.S. 507, 529-30 (2022). *See* Pls.' Mem. 30. The speech at issue there was a football coach's post-game prayers. Applying *Garcetti* and other cases governing the speech of government employees, the Supreme Court determined that the coach's prayers were "private speech, not government speech." *Kennedy*, 597 U.S. at 529-30. The Court emphasized that the speech was not "ordinarily within the scope" of the coach's duties; the coach "did not speak pursuant to government policy;" and he "was not seeking to convey a government-created message." *Id*. (citing *Lane v. Franks*, 573 U.S. 228, 240 (2014), and contrasting *Garcetti*, 547 U.S. at 421). In *Kennedy*, the Court was not asked—and did not decide—the constitutionality of a hostile-environment sex-based harassment standard in the education context. By contrast, the Supreme Court has routinely allowed schools considerably greater leeway to regulate speech to advance their educational mission, especially on-campus speech. *See* 89 Fed. Reg. at 33,504 (citing *Tinker*, 393 U.S. at 509). Although public employees may speak on matters "of public concern," the government may also limit that speech where "necessary . . . to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419-20. *Accord*

22

*Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (noting a coach may constitutionally be prohibited from "using racial epithets to motivate his players").

*Fourth*, if there were any doubt as to whether the Rule impinged on protected First Amendment rights, the regulations continue to state—as they did in the 2020 Amendments—that "[n]othing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment." 89 Fed. Reg. at 33,503; *see also* 34 C.F.R. § 106.6(d) (unchanged by the Rule). Accordingly, to the extent the application of the harassment standard in a specific context raises First Amendment concerns, "a recipient must formulate, interpret, and apply its regulations in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,505.

In addition to these general flaws, Plaintiffs' specific arguments also fail.

###### i. The Rule Does Not Unlawfully Compel Speech.

Plaintiffs complain the Rule violates their First Amendment right to be free from compelled speech, which prohibits the government from "telling people what they must say." *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.* (*FAIR*), 547 U.S. 47, 61 (2006). This argument is based on a misapprehension of the Rule and the relevant law. Pls' Mem. 30-33.

As an initial matter, simply requiring schools to respond to sex-based harassment that limits or denies a student's ability to access the education program cannot constitute compelled speech in violation of the First Amendment because policies banning harassment have been broadly permissible for decades. As the Rule observes, some courts considering those policies have "treated harassment as a form of conduct, thus leaving it outside the scope of the First Amendment even when the harassment was accomplished through speech." 89 Fed. Reg. at 33,504 (citing cases); *see also id.* at 33,884 ("unwelcome sex-based *conduct*. . ." (emphasis added)). This is a

foundational principle in anti-discrimination laws more generally: discrimination may be prohibited as unlawful conduct even if it takes the form of speech. "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62. This is likewise true even when the harassment at issue may, on occasion, be verbal. "[W]ords can in some circumstances violate laws directed not against speech but against conduct." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992).

Plaintiffs' challenge relies upon exaggerated hypotheticals and speculation about how the harassment standard might be applied. But the Department has repeatedly emphasized that the consideration of any specific incident will be based on the totality of the circumstances, and it is impossible to pre-judge hypotheticals in the abstract. 89 Fed. Reg. at 33,506. This is particularly the case given that, for example, whether a person has been limited or denied access to an education program or activity will depend on the specific circumstances; the same is true of determining whether harassment has been severe or pervasive.[5] That is hardly novel, as whether conduct amounts to prohibited discrimination always involves fact-specific inquiry. And Plaintiffs' fears of unconstitutionally compelled speech are further belied by the Department's express statements

---

[5] Plaintiffs hastily—and erroneously—dismiss the Final Rule's clear statement that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516; Pls.' Mem. 33. Plaintiffs complain that this "stray remark" standard does not sufficiently protect the conduct in which they wish to engage. Pls.' Mem. 33 ("*only* unintentional and accidental 'misgendering' may be protected from the threat of investigation. . ." (emphasis added)). But the Rule does not impose a "stray remark standard." Rather, a stray remark was provided as an example of conduct that would not meet the harassment definition. And, as the Rule makes clear, the many nuanced circumstances other than a "stray remark" that might arise should be addressed on a case-by-case basis consistent with how Title IX and other civil rights laws have operated for decades.

that "[n]othing in the Final [Rule] limits any rights that would otherwise be protected by the First Amendment," *id.* at 33,505, and "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.* at 33,516. Furthermore, the Department explicitly considered that "the First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech" and noted that recipients have "ample other means at their disposal" to address a hostile environment without violating anyone's First Amendment rights. *Id.* at 33,503.

Plaintiffs specifically complain that, to the extent refusing to use a student's pronouns consistent with their gender identity may constitute sex-based harassment, the Rule compels speech. On the contrary, the Rule does not compel any particular speech but rather prohibits *harassment*, consistent with how Title IX has always operated. *See* 89 Fed. Reg. at 33,516. Under the 2020 Amendments, a teacher could not address only female students with pet names (honey, sweetheart) if doing so amounted to harassment that was severe and pervasive, subjectively and objectively offensive, and denied the female students' access to that education program. Prohibiting the use of pet names in these circumstances would constitute a regulation of the teacher's harassing conduct, rather than impermissibly compelled speech. By the same logic, requiring schools to address conduct that meets the definition of sex-based harassment is not compelled speech.

