IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 5:24-cv-04041-JWB- |
| UNITED STATES DEPARTMENT OF | § | ADM |
| EDUCATION, *ET AL.* | § | |
| | § | |
| Defendants. | § | |

**REPLY IN SUPPORT OF PLANTIFFS' MOTION FOR A STAY/PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iii

INTRODUCTION...................................................................................................................1

ARGUMENT............................................................................................................................1

   A.   Plaintiffs are Likely to Succeed on the Merits ..................................................1

   1.   This is a Major Questions Doctrine Case ....................................................... 2

      a.   *Bostock* Does not Provide Clear Authorization for the Final Rule.......................... 3

      b.   The Final Rule is Contrary to the Plain Text of Title IX .................................... 5

      c.   The Final Rule Regulates Athletics in Contradiction to Title IX ....................... 6

      d.   The Final Rule is Contrary to Section 1688 of Title IX ...................................... 8

      e.   The Final Rule is Contrary to RFRA ............................................................... 9

   2.   The Final Rule is Unconstitutional ...............................................................15

      a.   The Final Rule Violates the Spending Clause..............................................15

      b.   The Final Rule Violates the First Amendment, Fifth, and Fourteenth Amendments.18

   3.   The Final Rule is Arbitrary and Capricious ................................................ 25

      a.   The Final Rule is Supported by an Implausible Explanation............................ 25

      b.   The Final Rule is a Sharp Departure from Past Practice ............................... 26

      c.   The Final Rule Ignores Reliance Interests ..................................................... 27

   B.   The Plaintiffs will be Irreparably Harmed .....................................................29

   1.   Plaintiff States will be Irreparably Harmed ..................................................29

   2.   Private Plaintiffs will be Irreparably Harmed ............................................... 31

   C.   The balance of harms and public interest favors Plaintiffs ........................... 32

   D.   Relief Should Not Be Limited to the Parties .................................................. 32

CONCLUSION .................................................................................................................... 35

## TABLE OF AUTHORITIES

### Cases

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)...........................................................22

*303 Creative LLC v. Elenis*, 600 U.S. 570, (2023) ........................................................... 17, 26, 28

*303 Creative, LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021), *overruled on other grounds at* 600 U.S. 570

    (2023) ..................................................................................................................................... 14

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)..........................................18

*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1283 (10th Cir. 2004) ...............................................22, 24

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) .............................................22, 24

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ..................................................................22

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................14

*Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036 (10th Cir. 2014) ........................................11

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)................................................................... 2, 4, 5

Braidwood Management, Inc. v. EEOC, 70 F.4th 914 (5th Cir. 2023) .........................................15, 17

*Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890 (Ariz. 2019) ............................................29

*Campbell v. Galeno Chem. Co.*, 281 U.S. 599 (1930) ..................................................................9

*Christian Employers All.* v. EEOC, No. 1:21-cv-195, 2022 WL 1573689 (D.N.D. May 16, 2022) ..........16

citation to *Florida v. Department of Health & Human Services*, 19 F.4th 1271 (11th Cir. 2021)................. 35

*City of Chi. v. Morales*, 527 U.S. 41 (1999)..............................................................................25

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) ..............................................................24

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) ...........................18

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ................................................................14

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012).........................................................27

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1263 (10th Cir. 2024).....................10

*Easyriders Freedom F.I.G.H.T v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ................................................. 39, 40

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................................... 36

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192 (10th Cir. 2005) .......................................................... 23

*FCC v. Fox Television Stations*, 556 U.S. 502 (2009) ................................................................................ 31

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022) ................................................................................ 35

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. __, 2024 WL 2964140 (June 13, 2024)......... 14

*Fowler v. Stitt*, 676 F. Supp.3d 1094 (N.D. Okla. 2023), *rev'd on other grounds by* 23-5080, 2024 WL
        3035712 (10th Cir. Jun. 18, 2024) ................................................................................................ 3, 5

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ................................................................................................ 26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).................................16

*Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377 (M.D.N.C. 2019) ....................................................... 38

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ........................................................................... 38

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)..........................................................................17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557 (1995)....................................17

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).......................................................................19

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ........................................................................... 26

*Jordan v. Pugh*, 425 F.3d 820 (10th Cir. 2005) ...................................................................................... 22

*Kansas v. United States*, 214 F.3d 1196 (10th Cir. 2000).......................................................................... 20

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)..............................................................................12

*L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023), *aff'd*
        2024 WL 2887665 (1st Cir. Jun. 9, 2024).........................................................................................13

*Little Sisters of the Poor Sts. Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) ..................................10

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)...................................................................... 38

*Menders v. Loudon Cnty. Sch. Bd.*, 65 F.4th 157 (4th Cir. 2023)..........................................................22, 40

*Merriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................................................. passim

*New Mexico Health Connections v. U.S. Dept. of Health & Human Services*, 946 F.3d 1138 (10th Cir. 2019)30

*North Carolina v. Covington*, 137 S. Ct. 1624 (2017) ................................................................ 38

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)............................ 23, 40

*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981) ........................................18, 19

*Perlot v. Green*, 609 F. Supp. 3d 1106 (D. Idaho 2022) ..............................................................15

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) *overruled by Dobbs v. Jackson Whole Women's Health Org.*, 597 U.S. 215 (2022)..............................................................................................29

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...........................................................................18

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ............................................. passim

*Steak N Shake Ent. v. Globex Co., LLC*, 110 F. Supp. 3d 1057 (D. Colo. 2015) ...................................... 28, 36

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023)............... 28

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................................. 11

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019) .................................................. 25, 26, 28

*Tennessee v. Dep't of Ed.*, 2024 WL 2984295 (6th Cir. June 14, 2024).................................................12

*Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350 (5th Cir. 2021) ..............................................19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)............................................... 26, 27

*West Virginia v. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023).................................................18

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................................................2, 3

## Statutes

20 U.S.C. § 1688 ...................................................................................................... 9

42 U.S.C. § 2000bb-2 ..................................................................................................12

42 U.S.C. § 2000cc-5..................................................................................................12

5 U.S.C. § 706 ..........................................................................................................................10

## Other Authorities

CLARIFY, Merriam-Webster Online Dictionary ......................................................................... 32

EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender

    Identity (June 15, 2021) ....................................................................................................13

IRREPARABLE INJURY, Black's Law Dictionary (11th ed. 2019).......................................... 34

## Regulations

34 C.F.R. § 100.7 ..................................................................................................................... 14

34 C.F.R. § 106.41 ................................................................................................................. 7, 8

34 C.F.R. § 106.81.................................................................................................................... 14

*Nondiscrimination on the Basis of Sex in Education*, 85 Fed. Reg. 30,026 (2020) .......................... 31

## Briefs

Brief for the U.S. as Amicus Curiae, *B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 541 (4th

    Cir. 2024) ...........................................................................................................................7

Brief for the United States as Amicus Curiae, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th

    Cir. 2023).........................................................................................................................12

## INTRODUCTION

Throughout their response, Defendants fail to engage with Plaintiffs' arguments. They ignore the arguments Plaintiffs actually made and instead create and respond to different ones altogether. This is ultimately the byproduct of an indefensible Final Rule. To date, three federal district courts have concluded the same and enjoined the Final Rule and the guidance document that preceded it. *See* Memorandum Ruling in *State of Louisiana, et al. v. U.S. Department of Education, et al,* 3:24-cv-563 (attached as Ex. 1); Memorandum and Order in *State of Texas v. Miguel Cardona, et al.,* 4:23-cv-604 (attached as Ex. 2); Memorandum and Order in *State of Tennessee, et al v. Miguel Cardona, et al.,* 2:24-cv-72 (attached as Ex. 3). In *Tennessee* the court correctly concluded that the Defendants' "new definition of 'discrimination on the basis of sex' wreaks havoc on Title IX and produces results that Congress could not have intended" and that the Defendants seek "to derail deeply rooted law with a Final Rule" that "would turn Title IX on its head by redefining 'sex' to include 'gender identity.'" Ex. 3 at 25, 91.

This Court should not allow the Defendants to wreak havoc on Title IX and turn it on its head.  This is particularly true in light of the irreparable harm that Plaintiffs are already facing. (Ex. 8). Just recently, the Kansas Association of School Boards ("KASB") directed schools to comply with the Final Rule in order meet the August 1 deadline imposed by the Final Rule. (attached as Ex. 4). The Court should act before these costs become irreparable and enjoin the Final Rule. That injunction should be nationwide due to the fact that Plaintiffs include not only States but also multiple organizational Plaintiffs with members throughout all 50 states in the country. Anything less would not provide complete relief for Plaintiffs in this case.

## ARGUMENT

Nothing in Defendants' response brief overrides the fact that Plaintiffs have clearly met their burden and are entitled to a preliminary injunction.

### A.  Plaintiffs are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits because (1) the Final Rule contradicts the text and statute triggers the major questions doctrine, (2) it is unconstitutional under the

Spending Clause, First, Fifth, and Fourteenth Amendments of the Constitution, and (3) the Final Rule is arbitrary and capricious.

     1.      **This is a Major Questions Doctrine Case**

Defendants try to hide the major questions doctrine argument toward the end of their brief and dedicate less than half a page to the analysis. Perhaps they hope that by downplaying the major questions doctrine, the Court will not seriously examine it. However, the major questions doctrine provides the appropriate lens through which the Court should view the case. In fact, at least three courts have already found that the Final Rule implicates the major questions doctrine. *See* Ex. 2 at 77 ("The lack of authority is exceptionally pernicious here. Specifically, the Guidance Documents decide major questions—primarily, whether to force schools, including staff, students, or parents to accept a person's subjective and potentially ever-changing gender identity regardless of biological sex.").

