IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, et al.,

      Plaintiffs,

v.                                        Case No.  24-4041-JWB

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

      Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on Plaintiffs' motion for a stay/preliminary injunction. (Doc. 24.)  The motion has been fully briefed and is ripe for decision.  (Docs. 25, 38, 43, 45, 47.)  Plaintiffs seek an injunction forbidding the "Final Rule"—as that term is defined herein—from going into effect on August 1, 2024.  (Doc. 24 at 1.)  The court held a hearing on the motion on June 20, 2024.  For the reasons set forth herein, Plaintiffs' motion for a preliminary injunction is GRANTED.

## I.      Facts and Procedural History

At its core, this case involves statutory interpretation of the word "sex" as that term is used in Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, *et. seq*.  The court begins with the history of Title IX and a review of the previous regulations issued by Defendant United States Department of Education (the "DoE").

In short, Title IX's text mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  Title IX was enacted on June 23, 1972, after a lengthy

battle.  *See Tennessee v. Cardona,* 2024 WL 3019146, at *2 (E.D. Ky. June 17, 2024) (discussing the history of Title IX).  Title IX was "patterned after Title VI of the Civil Rights Act of 1964." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 684–85 (1979).  When the provisions were introduced in the Senate for debate, Senator Bayh commented that the "heart of this amendment is a provision banning sex discrimination in educational programs receiving federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment." *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 524 (1982) (quoting 118 Cong. Rec. 5,803 (1972)).  He stressed that "one of the great failings of the American educational system is the continuation of corrosive and unjustified discrimination against women."  118 Cong. Rec. at 5,803.  He urged the passage of the amendment to "root out . . . the social evil of sex discrimination in education." *Id.* at 5,804.  It was clear to all that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004).

There are exemptions to Title IX, including those for religious organizations, military institutions, and social fraternities.  § 1681.  Also, institutions of undergraduate higher education which traditionally and continually only admitted students "of one sex" were exempt. § 1681(a)(5).  Further, § 1686 states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes."  Congress also passed legislation authorizing federal agencies which are empowered to extend federal financial assistance to an education program or activity to issue rules or regulations that are consistent with achievement of the objectives of the statute.  20 U.S.C. § 1682.

The United States Department of Health, Education, and Welfare promulgated final regulations in 1975 concerning Title IX.[1] *Bell*, 456 U.S. at 515.  The Title IX regulations included regulations in the area of athletics.  High schools and colleges were given three years to comply with the regulation on athletics which required equal opportunities for "members of both sexes" to participate in athletics.  34 C.F.R. § 106.41(c), (d).  The regulations also provided that a recipient "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex."  34 C.F.R. § 106.33.

Amendments to the regulations became effective on November 24, 2006, to "clarify and modify Title IX regulatory requirements pertaining to the provision of single-sex schools, classes, and extracurricular activities in elementary and secondary schools." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 71 Fed. Reg. 62530-01 (Oct. 25, 2006) (codified at 34 C.F.R. § 106.34).  The third major amendment to the regulations occurred in 2020.  These amendments addressed sex-based harassment as a form of sex discrimination, a recipient's obligation to address sexual harassment, grievance procedures, and implemented remedies for victims.  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01 (May 19, 2020) (codified in Title 34 of the Code of Federal Regulations).  This was the first time that the regulations addressed sexual harassment and included a definition for that term.  § 106.30.

On June 15, 2020, the United States Supreme Court issued *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020).  The Court held that an employer violates Title VII of the Civil

[1] "HEW's functions under Title IX were transferred in 1979 to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96-88, 93 Stat. 678, 20 U.S.C. § 3441(a)(3) (1976 ed., Supp. IV)." *Bell*, 456 U.S. at 516, n.4.

Rights Act of 1964 by firing an individual for being homosexual or transgender. *Bostock*, 590 U.S. at 683. On January 8, 2021, the DoE issued a memorandum regarding *Bostock*. *See* U.S. Dep't of Educ., Memorandum Re: *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) at 1 (Jan. 8, 2021) (rescinded in 2021), https://www2.ed.gov/about/offices/list/ocr/correspondence/other/ogc-memorandum-01082021.pdf. Notably, DoE stated that *Bostock* did not "construe Title IX," and that the "Title IX text is very different from Title VII text in many important respects," including that Title IX "contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex." *Tennessee v. Dep't of Educ.*, No. 22-5807, ---F.4th---, 2024 WL 2984295, at *2 (6th Cir. June 14, 2024) (quoting the January 8, 2021, memorandum). As the Sixth Circuit has noted, however, the new Biden administration has an "opposite take" on *Bostock*. *Id.*

On March 8, 2021, President Biden issued an executive order tasking the Secretary of Education to review all existing regulations, orders, guidance documents, policies and other similar agency actions to determine whether they were inconsistent with the Administration's policy that all students be guaranteed an educational environment free from discrimination on the basis of sex and discrimination on the basis of sexual orientation or gender identity. *See* Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021). On June 22, 2021, the DoE published its interpretation of Title IX in the Federal Register. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021). Notably, this document is currently enjoined from being applied to several States, including Plaintiffs Alaska and Kansas. *Tennessee*, 2024 WL 2984295, at *26–27.

4

On July 12, 2022, the DoE published the proposed regulations in the Federal Register.  The DoE received more than 240,000 comments on the proposed regulations.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33477 (Apr. 29, 2024), the "Final Rule."  The Final Rule slightly modified some of the proposed regulations based on the comments and is set to take effect on August 1, 2024.  According to the Final Rule, the DoE amended the regulations to "better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate."  89 Fed. Reg. at 33,474.  The Final Rule's main changes identified by the DoE include a change in the grievance procedures for complaints of sex discrimination, clarifying that Title IX's prohibition on sex discrimination includes different forms of sex-based harassment and a modification to the definition of that term, and clarifying that sex discrimination "includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."  *Id.* at 33,476.

With respect to the expansion of what constitutes sex discrimination under Title IX, DoE believes that its definition of sex discrimination is "consistent with the Department's statutory authority under Title IX, prior and current Department guidance, various Executive Orders, and Federal case law precedents."  *Id.* at 33,804.  In support, DoE repeatedly references the Supreme Court's decision in *Bostock* throughout the Final Rule.  DoE acknowledges that the Supreme Court expressly stated that its decision in *Bostock* was only applicable to Title VII but relies on that decision for authority to promulgate the new regulations.

The new regulations also amend § 106.31 to add a provision related to differential treatment or separation on the basis of sex which is permitted under the statute or regulations.  A recipient must not carry out "such different treatment or separation in a manner that discriminates on the

basis of sex by subjecting a person to more than de minimis harm." Fed. Reg. at 33,887 (to be codified at 34 C.F.R. 106.31(a)(2). The regulation defines "more than de minimis harm" as "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity." *Id.* The regulation states that § 106.31(a)(2) is not applicable to the aforementioned statutory exemptions to Title IX and the corresponding regulations to those exemptions. *Id.* DoE contends that the new regulation would not apply to sex-separate athletic teams permitted under § 106.41(b) as that regulation is carved out in § 106.31(a)(2). Fed. Reg. at 33,819. Section 106.31(a)(2) would apply to bathrooms and shower facilities. *Id.* at 33,819. Further, it would also apply to single-sex classes or portions of classes, such as physical education, that are allowed under the current regulations. *Id.*

The term "gender identity" is not defined in the new regulations. The DoE determined that it was not necessary to define the term. But the term is understood as "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809. The DoE did not specify how a school should determine a student's gender identity. *Id.* at 33,819. However, requiring a "student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm." *Id.*

Further, the Final Rule amends the definitions for sexual harassment. The previous version of § 106.30 in which sexual harassment was addressed has been removed and there are amendments to the definition section (§ 106.2) which include a definition for "sex-based harassment." *Id.* at 33,884. The Final Rule also changes the grievance procedures with respect to the process that is required after a sex discrimination complaint is filed.

Plaintiffs filed this complaint on May 14, 2024. (Doc. 1.) Plaintiffs include the States of Kansas, Alaska, Utah, and Wyoming. Plaintiffs also include K.R., a minor, and three organizations: Moms for Liberty, Young America's Foundation, and Female Athletes United (the "Plaintiff Organizations"). Plaintiffs allege that the Final Rule is contrary to law, in excess of statutory jurisdiction, arbitrary and capricious, violates separation of powers principles, violates the Spending Clause, and violates the First Amendment. Plaintiffs seek a declaratory judgment holding the Final Rule unlawful and other related declaratory relief. Plaintiffs also seek a preliminary and permanent injunction prohibiting Defendants from enforcing the Final Rule, as well as a stay of the Final Rule's effective date. Plaintiff States all receive federal funding for their schools and are thus required to comply with the Final Rule. A failure to comply with Title IX may result in termination of federal funding. 20 U.S.C. § 1682. Plaintiff States assert that the Final Rule conflicts with laws passed in their states such as laws regarding separate facilities and restrooms for both sexes and prohibiting males from competing against females in sports. (Doc. 25 at 25–26.)

