**IN THE** UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
TOPEKA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 24-4041-JWB |
| UNITED STATES DEPARTMENT OF | § | |
| EDUCATION, *ET AL.* | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
FOR A PARTIAL STAY PENDING APPEAL**

## INTRODUCTION

This Court made the right decision when it granted Plaintiffs' motion for preliminary injunction. In opposing that motion, Defendants already argued that the Court "should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Final Rule as to which the Court has found that Plaintiffs have established a likelihood of success." ECF No. 38 at 48–51. And the Court already rejected that argument because the core re-definition of sex discrimination in § 106.10 "permeates the entire rule," the rulemaking itself "was arbitrary and capricious," and parsing the rule would usurp the "purview of the Executive Branch." ECF No. 53 at 40 (cleaned up). The Court carefully considered the injunction's proper scope and rejected arguments for narrower relief in its thorough and well-reasoned 47-page Memorandum and Order. ECF No. 53 at 39–46. Nothing has changed since then.

Now, rather than moving for a stay on the merits of the Final Rule's key provisions, Defendants seek to limit the injunction's scope, saying it covers more provisions and people than necessary. *See* Mot. 1–2 (ECF No. 59). But they insist on keeping the Final Rule's redefinition of sex discrimination in § 106.10—the very provision this Court found "contrary to the statute and historical context of Title IX." ECF No. 53 at 24. That should be game, set, and match for Defendants' position, as it promotes the very harms the Court's injunction prevents.

Beyond that problem, courts need not conduct a roving severability analysis before entering an order preserving the status quo, and in any event, Defendants have failed to show that Rule could even be severed. Their attempt to parse the statue would only ratchet up the compliance costs and multiply the confusion that the Court's injunction alleviates.

The Court also properly granted relief for the Associational Plaintiffs, whose entitlement to relief is not diminished by the simple reality that organizational membership changes over time. Defendants' proposed stay is legally improper and practically unworkable; it would render the remaining portions of the Final Rule incomprehensible and would subject Plaintiffs to substantial costs and confusion associated with piecemeal implementation.

Because a motion for stay pending appeal is subject to "the exact same standards" as a motion to review this Court's initial decision, *Warner v. Gross*, 776 F.3d 721, 728 (10th Cir. 2015), the Court should stand by its decision and deny Defendants' motion. In doing so, the Court would be in good company: just this week, *two* district courts have already denied Defendants' nearly-identical motions seeking a partial stay of orders enjoining the Final Rule in related litigation. *Louisiana v. U.S. Dep't of Educ.*, Case No. 3:24-CV-00563 (W.D. La. July 11, 2024), a true and correct copy attached as **Exhibit 1**; *Tennessee v. U.S. Dep't of Educ.*, Case No. 2:24-cv-00072-DCR-CJS (E.D. Ky. July 10, 2024), a true and correct copy attached as **Exhibit 2**. Consistent with this Court's initial decision and the recent opinions of other courts, Defendants' motion should be denied.

<u>LEGAL STANDARD</u>

A motion for stay pending appeal is subject to the same standards that apply when reviewing this Court's initial decision to grant a preliminary injunction. *Warner*, 776 F.3d at 728. The Court considers (1) the applicant's likelihood of success on appeal; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Whether to stay an injunction pending appeal lies within this Court's "judicial discretion" and depends "upon the circumstances of the particular case." *Id.* at 433.

<u>ARGUMENT</u>

The Court should deny the motion because Defendants are not likely to succeed on appeal and they will suffer no harm from the temporary injunction, while Plaintiffs would suffer significant and irreparable harm if the Final Rule were allowed to take effect.

I.      **Defendants are not likely to succeed on appeal.**

Defendants argue that this Court should have severed the Final Rule and limited its injunction because Plaintiffs do not challenge every provision of the Final Rule and because the injunction might apply to members of Associational Plaintiffs who joined after this lawsuit was filed. Mot. 1–2. None of Defendants' arguments are likely to succeed on appeal.

