**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

STATE OF KANSAS *et al.*,

      *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION *et al.*,

      *Defendants.*

No. 24-4041-JWB

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD AND DISMISSAL
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTRADICTED FACTS ......................3

BACKGROUND ...............................................................................................................4

I.      Title IX and Its Implementing Regulations ...............................................................4

II.     The Department's 2024 Rule ....................................................................................4

III.    Procedural History ..................................................................................................9

LEGAL STANDARDS .......................................................................................................9

I.      Summary Judgment and Judgment on the Administrative Record .............................9

II.     Standing ...............................................................................................................10

ARGUMENT ..................................................................................................................11

I.      The Court Should Grant Judgment on the Administrative Record for Defendants. ...........11

        A.   Section 106.10's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ...............................12

        B.   Section 106.31(a)(2) Properly Effectuates the Scope of Congress's Prohibition on Discrimination with Respect to Sex Separation and Differentiation. ....................16

        C.   Section 106.2's Definition of Hostile Environment Harassment Is a Lawful Exercise of the Department's Statutory Authority. ...................................22

             1.   The Individual and Organizational Plaintiffs Lack Standing to Challenge the Hostile Environment Harassment Definition. .......................22

             2.   Plaintiffs' Challenges to the Definition Fail on the Merits. .............................25

                  i.    The Definition Does Not Violate the First Amendment. ...................26

                  ii.   The Definition Does Not Violate RFRA. ................................31

                  iii.  The Definition Is Not Arbitrary and Capricious. ................................32

        D.   The Challenged Reasonable Modification and Leave Provisions Do Not Violate 20 U.S.C. § 1688. ............................................33

        E.   No Provision of the Rule Violates the Spending Clause. ...................................35

        F.   The Rule Does Not Violate the Major Questions Doctrine. ................................37

II.    Any Relief Awarded in this Case Should Comport with Equitable Principles. .......................38

    A.    Any Relief Should Be Limited to Portions of the Rule Held To Be Unlawful.................39

        1.    The vast majority of the Rule's provisions are unchallenged. .........................40

        2.    The challenged provisions are severable. ...........................................................41

            i.    The Rule's severability clauses establish that the agency
              intended for the Rule to be broadly severable. ....................................42

            ii.   The unchallenged portions of the Rule function
              independently of those challenged by Plaintiffs. ..................................43

    B.    Any Relief Should Not Extend Beyond the Parties.................................................44

    C.    Any Injunctive Relief Should Be Appropriately Tailored. .......................................46

            i.    Plaintiffs have not demonstrated irreparable harm justifying
              injunctive relief that reaches outside the Plaintiff States. ...................46

            ii.   The balance of the equities and public interest counsels
              against an overbroad injunction. ...........................................................50

CONCLUSION.......................................................................................................................50

# TABLE OF AUTHORITIES

**CASES**

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
   75 F.4th 760 (7th Cir. 2023) ................................................................................................... 14

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.,*
   64 F.4th 1354 (D.C. Cir. 2023) .............................................................................................. 45

*Ariz. Pub. Serv. Co. v. EPA,*
   562 F.3d 1116 (10th Cir. 2009) ........................................................................................ 39, 42

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .................................................................................................. 46

*Ayotte v. Planned Parenthood of N. New England,*
   546 U.S. 320 (2006) .............................................................................................................. 39

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   591 U.S. 610 (2020) ................................................................................................... 10, 41, 42

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020) ........................................................................................................*passim*

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................................................................ 45, 49

*California v. Texas,*
   593 U.S. 659 (2021) ........................................................................................................ 39, 45

*Cannon v. Univ. of Chi.,*
   441 U.S. 677 (1979) .............................................................................................................. 50

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .............................................................................................................. 25

*D.L.S. v. Utah,*
   374 F.3d 971 (10th Cir. 2004) ............................................................................................... 23

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) .............................................................................................................. 10

*Davis Cnty. Solid Waste Mgmt. v. EPA,*
   108 F.3d 1454 (D.C. Cir. 1997) ............................................................................................ 42

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
   526 U.S. 629 (1999) ................................................................................................... 26, 33, 35

*Dep't of Educ. v. Louisiana,*
144 S. Ct. 2507 (2024) ...................................................................................... 14

*DHS v. Regents of the Univ. of Calif.,*
591 U.S. 1 (2020) .............................................................................................. 21

*Dine Citizens Against Ruining Our Env't v. Haaland,*
59 F.4th 1016 (10th Cir. 2023) ........................................................................ 45

*Direct Mktg. Ass'n v. Brohl,*
575 U.S. 1 (2015) .............................................................................................. 46

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo,*
18 F.4th 38 (1st Cir. 2021) ............................................................................... 50

*Doe v. Univ. of Denver,*
952 F.3d 1182 (10th Cir. 2020) ........................................................................ 13

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) .......................................................................................... 46

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) .......................................................................................... 11

*Fowler v. Stitt,*
104 F.4th 770 (10th Cir. 2024) ........................................................................ 13

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) .......................................................................................... 46

*Gill v. Whitford,*
585 U.S. 48 (2018) ............................................................................................ 46

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) .......................................................................................... 31

*Grimm v. Gloucester Cnty. Sch. Bd.,*
No. 19-1952, 2019 WL 6341095 (4th Cir. Nov. 25, 2019) .............................. 19

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ........................... 14

*Harmon v. City of Norman,*
61 F.4th 779 (10th Cir. 2023) .......................................................................... 29

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993) .................................................................................. 26, 27, 31

iv

*Hecht Co. v. Bowles,*
  321 U.S. 321 (1944) .................................................................................................45

*Heideman v. S. Salt Lake City,*
  348 F.3d 1182 (10th Cir. 2003) .................................................... 46, 47, 48, 49

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) .................................................................................................10

*Initiative & Referendum Inst. v. Walker,*
  450 F.3d 1082 (10th Cir. 2006) ..................................................................... 23, 25

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005) ...................................................................................1, 4, 22, 36

*Kane Cnty. v. Salazar,*
  562 F.3d 1077 (10th Cir. 2009) .............................................................................10

*Labrador v. Poe,*
  144 S. Ct. 921 (2024) ........................................................................................ 39, 46

*Laird v. Tatum,*
  408 U.S. 1 (1972) ............................................................................................... 23, 25

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................. 10, 13, 47

*Maryland v. King,*
  567 U.S. 1301 (2012) ...............................................................................................50

*Massachusetts v. Mellon,*
  262 U.S. 447 (1923) .................................................................................................37

*McLean v. Morgan,*
  No. 20-2145-JWB, 2020 WL 5094683 (D. Kan. Aug. 28, 2020) ........................3

*MD/DC/DE Broads. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001) ................................................................................42

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021) .................................................................................28

*Muldrow v. City of St. Louis,*
  601 U.S. 346 (2024) ......................................................................................... 16, 18

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) .............................................................................................25

*N.M. Health Connections v. HHS,*
    340 F. Supp. 3d 1112 (D.N.M. 2018) .......................................................................45

*N.M. Health Connections v. HHS,*
    946 F.3d 1138 (10th Cir. 2019) ......................................................................... 9, 10

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................................ 36, 37

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ...............................................................................................37

*North Carolina v. Covington,*
    585 U.S. 969 (2018) ...............................................................................................41

*Olenhouse v. Commodity Credit Corp.,*
    42 F.3d 1560 (10th Cir. 1994) ............................................................................ 3, 9

*Parents Def. Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.,*
    109 F.4th 453 (6th Cir. 2024) .......................................................................... 28, 29

*Parents Defending Education v. Linn Mar Community School District,*
    83 F.4th 658 (8th Cir. 2023) ..................................................................................28

*Peltier v. Charter Day Sch., Inc.,*
    37 F.4th 104 (4th Cir. 2023) ..................................................................................18

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988) ...............................................................................................28

*Rocky Mountain Wild v. Dallas,*
    98 F.4th 1263 (10th Cir. 2024) ..................................................................10, 13, 49

*Rowles v. Curators of Univ. of Mo.,*
    983 F.3d 345 (8th Cir. 2020) ........................................................................... 29, 30

*Rumsfeld v. FAIR, Inc.,*
    547 U.S. 47 (2006) .................................................................................................27

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ..............................................................................30

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ..................................................................................30

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ...............................................................................................35

*Tandy v. City of Wichita,*
    380 F.3d 1277 (10th Cir. 2004) ................................................................................10

*Tennessee v. Cardona,*
    --- F. Supp. 3d ---, 2024 WL 3019146 (E.D. Ky. June 17, 2024) ............................47

*Throupe v. Univ. of Denver,*
    988 F.3d 1243 (10th Cir. 2021) ................................................................................26

*Town of Chester v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) ................................................................................................22

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................................45

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ..................................................................................................1

*Walker v. Progressive Direct Ins. Co.,*
    472 F. App'x 858 (10th Cir. 2012) .........................................................................33

*Ward v. Utah,*
    398 F.3d 1239 (10th Cir. 2005) ................................................................................29

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ..........................................................................................37, 38

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................................................50

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................................................46

*Ziggy1 Corp. v. Lynch,*
    CIV-15-0715-HE, 2016 WL 4083656 (W.D. Okla. Mar. 23, 2016) .......................49

## STATUTES

5 U.S.C. § 702 ...............................................................................................................45

5 U.S.C. § 703 ...............................................................................................................44

5 U.S.C. § 706 ...............................................................................................................44

20 U.S.C. § 1681 ......................................................................................................*passim*

20 U.S.C. § 1682 .............................................................................................................4

20 U.S.C. § 1686 ....................................................................................................4, 7, 16

20 U.S.C. § 1688 ..................................................................................................11, 34, 35

42 U.S.C. § 2000e-2 .............................................................................................. 4, 15

42 U.S.C. § 2000bb–1 ...............................................................................................32

**RULES**

Fed. R. Civ. P. 56 ........................................................................................................9

**FEDERAL REGULATIONS**

34 C.F.R. § 106.2 ................................................................................................*passim*

34 C.F.R. § 106.6 ...........................................................................................7, 8, 26

34 C.F.R. § 106.8 .........................................................................................5, 40, 43

34 C.F.R. § 106.9 ................................................................................................ 9, 42

34 C.F.R. § 106.10 .................................................................................6, 9, 12, 39

34 C.F.R. § 106.11 ....................................................................................................23

34 C.F.R. § 106.18 ............................................................................................... 9, 42

34 C.F.R. § 106.24 ............................................................................................... 9, 42

34 C.F.R. § 106.30 (2020) ......................................................................................30

34 C.F.R. § 106.31 .............................................................................................*passim*

34 C.F.R. § 106.33 ....................................................................................................17

34 C.F.R. § 106.40 .............................................................................................*passim*

34 C.F.R. § 106.41 ......................................................................................................5

34 C.F.R. § 106.44 ......................................................................................................5

34 C.F.R. §§ 106.45-106.46 ............................................................................... 5, 40

34 C.F.R. § 106.46 ............................................................................................... 9, 42

34 C.F.R. § 106.48 ....................................................................................................42

34 C.F.R. § 106.57 .............................................................................................*passim*

34 C.F.R. § 106.62 ............................................................................................... 9, 42

34 C.F.R. § 106.71 ........................................................................................................................40

34 C.F.R. § 106.72 .......................................................................................................................9, 42

34 C.F.R. § 106.82 .......................................................................................................................9, 42

45 C.F.R. § 86.1 ...........................................................................................................................43

45 C.F.R. § 86.3 ...........................................................................................................................43

45 C.F.R. § 86.4 ...........................................................................................................................43

45 C.F.R. § 86.6 ...........................................................................................................................43

45 C.F.R. § 86.9 ...........................................................................................................................43

45 C.F.R. § 86.21 .........................................................................................................................34

45 C.F.R. § 86.36 .........................................................................................................................43

45 C.F.R. § 86.37 .........................................................................................................................43

45 C.F.R. § 86.38 .........................................................................................................................43

45 C.F.R. § 86.39 .........................................................................................................................43

45 C.F.R. § 86.40 .........................................................................................................................35

45 C.F.R. § 86.51 .........................................................................................................................43

45 C.F.R. § 86.53 .........................................................................................................................43

45 C.F.R. § 86.56 .........................................................................................................................43

45 C.F.R. § 86.59 (1975) ..............................................................................................................43

Department of Health, Education, & Welfare, General Administration,
    40 Fed. Reg. 24,128 (1975) ....................................................................................................34

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) .......................................................................................4

Exec. Order No. 14,021,
    86 Fed. Reg. 13,803 (Mar. 8, 2021) ........................................................................................4