None of the cases Plaintiffs cite on this issue warrants a different conclusion here. *Speech First, Inc. v. Cartwright* involved a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32

F.4th 1110, 1125 (11th Cir. 2022). In contrast to the Final Rule, "[t]he policy, in short, [was] staggeringly broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws." 89 Fed. Reg. at 33,505 (discussing *Speech First*, 32 F.4th 1110). Neither does *Meriwether* support Plaintiffs' claims; that court did not hold that the university's generally-applicable hostile environment definition ran afoul of the First Amendment. *See* 992 F.3d at 498. Rather, the case concerned a particular set of facts and a policy that flatly ordered faculty—on threat of discipline—to "refer to students by their 'preferred pronoun[s].'" *Id.* (citation omitted). By contrast, the Rule here provides a harassment definition that is designed to be applied on a case-by-case basis, based on the specific circumstances at hand, and also makes explicit that any application (and any associated enforcement) must be consistent with the First Amendment. 89 Fed. Reg. at 33,505.

Accordingly, there is no reason to conclude that the Rule would compel speech in violation of the First Amendment.

### ii.    The Rule Is Not Overbroad or Vague.

Plaintiffs next complain that the Rule's definition of hostile environment sex-based harassment is overbroad and vague in violation of the First Amendment. Pls.' Mem. 34-35. They further allege that this vagueness renders the Rule unconstitutional under the Due Process Clause. Pls.' Mem. 41-42. Plaintiffs are unlikely to succeed on the merits of these arguments.

*First*, nothing in the Rule raises overbreadth concerns. In the First Amendment context "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). But courts "have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation,"

*Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) (internal citations omitted); *see also NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 450 (5th Cir. 2022) (citing *Hicks*, 539 U.S. at 119). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1361, 1367 (10th Cir. 2000) ("[T]he overbreadth doctrine is 'not casually employed'" (quoting *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999))). Plaintiffs cannot satisfy this standard.

Indeed, Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment similar to the hostile environment sex-based harassment definition to be codified at 34 C.F.R. § 106.2. That definition is narrow: it "only prohibit[s] conduct that meets all the elements" set forth in the definition and is evaluated based on "the totality of the circumstances . . . to ensure that no element or relevant factual consideration is ignored." 89 Fed. Reg. at 33,506. When evaluated against the "plainly legitimate sweep" of preventing sex-based harassment, the Rule in no way reaches such a substantial proportion of protected speech to justify "the 'strong medicine' of overbreadth invalidation," *Hicks*, 539 U.S. at 119-22 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). At bottom, Plaintiffs' First Amendment arguments boil down to "speculat[ion] about the most extreme hypothetical applications" of the Rule, *NetChoice*, 49 F.4th at 451-52, but "[s]uch whataboutisms further exemplify why it's inappropriate to hold the [Rule] facially unconstitutional in a pre-enforcement posture." *Id.*

The Rule's harassment definition is not overbroad on its face, nor when "judged in relation to the [Rule's] plainly legitimate sweep." *Hicks,* 539 U.S. at 119-20 (citation omitted). The definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively

offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. 89 Fed. Reg. at 33,503. This is wholly consistent with Congress's instruction that the Department issue regulations to ensure no person is, "on the basis of sex. . . subjected to discrimination under any education program," 20 U.S.C. § 1681(a), which nobody disputes is a legitimate purpose. The Supreme Court has upheld Title VII's application to speech under a similar standard "without acknowledging any First Amendment concern." 89 Fed. Reg.. at 33,505 (citing *Harris*, 510 U.S. at 23); *see also Rowles*, 983 F.3d at 352 (finding that an anti-harassment policy based on conduct that was "sufficiently severe or pervasive and objectively offensive that it interfere[d] with, limit[ed] or denie[d] the ability of an individual to participate in or benefit from educational programs or activities" was not unconstitutionally vague or overbroad).

Moreover, Plaintiffs have brought a facial, pre-enforcement challenge to the Rule's definition of hostile environment sex-based harassment, even though its application will necessarily be fact intensive, and no facts yet exist for this Court to examine. As the Department explained, the definition in § 106.2 "requires a contextual consideration of the totality of the circumstances to determine whether harassment impacted a complainant's . . . educational benefits, and only accounts for conduct that is so serious that it implicates a person's access to the recipient's education program or activity." 89 Fed. Reg. at 33,498; *see also id.* at 33,508. It is precisely this approach that protects speech and avoids inappropriate discipline, *contra* Pls.' Mem. 32-33. This Court need not accept Plaintiffs' examples of what would constitute harassment. There is nothing in the Rule to require that students be investigated for exchanging collegial opinions. *Contra* Pls.' Mem. 34. Neither does the Rule "fully contemplate punishing speech" on any topic in particular. Pls.' Mem. 34. To the contrary, the Rule specifically contemplates that any complaint will be reviewed for the totality of the circumstances, 89 Fed. Reg. at 33,506, and in the event that

discipline is imposed, that too must be consistent with due process principles and the First Amendment. 89 Fed. Reg. at 33,500-01.

Finally, Plaintiffs complain about the Rule's clarification that sex stereotyping can constitute sex-based harassment that creates a hostile environment. Pls.' Mem. 34. But, on this point, Plaintiffs misrepresent the definition actually stated in the Rule. *Compare id.*, *with* 89 Fed. Reg. 33,803. The Rule does not, as Plaintiffs assert, define sex-based harassment based on sex stereotypes to include "any speech" related to "any asserted differences between males and females." Pls.' Mem. 34. Rather, "[t]he Department has long recognized, consistent with the text and purpose of the statute and courts' interpretations, that Title IX's prohibition on sex discrimination encompasses harassment based on sex stereotypes." 89 Fed. Reg. at 33,516 (citing 2001 Revised Sexual Harassment Guidance, at 3 (noting that "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping [is] a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program"); *id.* at 33,526 & nn.17-19 (citing cases); 85 Fed. Reg. at 30,179 ("sexual harassment . . . may consist of unwelcome conduct based on sex or sex stereotyping.")). In fact, the conclusion that sex stereotyping can, in some circumstances, be unlawful discrimination on the basis of sex was articulated by the Supreme Court in 1989 and has been a cornerstone of Title VII anti-discrimination law since. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989); 89 Fed. Reg. at 33,803.