Instead of making any effort to demonstrate how the Defendants have clear Congressional authorization to issue this Final Rule, they argue that the major questions doctrine does not apply. They argue that "just as the Supreme Court did not invoke the major questions doctrine when it endorsed the EEOC's interpretation of Title VII in *Bostock*, there is no basis for invoking it here." Dkt. 38 at 44. This argument is without merit because the major questions doctrine applies to agency action. *See West Virginia v. EPA*, 597 U.S. 697, 735 (2022) ("A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body.") (emphasis added). *Bostock* (discussed more below) involved employees making a Title VII claim against their employers, not a challenge to an agency action.

The court should follow the court in *Louisiana*, which found that the Final Rule covers an issue of "vast political significance because it will affect every public elementary school, middle school, high school, and college in the United States that receive federal funding" and it deals with "a polarizing political issue that an agency has no authority to make." Ex. 1 at 24-25. It attempts to end debate on "a polarizing political issue" by intruding in the sphere of education which is a domain of the States. *See West Virginia*, 597 U.S. at 744 (Gorsuch J., concurring) ("When an agency

claims the power to regulate vast swaths of American life, it not only risks intruding on Congress's power, it also risks intruding on powers reserved to the States.").

As this Court itself has pointed out,

> there is currently a debate across the country about the propriety of allowing biological men to participate in women's sports . . . . Women fought for decades to achieve equality in sports, resulting in victories such as Title IX of the Education Amendments of 1972, which required equal opportunities for women to participate in athletics at federally-funded education institutions. *See* 20 U.S.C. § 1681. Now, all of a sudden, it appears that some of those hard-fought victories may be slipping away as biological men, who may not be particularly competitive in male sports., compete as transgender women and begin to displace women from podiums in women's sporting events.

*Fowler v. Stitt*, 676 F. Supp.3d 1094, 1126 (N.D. Okla. 2023), *rev'd on other grounds by* 23-5080, 2024 WL 3035712 (10th Cir. Jun. 18, 2024).

Because the Final Rule triggers the major questions doctrine, the only question left for the Court is whether Congress gave the Defendants clear authorization for it. Defendants do not attempt to answer that question. The Court may treat that as a concession that there is no clear statutory authorization. In fact, the Final Rule not only lacks clear Congressional authorization but it effectively destroys Title IX for the reasons stated below.

### a. *Bostock* Does not Provide Clear Authorization for the Final Rule

The Defendants rely exclusively on *Bostock* for their authority to implement the Final Rule. In doing so, they ignore the plain text and history of Title IX. The Defendants state in their response, "the Department faithfully interpreted the statutory text in light of *Bostock*, which construed <u>Title VII's</u> provision . . ." Dkt. 38 at 8 (emphasis added). There are at least three reasons Bostock does not apply here. First, the fundamental problem with the Defendants' argument is Title IX is not Title VII. They are two different statutes with different purposes and histories. Title IX is not a general anti-discrimination statute like Title VII. Title IX was geared exclusively toward providing biological women and girls equal opportunity in education as they were the ones who were being discriminated against. Recognizing that in education, equality often requires different treatment, Title IX explicitly authorizes differential treatment of the biological

sexes in a manner that Title VII does not. It is discrimination to fire a man when a woman would not be fired for the same behavior. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020). It is not "discrimination" to provide separate opportunities and facilities for men and women in education as long as they remain equal—particularly in areas where sex matters like locker rooms, restrooms, and athletics. As the Sixth Circuit held: "it does not follow that principles announced in the Title VII context automatically apply to Title IX context." *Merriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

Second, *Bostock* itself acknowledged that the holding was limited to whether "an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual." 590 U.S. at 681. The Court expressly stated that its decision did not sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. *Id.* at 681. The Court also declined "to address bathrooms, locker rooms, or anything else of that kind," *id.*, the very issues to which Defendants now claim *Bostock* does apply. And *Bostock* also acknowledged that "how these doctrines protecting religious liberty interact with Title VII are questions for future cases" and that "RFRA operates as a kind of super statute, displacing normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." *Id.* at 682. The Final Rule tramples upon religious liberty as well.[1]

Third, the *Bostock* Court proceeded on the assumption that "sex" refers "only to biological distinctions between male and female." *Id.* at 655. Because of that assumption, *Bostock* cannot be cavalierly applied to Title IX the way the Defendants attempt to do. If *Bostock* applied to Title IX in the manner Defendants claim, it would wreak havoc on Title IX. It would mean that Title IX as drafted always made it unlawful for a school to protect the integrity of women's sports and their private spaces such as locker rooms and bathrooms by separating them based on biological sex. Given the history and text of Title IX, that would be ridiculous. Other courts have rejected

---

[1] In dicta, the Tenth Circuit stated that *Bostock*'s reasoning applied when an individual challenged a state policy on Equal Protection grounds. *See Fowler v. Stitt*, 3035712. But there is no support for the proposition that it applies to a federal agency regulation, that it applies to a statute with a different wholly purpose, or that it supersedes RFRA, the Spending Clause, or First, Fifth, and Fourteenth Amendments. *See Bostock*, 590 U.S. at 681–82.

Defendants' reliance on *Bostock* as "an attempt to circumvent Congress and make major changes to the text, structure, and purpose of Title IX." Ex. 1 at 21-22. This Court should do the same here.

### b. The Final Rule is Contrary to the Plain Text of Title IX

When the Defendants' utilization of *Bostock* as a pretext is stripped away all that is left is an agency action that wreaks havoc on the very statute it claims to "clarify." At its core the Final Rule equates "gender identity" to "sex" and concludes that Title IX prohibits discrimination based on that. But that concept has no support in the plain text of Title IX. As Plaintiffs' Principle Brief noted, both the past and present dictionary definitions of "sex" demonstrate that it is based on biological definitions. Defendants do not offer any dictionary definitions of their own to counteract that. This fact was fatal to Defendants' case in *Louisiana* as the Court found that "Plaintiffs provided this Court with three different dictionary definitions of 'sex'" while "Defendants have not provided a dictionary definition." *Id.* at 19.

Furthermore, Defendants' response never addresses the point made in Plaintiffs' Principle Brief that not only did they rewrite Title IX to protect gender identity but also, they invented a new standard of discrimination to cover it ("more than *de minimis* harm"). Those words are found nowhere in the statutory text. The Final Rule goes as far as saying that preventing students from using restrooms contrary to their sex but consistent with their gender identity automatically causes more than *de minimis* harm. 89 Fed. Reg. 33,814. Defendants point to nothing in Title IX that allows them to make up this standard. They also made no effort to address the absurd consequences, such as biological women being forced to share a restroom with biological males in violation of their privacy because schools are required to allow biological males to use the women's restrooms if they simply tell the school they identify as female. The Defendants' Response only parrots the Final Rule's conclusory statement on this serious issue by stating "there is no 'evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest.'" Dkt. 38 at 13 (internal citation omitted). In other words, according to Defendants, biological females like K.R. have no "legitimate privacy interest" in wanting to keep their private

spaces free from the intrusion of biological males. That assumption defies thousands of years of human experience and the evidence in the record before the Court.

This view is not only wrong but it goes against why Title IX exists in the first place, which is to protect biological females from discrimination in education. The Final Rule attempts to turn that protection on its head by elevating those who are biological males but claim to be female over biological females. This provides some insight into why Defendants did not include any of the history behind Title IX and instead immediately skipped to 2020 when *Bostock* was decided. If they did any historical analysis, it would be clear that their perverse view of Title IX has no support in its text or its history. Perhaps one day Congress may amend Title IX to explicitly prohibit discrimination on the basis of gender identity. But that day is not today. Rather than accepting that reality and following the law, the Defendants instead "seemingly use *Bostock* in an attempt to circumvent Congress and make major changes to the text, structure and purpose of Title IX." Ex. 1 at 21-22. This they cannot do.

c. **The Final Rule Regulates Athletics in Contradiction to Title IX**

The Defendants argue that their gender-identity mandate does not apply to sports. Dkt. 38 at 5–6. They say that the Final Rule leaves unchanged the "eligibility criteria a school can use for its male and female athletic teams," which they say appear in § 106.41(b). They further call § 106.41(b) "an exception to the regulation's general nondiscrimination mandate for athletics in § 106.41(a)" that "allows 'separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.'" Dkt. 38 at 5. That's a puzzling reversal for the Defendants. They argued to the Fourth Circuit last year that "[s]ection 106.41(b) does not dictate the athletic teams on which transgender students may participate," and is instead "silent" on the issue and "does not provide a 'safe harbor' for categorical bans from sex-separate athletic teams based on" biological sex. Br. for the U.S. as Amicus Curiae at 26, *B.P.J. ex. rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 541 (4th Cir. 2024).

So, if § 106.41(b) doesn't address who gets to play on the women's team, what section does? The obvious answer is § 106.41(a), the general non-discrimination mandate in sports, banning sex

discrimination "in any interscholastic, intercollegiate, club or intramural athletics . . . ." The Final Rule unquestionably affects that provision, as new § 106.10 redefines sex discrimination (including in § 106.41(a)) to include gender identity. The Final Rule also affects § 106.41(a) because the Final Rule doesn't except § 106.41(a) from § 106.31(a)(2)'s new de-minimis harm standard. And that means that keeping a male who identifies as female off of the women's sports team now violates § 106.41(a) by discriminating on the basis of gender identity and causing more than de minimis harm. In fact, that's what Defendants told the Fourth Circuit in *B.P.J.*: they explicitly cited § 106.41(a) and said that West Virginia's women's sports law "violate[s] the general nondiscrimination mandate in the statute <u>and regulations</u>." *BPJ* Amicus Brief at 27 (emphasis added). Defendants cannot explain why the prior sports regulation requires admitting men into women's sports and the Final Rule does not when the new rule simply redefined the old regulation to explicitly include gender identity. The Final Rule cannot help but affect sports by globally importing gender identity into Title IX and by failing to universally exempt sports from all these regulations.

Defendants' claim is also releveled to be false when one places their redefinition of "sex" discrimination to equate it to "gender identity" discrimination next to the statute itself:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a). If discrimination based on sex now means discrimination based on "gender identity," it is now illegal for any person to, "on the basis of [gender identity], be excluded from participation in any . . . an education program or activity." College and high school athletics are such an activity. There is little question that colleges and high schools across the nation will interpret Title IX this way under the Final Rule.