Plaintiff K.R. attends a public middle school in Oklahoma. K.R. has submitted an affidavit in support of the motion. K.R. states that she has encountered biological males using the girls' restroom in her school. (Doc. 25-4 at 3.) She was very uncomfortable using the restroom with a biological male and did not feel safe. Because she didn't feel safe, she remarkably refused to use the restroom at school during this time period in which transgender students were allowed to use the restroom which corresponded with their gender identity. Although most of the biological males using the girls' restroom identified as females, K.R. attested that on some occasions biological males who did not identify as female used the girls' bathroom because they knew they could get away with it. (*Id.*) Oklahoma passed a law which prohibits students from using a bathroom that

does not align with their biological sex.  Okla. Stat. Ann. tit. 70, § 1-125.  After the passage of this law, K.R. returned to using the school bathroom.  She fears, however, that the Final Rule will allow biological males to use the girls' bathroom.

Additionally, K.R. is a Christian who believes that God created two sexes, male and female.  She also believes that a person cannot change their sex.  K.R. believes that it violates her religious beliefs to use a pronoun for an individual when that pronoun does not accurately reflect their sex.  She has spoken on her beliefs at school.  K.R. fears that she will be punished under the Final Rule for declining to use a student's preferred pronouns and for expressing her religious beliefs.  (Doc. 25-4 at 6.)

Plaintiff Moms for Liberty is a national organization.  (Doc. 43-6.)  Its members' children attend schools that receive federal funding.  Its members include Merianne Jensen, Tricia Plank, Debbie Lochner, and Rebekah Koznek, who have all submitted declarations in support of the motion for injunctive relief.  Ms. Jensen lives in Virginia and has minor children in the Prince William County School District.  (Doc. 25-12 at 3.)  Ms. Plank lives in Pennsylvania and has minor children in the Upper Adams School District.  (Doc. 25-15.)  Ms. Lochner lives in New York and has a minor student in the Newark Central School District.  (Doc. 25-16.)  Ms. Koznek lives in California and has minor children in the Atascadero Unified School District.  (Doc. 25-13.)  The members declare that they and their children have deeply-held religious beliefs regarding gender identity and transgender issues similar to the beliefs of K.R.  They also share the belief that individuals should use the bathroom that aligns with their biological sex.  (Docs. 25-13 at 2; 25-15 at 2; 25-16 at 2.)  The members further state that their children share those views and have expressed them at their schools.  (Docs. 25-12, 25-13, 25-15, 25-16.)  Similar to K.R., their children have continued to use pronouns that align with biological sex based on their religious

beliefs.  They fear, however, that the Final Rule will subject them to school discipline for expressing statements related to gender identity.  Moms for Liberty has set also forth evidence that its mission would be impeded by the Final Rule by deterring its members and their children from expressing their viewpoints about gender identity and transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms. (Doc. 43-6.)

Plaintiff Young America's Foundation is a national organization devoted to promoting traditional values and providing students with resources to advance such values on college campuses.  (Docs. 1 at 7; 43-7 at 2.)  Young America has chapters on campuses across the country and including Kansas State University, the University of Utah, and the University of Wyoming. (doc. 43-7 at 2.)  Young America's members at these schools include declarants Thomas Adcock, Rachel Flynn, and Kailee Verdeyen.  All three have similar beliefs to K.R.  They plan to bring speakers to campus to discuss these issues with similar viewpoints and to personally engage in discussion on their views.  (Docs. 25-11, 25-10, 25-14.)  They are concerned that the Final Rule will subject them to investigatory or disciplinary proceedings and are afraid that they will be deterred from organizing events and speaking their views.

Plaintiff Female Athletes United ("FAU") is an organization that was formed to defend equal opportunity, fairness, and safety in women's and girls' sports.  (Doc. 25-5.)  FAU members A.R.S., T.P., and T.Z. attend public schools in Kansas, Wyoming, and Utah.  All three are minor students and play girls' sports at their schools and they currently do not have to play against biological males because of current state laws.  They also want to continue to speak freely about their views on women's sports, sharing intimate spaces with biological males, and issues related to gender identity.  They are concerned that they will be forced to express messages that they do

not agree with and want to continue speaking about their opinions on these issues in school. They are also concerned about having to share private places such as bathrooms and locker rooms with biological males. Sharing these intimate places make them feel uncomfortable and unsafe. (Docs. 25-7, 25-8, 25-17.)

On May 24, Plaintiffs filed a motion for a preliminary injunction. Plaintiffs seek a stay of the Final Rule under 5 U.S.C. § 705 prohibiting enforcement of the Final Rule during the pendency of this litigation. Defendants oppose the motion. The court held a hearing on the matter on June 20. At the hearing, the court heard oral argument from the parties and took the matter under advisement. The court has also reviewed an amici brief in support of Defendants filed by the Attorney General of New Jersey on behalf of several States that are not parties. (Doc. 41.) These States oppose the relief requested by Plaintiffs.

The court notes that there are several actions pending throughout the United States in which the plaintiffs in those cases raise similar claims and most of which have also sought injunctive relief. (*See* Doc. 36 at 3) (citing cases). At this time, two courts have issued decisions granting injunctive relief to the plaintiffs in those cases and enjoining the DoE from enforcing the Final Rule. *See Louisiana, et al. v. Dep't of Ed., et al*., No. 3:24-CV-00563, 2024 WL 2978786, at *2 (W.D. La. June 13, 2024); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, __ F. Supp.3d __, 2024 WL 3019146, at *1 (E.D. Ky. June 17, 2024). Those courts limited injunctive relief to the plaintiff States in those cases. This court joins those courts in granting injunctive relief to Plaintiffs as set forth herein.

## II.    Standard

Under the Administrative Procedures Act ("APA"), a reviewing court shall hold unlawful and set aside agency actions when the court finds such actions to be "(A) arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; or (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ."  5 U.S.C. § 706(2).

Further, pursuant to 5 U.S.C. § 705, a court reviewing a final rule may stay the effective date of agency action pending conclusion of the review proceedings.  In determining whether to stay the effective date of the final rule, the court applies the same four factors traditionally used to analyze a request for a preliminary injunction. *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021); *cf. Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980) (explaining that a § 705 stay is a provisional remedy in the nature of a preliminary injunction).  The four factors which must be shown by the movant to obtain preliminary injunctive relief include: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *Id*.  The third and fourth factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal. *First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1084 (D. Kan. 2020); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  "Additionally, some preliminary injunctions are disfavored and require a stronger showing by the movant—viz., movants must satisfy a heightened standard.  They are '(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.'" *Fish v. Kobach*, 840 F.3d 710, 723–24 (10th Cir. 2016) (citation omitted.)  "In seeking such an injunction,

the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* (citation and internal quotation marks omitted).

## III.    Analysis

Plaintiffs seek a preliminary injunction staying the effective date of the Final Rule.  In support, Plaintiffs contend that they will prevail on all of their claims.  Plaintiffs contend that the Final Rule is contrary to Title IX, violates the major questions doctrine, violates the Spending Clause and the individual Plaintiffs' constitutional rights, and is arbitrary and capricious.[2]  The court begins with the issue of standing and then turns to the arguments on the merits.  Ultimately, the court finds that Plaintiffs are likely to prevail on several claims and, as such, are entitled to injunctive relief.

### A.  Standing

The court has a duty to determine whether a party has standing if the court believes that there is an issue or if standing is raised by the parties.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005).  In their response brief, Defendants only challenge standing with respect to Plaintiffs' claim that the regulation violates RFRA.  (Doc. 38 at 44–46.)  Constitutional standing requires (i) that the plaintiff suffer an "injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  These requirements ensure that "the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the] invocation of federal-court jurisdiction."  *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  Where, as here, a

---

[2] While Plaintiffs raise additional arguments, the court declines to address those at this time in light of its finding that Plaintiffs will prevail on the issues addressed herein.

plaintiff seeks prospective relief such as an injunction, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). "The threatened injury must be certainly impending and not merely speculative." *Id.* (quotations and citation omitted).  Plaintiffs have the burden to establish standing.  *See Gandy*, 416 F.3d at 1154.