2

A.      Section 106.10 is unlawful and harmful

Defendants argue (at 7) that the Court should allow § 106.10, which redefines sex discrimination to include gender identity, sex stereotypes, and other characteristics, to take effect because it doesn't injure Plaintiffs. That's incorrect. Section 106.10 is the core flaw in the Final Rule because it sweepingly applies *Bostock*'s reasoning to the whole of Title IX, even though, as this Court held, "uniformly applying *Bostock* to Title IX is not appropriate and would contradict the purpose of Title IX." ECF No. 53 at 24. That provision causes severe harm because it deems any failure to treat a student by his or her asserted gender identity as a form of unlawful sex discrimination.

Defendants' arguments to the contrary are unpersuasive. They contend (at 6) that § 106.10 doesn't harm Plaintiffs because there are many areas—like science fairs and student government—where Defendants don't intend to discriminate against transgender students (because sex isn't relevant). That straw-man argument skirts the real issue: by incorporating *Bostock* throughout Title IX, the Final Rule vitiates sex-designations in situations where sex does matter, like showers and locker rooms.

In response, Defendants say (at 6) that § 106.10 does not require allowing males who identity as female into female-designated intimate spaces. But Defendants have argued for years that incorporating *Bostock* into Title IX does just that. Examples include:[1]

- **2016 Department of Education Dear Colleague Letter**: With respect to restrooms and locker rooms, a school "must allow transgender students access to such facilities consistent with their gender identity."

---

[1] U.S. Dep't of Educ., Off. for Civ. Rights, *Dear Colleague Letter on Transgender Students* 3 (May 13, 2016), https://perma.cc/G5VG-ZNV9; U.S. Dep't of Justice and U.S. Dep't of Educ., Civ. Rights Div. & Off. for Civ. Rights, *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families* (Fact Sheet) (June 23, 2021), https://perma.cc/F644-8GBC; U.S. Dep't of Justice, Statement of Interest, *Roe v. Critchfield*, Case No. 1:23-cv-315, ECF No. 41 at 12 (D. Idaho Aug. 8, 2023).

- **2021 Department of Education Fact Sheet**: Listing as an example of unlawful discrimination under Title IX a "transgender girl" being prevented from using "the girls' restroom" and instead being told "to use the boys' restroom."

- **2021 *Roe v. Critchfield* Statement of Interest**: Arguing that Title IX prohibits preventing "students who are transgender from using the single-sex bathrooms and changing facilities that are consistent with their gender identity."

So, the argument that § 106.10 somehow doesn't affect intimate spaces simply doesn't wash. Moreover, as this Court held, § 106.10 "permeates the entire rule" and vitiates sex-designation in myriad places that Title IX rightly allows it. ECF No. 53 at 40. Defendants' insistence that § 106.10 go into effect would render the Court's injunction meaningless and should not be countenanced.

        **B.**    **Severance is not required at the preliminary injunction stage.**

Defendants argue that the Court should have severed the Final Rule and limited its injunction to the challenged provisions. Mot. 3–7. But the purpose of a preliminary injunction is merely "to preserve the status quo pending a trial on the merits in order for the trial court to render a meaningful decision." *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1105 (D. Kan. 2000). Courts have "broad discretion" in crafting temporary relief to preserve the status quo, even if the final outcome involves narrower relief or no relief at all. *See Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). Severability, on the other hand, involves a final analysis of whether "what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987).

This Court acted well within its discretion in granting the preliminary injunction. Its relief stays a partial rollout that would confuse and impose expensive compliance costs on regulated parties, and it respects the APA—which directs courts to delay "the effective date" of agency action when required to stop irreparable harm and "to preserve" the status quo pending review. 5 U.S.C. § 705. Because the Final Rule has but one effective date and is but one agency action, its provisions stick together at this preliminary stage. No matter whether the Final Rule would be severable at final judgment, the Court rightly preserved the status quo for now.