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance,
    87 Fed. Reg. 41,390 (July 12, 2022) .......................................................................................5

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ...................................................................................6

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ...................................................................................*passim*

## STATE REGULATIONS

Utah Code § 34A-5-102 ...................................................................................31

Utah Code § 34A-5-104 ...................................................................................31

Utah Code § 34A-5-106 ...................................................................................31

Utah Code § 53E-9-205 ...................................................................................31

Utah Code § 58-1-511 ...................................................................................31

## OTHER AUTHORITIES

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities (2014), https://www.csba.org/Advocacy/~/media/CSBA/Files/Advocacy/ELA/2014_03_AB1266_FinalGuidance.ashx ...................................................................................49

Colville Sch. Dist., Policy No. 3207, Prohibition of Harassment, Intimidation, or Bullying (Revised Nov. 19, 2019), https://perma.cc/HP8M-83ZL ...................................................................................25

Kan. State Univ., Policy Prohibiting Discrimination, Harassment, and Sexual Harassment, and Procedure for Reviewing Complaints, Chapter 3010 (Revised Aug. 14, 2020), https://perma.cc/756N-UQAY ...................................................................................31

N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices (2023), https://perma.cc/97DC-3L8E ...................................................................................49

Prince William Cnty. Pub. Schs., PWCS Reporting Form, https://perma.cc/2ZG4-M5TA ...................................................................................24, 25

American Psychiatric Association, *Gender Dysphoria*, Diagnostic and Statistical Manual of Mental Disorders (5th ed.) (2013) ...................................................................................31

Prince William Cnty. Pub. Schs., PWCS Reporting Form, https://perma.cc/2ZG4-M5TA ...................................................................................24, 25

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools*
(Wash. Off. of Superintendent of Pub. Instruction) (Feb. 2012),
https://perma.cc/N7AC-6AJJ ........................................................................................48

Univ. of Utah, Policy 1-012, University Non-Discrimination Policy (Effective Date: Aug. 1, 2024),
https://perma.cc/Z4SB-J2KS ........................................................................................24

Univ. of Utah, Rule R1-012A: Non-Discrimination Rule (Effective Date: Aug. 1, 2024),
https://perma.cc/Z9TJ-N4QE ........................................................................................24

Univ. of Wyo. Regulation 4-2, Discrimination and Harassment (Effective Date: July 1, 2018),
https://perma.cc/AAQ4-GFJ4 ........................................................................................24

## INTRODUCTION

Title IX prohibits sex discrimination in federal funding recipients' education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education (Department) to issue rules to effectuate the statute's sweeping prohibition on sex discrimination. In April 2024, the Department exercised that authority by issuing an omnibus rule that makes amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). Plaintiffs—four States, an individual student, and three membership organizations—seek an injunction, declaratory relief, and vacatur of the Rule.

As an initial matter, despite the Court's preliminary findings, the individual and organizational Plaintiffs lack standing to challenge at least four of the five provisions at issue because they have not established an injury-in-fact. Thus, there is no basis to grant them relief with respect to those provisions as their challenges are not properly before this Court in the first place.

Defendants also are entitled to judgment on the merits. Defendants recognize that the Court already determined that Plaintiffs were likely to succeed on some of their claims. But "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties" until the Court can render a final disposition. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" when, as here, a court reaches the merits stage of the case. *Id.*

In particular, three aspects of the case warrant another look at this stage. The first is the structure and content of the Rule itself, which consists of numerous distinct and severable provisions—ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students—the vast majority of which Plaintiffs do not challenge and should

1

be permitted to go into effect, regardless of the outcome of Plaintiffs' challenges. But the challenged provisions, too, should be permitted to take effect because they are consistent with—or even compelled by—the text and structure of Title IX. Section 106.10 recognizes, consistent with the Supreme Court's interpretation of Title VII's materially indistinguishable text, that Title IX's prohibition on discrimination "on the basis of sex" encompasses discrimination based on gender identity. Section 106.31(a)(2) reflects Title IX's statutory design by providing that a school violates Title IX when it differentiates based on sex in a way that causes any student more than de minimis harm, unless Congress has authorized such differentiation. Section 106.2 includes a definition of "hostile environment harassment" that the Department designed to effectuate Title IX's broad reach, consistent with the standards used under other civil-rights statutes. Sections 106.40(b)(3) and 106.57 reiterate the Department's longstanding application of Title IX to prevent sex discrimination based on pregnancy or related conditions, including by requiring that recipients make reasonable modifications for students on these bases and treat them as any other temporary medical conditions for job-related purposes for employees.

The second point is that Defendants now have the opportunity to provide a more robust explanation of the reasoning underlying the challenged provisions of the Rule—one that draws upon the extensive administrative record. That record furnishes ample support for propositions that the Court found lacking, like evidence of the serious physical and emotional harms that can be caused by excluding transgender students from facilities that correspond to their gender identity, and evidence that allowing transgender students to use such facilities does not interfere with other students' interests in safety and privacy. The Department's fact-based conclusions, backed as they are by the Department's enforcement experience, relevant case law, empirical evidence, and stakeholder comments, should not lightly be cast aside.

The third is the importance of tailored relief. Plaintiffs seek an expansive remedy: vacatur, as

well as declaratory relief and an injunction against enforcement of the entire Rule. Particularly given that Plaintiffs do not challenge the vast majority of the Rule's provisions, and that the individual and organizational Plaintiffs have not even established standing to challenge most of the provisions at issue, the presumption of severability and the balance of equities clearly counsel in favor of limited relief that does not extend beyond the Plaintiff States or beyond provisions of the Rule that the Court finds unlawful.

**RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTRADICTED FACTS**

The Tenth Circuit has explained that judicial review of agency action under the APA should not "rely on evidence outside the administrative record," and has indicated that a dispositive motion based on the administrative record in an APA case should not be styled as a motion for summary judgment. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) (disapproving of separate statements of material fact in APA cases); *cf. McLean v. Morgan*, No. 20-2145-JWB, 2020 WL 5094683, at *5 (D. Kan. Aug. 28, 2020) (denying a motion for summary judgment because such motions are "improper" in proceedings for review of agency action, but "consider[ing] the parties' briefing, including Plaintiff's arguments in his motion for summary judgment, in ruling on Plaintiff's complaint which is to be treated as an appeal"). Plaintiffs nonetheless have styled their motion as one for summary judgment and submitted a purported "statement of uncontradicted facts" under Local Rule 56.1(a). Pls.' Mem. in Supp. of Mot. for Summ. J. 1-9, ECF No. 79 (PMSJ). Because Plaintiffs' Rule 56.1(a) statement is improper, Defendants do not here submit a response under Local Rule 56.1(b).  However, in an abundance of caution, Defendants respond to Plaintiffs' statement as follows:

Paragraphs 1-8 of Plaintiffs' statement consist not of statements of fact, but rather legal conclusions regarding the Rule at issue in this case. Defendants dispute Plaintiffs' legal conclusions and characterizations of the Rule for the reasons set forth in Defendants' Argument below.

3

Paragraphs 9-41 characterize the Plaintiffs and their beliefs, fears, motivations, and plans. Defendants lack knowledge or information to dispute the existence of the subjective beliefs, fears, motivations, or plans of the individual Plaintiff or individual members of Plaintiff organizations described in Paragraphs 9-41. To the extent Paragraphs 9-41 characterize the Rule, Defendants dispute those characterizations for the reasons set forth in Defendants' Argument below.

## BACKGROUND

### I. Title IX and Its Implementing Regulations

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions. *Jackson*, 544 U.S. at 173, 175; *see* 20 U.S.C. §§ 1681(a), 1686. Congress also authorized the Department to "issu[e] rules . . . consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682.

Since Title IX's enactment, the Department has promulgated regulations implementing the statute's prohibition on sex discrimination, including in 2020. *See* 85 Fed. Reg. 30,026 (May 19, 2020). One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Following *Bostock*, the President directed the Department to review the 2020 rule "for consistency with governing law." Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803 (Mar. 8, 2021).

### II. The Department's 2024 Rule.

Following an extensive public engagement process, the Department issued the Rule. In June

2021, the Department's Office for Civil Rights (OCR) held a nationwide virtual public hearing on Title IX. 89 Fed. Reg. at 33,480. OCR received more than 30,000 written comments in connection with the hearing as well as over 280 live comments. *Id.* at 33,835, 33,860. OCR also held listening sessions with a wide variety of stakeholders. *Id.* at 33,480. In July 2022, the Department issued a Notice of Proposed Rulemaking (NPRM). *See* 87 Fed. Reg. 41,390 (July 12, 2022). Following review of more than 240,000 comments submitted in response to the NPRM, the Department published the Rule, which went into effect as to states and schools not encompassed within a preliminary injunction on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

The omnibus Rule contains a multitude of provisions intended to "fully effectuate Title IX's sex discrimination prohibition." *Id.* Among other things, the Rule contains provisions that streamline requirements related to Title IX Coordinators, 34 C.F.R. § 106.8(a); revise recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); ensure access to lactation spaces for breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); address a recipient's response to sex discrimination, *id.* § 106.44; and provide recipients additional flexibility regarding procedures to respond to complaints of sex discrimination, including sex-based harassment, *id.* §§ 106.45-106.46.

The Rule explicitly does not amend or affect the Department's existing regulation regarding sex-separate athletic teams; the eligibility criteria a school may use for its male and female athletic teams remain unchanged by the Rule. 89 Fed. Reg. at 33,817; *see* Mem. & Order 23, ECF No. 53 (PI Opp'n). The section of the current athletics regulations that addresses sex-separate athletic teams is 34 C.F.R. § 106.41(b), which sets forth an exception to the regulation's general nondiscrimination mandate for athletics in § 106.41(a) and allows "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). The Rule makes no changes to § 106.41. Instead, the Department will address sex-

5

separate athletic teams through a separate rulemaking, which is ongoing. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023).

Plaintiffs' claims address just five provisions of the Rule. Their challenges to the first three of these provisions (§§ 106.10, 106.31(a)(2), and the "hostile environment harassment" definition in § 106.2) relate exclusively to those provisions' application to gender identity discrimination. Their challenges to the final two provisions (§§ 106.40(b)(3) and 106.57) relate exclusively to the application of those provisions to discrimination on the basis of one pregnancy-related condition—abortion.

**Section 106.10** recognizes that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. Consistent with the Supreme Court's reasoning in *Bostock*, the Rule explains that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

**Section 106.31(a)(2)** sets out the principle that Title IX generally permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] . . . by subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2). The Department derived the de minimis harm standard from the "well-established" understanding "that the concept of discrimination includes an element of injury or harm." 89 Fed. Reg. at 33,815. Applying this framework, the final sentence of § 106.31(a)(2) provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex," reflecting the Department's evidence-based conclusion that "students experience sex-based harm that violates Title

6

IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity," including "physical, emotional, and dignitary harms," *id.* at 33,818.

Section 106.31(a)(2) also recognizes, however, that Congress carved out certain contexts in which a school may permissibly differentiate on the basis of sex even though greater than de minimis harm may result, *see, e.g.,* 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities), and it excepts these contexts from application of the de minimis harm standard. 34 C.F.R. § 106.31(a)(2). The provision states explicitly that the de minimis harm standard also does not apply to § 106.41(b), the Department's preexisting regulation permitting sex-separate athletic teams. *Id.*; *see* 89 Fed. Reg. at 33,817; PI Opp'n 78-79.

**Section 106.2** is a glossary of terms used in the Department's Title IX regulations, and the amendments to § 106.2 address over a dozen terms, including "sex-based harassment." One form of sex-based harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)." 34 C.F.R. § 106.2. The Department drew the definition of hostile environment harassment from "Title IX's broad language," further concluding that the definition "will better align with the definitions of harassment in other civil rights laws . . . and will reduce confusion." 89 Fed. Reg. at 33,497. As with other civil rights statutes, § 106.2 explains that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of several enumerated factors.

In promulgating § 106.2's "hostile environment harassment" definition, the Department took multiple steps to protect First Amendment rights. The Department preserved language from the 2020 amendments stating that nothing in the Department's Title IX regulations "requires a recipient to . . . [r]estrict any rights" protected "by the First Amendment of the U.S. Constitution," 34 C.F.R.