For all of these same reasons, including that courts have historically upheld similar harassment policies against vagueness challenges, the Rule is not unconstitutionally vague. Plaintiffs argue that the Department should have defined "gender," Pls.' Mem. 41, but the Department explained that its discussion of the meaning of "gender identity" is in line with that

used by multiple courts. 89 Fed. Reg. at 33,809 (collecting cases). Plaintiffs assert that the Rule "adds a 'subjective' component to the definition of harassment," Pls.' Mem. 41, but that is misleading—the definition in the rule requires that proscribed conduct be "subjectively *and objectively offensive*," in addition to other requirements. This plainly means that conduct that was only subjectively, but not objectively offensive, would not be covered, 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2). It is unclear what Plaintiffs mean by asserting that the Rule's definition "permits a complainant to support his or her complaint without identifying a particular harm suffered," Pls.' Mem. 41, given that the Rule's definition states that conduct is only harassment if it "is so severe or pervasive *that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity*," 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2) (emphasis added).

Accordingly, the Rule's definition of hostile-environment sex-based harassment is not overbroad or vague, but instead tracks familiar standards used previously in Title IX and in analogous contexts, like Title VII's sex-based harassment definition.

> ### iii. Anti-Harassment Provisions, like the Final Rule's, Do Not Impermissibly Regulate Speech Based on Content or Viewpoint and Are Not Subject to Strict Scrutiny.

Contrary to Plaintiffs' assertions, Pls.' Mem. 35-40, the Rule's harassment standard regulates discriminatory conduct that creates a hostile environment—not speech alone—and is in any event both content- and viewpoint- neutral.[6] But, even if the Rule were somehow subject to

---

[6] As the Rule makes clear, its definition of hostile environment sex-based harassment is directed to "[u]nwelcome sex-based conduct." 89 Fed. Reg. at 33,884. And, as the Rule has observed, some courts have treated harassment as conduct, not speech, and thus outside the First Amendment. *Id.* at 33,504.

In the event that any potentially harassing speech does not rise to the level of conduct, the Department has specified that "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id*. at 33,516.

strict scrutiny, that standard would be satisfied because the Rule is narrowly tailored to the government's compelling interest in ensuring that its recipients provide educational programs free from discrimination. The definition of sex-based harassment is directed to "unwelcome, sex-based conduct" which is so severe or pervasive as to limit or deny a person access to an education program or activity. It is not true, as Plaintiffs suggest, that "*any* examination of speech or expression inherently triggers heightened First Amendment concern. Rather, it is regulations that discriminate based on 'the topic discussed or the idea or message expressed' that are content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022) (quoting and distinguishing *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)). The Rule does not so discriminate.

In any event, the Rule's harassment definition survives scrutiny at any level. Plaintiffs argue that the Department does not have a compelling interest in eliminating discrimination. *See* Pls.' Mem. 39. This is incorrect. *See, e.g.*, 89 Fed. Reg. at 33,503 ("[T]he government's compelling interest in preventing discrimination is well established. *See, e.g.*, *Saxe* [*v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001)] ('preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest' (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987)))"). The Supreme Court has specifically recognized the government's "compelling interest in eradicating discrimination" on the basis of sex. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984) (explaining that the goal of eliminating sex discrimination and assuring equal access to publicly available goods and services is "unrelated to the suppression of expression" and "plainly serves compelling state interests of the highest order"). And when the government has a compelling interest in combating discrimination, this balances against professed First Amendment interests. *See Roberts*, 468 U.S. at 623; *Rotary*

31

*Int'l*, 481 U.S. at 549. Plaintiffs are thus incorrect to argue the Department has no compelling interest in eliminating discrimination in education.

Furthermore, the Rule's "definition of hostile environment sex-based harassment is narrowly tailored" to advance that compelling interest "because it requires that the harassment have the actual effect of limiting or denying a person's ability to participate in or benefit from a recipient's education program or activity." 89 Fed. Reg. at 33,504; *see also id.* at 33,505 ("[T]he Department has narrowly tailored the definition of hostile environment sex-based harassment to advance a compelling government interest unrelated to the suppression of speech."); *cf. id.* at 33,503 (the Department "revised the definition to retain the 2020 amendments' reference to offensiveness" in light of commenter concerns about the First Amendment).

Plaintiffs argue that the Department should have maintained the harassment standard from the 2020 Amendments, which mirrors the standard used for private lawsuits in *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633 (1999). Pls.' Mem. 37. As an initial matter, maintaining the *Davis* standard would not address Plaintiffs' concerns about gender identity, because, with a correct understanding of *Bostock*, harassment based on gender identity could certainly be sufficiently "severe and pervasive" so as to "deny" a person access to an educational program, which would be barred under the *Davis* standard as well. Furthermore, the Department was in no way *required* to maintain the *Davis* standard. The Supreme Court in *Davis* was crafting a standard for a private right of damages, not for the Department's own enforcement action, and the Court understood that the two standards would be different. *See Davis*, 526 U.S. at 639 ("[W]e are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether [the facts] can support a private suit for money damages."). The Department reasonably concluded that the definition in the Rule would better effectuate Title IX's

nondiscrimination mandate and provide clarity to recipients. *E.g.*, 89 Fed. Reg. at 33,491. And as to the "limits or denies" requirement, the Department explained including both "limits" and "denies" is required by the text of Title IX, which states "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681—a standard that covered only harassment resulting in total exclusion would render the statutory phrase "be denied the benefits of" surplusage. 89 Fed. Reg. at 33,511.