Defendants' reading is also is contrary to Title IX for an additional reason. First, they err (at 5) when they describe § 106.41(b) as an "exception" to the nondiscrimination mandate. Sports are not a Title IX-free zone. Section 106.41(b) in particular does not say the nondiscrimination mandate is inapplicable. It just says that "[n]otwithstanding" § 106.41(a), sex-separate teams are

still allowed. Like the statutory provisions allowing sex-specific dormitories and beauty pageants, this provision helps define what is sex-discrimination in the first place. Plus, the provisions on sex-separate restrooms, showers, and locker rooms, were part of the same implementing regulations as athletics. Defendants fail to explain why the gender-identity mandate applies to showers but not athletics, as they have the same statutory and regulatory pedigree.

### d.  The Final Rule is Contrary to Section 1688 of Title IX

The Defendants' response to Plaintiffs' claim that the Final Rule violates 20 U.S.C. § 1688 (the abortion neutrality provision) leaves one wondering if they actually read Plaintiffs' brief. First, they say that the Final Rule does not require schools to provide abortion services. Dkt. 38 at 38. But that is not what Plaintiffs argued. Plaintiffs argued, "the Final Rule requires schools to provide benefits for those seeking voluntary abortions," Dkt. 25 at 12 (emphasis added), in direct contradiction with the statute ("Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service . . ." (emphases added)). Defendants do not dispute that "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations," Dkt. 25 at 13 (quoting 89 Fed. Reg. at 33,777), are benefits. So, it is undisputed that the Final Rule requires schools to provide benefits to students who are seeking voluntary abortions. This violates the plain language of the statute and is unlawful.

The Defendants next refer to other regulations, but this, too, entirely misses the point. Regulations cannot "extend a statute or modify its provisions." *Campbell v. Galeno Chem. Co.*, 281 U.S. 599, 610 (1930). Regulations certainly cannot supersede a statute. And here, the statute was specifically passed to supersede the very regulations Defendants cited. As discussed extensively in the P.I. Motion (and not at all by Defendants), the abortion neutrality provision was added following post *Roe v. Wade* regulations implemented by the Defendants out of concern that these very regulations would require schools to provide abortions or benefits related to voluntary

8

abortions. *See* Dkt. 25 at 6–8. So, the statute (passed in 1984) controls, and any regulations (passed in the 1970's) cannot be relied on to say otherwise.

Finally, the Final Rule requires schools to provide benefits related to voluntary abortions or risk losing millions in federal funding and opening themselves up to civil lawsuits. The Defendants' "trust us, we'll figure it out on a case-by-case basis" argument (at 40) should be rejected. Absent a strong argument as to why this part of the Final Rule might be legal (which the Defendants have not made), the Court should not allow them to proceed and put schools at risk in the hope that everything will shake out in the end.

### e.   The Final Rule is Contrary to RFRA

The Final Rule is contrary to RFRA because it forces religious students like K.R. and the FAU members to speak against their religious beliefs, and it chills them from sharing their religious views on gender-identity issues. Rather than engaging on the merits,[2] the Defendants challenge the private Plaintiffs' standing and the ripeness of their claims. But this fails because the private plaintiffs have standing and their claims are ripe for review.

As an initial matter, the private Plaintiffs do not need standing because Article III requires only "one party" to demonstrate standing "for each claim for relief." *Little Sisters of the Poor Sts. Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020); *see also Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1263, 1266 (10th Cir. 2024). Here, the Defendants have not challenged the plaintiff States' standing in Count I to challenge the Final Rule as contrary to law under 5 U.S.C. § 706. That claim asserts a variety of reasons why the Final Rule is unlawful, one of which is that it violates RFRA. Dkt. 1 ¶¶ 304–07. Since there is no dispute that the States have standing to bring Count I, which includes the contention that the Final Rule violates RFRA, whether the private plaintiffs have independent standing is irrelevant.

But they have it anyway. Pre-enforcement standing requires Under the APA, any person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

---

[2] The First Amendment ramifications of forced pronoun usage is addressed more fully infra in the compelled speech section.

entitled to judicial review thereof. The reviewing court shall set aside the agency action under § 706(2) if it is . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." B*iodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1059 (10th Cir. 2014) (cleaned up) (quoting 5 U.S.C. §§ 702 & 706). Here, private plaintiffs are adversely affected by the Final Rule because it forces them to share intimate spaces with members of the opposite sex, takes away their athletic opportunities, and tramples their free-speech rights and religious liberties. They have standing to bring their contrary-to-law claim because no one seriously disputes that they are affected by the Final Rule in multiple ways. Defendants simply demand too much, requiring standing for each specific argument and not just each claim. No matter, private plaintiffs have it. Plus, they meet the traditional requirements of pre-enforcement standing for their RFRA (and free-speech) argument too: (1) an intent to engage in conduct "arguably affected with a constitutional interest" that is (2) "arguably proscribed" by the law at issue with (3) a "credible threat" of enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–62 (2014) (cleaned up).

*Intent to engage in conduct*. K.R. has on multiple occasions declined a classmate's request to use pronouns that violate her religious beliefs. Decl. of K.R. ¶¶ 28–30. The classmate "has gotten mad" at K.R., but the school has not punished her. *Id*. The same is true for T.P., who declined to use "they/them" pronouns at a teacher's request. Dec. of T.P. ¶¶ 21–25. And FAU members A.B.S. and A.R.S. likewise object to using inaccurate pronouns on religious grounds. Dec. of A.B.S. ¶ 43; Dec. of A.R.S. ¶ 34. Declining to use pronouns constitutes the exercise of religious beliefs and therefore implicates RFRA. *Cf. Meriweather*, 992 F.3d at 517 (holding that declining to use pronouns implicates Free Exercise Clause).

K.R. and FAU members have also discussed, and intend to continue discussing, their religious views on gender-identity issues with their classmates at school. K.R. Dec. ¶¶ 29–30; A.B.S. Dec. ¶¶ 43–44; A.R.S. Decl. ¶ 34; T.P. Dec. ¶¶ 24–25, 29, 38; Zwahlen Dec. ¶¶ 25–27, 31; T.Z. Dec. ¶¶ 23–24, 29–30. This demonstrates that K.R. and FAU members intend to engage in religious speech, which implicates constitutional and RFRA-related interests. *Kennedy v. Bremerton*

*Sch. Dist.*, 597 U.S. 507, 523 (2022) (holding that "the First Amendment doubly protects religious speech"); 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A) (broadly defining religious exercise).

**Arguably proscribed.** The Final Rule at least arguably requires students like K.R. and the FAU members to use inaccurate pronouns. It proclaims that any "practice" that does not treat a student "consistent with the person's gender identity" automatically causes "more than de minimis harm" and violates Title IX. 89 Fed. Reg. 33,887. And declining to use a person's requested pronouns easily satisfies the broadened standard for harassment: the refusal will be unwelcome to some students; since it causes more-than-de-minimis harm, it will obviously qualify as "offensive"; it will be pervasive because pronouns are pervasive; and it will meet the low bar of having "some impact" on the person. 89 Fed. Reg. 33,884, 33,511.

The Defendants nowhere disavow this analysis. Nor could they, as the Department's position is clear. In a Fact Sheet enjoined by the Sixth Circuit, the Department suggested that failing to use a student's self-selected pronouns would violate Title IX. *Tennessee v. Dep't of Ed.*, __ F.4th __, 2024 WL 2984295, at *2 (6th Cir. June 14, 2024). Likewise, in a recent amicus brief, the government contended that declining to use self-selected pronouns could trigger Title IX liability. Brief for the United States as Amicus Curiae at 27–30, *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. 2023). Plus, the preamble of the Final Rule makes it clear that "misgendering" can be a form of sex-based harassment. 89 Fed. Reg. 33,516 (responding the comments about "misgendering" with "acts of verbal . . . hostility based on the student's ... gender identity—can constitute discrimination on the basis of sex under Title IX in certain circumstances"). And with respect to Title VII, which it imports wholesale into Title IX via the Final Rule, the Biden Administration has been clear that "using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment."[3] Thus, "the refusal to abide by preferred pronouns can be deemed harassment and exposes a recipient of Federal funds to liability under Title IX." Ex. 3.

---

[3] EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity (June 15, 2021), https://bit.ly/3zgP7iP.

The Final Rule also at least arguably proscribes religious speech asserting views such as there are only two sexes, sex cannot be changed, and males should not be permitted in female-designated intimate spaces or women's sports. Because the Final Rule's "broader standard" for harassment relies on vague concepts like whether the challenged speech is "unwelcome," "offensive," or has "some impact" on the hearer, based on myriad non-dispositive factors, there is no way for students like K.R. or the FAU members to know what they can say. 89 Fed. Reg. 33,498. What they do know is that the Final Rule "imposes a viewpoint consistent with the affirmation of gender identity." Ex. 3. And they know that the Final Rule has warned them that saying things like "there are only two genders" is subject to sanction. 89 Fed. Reg. at 33,504, citing *L.M. v. Town of Middleborough*, No. 23-cv-11111, 2023 WL 4053023 (D. Mass. June 26, 2023), *aff'd* 2024 WL 2887665 (1st Cir. Jun. 9, 2024). Nor does the Department anywhere disavow enforcement against this kind of speech. The message is clear: religious speakers beware.

*Credible threat of enforcement.* K.R. and FAU members face a credible threat of enforcement. As an initial matter, the government contends that they do not because Title IX regulates schools, not individual students. But as the Supreme Court recently noted, there are "familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. __, 2024 WL 2964140, at *8 (June 13, 2024). These include when government regulation injures "customers" or "users" of the regulated party. *Id.* Here, the Defendants' requirement that schools prevent speech the Defendants deem harassing forces schools to regulate student speech, which creates a "predictable chain of events leading from the government action to the asserted injury." *Id.*; *accord Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019) (standing can rest "on the predictable effect of Government action on the decisions of third parties"); *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (standing when government action has "determinative or coercive effect upon the action of someone else.").