The court has no trouble finding that Plaintiffs have established standing with respect to their claims.[3]  The Plaintiff States have laws pertaining to students' privacy and separation of students by their biological sex.  The Plaintiff States allege that the Final Rule interferes with their sovereign right to create and enforce their own laws, imposes administrative costs and burdens, and requires Plaintiff States to redesign or reconfigure their physical facilities.  (Doc. 1 ¶¶ 209, 210, 212.)  States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal."  *Texas v. Cardona*, No. 4:23-CV-00604-O, ---F. Supp. 3d.---, 2024 WL 2947022, at *11 (N.D. Tex. June 11, 2024) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)).  Here, Plaintiffs contend that DoE seeks to regulate Title IX in a manner that is not compatible with their state laws.  *See* K.S.A. § 72-6286(a) (requiring that overnight accommodations on school travel be separated by sex of the student); Alaska Stat. § 14.18.040 (requiring that schools provide showers, toilets, and training-room facilities for both sexes for athletic or recreational purposes): Utah Code Ann. § 63G-31-301(1) (restrooms and changing rooms must correspond to the student's sex); and Wyo. Stat. Ann. § 21-25-102

---

[3] In any event, even if the individual Plaintiffs do not have standing on their RFRA claim, standing as to the other claims addressed herein has been plausibly alleged and this court's decision to grant preliminary injunctive relief is based on Plaintiffs' claims as addressed herein.  Further, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rocky Mountain Peace & Just. Ctr. v. United States Fish & Wildlife Serv.*, 40 F.4th 1133, 1153, n.19 (10th Cir. 2022) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

(separating athletic activities by sex).  Recipients of federal education funding in Utah are faced with having to either comply with Title IX or state law regarding bathroom use.  As a result, those schools would have to reconfigure all bathrooms to comply with both state law and the Final Rule. (Doc. 25-3 at 3.)

Further, new duties are imposed under the Final Rule that were not required under the prior regulations.  The States must now investigate allegations of sex discrimination based on gender identity discrimination.  The States must comply with the requirement of new policies in accordance with the Final Rule and hire Title IX coordinators to make sure the policies are carried out.  (Docs. 25-2, 25-3.)  This is sufficient to show an injury for standing purposes.  Further, Plaintiff States have standing due to the alleged injuries to their state universities. *See Tennessee*, 2024 WL 2984295, *4 (quoting *Arkansas v. Texas*, 346 U.S. 368, 370, 371 (1953) (holding that Arkansas had Article III standing to represent the interests of the University of Arkansas because under Arkansas law "the University of Arkansas is an official state instrumentality" and "any injury . . . to the University is an injury to Arkansas").  They are also threatened with a loss of federal funding if they fail to comply with the Final Rule. *Id.* at *5.  The States have further sufficiently alleged that their injury is traceable to Defendants and redressable by a favorable ruling. *See id.* at *7; *see also Texas*, 2024 WL 2947022 at *18–19.

Next, K.R. and the Plaintiff Organizations have put forth evidence by way of declarations as discussed herein.  In those declarations, K.R. and the Plaintiff Organizations' members attest to their religious beliefs that there are two sexes, a person's sex cannot be changed, and that they believe that they must use pronouns which align with a person's biological sex.  They have all espoused these views at their schools.  In light of the Final Rule, however, they are fearful that they would be subject to investigation and potential discipline for continuing to speak their views.

The court finds that K.R. has standing to challenge the Final Rule.  *See Kansas Judicial Review v. Stout*, 519 F.3d 1107, 116–17 (10th Cir. 2008) (discussing standing with respect to a First Amendment claim).

Turning to the Plaintiff Organizations, they have standing to sue on behalf of their members when (1) their members have standing in their own right; (2) the interests at stake are relevant to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the individual members to participate in the lawsuit.  *See Friends of the Earth v. Laidlaw Envtl. Serv.*, 528 U.S. 167, 181 (2000).  Based on the affidavits submitted by the members of the Plaintiff Organizations, the court finds that those members have established standing to challenge the constitutionality of the Final Rule based on a potential chilling of their speech in violation of the First Amendment.  *See Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 666 (8th Cir. 2023) ("Parents have standing to sue when the practices and policies of a school threaten the rights and interests of their minor children.") (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718–19 (2007)).  In their supplemental briefing, Defendants contend that the affidavits fail to show that the members face imminent, irreparable injury outside of the Plaintiff States.  (Doc. 47 at 3.)  This argument, however, is focused on the scope of relief.  It does not suggest that this deprives the Plaintiff Organizations of standing.

Next, the interest at stake must be relevant to the organization's purpose.  All three Plaintiff Organizations have submitted declarations setting forth their purpose.  Moms for Liberty is a nationwide organization with chapters across the country.  Moms for Liberty's mission is to defend the fundamental right of parents to raise their children in accordance with their values and morals.  (Doc. 43-6.)  Its mission would be impeded if the Final Rule went into effect by deterring its members and their children from expressing their viewpoints about gender identity and

transgenderism in schools and by placing them in uncomfortable and unsafe positions in private places such as restrooms and locker rooms. *Id.* YAF is a national organization with "thousands of student members on college campuses across the country" and in all fifty states. (Doc. 43-7.) Their mission is to ensure that young Americans are inspired by the ideas of individual freedom, a strong national defense, free enterprise, and traditional values. *Id.* Those values include the belief that sex is determined at birth, "there are two sexes/genders, and an individual cannot change his or her sex/gender." *Id.* at 2. If the Final Rule goes into effect, it will impede the mission by deterring their members from engaging in discussion about gender identity and transgenderism and it will deter students from hosting speakers who discuss these issues. *Id.* at 3. Finally, one of FAU's purposes and goals is that its members can "freely advocate in favor of fairness in women's sports at their schools." (Doc. 25-5 at 9.) This includes empowering its members to express views that males should not be permitted on women's teams or in private spaces such as restrooms and locker rooms. FAU members also want to express their beliefs that male athletes who identify as female are in fact males. *Id.* at 8. FAU is concerned that its members will lose their scholarships, privacy, and freedom of speech. Based on this review, the court finds that the interests at stake are relevant to the Plaintiff Organizations' purposes.

Finally, neither the claim nor the relief sought requires that the individual members participate. Plaintiffs are merely seeking declaratory and injunctive relief. (Doc. 1 at 81–83.) As such, the individual members do not need to participate. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 696 n.13 (10th Cir. 2009).

Based on the foregoing, the court finds that Plaintiffs have standing to challenge the Final Rule.

**B.  Preliminary Injunction Element One: Prevail on the Merits**

16

### i. Contrary to Law

Plaintiffs argue that the final regulation is contrary to the plain language of Title IX in defining sex discrimination as discrimination on the basis of gender identity.  The court must first look to the statute to determine its meaning.  "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock*, 590 U.S. at 654.  Further, the court is to interpret a statute "in accord with the ordinary public meaning of its terms at the time of its enactment." *Id.*  The Supreme Court recently held that the court "need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enter. v. Raimondo*, ---S. Ct.---, 2024 WL 3208360, *22 (June 28, 2024).  The court must exercise its "independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.*

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  At issue here is Title IX's command that an individual not be discriminated against "on the basis of sex."  Therefore, the court must determine the ordinary meaning of this command.  *Bostock*, 590 U.S. at 654.  After review, the court finds that the unambiguous plain language of the statutory provisions and the legislative history make clear that the term "sex" means the traditional concept of biological sex in which there are only two sexes, male and female.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (discussing that the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme.")

Defendants do not dispute that at the time Title IX was enacted in 1972, the term "sex" was understood to mean the biological distinctions between males and females and conceded as such

during the hearing.  Tr. at 27–28; *see Bostock*, 590 U.S. at 655 (assuming that "sex" in Title VII referred only to the "biological distinctions between male and female"); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions) (discussing that in 1972, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females—particularly with respect to their reproductive functions."); *Tennessee*, 2024 WL 3019146, at *9 (citing *The American College Dictionary* 1109 (1970) and *Webster's Third New International Dictionary* 2081 (1971) (sex was defined as "one of the two divisions of organic [sic] esp. human beings respectively designated male or female").

The legislative history also supports a finding that the term "sex" referred to biological sex. As discussed, one of the principal purposes of the statute was to root out discrimination against women in education.  The legislative history shows that Congress was concerned about the unequal treatment between men and women for admissions opportunities, scholarships, and sports.  The legislative history provided statistics on the number of women and men being included in various programs and activities.  118 Cong. Rec. at 5,804–06.  The legislative history is clear that Congress was referring to the biological sex of both males and females.

The text of the statute also supports a finding that the term "sex" meant biological sex and not gender identity or sexual orientation.  Title IX explicitly provides exceptions to the nondiscrimination mandate.  In one exception, the statute discusses that Title IX will not apply for a period of time to an institution which "admits only students of one sex" while that institution transitions to "being an institution which admits students of both sexes."  § 1681(a)(2).  In another exception discussing "father-son" and "mother-daughter" activities, the statute states that such activities, if provided for "one sex," shall not be precluded for the "other sex" as long as the "other

sex" has opportunities for "reasonably comparable activities." § 1681(a)(8).  Therefore, it is clear from the statutory language that the term "sex" refers to the traditional binary concept of biological sex.  That is also supported by the ordinary meaning of the word "sex" at the time Congress enacted Title IX.  Given this background, the plain language of "sex" in Title IX does not mean "gender identity."