C.     **Defendants failed to show that the Final Rule is severable.**

Defendants also failed to show that the Final Rule is severable. While the presence of a severability clause is informative, "the ultimate determination of severability will rarely turn on the presence or absence of such a clause." *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968). Rather, courts ask whether unchallenged provisions will still operate as the agency intended. *Alaska Airlines*, 480 U.S. at 685. A coherent balance of remaining provisions is necessary but not sufficient, and the Final Rule must "function in a *manner* consistent with" the agency's intent. *Id.* at 684–85. Even then, the Court must set aside the Final Rule in its entirety if it determines that the Government would not have enacted it without the unlawful provisions. *Id.* Defendants cannot prevail on their severability argument for at least two reasons.

i.     **The Final Rule cannot fully operate without the challenged provisions.**

First, the challenged provisions are so central to the Final Rule that it cannot fully operate without them. The challenged portions go to the redefinition of "sex discrimination" in 34 C.F.R. § 106.10, the novel de-minimis-harm standard in 34 C.F.R. § 106.31(a)(2), and the definition of hostile environment harassment in 34 C.F.R. § 106.2 only as applied to gender identity. These provisions—particularly the redefinition of sex discrimination—inform and pervade the remainder of the Final Rule. Because these provisions are foundational, the Final Rule cannot function coherently in their absence. Indeed, this Court enjoined the hostile-environment provision for vagueness concerns separate and apart from its reference to gender identity, so Defendants' proposed injunction wouldn't solve the problem. ECF No. 53 at 24.

Defendants cite various parts of the Final Rule to argue for severability, but even these examples depend upon the challenged portions, underscoring that severance would be inappropriate. Defendants point (ECF No. 59 at 4) to the "role of Title IX Coordinators" at 34 C.F.R. § 106.8(a), but these coordinators are tasked with "ensur[ing] the recipient's consistent compliance with its responsibilities under Title IX and this part." Take away the challenged provisions and the Coordinators' responsibilities to ensure compliance with "this part" become

unclear. Indeed, if Defendants had their wish and § 106.10's definition of sex-based harassment took effect, Title IX Coordinators would be left to wonder whether it is gender identity, sex, or something else that takes precedence when it comes to the many sex-based distinctions recognized by Title IX and its longstanding regulations.

Similarly, the regulations on lactation spaces at 34 C.F.R. § 106.40(b)(3)(v) require "actions . . . to promptly and effectively prevent sex discrimination and ensure equal access." If the de-minimis-harm provision (§ 106.31(a)(2)) is cut out— and Defendants do not ask for a stay as to that provision—the result is unclear. For example, if § 106.10 were allowed to go into effect, would schools have to allow males access to these private spaces, just as the Final Rule requires for restrooms, showers, and locker rooms? Because it is unclear how the new "gender identity" and "sex stereotypes" provisions coexist with existing law, women may be put in harm's way just to avoid accusations of discrimination.

Defendants' also point to the sections on recipients' notice and recordkeeping obligations, 34 C.F.R. § 106.8(c), (f); a recipient's response to sex discrimination, *id.* at § 106.44; and grievance procedures for claims of sex discrimination, *id.* at §§ 106.45, 106.46. But executing these provisions turns on the contested definition of sex discrimination and the de-minimis-harm provision. These new requirements on teachers and staff exacerbate the First Amendment harm caused by the new and broader definitions of sex discrimination and sex-based harassment. And if § 106.10 were allowed to take effect, as Defendants request, each of these provisions would impose uncertain duties for addressing allegations of discrimination. Thus, Defendants' own examples show that severance is unworkable.

### ii.   The Government likely would not have enacted the Final Rule without its challenged provisions.

Second, Defendants have not shown that the Government would have enacted the provisions it seeks to sever absent the challenged portions. To be sure, Defendants cite a routine severability clause, but "the ultimate determination of severability will rarely turn on ... such a clause." *Jackson*, 390 U.S. at 585 n.27. And such a clause cannot save a rule when the remaining

provisions are otherwise unjustified. *Ohio v. EPA*, No. 23A349, 603 U.S. ---, 2024 WL 3187768, at *8 (U.S. June 27, 2024).

This Court should not assume that the Government "would have preferred to apply the [Final Rule] in as many" situations "as possible" if "key" provisions were held invalid. *United States v. Booker*, 543 U.S. 220, 248 (2005). The Final Rule is "highly complex" and riddled with "interrelated provisions." *Id.* It is "one coherent policy," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 (1999), principally ensuring that students are not denied educational opportunities, *see* 89 Fed. Reg. at 33,476 (Rule aims "to fully effectuate ... sex discrimination prohibition."). And Defendants have said its provision redefining sex discrimination is "essential" to this goal. *Id.* at 33,500. The Government would likely not have been content without it.