§106.6(d)(1); reiterated that "a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees"; and acknowledged that "the First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

**Section 106.40(b)(3)**, addressing student "pregnancy or related conditions," requires a recipient to "make reasonable modifications to the recipient's policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity." 34 C.F.R. § 106.40(b)(3)(ii)(A). The provision specifies that such reasonable modifications may include, among other things, "intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; [and] extensions of time for coursework and rescheduling of tests and examinations." *Id.* § 106.40(b)(3)(ii)(C). It also provides that a recipient must allow a student who is pregnant or has a pregnancy-related condition to take a voluntary leave of absence "to cover, at minimum, the period of time deemed medically necessary by the student's licensed healthcare provider." *Id.* § 106.40(b)(3)(iv). Under the Department's regulations, "pregnancy or related conditions" include "[p]regnancy, childbirth, termination of pregnancy, or lactation," as well as "[m]edical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation," and "[r]ecovery from pregnancy, childbirth, termination of pregnancy, lactation, or related medical conditions." *Id.* § 106.2.

**Section 106.57**, similarly provides, in relevant part, that, for an employee, "[a] recipient must treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes," including with respect to leave. *Id.* § 106.57(c). It further specifies that if a recipient "does not maintain a leave policy for its employees," or if an employee has "insufficient leave or accrued employment time to qualify for leave under such a policy, a recipient must treat pregnancy or related conditions as a justification for a voluntary leave of absence without pay for a reasonable period of

time." *Id.* § 106.57(d).

**Severability.** Although the Department "believes that every provision of the final regulations is legally supportable," the Rule reiterates that the preexisting severability clauses in the Department's regulations "continue to be applicable." 89 Fed. Reg. at 33,848; *see* 34 C.F.R. §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72, 106.82. The Department has "confirm[ed] that each of the provisions in the final regulations is intended to operate independently of each other," and described how different provisions—including §§ 106.2, 106.10, and 106.31(a)(2)—operate independently from one another and from the remainder of the Rule. 89 Fed. Reg. at 33,848.

## III.    Procedural History

Plaintiffs filed their complaint on May 14, 2024. ECF No. 1. The Court entered a preliminary injunction on July 2, 2024, ECF No. 54, which Defendants appealed, ECF No. 58.

On August 26, 2024, Plaintiffs filed a motion for summary judgment. ECF No. 79. The Department opposes Plaintiffs' motion and cross-moves for judgment on the administrative record. Pursuant to the Court's August 13 Scheduling Order, ECF No. 77, Defendants have consolidated their response to the Complaint with their motion for judgment on the administrative record, as it explains why Plaintiffs fail to state a claim under Rule 12(b)(6) and why certain claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

**LEGAL STANDARDS**

## I.    Summary Judgment and Judgment on the Administrative Record

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In *Olenhouse*, the Tenth Circuit instructed district courts reviewing agency action under the APA to "act as an appellate court," and process such cases "as appeals." 42 F.3d at 1580. The district court's review in an APA case "is limited to the administrative record." *N.M. Health*

9

*Connections v. HHS*, 946 F.3d 1138, 1161-62 (10th Cir. 2019). Where a plaintiff raises an arbitrary-and-capricious claim under the APA, the agency's "actions are entitled to a presumption of regularity, and [plaintiff] bears the burden of persuasion to show [the agency] acted arbitrarily and capriciously." *Id.* at 1162. A district court may also dismiss APA claims on threshold grounds. "[N]othing in *Olenhouse* . . . precludes an APA-based complaint from being summarily dismissed pursuant to Federal Rule of Civil Procedure 12(b)." *Kane Cnty. v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009).

## II.     Standing

A plaintiff who seeks to show standing must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-561 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. In some instances, an association can establish standing to bring suit on behalf of its members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As a threshold requirement for associational standing, an organization must "show [that] at least one of its members meets the requirements for Article III standing." *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1286 (10th Cir. 2024).

"[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Thus, a plaintiff that has standing to challenge one provision of a Rule nonetheless "may lack standing to challenge other provisions of that [Rule]." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020). Moreover, a plaintiff bears the burden of establishing each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. At the summary judgment stage, "the elements of standing must be set forth, through specific facts, by affidavit or other evidence." *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

## ARGUMENT

### I.     The Court Should Grant Judgment on the Administrative Record for Defendants.

For all but one of the challenged provisions, the individual and organizational Plaintiffs have failed to demonstrate any injury-in-fact, and they therefore lack standing to seek relief.

Plaintiffs' claims also fail on the merits. The challenged provisions of the Rule—the description of the scope of prohibited sex discrimination in § 106.10; the specification of how Title IX's prohibition on sex discrimination applies to separation or differentiation based on sex in § 106.31(a)(2); the definition of hostile environment harassment in § 106.2; the requirements to provide students reasonable modifications and voluntary leave based on pregnancy or related conditions in § 106.40(b)(3); and the requirements that pregnancy or related conditions be treated like any other temporary medical conditions for job-related purposes and that employees be allowed voluntary leaves of absence on these bases in § 106.57—are lawful in their application to gender-identity discrimination and discrimination based on termination of pregnancy, and otherwise. The Department is therefore entitled to judgment on the administrative record.

Plaintiffs' APA claims fail because the challenged provisions of the Rule are fully consistent with the text of Title IX, its statutory design, and pertinent Supreme Court decisions, including *Bostock*. To the extent the Rule reflects interstitial policy decisions by the Department, the Department acted well within the "zone of reasonableness" in making them. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Moreover, the challenged "hostile environment harassment" definition violates neither the Religious Freedom Restoration Act (RFRA) nor the First Amendment. Further, §§ 106.40(b)(3)(ii) & (iv) and 106.57(c)-(d) are entirely consistent with the abortion-neutrality provisions in 20 U.S.C. § 1688. And Plaintiffs have not shown that any provision of the Rule raises a Spending Clause issue or implicates the major questions doctrine.

### A. Section 106.10's Recognition that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 106.10 accurately describes the scope of that prohibition: "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). Section 106.10 thus makes clear that prohibited sex discrimination includes actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender. That interpretation is lawful, and the individual and organizational Plaintiffs have not even demonstrated standing to challenge it.

**a.** As a threshold matter, the individual and organizational Plaintiffs lack standing to challenge § 106.10. As explained above, § 106.10 merely recognizes the unambiguous meaning of Title IX's prohibition on discrimination "on the basis of sex" by recipients of federal funds. 34 C.F.R. § 106.10; *see* 89 Fed. Reg. at 33,802. The individual Plaintiff (K.R.) and members of Plaintiff organizations are not such recipients and thus are not regulated parties. These individuals object to § 106.10's reference to "gender identity," but they do not claim that they are harmed by § 106.10's recognition that Title IX prohibits a school from discriminating against someone "simply for being . . . transgender." *Bostock*, 590 U.S. at 651. Rather, their asserted harms relate exclusively to their desires not to encounter transgender individuals in sex-separate spaces like restrooms and locker rooms, their opposition to transgender girls' and women's participation on female athletics teams, and their fears that schools will interpret recipients' obligations under the Rule to require punishment of speech expressing certain views on gender-identity-related issues. PMSJ 3-9. But § 106.10 does not address the bounds of permissible sex separation under Title IX, let alone sex-separate athletic teams. 89 Fed.

Reg. at 33,809. Nor does it define the circumstances in which conduct constitutes sex-based harassment or how a recipient should address any such harassment.[1] Because there is no evidence that K.R. or any member of a Plaintiff organization faces a concrete and particularized, actual or imminent harm due to § 106.10, the individual and organizational Plaintiffs lack standing to challenge this provision. *See Lujan*, 504 U.S. at 560; *Rocky Mountain Wild*, 98 F.4th at 1286.

      **b.**      In any case, § 106.10's recognition that discrimination on the basis of gender identity is necessarily discrimination "on the basis of sex" is lawful because it faithfully applies *Bostock*'s logic "concerning the intertwined nature of transgender status and sex." *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024). As the Tenth Circuit recently recognized, this logic is not confined to Title VII, *see id.*, and § 106.10 reflects a straightforward application of *Bostock*'s reasoning to materially indistinguishable language in Title IX:

      *First,* by prohibiting discrimination "on the basis of" sex, 20 U.S.C. § 1681(a), Title IX "incorporates" a causation standard no more stringent than "the 'simple' and 'traditional' standard of but-for causation" under Title VII. *Bostock*, 590 U.S. at 656 (citation omitted); *see Doe v. Univ. of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." (citation omitted)).

      *Second*, whether in the workplace or in a school, "sex is necessarily a but-for cause" of discrimination on the basis of gender identity "because it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660-61 (emphasis omitted). And that is why courts have concluded, in light of *Bostock*, that discrimination on the basis of gender identity is necessarily a form of prohibited sex discrimination

---

[1] To the extent K.R. and Plaintiff organizations argue they are injured because of the interaction of § 106.10's reference to gender identity and § 106.2's hostile environment harassment definition, they also lack standing to make that claim for the reasons discussed in Part I.C.1 *infra*.

under Title IX. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023).[2]

     **c.**     Plaintiffs' responses are unavailing. Like the Court in *Bostock*, the Department did not "redefin[e]" the term sex, PMSJ 12, nor construe the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). *Contra* PMSJ 10, 12. Section 106.10, like *Bostock*, recognizes that gender-identity discrimination is sex discrimination even under that binary understanding of sex. 89 Fed. Reg. at 33,802.

     Plaintiffs protest that Title IX does not use the phrase "gender identity." PMSJ 10. But Title VII, similarly, does not use the term "transgender status" or "sexual orientation." The absence of express references to those bases for discrimination in Title VII did not change the plain meaning of Title VII's prohibition on discrimination "because of" sex. *See Bostock*, 590 U.S. at 669 (rejecting respondents' argument that "homosexuality and transgender status" are excluded from "Title VII's reach" because they do not appear on Title VII's list of protected characteristics).[3] Likewise,

---

    [2] In two parallel lawsuits challenging the Rule, the Department filed applications with the Supreme Court to partially stay preliminary injunctions pending appeal. *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507 (2024). In denying the stay applications, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text. Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunction, let alone plaintiffs' request for more permanent relief. The brief per curiam order merely stated that "all Members of the Court today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to" the challenged provisions, noting that the dispute before the Court concerned whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at 2509-2510. This statement described only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Id.* at 2509; *see id.* at 2510-11 (Sotomayor, J., dissenting in part).

    [3] *Bostock* likewise disposes of Plaintiffs' suggestion, PMSJ 11 n.1, that Congress's failure at various points to amend the statute to include "gender identity" as a separate protected class changes the plain meaning of the Title IX's prohibition of discrimination "on the basis of sex." *See* 590 U.S. at 670 (rejecting "speculation about why a later Congress declined to adopt new legislation" as a "basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt.").

discrimination on the basis of gender identity or sexual orientation violates Title IX because it is necessarily discrimination "on the basis of sex." 89 Fed. Reg. at 33,802. Recognizing this plain meaning neither "elevate[s]" gender identity and sexual orientation over sex, PMSJ 10, nor "retroactively change[s]" the meaning of any word in the statutory text, *id. Contra* PI Opp'n 23.

As for the fact that Title IX and its original implementing regulations contain provisions allowing sex separation in some contexts, PMSJ 12; PI Opp'n 19, 21, those provisions do not compel a different understanding of what constitutes discrimination "on the basis of sex." Title VII, too, contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation, like "sex-segregated bathrooms, locker rooms, and dress codes," and yet the Supreme Court still held that discrimination because of transgender status is necessarily a form of sex discrimination. *Bostock*, 590 U.S. at 681.

Extratextual considerations, like Congress's purpose in enacting Title IX, do not undermine the straightforward textual analysis set out above, nor could they. *Contra* PMSJ 10, 19; PI Opp'n 19-20, 23. "[I]t is ultimately the provisions of [a statute] rather than the principal concerns of our legislators by which we are governed." *Bostock*, 590 U.S. at 674 (citation omitted). In any event, the relevant purpose of both Title IX and Title VII is the same: to root out sex discrimination—for *all* individuals, not just women and girls—albeit in different settings. *Compare* 20 U.S.C. § 1681(a) (prohibiting discrimination on the basis of sex against any "person"), *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination because of sex against "any individual").