Finally, Plaintiffs' argument fails to confront the reality, discussed above, that students' speech is necessarily regulated, and certainly more regulated than the speech of adults in the general public engaged in expressive activities. "[C]onduct by the student, in class or out of it, which for any reason . . . materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513. *See supra*, Part I.C.2 (discussing *Tinker* and *Garcetti*); *see also generally Garcetti*, 547 U.S. 410 (as public employees, teachers also have more constrained First Amendment rights than the general public).

Because the Rule regulates conduct, not speech—and would satisfy strict scrutiny in any event—Plaintiffs are not likely to succeed on the merits of their challenge.

3.  The Rule's Definition of Harassment Also Does Not Violate RFRA, Although Plaintiffs Also Lack Standing to Bring a RFRA Challenge.

The Rule makes explicit that the Department "interprets and applies its regulations consistent with RFRA and Title IX's exemption for educational institutions controlled by religious organizations." 89 Fed. Reg. at 33,822. Yet, despite this express commitment to enforce Title IX and the Rule consistent with RFRA, Plaintiffs argue that the harassment definition violates RFRA, Pls.' Mem. 25-28, based on asserted fears that it will "compel[] religious students to use inaccurate

pronouns against their beliefs and prohibit[] them from sharing their religious views on issues related to gender identity." Pls.' Mem. 25. Plaintiffs lack standing to make this claim and, in any event, it also fails on the merits.

> i.   As an initial matter, Plaintiffs' lack standing to bring a RFRA challenge, and any challenge is unripe.

"Federal courts do not possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Rather, "[t]he Constitution gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 593 U.S. 659, 668 (2021) (quoting U.S. Const. art. III, § 2). The limits governing this exercise of judicial power are "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was" unlawful. *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

In the specific context of pre-enforcement review, Plaintiffs "must show that the likelihood of future enforcement is substantial." *California v. Texas*, 593 U.S. at 670 (citation omitted). Plaintiffs have not met that high bar here. For Plaintiff's RFRA theory to come to pass, a student or teacher would have to, for example, express a view on an issue related to gender identity rooted in their religious beliefs, a school would have to consider that to be harassment as defined by the Rule, and the school would have to take disciplinary action against the student or teacher.[7] The Supreme Court has routinely rejected such theories of injury that "rel[y] on a highly attenuated chain of possibilities[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Summers v.*

---

[7] To be clear, it is schools, not the Department, that would typically take action against a student or teacher based on an alleged violation of that school's harassment standard. The Department has an oversight role with regard to schools' implementation of Title IX; the Department does not directly bring disciplinary proceedings against any individual students or teachers. And when the Department "evaluates a recipient's compliance with Title IX," it "considers RFRA's requirements." 89 Fed. Reg. at 33,823.

*Earth Island Inst.*, 555 U.S. 488, 496 (2009); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990).

Even if Plaintiffs can overcome the above standing deficiencies, their claims still are not prudentially ripe. The ripeness doctrine serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 807-08 (2003)). Courts evaluate ripeness by considering "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)).

Given the Rule's express instruction to schools to consider the First Amendment and the Department's commitment to compliance with RFRA in its enforcement, there is no reason to expect enforcement against individuals in the way Plaintiffs fear. And the Court lacks any specific facts to evaluate Plaintiffs' RFRA concern—yet RFRA is a particularly fact-specific area. The Supreme Court has made clear that RFRA "contemplate[s] an inquiry more focused than [a] categorical approach." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006). Where it applies, "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 430-31 (quoting 42 U.S.C. § 2000bb–1(b)). The circumstances would also determine whether any application of the harassment standard was the least restrictive means of achieving the particular government interest being asserted. This need for case-specific evaluation demonstrates that the RFRA issues raised by Plaintiffs are not fit for decision in the absence of a particular factual context.

ii.     *Plaintiffs' RFRA Challenge Would Also Fail on the Merits.*

If the Court were to reach Plaintiffs' RFRA argument, it would still fail because the Department considered religious liberty in crafting the Rule, and specifically noted that the RFRA could affect application of the requirements of the Rule in appropriate circumstances, disproving Plaintiffs' claim that "the Final Rule provides no exceptions for sincerely held religious beliefs," Pls.' Mem. 27.[8] *Cf. Bostock*, 590 U.S. at 682 (describing RFRA as "a kind of super statute, displacing the normal operation of other federal laws").