Further, K.R. and the FAU members meet all three non-exclusive factors for demonstrating a credible threat: a history of past enforcement, diffuse authority to initiate

12

charges, and the government's refusal to disavow. *303 Creative, LLC v. Elenis*, 6 F.4th 1160, 1174 (10th Cir. 2021), *overruled on other grounds at* 600 U.S. 570 (2023). As noted above, the government has made its enforcement intentions clear in the preamble to the Final Rule, the enjoined Fact Sheet, the *Kluge* brief, and its various statements about what constitutes actionable harassment under Title VII. And anyone "who believes himself or any specific class of individuals to be subjected to discrimination" can file a Title IX complaint and trigger an OCR investigation. 34 C.F.R. §§ 106.81; 100.7(b). What's more, the Final Rule requires each school to have its own written grievance procedure whereby nearly anyone connected to the school, whether involved in the complained-of incident or not, may file a complaint and force an investigation. 89 Fed. Reg. 33,891 (allowing "[a]ny student or employee" or "[a]ny person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination" to file a complaint). Plus, the Department refuses to disavow the fact that any of the religious speech that K.R. or the FAU members want to engage in would violate Title IX.

Adding to the credible threat is the coercive effect of Title IX on schools. Losing Title IX funding "would have a devastating impact" on most schools. Ex. 3. So, schools have no practical choice but to clamp down on any speech that might jeopardize their funding. Indeed, zeal in attempting to comply with Title IX often runs schools headlong into the First Amendment. *See, e.g., Meriwether*, 992 F.3d at 511 (university claimed it compelled pronouns in effort to comply with Title IX); *Perlot v. Green*, 609 F. Supp. 3d 1106, 1110 (D. Idaho 2022) (university claimed it issued unconstitutional "no contact" order in effort to comply with Title IX). So, it is entirely predictable that K.R.'s and FAU members must either chill their religious speech or face defending themselves against Tile IX complaints.

*Ripeness.* Defendants next contend that any challenge to the Final Rule based on RFRA is not ripe because RFRA "is a particularly fact-specific area." Dkt. 38 at 35. Under this argument, a law or rule would never be subject to a pre-enforcement challenge based on RFRA because RFRA is too fact-dependent. But courts routinely reject this argument. In *Braidwood Management*,

13

*Inc. v. EEOC*, for example, the Fifth Circuit permitted a pre-enforcement RFRA challenge to EEOC guidelines similar to the Final Rule concerning gender identity. 70 F.4th 914, 930–31 (5th Cir. 2023). The Court rejected the EEOC's "near talismanic mantra that further factual development was needed" because it was sufficiently clear that the employer's conduct likely violated the operative guidance. *Id.* at 931 (cleaned up); *accord Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 376–77 (5th Cir. 2022) (holding RFRA challenge to § 1557 regulations was ripe); *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602–06 (8th Cir. 2022) (same); *Christian Employers All. v. U.S. EEOC*, No. 1:21-cv-195, 2022 WL 1573689, at \*5 (D.N.D. May 16, 2022).

The same is true here. K.R. and many FAU members will not use inaccurate pronouns and will express their religious views on gender identity. *See, e.g.*, K.R. Decl. ¶¶ 28–30; A.B.S. Decl ¶¶ 43–44; A.R.S. Decl. ¶ 34; T.P. Decl. ¶¶ 24–25, 29, 38; Zwahlen Decl. ¶¶ 25–27, 31; T.Z. Decl. ¶¶ 23–24, 29–30. So, their conduct is clear. And for the reasons set forth above, it is equally clear that this conduct violates—or at least arguably violates—the Final Rule. Nothing further is needed to determine if the Final Rule violates RFRA by infringing on their religious liberty.

The one RFRA case Defendants cite—*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*—only reinforces the point. 546 U.S. 418 (2006). There, the Supreme Court held that *the government* cannot rely on general interests when it denies a religious exemption under RFRA. *Id.* at 430. Here, the government relies on its general interest "eradicating discrimination" to impose a speech code on religious students that reaches more speech than prior regulations and contains no clear exceptions. Ex. 3 (quoting 89 Fed. Reg. 33,503). Without the ability to challenge the Final Rule now, religious students' only practical option is to violate their consciences or chill their religious expression. Nor can Defendants' insistence that they will comply with RFRA when specific cases present themselves save the Final Rule. After all, "[r]eligious freedom cannot be encumbered on a case-by-case basis." *Christian Employers All.* v. EEOC, No. 1:21-cv-195, 2022 WL 1573689, at \*8 (D.N.D. May 16, 2022) (rejecting similar insistence by EEOC in RFRA challenge to guidance documents). And the "*in terrorem* effects" of the Final Rule exist now: students must either chill their religious expression or risk a painful and costly enforcement action. *Braidwood*,

70 F.4th at 931. Moreover, the Supreme Court has permitted pre-enforcement challenges despite vague assurances that the government will respect a party's rights on a case-by-case basis. *See, e.g.,* *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15–16 (2010) (allowing pre-enforcement challenge despite First Amendment savings clause in 18 U.S.C. § 2339(B)(i)). So, the RFRA challenge is ripe for adjudication now.

*Merits*. Curiously, the Defendants ignore the merits of the RFRA problem, focusing entirely on the alleged need for more facts. Dkt. 38 at 35–36. Regardless, the merits are clear: Defendants have no compelling interest in forcing students like K.R. and the FAU members to use self-selected pronouns, nor in chilling their speech on their religious views. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 578–79 (1995) (no legitimate interest in "produc[ing] speakers free" from purported bias); *303 Creative LLC v. Elenis*, 600 U.S. 570, 591–92 (2023) (anti-discrimination interest insufficient to compel speech). Nor is the Final Rule narrowly tailored given that Defendants could have written in an exception for faith-based speech by students as it did for religious organizations. Thus, the Final Rule violates RFRA.

## 2. The Final Rule is Unconstitutional

The Final Rule is unconstitutional because (1) it violates the Spending Clause and (2) it violates the First, Fifth, and Fourteenth Amendments.

### a. The Final Rule Violates the Spending Clause

The Final Rule violates the Spending Clause.[4] "[W]hen Congress attaches conditions to a State's acceptance of federal funds," including education funds, "the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *see also*

---

[4] Defendants argue (at 40–41) that, as Congress has the spending power, the focus of a Spending Clause challenge should be on the statute enacted by Congress. So, they argue, if the Court agrees with Plaintiffs that the Final Rule violates the *Dole* restrictions, the whole of Title IX is unconstitutional. If they are correct (they cite no authority that an agency action cannot be found unconstitutional under the Spending Clause), it is a strong reason why the Court should agree with Plaintiffs' statutory interpretation argument and hold that Defendants' interpretation of Title IX is wrong as a matter of constitutional avoidance. When an agency's interpretation of a statute raises constitutional concerns, the Court should avoid interpreting it that way if there is another interpretation. *See Integrity Advance, LLC v. Consumer Fin. Prot. Bureau*, 48 F.4th 1161, 1178 (10th Cir. 2022) (Phillips, J., concurring), *cert. denied*, 143 S. Ct. 2610 (2023). As discussed above, there clearly is another, constitutionally sound interpretation.

*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981). Title IX was enacted pursuant to Congress's spending power, *see Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639–40 (1999), and therefore the conditions must be clear and unambiguous. Congress's spending power is not unlimited; there are four widely recognized restrictions (the *Dole* restrictions), all of which must be satisfied or a Congressional spending program will be found unconstitutional. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

As to the first *Dole* restriction (that the terms of funding be clear and unambiguous), Defendants argue that the Final Rule merely "clarifies" Title IX's existing requirement that schools cannot discriminate on the basis of sex, which, post-*Bostock*, includes discrimination on the basis of "gender identity." Dkt. 38 at 41–42. This argument defeats itself: A statute that imposes "unambiguous" conditions on States does not need "clarification" fifty years after it is passed. The "gender identity" condition is not contained in Title IX and therefore was not "unambiguously" attached to the federal funding at the time the law was passed.

Defendants make no attempt to dispute this. They do not contest that the plain meaning of the word "sex," as it would have been understood by the Congress that passed Title IX or the State officials who accepted its terms, is "biological sex." They also do not (and cannot) contest that courts evaluate Spending Clause cases in the same way they do contract cases. As the Supreme Court said in *Pennhurst*, "in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract'" at the time the "contract" was made. 451 U.S. at 17. In other words, the terms set by Congress in 1972 and 1974 were that "sex" meant biological sex, not "gender identity." Those terms cannot now be changed by agency action.

The States did not agree to these conditions; they did not agree to (1) abolish sex-separated restrooms and locker rooms, (2) allow biologicals males to play on women's teams, (3) police teachers' and students' pronoun use, or (4) force teachers, students, and others to violate their

religious convictions. In *Tennessee*, the court addressed the same issue and rejected the same Defendants' arguments. Ex. 3 at 30 ("Title IX's language provides no indication that an institution's receipt of federal funds is conditioned on any sort of mandate concerning gender identity."). So, it is undisputed that "sex" in 1972 and 1976 meant "biological sex" and the Final Rule's redefinition of "sex" to include "gender identity" changes the terms of the "contract" and is unconstitutional.[5]

After ignoring the plain language of the statute altogether, the Defendants argue (at 42) that the terms of the Final Rule are clear and that it provided adequate guidance for school officials. They argue that a school should not have difficulty determining a student's "gender identity" because the school may rely on the student's word. But, as Plaintiffs noted, the Final Rule contains no requirement that the school know a student's "gender identity" is different than his or her biological sex, schools are not allowed to inquire about "gender identities," and a person's "gender identity" may change over time. Dkt. 25 at 9, 44. In other words, Defendants' assurance that, "It's ok, the student will tell you," is no assurance at all. Further, they do not bother wrestling with the fact that the Final Rule applies to people who do not attend or work at the school (parents, visiting students, visiting coaches, other guests, etc.). So, if a school stops a forty-year-old (apparent) man from entering an elementary school girls' restroom, could it lose millions in federal funding? The Final Rule is completely silent. The Final Rule also provides no guidance as to how schools should treat students who "identify" as neither male nor female or as any of the other "gender identities" identified by the "respected medical organizations" on which Defendants rely. For these reasons, even if the word "sex" does need "clarification" (and it does not), the way the Final Rule "clarified" it is unconstitutional.