Defendants do not make much effort to dispute that the term "sex" in Title IX means biological sex.  Rather, Defendants argue that this makes no difference because discrimination on the basis of gender identity **is** discrimination on the basis of biological sex.  (Doc. 38 at 19.) Therefore, the final regulation is not contrary to Title IX.  In support of their position, Defendants rely on *Bostock* and other cases citing *Bostock* in support, including the Tenth Circuit's recent decision applying *Bostock* to the Equal Protection clause.  *See Fowler v. Stitt*, No. 23-5080, --- F.4th---, 2024 WL 3035712 (10th Cir. June 18, 2024).[4]

The "only question" in *Bostock,* however, was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex'" in violation of Title VII.  590 U.S. at 681.  First and foremost, *Bostock* involved a different statute, Title VII, which prohibits sex discrimination in employment.  Although the statutes are similar in that they both prohibit sex discrimination, there are notable differences.  Significantly, Title IX includes several carve outs to the prohibition on sex discrimination that are not present in Title VII.  *See* § 1681(a)(1)–(9).  Further, Title IX is about schools, and "the school is not the workplace." *Adams by & through Kasper v. Sch. Bd. of*

---

[4] The court also notes that in an unpublished opinion the Tenth Circuit assumed for purposes of an appeal "that under Title IX, discrimination on the basis of sexual orientation is sex-based discrimination." *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 23-2064, 2024 WL 1881076, at *8, n.9 (10th Cir. Apr. 30, 2024).  This statement was contained in a footnote without discussion.  Because the issue here was not presented to the court of appeals for review and the decision was unpublished, *Dimas* is neither binding nor helpful.  *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005) ("[U]npublished orders are not binding precedent . . . .")

*St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) ("Courts, moreover, must bear in mind that schools are unlike the adult workplace."); *id.* at 675 (Kennedy, J., dissenting) (noting the "differences between children and adults, peers and teachers, schools and workplaces" and that "schools are not workplaces and children are not adults"). The Supreme Court also explicitly declined to address any other laws and the meaning of their terms or whether its holding would be applicable to "bathrooms, locker rooms, or anything else of the kind." *Bostock*, 590 U.S. at 681.

If *Bostock* expressly disavowed its application to bathrooms and showers under Title VII, it certainly has no application to bathrooms and showers under Title IX. Moreover, *Bostock* arose in a situation where the plaintiffs were employees of private businesses who were fired because of decisions they made as consenting adults regarding their private lives, and those decisions caused no harm to their employers, coworkers, or anyone else for that matter. In that sense, *Bostock* can fairly be described as a live-and-let-live decision where employers were prohibited from interfering with their employees' personal lifestyle choices when those choices had no bearing on the employees' abilities to perform their jobs. By contrast, this case involves the government's decision to interpose itself into the field of education, an area traditionally left to state and local governments and the schools, themselves, and in which the government's edicts result in the subordination of the interests of non-transgender students (many of whom are minors) in free speech, privacy, and safety to the interests of transgender students in expressing and conducting themselves in accordance with their individual notions of gender identity. These differences, among others, demonstrate why the reasoning from *Bostock* does not automatically transfer to the Title IX context, nor does *Bostock* compel the changes to the Title IX regulations encompassed by the Final Rule.

Notwithstanding these differences, Defendants assert that the Final Rule's definition of sex discrimination is not contrary to law because "it is impossible to discriminate against a person for being transgender 'without discriminating against that individual based on sex.'" (Doc. 38 at 12)( quoting *Bostock*, 590 U.S. at 660).  In repeating this quote throughout their brief, however, Defendants are ignoring Title IX's carve outs which explicitly allow discrimination based on (biological) sex.  These carve outs show that Congress recognized that recipients could properly discriminate on the basis of sex under certain circumstances.  Therefore, not all differential treatment based on biological sex is discrimination under Title IX.  Rather, Title IX "prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other.  But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process." *Texas*, 2024 WL 2947022, at *31.

Specifically, Title IX provides that a recipient may maintain "separate living facilities for the different sexes."  20 U.S.C. § 1686.  This "instruction is the authoritative expression of Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Texas*, 2024 WL 2947022, at *32 (citing 118 Cong. Rec. 5,807 (Feb. 28, 1972)).  The Final Rule essentially renders meaningless the exemptions in Title IX. *Louisiana*, 2024 WL 2978786, at *11.  The DoE argues that the Final Rule protects those exemptions because they are excepted from the new discrimination standard which provides that

> a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education

> program or activity consistent with the person's gender identity subjects a person
> to more than de minimis harm on the basis of sex.

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

DoE explains that this provision continues to allow sex separation based on biological sex with respect to the statutory exceptions and the regulations regarding housing and athletics. Essentially, under DoE's interpretation, a recipient may deny the request of a male student who identifies as female to live in a female dormitory because that is a living facility. By contrast, a recipient may not deny that same male student access to the girls' restroom, shower, or locker room because the regulation that allows sex separate facilities for restrooms and locker rooms will now be subject to the new rule under which such conduct is categorically deemed to result in more than de minimis harm to a transgender person. DoE's justification is that Congress has allowed sex segregation in, and only in, those limited circumstances identified in the statutory text. DoE's explanation does not pass muster because the "comparable facilities," i.e. bathrooms and locker rooms, impacted by the Final Rule appear to fall under the statutory category of living facilities. 34 C.F.R. § 106.33. The statute does not define "living facilities." However, the implementing regulations enacted after the passage of Title IX and §§ 106.32 and 106.33 directly correspond with § 1686. Section 106.32 deals with "housing," and § 106.33 with "comparable facilities." Although the final regulations were "published without public comment," § 106.33 "was meant to cover" § 1686. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023). Bathrooms and locker rooms would be facilities that are used for activities of daily living such as bathing and dressing. Given Congress's stated concern about privacy for students, it would be counterintuitive if that privacy only extended to students who lived in student housing.

Plaintiffs also argue that the Final Rule is contrary to Title IX in that it would allow biological men to play on women's sports teams. Defendants, however, argue that the athletics

regulation is not impacted by the new rule.  The Final Rule's proposed § 106.31(a)(2) does include the athletics regulation as a circumstance in which a policy may lawfully cause more than de minimis harm to students.  *See* 89 Fed. Reg. at 33,887.  There is also a proposed rule that will amend the athletics regulation.  *See* 89 Fed. Reg. at 33,839 (citing 88 Fed. Reg. 22,862.)  Because the proposed rule is not final and the Final Rule carves out an exception for the athletics regulation, the court has not considered the arguments on athletics in ruling on whether the agency acted without statutory authority in promulgating the Final Rule.  *See Louisiana*, 2024 WL 2978786, at *14 (declining to consider the effect of the Final Rule on sports at the preliminary injunction stage due to the proposed rule).

Significantly, the purpose of Title IX was to protect "biological women from discrimination in education[;] [s]uch purpose makes it difficult to sincerely argue that, at the time of enactment, 'discrimination on the basis of sex' included gender identity, sex stereotypes, sexual orientation, or sex characteristics."  *Id.*, at *12.  The DoE's reinterpretation of Title IX to place gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex would subvert Congress' goals of protecting biological women in education.  The Final Rule would, among other things, require schools to subordinate the fears, concerns, and privacy interests of biological women to the desires of transgender biological men to shower, dress, and share restroom facilities with their female peers.  Moreover, to expand sex discrimination to encompass "self-professed and potentially ever-changing gender identity is inconsistent with Title IX's sex-separation dictates."  *Texas*, 2024 WL 2947022, at *38 (citing *Doe 2 v. Shanahan*, 917 F.3d 694, 723 (D.C. Cir. 2019) (Williams, J., concurring in the result).  Because of these significant differences between Title IX and Title VII, uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX.  Although not briefed by the parties, the

Tenth Circuit's decision in *Fowler* does not compel a different decision for the same reasons. There, the question was whether purported discrimination based on transgender status was sex-based discrimination that implicated the Equal Protection clause. 2024 WL 3035712, at *13. Here, the sex-based categories of Title IX are explicit—and the question is what the text of Title IX requires as a result.

The Final Rule's interpretation of sex and discrimination are therefore contrary to the statute and historical context of Title IX. The court finds that Plaintiffs are likely to succeed on their claim that the DoE exceed its statutory authority in expanding the definition of sex discrimination in the Final Rule. *See Tennessee*, 2024 WL 3019146, *13; *Louisiana*, 2024 WL 2978786, *12.