Here, the Government justified the Final Rule and its high costs based on benefits it expects from implementing the challenged provisions. 89 Fed. Reg. at 33,861–62. But without those benefits, Defendants cannot show the costs are worth it. And Defendants relied on extensive estimates of costs that the Final Rule would impose on schools. 89 Fed. Reg. at 33,860–81. If the Final Rule is rolled out in stages through severance, it will duplicate many of those costs in a way the Government's reasoned estimates did not contemplate. *Cf. Ohio v. EPA*, 2024 WL 3187768, at *7–8 (staying a rule that imposed different burdens than the Government estimated). In sum, the challenged provisions are essential to the Final Rule and the other provisions cannot function as intended without them. Defendants cannot show that the Final Rule is severable.

### D.     Severance would require the Court to engage in inappropriate rulemaking.

Courts should not seek to sever when doing so would "entail quintessentially" executive work. *Cf. Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006). Requiring courts to craft such judicial remedies "would inflict enormous costs on both courts and litigants . . . whenever a single application of a law might be valid." *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 625 (2016), *as revised* (June 27, 2016), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597

U.S. 215 (2022). Granting a partial stay would require this Court to go through the Final Rule with a fine-tooth comb in search of any portion that could potentially operate independently of the challenged provisions. Such an in-depth analysis essentially conscripts the Court into executive rulemaking, which falls well outside of the proper judicial role. *See* Mem. Op. 43–44.

### E. Defendants forfeited their severance argument.

Even if some Final Rule provisions were severable, Defendants forfeited that argument by failing to brief it meaningfully. Defendants made two passing references to severability in the final paragraph of their preliminary-injunction opposition (ECF No. 38 at 50), but this meager mention does not preserve the argument. "Cursory statements, without supporting analysis and case law' are inadequate to preserve an issue." *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019). Courts in this Circuit will "not address arguments raised in the district court in a perfunctory and underdeveloped manner." *Valdez v. Macdonald*, 66 F.4th 796, 817 (10th Cir. 2023); *United States v. Kravchuk*, 335 F.3d 1147, 1153 (10th Cir. 2003) (noting that courts "cannot make a party's arguments for him"). Defendants failed to brief the issue or put forth any meaningful effort at developed argumentation regarding how the Court could manage to sever central provisions from a complex rule. Defendants failed to adequately develop and preserve this argument.

### F. The associational Plaintiffs have standing, and the Court need not parse its injunction to specify which of their members obtain relief.

In their motion, Defendants do not dispute that the associational Plaintiffs have standing or that they are entitled to injunctive relief. *See* Mot. 7–8. Instead, they argue that the Court should have limited its injunction to only those schools attended by students or parents who were members of the associational Plaintiffs at the time that this lawsuit was filed, or alternatively, at the time that the Court issued the injunction. *Id.* The only reason that Defendants provide for this argument is that the "the Plaintiff Associations' treatment of the Court's injunction contravenes longstanding equitable principles requiring that *a party* has one opportunity for relief and that the effect of any judgment should be bidirectional." Mot. at 8.

But the relevant "parties" here are the Associational Plaintiffs, and Defendants do not dispute that *they* have one opportunity for relief or that the effect of a judgment *on them* would be bidirectional. The purpose of associational standing is to allow an organization to protect the interests of its members collectively. See *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023); *NAACP v. Patterson*, 357 U.S. 449, 459 (1958) ("Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical."). Artificially restricting the injunction to a subset of members based on joining date would undermine this purpose, as well as the Associational Plaintiffs ability to fulfill their organizational missions. It would also create an untenable situation where some members' children are protected from the Final Rule's provisions while others are not, solely based on when their parents joined the organization. (To say nothing of forcing the Court to figure out whether new members may benefit from a final judgment, or subsequent affirmances on appeal).

The Supreme Court's decision in *Hunt v. Washington State Apple Advertising Commission* supports this interpretation. 432 U.S. 333 (1977). In *Hunt*, the Court recognized that an association may assert the interests of its members, even when membership is fluid. *Id.* at 343-45 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.") (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975)). The Court in *Hunt* held that the association had standing because its purpose was to protect and promote the interests of Washington apple growers and dealers, regardless of their specific identities at any given time. The Associational Plaintiffs likewise seek to support the interests of female athletes, parents, and young people regardless of their identities or membership at any given time.