    **d.**    Plaintiffs' arbitrary-and-capricious arguments largely reprise their statutory arguments. To start, it was not arbitrary and capricious for the Department to recognize, in light of *Bostock*, that Title IX's unambiguous text prohibits discrimination on the basis of gender identity; *Bostock*'s reasoning applies to Title IX's materially indistinguishable language for the reasons provided above. *Contra* PMSJ 32. Moreover, Plaintiffs' suggestion that the Department failed to acknowledge that

15

§ 106.10 reflects a change in the Department's interpretation of Title IX, *id.*, is simply wrong. *See, e.g.*, 89 Fed. Reg. at 33,807 (acknowledging and explaining the justification for "changes from the position taken in the . . . Rubinstein Memorandum"). Further, the Department extensively explained the reasons for its adoption of the interpretation reflected in § 106.10. *See id.* at 33,801-10.

### B. Section 106.31(a)(2) Properly Effectuates the Scope of Congress's Prohibition on Discrimination with Respect to Sex Separation and Differentiation.

It is § 106.31(a)(2), not § 106.10, that addresses how Title IX's prohibition on sex discrimination applies to sex separation or differentiation. *Contra* PI Opp'n 20. It does so in three steps:

*First*, § 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex, 20 U.S.C. § 1681(a), by providing that Title IX generally permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] . . . by subjecting a person to more than de minimis harm." 89 Fed. Reg. at 33,887. As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Bostock*, 590 U.S. at 681 (citation omitted); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (same). Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation." *id.* at 33,814. In particular, the Rule makes clear, Title IX does not prohibit such distinctions where they cause no harm. *Id.*

*Second*, § 106.31(a)(2) follows Congress's direction by recognizing certain contexts in which Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See id.* at 33,886. Those limited contexts include membership practices of sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); youth service organizations*, id.* § 1681(a)(6)(B); and "living facilities," *id.* § 1686. The Rule effectuates Congress's decision to treat those contexts differently by providing that § 106.31(a)(2)'s de minimis harm standard does not apply

16

to contexts carved out by statute and corresponding regulations. 89 Fed. Reg. at 33,816.

*Third*, § 106.31(a)(2) specifies a context in which separation or differential treatment on the basis of sex causes more than de minimis harm: preventing someone from participating in an education program or activity consistent with the person's gender identity. Therefore, except as covered by a congressionally-specified carveout, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity. In particular, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms . . . is not presumptively unlawful sex discrimination" because, for example, a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom. *Id.* at 33,818; *see* 34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because restrooms are not exempted from the statute's general nondiscrimination mandate and barring such students *does* cause them cognizable sex-based harm. 89 Fed. Reg. at 33,818.

Plaintiffs do not challenge the Department's conclusion—supported by ample case law, research, testimony and comments from stakeholders, and evidence from schools' many years of practical experience, *see id.* at 33,818-19—that preventing a person from participating in a program or accessing a sex-separate facility consistent with their gender identity subjects them to harm. Nor could they. As the American Medical Association and thirteen other medical associations have explained, substantial evidence[4] demonstrates that excluding students from facilities that correspond to their

---

[4] *See, e.g.*, Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 J. of Pub. Mgmt. & Soc. Pol'y 65 (2013), AR_293089-104; Jason Rafferty et al., Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents*, 142 Pediatrics 1 (2018), AR_281253-66; Thea A. Schlieben, *Sex-Segregated Bathrooms and Suicidal Ideation in Transgender Youth*, 15 J. Adv. Generalist Soc. Work Prac. 27 (2020), AR_293382-88; Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378 (2016), AR_293395-99, https://perma.cc/ W6UL-NKSW; Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 Child. Legal Rts. J. 153, 153 (2016), AR_293105-08.

gender identity "endangers their health, safety and well-being, leads to negative health outcomes and heightens stigma and discrimination." Tanya Albert Henry, *Exclusionary bathroom policies harm transgender students*, Am. Med. Ass'n (Apr. 17, 2019), AR_275350-52.

Instead of contesting this evidence-based conclusion, Plaintiffs contend that the Department "invent[ed]" the de minimis harm standard in a wrongful "attempt[] to elevate those who are transgender above those who are biological females." PMSJ 10. But as set forth above, that standard follows directly from the statute's prohibition on "discrimination" and Supreme Court precedents holding that to unlawfully discriminate means to treat someone differently in a manner that causes some harm. *See Muldrow*, 601 U.S. at 354.

Nor does § 106.31(a)(2) grant some sort of preferential treatment to transgender students. *Contra* PMSJ 10-11; PI Opp'n 34. Section 106.31(a)(2)'s protections are not limited to transgender students, but rather apply "with equal force to all students." 89 Fed. Reg. at 33,818; *see also id* at 33,820. The Rule protects all students from harmful sex-based distinctions not recognized as permissible by Congress, such as discriminatory dress and appearance codes. *See, e.g.*, *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 130 (4th Cir. 2023) (en banc) (holding that a "requirement that only girls must wear skirts, when boys may wear shorts or pants" discriminates in violation of Title IX if girls "are harmed by the requirement"). The Rule simply recognizes, as many courts have, that "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity" is an example of separation or differentiation that "subjects a person to more than de minimis harm on the basis of sex." 34 C.F.R. § 106.31(a)(2); *see* 89 Fed. Reg. at 33,818. Plaintiffs offer no reason to doubt that well-reasoned conclusion.

Plaintiffs' arbitrary-and-capricious arguments about § 106.31(a)(2) reprise their statutory arguments and similarly fail. As detailed above, the Department's conclusion that transgender students face "substantial harm" if "they are excluded from a sex-separate facility consistent with their gender

identity" was well-considered and supported by ample evidence, *id.* at 33,819, and this evidence-based

determination does not "elevat[e] only transgender individuals over . . . women and girls," PMSJ 32.

Moreover, contrary to Plaintiffs' suggestion, *id.* 31, the Department thoroughly considered

concerns about privacy. The Department "agree[d] that recipients have a legitimate interest in

protecting all students' safety and privacy," and concluded that such goals are not "inconsistent with

§ 106.31(a)(2)." 89 Fed. Reg. at 33,820. Specifically, the Department emphasized that nothing prevents

recipients from taking steps "to ensure privacy and safety for all students in a recipient's sex-separate

facilities—steps that many recipients already take consistent with their general codes of conduct,

including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further

explained that recipients may, but would not be required to, "offer[] single-occupancy facilities, among

other accommodations, to any students who seek additional privacy for any reason." *Id.*

The Department's conclusion that § 106.31(a)(2) would not infringe upon safety and privacy

was amply backed by the record before the agency. The Department explained that based on its

"enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it

disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence

of a transgender person in a single-sex space compromises anyone's legitimate privacy interests." *Id.*

The Department further pointed to the experience of schools across the country which attested that,

when they have "integrate[d] transgender students into gender-specific facilities," "hypothetical fears

and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Br. of

School Administrators *18-19, *Grimm v. Gloucester Cnty. Sch. Bd.*, No. 19-1952, 2019 WL 6341095 (4th

Cir. Nov. 25, 2019) (cited at 89 Fed. Reg. at 33,820; *see* AR_280882). And it noted court decisions that

have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-

separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820. Again, empirical

evidence confirms the Department's conclusions.[5]

The Department also addressed concerns about recipients' reliance interests and potential costs. *Contra* PMSJ 32-34. To begin, as noted above, the Rule does not affect policies regarding sex-separate athletics. *Contra id.* 33-34. And again, recipients may, but are not required to, provide "single-occupancy facilities" both "because such facilities are not the only way a recipient could provide nondiscriminatory access" and because it "would likely carry significant cost implications." 89 Fed. Reg. at 33,820. While Plaintiffs assert that protecting individual students' privacy "cannot be accomplished with the schools' existing sex-separated facilities," PMSJ 33, and that schools thus will "incur significant costs" to comply with § 106.31(a)(2), *id.* 34, they do not point to any evidence supporting these assertions that the Department failed to consider.

As to compliance, *id.* 19, the Department specifically addressed how schools may ascertain a student's gender identity, 89 Fed. Reg. at 33,819. *Contra* PI Opp'n 36. The Department acknowledged that "many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819. Recipients may also request documentation except to the extent requesting such documentation would be invasive or burdensome, or where "access to such documentation is prohibited by law." *Id.* And as to how § 106.31(a)(2) applies to individuals whose gender identity is nonbinary, PMSJ 33, the Department explained that "a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to

---

[5] *See, e.g.,* Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms* (July 23, 2018), AR_293039-53 (reviewing public records to compare the safety of public restrooms, locker rooms, and changing rooms in localities that permit access based on gender identity with localities that do not and concluding that those laws are not related to the frequency of criminal incidents); Office of Safe & Healthy Students, U.S. Dep't of Educ., *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016), AR_293260-84 (providing examples of how schools have provided access without resulting in safety and privacy concerns).

best provide the student with safe and nondiscriminatory access to facilities." 89 Fed. Reg. at 33,818. The text of § 106.31(a)(2), along with the Rule's extended discussion of permissible sex separation, *e.g.*, *id.* at 33,817-21, contradicts Plaintiffs' hyperbolic assertion that "the only way schools can ensure compliance is to eliminate sex-separation altogether," PMSJ 19.

In sum, Plaintiffs do not show that they relied in any concrete way on the Department's prior regulations, that § 106.31(a)(2) interferes with such reliance interests, or that the Department failed to consider relevant concerns regarding costs or burdens associated with the Rule. *Cf. DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 31 (2020) (faulting agency for failing to address concrete reliance interests on rescinded program where agency claimed it could ignore such interests because it had determined that the rescinded program was unlawful).

Finally, Plaintiffs' suggestion—raised in various contexts—that § 106.31(a)(2) somehow creates a sex-based harassment standard is unsupported and misunderstands the Rule. *See* PMSJ 14, 19, 23. Section 106.31(a)(2) addresses the manner in which a recipient may carry out "different treatment or separation on the basis of sex" where such different treatment or separation is permitted by Title IX or the Department's regulations; and it explains that, subject to certain exceptions, a recipient may not adopt a "policy or practice" that prevents a person from using sex-separate facilities consistent with the person's gender identity. 34 C.F.R. § 106.31(a)(2). Section 106.31(a)(2) does not define circumstances in which conduct by students or employees will constitute sex-based harassment that a recipient has an obligation to address, *contra* PMSJ 14, 23, let alone define a standard under which a school could be held liable in a private action for damages, *contra id.* 19. *See, e.g.*, 89 Fed. Reg. at 33,816 (explaining that § 106.31(a)(2) "does not apply to sex-based harassment"). To the extent any argument with respect to § 106.31(a)(2) rests on either of these inaccurate premises, it fails.

C.   **Section 106.2's Definition of Hostile Environment Harassment Is a Lawful Exercise of the Department's Statutory Authority.**

The Rule's sex-based harassment standard is set forth in § 106.2. It is well established that prohibited sex discrimination under Title IX includes sex-based harassment. *See Jackson*, 544 U.S. at 174. One form of prohibited harassment is hostile environment harassment, which § 106.2 defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)." 34 C.F.R. § 106.2.

As a threshold matter, the individual and organizational Plaintiffs lack standing to challenge the hostile environment harassment definition because they have demonstrated no injury-in-fact caused by this provision. Because Counts V and VI of the Complaint are challenges to the definition raised solely by MFL and YAF, those claims should be dismissed under Rule 12(b)(1). *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (plaintiff must establish standing "for each claim [it] seeks to press"). Moreover, the provision should be upheld on the merits because it violates neither the First Amendment nor RFRA, and it is not arbitrary and capricious.

1.   **The Individual and Organizational Plaintiffs Lack Standing to Challenge the Hostile Environment Harassment Definition.**

The individual and organizational Plaintiffs lack standing to challenge the hostile environment harassment definition because they have not demonstrated any injury-in-fact traceable to this provision. K.R. and the Plaintiff organization members declare that they or their minor children will refrain from speaking about gender-identity-related issues if the definition is in effect due to fears of discipline or punishment. *See, e.g.*, K.R. Decl. ¶¶ 24, 31, ECF No. 25-4; T.P. Decl. ¶ 38, ECF No. 25-8; Flynn Decl. ¶¶ 16-18, ECF No. 25-10; Jensen Decl. ¶ 17, ECF No. 25-12; Verdeyen Decl. ¶ 18, ECF No. 25-14. However, such planned self-censorship amounts to no more than a "subjective chill,"

22

which is not a concrete and particularized injury. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088 (10th Cir. 2006) (en banc) (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).