At several points the Rule recognizes the need to harmonize its application with principles of religious liberty enshrined in federal law. *E.g.*, 89 Fed. Reg. at 33,823 ("The Department is committed to enforcing Title IX consistent with all applicable free speech and religious liberty protections."); *id.* at 33,822 ("[N]othing in these regulations requires a recipient to restrict rights protected under the First Amendment or any other rights guaranteed against government action under the U.S. Constitution. The Department likewise interprets and applies its regulations consistent with RFRA and Title IX's exemption for educational institutions controlled by religious organizations."). The Department specifically affirmed that it will comply with RFRA, and that "OCR [the Department's Office for Civil Rights] considers RFRA's requirements when it evaluates a recipient's compliance with Title IX." *id.* at 33,823. Because the RFRA analysis is highly fact-specific, this analysis will be particular to each set of facts and cannot be pre-judged or applied to broad hypotheticals. *See id.* ("The Department cannot opine on how RFRA might be applied in particular situations, including in hypotheticals suggested by commenters, because

---

[8] Although this fact is not at issue in this case, Title IX also provides a religious exemption to "educational institution[s] which [are] controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). The Department has implemented that exemption through regulations, *see* 34 C.F.R. § 106.12, which are not changed by the Rule. 89 Fed. Reg. at 33,836-38.

determinations about whether the application of Title IX in a particular context substantially burdens a person's exercise of religion would necessarily depend on the circumstances at hand."); *see also Gonzales*, 546 U.S. at 431 (RFRA cases involve "look[ing] beyond broadly formulated interests justifying the general applicability of government mandates and scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants"). In other words, the Department has recognized that the Rule may raise religion-related concerns and has committed to evaluating such issues on a case-by-case basis as they arise. (Nor must this Court accept Plaintiffs' examples of what would constitute harassment, given that the Rule explains that any complaint will be reviewed for the totality of the circumstances. 89 Fed. Reg. at 33,506.)

Plaintiffs entirely ignore the Rule's discussion of RFRA, and fail to articulate any reason why this case-by-case adjudication of RFRA defenses described in the Rule itself violates RFRA. Plaintiffs assert that the Department should have applied the categorical exemption for religious institutions "to individuals at non-religious educational institutes that also hold such beliefs," Pls.' Mem. 28, but Congress specifically drafted that exemption to apply to educational institutions, not individuals, *see* 20 U.S.C. § 1681(a)(3) (addressing "Educational institutions of religious organizations with contrary religious tenets"), and of course many relevant considerations will differ between an educational institution controlled by a religious organization with tenets inconsistent with Title IX and individuals, and the Department has an interest in ensuring the protections of the nondiscrimination mandate consistently and broadly, unless they conflict with religious-liberty principles. Plaintiffs offer no reason why the Rule's case-by-case approach will not address Plaintiffs' religious liberty concerns and be in harmony with the fact-specific nature of a RFRA analysis. *See Gonzales*, 546 U.S. at 430-31 ("RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law

'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." (citing 42 U.S.C. § 2000bb–1(b))); *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir. 2014) (noting in analyzing the analogous Religious Land Use and Institutionalized Persons Act that "we must examine both sides of the ledger on the same case-specific level of generality: asking whether the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case"). Indeed, RFRA itself recognizes that sometimes the statute may need to be asserted "as a . . . defense in a judicial proceeding." 42 U.S.C. § 2000bb-1(c).

### D.  The Final Rule Does Not Violate 20 U.S.C. § 1688.

Plaintiffs argue that the Rule is contrary to 20 U.S.C. § 1688, which provides that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." That argument lacks merit.

In promulgating the Final Rule, the Department specifically recognized the application of Section 1688, and stated that "[c]onsistent with [the limitation in 20 U.S.C. § 1688], these final regulations prevent recipients from being required to provide or pay for benefits or services related to, or use facilities for, abortions[.]" 89 Fed. Reg. at 33,757. As such, the Final Rule does not regulate—much less require—the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. Rather, the Rule merely protects students, applicants, and employees who are experiencing pregnancy or related conditions, including abortion, from discrimination in education programs. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.40(b)) ("A recipient must not discriminate in its education program or activity against any student based on the student's current, potential, or past pregnancy or related conditions."); *see also id.* (to be codified at 34 C.F.R. § 106.21(c)(2)(ii)); *id.* at 33,896 (to be codified at 34 C.F.R.

§ 106.57(b)).

This protection is not novel; rather, Title IX regulations have prohibited discrimination on the basis of "termination of pregnancy" since 1975. *Compare* Department of Health, Education, & Welfare, General Administration, 40 Fed. Reg. 24,128 (1975) (codified at 45 C.F.R. § 86.21(c)(2) (prohibiting discrimination in admissions based on "termination of pregnancy or recovery therefrom"), 45 C.F.R. § 86.40(b)(1) (providing that a "recipient shall not discriminate against any student, or exclude any student from its education program or activity" based on "termination of pregnancy or recovery therefrom"), *id.* § 86.57(b) ("A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of . . . termination of pregnancy, or recovery therefrom."); *with* 34 C.F.R. § 106.21(c) (prohibiting discrimination in admissions based on "termination of pregnancy, or recovery therefrom"), *id.* § 106.40(b)(1) (prohibiting a recipient from discriminating "against any student, or exclud[ing] any student from its education program or activity" based on "termination of pregnancy, or recovery therefrom"), *id.* § 106.57(b) (recipients may not discriminate against or exclude a person from employment based on "termination of pregnancy, or recovery therefrom") (current). In other words, the Rule does not add abortion to the scope of Title IX's protections against discrimination because it has already been covered for decades without issue. At most, the Rule merely confirms these long-standing protections and adds clarity by revising the definition of prohibited sex discrimination to state explicitly that discrimination on the basis of "pregnancy or related conditions" includes discrimination on the basis of "termination of pregnancy." 34 C.F.R. § 106.2.