The third *Dole* restriction is that "the conditions must be related to the federal interest in the particular program." *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000) ("*Kansas I*")

---

[5] Even if Congress could now change the conditions attached to Title IX funding, Defendants cannot usurp Congress's power and attached their own conditions to federal funding. *See Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021). *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), on which Defendants rely, did not involve an agency's interpretation of a statute. *See also* Ex. 3 at 31.

(emphases added). Title IX already protects all students from discrimination on the basis of sex—but not on "gender identity." Defendants sputter that the Final Rule creates protection for all students, but they utterly fail to explain how a rule that eliminates protections for women and girls is related to a statute that was passed specifically for the protection of women and girls. A statute passed to protect rats does not protect rats when it is interpreted to also protect cats. The Final Rule is not, therefore, related to the federal interest in Title IX.

The Final Rule also violates the fourth *Dole* restriction (the terms must be consistent with the Constitution) because it will require States to violate the Constitutional rights of students, parents, teachers, school administrators, and others. The Final Rule contains no explicit protections for free speech, religious liberty, or equal protection and no guidance as to how a school could possibly carry out the terms of the Final Rule without infringing on these rights. For these reasons, the Final Rule violates the Spending Clause.

Finally, the Final Rule violates the principle that the Spending Clause and the Supremacy Clause require Congress to speak. As Plaintiffs explained at length in their principal brief, the Final Rule effectively preempts multiple state laws. Kansas's S.B. 180, which requires all public schools to record a student's sex as his or her se at birth, is a case in point. Only Congress can take action that displaces state law. And Congress has not acted here. Defendants offer no answer to this argument. That is because they have no answer. The purchased preemption presented by the Final Rule is especially troubling; unlike the situation in *Dole*, nether Congress nor the State legislature is involved. The executive agency sets the new terms of the deal, and the school districts change their behavior to get the money. The state's legislature and statutes are ignored.

b.  **The Final Rule Violates the First Amendment, Fifth, and Fourteenth Amendments**

**Vagueness and Overbreadth**. The Defendants' responses to private Plaintiffs' First Amendment vagueness and overbreadth arguments fare no better. Their major mistake is to broadly argue that private Plaintiffs' fears are too speculative and must await actual enforcement

to be challengeable. *But see* Ex. 3 at 56 (Final rule is "vague and overbroad in a way that impermissibly chills protected speech"). The Defendants' wait-and-see approach has never been the standard for a pre-enforcement First Amendment challenge. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (quoting *Dana's R.R. Supply v. Att'y Gen. Fla..*, 807 F.3d 1235, 1241 (11th Cir. 2015)) (plaintiffs who suffer chilled speech "suffer a discrete injury independent of enforcement, and that harm creates the basis for our jurisdiction"). As the Fourth Circuit observed recently in the context of a membership association who wished to challenge the bias reporting system at Loudoun County Public Schools in Virginia, "[e]stablishing standing in First Amendment claims alleging the chilling of free speech, however, is not that demanding." *Menders v. Loudon Cnty. Sch. Bd.*, 65 F.4th 157, 164 (4th Cir. 2023).

Only when fears of enforcement are "imaginary or speculative" are they too speculative, a standard the Defendants do not even address. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). It is not necessary for the government to punish, or even threaten to punish, speech; reasonable persons of ordinary firmness may stop well short of the line and still have a First Amendment injury, especially when they are made to guess what consequences will befall them for speaking. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71–72 (1963) (finding speech was chilled even when commission lacked authority to impose a punishment); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1283, 1290 (10th Cir. 2004) (finding injury where speaker believed, based on school officials' words, that "it was only a matter of time" before she was punished); *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (government need not punish a speaker for an injury of compulsion or chill to exist); *Cartwright*, 32 F.4th at 1123. Because not even the Defendants can say what the Final Rule will require, Plaintiffs need not await actual enforcement to find out what will happen if they fail to comply.

The standard for when speech will be chilled by a vague or overbroad rule is "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005) (quoting *Hoffman Ests. v. Flipside Hoffman Ests.*, 455 U.S. 489, 494 (1982)); *see also Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1199 (10th Cir. 2005) (same language

as to overbreadth challenge); Ex. 3 at 49. This standard clearly does not require the private plaintiffs to demonstrate, as Defendants assert, that the Final Rule has no constitutional application. And, quite the opposite, a plaintiff satisfying this standard "suffices to invalidate all enforcement of [the rule], until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Faustin*, 423 F.3d at 1199.

Defendants cannot bring themselves to outright state that private plaintiffs are imagining that their speech will soon land them in trouble, or that the Final Rule won't reach a substantial amount of protected conduct. They rather appear to be keeping their options open. The court in *Tennessee* just ruled that the Final Rule's definitions were vague and "the Department's response [to commentors raising this issue] offers no guidance whatsoever." Ex. 3 at 50 (emphasis preserved). When the government labels speech pejoratively—hateful, biased, intolerant, harassment—it is chilling. *See Cartwright*, 32 F.4th at 1124 ("No reasonable college student wants to run the risk of being accused of 'offensive,' 'hostile,' 'negative,' or 'harmful' conduct—let alone 'hate or bias.'"); *Menders*, 65 F.4th at 165 (fear of bias and harm to standing in community ruining their "college or career prospects"). The younger the individual, the more vulnerable they are to chill. *See Cartwright*, 32 F.4th at 1123 ("teenagers and young people who, it stands to reason, are more likely to be cowed by subtle coercion than the relatively sophisticated business owners in those cases."). The Final Rule's "slipperiness" gives rise to the injury of chilled speech. *Cartwright*, 32 F.4th at 1122; *see Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023) ("The lack of clarity also makes the [school policy requiring students respect a student's "gender identity"] susceptible to arbitrary enforcement.").

People avoid testing the limits when confronted with governmental threats. That is the danger of vague and overbroad policies. They cause people to err on the side of caution and stop talking. Here, the Defendants' definitions are vague, and this infirmity is compounded by the "entirely fact-dependent and subjective nature" making it overly broad as well. Ex. 3 at 51. Putting speakers in the position of speaking and risking consequences or self-censorship is an

unmistakable injury. *See Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013) (finding injury where the government presented a speaker with three options: display the government's message, pay to avoid displaying the message, or refuse to speak and face consequences); *Meriwether*, 992 F.3d at 517 (finding coercion where a professor had to affirm a student's preferred pronouns or risk punishment); *Axson-Flynn*, 356 F.3d at 1290. That is why courts do not require would-be speakers to test the waters first. *See Babbitt*, 442 U.S. at 298.

Defendants never address any of these arguments. Rather, they say that since "stray remarks" are not harassment and that disciplinary inquires will be "fact-specific," the Final Rule survives. Dkt. 38 at 24. That is not nearly good enough to satisfy the First Amendment. *See* Ex. 3 at 52 (criticizing the subjectivity of "subjectively offensive" and "severe or pervasive" standard, as well as the fact-specific standard as what makes the Final Rule chill speech). In the end, the Defendants fail to show that the Final Rule is not impossibly vague and overbroad because they "intentionally opted to leave the vague terms undefined." Ex. 3 at 54 (emphasis preserved).

**Due Process.** For the same reasons that the Final Rule is overboard or vague on First Amendment grounds, it violates the due process provisions of the Fifth and Fourteenth Amendments. *City of Chi. v. Morales*, 527 U.S. 41, 68 (1999).

**Compelled Speech.** The Defendants allege that plaintiffs' compelled speech challenge "relies upon exaggerated hypotheticals and speculation about how the harassment standard might be applied." Dkt. 38 at 24. But the court in *Tennessee* just rejected the argument that private plaintiffs' fears are exaggerated given the Department of Education's response to comments and its past enforcement actions. Ex. 3 at 43-47; *see also Cartwright*, 32 F.4th at 1121-22 (government's failure to say how its policy worked is what made it impermissible). As the court recognized, "[w]ith respect to the topic of gender identity, the Biden Administration has taken a clear position." *Id.* at 46-47. For instance, the Department of Education responded to commenters by reaffirming its position that verbal and nonverbal acts directed at a transgender individual's nonconformity can qualify as harassment. 89 Fed. Reg. at 33,516. It then cited a District of Minnesota case that permitted a Title IX claim to proceed based on students using a classmate's

21

biological pronouns and using a feminized version of the individual's preferred name. *See id.* (citing *Montgomery v. Indep. Sch. Dist. No. 709*, 809 F. Supp. 2d 1081, 1092 (D. Minn. 2000)). Defendants' refusal to give assurances that using biologically correct pronouns won't trigger an investigation is impermissible. *See Cartwright*, 32 F.4th at 1122 (finding fault with policy where policymaker could not state whether a particular statement would run contrary to the policy). Private plaintiffs' members are left with the choice of following their beliefs and being the target of a hostile environment harassment investigation or being compelled to speak by using "preferred" pronouns and names.

Defendants attempt to sweep away the obvious free speech concerns by characterizing speech as conduct. See Dkt. 38 at 17-18, 21, 23-25, 30, 33. But the government cannot sidestep the First Amendment by calling speech conduct. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019) ("Speech is not conduct just because the government says it is."). Obviously, any speech could be characterized as conduct by semantics: "The government could argue . . . that painting is not speech because it involves the physical movements of a brush." *Id.* Anti-discrimination laws regulate conduct and sometimes that can have "merely incidental effects on expression," *id.* at 776, such as requiring a business to serve all customers and prohibiting a "whites only" sign.   Forcing individuals to speak or not speak under the Final Rule "on weighty issues with which [private plaintiffs disagree[]" is a suggestion that the Supreme Court has rejected "time after time— including in the context of public accommodations laws." *303 Creative*, 600 U.S. at 599.