### ii.  Major Questions Doctrine

As discussed herein, the term "sex" is unambiguous as used in Title IX. Moreover, under *Raimondo*, even if that term was ambiguous, it no longer results in deference to DoE's interpretation of the meaning of "sex" under Title IX. 2024 WL 3208360, at *22. The court therefore does not defer to the agency's interpretation of Title IX with regard to the Final Rule. The DoE simply lacks authority to expand sex to mean gender identity. The DoE is an administrative agency created by statute and, as such, only possesses "the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). In issues of "vast economic and political significance," the Supreme Court has held that Congress must speak clearly if "it wishes to assign" such issues to an agency. *Util. Air Reg. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014). This is because agencies "have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (internal quotations and citation

omitted).  Therefore, if DoE's regulatory action in formulating the Final Rule "bring[s] about an enormous and transformative expansion in [the DoE's] regulatory authority," then there must have been "clear congressional authorization" for those actions.  *Util. Air. Reg. Grp.*, 573 U.S. at 324. Here, Congress did not authorize the DoE to rewrite Title IX or "render any statutory provisions meaningless," which is the result of the Final Rule.  *Texas*, 2024 WL 2947022, at *36.

In response to Plaintiff's argument, Defendants merely state that this is not a major questions case and that the DoE "does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity."  (Doc. 38 at 55.)  Rather, Defendants argue that the Final Rule is justified in light of *Bostock* and that the major questions doctrine should not be invoked because it was not invoked in *Bostock*.  *Id.* Defendants' argument fails to grasp that the major questions doctrine is applicable to agency action that exceeds its authority.  The major questions doctrine could not have been raised in *Bostock* because that case involved a claim of individual discrimination under Title VII; it was not a challenge to agency action.  Therefore, Defendants' argument is not persuasive and they make no attempt to address Plaintiffs' arguments that this issue is a major question.  Their bedrock position that the Final Rule is justified in light of *Bostock* carries no weight for the reasons stated herein.

The Final Rule clearly decides major questions involving whether to force schools, students, and teachers to accept an individual's subjective gender identity regardless of biological sex.  Further, it determines whether biological males who identify as females are allowed in female bathrooms and locker rooms.  It further prohibits requiring any medical documentation or other documents to determine whether those beliefs are sincere and there are no limits on how "many times a person may change their gender identity."  *Louisiana*, 2024 WL 2978786, at *13.  The Final Rule is applicable to "every public elementary school, middle school, high school, and

college in the United States that receives federal financial assistance." *Id*. The reach of the Final Rule is clearly significant. Further, States are threatened with hundreds of millions, or even billions, of dollars of lost funding if they fail to comply with the Final Rule. Moreover, States who have conflicting state laws will be required to spend significant sums to make improvements to facilities to comply with the Final Rule and their own laws. *Id.*

In deciding these questions, DoE has essentially taken it upon itself to answer questions that have prompted significant debate at both the state and federal levels in recent years. *See Texas*, 2024 WL 2947022, at *36 and n.126 (citing authority). In Congress, several proposals that would expand "Title IX's anti-discrimination provisions to include sexual orientation and gender identity" have been repeatedly rejected. *Id.* (citing Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015); Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021); Equality Act, H.R. 5, 117th Cong. § 9(2) (2021)). Further, the Final Rule represents an enormous invasion into the sphere of education, which has traditionally been an area where States have been sovereign. *United States v. Lopez*, 514 U.S. 549, 564 (1995).

In sum, the court finds that the Final Rule involves issues of both vast economic and political significance and therefore involves a major question. *See Louisiana*, 2024 WL 2978786, *14; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40. As such, Congress must have given the agency "clear statutory authorization" to promulgate such a Final Rule. *W. Virginia*, 597 U.S. at 723. The court finds that Congress did not give such clear statutory authorization to the DoE. *See Louisiana*, 2024 WL 2978786, *14–15; *Tennessee*, 2024 WL 3019146, at *14; *Texas*, 2024 WL 2947022, at *40. Therefore, Defendants do not have authority to expand the meaning of "sex discrimination" to include gender identity.

### iii. Spending Clause

The above analysis is sufficient to show a likelihood of success on the merits as to some of Plaintiff's claims.  But the court further notes Plaintiffs argue that the Final Rule violates the Constitution's Spending Clause.  Title IX was enacted pursuant to Congress's authority under the Spending Clause, which marks another substantial distinguishing feature between this case and *Bostock*.  *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 181 (2005).  Under Spending Clause jurisprudence, "Congress may attach conditions on the receipt of federal funds . . . [but] [s]uch conditions must (among other requirements) bear some relationship to the purpose of the federal spending[.]" *New York v. United States*, 505 U.S. 144, 167 (1992).  If Congress desires "to impose a condition on the grant of federal moneys, it must do so unambiguously," so that the States may "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Legislation that conditions the receipt of federal moneys must (1) be in pursuit of the general welfare; (2) impose unambiguous conditions; (3) such conditions must relate to federal interests in the program; and (4) not induce unconstitutional action.  *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987).  Here, Plaintiffs argue that the last three requirements are not met here because Title IX did not impose a condition regarding gender identity discrimination, the Final Rule is contrary to federal interests, and it will violate the First Amendment.  (Doc. 25 at 52–56.)  The court finds that Plaintiffs are likely to prevail on this claim in that Title IX did not unambiguously condition funds on the prohibition of gender identity discrimination and the Final Rule results in First Amendment constraints.  As such, the court declines to address the argument that the Final Rule is contrary to federal interests.

Based on this court's extensive discussion herein, at the time of enactment, sex discrimination under Title IX meant discrimination based on biological sex.  Title IX did not

prohibit discrimination based on gender identity.  Defendants' arguments relating to *Bostock* are not persuasive for the reasons discussed.  Defendants further contend that an  express statement covering gender identity is not required and cite to *Jackson* in support.  (Doc. 38 at 52–53.)  In *Jackson,* the Supreme Court rejected an argument that Title IX did not encompass retaliation because the defendant was not on notice that it could be liable for retaliating against those who complain of Title IX violations.  544 U.S. at 182.  While holding as much, the Court made clear that the Board was on notice because Title IX's private cause of action broadly encompasses "diverse forms of intentional sex discrimination," such as retaliation and sexual harassment.  *Id.* at 183.  The Court further explained the regulations prohibiting retaliation had "been on the books for nearly 30 years" and the courts had already interpreted Title IX to cover retaliation.  *Id.*

In contrast, this case involves agency action in which the Final Rule expands the definition of sex discrimination.  *Tennessee*, 2024 WL 3019146, *15.  Further, DoE has not had regulations regarding gender identity discrimination on the books for several years and, just a few short years ago, took a position contrary to the one being advanced today.  Therefore, a "clear statement from Congress equating 'sex' to 'gender identity' or 'transgender status is necessary before States' acceptance of federal funds may be conditioned on such a term."  *Id*.  Title IX does not provide such a statement.  The Plaintiff States here did not knowingly and voluntarily agree to ignore the "differences between biological sex and gender identity in exchange for federal funds under Title IX."  *Texas*, 2024 WL 2947022, at *41.  Nor did they "agree to abolish sex-specific bathrooms, locker rooms, room assignments, and sports in exchange for Title IX's funds."  *Id.* (citing *Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable.")).  In sum, Title IX falls short of providing notice to the Plaintiff States that "sex discrimination

includes gender identity." *Id.* at *42.   Therefore, the Final Rule violates the Spending Clause because it introduces conditions for spending that were not unambiguously clear in Title IX. Further, based on the discussion *infra*, the Final Rule violates the Spending Clause because it violates' students First Amendment rights.  *See Louisiana*, 2024 WL 2978786, at *16.

The court finds that Plaintiffs are likely to succeed on their claim that the Final Rule violates the Spending Clause.  *See id.*; *Tennessee*, 2024 WL 3019146, *15.

### iv.  First Amendment

K.R. and the Plaintiff Organizations assert that the Final Rule violates the First Amendment rights of individuals by compelling speech that aligns with Defendants' ideology, censoring speech through content-based restrictions and viewpoint discrimination, chilling speech through vague and overbroad language, and forcing individuals to engage in speech that violates their sincerely held beliefs.  (Doc. 25 at 40.)  The court finds that Plaintiffs have shown that the Final Rule violates the First Amendment by chilling speech through vague and overbroad language.  See *Tennessee*, 2024 WL 3019146, at *24 (ruling that the Final Rule was vague and overbroad.)  Given this ruling, the court declines to address all of Plaintiffs' arguments at this stage.