Of course, individual students and parents may join or separate from the Associational Plaintiffs, but that is true of any organization, and none of the cases that Defendants cite are to the contrary. In *American Pipe & Construction Co. v. Utah*, the Court was concerned with one-way intervention in the class action context, where potential plaintiffs could wait to see how the

case developed before deciding whether to join. 414 U.S. 538, 547 (1974). Here, new members of the Associational Plaintiffs are not strategically waiting to join an existing lawsuit, but rather are seeking protection from an ongoing threat to their interests that the organization was formed to address. The Defendants' reliance on *Arizona v. Biden* is also misplaced. 40 F.4th 375, 395-96 (6th Cir. 2022). In that case, Judge Sutton's concurrence expressed concern about nationwide immigration injunctions that are "applicable-against-the-world," particularly non-parties. *Id*. Here, the injunction is limited to members of the plaintiff organizations, maintaining a direct connection between the relief granted and the parties before the court.

Indeed, courts regularly acknowledge that relief granted for an associational party applies even to future members. *See, e.g., Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021) (granting relief against the gender identity mandates to associational Plaintiffs including "their current and future members"); *Religious Sisters of Mercy v. Cochran*, No. 3:16-CV-00386, 2021 WL 1574628, at *2 (D.N.D. Feb. 19, 2021) (granting RFRA relief against the gender identity mandates to the "Catholic Plaintiffs, their present and future members"); *Christian Emps. All. v. Azar*, No. 3:16-CV-309, 2019 WL 2130142, at *6–7 (D.N.D. May 15, 2019) (granting relief against HHS's contraceptive mandate to "all present and future members of the Christian Employers Alliance"); *see also Texas v. Becerra*, No. 5:22-CV-185-H, 2023 WL 2467217, at *1 (N.D. Tex. Jan. 13, 2023) (granting injunction for "AAPLOG's members and CMDA's members" without limitation); *Pierce v. Society of Sisters*, 268 U.S. 510, 535-36 (1925) (affirming injunction because law interfered with plaintiff's relationships with "present and prospective patrons").

Similar orders often occur in the class action context. *See Native Am. Council of Tribes v. Solem*, 691 F.2d 382, 385 (8th Cir. 1982) (remanding for the court to consider religious freedom claims brought from members of a certified class of "present and future inmates"); *U.S. Fid. & Guar. Co. v. Lord*, 585 F.2d 860, 861, 863, 865 (8th Cir. 1978) (affirming certification of a class of "all female persons who have been, or are presently employed or might be employed and all past, present and future female applicants for employment at defendant USF&G offices throughout the United States").

10

Simply put, the Associational Plaintiffs established standing and entitlement to relief, and their entitlement to relief is not diminished or altered by the addition of members. Indeed, their need for relief is only strengthened. Thus, Defendants are not likely to succeed on appeal.

## II.  The remaining factors favor preserving the status quo.

The Court has already concluded that the remaining three factors (threat of irreparable harm, balance of hardships, and public interest) favor maintaining the status quo with a preliminary injunction. Order 38–46. Defendants' motion does nothing to alter that determination.

### A.       The proposed stay would irreparably harm Plaintiffs.

Defendants do not dispute that Plaintiff States will face irreparable harm if the Rule is not enjoined. Instead, they argue that all of Plaintiffs' harms "are grounded in objections to the Rule's treatment of gender identity," and so only § 106.10 should be enjoined. Mot. at 3. But this argument overlooks that the Rule's definition of "sex," which Defendants interpret to include gender identity, permeates every other aspect of the Rule. So, at this stage of the litigation, a line-item injunction "would be impractical." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (*per curiam*). And a piecemeal rollout would impose significant, unnecessary compliance costs and create significant "uncertainty" among educators and students. *Id.*

*Piecemeal compliance costs are extraordinary.* Unrecoverable compliance costs—like the costs to update policies and train educators and students—impose irreparable harm. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). The Final Rule acknowledges that the changes related to the maintenance of "records related to sexual harassment"—to which the new definition of "sex" is critical—will cost some recipients "approximately $13,022,034 in Year 1." 89 Fed. Reg. 33873. Other compliance costs include modifying spaces and hiring additional Title IX coordinators. *See* ECF No. 25-2 (Cawvey Decl.) (discussing evidence of significant compliance costs for school districts); ECF No. 25-3 (Earl Decl.) (same). These costs are irrecoverable and therefore irreparable. Defendants' request for a partial stay only multiplies the harm because schools would have to comply not just once, but at least twice.