For a purported "chilling effect" of a regulation to amount to an Article III injury, "[i]t must arise from an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the [regulation's] enforcement." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004); *see Laird*, 408 U.S. at 13-14 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Here, the Rule does not impose penalties or sanctions on students for engaging in particular speech, let alone for "express[ing] views on gender identity issues." PMSJ 29. Rather, the Rule imposes obligations on recipients of federal funding, including specifying that a recipient "has an obligation to address a sex-based hostile environment under its education program or activity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.11). The Rule specifies that sex-based "hostile environment harassment" is limited to sex-based conduct that is not only "subjectively and objectively offensive," but also "so severe or pervasive that it limits or denies a person's ability to participate in or benefit from an education program or activity." 34 C.F.R. § 106.2.

K.R. and the declarants who are members of the Plaintiff organizations take issue with the Rule's definition of sex-based "hostile environment harassment" based on speculation about how schools might apply that definition with respect to harassment based on gender identity. *See* PMSJ 14-15, 22-23; Compl. ¶ 110; K.R. Decl. ¶ 31; Zwahlen Decl. ¶ 31, ECF No. 25-9; Flynn Decl. ¶¶ 15-18; Adcock Decl. ¶¶ 14-17, ECF No. 25-11; Jensen Decl. ¶¶ 14-17; Koznek Decl. ¶¶ 17-19, ECF No. 25-13; Verdeyen Decl. ¶¶ 15-18; Plank Decl. ¶¶ 16-18, ECF No. 25-15; T.P. Decl. ¶ 38; Lochner Decl. ¶ 16, ECF No. 25-16; T.Z. Decl. ¶¶ 29-31, ECF No. 25-17; Suppl. A.R.S. Decl. ¶¶ 17-20, ECF No. 79-4; A.K. Decl. ¶¶ 55-56, ECF No. 79-7; H.K. Decl. ¶¶ 35-38, ECF No. 79-8; Suppl. K.R. Decl. ¶ 10, ECF No. 79-2. However, these fears are not objectively justified because the definition does not

23

require or prohibit the expression of particular views, *see infra* Part C.2.i, and the declarants do not indicate that they or their minor children actually want to engage in conduct encompassed by the definition—that is, conduct that not only is based on gender identity, but also is so severe or pervasive, and subjectively and objectively offensive, that it limits or denies another person's ability to participate in or benefit from an education program or activity. *See* 34 C.F.R. § 106.2. Indeed, none of Plaintiffs' declarants indicates that anyone has ever even accused the declarants or their minor children of harassment based on the gender-identity-related speech described in their declarations.

Nor is there a reasonable basis for K.R. or the Plaintiff organization members to conclude they or their minor children would face discipline due to the challenged definition. They present no evidence that their respective schools would fail to adhere to the Rule's insistence that a "recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503. Recipients have long operated under this obligation, despite individuals' differing views on sometimes-controversial matters involving sex. Indeed, many of Plaintiffs' members' own schools already are governed by non-harassment policies similar to—or even broader than—the sex-based "hostile environment harassment" definition in § 106.2.[6] Yet, as Plaintiffs note, "the members

---

[6] *See, e.g.*, Univ. of Utah, Rule R1-012A: Non-Discrimination Rule (Effective Date: Aug. 1, 2024), https://perma.cc/Z9TJ-N4QE (defining "harassment" as "unwelcome conduct based on an individual's protected class that, based on the totality of the circumstances, is subjectively and objectively offensive, and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the University's Programs or Activities (i.e., creates a hostile environment)."); Univ. of Utah, Policy 1-012, University Non-Discrimination Policy (Effective Date: Aug. 1, 2024), https://perma.cc/Z4SB-J2KS (listing "gender identity" as a protected class); Univ. of Wyo. Regulation 4-2, Discrimination and Harassment (Effective Date: July 1, 2018), https://perma.cc/AAQ4-GFJ4 (defining "Hostile Environment" as "[u]nwelcome conduct by an individual against another individual based upon the individual's Protected Class that is sufficiently severe or pervasive that it alters the conditions of education or employment and creates an environment that a reasonable person would find intimidating, hostile or offensive," and listing "gender identity" as a protected class); Prince William Cnty. Pub. Schs., PWCS Reporting Form, https://perma.cc/2ZG4-M5TA (defining

of FAU, YAF, and MFL and their children have engaged in [their desired] speech activities without becoming the subject of any investigatory or disciplinary proceedings." PMSJ 29.

At best, the declarants' claimed intent to self-censor is based on a speculative fear that, contrary to the Rule's express admonitions, recipients will invoke the Rule as a basis to target protected speech. *See, e.g.*, K.R. Decl. ¶ 31; A.K. Decl. ¶¶ 55-56; Koznek Decl. ¶ 19; Lochner Decl. ¶ 16. But standing cannot be based on speculation about independent, unlawful actions by third parties. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (citation omitted)); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."). Because K.R. and the members of the Plaintiff organizations have shown "no objective basis to believe" they will be punished due to § 106.2's hostile environment harassment definition, the individual and organizational Plaintiffs lack standing to challenge this provision. *Initiative & Referendum Inst.*, 450 F.3d at 1090 (discussing *Laird*, 408 U.S. at 12-13).

### 2.  Plaintiffs' Challenges to the Definition Fail on the Merits.

Because Plaintiffs' challenges to the Rule's hostile environment harassment definition rest on mischaracterizations of the Rule, misapprehension of the definition's scope, and speculation about potential unlawful acts by third parties, they also fail on the merits.

---

"harassment" as "a course of demeaning, threatening, intimidating, and/or harmful conduct that targets someone on the basis" of any of a number of characteristics, including "gender identity"); Colville Sch. Dist., Policy No. 3207, Prohibition of Harassment, Intimidation, or Bullying (Revised Nov. 19, 2019), https://perma.cc/HP8M-83ZL (defining "[h]arassment, intimidation, or bullying" to include "any intentional electronic, written, verbal, or physical act" that has one of several effects, including "substantially interfering with a student's education" or "[i]s so severe, persistent, or pervasive that it creates an intimidating or threatening educational environment").

i.        **The Definition Does Not Violate the First Amendment.**

Plaintiffs' constitutional challenges fail because the hostile environment harassment definition does not infringe on any First Amendment right. Plaintiffs' argument boils down to the unfounded assertion that recipients will inevitably adopt policies to comply with § 106.2's hostile environment harassment definition that run afoul of the First Amendment. But the definition mirrors standards applied in the context of "numerous civil rights laws, including Title VII." 89 Fed. Reg. at 33,508; *see, e.g.*, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (applying a severe "or" pervasive standard to conduct that "alter[ed] the conditions" of employment); *see also Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (assessing "Title IX discrimination claims" premised on hostile environment harassment "under the same legal analysis as Title VII claims"). Prior to litigation over the Rule, no court had held that the standards for evaluating hostile environment harassment long applied in the Title VII and Title IX contexts contravened the First Amendment. To the contrary, the Supreme Court upheld "similar proscriptions on hostile environment harassment" in both contexts "without raising any First Amendment concerns." 89 Fed. Reg. at 33,506 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Harris*, 510 U.S. 17).

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including any definition in § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.* at 33,516; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503. To the extent recipients adopt policies that raise First Amendment concerns, those policies are neither required nor authorized by the definition in § 106.2.

Plaintiffs' First Amendment theories fare no better when assessed individually.

a.        As to compelled speech and viewpoint discrimination, Plaintiffs assert that recipients

will adopt policies to comply with § 106.2's definition of hostile environment harassment that, "compel[] the use of 'preferred pronouns,'" PMSJ 22; "force[] [students] to express messages they disagree with," *id.* 29; and prevent students from "shar[ing] their beliefs" about gender identity issues, *id.* But the definition neither compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. It merely requires that recipients address sex-based harassment that is "subjectively and objectively offensive" and so "severe or pervasive" as to limit or deny a person's ability to access their programs. 34 C.F.R. § 106.2.[7] As the Department explained, "whether verbal conduct constitutes sex-based harassment is necessarily fact-specific." 89 Fed. Reg. at 33,516. Attempting to turn this explanation on its head, Plaintiffs argue that the challenged definition will lead schools to compel speech because of the Department's clarification that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." PMSJ 24 (quoting 89 Fed. Reg. at 33,516). But the observation that certain conduct will necessarily fall outside the scope of the harassment definition self-evidently does not mean that everything beyond such conduct falls within it.

Requiring schools to address sex-based harassment—even where it involves speech—is different in kind from "telling" students and staff "what they must say." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 61 (2006). Nor is it unlawfully "coercive." *Contra* PMSJ 23-24. The government can ensure that the classroom, no less than the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance." *Harris*, 510 U.S. at 21 (citations omitted). Indeed, the Rule requires recipients to "formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503. That is true in every context, including with respect to gender

---

[7] As explained above, *see supra* Part B, Plaintiffs' suggestion that the de minimis harm provision in § 106.31(a)(2) somehow expands this harassment standard is incorrect. *Contra* PMSJ 23.

identity. Because the Rule does not "force[] pronoun usage" or require expression of a certain viewpoint, PMSJ 23, *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021), and *Parents Defending Education v. Linn Mar Community School District*, 83 F.4th 658, 667 (8th Cir. 2023), are inapposite.

Moreover, even if there were circumstances in which the repeated or acute refusal to use pronouns consistent with a student's gender identity contributed to a hostile environment, nothing in the Rule would "require[] or authorize[]" the recipient to take remedial measures that would "violate anyone's First Amendment rights," 89 Fed. Reg. at 33,516. Nor would anything in the Rule require or authorize the recipient to "compel[] silence" of opposing viewpoints, PMSJ 22 (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)) As the Sixth Circuit recently noted—and as the experiences of Plaintiff organizations' own members reflect—schools have been able to implement policies that avoid the creation of a hostile environment while respecting "deeply held beliefs concerning gender identity." *Parents Def. Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 467 (6th Cir. 2024); *see supra* at 24-25 & n.6. While the Department cannot "prejudge or comment on whether specific cases or factual scenarios comply with Title IX prior to conducting an investigation and evaluating the relevant facts and circumstances," 89 Fed. Reg. at 33,507,[8] such policies indicate that recipients are capable of balancing these concerns.

    **b.**    Nor is the Rule's hostile environment harassment definition vague or overbroad. *Contra* PMSJ 25; PI Opp'n 29. An overbroad law prohibits a "substantial" amount of protected speech "judged in relation to its plainly legitimate sweep," while a vague law "fails to provide . . . a reasonable opportunity to understand what conduct it prohibits" and "encourages arbitrary and discriminatory

---

[8] Consistent with this, and contrary to Plaintiffs' assertion, PMSJ 23, the Rule's citation of certain district court cases in support of broad legal propositions when addressing concerns raised by commenters does not mean that the Department determined that the conduct at issue in those cases falls within the Rule's hostile environment harassment definition. *See* 89 Fed. Reg. at 33,504, 33,516. Nor do positions the Department has taken in past cases involving specific factual scenarios change the scope or meaning of the harassment definition in the Rule. *Contra* PMSJ 22-23.

enforcement." *Harmon v. City of Norman*, 61 F.4th 779, 795, 797-98 (10th Cir. 2023) (cleaned up). The Tenth Circuit has warned that because "facial" invalidation of an allegedly overbroad or vague regulatory scheme "push[es] the judiciary towards the edge of its traditional purview and expertise, courts must be vigilant in applying a most exacting analysis to such claims." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). Such "strong medicine" is clearly unwarranted here. *Id.* at 1246.

Section 106.2's definition of hostile-environment harassment poses no overbreadth problems because it "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate." 89 Fed. Reg. at 33,503. The Rule "only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] . . . is ignored." *Id.* at 33,506. *Contra* PI Opp'n 32. Even if the prohibition occasionally "sweeps in speech," 89 Fed. Reg. at 33,494, there is no indication that the standard prohibits a substantial amount of protected speech in an absolute sense or relative to the Rule's "plainly legitimate sweep." *Harmon*, 61 F.4th at 795 (citation omitted); *see, e.g.*, *Parents Def. Educ.*, 109 F.4th at 471 (rejecting overbreadth challenge to harassment policy). Indeed, Plaintiffs do not dispute that the definition has many legitimate applications, including to sex-based harassment unrelated to gender identity, or to allegations of gender-identity harassment unrelated to pronoun usage or political and religious views about sex.

Courts and agencies have long applied similar standards under Title VII and Title IX, without identifying any First Amendment concerns. *See, e.g.*, *Harris*, 510 U.S. at 23; *Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 352, 355 (8th Cir. 2020) (rejecting overbreadth challenge to standard nearly identical to § 106.2's hostile environment standard). Contrary to Plaintiffs' assertion, PMSJ 27, the challenged hostile environment definition bears no resemblance to the policy in *Speech First, Inc. v. Cartwright*, which prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any

of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32 F.4th 1110, 1125 (11th Cir. 2022). Nor is it anything like the policy in *Saxe v. State College Area School District*, which provided that "[h]arassment can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the [specified] characteristics," regardless of whether such conduct was severe or pervasive, and without requiring that it be both subjectively and objectively offensive. 240 F.3d 200, 202-03 (3d Cir. 2001).