For these same reasons, Plaintiffs err in arguing that the Rule is unlawful because it "has the effect of effectively preempting state law on abortion," Pls.' Mem. 24. As explained above, the

Final Rule does not regulate the provision of abortion or affect the circumstances under which an abortion should be permitted; therefore, it has no effect on Utah's (or any state's) laws prohibiting abortion.

Finally, to the extent Plaintiffs claim that the Rule is invalid because it does not allow recipients to discriminate against a student who obtained a legal abortion, Pls.' Mot. 25, they are wrong. Title IX itself prohibits a recipient from discriminating based on sex, 20 U.S.C. 1681, and cautions against an interpretation of Section 1688 that would permit penalizing a student because the student "is seeking or has received any benefit or service related to a legal abortion," *id.* § 1688. The prohibition against discrimination on this basis is a function of the statute and not the challenged Rule. Plaintiffs' claimed injury is therefore neither traceable to the Rule nor redressable through this lawsuit. Moreover, because determining whether a recipient's action constitutes a penalty related to a legal abortion is inherently fact-specific, it would reasonably need to be addressed on a case-by-case basis. 89 Fed. Reg. at 33,758.

E.    **The Final Rule's Delineation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause or Supremacy Clause Issue.**

Plaintiffs are also incorrect in contending that the Final Rule violates the Spending Clause. *See* Pls.' Mem. 42-44. The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions, *inter alia*, (1) are "unambiguous[]," (2) relate "to the federal interest" in the project, and (3) are consistent with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987) (citation omitted). The focus of a Spending Clause inquiry is typically on a *statute*, not an implementing regulation, because the Spending Clause limits *Congress's* authority to condition federal funds. Title IX has long been held to be consistent with the Spending Clause. *Davis*, 526 U.S. at 640. Here, however, Plaintiffs argue that if the Rule effectuates Title IX, then the Rule's alleged

infirmities would render it or Title IX invalid under the Spending Clause. Pls.' Mem. 42-45. This theory largely restates Plaintiffs' other merits arguments, and is likewise wrong.

First, there is no issue with ambiguity of Title IX's provisions. The requirement of unambiguity requires that Congress "make the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation omitted). Indeed, "so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Id.* at 1306.

Here, this standard is met because the relevant provision in the Final Rule merely delineates the scope of Title IX's unambiguous prohibition on sex discrimination, based on the plain meaning of the statutory language. *See* 89 Fed. Reg. at 33,802. Title IX unambiguously prohibits any form of sex-based discrimination not specifically excepted by statute. *See* 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be excluded from . . . ."). Because it is "impossible" to discriminate against a person for being transgender "without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, Title IX's prohibition on sex-based discrimination necessarily includes discrimination because of gender identity. Plaintiffs in essence argue that certain obligations imposed by the Rule are not ones they expected, Pls.' Mem. 43, but Plaintiffs were on notice that they were barred from discriminating based on sex, and "the fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up); *see also id.* at 688 (Alito, J., dissenting) ("According to the Court, the text is unambiguous."). Indeed, in 2005, the Supreme Court rejected an analogous argument that Title IX did not cover retaliation because it was not specifically mentioned in the statute,

concluding that specific forms of discrimination not mentioned in the statute—such as retaliation—were nonetheless discrimination. *Jackson*, 544 U.S. at 175; *see also id.* ("Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.").

Plaintiffs also criticize the Rule for being "mercurial" and "difficult for a state official to comply" with. Pls.' Mem. 43. But the Department has addressed each of the topics identified by Plaintiffs, and provided guidance on them; that this guidance may not be exhaustive does not give rise to a Spending Clause violation. *Cf. Jackson*, 544 U.S. at 175 (concluding Title IX prohibited retaliation despite lack of an affirmative mention of retaliation). Specifically, Plaintiffs assert that schools may have difficulty ascertaining a student's gender identity, Pls.' Mem. 44, but the Department provided guidance specifically on this topic. *See* 89 Fed. Reg. at 33,819 (noting that "many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher" and contrasting that with practices "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements," which would not be permissible because those practices "impose[] more than de minimis harm").

Plaintiffs' remaining Spending Clause theories—that the Rule is contrary to federal interests and is otherwise unconstitutional, Pls.' Mem. 44-45—restate their other merits arguments. For the same reasons that the Rule is consistent with Title IX and the First Amendment, there also is no Spending Clause violation on these bases. Plaintiffs argue that "[i]f the Final Rule takes effect, women and girls' sports will be will be [sic] effectively destroyed over time," Pls.' Mem. 44, but as explained, the Rule has no effect on the regulation governing sex-separate athletic teams.

*See supra* Background. It is unclear what Plaintiffs mean by arguing that "[b]iological females will be denied the schooling opportunities that Title IX funds were intended to create," Pls.' Mem. 44, but in any event the Rule was designed "to fulfill Title IX's protection for students, teachers, and other employees in federally funded [schools] against all forms of sex discrimination, including sex-based harassment and sexual violence." 89 Fed. Reg. at 33,476. And while Plaintiffs argue that "biological females will be placed in unsafe and invasive situations at schools and universities," Pls.' Mem. 44, the Department, while agreeing that schools should provide privacy and safety for all students, does not agree that the mere presence of a transgender student in a single-sex space presents privacy concerns, or that transgender students pose a safety risk to cisgender students, 89 Fed. Reg. at 33,820. This position is consistent with the holding of other courts. *See, e.g.*, *Parents for Priv. v. Barr*, 949 F.3d 1210, 1225 (9th Cir. 2020) (rejecting the assertion that there exists a "right to privacy that protects against any risk of bodily exposure to a transgender student in school facilities").