Alternatively, Defendants contend that if the Final Rule compels the use of "preferred" pronouns and names, it is a lawful exercise of authority because it regulates harassment and discrimination. But forcing a speaker to use "preferred" pronouns is a form of compelled speech that violates the First Amendment. *Meriwether*, 992 F.3d at 517; *see also*, Ex. 2 at 41, 48. Defendants fault private Plaintiffs for overlooking the differences in how the First Amendment works in the educational context but fail to explain why this means the Final Rule satisfies the First Amendment. Perplexingly, much of their argument is devoted to an analysis of the public employee speech doctrine and *Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006). Obviously, that has

no bearing on private plaintiffs whose members are not government employees, tasked with sometimes speaking the government's messages. *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2471 (2018); *Meriwether*, 992 F.3d at 503-04.

It is true that under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969), students have different First Amendment expectations in the school setting, but they do not "shed their constitutional right to freedom of speech or expression at the schoolhouse gate." *Id.* at 503l; *Meriwether*, 992 F.3d at 492 ("public universities do not have license to act as classroom thought police."). Schools are not "enclaves of totalitarianism." Ex. 3 at 36 (quoting *Tinker*, 393 U.S. at 511). *Tinker* requires Defendants show more than a "mere 'fear of apprehension of disturbance'" from private plaintiffs' speech before it can "'overcome the right of freedom of expression.'" *Meriwether*, 992 F.3d at 511 (quoting *Tinker*, 393 U.S. at 508). Defendants cannot tamp down on speech out of a "mere desire to avoid the discomfort and unpleasantness that always accompan[ies] an unpopular viewpoint." Ex. 3 at 36 (quoting *Tinker*, 393 U.S. at 509). Defendants do not even point to a fear of a disruption, let alone credible evidence, that expressing routine viewpoints held by millions of Americans would cause a substantial disruption. *See Meriwether*, 992 F.3d at 511 ("[There is no indication at this stage of the litigation that Meriwether's speech inhibited Doe's education or ability to succeed in the classroom."). Their conclusory assertion that speech that "materially disrupts classwork" is regulable, *see* Dkt. 38 at 33, stops far short of showing that private plaintiffs' speech actually will disrupt others. In reality, any disruption caused by private plaintiffs' speech would be nothing more than a "content-based hecklers veto" exercised by those who will not tolerate dissent from gender orthodoxy. Ex. 3 at 46.

The Defendants also ask the Court to "trust us." Dkt. 38 at 23 (arguing the Final Rule does not violate the First Amendment because the Rule says it does not require recipients violate the First Amendment). The government is entitled to no presumptions in its favor when its restriction infringes upon First Amendment rights. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012). Schools are not known for their judgment at the moment, and courts are loathe to accept "trust us" justifications from the government when it comes to protecting enumerated rights in

any event. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2168 (2023) ("*SFFA*") ("The universities' main response to these criticisms is, essentially, 'trust us.'"). The Defendants' argument that they and their recipients can be trusted because they say they can be trusted "is a dangerous one indeed." *303 Creative*, 600 U.S. at 601.

**Content and Viewpoint.** The Final Rule "engages in viewpoint discrimination" because it "suppresses one side of the debate, strangling the marketplace of ideas in a way that is 'uniquely harmful to a free and democratic society.'" Ex 3. at 48 (quoting *Nat'l Rifle Assoc. of Am.*, 216 L.Ed. 2d at 652). Defendants waste little time arguing that the Final Rule is not content-based and viewpoint discriminatory. Dkt. 38 at 30 (stating *ipse dixit* that the Final Rule is "in any event both content- and viewpoint neutral"). Rather, Defendants maintain that the Final Rule satisfies strict scrutiny. *Id.* But they have forfeited the opportunity to respond, *see Steak N Shake Ent. v. Globex Co., LLC*, 110 F. Supp. 3d 1057, 1085 (D. Colo. 2015), to the argument that both compelled speech and viewpoint discrimination challenges are not subject to any form of a balancing test at all. *See* Dkt. 25 at 39 (collecting cases).

The Final Rule fails strict scrutiny regardless. The Defendants' interest in combatting "discrimination" is not sufficient to justify a speech restriction. *303 Creative*, 600 U.S. at 599-600; *id.* at 600 n. 6 (nothing is "incidental" about burden on speech when public accommodation laws "compel expressive activity"); *Telescope Media*, 936 F.3d at 755 (while government may act to prevent the act of discrimination it may not "'declar[e] [another's] speech itself to be [a] public accommodation'" (quoting Hurley, 515 U.S. at 579)); *see Meriwether*, 992 F.3d at 511 (university's interest in punishing refusal to use preferred pronouns "is comparatively weak").

Nor is the Final Rule narrowly tailored. Adopting a definition of "hostile environment harassment" that considers a non-exhaustive list of factors based on the totality of the circumstances and looks at whether expressive statements were "subjectively . . . offensive," 89 Fed. Reg. at 33884, exposes an extremely wide range of statements to investigation and discipline rather than targeting only true conduct that creates discrimination. *See Cartwright*, 32 F.4th at 1152 (describing a university policy like the Final Rule as "staggeringly broad," and prohibitive of

24

"statement . . . undoubtedly protected by the First Amendment," so as to fail the narrowly tailored requirement). And this is most evident from the fact that Defendants, the drafters of the Final Rule, cannot even tell the courts what speech the Final Rule does and does not reach. *See* Ex. 3 at 50, 54. How can Defendants meet their burden of establishing that the Final Rule is narrowly tailored where they effectively argue that the Final Rule must be permitted to take effect for us to know how it operates?

      **Conclusion.** Defendants are as eager to cut off debate as they are cut out Congress. By curtailing the "outlet for the deep passions this issue arouses" through the "imposition of a rigid national rule," *Planned Parenthood v. Casey*, 505 U.S. 833, 1002 (1992) (Scalia, J., dissenting), *overruled by Dobbs v. Jackson Whole Women's Health Org.*, 597 U.S. 215, 231 (2022)). The Defendants add to the string of problems with this Rule by violating the First Amendment. The Defendants treat private plaintiffs' members' viewpoints unworthy of the public square, "old fashioned, or even offensive," but First Amendment rights "are not only for those who are deemed sufficiently enlightened, advanced or progressive." *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 896 (Ariz. 2019). Despite their best efforts, Defendants fail to show that Plaintiffs are not likely to succeed in their First Amendment claims.

    **3.   The Final Rule is Arbitrary and Capricious**

      The Defendants' response (much like the Final Rule itself) pays lip service to the Plaintiffs' arguments that it is arbitrary and capricious, but it relies on conclusory statements rather than serious legal analysis.  This is further proof that the Final Rule is arbitrary and capricious because (1) it offers an implausible explanation for the agency action, (2) it represents a sharp departure from past practice without reasonable explanation, and (3) it fails to consider reliance interests.

    **a.   The Final Rule is Supported by an Implausible Explanation**

      In their response, the Defendants repeat that the Final Rules reasoning "follows from carefully considering the structure and text of Title IX." Dkt. 38 at 14. This explanation of the Final Rule is so implausible it cannot be ascribed to difference in view of the product of agency expertise. *See New Mexico Health Connections v. U.S. Dept. of Health & Human Services*, 946 F.3d 1138, 1161

(10th Cir. 2019). Instead, by prohibiting educational institutions from maintaining facilities and sports teams based on biological sex, the Final Rule contradicts the text and history of Title IX in order to codify gender ideology.

According to the Defendants, sex-separated facilities and activities that are otherwise permissible still cannot maintain that separation if it causes more than *de minimis* harm. Since facilities separated by sex *always* cause more than *de minimis* harm to transgender individuals, sex-separated facilities and activities are impermissible. Dkt. 38 at 12-13. This explanation cannot be ascribed to agency expertise or difference in view. By prohibiting sex-separation in facilities and activities, the Final Rule <u>imperils</u> Title IX protections of biological females, the very group the statute was designed to protect. Biological females will no longer have sole access to female-only facilities and will lack the privacy and safety from biological males. And in activities, especially sports, biological females will lose access and opportunity as they are forced to compete with biological males in competitions where sex-separation had previously ensured a fair playing field. This cannot possibly be "compelled by that natural reading" of Title IX. Dkt. 38 at 12. The Final Rule is transparently motivated by gender ideology, not the text and structure of Title IX. Any notion that the Final Rule is justified because Title IX prohibits sex-separation in facilities and activities is therefore implausible.

**b.  The Final Rule is a Sharp Departure from Past Practice**

In their response, Defendants refer to the correct legal standard—"When an agency changes its position, it must 'display awareness that it is changing position'" *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)—but only cite a conclusory statement that they met that standard without saying how. These legal conclusions are present throughout their Response and should be treated by the court as a concession that the Defendants do not have any legal support for their positions.

The Defendants do not acknowledge that the Final Rule is a sharp departure from past practice. The inclusion of gender identity in Title IX is not the longstanding position of the Department of Education: the prior most recent rulemaking on this subject, *Nondiscrimination on*

*the Basis of Sex in Education*, held the opposite position. 85 Fed. Reg. 30,026, 30,178 (2020) ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification, and provisions in the Department's current regulations, which the Department did not propose to revise in this rulemaking, reflect this presupposition."). Other courts agree. *See* Ex. 3 at 39 ("But the Department doesn't provide any support for the position that its understanding of Title IX is "longstanding".). Throughout the Final Rule and their response, the Defendants insist they are merely issuing a "clarification" of Title IX's prohibition on the basis sex. *See* Dkt. 38 at 4 ("the Final Rule (1) clarifies the scope of prohibited sex discrimination under Title IX"); *Id.* at 7 ("The Rule's clarification that the scope of discrimination on the basis of sex includes discrimination on the basis of gender identity . . . reflects a straightforward construction of Title IX's text…"). Merriam-Webster's dictionary defines clarify as "to make understandable" or "to free of confusion."[6] It is impossible for anyone to display awareness they are changing position when they repeatedly insist that they merely clarifying.