Plaintiffs assert that the Final Rule violates their constitutional rights because it is unconstitutionally vague and overbroad resulting in chilled speech.  Chilled speech is different from the suppression of speech; it is self-imposed but nonetheless violates the First Amendment. *See Speech First, Inc. v. Sands*, 144 S. Ct. 675, 676 (2024) (Thomas, J., dissenting) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (discussing that "self-censorship" violates the "First Amendment just as acutely as a direct bar on speech")).  The First Amendment's Free Speech Clause prohibits government entities and actors from "abridging the freedom of speech."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1326 (2024).   When a vague law "abut(s) upon

sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.  Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (internal citations and quotations omitted).  A regulation is also impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

Plaintiffs argue that the Final Rule's sexual harassment definition will chill students who want to articulate that sex is immutable and binary, explain their beliefs as to the differences between men and women, refer to individuals with biologically accurate pronouns, and speak in opposition to sharing bathrooms and other intimate spaces with individuals who do not share their biological sex.[5]  (Doc. 25 at 26–30, 44–46.)  They assert that the term "gender identity" is vague as it is not defined but is explained in the preamble to the Final Rule to be an individual's subjective sense of their gender.  (*Id.* at 44) (quoting 89 Fed. Reg. at 33,809.)  Further, the term sex stereotypes is defined as any asserted differences between males and females.  Moreover, and relevant to this particular aspect of Plaintiffs' claim, the standard for harassment has changed and now encompasses gender identity discrimination such that students are concerned that any speech that sex is immutable would risk a harassment claim.  Plaintiffs' concerns were shared by the general public as evidenced in the preamble.  89 Fed. Reg. at 33,809.

---

[5] Plaintiffs also argue that there is a chilling effect for students who wish to speak in opposition of allowing biological males to compete in women's sports, but the court does not consider this argument in its analysis due to the Final Rule's carveout for athletics.

With respect to the concerns that the term "gender identity" was impermissibly vague, the Department disagreed but offered no further guidance.  Rather, the Department stated that this "term of vital importance can be subjectively defined by each and every individual based entirely upon his or her own internal sense of self."  *Tennessee*, 2024 WL 3019146, at *24.  Further, although a student may not know "another's gender identity," the Department stated that gender identity discrimination remains sex discrimination.  89 Fed. Reg. at 33,809.

Turning to the sex-based harassment standard, hostile environment harassment is defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)"  *Id.* at 33,884 (amending 34 C.F.R. § 106.2).  This definition is vague and also overbroad because it is entirely fact dependent and there is no guidance as to how a recipient is to determine what constitutes hostile environment harassment.  Again, commenters raised these same concerns to the Department.  This is concerning given the Department's position on the issues of gender identity and misgendering.  As pointed out by Plaintiffs, the preamble makes clear that the Department views misgendering as potentially sex-based harassment.  The Department states that a "stray remark, such as a misuse of language, would not constitute harassment," but otherwise fails to identify what objectively constitutes harassment and under whose standard is it measured.  89 Fed. Reg. at 33,516.  Rather, the Department merely kept parroting the definition in support of its position that the standard is not vague or overbroad.  *Tennessee*, 2024 WL 3019146, at *26 ("Not only did the Department fail to meaningfully address these First Amendment concerns, *but it also intentionally opted to leave the vague terms undefined*.")  This is concerning because the "objective standard" is "inherently not objective at all because the Final Rule imposes a viewpoint

consistent with the affirmation of gender identity.  So, in the context of misgendering, the offensive conduct must be 'subjectively offensive' and 'objectively offensive' as viewed through the lens of someone who recognizes sex and gender to be separate and distinct."  *Id.* at *25 (quotations and citations omitted).

Notably, during the hearing, the court asked the DoE's counsel whether students could engage in a civil discourse regarding the issue of gender identity without being fearful of an accusation of sex-based harassment.  Specifically, the court asked defense counsel if a student were to state that she believes that sex and gender are the same, they are immutable, and/or that a person's gender identity cannot deviate from his or her biological sex, would that person be subjected to an actionable discrimination complaint under the Final Rule?  Defense counsel could not definitively answer the question and continued to state that it would depend on the facts and specific circumstances.  Counsel then stated that the complainant would also have to show that such speech limited or denied a person's ability to participate in or benefit from the recipient's education program or activity.  What does it mean to limit a person's ability to participate in an education program?  Those terms are not defined in the Final Rule and, as discussed at the hearing, the term "program or activity" as defined by Title IX means **all** operations of a school.[6]  *See* 20 U.S.C. § 1687.  Therefore, this standard for actionable discrimination under the Final Rule could conceivably be met in any circumstance where a student simply complained that he could not concentrate in class due to another student's statements on the topic of gender identity.  This interpretation is supported by the Department's statement that the student need not demonstrate a

---

[6] Indeed, as all counsel agreed at the hearing, the statutory definition of "program or activity" reaches every aspect of every part of every state and local government in the entire nation if any part thereof receives federal financial assistance.  *See* 20 U.S.C. 1687(1)(A).  And since pretty much every state and local government receives some federal funding of one kind or another, the practical application of this statute is to sweep in every aspect of every state and local government in the country.  The astonishing sweep of that language only gets pared down when section 1681 of title 20 limits the prohibitions against sex-based discrimination to any "education program or activity."

particular harm just "some impact on their ability to participate or benefit from the education program . . . ." 89 Fed. Reg. at 33,511. Therefore, contrary to defense counsel's argument that this language imposes some limit on the scope of a harassment claim, it does not; rather, it is an entirely subjective standard that is potentially met whenever the complainant alleges that the conduct or speech somehow impacts the complainant's education. And there is no objective standard to measure whether the complainant was actually impacted because there is no need to demonstrate harm.

In sum, the court finds that this standard is impermissibly vague and overbroad. *Tennessee*, 2024 WL 3019146, at *27. There was not one lawyer in the courtroom, including the undersigned, who was able to offer any possible explanation of what a parent should tell their child about the limits of legal speech at their schools on the topic of gender identity or sexual orientation under the Final Rule. The result is that speech is chilled because what student wants to "run the risk of being accused of" sex-based harassment and subjected to an investigation and potential discipline. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022).

### v. Arbitrary and Capricious

Finally, the court finds in the alternative that the Department acted arbitrarily and capriciously when promulgating the Final Rule. Even if the agency had the authority to alter the Title IX standard in this manner, the court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

> An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

33

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023) (quoting *Wyoming, U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011)).

Plaintiffs assert that they will succeed on this claim because the DoE's explanation for the Final Rule is implausible and the Final Rule is a sharp departure from past practice without reasonable explanation.  With respect to their first argument, Plaintiffs contend that the agency action is implausible because the Final Rule inflicts harm on those it was meant to protect and elevates transgender individuals' interests.  Essentially, Plaintiffs argue that the agency failed to consider and give weight to harm to females who will have to share intimate spaces with biological males.  In response to this argument, Defendants argue that the DoE's reasoning flows from carefully considering the structure and text of Title IX.  (Doc. 38 at 25.)  The DoE asserts it fully considered and addressed privacy concerns and determined that there was a lack of evidence that transgender students posed a risk to non-transgender students in a single-sex space and asserted that such generalized concerns have been unsubstantiated.  89 Fed. Reg. at 33,820.  The DoE determined that not allowing a biological male who identifies as a female to use the girls' locker room amounts to gender identity discrimination and always results in more than de minimis harm.  By contrast, the agency concludes that a biological female is not harmed by having to share a locker room and shower with a biological male because her privacy concerns are not substantiated.

During oral argument, the court noted that such treatment elevates gender identity discrimination over the traditional view of biological sex discrimination that Title IX was intended to address.  The DoE has determined that the harm to the transgender student is more than the harm to the biological female.  In fact, according to the DoE, biological females are not harmed by having to share a bathroom and shower with biological males.  Such a conclusion is not supported by the evidence in this case.  Notably, K.R.'s affidavit states that she avoided using school

restrooms and that biological males who do not even identify as females went into the female restroom because they knew that they would get away with it and wanted to go into the female restroom with the girls.  (Doc. 25-3 at 3.)  Such fears by students, therefore, come from real and justified concerns.

Further, the DoE was faced with numerous comments in which similar fears about legitimate harms were expressed.  The State of Tennessee offered evidence of "numerous instances of males attacking females in public restrooms that were designated for females only."  *Tennessee*, 2024 WL 3019146 at *35 (citing to the administrative record).  This comment by Tennessee was not addressed at all in the preamble.  Further, the DoE's position ignores the fact that the biological sexes have long had separate spaces to use the restroom and shower and that this is based on a "significant privacy interest in [one's] unclothed" body.  *Id.* (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008) and citing *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) ("most people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'"); *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 626 (1989) ("[E]xcretory function[s are] traditionally shielded by great privacy."); *Grimm*, 972 F.3d at 633 (Neimeyer, J., dissenting) (discussing that "courts have long recognized" an individual's bodily privacy interests are "significantly heightened when persons of the opposite biological sex are present.") (collecting cases).  That privacy interest was recognized by Congress as evidenced in the congressional record and as set forth in Title IX.  Further, the Supreme Court recognized that integrating an all-male military institution "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."  *United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996).