11

Title IX has been read the States' way for over fifty years. Now, Defendants would have schools amend their policies and procedures, modify their spaces, and train their employees on some parts of the Final Rule, all within a matter of days. Schools must do this with no idea how to interpret sex discrimination in 34 C.F.R. § 106.10 consistent with Title IX's many permissible sex distinctions. And they must apply the Rule's "broader" harassment provision, but not if the complainant alleges gender-identity harassment, in which case the prior regulations presumably remain in place. That piecemeal approach is troubling enough.

And then, Defendants would have every school do this all over again at the end of this litigation. They believe the whole Final Rule is lawful, Mot. 3 n.1, but their motion does not defend the de-minimis-harm provision or the harassment standard as applied to gender-identity discrimination. In other words, Defendants would require training and re-training to partially enforce their new Rule, which forces schools to potentially suffer twice the compliance costs. This is inconsistent with the costs the Defendants themselves estimated, 89 Fed. Reg. at 33860–81, and irreparably injures those that Defendants are obligated to serve.

***Piecemeal compliance would create confusion.*** The Court's order rightly delays the compliance date for the Final Rule entirely. It allows schools to avoid wholesale changes to their policies and practices until the conclusion of litigation, sparing teachers and students the confusion and headache of trying to learn and comply with shifting—even contradictory—requirements. And make no mistake, piecemeal compliance would create confusion. For example, Defendants never explain how schools can comply with § 106.10 if it goes into effect but § 106.31(a)(2) does not: how can schools prevent discrimination based on gender identity under § 106.10 and prevent discrimination based on sex in circumstances where doing both is impossible? And how does a school parse out if a hostile-environment complaint addresses gender identity, sex characteristics, or sex stereotypes? No one knows.

Forcing teachers to enforce such contradictory requirements will mire them in regulatory mud and impede their ability to engage students. The Court reasonably prevented the Final Rule from taking effect and enjoined its enforcement entirely until litigation ends. *Cf. Ohio*

*State Conf. of NAACP*, 769 F.3d at 389 (refusing to stay preliminary injunction when it would create "confusion" among affected individuals and risk placing regulated officials in a "position of trying to communicate" multiple, conflicting instructions). There is no good reason to disturb that ruling and replace it with chaos.

    **B.** **The balance of equities and public interest favor preserving the injunction, and Defendants will suffer no harm without a stay.**

    Plaintiffs would suffer irreparable harm if the status quo is disrupted in the way Defendants propose. On the other hand, Defendants have not shown they would suffer any harm if the entire Final Rule is temporarily enjoined while litigation progresses. And because the public interest merges with Defendants' harm, a stay is not in the public interest either. *See Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020), *abrogated on other grounds* by *Garland v. Cargill*, 602 U.S. 406 (2024); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019).

    Defendants first quote Chief Justice Roberts' statement granting a stay in *Maryland v. King* to argue that "[e]very time the federal government 'is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" Mot. at 8 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But Defendants omit the key part of this quote: "[A]ny time *a State* is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (brackets in original, emphasis added) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). Defendants are not a State, and they are not effectuating a statute enacted by representatives of the people; they are unelected bureaucrats attempting to rewrite a statute via regulation. So, there is no sovereign harm if the Final Rule is preliminarily enjoined. And, if Defendants *were* irreparably harmed "every time" they are enjoined from effectuating a rule, then a stay that allows even part of the injunction to take effect would not alleviate that harm. The Court should reject

Defendants' theory that no law, regulation, or administrative rule could be enjoined—even in part—without causing irreparable harm.