The definition also is not vague. *Contra* PMSJ 25-26. It offers "specific and required elements," 89 Fed. Reg. at 33,506, "using language with common usage and understanding" in the antidiscrimination context, *Rowles*, 983 F.3d at 358. It enumerates relevant considerations based on factors that "courts and agencies have used in evaluating a hostile environment" in both the Title VII and Title IX contexts. 89 Fed. Reg. at 33,512. Indeed, the Department discussed at length questions regarding the "objectively offensive," "severe or pervasive" and "limits or denies" elements. *See id.* at 33,508-11. Contrary to Plaintiffs' characterization, PMSJ 26, § 106.2 plainly does not define the existence of a hostile environment from the "subjective position" of a complaining individual nor suggest that conduct may constitute a hostile environment based on "mere frequency." *See generally* 34 C.F.R. § 106.2. The hostile environment standard's specificity and long lineage more than suffice to put the public on constitutionally adequate notice of its contours and demonstrate that it is neither unworkable nor prone to arbitrary or discriminatory enforcement. *Contra* PMSJ 26; PI Opp'n 31.

In fact, § 106.2's definition of hostile environment harassment utilizes many of the same terms as the standard adopted by the 2020 rule (which Plaintiffs did not challenge and have not challenged here), including "unwelcome," "severe," "pervasive," and "objectively offensive." 34 C.F.R. § 106.30 (2020). Likewise, the standard is not vague merely because it applies to discrimination based on "gender identity," *contra* PMSJ 26, a term the Department did not define because it "is now well

understood" and "used widely in laws and policies." 89 Fed. Reg. at 33,809.[9] Even so, the Rule does

offer guidance, explaining that gender identity "describe[s] an individual's sense of their gender." *Id.*

To be sure, the hostile environment standard is fact-dependent; it is "not, and by its nature

cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. The Department permissibly declined

to answer "all the potential questions it raises." *Id.* at 22-23. "It will always be true that the fertile legal

imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice

question," but that does not render § 106.2 unconstitutionally vague. *Grayned v. City of Rockford*, 408

U.S. 104, 110 n.15 (1972) (cleaned up).

### ii.    The Definition Does Not Violate RFRA.

Plaintiffs' argument that the hostile environment harassment definition violates RFRA relies

on the same mistaken premises as their First Amendment claim and fails for many of the same reasons.

As explained above, the multi-element definition is consistent with similar standards long applied by

courts in the Title IX and Title VII contexts. *See supra* Part I.C.2.i. Contrary to Plaintiffs'

characterization, PMSJ 14, the definition does not deem harassment "anything a student considers

'unwelcome' that 'limits' the student's ability to benefit from an educational program." Nor does it

define as harassment a "student declining to use another student's [requested] pronouns," PMSJ 14.

---

[9] For example, numerous provisions of the Utah Code refer to "gender identity." *E.g.*, Utah
Code §§ 34A-5-104, 34A-5-106, 53E-9-205, 58-1-511. Rather than defining "gender identity," the
Utah Code states that the phrase "has the meaning provided in the Diagnostic and Statistical Manual
(DSM-5)." *E.g.*, *id.* § 34A-5-102(1)(o). The DSM-5 merely says that "*[g]ender identity* is a category of
social identity and refers to an individual's identification as male, female, or, occasionally, some
category other than male or female." American Psychiatric Association, *Gender Dysphoria*, Diagnostic
and Statistical Manual of Mental Disorders, at 451 (5th ed.) (2013). Other policies, governing schools
attended by members of Plaintiff organizations, refer to "gender identity" without any definition or
explanation whatsoever. *See, e.g.*, Kan. State Univ., Policy Prohibiting Discrimination, Harassment, and
Sexual Harassment, and Procedure for Reviewing Complaints, Chapter 3010 (Revised Aug. 14, 2020),
https://perma.cc/756N-UQAY (prohibiting discrimination and harassment on the basis of "gender
identity" without defining "gender identity").

Further, the Rule makes explicit that the Department "interprets and applies its regulations consistent with RFRA and Title IX's exemption for educational institutions controlled by religious organizations." 89 Fed. Reg. at 33,822. The Department considered religious liberty in crafting the Rule, and it specifically noted that RFRA could inform application of the Rule's provisions in appropriate circumstances, *id.*, contradicting Plaintiffs' claim that "the Final Rule provides no exceptions for sincerely held religious beliefs," PMSJ 15. Indeed, the Rule repeatedly recognizes that both the Department and recipients must harmonize application of the Rule's provisions with principles of religious liberty enshrined in federal law. *E.g.*, 89 Fed. Reg. at 33,823 ("The Department is committed to enforcing Title IX consistent with all applicable free speech and religious liberty protections."); *id.* at 33,822 ("[N]othing in these regulations requires a recipient to restrict rights protected under the First Amendment or any other rights guaranteed against government action under the U.S. Constitution. The Department likewise interprets and applies its regulations consistent with RFRA and Title IX's exemption for educational institutions controlled by religious organizations."). With respect to its own enforcement efforts, the Department specifically affirmed that it will comply with RFRA, and that "OCR considers RFRA's requirements when it evaluates a recipient's compliance with Title IX." *Id.* at 33,823. In sum, the Department has recognized that application of Title IX and the Department's regulations may raise religion-related concerns and has committed to evaluating such issues on a case-by-case basis as they arise. *See id.* Plaintiffs ignore the Rule's discussion of RFRA and fail to articulate any reason why this case-by-case approach to RFRA issues set forth in the Rule itself "substantially burden[s]" any person's "exercise of religion." 42 U.S.C. § 2000bb–1(a).

### iii.   The Definition Is Not Arbitrary and Capricious.

Plaintiffs also allege that the Department failed to "address the State reliance interest" on the Department's previous definition of sexual harassment, without even identifying what interests they mean or how the Rule implicates them. Compl. ¶¶ 411-13. By failing to assert these arguments on

summary judgment, Plaintiffs have waived them. *See Walker v. Progressive Direct Ins. Co.*, 472 F. App'x 858, 862 (10th Cir. 2012) (unpublished). Regardless, the Department adequately explained why it had authority to adopt a broader standard for administrative enforcement than the standard applicable to private damages actions set forth in *Davis*, 526 U.S. 629, and why it "disagree[d] with commenters who maintained that distinctive standards for money damages and administrative enforcement will be unduly burdensome, confusing, or otherwise improper given the 2020 amendments or other Department statements." 89 Fed. Reg. at 33,499. Plaintiffs thus have not demonstrated that the definition is arbitrary and capricious.

### D. The Challenged Reasonable Modification and Leave Provisions Do Not Violate 20 U.S.C. § 1688.

Plaintiffs' challenge to two provisions addressing discrimination based on pregnancy or related conditions also fails. Section 106.40(b)(3), in relevant part, requires a recipient to offer "reasonable modifications . . . as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity" for students who are pregnant or experiencing pregnancy-related conditions, 34 C.F.R. § 106.40(b)(3)(ii)(A), and to allow medically necessary leaves of absence for such students, *id.* § 106.40(b)(3)(iv). Regarding employees, § 106.57, similarly, requires recipients to treat pregnancy and pregnancy-related conditions like any other temporary medical conditions for job-related purposes, *id.* § 106.57(c), and, absent a leave policy or accrual of sufficient leave by the employee under an existing policy, to "treat pregnancy or related conditions as a justification for a voluntary leave of absence without pay for a reasonable period of time," *id.* § 106.57(d). Plaintiffs challenge these reasonable-modification and leave provisions only as they apply to one pregnancy-related condition—abortion. PMSJ 12-13; Compl. ¶¶ 165-178, 218-219, 302.

As an initial matter, the individual and organizational Plaintiffs do not contend that they suffer any injury due to the challenged reasonable-modification and leave provisions, including as they apply to abortion. Thus, they lack standing to seek relief with respect to those provisions.

Plaintiffs' challenges to §§ 106.40(b)(3)(ii) & (iv) and 106.57(c)-(d) also fail on the merits. Plaintiffs argue that, insofar as they apply to termination of pregnancy, the reasonable-modification and leave provisions are contrary to 20 U.S.C. § 1688, which provides that "[n]othing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." PMSJ 13. But in promulgating the Rule, the Department specifically recognized the application of § 1688, and stated that "[c]onsistent with [the limitation in 20 U.S.C. § 1688], these final regulations prevent recipients from being required to provide or pay for benefits or services related to, or use facilities for, abortions[.]" 89 Fed. Reg. at 33,757.

In accordance with that clear limitation in the Rule, the challenged provisions do not violate § 1688 because they do not regulate, much less require, the provision of abortion services or affect whether and under what circumstances an abortion should be permitted. Rather, they protect students and employees who are pregnant or experiencing pregnancy-related conditions, including abortion, from sex discrimination and ensure they are not denied equal access to education programs and activities based on such conditions. *See generally* 34 C.F.R. §§ 106.40(b)(3), 106.57; 89 Fed. Reg. at 33,773-79, 33,782-85, 33,796-98. Plaintiffs take issue with the provisions insofar as they apply to abortion. PMSJ 12-13. But Plaintiffs do not dispute that Title IX prohibits discrimination based on pregnancy or related conditions; that, under Title IX, the Department may properly require recipients to provide reasonable modifications and leave to students and employees who are pregnant or experiencing pregnancy-related conditions; or that the Department has properly defined "pregnancy or related conditions" to include termination of pregnancy, *see* 34 C.F.R. § 106.2.

Indeed, Title IX regulations have prohibited discrimination on the basis of "termination of pregnancy" since 1975. *See Department of Health, Education, & Welfare, General Administration,* 40 Fed. Reg. 24,128 (1975) (codified at 45 C.F.R. § 86.21(c)(2) (prohibiting discrimination in admissions based

on "termination of pregnancy or recovery therefrom"), 45 C.F.R. § 86.40(b)(1) (providing that a "recipient shall not discriminate against any student, or exclude any student from its education program or activity" based on "termination of pregnancy or recovery therefrom"), *id.* § 86.57(b) ("A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of . . . termination of pregnancy, or recovery therefrom.")). The challenged reasonable modification and leave provisions just reinforce this longstanding prohibition. Because no provision of the Rule requires a recipient to "provide or pay for any benefit or service . . . related to an abortion," Plaintiffs fail to establish any inconsistency with 20 U.S.C. § 1688.

### E.      No Provision of the Rule Violates the Spending Clause.

Plaintiffs also fail to show that any provision violates the Spending Clause. PMSJ 17-20. The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions, *inter alia*, (1) are "unambiguous[]," (2) relate "to the federal interest" in the project, and (3) are consistent with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987) (citation omitted). The focus of a Spending Clause inquiry is typically on a statute, not an implementing regulation, because the Spending Clause limits Congress's authority to condition federal funds. Title IX has long been held to be consistent with the Spending Clause. *Davis*, 526 U.S. at 640. Here, however, Plaintiffs argue that if the Rule effectuates Title IX, then the Rule's alleged infirmities would render it or Title IX invalid under the Spending Clause. PMSJ 17-20. This theory largely restates Plaintiffs' other merits arguments and, like them, fails.

Plaintiffs' Spending Clause arguments rest exclusively on § 106.10, § 106.31(a)(2), and the hostile environment harassment definition in § 106.2, as applied to gender identity discrimination. But those provisions do not violate the Spending Clause because they all are consistent with Title IX's text and structure and do not expand or otherwise modify the funding conditions set by Congress itself.

Indeed, § 106.10, the major focus of Plaintiffs' Spending Clause arguments, simply recognizes

the scope of Title IX's unambiguous prohibition on discrimination "on the basis of sex." *See supra* Part I.A. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up). Title IX places recipients clearly on notice that they must comply with the statute's prohibition on sex discrimination. The Rule's recognition in § 106.10 that Title IX's prohibition encompasses various *bases* of discrimination that involve consideration of sex no more implicates the Spending Clause than the recognition that this prohibition encompasses various *forms* of sex discrimination, like retaliation or harassment. *Cf. Jackson*, 544 U.S. at 174-75. *Contra* PI Opp'n 28.