Defendants have already explained why Plaintiffs' contention that the Rule violates free speech or religious liberty rights is incorrect, *supra* Part I.C, and for the same reasons the Rule is not unconstitutional, particularly where Plaintiffs' hypothetical examples of conduct that they believe would be barred by the harassment definition are too speculative to be resolved in the abstract.

Similarly, Plaintiffs' argument that the Rule goes beyond Congress's authorization to the Department in recognizing that discrimination based on gender identity is a form of sex-based discrimination, Pls.' Mem. 45-46, is incorrect because the Department is simply implementing the plain text of Title IX. *See supra* Part I.A.

### F.    The Rule Does Not Violate the Major Questions Doctrine.

Contrary to Plaintiffs' assertions, this case does not implicate the major questions doctrine.

*See* Pls.' Mem. 28-30. That doctrine is reserved for only "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). This is not such a case. The Department does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity. Instead, as the Supreme Court explained was the case in *Bostock*, the relevant portions of the rule reflect "policy decisions" made by "Congress . . . itself" in the unambiguous text of the statute. *Id.* at 723. Accordingly, just as the Supreme Court did not invoke the major questions doctrine when it endorsed the EEOC's interpretation of Title VII in *Bostock*, there is no basis for invoking it here.

## II.    Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. To justify a preliminary injunction, a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)). As such, "[m]erely serious or substantial harm" is not sufficient to show that the harm is irreparable. *Id.* (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).

*First*, Plaintiffs claim that the States will suffer irreparable harm in the form of unrecoverable compliance costs in the lead up to the Final Rule's effective date of August 1, 2024. Specifically, Plaintiffs allege that the States will need to incur compliance costs to reconfigure facilities and sex-separate athletic teams. Pls.' Mem. 48-49. But, as explained above, the Rule does not require recipients to construct or re-configure sex-separate facilities such as bathrooms and

locker rooms, *see supra* Part I.B.2, nor does the Rule impact sex-separate athletic teams, *see supra* Background. Needless to say, the States will not suffer irreparable harm as a result of costs associated with actions they need not take in response to the Rule.

States also allege compliance costs related to "(1) updat[ing] their training materials, (2) hir[ing] additional Title IX coordinators, and (3) updat[ing] their handouts on Title IX." Pls.' Mem. 51. But these allegations point to nothing more than routine and standard costs associated with compliance with any new federal regulation. Thus, at most, these allegations state the obvious: a new regulation will likely require regulated parties to undertake *some* activities to assure compliance. Such assertions do not justify the extraordinary relief in the form of a preliminary injunction. *See Prairie Band*, 253 F.3d at 1250 (explaining that irreparable harm must be at least "serious or substantial").

*Second*, Plaintiffs argue that the Rule imposes irreparable harms by "preempting their laws." Pls.' Mem. 52. To support their claim, Plaintiffs cite to *Kansas v. United States* (*Kansas II*), 249 F.3d 1213, 1227 (10th Cir. 2001). But *Kansas II* did not pertain to preemption; rather, the case concerned whether the State of Kansas could challenge an administrative decision by the National Indian Gaming Commission in federal court. In the context of preemption, however, "it is black-letter law that the federal government does not 'invade[ ]' areas of state sovereignty 'simply because it exercises its authority' in a way that preempts conflicting state laws." *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981)). "Indeed, to conclude otherwise would mean that a state would suffer irreparable injury from all law federal laws with preemptive effect." *Florida*, 19 F.4th at 1292. Accordingly, regardless of whether the Rule preempts any States' laws, it is the federal government, not the States, that faces significant irreparable harm, if

45

it is prevented from administering the Rule. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (reasoning that if the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

Finally, the States claim that they will suffer irreparable harm by being "forced to violate the constitutional rights of their students and staff or risk losing federal funding." Pls.' Mem. 52. Similarly, the non-state Plaintiffs claim that the Rule will cause irreparable harm by violating their First Amendment rights, infringing on their rights "of not being required to share intimate spaces or be unclothed in front of the opposite sex," Pls.' Mem. 53, violating their "religious beliefs," Pls.' Mem. 54, and forcing them to "compete against males in women's sports," Pls.' Mem. 54.[9] Plaintiffs, however, fail to show how any of these alleged harms are "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier*, 427 F.3d at 1267 (quoting *Heideman*, 348 F.3d at 1189). Indeed, Plaintiffs' allegations are based on a series of speculative and conclusory statements. *See, e.g.*, Lochner Decl. ¶ 14, ECF No. 25-16 (speculating that "K.L. *may* encounter a biological male who identifies as transgender while she is changing in the women's locker room" (emphasis added)); A.B.S. Decl. ¶ 41, ECF No. 25-6 ("I also do not use the shower for fear that a male *could* come into the restroom." (emphasis added)). As the Tenth Circuit has clearly expressed, "[p]urely speculative harm will not suffice, but rather, '[a] plaintiff who can show a *significant* risk of irreparable harm has demonstrated that the harm is not speculative.'" *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (emphasis

---

[9] As explained above, *see supra* Background, the Rule does not address athletics. The Title IX regulation governing sex-separate athletics remains what it was before the Rule was issued. Any claim of harm from the participation of transgender individuals in sex-separate athletics is therefore irrelevant here.

added) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). At most, Plaintiffs have alleged a mere possibility of the future harms they fear. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy." *Winter,* 555 U.S. at 22.

### III.     The Equities and Public Interest Weigh Against Preliminary Relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, these combined factors strongly counsel against issuing the requested preliminary relief. The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities.