The Defendants' response also illustrates their sharp departure from their prior policy. For example, the Defendants write that "[b]ecause preventing a student from using sex-separate restrooms consistent with their gender identity causes more than *de minimis* harm on the basis of sex . . . it is prohibited by Title IX." *Id.* at 12-13. But the prior policy did not include any notion of "*de minimis* harm"—until the Final Rule, Title IX prohibited only discrimination and denial of access and benefits on the basis of biological sex. And the Final Rule incorporates this new standard of "de minimis harm" only for gender identity, which also debuts in the Final Rule. By inventing two new standards out of thin air (neither of which are supported by the text of Title IX) the Defendants ban the sex-separate restrooms that were expressly permitted by its longstanding prior policy. It is arbitrary and capricious not to acknowledge this change of position.

    c.   **The Final Rule Ignores Reliance Interests**

---

[6] CLARIFY, Merriam-Webster Online Dictionary, available at https://tinyurl.com/259m3rth.

Educational institutions rely on the long-held understandings of the sex-separation provisions of Title IX to protect the safety and privacy of biological females. Defendants did not adequately address those interests—they simply denied they were affected by the Final Rule. First, Defendants assert they "lacked evidence that transgender students pose a safety risk to cisgender students, or that simply having a transgender student in a single-sex space compromised privacy interests." Dkt. 38 at 15-16. This ignores common sense, as well as prominent public incidents where female students were victimized by male students in school bathrooms.[7]

Defendants claim that they "strongly agree[] that recipients have a legitimate interest in protecting all students' safety and privacy" and insist that "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students." 89 Fed. Reg. 33,820. But they do not offer any elaboration or explanation of what those rules might be. Nonetheless, they prohibit states from making and enforcing the one rule that has historically protected all students' safety and privacy by separating facilities by biological sex. Moreover, Defendants categorically deny that the presence of biological males in facilities designated for biological females might "compromise[] privacy interests." But that begs the question: if not to protect the privacy and safety of women and girls, why separate restrooms and locker rooms by sex in the first place?

In addition to merely implying that some rules exist which can protect females' safety and privacy in mixed-sex facilities, the Defendants assert, again without any explanation, that educational institutions can adopt such rules at virtually no cost: "there are many ways for a recipient to comply with the Rule and provide nondiscriminatory access to its facilities, short of undertaking significant expenditures." Dkt. 38 at 15. Defendants first of all completely ignore that "gender identity" may include non-binary and gender-fluid individuals who may not believe that male- and female-designated facilities apply to them. The Final Rule entitles them to facilities "consistent with their gender identity"—which in most schools do not currently exist.

---

[7] *See, e.g., Virginia Family Sues School System for $30 Million Over Sexual Assault in Bathroom*, October 6, 2023, AP News, *available at* https://tinyurl.com/4nj3e5s6.

They also failed to consider the costs to states of retrofitting those facilities to protect the privacy and safety of the biological females who must continue to use those facilities alongside biological males. *See* Dkt 24 Exs. 1, ¶ 15; 2, ¶ 15. Some women and girls may not use them if they are not so retrofitted. *See Id.* Ex. 3, ¶¶ 4, 8. Defendants thus failed to consider the states' reliance on the manner in which privacy and safety were always protected under Title IX, which allowed sex-separated facilities. This failure was arbitrary and capricious. At least one other federal court agreed. *See* Ex. 1 at 33 ("[C]ompliance requires recipient schools to hire a Title IX Coordinator, redesign locker rooms and bathrooms . . . . The Final Rule did not even consider or discuss these additional construction and insurance costs").

### B.  The Plaintiffs will be Irreparably Harmed

The Plaintiff States, K.R., Female Athletes United, Moms for Liberty, and Young Americas Foundation have met their burden to show irreparable harm.

#### 1.  Plaintiff States will be Irreparably Harmed

Plaintiff States will suffer irreparable harm unless the Court enjoins or stays the Final Rule. The Defendants argue that "merely serious or substantial harm is not sufficient to show that the harm is irreparable." Dkt. 38 at 44 (cleaned up) (quoting S*chrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)). This is true in that "irreparable," also requires that the harm "cannot be adequately measured or compensated by money." IRREPARABLE INJURY, Black's Law Dictionary (11th ed. 2019).[8] It is undisputed that Plaintiffs will not be able to recover damages should they prevail on the merits because of sovereign immunity. Any costs Plaintiff States incur as a result of the Final Rule are unrecoverable. Their financial harms are, therefore, irreparable.

It is also undisputed that Plaintiff States will suffer financial harm as a result of the Final Rule. Plaintiffs will incur costs updating facilities that have been single-sex for decades (including locker rooms and restrooms) to ensure privacy for all students, and costs related to updating Title

---

[8] "If the threatened injury would be substantial and serious—one not easily to be estimated, or repaired by money—and if the loss or inconvenience to the plaintiff if the injunction should be refused . . . would be much greater than any which can be suffered by the defendant through the granting of the injunction . . . the case is one of such probable great or 'irreparable' damage as will justify a preliminary injunction." *Id.* (quoting Elias Merwin, *Principles of Equity and Equity Pleading* 426–27 (H.C. Merwin ed., 1895)).

IX materials, and costs related to hiring additional Title IX coordinators. They submitted declarations attesting to this. *See* Dkt. 25 Exs. 1–2. This will all need to be done—in every public elementary, middle, and high school and college in the country—before August 1, adding to the expense. Schools are already scrambling to comply. *See* Ex. 4

 Rather than dispute the costs, Defendants call them "routine" or "standard." *See* Dkt. 38 at 45. But their own Final Rule acknowledged that these costs would be "significant." *See* 89 Fed. Reg. 33,820; *see also* Ex. 3 at 76. And there is nothing "routine" or "standard" about having to hire additional staff (with very little notice) or having to retrain staff on new, nebulous requirements. Courts have already found as much, rejecting this argument. *See* Ex. 1 at 36 ("Based upon the Affidavits and Declarations of Plaintiffs, the compliance costs, the short time Plaintiffs have to comply, and the substantial likelihood of the violations of First Amendment rights and violations of the Spending Clause, Plaintiffs have shown irreparable harm.").

 The Defendants argue (at 14–15, 44–45) that the Final Rule does not require Plaintiffs to make changes to their facilities because they could just allow males who "identify" as females to use the girls' restroom and vice versa. But Plaintiffs States have an interest in protecting student privacy, and in many cases, that would require reconfiguring existing structures. *See* Dkt. 25 Exs. 1–2. And Plaintiffs are not required to "subject [themselves] to the very framework" they say is unconstitutional and thus avoid harm. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022). "Such a principle finds no support in our standing jurisprudence." *Id.*

 Defendants' out-of-circuit citation to *Florida v. Department of Health & Human Services*, 19 F.4th 1271 (11th Cir. 2021), does not help them. In that case, the Eleventh Circuit found that, while the Secretary of Health and Human Services' vaccination mandate interfered with the state's "new statutory scheme barring employers from imposing vaccine mandates," *id.* at 1278 (emphasis added), such interference was not an irreparable injury, *id.* at 1291. Here, Plaintiffs States have enacted policies to comply with Title IX for the past fifty years, all of which will be undone by the Final Rule. Plaintiffs States will not be compensated for re-doing their statutory schemes in light of the Final Rule. In addition, schools are an area of local and State control, not typically governed

by the federal government. When was the last time the U.S. Secretary of Education had a say in the composition of the fourth-grade girls' basketball team? Interference to this degree causes irreparable harm.

Plaintiff States will also be forced to infringe on the constitutional rights of their students, teachers, parents, and others. As discussed above and below, the Final Rule violates the First and Fourteenth Amendments. As schools are charged with enacting the Final Rule (or else risking losing federal funding and exposing themselves to lawsuits), they will be the ones to do the violating. This is not only wrong, but it also opens the schools up to additional civil lawsuits from those whose rights were violated. None of this will result in compensation from Defendants. These harms are, therefore, irreparable.

### 2.    Private Plaintiffs will be Irreparably Harmed

It is well established that even momentary losses of First Amendment freedoms constitute an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This was recently reaffirmed in *Louisiana*, slip op. at 36. The Defendants respond to the mountain of evidence private Plaintiffs propounded on their free speech and religious liberty concerns by addressing one item on their menu of injuries: changing clothes in front of members of the opposite sex. *See* Dkt. 38 at 46. This too should result in a forfeiture of this argument. *See Steak N Shake*, 110 F. Supp. 3d at 1085. They argue that this injury is too speculative to warrant preliminary relief. Defendants are wrong about the standard for First Amendment vagueness/overbreadth and RFRA injuries as discussed above. But Defendants also ignore (1) the problem that the Final Rule compels using inaccurate pronouns, which K.R. has already been asked to use, K.R. Dec. ¶¶ 28; (2) that the Final Rule prohibits private plaintiffs from discussing the issue, which they're already doing, *e.g.*, T.P. Dec. ¶ 29, K.R. Dec. ¶ 18; (3) the litany of other issues private plaintiffs have good reason to fear discussing and will chill their speech on, *e.g.*, K.R. Dec. ¶ 29–31; A.B.S. Dec. ¶ 44, A.R.S. Dec. ¶ 34, T.P. Dec. ¶ 38; T.Z. Dec. ¶¶ 30–31; and (4) the harm of forcing FAU members to compete against males, *e.g.*, T.Z. Dec. ¶ 28, Zwahlen Dec. ¶ 34, T.Z. Decl. ¶ 39, A.R.S. Decl. ¶ 35, A.B.S. Decl. ¶ 47. Finally, the evidence shows that the likelihood of males changing clothes in front of female

31

students is significant. This has occurred at schools where plaintiffs attend and in their communities. *See* Verdeyen Dec. at 2-3; Plank Dec. at 3; K.R. Dec. ¶¶ 3–22; T.P. Dec. ¶¶ 26–29.