In response to the court's questions about biological females' fears and safety concerns, especially in light of K.R.'s affidavit, defense counsel stated that the school should have policies in place to protect the student from transgender biological males using restrooms and locker rooms and that other States that require transgender students have access to the restrooms and locker rooms of their choice have not had privacy and safety concerns.  Further, counsel stated that a biological female who feels unsafe using the locker room or restroom could ask for an accommodation such as using the staff restrooms.  According to the DoE, such accommodation, however, is clearly not acceptable as a response to a transgender student.  Rather, that student is to use the restroom or shower facilities that align with the student's gender identity.  Moreover, the school cannot seek documentation or otherwise attempt to confirm the student's gender identity with a medical provider.  Defense counsel asserts that the recipient can put in place policies to verify gender identity, and the recipient can seek verification from a parent or coach.  The preamble merely discusses that the DoE is aware that some schools rely on the student, or written confirmation from a parent, a coach, or a teacher.  89 Fed. Reg. at 33,819.  However, this was merely an observation of current practices, not the DoE's blessing on such practices.  In the next sentence, the DoE clearly states that requiring a student to submit to "burdensome documentation requirements. . . imposes more than de minimis harm." *Id.*  The DoE does not explicitly authorize any policy to determine a student's gender identity apart from said student's own statement and, in fact, dissuades a recipient from any documentation requirements, which could include a letter from a parent or coach.  Given that and the evidence before the court, it is not hard to imagine that, under the Final Rule, an industrious older teenage boy may simply claim to identify as a female to gain access to the girls' showers, dressing rooms, or locker rooms so that he can observe his female peers disrobe and shower.  Under the Final Rule, the recipients would appear to be obliged to

36

accept this young man's assertions and give him unfettered access to those female facilities, or else risk running afoul of the anti-discrimination provisions of the Final Rule.  "Allowing a biological male student to change to a female by simply declaring it, requiring no documentation of the change, and allowing the student to shower with [biological] females in the girls' locker room goes beyond the scope of arbitrary and capricious." *Louisiana*, 2024 WL 2978786, at *19. "As the Department would have it, sex means sex except when gender identity comes until play. Not only is this an illogical distinction forbidden by Title IX's exclusions, but it would also constitute the very type of sex discrimination Title IX prohibits by privileging transgender persons with the ability to abide by their biological sex or not in order to take advantage of preferred benefits or services." *Texas*, 2024 WL 2947022, at *38.   Therefore, the Final Rule's explanation for its actions is implausible under the arbitrary and capricious standard.  Moreover, it is clear that the DoE failed to consider several important aspects of the problems raised by the Final Rule.

The Final Rule is also a sharp departure from past practice without reasonable explanation. The DoE claims that this rule is merely a clarification.  However, just two short years before the proposed rule was issued, the DoE stated that Title IX *did not* cover gender identity discrimination. Further, the Final Rule's attempt to reason the exceptions in section 106.31(a)(2) rings hollow. The DoE claims that a recipient may engage in sex discrimination, including gender identity discrimination, if it is done in accordance with a statutory exception or the athletics regulation. DoE's justification for allowing gender identity discrimination to continue in athletics is because of the unique considerations that athletics presents and its new proposed regulation which is not at issue here.  89 Fed. Reg. at 33,839.  However, the regulation regarding sex separation in restrooms and locker rooms has been in effect just as long as the athletics regulation.  And just as Congress was concerned about equal treatment in athletics, it was also concerned about privacy for students.

Therefore, the DoE has failed to adequately explain the reason for allowing continued sex separation in athletics but not in restrooms and locker rooms.

The court further finds that the DoE failed to adequately consider several relevant factors when drafting the Final Rule. The DoE failed to include requirements for a change in gender identity, failed to consider harms to non-transgender students, and failed to sufficiently explain how the harm to transgender students is outweighed by the harm to non-transgender students with respect to the use of restrooms and locker rooms. *See Louisiana*, 2024 WL 2978786, *19.

In sum, the court finds that the Final Rule is arbitrary and capricious because it offers an implausible explanation for agency action, is a sharp departure from prior action without a reasonable explanation, and failed to consider important interests as discussed herein.

### vi. Conclusion

In sum, the court finds that Plaintiffs are likely to prevail on their claims that the Final Rule is contrary to law and exceeds statutory authority, the Final Rule is an unconstitutional exercise of legislative power under the Spending Clause, the Final Rule violates the First Amendment, and the Final Rule is arbitrary and capricious. In light of the decision herein and the relief available as discussed below, the court declines to address all of Plaintiffs' claims and arguments pertaining to other laws and provisions of the Final Rule.

### C. Preliminary Injunction Element 2: Irreparable Injury

The court finds that Plaintiffs have shown irreparable injury if the Final Rule goes into effect on August 1. Based on the declarations, Plaintiff States will incur costs that cannot be recouped including costs to update policies, materials, and hiring additional Title IX staff. Further, States are required to comply with the Final Rule in a short period of time. "Plaintiffs have sufficiently demonstrated that the compliance costs here are extraordinary due to the sweeping

policy changes they are required to implement and the short timeframe in which they must do so. And because the recovery of these costs would necessarily be barred, this factor weighs in favor of a finding of irreparable harm." *Tennessee*, 2024 WL 3019146, at *39 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.")).   Further, private Plaintiffs have shown irreparable harm with respect to the violation of First Amendment rights. *Louisiana*, 2024 WL 2978786, at *19.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### D.  Preliminary Injunction Elements 3 and 4: Balance of Harms and Public Interest

The final two factors involve balancing the harms to each party and the public interest.  The Tenth Circuit has held that when a law "is likely unconstitutional," the government's interests do "not outweigh a plaintiff's interest in having [his or her] constitutional rights protected." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (internal quotation and citation omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).  Further it is always in the public interest to "prevent the violation of a party's constitutional rights." *Id.*

Moreover, the regulations that are currently in effect have essentially "been unchanged for approximately 50 years.  Therefore, it would be of relatively little harm to others to maintain the status quo pending the resolution of this lawsuit." *Tennessee*, 2024 WL 3019146, *42.  The court finds that these factors weigh in favor of Plaintiffs.

### E.  Scope

Plaintiffs seek to stay the Final Rule in its entirety and also ask the court for a nationwide preliminary injunction.  In response, Defendants ask the court to allow some parts of the Final

Rule to go forward and to limit any injunctive relief to the Plaintiff States and K.R.'s school. Defendants point to the severability clause contained in each subsection in the current regulations which provides: "If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9; 106.18; 106.48; *see also* 89 Fed. Reg. at 33,848.

Although the court did not explicitly address all of the provisions in the Final Rule, the court finds that § 106.10, the new definition of sex discrimination, is unlawful for the reasons stated herein. That impermissible definition permeates the entire rule and, as such, it is difficult to excise the remaining regulations without also eliminating those regulations that involve sex discrimination. *Tennessee*, 2024 WL 3019146, at *43. Further, Plaintiffs will likely prevail on their claim that the DoE's rulemaking was arbitrary and capricious. Therefore, the Final Rule would be invalid in its entirety. *Id.* The court also declines to parse out the sections that may remain as "rulemaking is exclusively within the purview of the Executive Branch." *Id.* (citing *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (asking whether the legislature would have "preferred what is left of its statute to no statute at all").

Finally, Plaintiffs seek a nationwide injunction[7] so that all parties may be provided relief. Defendants object to a nationwide injunction asserting that the relief should be limited to the Plaintiff States. Plaintiffs argue that universal relief is appropriate here because of the Plaintiff Organizations. In response, Defendants assert that it is not appropriate because the affidavits submitted are mostly limited to individuals in the plaintiff States. (Doc. 47.) Defendants

---

[7] As noted by Judge Crabtree recently, the "proper terminology for this request is unsettled." *Alaska v. United States Dep't of Educ.*, No. 24-1057-DDC-ADM, 2024 WL 3104578, at *17 (D. Kan. June 24, 2024) (discussing that courts have used both nationwide and universal in seeking such relief).

painstakingly review all of the declarations and the physical locations of the declarants in their supplemental brief to support their position that relief should be limited to the Plaintiff States and K.R.'s school even though some affidavits are from individuals in other States.  But Defendants fail to cite any authority that injunctive relief should be so limited in light of Plaintiff Organizations' standing to bring this suit.  As such, they can seek relief on behalf of all their members.  An injunction limiting relief to Plaintiff States would not provide the Plaintiff Organizations complete relief.

The court recognizes that nationwide injunctions are the "subject of much debate."  *Alaska*, 2024 WL 3104578, at *17, n.11.  Both courts that have granted similar relief have limited that relief to the plaintiff States involved in those cases.  *See Tennessee*, 2024 WL 3019146, at *43; *Louisiana*, 2024 WL 2978786, at *20.  In *Louisiana*, the Plaintiffs included several school districts in Louisiana, and the States of Louisiana, Montana, Mississippi, and Idaho.  2024 WL 2978786, at *2, n.13.  The Plaintiffs in *Tennessee* included Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia.  2024 WL 3019146, at *6.  Those actions did not include private plaintiffs and are thus distinguishable.