Defendants next argue the injunction "*could* impair" the rights of others. Mot. at 9 (emphasis added). They provide some hypothetical examples of people whose rights *could* be impaired if parts of the Final Rule do not take effect on August 1: new mothers who need access to lactation rooms or students who might be punished for being gay or transgender. But Defendants provide no evidence that the States have punished students for being gay or transgender or denied new mothers the access they need, nor do they show that, in the absence of the Final Rule, the States are likely to punish such students. But such speculative claims cannot demonstrate irreparable harm for the purposes of a stay. *See Nat'l Ass'n of Mfrs. v. Taylor*, 549 F. Supp. 2d 68, 75 (D.D.C. 2008).

To obtain a stay, the claimed injury "must be both certain and great; it must be actual and not theoretical. Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)). They must show "that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. Of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005). Defendants' bald and speculative assertions fall woefully short.

In sum, the definition of the word "sex" pervades the Final Rule and is integral to the application of its many provisions. Plaintiffs have shown they will be irreparably harmed if the Final Rule is allowed to take effect pending a determination on the merits. They will face irrecoverable compliance costs, harm to their sovereignty, and constitutional injuries. Defendants, on the other hand, cannot show that temporarily halting the entire rule causes any cognizable harm. The balance of equities remains overwhelmingly in favor of an injunction.

<u>CONCLUSION</u>

This Court properly exercised its discretion in issuing preliminary relief to maintain the status quo. The Government's Motion for Partial Stay Pending Appeal should be denied.

14

Respectfully submitted this 12th day of July, 2024.

KRIS W. KOBACH
**Attorney General of Kansas**

*/s/ Erin B. Gaide*
Abhishek S. Kambli, 29788
*Deputy Attorney General*
Erin B. Gaide, 29691
*Assistant Attorney General*
Jay Rodriguez, 29172
*Assistant Attorney General*
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Fax: (785) 291-3767
Email: abhishek.kambli@ag.ks.gov
         erin.gaide@ag.ks.gov
         jay.rodriguez@ag.ks.gov

TREG TAYLOR
Attorney General of Alaska

*/s/ Cori Mills*
Cori Mills*
*Deputy Attorney General*
ALASKA DEPARTMENT OF LAW
1031 West 4th Avenue, Suite 200
Anchorage, Alaska 99501-1994
(907) 465-4239
(515) 281-4209 (fax)
cori.mills@alaska.gov

*Counsel for Plaintiff State of Alaska*

SEAN REYES
Attorney General of Utah

*/s/ Lance F. Sorenson*
Lance F. Sorenson*
*Assistant Utah Attorney General*
UTAH ATTORNEY GENERAL
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0100
lancesorenson@agutah.gov

*Counsel for Plaintiff State of Utah*

BRIDGET HILL
Attorney General of Wyoming

/s/ Ryan Schelhaas
Ryan Schelhaas*
*Chief Deputy Attorney General*
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786 Direct line
(307) 777-6869 Fax
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of Wyoming*

/s/ William E. Trachman
William E. Trachman*
James L. Kerwin*
MOUNTAIN STATES LEGAL
FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org
*Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation*

/s/ Braden H. Boucek
Kimberly S. Hermann*
Ga. Bar No. 646473
Braden H. Boucek*
Tenn. BPR No. 021399
Ga. Bar No. 396831
Jordan Miller*
Michigan Bar. No. P81467
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
khermann@southeasternlegal.org
bboucek@southeasternlegal.org
jmiller@southeasternlegal.org

*Counsel for Plaintiffs Moms for Liberty and
Young America's Foundation*

/s/ Tyson C. Langhofer
Tyson C. Langhofer
Kansas Bar No. 19241
Rachel A. Rouleau*
Virginia Bar No. 97783
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-2119
(571) 707-4790 Fax
tlanghofer@ADFlegal.org
rrouleau@ADFlegal.org

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Natalie D. Thompson*
TX Bar No. 24088529
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
(202) 347-3622 Fax
nthompson@ADFlegal.org

*Counsel for Plaintiffs K.R. and FAU*

* Pro Hac Vice

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 12th day of July, 2024, this memorandum was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic service to all counsel.

<u>*/s/ Erin B. Gaide*</u>

Erin B. Gaide