Section 106.31(a)(2), in turn, reflects the well-established meaning of "discrimination" and Congress's decision to exempt certain contexts from Title IX's overarching prohibition. *See supra* Part I.B. And § 106.2's definition of hostile environment harassment implements the statute's broad nondiscrimination requirement in a manner consistent with the First Amendment and harassment standards courts have long applied other civil-rights contexts. *See supra* Part I.C. Plaintiffs' unsupported assertions regarding hypothetical applications of these provisions do not render the Rule "mercurial," PMSJ 19, let alone establish a Spending Clause violation. And as already explained, *supra* at 5-6, no provision of the Rule affects recipients' policies regarding sex-separate athletic teams. *Contra* PMSJ 18.

Because the challenged provisions merely apply the clear text of Title IX, and do not create or depend on any ambiguity in the statute's funding conditions, Plaintiffs' argument that "the Spending Clause and the Supremacy Clause require Congress to speak," PMSJ 20, is of no moment. Plaintiffs' assertion that one Kansas law is preempted by the Rule, PMSJ 20, is likewise irrelevant, as preemption is not part of the Spending Clause analysis.

Accordingly, Plaintiffs fail to show that any provision of the Rule violates the Spending Clause or depends on a construction of Title IX that violates the Spending Clause, and they also fail to show

that the Rule implicates—let alone violates—the Tenth Amendment. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."). *Contra* Compl. ¶¶ 393-401.

### F.    The Rule Does Not Violate the Major Questions Doctrine.

No portion of the Rule runs afoul of the major-questions doctrine. *Contra* PMSJ 15-17. As an initial matter, that doctrine is reserved for "extraordinary" cases: cases that involve "unprecedented" agency action relying on "ancillary" statutory provisions to regulate issues of great "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721-24 (2022) (citations omitted). In contrast, the challenged provisions of the Rule exercise the Department's longstanding authority to implement Title IX, including its core prohibition on sex discrimination. Plaintiffs also have not shown that any of the challenged provisions will "require the kind of costs or restructuring that might implicate the major questions doctrine," a prediction the Department both considered and rejected. 89 Fed. Reg. at 33,815. *Contra* PI Opp'n 26. Nor do the challenged provisions trigger the major-questions doctrine by intruding upon the "states' legal domain," PMSJ 17; if the States are unhappy with any of Title IX's requirements, they may "defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments." *NFIB v. Sebelius*, 567 U.S. 519, 579 (2012) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)).

Even if the major-questions doctrine could be deemed to have any application in this case, none of the challenged provisions would violate it. *Contra* PMSJ 16.

a.    Plaintiffs' caricature that the Rule "enshrin[es] gender ideology" is presumably a reference to §§ 106.10 and 106.31(a)(2). *Id.* But consistent with the Supreme Court's reasoning in *Bostock*, § 106.10 simply recognizes that discrimination "on the basis of sex," 20 U.S.C. § 1681(a), encompasses discrimination on the basis of gender identity and the other listed bases. Section 106.31(a)(2) is predicated on both the generally accepted meaning of "discrimination"—i.e.,

differential treatment that result in cognizable harm—and Congress's decision to exempt certain contexts from Title IX's overarching nondiscrimination mandate. Both provisions thus find adequate support in Title IX's text and structure, and so reflect "policy decisions" made by "Congress . . . itself." *West Virginia*, 597 U.S. at 723 (citation omitted). *Contra* PI Opp'n 24-25.

     **b.**     Although Plaintiffs criticize the Rule for "mandating a campus grievance procedure that limits . . . due process rights," PMSJ 16, their motion does not actually advance a challenge to any of the Rule's grievance-procedure requirements, let alone a due process challenge. Nor could they, given that those requirements are fully consistent with both Title IX and the U.S. Constitution. *Cf.* Defs.' Opp. to Pls.' Mot. for Stay or Prelim. Inj. 5 n.1, ECF No. 38; 89 Fed. Reg. at 33,634-39. That lapse similarly dooms Plaintiffs' major-questions argument, as Plaintiffs have not and cannot show that the Rule's grievance-procedure requirements lack adequate support in the text of Title IX. Moreover, Plaintiffs do not take issue with the 2020 rule's grievance-procedure requirements, which necessarily would have addressed the very same so-called "major questions" about the appropriate scope of due process on college campuses.

     **c.**     Finally, Plaintiffs assert that the Rule "requir[es] schools to provide benefits . . . for voluntary abortions." PMSJ 16. But that is not what the Rule does; instead, it properly protects students, applicants, and employees who are pregnant or experiencing pregnancy-related conditions, including abortion, from discrimination in education programs, including via the reasonable modification and leave provisions challenged by Plaintiffs. 89 Fed. Reg. at 33,887; *see supra* Part I.D. Plaintiffs' major-questions argument also fails to recognize that "the Title IX regulations have included nondiscrimination protection for 'termination of pregnancy' since their initial promulgation in 1975." 89 Fed. Reg. at 33,757. The Department's decision to continue to apply nondiscrimination protections to pregnancy termination is therefore anything but "unprecedented." *West Virginia*, 597 U.S. at 721.

## II.      Any Relief Awarded in this Case Should Comport with Equitable Principles.

The Department is confident that the Rule is lawful in its entirety, and judgment in favor of Defendants is therefore appropriate on all claims. But to the extent the Court disagrees, Plaintiffs' requested relief is overbroad—most of the Rule has not been challenged and thus should not be held unlawful. Moreover, even as to the challenged provisions, Plaintiffs are not entitled to relief that extends beyond the parties, or beyond what is necessary to remedy Plaintiffs' demonstrated injuries.

### A.      Any Relief Should Be Limited to Portions of the Rule Held To Be Unlawful.

Under Article III, a court's power is limited to adjudication of the case or controversy before it; a plaintiff therefore lacks standing to seek relief with respect to a statutory or regulatory provision it does not contend is unlawful. *See California v. Texas*, 593 U.S. 659, 680 (2021). And equitable relief must be limited to the unlawful conduct that produced the plaintiff's injury. *See Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Mem.) (Gorsuch, J. concurring) (explaining that "sweeping relief" entered by district court was error because "the plaintiffs had failed to 'engage' with other provisions of [the state's] law that [did not] presently affect them"). Thus, both Article III and equitable principles dictate that if a rule is severable, any relief should be limited, at minimum, to portions of the rule that the plaintiffs have challenged and that have been held unlawful. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) ("We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force[.]"); *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) (explaining that, where vacatur is an appropriate remedy, a court "may partially set aside a regulation if the invalid portion is severable").

Here, the Court should not grant relief with respect to portions of the Rule that Plaintiffs have not challenged. The legal violations asserted by Plaintiffs—if any—relate exclusively to §§ 106.10, 106.31(a)(2), 106.2 ("hostile environment harassment" definition), and the application of §§ 106.40(b)(3)(ii) & (iv) and 106.57(c)-(d) to abortion. Any relief should go no further.

### 1. The vast majority of the Rule's provisions are unchallenged.

Plaintiffs characterize their claims as objections to the "Final Rule." *See generally* PMSJ. Notwithstanding Plaintiffs' characterization, the numerous provisions of the Rule have different functions, and the Department provided separate, detailed explanations for its adoption of these various provisions.[10] *Contra* PI Opp'n 40. Plaintiffs challenge only five provisions of the Rule, and their arguments focus exclusively on those provisions' application to gender identity discrimination or discrimination based on termination of pregnancy. Plaintiffs have not alleged legal defects in the Rule's other provisions and applications, nor did the Court find legal defects at the preliminary stage. Many of them have nothing to do with gender identity or abortion. To identify a few specific examples:

- The Rule streamlines requirements related to designation of Title IX Coordinators. 34 C.F.R. § 106.8(a).
- The Rule contains numerous definitions that Plaintiffs have not contested and that have nothing to do with gender identity, ranging from "administrative law judge" to "complaint" and "complainant" to "remedies." 34 C.F.R. § 106.2.
- The Rule requires recipients to ensure access to lactation spaces for breastfeeding students and employees. 34 C.F.R. §§ 106.40(b)(3)(v), 106.57(e)(2).
- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.
- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures. 34 C.F.R. §§ 106.45-106.46.

None of those amendments depends in any way on the challenged provisions addressing gender identity discrimination and harassment, or on the reasonable modification and leave provisions applicable to termination of pregnancy. All of them would remain fully operative if the challenged provisions and applications were enjoined in whole or in part, and each of them could easily have

---

[10] For example, quoting language from the beginning of the Rule's Preamble, Plaintiffs assert that the Department's determination that the Rule's "amendments are required to fully effectuate Title IX's sex discrimination prohibition" is "implausible." PMSJ 31 (quoting 89 Fed. Reg. at 33,477). The statement Plaintiffs characterize as "implausible" summarizes the Department's determinations as to all the Rule's different provisions, which are explained separately and in detail in the hundreds of pages that follow. Yet Plaintiffs' argument in support of their characterization focuses solely on the Department's reasoning in support of § 106.31(a)(2). *See* PMSJ 31-32.

been issued as separate rules. Without holding that these provisions conflict with Title IX, the Constitution, or any other federal law, the Court should not enjoin them. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (per curiam) (a court's "remedial authority" is "limited" to curing the violation established by the plaintiffs).

Moreover, although Plaintiffs purport to challenge § 106.10, that provision addresses much more than gender identity discrimination, recognizing that Title IX prohibits "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886. Plaintiffs have not sought to allow discrimination against students for being pregnant, gay, or failing to conform to sex stereotypes.

Similarly, Plaintiffs' First Amendment and RFRA challenges to the Rule's "hostile environment harassment" definition focus exclusively on concerns regarding the definition's application to harassment based on gender identity. *See* PMSJ 13-15, 20-30. And Plaintiffs' challenge to the provisions regarding students who are pregnant or have pregnancy-related conditions focus exclusively on their application to one condition—abortion. *See* PMSJ 12-13.

### 2. The challenged provisions are severable.

The Supreme Court has "developed a strong presumption of severability," reflecting a court's obligation to "salvage rather than destroy" an otherwise lawful statute or regulation. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625-26 (2020) (plurality).[11] Whatever form of relief the Court elects to enter, this "strong presumption," *id.*, coupled with the severability provisions in the Department's Title IX regulations, 89 Fed. Reg. at 33,848, confirm that any such relief should be limited to provisions and applications that the Court concludes are unlawful. "Whether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether

---

[11] Six Justices agreed as to the severability portion of the Court's opinion. *Barr*, 591 U.S. at 625 (Kavanaugh, Roberts & Alito, JJ.); *id.* at 648 (Breyer, Ginsburg & Kagan, JJ.).

the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis omitted); *accord Ariz. Pub. Serv.*, 562 F.3d at 1122 (explaining that whether a regulation is severable depends on agency intent and whether the severed portions operate independently of each other (citing *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997))). In determining intent, "courts hew closely to the text of severability or nonseverability clauses." *Barr*, 591 U.S. at 624. Here, each prong favors severability.

### i. The Rule's severability clauses establish that the agency intended for the Rule to be broadly severable.

The agency intent prong of the severability analysis is clear—the Department expressly determined and stated in the Rule itself that the Rule's various provisions are severable. The Department explained that each provision serves "an important, related, but distinct purpose," and that "[e]ach provision provides a distinct value" that is "separate from, and in addition to, the value provided by the other provisions." 89 Fed. Reg. at 33,848. The Department thus "confirm[ed]" that "each of the provisions" is "intended to operate independently" and that "the potential invalidity of one provision should not affect the other provisions." *Id.* The Department also noted the severability provisions in its existing regulations, which provide as to each relevant subpart that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected." *Id.* (citing 34 C.F.R. §§ 106.9, 106.18 (redesignated in the Rule as § 106.16), 106.24, 106.46 (redesignated in the Rule as §§ 106.48, 106.62, 106.72, and 106.82). The Department unambiguously confirmed that those severability instructions apply to the provisions added or amended by the Rule. *Id.*

These severability determinations remove any doubt that the Department would have adopted on their own the Rule's unchallenged provisions addressing grievance procedures, lactation accommodations, and other issues unrelated to gender identity or termination of pregnancy. *See Ariz. Pub. Serv.*, 562 F.3d at 1122 (explaining that the court examines whether "circumstances indicate the

42

agency would have adopted the regulation even without the faulty provision").

> **ii.    The unchallenged portions of the Rule function independently of those challenged by Plaintiffs.**

The Department determined that each provision of the Rule was severable with good reason. The unchallenged portions of the Rule function independently of the challenged portions, and the challenged portions can also be severed from each other.