Moreover, Title IX mandates that "[n]o person" be subjected to sex discrimination in any education program or activity. Granting preliminary relief would significantly harm the Government's interests in preventing such discrimination. Sex discrimination in educational environments has devastating consequences, including the effects of harassment based on sexual orientation and gender identity. *See, e.g.*, 89 Fed. Reg. at 33,478-80 (summarizing personal stories submitted by commenters). The Final Rule therefore, effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *Roberts*, 468 U.S. at 623-24.

Conversely, Plaintiffs have failed to show they face significant imminent and irreparable harm. *See supra* Part II. As explained above, any injury to Plaintiffs' purported constitutional

injuries is speculative and far from imminent. *See id.* Thus, at most, Plaintiffs identify standard compliance costs. *See id.* But regardless, compelling non-monetary government interests measure up against even serious economic harm. *See, e.g.*, *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021) (allowing the state government's restrictions with respect to the operations of bars in response to COVID-19 despite financial harms to the bars); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (unpublished) (weighing Plaintiffs' "very real risk of losing their businesses" against "the Governor's interest in combatting COVID-19").

 In sum, the balance of the equities and the public interest weigh in favor of denying the requests for a preliminary injunction.

## IV. Any Relief Afforded by the Court Should Be Limited in Accordance with the Administrative Procedure Act and Equitable Principles.

 While Defendants dispute that any relief is warranted for the reasons explained above, any relief afforded must be appropriately limited. The Court should disregard Plaintiffs' contrary argument based on the fact that otherwise the government will "unlawfully forgiv[e] hundreds of billions in loans pending a decision on merits," Pls.' Mem. 55, because it is irrelevant to the facts of this case.

 The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success. The Court should further decline to conflate the Rule's provisions as Plaintiffs have. Plaintiffs cite an out-of-circuit case in support of its argument that the Rule should be "vacated," Pls.' Mem. 55, but the better view is that the APA does not authorize any specific remedies, including vacatur—remedies are addressed in § 703 of the APA, which says nothing about "set aside" but refers to the existing forms of relief. *Cf. United States v. Texas*, 599 U.S. 670, 693-99

(2023) (Gorsuch, J., concurring in the judgment).

Here, if any preliminary relief were appropriate, it should be limited to the states of Kansas, Utah, Alaska, and Wyoming, and perhaps K.R.'s school. While Plaintiffs claim harms to the organization Female Athletes United, as discussed, *supra* Background, the Rule does not make changes to the athletics regulations, and thus they are not injured. Furthermore, Plaintiffs have chosen not to put any evidence in the record indicating whether any members of Female Athletes United attend school outside of the plaintiff-States. *Cf.* T.P. Decl., ECF No. 25-8 (in Wyoming); Zwahlen Decl., ECF No. 25-9 (in Utah). As to the organization Moms for Liberty, their members are apparently parents, and Plaintiffs do not describe them as either students or teachers. It is thus not clear how the Rule would affect *their own* speech rights. *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("generally" a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). As to the organization Young America's Foundation, it is unclear if any of the speech they wish to engage in would be barred under the Rule, which is fact-specific. Furthermore, Plaintiffs have chosen not to put any evidence in the record indicating whether any members of Young America's Foundation attend school outside of the plaintiff-States. *Cf.* Flynn Decl., ECF No. 25-10 (in Utah); Adcock Decl., ECF No. 25-11 (in Kansas);Verdeyen Decl., ECF No. 25-14 (in Wyoming); T.Z. Decl., ECF No. 25-17 (in Utah).

In any event, relief should be limited by traditional equitable principles, including that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *cf., e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (2023). "At a minimum, a district court should think twice—and perhaps twice again—before granting

universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395-96 (6th Cir. 2022) (Sutton, C.J., concurring).

Plaintiffs also state without explanation that "[t]he Final Rule should be stayed across the country while the Court examines the legality of Defendants' actions." Pls.' Mem. 55. Whether Plaintiffs refer to a § 705 stay or some other type of stay, either would raise all the same problems as a nationwide injunction if it applied universally to parties not before the Court. *See DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay). Furthermore, like other APA provisions, section 705 "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Government has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under section 705 "would normally, if not always, be limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. at 277 (1946). And even if Section 705 did authorize universal preliminary relief, such an "extraordinary remedy" that applied to non-parties should at minimum "demand truly extraordinary circumstances to justify it." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring in the judgment).

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful." (citation omitted)). Plaintiffs have challenged only certain portions of the Rule; the remainder should be permitted to go into effect, as intended, on August 1, 2024. As the Supreme Court explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N.*

*New England*, 546 U.S. 320, 328-29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.


Dated: June 13, 2024                                 Respectfully submitted,

                                                     BRIAN M. BOYNTON
                                                     Principal Deputy Assistant Attorney General

                                                     EMILY B. NESTLER
                                                     Assistant Branch Director

                                                     */s/ Rebecca Kopplin*
                                                     REBECCA KOPPLIN
                                                     Cal. Bar 313970
                                                     ELIZABETH TULIS
                                                     BENJAMIN TAKEMOTO
                                                     HANNAH SOLOMON-STRAUSS
                                                     PARDIS GHEIBI
                                                     Trial Attorneys
                                                     United States Department of Justice
                                                     Civil Division, Federal Programs Branch
                                                     1100 L Street NW
                                                     Washington, DC 20005
                                                     Phone: 202-514-3953
                                                     Email: Rebecca.M.Kopplin@usdoj.gov

                                                     *Counsel for Defendants*