Last, the Defendants ignore altogether the proof that YAF members are deterred right now from trying to host speakers speak on gender identity topics. *See* Verdeyen Dec. at 2-3 (deterred from hosting Chloe Cole, Paula Scanlan and Abby Roth as speakers); Adcock Dec. at 2-4 (deterred from hosting speakers and movie nights, and from organizing chalking event); Dkt. 25 Ex. 9; *see also* Dkt. 25 at 53. As college students, they need to plan for fall speakers currently but have a credible fear that if they do so, the Final Rule will subject them to discipline. This causes an irreparable injury by both chilling speech and by restricting the membership growth of YAF.

## C. The balance of harms and public interest favors Plaintiffs

The balance of equities favors the Plaintiffs. Defendants, and the public, have no interest in the promulgation of an unlawful rule. Multiple courts across the country have already found the balance of equities favor an injunction of the Final Rule. *See* Ex. 1 at 38 ("Equity is not in Defendants' favor"); Ex. 3 at 42 ("the public's <u>true</u> interest lies in the correct application of the law.") (internal citations omitted). But Defendants also lack any convincing argument that delaying the Final Rule would harm the public interest. They can point only to their interest in promulgating regulations. This interest is less significant when agency "clarifies" the application of statutes that were enacted in 1972. *See* 89 Fed. Reg. 33805 ("The Department's interpretation of Title IX flows from the statute's 'plain terms.'"). In the cases the Defendants cite, courts protected agency *enforcement* authority under existing law and regulation. There is no comparable agency interest in finding questionable authority to promulgate new regulations through notice-and-comment rulemaking. The Defendants' also claim that "preventing sex discrimination is in the public interest." But as noted the Final Rule perpetrates sex discrimination, by elevating the inclusion interests of biological men identifying as female over biological women. Thus, preventing sex discrimination is best achieved by enjoining or staying the Final Rule.

## D. Relief Should Not Be Limited to the Parties

There is no doubt that the Defendants should be enjoined from wreaking havoc on Title IX through this Final Rule. The only remaining question for the court is what the scope of the injunction should be. The Court should grant a nationwide injunction. In APA cases, the normal remedy is complete vacatur of the rule. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989). "Courts have, thus, found a nationwide injunction appropriate in such cases." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 397 (M.D.N.C. 2019); see also *id.* (collecting cases); *Jordan v. Pugh*, No. CIV.A. 02-CV-01239MS, 2007 WL 2908931, at *4 (D. Colo. Oct. 4, 2007). Furthermore, injunctive relief must also "provide complete relief to the plaintiffs" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) and be "workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017). Limiting relief to the Plaintiff class would neither provide complete relief to the plaintiffs nor be workable.

First, the Plaintiffs not only include four sovereign states but an out-of-state Plaintiff and three organizational plaintiffs with members who reside in all 50 states. Dec. of Tiffany Justice at ¶ 5 (attached as Ex. 5) ("Moms for Liberty has chapters across the country. . . .); Dec. of Madison Hahn at ¶ 5 (attached as Ex. 6) (YAF "has members in all fifty states); *id.* ("The vast majority of Young America's Foundation's members and chapter organizations are outside the states of Kansas, Alaska, Utah, and Wyoming."); Brown Dec. ¶¶ 25–26 (listing states with FAU members). If the Court were to limit the injunction to four states, there would not be "complete relief" for the remaining plaintiffs. And the Court cannot provide effective relief simply by enjoining the Defendants from enforcing the Final Rule against private Plaintiffs and their members. The primary purpose injunctive relief would serve toward these Plaintiffs would be preventing their schools from enforcing the Final Rule against them. Therein lies the problem. To provide complete relief for these Plaintiffs, the Court would have to order their schools not to comply with the Defendants' Final Rule. At that point, the Court has no option but to go outside the parties of this case in order to provide "complete relief" to the Plaintiffs.

Second, an injunction must be "workable." Given the interstate nature of the Final Rule and the effects that flow from it, a limited injunction would not be "workable." Plaintiffs include four States, Kansas, Alaska, Utah, and Wyoming, K.R. (who lives in Oklahoma), and organizations who have members across the county, including California, Virginia, Pennsylvania, New York, and other states. Tailoring relief so that it only effected Plaintiffs would be extraordinarily difficult. One cannot craft an injunction that provides relief to Plaintiffs without it applying to other states as well. Members of Plaintiff FAU play sports on a college level all over the country, including in Plaintiff States. Dkt. 25 Ex. 4 ¶¶ 25–26. Specifically, member A.B.S. will play college volleyball in Kansas. Dkt. 25 Ex. 5 ¶ 47. She will play against schools in other states. *Id.* ¶ 48. If the Court limits relief, she may be forced to play against biological males in other states. This is not workable. Other members of FAU compete outside the Plaintiff States. (Ex. 7).

Finally, the two courts that issued limited injunctions had circumstances differing than the case at bar. For example, in *Louisiana* all of the Plaintiffs resided in the Plaintiff States. *See generally* Ex. 1. In *Tennessee*, the only plaintiff that resided outside the Plaintiff States was a group of Christian educators all of whom are presumably adults. *See generally* Ex. 3. It is significantly more workable to afford injunctive relief to adults in their capacity as educators. This case includes Plaintiffs who are both parents and students; it therefore presents more difficulties in issuing narrowed injunctive relief. Finally, in *Tennessee* the court issued narrow relief based primarily on Sixth Circuit precedent that cautioned against granting nationwide injunctions against the federal government. Ex. 3 at 90-91. The Tenth Circuit does not have similar cautions.

While a nationwide injunction would extend relief beyond the parties, it would not be overbroad. When three named plaintiffs are national groups with members across the country, "such breadth is necessary to give the prevailing parties the relief to which they are entitled." *Easyriders Freedom F.I.G.H.T v. Hannigan*, 92 F.3d 1486, 1502 (9th Cir. 1996) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (emphasis preserved)). *Easyriders* is instructive. The case involved a challenge to California's law requiring motorcycle riders to wear helmets that complied with federal safety standards. One of the plaintiffs was Easyriders, an "association of motorcycle

enthusiasts." *Id.* at 1490. No way existed to effectively protect Easyrider's members without an injunction that protected "all motorcyclists," instead of just named plaintiffs and their members. *Id.* at 1501-02. Like the state officers, the schools which Plaintiffs attend have no way of knowing who is a member of YAF or Moms for Liberty before acting. *Id.* at 1502. Trying to implement an injunction that only protected some students but not others on the same campus would be an administrative nightmare of such proportions as to render any injunction ineffective.

The Defendants also are mistaken in claiming that Moms for Liberty members cannot, as parents, vindicate the rights of their children. *See Linn Mar*, 83 F.4th at 663, 666 ("Parents Defending Education, an association of parents" has standing "to sue when the practices and policies of a school threaten the rights and interest of their minor children"); *Menders*, 65 F.4th at 157 ("[T]he parents of several children . . . [who] sued the [school board]" could allege that a new school policy "chilled their children's speech to support their First Amendment claims").[9] Issuing a nationwide injunction would also be appropriate because, if the Plaintiffs are successful at the merits stage, the remedy would be vacatur. And given that there is not a feasible way to have a limited injunction that both provides complete relief to the Plaintiffs and is workable, the appropriate relief at this stage would be a nationwide injunction.[10]

<u>CONCLUSION</u>

There is no universe in which this Final Rule is lawful. The Defendants know they don't have the authority to issue the Final Rule but utilized Title IX and *Bostock* as a pretext to force their radical ideology on schools across the nation. Other courts have seen past the Defendants' charades, and so should this Court. The Court should enjoin the Final Rule and do so nationwide.

---

[9] Private plaintiffs ask this court to waive the bond requirement if it should issue a preliminary injunction considering the strong public interest in this case. *See Tennessee*, slip op. at 91.

[10] The amicus filed provides no support for a narrow injunction either. States are still free under the status quo to adopt aspects of the Final Rule into their own laws if there is support for it within the respective state.

Respectfully submitted this 19th of June, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Bar no. 29788
Deputy Attorney General
Erin B. Gaide, Bar No. 29691
Assistant Attorney General
Jay Rodriguez, Bar No. 29172
Assistant Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
         erin.gaide@ag.ks.gov
         jay.rodriguez@ag.ks.gov

TREG TAYLOR
**Attorney General of Alaska**

*/s/ Cori Mills*
Cori Mills*
Deputy Attorney General
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

**Counsel for Plaintiff State of Alaska**

SEAN REYES
**Attorney General of Utah**

*/s/ Lance F. Sorenson*
Lance F. Sorenson*
Assistant Utah Attorney General
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

**Counsel for Plaintiff State of Utah**

36

BRIDGET HILL
Attorney General of Wyoming

*/s/ Ryan Schelhaas*
Ryan Schelhaas*
Chief Deputy Attorney General
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786 Direct line
(307) 777-6869 Fax
ryan.schelhaas@wyo.gov

**Counsel for Plaintiff State of Wyoming**

*/s/ William E. Trachman*
William E. Trachman**
James L. Kerwin*
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org
*Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation*

*/s/ Braden H. Boucek*
Kimberly S. Hermann*
Ga. Bar No. 646473
Braden H. Boucek*
Tenn. BPR No. 021399
Ga. Bar No. 396831
Jordan Miller*
*Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation*

Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

*/s/ Tyson C. Langhofer*
Tyson C. Langhofer
Kansas Bar No. 19241

Rachel A. Rouleau*
Virginia Bar No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*Counsel for Plaintiffs K.R. and FAU*

* Pro Hac Vice
* Pro Hac Vice Forthcoming

37

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 19th day of June, 2024, this memorandum was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic service to all counsel.

_/s/ Abhishek S. Kambli_
Abhishek S. Kambli