Under section 705 of the APA a reviewing court is to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is under review.  5 U.S.C. § 705.  "Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) (citing *Doran v. Salem Inn, Inc*., 422 U. S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with the enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs.")  Nationwide injunctions are a "relatively new phenomenon" and a phenomenon which

the Supreme Court has yet to fully address.  *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J., concurring) (discussing that "the propriety of universal injunctive relief [is] a question of great significance that has been in need of the Court's attention for some time.")  Problems with nationwide injunctions include depriving other courts of the opportunity to weigh in on these important questions, encouraging forum shopping, and circumventing rules governing class-wide relief.  *Texas,* 599 U.S. at 694 (Gorsuch, J., concurring).  Issuing a nationwide injunction in this case would result in the court ordering Defendants to stop the Final Rule from taking effect for **everyone**, including States which clearly do not want such relief as evidenced in the amicus brief.  As discussed, this issue is currently being litigated in several districts and a nationwide injunction may result in one or more of those courts concluding that the plaintiffs can no longer show an irreparable injury in light of a decision granting universal relief.  Both courts in *Tennessee* and *Louisiana* refrained from issuing nationwide injunctions at least in part because of the ongoing litigation in other courts.  Given the above, the court remains circumspect about the propriety of a nationwide injunction in this case.

In formulating a preliminary injunction, the court is to exercise its discretion and judgment in light of the "equities of a given case [and] the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).  The "court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation and internal quotation marks omitted).  The Supreme Court instructs that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Here, Plaintiffs include organizations with members all over the country.  Therefore, to provide complete relief to all parties, the court must enjoin the Final Rule from going into effect against Plaintiffs and their members given the rulings herein.  At this time, there is no evidence before the court that enjoining the Final Rule from being applied to the members of the Plaintiff Organizations would be unduly burdensome to Defendants as opposed to providing a nationwide or universal injunction.

Instead, the court determines that the better path is to abide by the traditional approach and limit preliminary injunctive relief to the parties, including the members of Plaintiff Organizations.  That leaves it to Defendants, in the first instance, to determine whether patchwork enforcement of the Final Rule is feasible and worth the risk of running afoul of the court's injunction, thereby exposing Defendants and their representatives to sanctions for contempt.  This seems to align with the APA's admonition that, "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."  5 U.S.C. § 705.  That is the first sentence in section 705.  It is only the second sentence of that section that empowers a reviewing court, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  *Id.*  That sequencing of the statutory language suggests that the better approach is to allow the agency to evaluate the court's ruling and the scope of relief provided in order to determine whether a voluntary stay of the entire rule should be rendered until judicial review is completed.  The agency is in a far better position than the court to evaluate the practicalities and feasibility of continued enforcement of the rule in light of relief afforded to date.  In this case, that means that Defendants can evaluate the cumulative effect of relief provided by this court, along with relief provided in

other courts, both prior to and after this order is entered, in making a decision as to whether to stay the effective date of the Final Rule pending completion of judicial review.

Additionally, the court's decision is influenced by the Tenth Circuit's admonition that certain injunctions are disfavored and require heightened scrutiny, including "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Fish*, 840 F.3d at 723–24.  Under the APA, courts are ultimately authorized to set aside unlawful agency action, a remedy referred to as vacatur.  *See* 5 U.S.C. § 706(2).  "[V]acatur is universal in scope because an unlawful regulation cannot be vacated as to only one party." *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at *47 (N.D. Tex. June 11, 2024) (citing *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ., et al.*, 98 F.4th 220, 255 (5th Cir. 2024)).  But that case was decided at summary judgment, not on a motion for preliminary injunction.  *See id.* at *1.  And while the Fifth Circuit case relied on for that proposition held that vacatur was appropriate even at the preliminary injunction phase, that conclusion remains the subject of substantial debate.  *See, e.g., Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J., concurring).  Granting a nationwide injunction in this case would effectively give Plaintiffs all the relief they might ultimately hope to obtain at the completion of this litigation – a decision better made with a fully developed record.  Suffice it to say that this court can fashion appropriate preliminary relief for Plaintiffs without resort to universal injunctions, leaving it to Defendants to determine in the first instance whether continued enforcement in compliance with this decision is worth the effort.  *See, e.g.,* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev. 417, 476–79 (2017).

As for Plaintiff States, the court can enjoin implementation and enforcement of the Final Rule with respect to the States, including any education programs or activities within those States.

Turning to Plaintiff K.R., the court observes that counsel for Defendants conceded at oral argument that relief for K.R. should be imposed at the level of her school. The court agrees. By way of example, given that the flash points of this dispute involve matters such as how to segregate and restrict access to intimate spaces such as bathrooms, dressing rooms, and showers, it would be impossible to limit relief to K.R., yet allow Defendants to demand compliance with the Final Rule as to everyone else who uses those facilities at her school. Accordingly, relief for K.R. is appropriately provided by enjoining Defendants from implementing or enforcing the Final Rule at her school. As for the Plaintiff Organizations, given their standing to seek relief on behalf of their members, the appropriate scope of relief there is, similar to the relief provided for K.R., to enjoin implementation and enforcement of the Final Rule at any school attended by a member of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.

While the scope of this relief is broad, it follows the traditional approach of limiting injunctive relief to the parties to this litigation. Moreover, there is no obvious reason to limit the relief sought by Plaintiff Organizations to the geographic limits of the co-plaintiff States. The Plaintiff Organizations demonstrated standing in their own right; thus, they could have brought this suit on their own without joining with Plaintiff States. Accordingly, it makes no sense to penalize Plaintiff Organizations by circumscribing the scope of relief to which they are otherwise entitled by limiting it to the States represented by their co-plaintiffs. To rule otherwise would risk rendering the participation of the Plaintiff Organizations a legal nullity because they would have obtained the same relief through the participation of Plaintiff States.

Finally, nothing in this order limits the ability of any school to adopt or follow its own policies, or otherwise comply with applicable state or local laws or rules regarding the subjects

addressed herein.  Rather, it simply prohibits Defendants from demanding compliance with the Final Rule by the schools affected by this order, or imposing any consequences for such schools' failure to comply with the Final Rule.

Accordingly, Defendants are enjoined from implementing or taking any action to enforce the Final Rule against Plaintiff States, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as any school attended by a minor child of a member of Moms for Liberty.  In order to effectuate this preliminary injunction, Plaintiff Organizations are directed to file a notice in the record identifying the schools which the members of Young America's Foundation or Female Athletes United attend, as well as the schools attended by the minor children of the members of Moms for Liberty, on or before July 15, 2024. This filing should not identify members of those organizations or the children of any such members.  Rather, it should provide notice to Defendants of the schools as to which this order enjoins enforcement of the Final Rule.  Should Defendants conclude that they need to know the names of members or their children, Defendants can seek that information through discovery and the court can evaluate the propriety of any such requests and the need for protective orders or similar tools surrounding disclosure of such information, all in a more concrete context.

### F. Bond

Under Rule 65(c), the court may issue an injunction "only if" the moving party provides security sufficient to cover damages sustained by the enjoined party if that enjoined party were wrongly enjoined.  Private Plaintiffs ask the court to waive the bond requirement.  (Doc. 43 at 35 n.9.)  In the Tenth Circuit, district courts have "wide discretion" in determining "whether to require security." *Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)

(emphasis added).  Where there is "an absence of proof showing a likelihood of harm" to the enjoined party, failing to require a bond is permissible.  *See id.*

Here, the court finds that no security is necessary in this case due to the strength of Plaintiffs' case and the public interest.  Moreover, the current regulations continue to be in effect which support a finding that the injunction will not harm Defendants.

## IV.    Conclusion

Plaintiffs' motion for a preliminary injunction (Doc. 24) is GRANTED.

Accordingly, it is hereby ordered that the United States Department of Education, Miguel Cardona, Secretary of U.S. Dept. of Education, the United States Department of Justice, Merrick Garland, Attorney General of the United States, and all their respective officers, agents, employees, attorneys, and persons acting in concert or participation with them are ENJOINED from implementing, enacting, enforcing, or taking any action to enforce the Final Rule promulgated by the Department of Education titled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" and published in the Federal Register at 89 Fed. Reg. 33,474, set to become effective on August 1, 2024, against Kansas, Alaska, Utah, Wyoming, K.R.'s school, the schools attended by the members of Young America's Foundation or Female Athletes United, as well as the schools attended by the children of the members of Moms for Liberty.  Plaintiff Organizations are directed to file a notice in the record identifying the schools which their members or their members' children, as applicable, attend on or before July 15, 2024.[8]  IT IS SO ORDERED.  Dated this 2nd day of July, 2024.

_ s/ John W. Broomes _____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE

---

[8] The court will enter the preliminary injunction by separate order.  *See Alaska*, 2024 WL 3208360, *20, n.14 (citing cases requiring a preliminary injunction to be entered by separate document).