*First*, any relief as to § 106.10 should be limited to its reference to discrimination based on "gender identity"—the only part challenged as unlawful. Such relief would require the Department to treat § 106.10 as if it provided: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, [and] sexual orientation." Severing "gender identity" would not render the unchallenged remainder incoherent or unworkable.

*Second*, the Rule would operate without the challenged portions. Even if § 106.10 were enjoined or vacated in its entirety, the remainder of the Rule could remain in place using the pre-Rule understanding of sex discrimination. *Contra* PI Opp'n 40. The Department's pre-existing regulations (amended in 2020) repeatedly reference "sex discrimination" without defining that term. *See, e.g.*, 34 C.F.R. § 106.8(a) (Title IX coordinators), (c) (grievance procedures), (d) (extraterritoriality), and 106.71(a) (retaliation) (2020). Earlier regulations, too, referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *See, e.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a) and (c), 86.36(a)-(c), 86.37(a)(2) and (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). In short, the term "sex discrimination" or its variants has been ubiquitous in the Department's Title IX regulations for decades, and both the Department and recipients have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), without further regulatory gloss. If § 106.10 remained enjoined, regulated entities would simply apply the rest of the updated Title IX regulations in the Rule in accordance with the text of Title IX, relevant precedent, and agency guidance, just as they have for nearly 50 years.

Nor would enjoining § 106.31(a)(2) or § 106.2's "hostile environment harassment" definition render the remainder of the Rule unworkable. Without § 106.31(a)(2), recipients would apply the Department's existing regulations regarding sex-separate activities and facilities as they did prior to the Rule. If the "hostile environment harassment" definition were enjoined, recipients would continue to rely on the parallel harassment standard set forth in the Department's 2020 rule. And if the reasonable modification and leave provisions were enjoined as to abortion, recipients simply would not be required by the Rule to take those specific steps to prevent sex discrimination based on one particular pregnancy-related condition.

*Third*, the challenged provisions also can be severed from each other. For example, the challenged harassment definition functions regardless of the scope of discrimination "on the basis of sex." And to the extent Plaintiffs take issue with the Rule's implications for recipients' policies regarding sex separation, that issue is affected only by § 106.31(a)(2), *see* 89 Fed. Reg. at 33,809; *supra* Part I.B, which can be severed from § 106.10 and the rest of the Rule.

### B.     Any Relief Should Not Extend Beyond the Parties.

Any relief granted by the Court also should not extend beyond the parties. In addition to injunctive and declaratory relief, Plaintiffs seek vacatur. But the APA does not provide for universal vacatur as a remedy, and in any case, neither vacatur nor a nationwide injunction is appropriate here.

To begin, the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek. As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not

purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable remedies like injunctions. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment).

The Department recognizes that the Tenth Circuit has described "[v]acatur of agency action" as "a common" and "often appropriate" form of relief entered by district courts. *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1048 (10th Cir. 2023) (citation omitted). Even still, vacatur is not required; vacatur is a form of "equitable relief," and "so, upon a balance of the equities, vacatur may not be appropriate in all cases." *N.M. Health Connections v. HHS*, 340 F. Supp. 3d 1112, 1176-77 (D.N.M. 2018) (cleaned up) (collecting cases). That comports with longstanding precedent that a statute authorizing remedies, especially equitable remedies, should be interpreted consistent with "the traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Indeed, the APA explicitly states that its authorization of judicial review does not affect "the power or duty of the court to . . . deny relief on any . . . equitable ground." 5 U.S.C. § 702.

Here, universal vacatur would defy the principle that remedies "ordinarily 'operate with respect to specific parties,'" *California*, 593 U.S. at 672 (citation omitted), and the rule that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see infra* Part II.C. And the Court has powerful, equitable alternatives available. Declaratory relief could adequately define the legal rights of the parties and establish any unlawfulness of the Rule, preventing any alleged harm. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366-67 (D.C. Cir. 2023). If the Court chooses to implement an injunction, it could do so in a way that would also fully resolve

any harm shown by Plaintiffs. The injunction "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), and it requires federal officials to "refrain from taking actions to enforce, implement, or otherwise carry out" agency action that contravenes the injunction. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Declaratory relief or an injunction could therefore provide sufficient relief for any injuries caused by provisions of the Rule found to be unlawful.

The problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a nationwide injunction or universal vacatur. *See, e.g., Labrador*, 144 S. Ct. at 921-28 (Gorsuch, J., concurring); *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring). Accordingly, any relief the Court may award in this case should not extend beyond the parties.

### C.    Any Injunctive Relief Should Be Appropriately Tailored.

Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any injunctive relief also should be narrowly tailored to redress only those irreparable injuries established by Plaintiffs. *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018). To obtain a permanent injunction, a plaintiff must demonstrate not only success on the merits, but also irreparable injury, that remedies at law are unavailable, and that the balance of equities and the public interest warrant a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Even if Plaintiffs succeed on the merits of one or more of their claims, they have failed to meet their burden with respect to permanent injunctive relief.

### i.    Plaintiffs have not demonstrated irreparable harm justifying injunctive relief that reaches outside the Plaintiff States.

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Moreover, "[t]he party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to

46

prevent irreparable harm." *Id.* (citation omitted). Plaintiffs seek a broadly sweeping injunction, but they have not demonstrated irreparable harm that would justify such relief.

As an initial matter, the States do not even attempt to demonstrate irreparable harm in support of their motion for summary judgment. In issuing a preliminary injunction, the Court concluded that the States had an irreparable injury in the form of "compliance costs." PI Opp'n 38 (quoting *Tennessee v. Cardona*, --- F. Supp. 3d ---, 2024 WL 3019146, at \*39 (E.D. Ky. June 17, 2024)). But then and now, the States cited no evidence documenting any specific costs.

The individual and organizational Plaintiffs, in turn, have not even established standing with respect to most of the challenged provisions. *See supra* Parts I.A, I.C-D. *A fortiori*, they have not demonstrated irreparable harm justifying injunctive relief as to these provisions. *Compare Lujan*, 504 U.S. at 560 (standing elements), *with Heideman*, 348 F.3d at 1189 (irreparable harm standard).

As to the remaining provision, § 106.31(a)(2), the individual and organizational Plaintiffs have not shown that injunctive relief is needed to remedy any injury outside the Plaintiff States. K.R.'s asserted standing to challenge § 106.31(a)(2) rested on her desire not to encounter transgender girls in the girls' restroom or locker room at her Oklahoma middle school., from which she graduated before the Rule's effective date. K.R. Decl. ¶¶ 18, 21. K.R.'s concerns about encountering transgender students in sex-separate facilities due to the Rule thus were and remain speculative. Moreover, she has since declared that she will be completing school from home this year, and she has offered no more than speculation that she might encounter transgender girls in the restroom when participating in extracurricular activities through her public online charter school. Suppl. K.R. Decl. ¶¶ 3, 5, 18, 22. In other words, she faces no irreparable harm due to § 106.31(a)(2). *See Heideman*, 348 F.3d at 1189 (irreparable harm cannot be "theoretical").

The organizational Plaintiffs likewise fail to establish that an injunction as to § 106.31(a)(2) would be needed outside the Plaintiff States. Neither § 106.31(a)(2) nor any other portion of the Rule

affects sex-separate athletic team policies. *See supra* at 5-6. Plaintiff organization members' concerns about transgender students' participation on sex-separate athletic teams are therefore irrelevant. And to the extent the Plaintiff organizations' claimed injuries from § 106.31(a)(2) rest on potential encounters with transgender individuals in sex-separate restrooms, locker rooms, or other spaces, they present no evidence of such injuries outside Kansas, Utah, and Wyoming.

*First*, all the YAF member declarants attend school in Wyoming, Kansas, and Utah. *See* Verdeyen Decl. ¶ 4; Adcock Decl. ¶ 4; Flynn Decl. ¶ 4.

*Second*, all the original FAU member declarants attend school in Wyoming, Kansas, and Utah. *See* Defs.' Suppl. Br. in Opp. to PI Mot. 3, ECF No. 47 (Defs. Suppl. Br.). The new FAU declarants, A.K. and H.K., attend school in Colville, Washington. A.K. Decl. ¶ 2; H.K. Decl. ¶ 2. Washington State, however, already requires school districts to allow students to use restrooms and locker rooms consistent with their gender identity. *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction) (Feb. 2012), https://perma.cc/N7AC-6AJJ. While A.K. also asserts that she "would be very uncomfortable if . . . forced to share a room or a bed" with a transgender female student on a trip for an out-of-town sports competition, A.K. Decl. ¶ 51, she does not attest that there is any transgender female student on either of her teams, let alone show that any such rooming assignment is "certain" and actual rather than theoretical. *Heideman*, 348 F.3d at 1189. Nor does she (or any other declarant) present evidence that she is likely—let alone certain—to imminently encounter transgender students in the locker room or restroom at an away game due to § 106.31(a)(2).[12]

*Third*, none of the MFL declarants provides evidence that her children would be injured by § 106.31(a)(2) outside the Plaintiff States. The Lochner and Koznek declarations provide no such

---

[12] Indeed, as noted in Defendants' supplemental brief in opposition to Plaintiffs' preliminary injunction motion, any such theory of injury is entirely speculative. *See* Defs. Suppl. Br. 3 n.2.

evidence because New York and California already direct public schools to permit students to use sex-separate restrooms and locker rooms consistent with their gender identity. *See* N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (2023), https://perma.cc/97DC-3L8E; Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities, at 2 (2014), https://www.csba.org/Advocacy/~/media/CSBA/Files/Advocacy/ELA/2014_03_AB1266_FinalGuidance.ashx. Further, the Plank declaration indicates that, at her children's school in Pennsylvania, transgender students already may use the restrooms consistent with their gender identity. Plank Decl. ¶ 12. And the Jensen declaration does not address sex-separate facilities at all.

At the preliminary stage, the Court declined to limit the scope of the injunction based on the Plaintiff organizations' failure to present evidence of injury to members outside the Plaintiff States because the Court had concluded that the organizations had associational standing. PI Opp'n 40-41. However, the existence of standing does not determine the scope of appropriate relief. *See, e.g.*, *Ziggy1 Corp. v. Lynch*, CIV-15-0715-HE, 2016 WL 4083656, at *1 (W.D. Okla. Mar. 23, 2016) (concluding that plaintiff had standing but acknowledging that deficiencies identified by defendants "may impact or limit the scope of relief it might otherwise be entitled to"). That is especially true here: For associational standing, each Plaintiff organization only needed to demonstrate that at least *one* of its members had standing to sue in her own right. *See Rocky Mountain Wild*, 98 F.4th at 1286. But clearing the associational standing hurdle did not relieve Plaintiffs of their separate burden to demonstrate entitlement to injunctive relief, which requires a showing of "actual" injury that is "certain" and "great" and that creates a "clear and present need" for the relief sought. *Heideman*, 348 F.3d at 1189; *see Califano*, 442 U.S. at 702. Here, it is uncontroverted that Plaintiff organizations have failed to establish that members outside the Plaintiff States have any such injury with respect to § 106.31(a)(2).

Accordingly, regardless of whether Plaintiff States have established irreparable harm, there is no basis to issue an injunction that reaches beyond those States.

### ii. The balance of the equities and public interest counsels against an overbroad injunction.

The equities and public interest tilt decisively against the broad injunction sought here. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). That is all the more true for the federal government, which implements Acts of Congress that serve and protect the people of all States. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (extending *Maryland v. King* to federal agencies). Enjoining enforcement of the Rule prevents the Department from exercising the authority given to it by Congress under Title IX and therefore causes it irreparable harm.

The harm is particularly pronounced here because the Rule effectuates the compelling public interest of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Plaintiffs' harms, even if the Court finds them cognizable, are dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students' access to federally funded educational opportunities. *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (public interest in naval training "outweighed" irreparable injury to wildlife).

\* \* \*

Accordingly, Plaintiffs have failed to demonstrate entitlement to the broad injunction of the Rule sought, let alone a nationwide injunction or universal vacatur.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, and grant judgment on the administrative record for Defendants.

Dated: September 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Rebecca Kopplin*

REBECCA KOPPLIN
Cal. Bar 313970
ELIZABETH TULIS
BENJAMIN TAKEMOTO
JOHN T. LEWIS
CLAYTON L. BAILEY
PARDIS GHEIBI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: 202-514-3953
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Defendants*