# EXHIBIT A

Index of Included Portions of the Administrative Record

| AR start | AR end | Description |
| --- | --- | --- |
| AR_275350 | AR_275352 | Tanya Albert Henry, Exclusionary Bathroom Policies Harm Transgender Students, American Medical Association (Apr. 17, 2019) |
| AR_280865 | AR_280890 | List of Publicly Available Sources: Federal Cases, Federal Court Filings, Federal Statutes, Federal Regulations, Executive Orders, Websites |
| AR_281253 | AR_281266 | Jason Rafferty et al., Am. Acad. of Pediatrics, Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents 142 Pediatrics 72 (2018) |
| AR_293039 | AR_293053 | Amira Hasenbush, et al. Gender Identity Nondiscrimination Laws in Public Accommodations A Review of Evidence re: Safety and Privacy in Public Restrooms, Locker Rooms and Changing Rooms (Jul. 23, 2018) |
| AR_293089 | AR_293104 | Jody L. Herman, Gendered Restrooms and Minority Stress The Public Regulation of Gender and Its Impact on Transgender People's Lives, 19 J. of Pub. Mgmt. & Soc. Pol'y 65 (2013) |
| AR_293105 | AR_293108 | Katherine Szczerbinski, Education Connection The importance of allowing students to use bathrooms and locker rooms reflecting their gender identity, 36 Child. Legal Rts. J. 153 (2016) |
| AR_293260 | AR_293284 | U.S. Dept. of Educ., Office of Safe and Healthy Students, , Examples of Policies and Emerging Practices for Supporting Transgender Students (May 2016) |
| AR_293382 | AR_293388 | Thea A. Schlieben, Sex-Segregated Bathrooms and Suicidal Ideation in Transgender Youth, 15 J. Advanced Generalist Soc. Work Prac. 1 (2020) |
| AR_293395 | AR_293399 | Kristie L. Seelman, Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality. 63 Journal of Homosexuality 1378 (2016) |



# Exclusionary bathroom policies harm transgender students

APR 17, 2019

**Tanya Albert Henry**
Contributing News Writer

For the sake of transgender students' physical and mental health, the AMA and other medical societies are urging a federal appeals court to uphold an Oregon school district's policy allowing transgender students to use bathrooms and locker rooms that match their gender identities.

# Membership Moves Medicine™

- Free access to JAMA Network™ and CME
- Save hundreds on insurance
- Fight for physicians and patient rights

Join the AMA Today

Denying transgender students this access endangers their health, safety and well-being, leads to negative health outcomes and heightens stigma and discrimination, says the amicus brief filed by the AMA, the Oregon Medical Association and a dozen other mental health and health care organizations. They filed the brief in the 9th U.S. Circuit Court of Appeals.

A group of parents of cisgender students filed a lawsuit challenging the Oregon school district's policy, saying it violated their children's right to privacy. Last summer, a federal district court judge in Oregon ruled the policy didn't violate cisgender students' privacy. Now those parents are appealing the decision in the case, Parents for Privacy v. Dallas School District No. 2.

AMA policy supports transgender individuals' use of public restrooms in line with their gender identities, and the amicus brief informs the federal court about gender dysphoria and transgender health research.

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.

AR_275350



For example, living one's life in accordance with one's gender identity is often critical to mental health. That can include adopting a new name, dressing in a way associated with one's gender identity, and using restrooms and other single-sex facilities consistent with the identity, the brief says.

"Exclusionary policies require transgender individuals to live one facet of their lives in contradiction with their gender identity," the brief explains. Such "policies threaten to exacerbate the risk of anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness and eating disorders, among other adverse outcomes."

And these are risks that are already higher among transgender people. The brief points to the Report of the 2015 U.S. Transgender Survey from the National Center for Transgender Equality, which surveyed 27,000 transgender people and found that 40% reported a suicide attempt. That rate is nine times higher than in the general U.S. population.

# Exposed to harassment and abuse

Transgender students may have transitioned before arriving at a school and forcing them to use facilities that do not match how they live and are recognized in the world may forcibly out them to their peers as transgender. That is harmful, the AMA brief tells the court.

"These policies rob transgender individuals of the personal choice of whether and when to reveal their status. It is often anxiety-inducing and fraught," the brief states.

The compelled disclosure also opens up students to potential harassment and abuse. Nearly 70% of transgender survey respondents reported verbal harassment and 9% reported at physical assault in gender-segregated bathrooms, the brief says, citing research from 2013.

# UTIs, constipation can result

Exclusionary policies also force transgender students to decide whether to violate the policy and potentially face disciplinary actions; use a bathroom that doesn't match their gender identity or use a special bathroom that no other students are required to use; or not use any restroom.

None are good choices, the AMA brief tells the court, saying that "this difficult choice produces heightened anxiety and distress around restroom use, which may make it difficult for transgender individuals to concentrate or focus at school or work and potentially cause them to eschew social activities or everyday tasks."

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.

AR_275351



And students who avoid using the restroom can have medical consequences, the brief states, including recurrent urinary tract infections and constipation, as well as the possibility of more serious health complications, including hematuria and chronic kidney disease.

## Welcoming school, better outcomes

On the flip side, numerous studies show that more welcoming, safer school environments result in lower rates of depression, suicidality and other negative health outcomes, the AMA tells the court, concluding that the court should uphold the lower court ruling that kept the Oregon school policy in place.

URL: https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students
Copyright 1995 - 2024 American Medical Association. All rights reserved.

AR_275352

**List of Citations for Administrative Record**
**Nondiscrimination on the Basis of Sex in Education Programs or Activities**
**Receiving Federal Financial Assistance**
**89 Fed. Reg. 33474 (April 29, 2024)**

**Federal Cases**

- 303 Creative LLC v. Elenis, 600 U.S. 570 (2023)
- A.C. by M.C. v. Metro. Sch. Dist. of Martinsville, 75 F.4th 760 (7th Cir. 2023)
- A.P. v. Fayette Cnty. Sch. Dist., No. 21-12562, 2023 WL 4174070 (11th Cir. 2023)
- Adams v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791 (11th Cir. 2022)
- Adams v. Sch. Bd. of St. Johns Cnty., 968 F.3d 1286 (11th Cir. 2020), vacated and superseded, 3 F.4th 1299 (11th Cir. 2021), reh'g en banc pending, 9 F.4th 1369 (11th Cir. 2021)
- Adams v. Univ. of North Carolina-Wilmington, 640 F.3d 550 (4th Cir. 2011)
- Addington v. Texas, 421 U.S 418 (1979)
- Aguilar v. Avis Rent A Car Sys., Inc., 21 Cal. 4th 121 (1999)
- Air Transp. Ass'n of Am. v. FAA, 169 F.3d 1 (D.C. Cir. 1999)
- Alaska Factory Trawler Ass'n v. Balridge, 831 F.2d 1456 (9th Cir. 1987)
- Albeiz v. Kaminski, No. 09–1127, 2010 WL 2465502 (E.D. Wisc. June 14, 2010)
- Alexander v. Choate, 469 U.S. 287 (1985)
- Alexander v. Sandoval, 532 U.S. 275 (2001)
- Am. Fuel & Petrochemical Manufacturers v. E.P.A., 937 F.3d 559 (D.C. Cir. 2019)
- Anderson v. G.D.C., Inc., 281 F.3d 452 (4th Cir. 2002)
- Arceneaux v. Vanderbilt Univ., 25 Fed. Appx. 345 (6th Cir. 2001)
- Archut v. Ross Univ. Sch. of Veterinary Medicine, 580 Fed. Appx. 90 (3rd Cir. 2014)
- Arizona v. U.S., 567 U.S. 387 (2012)
- Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291 (2006)
- Arnold v. Barbers Hill Indep. Sch. Dist., 479 F. Supp. 3d 511 (S.D. Tex. 2020)
- Ashmore v. Hilton, 834 So. 2d 1131 (La. Ct. App. 2002)
- Asiana Airlines v. FAA, 134 F.3d 393 (D.C. Cir. 1998)
- Ass'n of Nat'l Advertisers, Inc. v. FTC, 627 F.2d 1151 (D.C. Cir. 1979)
- Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104 (1st Cir. 1997)
- Averett v. Hardy, No. 19-00116, 2023 WL 2471361 (W.D. Ky. Mar. 10, 2023)
- B.P.J. v. W. Va. State Bd. of Educ., 550 F. Supp. 3d 347 (S.D. W. Va. 2021)
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316, 2023 WL 111875 (S.D. W. Va. Jan. 5, 2023)
- Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112(9th Cir. 2001)
- Bailey v. Metro. Ambulance Servs., Inc., 992 F.3d 1265 (11th Cir. 2021)
- Balakrishnan v. Regents of the Univ. of California, 99 Cal.App.5th 513 (Cal. Ct. App. 2024)
- Banner Health v. Burwell, 55 F.Supp.3d 1 (D.D.C. 2014)
- Barker v. Riverside Cty. Office of Educ., 584 F.3d 821 (9th Cir. 2009)
- Barker v. Taft Broadcasting Co., 549 F.2d at 401 (6th Cir. 1977)
- Barnes v. Gorman, 536 U.S. 181 (2002)
- Barnett Bank of Marion Cnty, N.A. v. Nelson, 517 U.S. 25 (1996)

AR_280865

- Barnett v. Kapla, No. 20-03748, 2020 WL 7428321 (N.D. Cal. Dec. 18, 2020)
- Barnhardt v. Open Harvest Co-op, 742 F.3d 365 (8th Cir. 2014)
- Barrett v. Whirlpool Corp., 556 F.3d 502 (6th Cir. 2009)
- Baxter v. Palmigiano, 425 U.S. 308 (1976)
- Bd. of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78 (1978)
- Bd. of Dirs. of Rotary Internat'l v. Rotary Club of Duarte, 481 U.S. 537 (1987)
- Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ., 208 F. Supp. 3d 850 (S.D. Ohio 2016)
- Bd. of Educ. v. Melrose Municipal Sch. (Ct. App. N.M. 1987)
- Bd. of Educ. v. State Bd. of Educ. (Kimbrough), 497 N.E.2d 984 (Ill. 1986)
- Behne v. Union Cnty. Coll., No. 14–6929, 2018 WL 566207 (D.N.J. Jan. 26, 2018)
- Bennett v. Ky. Dep't of Educ., 470 U.S. 656 (1985)
- Bigge v. Dist. Sch. Bd. of Citrus Cnty., Fla., No. 11–00210, 2011 WL 6002927 (M.D. Fl. Nov. 28, 2011)
- Blackburn v. Fisk Univ., 443 F.2d 121 (6th Cir. 1971)
- Blunt v. Lower Merion Sch. Dist., 767 F.3d 247 (3d Cir. 2014)
- Bd. of Regents v. Roth, 408 U.S. 564 (1972)
- Boermeester v. Carry, 15 Cal.5th 72, 95 (Cal. 2023), cert. denied, 144 S. Ct. 497 (2023)
- Bostock v. Clayton Cnty., 590 U.S. 644 (2020)
- Bowen v. Georgetown Univ. Hosp., 488 U.S. 204 (1988)
- Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)
- Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993)
- Brine v. Univ. of Iowa, 90 F.3d 271, 274 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997)
- Brock v. Roadway Exp., Inc., 481 U.S. 252 (1987)
- Brooks v. Skinner, 139 F.Supp. 3d 869 (S.D. Ohio 2015)
- Brown v. Arizona, 82 F.4th 863 (9th Cir. 2023), cert. denied, 144 S. Ct. 1346, 218 L. Ed. 2d 423 (2024)
- Brown v. City of Tucson, 336 F.3d 1181 (9th Cir. 2003)
- Brown v. Hot, Sexy, and Safer Products, Inc., 68 F.3d 525 (1st Cir. 1995)
- Brown v. Univ. of Mass. Amherst, No. 22-30068, 2023 WL 2383779 (D. Mass. Mar. 6, 2021)
- Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536 (4th Cir. 2003)
- Bryant v. Indep. Sch. Dist. No I-38, 334 F.3d 928 (10th Cir. 2003)
- Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001)
- Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n, 96 F.4th 707 (4th Cir. 2024)
- Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n, No. 20-3132, 2022 WL 2869041 (D. My. Jul. 21, 2022)
- Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)
- Bushco v. Shurtleff, 729 F.3d 1294 (10th Cir. 2013)
- Butler v. Oak Creek-Franklin Sch. Dist., 172 F. Supp. 2d 1102 (E.D. Wis. 2001)
- Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 Fed. App'x 515 (4th Cir. 2005)
- C.V. v. Waterford Township Bd. of Ed., 225 N.J. 289 (2023)
- C.G on behalf of C.G. v. Siegfried, 38 F.4th 1270 (10th Cir. 2022)
- C.R. v. Eugene School District 4J, 835 F.3d 1142 (9th Cir. 2016)
- Cablevision Sys. Corp. v. FCC, 649 F.3d 695 (D.C. Cir. 2011)

[ PAGE  \* MERGEFORMAT ]

- Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886 (1961)
- California v. Green, 399 U.S. 149 (1970)
- Cameron v. EMW Women's Surgical Ctr., P.S.C., 595 U.S. 267 (2022)
- Cannon v. Univ. of Chicago, 441 U.S. 677 (1979)
- Canton v. Benton Pub. Sch., No. 00-00215, 2002 WL 562638 (E.D. Ark. Apr. 11, 2002)
- Carney v. Adams, 592 U.S. 53 (2020)
- Centro Legal de la Raza v. Exec. Off. for Immigr. Rev., 524 F.Supp.3d 919 (N.D. Cal. 2021)
- Chambers v. D.C., 35 F.4th 870 (D.C. Cir. 2022), judgment entered, No. 19-7098, 2022 WL 2255692 (D.C. Cir. June 23, 2022)
- Chaplin v. Consol. Edison Co., 628 F. Supp. 143 (S.D.N.Y. 1986)
- Chen Through Chen v. Albany Unified Sch. Dist., 56 F.4th 708 (9th Cir. 2022), cert. denied sub nom. Epple v. Albany Unified Sch. Dist., 143 S. Ct. 2641 (2023)
- Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984)
- Chiara v. Town of New Castle, 126 A.D.3d 111 (App. Div. 2015)
- Christian Legal Society Chapter of the Univ. of California, Hastings College of Law v. Martinez, 561 U.S. 661 (2010)
- Cianciotto ex rel. D.S. v. N.Y.C. Dep't of Educ., 600 F. Supp. 3d 434 (S.D.N.Y. 2022)
- Cigar Ass'n of Am. v. U.S. Food & Drug Admin., 480 F. Supp. 3d 256 (D.D.C. 2020), judgment entered, No. 16-01460, 2020 WL 12957025 (D.D.C. Aug. 24, 2020), and aff'd sub nom. Cigar Ass'n of Am. v. U.S. Food & Drug Admin., 5 F.4th 68 (D.C. Cir. 2021)
- City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432 (1985)
- City of Hoboken v. Chevron Corp., 45 F.4th 699 (3d Cir. 2022)
- City of New York v. F.C.C., 486 U.S. 57 (1988)
- City of Stoughton v. EPA, 858 F.2d 747 (D.C. Cir. 1998)
- Clark v. Arizona, 548 U.S. 735 (2006)
- Clark v. Ariz. Interscholastic Ass'n, 695 F.2d 1126 (9th Cir. 1982)
- Clayton v. Trustees of Princeton Univ., 519 F. Supp. 802 (D.N.J. 1981)
- Cleveland Bd. of Education v. LaFleur, 414 U.S. 632 (1974)
- Cloud v. Trustees of Boston Univ., 720 F.2d 721 (1st Cir. 1983)
- Cmty. Nutrition Inst. v. Block, 749 F.2d 50 (D.C. Cir. 1984)
- Cohen v. Brown Univ., 991 F.2d 888 (1st Cir. 1993)
- Cohen v. San Bernardino Valley College, 92 F.3d 968 (9th Cir. 1996)
- Cole v. Tansy, 926 F.2d 955 (10th Cir. 1991)
- Coleman v. Bobby Dodd Inst, No. 17-00029, 2017 WL 2486080 (M.D. Ga. June 8, 2017)
- Collins Sec. Corp. v. SEC, 562 F.2d 820 (D.C. Cir. 1977)
- Conley v. Nw. Fla. State Coll., 145 F. Supp. 3d 1073 (N.D. Fla. 2015)
- Connecticut v. Doehr, 501 U.S. 1 (1991)
- Conner v. Schrader-Bridgeport Int'l Inc., 227 F.3d 179 (4th Cir. 2000)
- Consolidated Rail Corp. v. Darrone, 465 U.S. 624 (1984)
- Corso v. Creighton Univ., 731 F.2d 529 (8th Cir. 1984)
- Coveney v . President & Trustees of College of Holy Cross, 388 Mass. 16 (1983)
- Crandell v. N.Y. Coll., Osteopathic Med., 87 F. Supp. 2d 304 (S.D.N.Y. 2000)
- Crane v. Kentucky, 476 U.S. 683 (1986)

[ PAGE   \* MERGEFORMAT ]

- Crews v. City of Mt. Vernon, 567 F.3d 860 (7th Cir. 2009)
- Crenshaw v. Erskine College, 432 S.C. 1 (2020)
- Cruzan v. Special Sch. Dist. # 1, 294 F.3d 981 (8th Cir. 2002)
- Cummings v. Walsh Constr. Co., 561 F. Supp. 872 (S.D. Ga. 1983)
- D.F. ex rel. Finkle v. Bd. of Educ. Of Syosset Cent. Sch. Dist., 386 F.Supp.2d 119 (E.D.N.Y. 2005)
- D.J. v. Sch. Bd. of Henrico Cnty., 488 F.Supp.3d 307 (E.D. Va. 2020)
- Dahmer v. Western Kentucky Univ., No. 18- 00124, 2019 WL 1781770 (W.D. Ky. Apr. 23, 2019)
- Dambrot v. Central Michigan Univ., 55 F.3d 1177 (6th Cir. 1995)
- Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999)
- Dean v. Raplee, 39 N.E. 952 (N.Y. 1895)
- DeGroote v. Arizona Bd. of Regents, No. 18-00310, 2020 WL 10357074 (D. Ariz. Feb. 7, 2020)
- DeJohn v. Temple Univ., 537 F.3d 301 (3d Cir. 2008)
- Delaware Dep't of Nat. Res. & Env't Control v. E.P.A., 785 F.3d 1 (D.C. Cir. 2015), as amended (July 21, 2015)
- Delaware v. Van Arsdall, 475 U.S. 673 (1986)
- Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891 (2020)
- Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003)
- Dillon v. Pulaski Co. Special Sch. Dist., 594 F.2d 699 (8th Cir. 1979)
- Dismukes v. Brandeis Univ, No. 19-11049, 2021 WL 1518828 (D Mass 2021)
- DiStiso v. Cook, 691 F.3d 226 (2d Cir. 2012)
- Dixon v. Ala. St. Bd. of Educ., 294 F.2d 150 (5th Cir. 1961)
- Dixon v. Love, 431 U.S. 105 (1977)
- Dodds v. U.S. Dep't of Educ., 845 F.3d 217 (6th Cir. 2016)
- Dobbs v. Jackson Women's Health Organization, 597 U.S. 215 (2022)
- Doe 12 v. Baylor U., 336 F. Supp. 3d 763 (W.D. Tex. 2018)
- Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd., 384 F. Supp. 3d 598 (E.D. Va. 2019)
- Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd., 832 F. App'x 802 (4th Cir. 2020)
- Doe 2 v. Citadel, 421 S.C. 140, 152, 805 S.E.2d 578 (Ct. App. 2017), reh'g denied (Sept. 27, 2017), cert. denied (Mar. 28, 2018)
- Doe by Watson v. Russell Cty. Sch. Bd., 292 F.Supp.3d 690 (W.D. Va. 2018)
- Doe ex rel. Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438 (D. Conn. 2006)
- Doe v. Alger, 228 F. Supp. 3d 713 (W.D. Va. 2016)
- Doe v. Allee, 30 Cal. App. 5th 1036 (Ct. App. 2019)
- Doe v. Baum, 903 F.3d 575 (6th Cir. 2018)
- Doe v. Bd. of Regents of Univ. of Wis., 615 F. Supp. 3d 877 (W.D. Wis. 2022)
- Doe v. Bd. of Supervisors of Univ. of La. Sys., 650 F.Supp.3d 452 (M.D. La. 2023)
- Doe v. Belmont Univ., 334 F. Supp. 3d 877 (M.D. Tenn. 2018)
- Doe v. Belmont Univ., 367 F.Supp.3d 732 (MD Tenn. 2019)
- Doe v. Boyertown Area Sch. Dist., 897 F.3d 518 (3d Cir. 2018)
- Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass. 2016)
- Doe v. Brown Univ., 896 F.3d 127 (1st Cir. 2018)
- Doe v. Claremont McKenna College, 24 Cal. App. 5th 1055 (CA Ct of Appeal, Second Civ., 2018)
- Doe v. Coastal Carolina Univ., 522 F. Supp. 3d 173 (D.S.C. 2021)

[ PAGE   \* MERGEFORMAT ]

- Doe v. Coventry Bd. of Ed., 603 F. Supp. 2d 226 (2009)
- Doe v. Cummins, 662 F. App'x 437 (6th Cir. 2016)
- Doe v. Dallas Ind. Sch. Dist., No. 01-1092, 2002 WL 1592694 (N.D. Tex. July 16, 2002)
- Doe v. DiGenova, 779 F.2d 74 (D.C. Cir. 1985)
- Doe v. East Haven Bd. of Educ., 200 Fed.Appx. 46 (2d Cir. 2006)
- Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257 (4th Cir. 2021), cert. denied, 143 S. Ct. 442 (2022)
- Doe v. Fairfax Cnty. Sch. Bd., 403 F. Supp. 3d 508 (E.D. Va. 2019)
- Doe v. Galster, 768 F.3d 611 (7th Cir. 2014)
- Doe v. Haas, 427 F. Supp. 3d 336 (E.D.N.Y. 2019)
- Doe v. Hamden Bd. of Ed., No. 06–1680, 2008 WL 2113345 (D. Conn. May 19, 2008)
- Doe v. Harvard Univ., 462 F. Supp. 3d 51 (D. Mass. 2020)
- Doe v. Hobart & William Smith Colls., 546 F. Supp. 3d 250 (W.D.N.Y. 2021)
- Doe v. Ind. Wesleyan Univ., No. 20-00039, 2020 WL 2474483 (N.D. In. May 12, 2020)
- Doe v. Loyola Univ. Md., No. 20-1227, 2021 WL 1174707 (D. Md. Mar. 29, 2021)
- Doe v. Mass. Dep't of Corr., No. 17-12255, 2018 WL 2994403 (D. Mass. June 14, 2018)
- Doe v. Mass. Inst. of Tech., 46 F.4th 61 (1st Cir. 2022)
- Doe v. Mercy Catholic Med. Ctr., 850 F.3d 545 (3d Cir. 2017)
- Doe v. Miami Univ., 882 F.3d 579 (6th Cir. 2018)
- Doe v. Michigan State Univ., 989 F.3d 418 (6th Cir. 2021)
- Doe v. Mississippi, No. 16-00063, 2018 WL 3570229 (S.D. Miss. July 24, 2018)
- Doe v. Morehouse Coll., Inc., 622 F. Supp. 3d 1279 (N.D. Ga. 2022)
- Doe v. N. Michigan Univ., 393 F. Supp. 3d 683 (W.D. Mich. 2019)
- Doe v. Oberlin College, 963 F.3d 580 (6th Cir. 2020)
- Doe v. Ohio Univ., No. 21-858, 2022 WL 899687 (S.D. Oh. Mar. 28, 2022)
- Doe v. Princeton Univ., No. 19-07853, 2020 WL 7383192 (D.N.J. Dec. 16, 2020)
- Doe v. Princeton Univ., 30 F.4th 335 (3d Cir. 2022)
- Doe v. Purdue Univ., 928 F.3d 652 (7th Cir. 2019)
- Doe v. Quinnipiac Univ., 404 F. Supp. 3d 643 (D. Conn. 2019)
- Doe v. Regents of Univ. of Cal. (UCLA), 23 F.4th 930 (9th Cir. 2022)
- Doe v. Rocky Mountain Classical Acad., No. 19-03530, 2022 WL 16556255 (D. Colo. Sept. 30, 2022)
- Doe v. Rollins College No. 18-1069, 2019 WL 11703979 (M.D. Fla. Apr. 10, 2019)
- Doe v. Rollins College, No. 18-1069, 2020 WL 10090795 (M.D. Fla. Mar. 9, 2020)
- Doe v. Salisbury Univ., 123 F. Supp. 3d 748 (D. Md. 2015)
- Doe v. Sch. Dist. No. 1, Denver, Colo., 970 F.3d 1300 (10th Cir. 2020)
- Doe v. Snyder, 28 F.4th 103 (9th Cir. 2022)
- Doe v. Starpoint Cent. Sch. Dist., No. 23-207, 2023 WL 2859134 (W.D.N.Y. Apr. 10, 2023)
- Doe v. Stephens, 851 F.2d 1457 (D.C. Cir. 1988)
- Doe v. Syracuse Univ., No. 22-00644, 2023 WL 4105481 (N.D.N.Y. June 21, 2023)
- Doe v. Tex. Christian Univ., 601 F. Supp. 3d 78 (N.D. Tex. 2022)
- Doe v. The Citadel, No. 22-1843, 2023 WL 3944370 (4th Cir. Jun. 12, 2023)
- Doe v. The League Sch. of Greater Boston, No. 16-11940, 2018 WL 2077595 (D. Mass. May 3, 2018)
- Doe v. Trustees of Boston College, 942 F.3d 527 (1st Cir. 2019)
- Doe v. Trustees of the Univ. of Pennsylvania, 270 F. Supp. 3d 799 (E.D. Pa. Sep. 13, 2017)

[ PAGE  \* MERGEFORMAT ]

- Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858 (8th Cir. 2020)
- Doe v. Univ. of Cincinnati, 872 F.3d 393 (6th Cir. 2017)
- Doe v. Univ. of Conn., No. 20-00092, 2020 WL 406356 (D. Conn. Jan. 23, 2020)
- Doe v. Univ. of Denver, 1 F.4th 822 (10th Cir. 2021)
- Doe v. Univ. of Ky., 357 F. Supp. 3d 620 (E.D. Ky. 2019)
- Doe v. Univ. of Ky., 860 F.3d 365 (6th Cir. 2017)
- Doe v. Univ. of Mich., 325 F. Supp. 3d 821 (E.D. Mich. 2018)
- Doe v. Univ. of Neb., 451 F. Supp. 3d 1062 (D. Neb. 2020)
- Doe v. Univ. of Notre Dame, No. 17-00298, 2017 WL 1836939 (N.D. Ind. May 8, 2017)
- Doe v. Univ. of Or., No. 17-01103, 2018 WL 1474531 (D. Or. Mar. 26, 2018)
- Doe v. Univ. of S. Cal., 200 Cal. Rptr. 3d 851 (Cal. Ct. App. 2016)
- Doe v. Univ. of S. Ind., 43 F.4th 784 (7th Cir. 2022)
- Doe v. Univ. of Scis, 961 F.3d 203 (3d Cir. 2020)
- Doe v. Univ. of So. Cal., 241 Cal. Rptr. 3d 146 (Cal. Ct. App. Dec. 11, 2018)
- Doe v. Univ. of Denver, 952 F.3d 1182 (10th Cir. 2020)
- Doe v. Univ. of Sciences, 961 F.3d 203 (3d Cir. 2020)
- Doe v. Va. Polytechnic Inst. & State Univ., 77 F.4th 231 (4th Cir. Aug. 8, 2023)
- Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018)
- Doe v. Westmont Coll., 246 Cal. Rptr. 3d 369 (Cal. Ct. App. Apr. 23, 2019)
- Doe v. William Marsh Rice Univ., 67 F.4th 702 (5th Cir. 2023)
- Doe v. Yale Univ, 564 F.Supp.3d 11 (D.Conn. 2021)
- Doherty v. Bice, No. 18-10898, 2020 WL 5548790 (S.D.N.Y. Sept. 16, 2020)
- Doherty v. S. Coll. of Optometry, 862 F.2d 570 (6th Cir. 1988)
- Donobue v. Baker, 976 F. Supp. 136 (D.N.Y. 1997)
- Donovan v. Ritchie, 68 F.3d 14 (1st Cir. 1995)
- Dowd v. United Steelworkers of America, Local No. 286, 253 F. 3d 1093 (8th Cir. 2001)
- Du Bois v. Board of Regents of Univ. of MN
- Du Bois v. Board of Regents of Univ. of Minn., 987 F.3d 1199 (8th Cir. 2021)
- DTH Media Corp. v. Folt, 374 N.C. 292 (2020)
- Edmo v. Corizon, Inc., 935 F.3d 757, 771 (9th Cir. 2019)
- E.E.O.C. v. WC&M Enters., Inc., 496 F.3d 393 (5th Cir. 2007)
- E.E.O.C. v. Abercrombie & Fitch Stores, Inc, 575 U.S. 768 (2015)fai
- E.E.O.C. v. Arabian Am. Oil Co (Aramco), 499 U.S. 244 (1991)
- E.E.O.C. v. Bd. of Governors of State Colleges and Universities, 957 F.2d 424 (1992)
- E.E.O.C. v. Firestone Fibers & Textiles Co., 515 F.3d 307 (4th Cir. 2008)
- E.E.O.C. v. Houston Funding II, Ltd., 717 F.3d 425 (5th Cir. 2013)
- E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560 (6th Cir. 2018)
- E.E.O.C. v. SunDance Rehabilitation Corp., 466 F.3d 490 (6th Cir. 2006)
- E.E.O.C. v. L. B. Foster, 123 F.3d 746 (3d Cir. 1997)
- E.H. v. Valley Christian Acad., 616 F. Supp. 3d 1040 (C.D. Cal. 2022)
- E.M. v. Austin Indep. Sch. Dist., No. 17–00387, 2018 WL 627391 (W.D. Tex., Jan. 30, 2018
- Earwood v. Continental Se. Lines, Inc., 539 F.2d 1349 (4th Cir. 1976)
- Emeldi v. Univ. of Or., 673 F.3d 1218 (9th Cir. 2012)

AR_280870

- Emily O. v. Regents of the Univ. of Cali., No. 20-08159, 2021 WL 1535539 (C.D. Cali. Mar. 9, 2021)
- Estate of Lance v. Lewisville Indep. Sch. Dist, 743 F.3d 982 (5th Cir. 2014)
- Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969)
- Fain v. Brooklyn Coll. Univ. of N.Y., 493 N.Y.S.2d 13 (N.Y. App. Div. 1985)
- Fairchild v. Quinnipiac Univ., 16 F.Supp.3d 89 (D. Conn. 2014)
- Faragher v. City of Boca Raton, 524 U.S. 775 (1998)
- Farmer v. Kansas State Univ., No. 16-02256, 2017 WL 980460 (D. Kan. Mar. 14, 2017) aff'd, 918 F.3d 1094 (10th Cir. 2019)
- Faparusi v. Case Western Reserve University, 711 Fed.Appx. 269 (6th Cir. 2017)
- Fed. Deposit Ins. Corp. v. Mallen, 486 U.S. 230 (1988)
- Felder v. Casey, 487 U.S. 131 (1988)
- Feminist Majority Found. v. Hurley, 911 F.3d 674 (4th Cir. 2018)
- Fennell v. Marion Indep. Sch. Dist., 804 F.3d 398 (5th Cir. 2015)
- Ferris v. Delta Airlines Inc., 277 F.3d 128 (2d Cir. 2001)
- Fidelity Fed. S. & L. v. De la Cuesta, 458 U.S. 141 (1982)
- Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246 (2009)
- Fla. v. Bostick, 501 U.S. 429 (1991)
- Flaim v. Med. Coll. of Ohio, 418 F.3d 629 (6th Cir. 2005)
- Flor v. Univ. of N.M., 469 F. Supp. 3d 1143 (D.N.M. 2020)
- Florida Lime & Avocado Growers Inc. v. Paul, 373 U.S. 132 (1963)
- Florida State Univ. Bd. of Regents, 414 So. 2d 1102 (Fla. Dist. Ct. App. 1982)
- Fogleman v. Mercy Hospital, 283 F.3d 561 (3d Cir. 2002)
- Fox v. Pittsburg State Univ., 257 F. Supp. 3d 1112 (D. Kan. 2017)
- Franklin v. Gwinnett Cnty. Pub. Sch., 503 U.S. 60 (1992)
- Frazier v. Fairhaven Sch. Comm., 276 F.3d 52 (1st Cir. 2002)
- Free v. Bland, 369 U.S. 663 (1962)
- Freightliner Corp. v. Myrick, 514 U.S. 280 (1995)
- Frisby v. Schultz, 487 U.S. 474 (1988)
- Frost v. Univ. of Louisville, 392 F. Supp. 3d 793 (W.D. Ky. 2019), appeal dismissed, No. 19-5624, 2019 WL 9051185 (6th Cir. Dec. 19, 2019)
- G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd., 822 F.3d 709 (4th Cir. 2016)
- G.P. v. Lee Cnty. Sch. Bd., 737 Fed.Appx. 910 (11th Cir. 2018)
- Gagne v. Trustees of Ind. Univ., 692 N.E.2d 489 (Ind. Ct. App. 1998)
- Garcia v. San Antonio Metro. Transit Auth., 469 U. S. 528 (1985)
- Gardner v. Schumacher, 547 F.Supp.3d 995 (D.N.M. 2021)
- Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998)
- Gilbert v. Homar, 520 U.S. 924 (1997)
- Gomes v. Maine, 365 F. Supp. 2d 6 (D. Me. 2005)
- Gonzalez v. McEuen, 435 F. Supp. 460 (C.D. Cal. 1977)
- Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001)
- Goodwin v. Pennridge Sch. Dist., 389 F.Supp.3d 304 (E.D. Pa. 2019)
- Gorman v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988)
- Goss v. Lopez, 419 U.S. 565 (1975)

AR_280871

- Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172 (10th Cir. 2001)
- Grabowski v. Arizona Bd. of Regents, 69 F.4th 1110 (9th Cir. 2023)
- Grafton v. Brooklyn Law Sch., 478 F.2d 1137 (2d Cir. 1973)
- Grandee Beer Distributors, Inc. v. NLRB, 630 F.2d 928 (2d Cir. 1980)
- Greier v. Am. Honda Motor Co., 529 U.S. 861 (2000)
- Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020)
- Grove City Coll. v. Bell, 465 U.S. 555 (1984)
- Guardians Ass'n. v. Civil Service Comm'n of New York City, 463 U.S. 582 (1983)
- Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56 (1st Cir. 2019)
- Hall v. Millersville Univ., 22 F.4th 397 (3d Cir. 2022)
- Hammons v. Univ. of Maryland Medical System Corp., 649 F.Supp.3d 104 (D. My. 2023)
- Hannah v. Larche, 363 U.S. 420 (1960)
- Harnett v. Fielding Graduate Inst., 400 F. Supp. 2d 570 (S.D.N.Y. 2005), aff'd in part, rev'd in part & remanded, 198 F. App'x 89 (2d Cir. 2006)
- Harper v. Poway Unified Sch. Dist., 445 F.3d 1166 (9th Cir. 2006)
- Harrington v. Lesley Univ., 554 F.Supp.3d 211 (D. Mass. 2021)
- Harris v. Blake, 798 F.2d 419 (10th Cir. 1986)
- Harris v. Forklift Systems, 510 U.S. 17 (1993)
- Harry & Bryant Co. v. Fed. Trade Comm'n, 726 F.2d 993 (4th Cir. 1984)
- Harvey v. Palmer College of Chiropractic, 363 N.W.2d 443 (Iw. 1984
- Hayden v. Greensburg Cmty. Sch. Corp., 743 F.3d 569 (7th Cir. 2014)
- Hayut v. SUNY, 352 F.3d 733 (2d Cir. 2003)
- Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166 (2023)
- Hecox v. Little, 479 F. Supp. 3d 930 (D. Idaho 2020), appeal argued, No. 20-35815 (9th Cir. Nov. 22, 2022)
- Hecox v. Little, 79 F.4th 1009(9th Cir. 2023)
- Henderson v. Bd. of Super. Of Southern Univ. and A&M Coll., 663 F.Supp.3d 542 (M.D. La. 2023)
- Henson v. City of Dundee, 682 F.2d 897 (11th Cir. 1982)
- Herman & McLean v. Huddleston, 459 U.S. 375 (1983)
- Herman v. U. of S.C., 341 F. Supp. 226 (D.S.C. 1971), aff'd per curiam, 457 F.2d 902 (4th Cir. 1972)
- Hewitt v. Commissioner, 21 F.4th 1336 (11th Cir. 2021)
- Hicks v. City of Tuscaloosa, Ala., 870 F.3d 1253 (11th Cir. 2017)
- Hill v. Blount Cnty. Bd. of Educ., 203 F.Supp.3d 871 (E.D. Tenn. 2016)
- Hill v. Bd. of Trustees, 182 F. Supp. 2d 621 (W.D. Mich. 2001)
- Hill v. Cundiff, 797 F.3d 948 (11th Cir. 2015)
- Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707 (1985)
- Hines v. Davidowitz, 312 U.S. 52 (1941)
- Hively v. Ivy Tech Cmty. Coll. of Indiana, 853 F.3d 339 (7th Cir. 2017)
- Holcomb v. Iona College, 521 F.3d 130 (2nd Cir. 2008)
- Holloway v. Arthur Andersen & Co., 566 F.2d 659 (9th Cir. 1977), overruling recognized by Schwenk v. Hartford, 204 F.3d 1187 (9th Cir. 2000)
- Home Box Office, Inc. v. FCC, 567 F.2d 9 n.58 (D.C. Cir. 1977)
- Horner v. Ky. High Sch. Athletic Ass'n, 43 F.3d 265 (6th Cir. 1994)

AR_280872

- Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171 (2012)
- HUD v. Gruzdaitis, HUDALJ 02-96-0377-8, 1998 WL 482759 (HUD ALJ, Aug. 14, 1998)
- HUD v. Weber, HUDALJ 05-91-0819-1, 1993 WL 42262 (HUD ALJ, Feb. 18, 1993)
- HUD v. Williams, HUDALJ 02-89-0459-1, 1991 WL 442796 (HUD ALJ, March 22, 1991)
- Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995)
- Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995)
- Immigrant Legal Res. Ctr. v. Wolf, 491 F. Supp. 3d 520 (N.D. Cal. 2020)
- In re Grand Jury Matter, 762 F. Supp. 333 (S.D. Fla. 1991)
- In re Grand Jury Subpoena, 198 F. Supp. 2d 1113 (D. Alaska 2002)
- In re Motion to Compel Compliance with Subpoena Directed to Minnesota Dep't of Health, 423 F.Supp.3d 670 (D. Minn. 2019)
- In re Winship, 397 U.S. 358 (1970)
- Int'l Fabricare Inst. V. EPA, 972 F.2d 384 (D.C. Cir. 1992)
- InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ., 534 F. Supp. 3d 785 (E.D. Mich. 2021)
- InterVarsity Christian Fellowship/USA v. Univ. of Iowa, 408 F. Supp. 3d 960 (S.D. Iowa 2019) aff'd, 5 F.4th 855 (8th Cir. 2021
- J.M. v. Hilldale Independent Sch. Dist. No. 1-29, 397 Fed. App'x 445 (10th Cir. 2010)
- Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005)
- Jackson v. Willoughby Eastlake Sch. Dist, No. 16-3100, 2018 WL 1468666 (N.D. Ohio Mar. 23, 2018)
- Jauquet v. Green Bay Area Catholic Educ., Inc., 996 F.3d 802 (7th Cir. 2021)
- Jennings v. Univ. of N.C., 482 F.3d 686 (4th Cir. 2007)
- Jensen v. Eveleth Taconite Co., 824 F. Supp. 847 (D. Minn. 1993)
- Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc., 134 F. Supp. 2d 965 (N.D. Ill. 2001)
- Johnson v. Watkins, 803 F. Supp. 2d 561 (S.D. Miss. 2011)
- Jones v. State Bd. of Educ., 407 F.2d 834 (6th Cir. 1969)
- Jones v. UPS Ground Freight, 683 F.3d 1283 (11th Cir. 2012)
- Jordan v. McKenna, 573 So. 2d 1371 (Miss. 1990)
- K.T. v. Culver-Stockton College, 865 F.3d 1054 (8th Cir. 2017)
- Kalinsky v. State Univ. of N.Y. at Binghamton, 557 N.Y.S.2d 577 (N.Y.A.D. 3 Dept., 1990)
- Kaltenberger v. Ohio Coll. of Podiatric Med., 162 F.3d 432 (6th Cir. 1998)
- Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ., 397 F.Supp.3d 97 (D. Mass. 2019)
- Karanik v. Cape Fear Academy, Inc., 608 F.Supp. 3d 268 (E.D.N.C. 2022)
- Karanik v. Cape Fear Academy, Inc., No. 21-169, 2022 WL 16556774 (E.D.N.C. 2022)
- Karasek v. Regents of Univ. of Ca., 534 F.Supp.3d 1136 (N.D. Cal. 2021)
- Katz v. Dole, 709 F.2d 251 (4th Cir. 1983)
- Keefe v. Adams, 840 F.3d 523 (8th Cir. 2016)
- Keene v. Rodgers, 316 F. Supp. 217 (D. Me. 1970)
- Kengerski v. Harper, 6 F.4th 531, 534 (3d Cir. 2021)
- Kern Cty. Farm Bureau v. Allen, 450 F.3d 1072 (9th Cir. 2006)
- Khan v. Midwestern Univ., 147 F.Supp.3d 718 (2015)
- Khan v. Yale Univ., 347 Conn. 1 (Conn. June 27, 2023)
- King v. Eastern Michigan Univ., 221 F. Supp. 2d 783 (E.D. Mich. 2002)

AR_280873

- King v. Smith, 392 U.S. 309 (1968)
- Kinsman v. Fla. State Univ. Bd. Of Trustees, No.15-235, 2015 WL 11110848 (M.D. Fla. Aug. 12, 2015)
- Kinsman v. Fla State Univ. Bd. Of Trustees, No. 6:15-cv-16, 2015 WL 11110542 (M.D. Fl April 27, 2015)
- Kiobel v. Royal Dutch Petroleum, 569 US 108 (2013)
- Kluge v. Brownsburg Cmty. Sch. Corp., 548 F. Supp. 3d 814 (S.D. Ind. 2021), aff'd, 64 F.4th 861 (7th Cir. 2023), vacated on denial of reh'g, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023)
- Knott v. Mo. Pac. Ry. Co., 527 F.2d 1249 (8th Cir. 1975)
- Koenke v. Saint Joseph's Univ., No. 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021)
- Koeppel v. Romano, 252 F. Supp. 3d 1310 (M.D. Fla. 2017) aff'd sub nom. Doe v. Valencia Coll., 903 F.3d 1220 (11th Cir. 2018)
- Kollaritsch v. Mich. State Univ. Bd. of Trustees, 944 F.3d 613 (6th Cir. 2020)
- Kolstad v. Amer. Dental Assoc. 527 U.S. 526 (1999)
- Kunche v. Univ. of Dubuque, 579 F.Supp.3d 1071 (SD Iowa 2022)
- Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist., 69 F.4th 350 (6th Cir. 2023)
- Kuritzky v. Emory Univ., 294 Ga.App. 370 (2008)
- L.E. v. Lakeland Joint Sch. Dist. 272, 403 F. Supp. 3d 888 (D. Idaho 2019)
- L.L. v. Evesham Twship. Bd. of Educ., 710 Fed. Appx. 545 (3d Cir. 2017)
- L.M. v. Town of Middleborough, 677 F.Supp.3d 29 (D. Mass. 2023)
- Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384 (1993)
- Larimer v. International Business Machines Corp., 370 F.3d 698 (7th Cir. 2004)
- Lee v. Natomas Unified Sch. Dist., 93 F. Supp. 3d 1160 (E.D. Cal 2015)
- Lee v. Univ. of N.M., 449 F. Supp. 3d 1071 (D.N.M. 2020)
- Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin., 741 F.3d 1309 (D.C. Cir. 2014)
- Lipsett v. Univ. of P. R., 864 F.2d 881 (1st Cir. 1988)
- Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania, 140 S. Ct. 2367 (2020)
- Long v. Murray Cnty. Sch. Dist., 522 Fed. Appx. 576 (11th Cir. 2013)
- Lopez v. Metro. Gov't. of Nashville and Davidson Cnty., 594 F. Supp.2d 862 (M.D. Tenn. 2009)
- Lopez v. San Luis Valley, Bd. of Co-op. Educ. Services, 977 F. Supp. 1422 (D. Colo. 1997)
- Louisiana Independent Pharmacies Ass'n v. Express Scripts, Inc., 41 F. 4th 473 (5th Cir. 2022)
- Lucey v. Bd. of Regents of Nevada, 380 Fed. App'x. 608 (9th Cir. 2010)
- M.D. v. Bowling Green Indep. Sch. Dist., No. 15-00014, 2017 WL 390280 (W.D. Ky. Jan. 27, 2017)
- M.H.D. v. Westminster Sch., 172 F.3d 797 (11th Cir. 1999)
- Mackey v. Montrym, 443 U.S. 1 (1979)
- Madrill v. Sch. Dist. No. 11 (Ct. App. Colo. 1985)
- Madsen v. Women's Health Ctr., 512 U.S. 753 (1994)
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, 141 S. Ct. 2038 (2021)
- Mangla v. Brown University, 135 F.3d 80 (1st Cir. 1998)
- Mann Construction, Inc. v. U.S., 27 F.4th 1138 (6th Cir. 2022)
- Marshall v. Ohio Univ., No. 15–00775, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015)
- Mathews v. Eldridge, 424 U.S. 319 (1976)
- Matter of Doe v. Purchase College State Univ. of New York, 192 A.D.3d 1100 (N.Y. App. Div. 2021)

AR_280874

- Maxon v. Fuller Theological Seminary, No. 20-56156, 2021 WL 5882035 (9th Cir. Dec. 13, 2021)
- Mayor of Baltimore v. Azar, 973 F.3d 258 (4th Cir. 2020)
- McGinest v. GTE Service Corp., 360 F. 3d 1103 (9th Cir. 2004)
- McGlotten v. Connally, 338 F. Supp. 448 (D.D.C. 1972)
- McGuinness v. Univ. of N.M. Sch. of Med., 170 F.3d 974 (10th Cir. 1998)
- McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995)
- McNeil v. Sherwood School District 88J, 918 F.3d 700 (9th Cir, 2019)
- MediNatura, Inc. v. Food & Drug Admin., 496 F. Supp. 3d 416 (D.D.C. 2020), aff'd, 998 F.3d 931 (D.C. Cir. 2021)
- Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996)
- Meece v. Atl. Se. Airlines, Inc., No. 04-3698, 2006 WL 2228937 (N.D. Ga. Aug. 2, 2006)
- Menaker v. Hofstra University, 935 F.3d 20 (2d Cir. 2019)
- Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986)
- Meriwether v. Hartop, 992 F.3d 492 (6th Cir. 2021)
- Messeri v. DiStefano, 480 F. Supp. 3d 1157 (D. Colo. 2020)
- Metro. Life Ins. Co. v. Kelley, 890 F. Supp. 746 (N.D. Ill. 1995)
- Metz v. Dilley (In re Dilley), 339 B.R. 1 (B.A.P. 1st Cir. 2006)
- Meyer v. Nebraska, 262 U.S. 390 (1923)
- Mich. Prot. & Advocacy Serv. v. Babin, 18 F.3d 337 (6th Cir. 1994)
- Michigan v. Lucas, 500 U.S. 145 (1991)
- Miller v. Woodharbor Molding & Millworks, Inc., 80 F. Supp. 2d 1026 (N.D. Iowa 2000)
- Mistretta v. U.S. , 488 U.S. 361 (1989)
- Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288 (1960)
- Mitra v. Univ. of Med. & Dentistry of N.J., 719 A.2d 693 (N.J. Super. Ct. App. Div. 1998)
- Mock v. Univ. of Tenn. at Chattanooga, No. 14-1687-II (Tenn. Ch. Ct. Aug. 10, 2015)
- Moe v. Grinnell Coll., 556 F. Supp. 3d 916 (S.D. Iowa 2021)
- Monteiro Tempe Union High Sch. Dist., 158 F.3d 1022, 1025 (9th Cir. 1998)
- Montgomery v. Indep. Sch. Dist. No. 709, 109 F. Supp. 2d 1081 (D. Minn. 2000)
- Morrison v Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010)
- Morrissey v. Brewer, 408 U.S. 471 (1972)
- Moylan v. Maries Cnty., 792 F.2d 746 (8th Cir. 1986)
- Munoz v. Strong, No. 20-984, 2021 WL 5548081 (W.D. Mich. June 23, 2021)
- Muro v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll., No. 19-10812, 2019 WL 5810308 (E.D. La. Nov. 7, 2019)
- Murrell v. Sch. Dist. No. 1, 186 F.3d 1238 (10th Cir.1999)
- Musacchio v. U.S. , 577 U.S. 237 (2016)
- N.C. Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755 (4th Cir. 2012)
- Nash v. Auburn Univ., 812 F.2d 655 (11th Cir. 1987)
- Nat'l Lifeline Ass'n v. FCC, 921 F.3d 1102 (D.C. Cir. 2019)
- Nat'l Pork Producers Council v. Ross, 598 U.S. 356 (2023)
- Nat'l Retired Teachers Ass'n v. U.S. Postal Serv., 430 F. Supp. 141 (D. D.C. 1977)
- Nathanson v. Med. Coll. of Pa., 926 F.2d 1368 (3d Cir. 1991)
- Nat'l Ass'n of Home Builders v. EPA, 682 F.3d 1032 (D.C. Cir. 2012)

AR_280875

- NCAA v. Smith, 525 U.S. 459 (1999)
- Neese v. Becerra, No. 23-10078 (5th Cir. 2023) - Def. Brief
- Neese v. Becerra, No. 23-10078 (5th Cir. 2023) - Def. Reply Brief
- Neese v. Becerra, 640 F. Supp. 3d 668 (N.D. Tex. 2022)
- Neese v. Becerra, No. 21-163, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022)
- Nelson v. Colorado, 581 U.S. 128 (2017)
- Nevada Dep't of Hum. Res. v. Hibbs, 538 U.S. 721 (2003)
- New Jersey v. T.L.O., 469 U.S. 325 (1985)
- New York v. U.S. Dep't of Educ., 477 F. Supp. 3d 279 (S.D.N.Y. 2020)
- New York v. U.S., 505 U.S. 144 (1992)
- Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669 (1983)
- Newsome v. Batavia Loc. Sch. Dist., 842 F.2d 920 (6th Cir. 1988)
- Nissen v. Cedar Falls Cmty. Sch. Dist., No. 20-2098,2022 WL 873612 (ND Iowa Mar. 23, 2022)
- Noakes v. Case Western Reserve Univ, No. 21-01776, 2022 WL 17811630 (N.D. Ohio, Dec 19, 2022)
- Noelle-Marie Harrington v. City of Attlebro, No. 15-12769, 2018 WL 475000 (D. Mass. Jan. 17, 2018)
- Nokes v. Miami Univ., No. 17-00482, 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017)
- North Haven Bd. of Education v. Bell, 456 U.S. 512 (1982)
- North v. West Virginia Bd. of Regents, 233 S.E.2d 411 (W. Va. 1977)
- Nungesser v. Columbia U., 244 F. Supp. 3d 345 (S.D.N.Y. 2017), appeal withdrawn, No. 17–900, 2017 WL 4404575 (2d Cir. July 10, 2017)
- O'Brien v. Mass. Bay Transp. Auth., 162 F.3d 40 (1st Cir. 1998)
- O'Connor v. Davis, 126 F.3d 112 (2d Cir. 1997)
- Ober v. EPA, 84 F.3d 304 (9th Cir. 1996)
- Oden v. Northern Marianas College, 440 F.3d 1085 (9th Cir. 2006)
- Oliveras-Sifre v. Puerto Rico Dept. of Health, 214 F.3d 23 (1st Cir. 2000)
- Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843 (9th Cir. 2014)
- Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999)
- Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998)
- Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S. Ct. 2049 (2020)
- Overbrook Land Holdings, LLC v. Commissioner, 28 F.4th 700 (6th Cir 2022)
- Overdam v. Texas A&M Univ., 43 F.4th 522 (5th Cir. 2022)
- Pacheco v. St. Mary's Univ., No. 15-cv-1131, 2017 WL 2670758 (June 20, 2017)
- Palko v. Connecticut, 302 U.S. 319 (1937)
- Pangea Legal Servs. v. U.S. Dep't of Homeland Sec., 501 F. Supp. 3d 792 (N.D. Cal. 2020)
- Paralyzed Veterans of Am. v. Civil Aeronautics Bd., 752 F.2d 694 (D.C. Cir. 1985)
- Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist., No. 22-cv-78, 2022 WL 4356109 (N.D. IA, Sept. 20, 2022)
- Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist., 83 F.4th 658 (8th Cir. 2023)
- Parents Defending Educ. v. Olentangy Loc. Sch. Dist., 684 F.Supp.3d 684 (S.D. Ohio 2023)
- Parents for Priv. v. Barr, 949 F.3d 1210 (9th Cir.), cert. denied, 141 S. Ct. 894 (2020)
- Parr v. Woodmen of the World Life Ins., 791 F.2d 888, 892 (11th Cir. 1986)
- Patane v. Clark, 508 F.3d 106 (2d Cir. 2007)

AR_280876

- Patterson v. Hudson Area Sch., 551 F.3d 438 (6th Cir. 2009)
- Paul v. Davis, 424 U.S. 693 (1976)
- Pederson v. La. State Univ., 213 F.3d 858 (5th Cir. 2000)
- Peltier v. Charter Day Sch., Inc., 384 F.Supp.3d 579 (E.D. NC, 2019)
- Peltier v. Charter Day Sch., Inc., 37 F.4th 104 (4th Cir. 2022), cert. denied, 143 S. Ct. 2657 (2023)
- Pennhurst State Sch. & Hospital v. Halderman, 451 U.S. 1 (1981)
- Pennsylvania v. DeVos, 480 F.Supp.3d 47 (D.D.C. 2020)
- Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633 (1990)
- Perlot v. Green, 609 F. Supp. 3d 1106 (D. Idaho 2022)
- Peterson v. City of Greenville, 373 U.S. 244 (1963)
- Petrosino v. Bell Atl., 385 F.3d 210 (2d Cir. 2004)
- Phillips v. St. George's Univ., No. 07-1555, 2007 WL 3407728 (E.D.N.Y. Nov. 15, 2007)
- Pierce v. Soc'y of Sisters, 268 U.S. 510 (1925)
- Planned Parenthood of Hous. v. Sanchez, 403 F.3d 324 (5th Cir. 2005)
- Plummer v. Univ. of Houston, 860 F.3d 767 (5th Cir. 2017)
- Plyler v. Doe, 457 U.S. 202 (1982)
- Pogorzelska v. VanderCook Coll. of Music, No. 19-05683, 2023 WL 3819025 (N.D. Ill. June 5, 2023)
- Polite v. Dougherty Cnty. Sch. Sys., 314 F. App'x 180 (11th Cir. 2008)
- Portland Cement 486 F.2d 375 (D.C. Cir. 1973)
- Porto v. Town of Tewksbury, 488 F.3d 67 (1st Cir. 2007)
- Powell v. Montana State Univ., No. 17-00015, 2018 WL 6728061 (D. Mont. Dec. 21, 2018)
- Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79 (2d Cir. 2004)
- Prasad v. George Washington Univ., No. 15-1779, 2019 WL 2605095 (D.D.C. June 25, 2019)
- Pratt v. Indian River Cent. Sch. Dist., 803 F. Supp. 2d 135 (N.D.N.Y. 2011)
- Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)
- Prof'l Plant Growers Ass'n v. Dep't of Agric., 942 F.Supp. 27 (D.D.C. 1996)
- Pryor v. United Airlines, Inc., 791 F.3d 488 (4th Cir. 2014)
- PSI Upsilon of Phil v. Univ. of Penn, 404 Pa. Super 604 (May 16, 1991)
- Pub. Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993)
- Qualls v. Cunningham, 183 Fed. Appx. 564 (7th Cir. 2006)
- Radwan v. Manuel, 55 F.4th 101 (2d Cir. 2022)
- Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906 (8th Cir. 2003)
- Religious Sisters of Mercy v. Azar, No. 16-00386, 00432, 2021 WL 191009 (D.N.D. 2021)
- Rendell-Baker v. Kohn, 457 U.S. 830 (1982)
- Reno v. ACLU, 521 U.S. 844 (1997)
- Republican Nat'l Comm. v. Fed. Election Comm'n, 76 F.3d 400 (D.C. Cir. 1996)
- Republican Party v. Pritzker, 973 F.3d 760 (7th Cir. 2020)
- Retail Clerks v. Schermerhorn, 375 U.S. 96 (1963)
- Rice v. Santa Fe Elevator Corp., 331 U.S. 218 (1947)
- Richardson v. N.Y. Dep't of Correctional Serv., 180 F.3d 426 (2d Cir. 1999)
- Rios v. Direct Mail Express, 435 F. Supp.2d 1199 (S.D. Fla 2006)
- RJR Nabisco Inc. v. European Cmty, 136 S. Ct. 2090 (2016)
- Roberts v. Glenn Indus. Group, Inc., 998 F.3d 111 (4th Cir. 2021)

AR_280877

- Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)
- Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486 (M.D. Fla. 1991)
- Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703 (9th Cir. 2010)
- Roe v. Critchfield, No. 23-00315, 2023 WL 6690596 (D. Idaho Oct. 12, 2023)
- Roe v. Cypress-Fairbanks Indep. Sch. Dist., No. 20-20657, 2022 WL 16918818 (Nov. 14, 2022)
- Roe v. Marshall Univ. Bd. of Governors, 668 F. Supp. 3d 461 (S.D.W. Va. 2023)
- Roe v. Wade, 410 U.S. 113 (1973)
- Rollins v. Cardinal Stritch Univ., 626 N.W.2d 464 (MN 2001)
- Ross v. Corp. of Mercer Univ., 506 F. Supp. 2d 1325, 1357 (M.D. Ga. 2007)
- Rossley v. Drake Univ., 336 F.Supp.3d 959 (SD Iowa 2018)
- Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114 (10th Cir. 2008)
- Rowles v. Curators of Univ. of Mo., 983 F.3d 345(8th Cir. 2020)
- Ruane v. Shippensburg Univ., 871 A.2d 859 (Pa. Cmwlth. App. 2005)
- Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47 (2006)
- S.B. ex rel. A.L. v. Bd. of Educ. Of Hartford Cty., 819 F.3d 69, 75-76 (4th Cir. 2016)
- S.C. v. Met. Gov't of Nashville, No. 3:17-cv-01098, 2022 WL 127978 (M.D. TN, Jan. 12, 2022)
- S.H. v. Lower Merion Sch. Dist., 729 F.3d 248 (3d Cir. 2013)
- S.S. v. E. Ky. Univ., 532 F.3d 445 (6th Cir. 2008)
- Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115 (1989)
- Salisbury v. Hickman, 974 F. Supp. 2d 1282 (E.D. Cal. 2013)
- Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist. 647 F.3d 156 (5th Cir. 2011)
- Santosky v. Kramer, 455 U.S. 745 (1982)
- Saphir by and through Saphir v. Broward Cnty. Public Sch.s, 744 Fed.Appx. 634 (11th Cir. 2018)
- Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3d Cir. 2001)
- Sch. Bd. of Nassau Cnty. v. Arline, 480 U.S. 273 (1987)
- Schaer v. Brandeis Univ., 716 N.E.2d 1055 (Mass. App. 1999)
- Schaumleffel v. Muskingum Univ., No. 17-463, 2018 WL 1173043 (S.D. Ohio Mar. 6, 2018)
- Schrader v. Emporia State Univ., No. 19-2387, 2021 WL 4284543 (D. KS Sept. 21, 2021)
- Se. Comm. Coll. v. Davis, 442 U.S. 397 (1979)
- Sea Island Broad. Corp. of S.C. v. FCC, 627 F.2d 240 (D.C. Cir.), cert. denied, 449 U.S. 834 (1980)
- Seiwert v. Spencer-Owen Cmty. Sch. Corp., 497 F. Supp. 2d 942 (S.D. Ind. 2007)
- Sewell v. Monroe City Sch. Bd., 974 F.3d 977 (5th Cir. 2020)
- Shaboon v. Duncan, 252 F.3d 722 (5th Cir. 2001)
- Shank v. Carleton College, No. 19-3047, 2021 WL 1228068 (8th Cir., April 2, 2021)
- Sharif by Salahuddin v. New York State Educ. Dept., 709 F. Supp. 345 (S.D.N.Y. 1989)
- Sheppard v. Visitors of Va. State Univ., 993 F.3d 230 (4th Cir. 2021)
- Sierra Club v. E.P.A., No. 15-1246, 2017 WL 3027081 (D.C. Cir. July 18, 2017)
- Sill v. Pa. State Univ., 462 F.3d 463 (3d Cir. 1972)
- Silva v. Baptist Health S. Florida, Inc., 856 F.3d 824 (11th Cir. 2017)
- Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170 (10th Cir. 2007)
- Slater v. Douglas Cnty., 743 F. Supp. 2d 1188 (D. Or. 2010)
- Smith v. Metro. Sch. Dist. Perry Twp., 128 F.3d 1014 (7th Cir. 1997)
- Smith v. Stechel, 510 F.2d 1162 (9th Cir. 1975)

AR_280878

- Smock v. Bd. of Regents of Univ. of Mich., 353 F. Supp. 3d 651 (E.D. Mich. 2018)
- Smolsky v. Consol. Rail Corp., 780 F. Supp. 283 (E.D. Pa. 1991), reconsideration denied, 785 F. Supp. 71 (E.D. Pa. 1992)
- Smyth v. Lubbers, 398 F. Supp. 777 (W.D. Mich. 1975)
- Snyder-Hill v. Ohio State Univ., 48 F.4th 686 (6th Cir. 2022) reh'g denied, 54 F.4th 963 (6th Cir. 2022), cert. denied, 143 S. Ct. 2659 (2023)
- Sommers v. Budget Mktg., Inc., 667 F.2d 748 (8th Cir. 1982)
- Somoza v. Univ. of Denver, 513 F.3d 1206 (10th Cir. 2008)
- Soper v. Hoben, 195 F.3d 845, 855 (6th Cir. 1999)
- Soule by Stanescu v. Connecticut Ass'n of Sch., Inc., No. 20--00201, 2021 WL 1617206 (D. Conn. Apr. 25, 2021), aff'd, 57 F.4th 43 (2d Cir. 2022), and vacated and remanded sub nom. Soule v. Connecticut Ass'n of Sch., Inc., 90 F.4th 34 (2d Cir. 2023)
- Southwell v University of Incarnate Word, No. 04-97-00817, 974 S.W.2d 351 (July 15, 1998)
- Speake v. Grantham, 317 F. Supp. 1253 (S.D. Miss. 1970)
- Speech First Inc v Cartwright, 32 F.4th 1110 (11th Cir. 2022)
- Speech First v. Fenves, 979 F.3d 319 (5th Cir. 2020)
- Speech First v. Khator, No. 22-00582, 2022 WL 1638773 (S.D. Tex. May 20, 2022)
- Speech First, Inc. v. Cartwright, 32 F.4th 1110 (11th Cir. 2022)
- Spencer v. Univ. of N.M. Bd. of Regents, No. 15-00141, 2016 WL 10592223 (D.N.M. Jan. 11, 2016)
- St. Mary Med. Ctr. v. Becerra, 581 F. Supp. 3d 119 (D.D.C. 2022)
- State v. Hinchliffe, 186 Vt. 487 (2009)
- State v. Richards, 127 Idaho 31 (Ct. App. 1995)
- State v. Thorne, 333 S.E.2d 817 (1985)
- Stiles ex. rel. D.S. v. Grainger Cnty., Tenn., 819 F.3d 834, 849 (6th Cir. 2016)
- Stiles v. Brown Univ., No. 21--00497 (D.R.I. Jan. 25, 2022)
- Stilwell v. Off. of Thrift Supervision, 569 F.3d 514 (D.C. Cir. 2009)
- Stover v. Coll. Of William & Mary, 635 F. Supp. 3d 429 (E.D. Va. 2022)
- Sturgis v. Copiah Cty. Sch. Dist., No. 10–00455, 2011 WL 4351355 (S.D. Miss. Sept. 15, 2011)
- Swearingen v. Pleasanton Unified Sch. Dist., 641 F. Supp. 3d 1141 (D. Kan. 2022)
- Swingle v. Henderson, 142 F. Supp. 2d 625 (D.N.J. 2001)
- T.C. v. Hempfield Area Sch. Dist., No. 17-1507, 2018 WL 3707419 (W.D. Penn. Aug. 03, 2018)
- T. C. on behalf of her minor children SC v. Met. Gov't of Nashville & Davidson Cty., Tenn, Nos. 3:17-cv-01098, 2018 WL 3348728 (M.D. Tenn. July 9, 2018)
- T.E. v. Pine Bush Cent. Sch. Dist., 58 F.Supp.3d 332 (S.D.N.Y. 2014)
- T.Y. v. Shawnee Mission Sch. Dist., No. 17-2589, 2018 WL 2722501 (D. Kan. June 6, 2018)
- Tabura v. Kellogg USA, 880 F.3d 544 (10th Cir. 2018)
- Tennessee v. U.S. Dep't of Educ., 615 F. Supp. 3d 807 (E.D. Tenn. 2022)
- Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc., 173 F.3d 988 (6th Cir. 1999)
- Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1980)
- Theno v. Tonganoxie Unified Sch. Dist. No. 464, 377 F. Supp. 2d 952 (D. Kansas 2005)
- Thomas v. Bd. of Regents of Univ. of Nebraska, No. 20-3081, 2022 WL 1491102 (D. Neb. May. 11, 2022)

AR_280879

- Thompson v. Clark, 741 F.2d 401 (D.C. Cir. 1984)
- Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011)
- Thorne v. Bailey, 846 F.2d 241 (4th Cir. 1988)
- Threat v. City of Cleveland, 6 F.4th 672 (6th Cir. 2021)
- Tinker v. Des Moines Independent Cmty. Sch. Dist., 393 U.S. 503 (1969)
- Townsend v. Swank, 404 U.S. 282 (1971)
- Troxel v. Granville, 530 U.S. 57 (2000)
- Truax v. Raich, 239 U.S. 33 (1915)
- Tucker v. Univ. of New Mexico Bd. of Regents, 618 F. Supp. 3d 1201 (D.N.M. 2022)
- Tn. v. U.S. Dep't of Arg., 665 F.Supp.3d 880 (E.D. Tn. 2023)
- U.S. Telecom Ass'n v. FCC, 825 F.3d 674 (D.C. Cir. 2016)
- U.S. v. Articles of Drug Consisting of 203 Paper Bags, 818 F.2d 569 (7th Cir. 1987)
- U.S. v. Darby, 312 U.S. 100 (1941)
- U.S. v. Joy, 192 F.3d 761 (7th Cir. 1999)
- U.S. v. Scarpa, 913 F.2d 993 (2d Cir. 1990)
- U.S. v. South Carolina, 720 F.3d 518 (4th Cir. 2013)
- U.S. v. Miami Univ., 294 F.3d 797 (6th Cir. 2002)
- U.S. v. Virginia, 518 U.S. 515 (1996)
- U.S. v. Wardlow, 830 F.3d 817 (8th Cir. 2016)
- U.S. v. Yung, 37 F.4th 70 (3d Cir. 2022)
- Ulane v. Eastern Airlines, 742 F.2d 1081 (7th Cir. 1984), not followed as dicta by Hively v. Ivy Tech Cmty. Coll. of Indiana, 853 F.3d 339 (7th Cir. 2017)
- Univ. of Michigan v. Ewing, 474 U.S. 214 (1985)
- Vance v. Terrazas, 444 U.S. 252 (1980)
- Vanderhurst v. Colo. Mountain Coll. Dist., 16 F. Supp. 2d 1297 (D. Colo. 1998)
- Varlesi v. Wayne State Univ., 909 F. Supp. 2d 827 (E.D. Mich. 2012)
- Vengalattore v. Cornell Univ., 36 F.4th 87 (2d Cir. 2022)
- Victim Rights Law Center v. Cardona, 552 F.Supp.3d 104 (D. Mass 2021)
- Victim Rights Law Center v. Rosenfelt, 988 F.3d 556 (1st Cir. 2021)
- Videckis v. Pepperdine Univ., 150 F. Supp. 3d 1151 (C.D. Cal. 2015)
- Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498-99 (1982)
- Vinson v. Taylor, 753 F.2d 141 (D.C. Cir. 1985)
- Viscecchia v. Alrose Allegria LLC, 117 F. Supp. 3d 243 (E.D.N.Y. 2015)
- Vlaming v. W. Point Sch. Bd., 10 F.4th 300 (4th Cir. 2021)
- Vlaming v. W. Point Sch. Bd., 302 Va. 504 (Va. 2023)
- W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943)
- Walker v. City of Lakewood, 272 F.3d 1114 (9th Cir. 2001)
- Wallace v. Pyro Mining Co., 789 F. Supp. 867 (W.D. Ky. 1990), aff'd, 951 F.2d 351 (6th Cir. 1991)
- Walsh v. Hodge, 975 F.3d 475, 487 (5th Cir. 2020), cert. denied, 141 S.Ct. 1693 (2021)
- Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305 (1985)
- Wamer v. Univ. of Toledo, 27 F.4th 461 (6th Cir. 2022)
- Watson v. Beckel, 242 F.3d 1242 (10th Cir. 2001)

[ PAGE  \* MERGEFORMAT ]

- Weckhorst v. Kansas State Univ., 241 F. Supp. 3d 1154 (D. Kan. 2017) aff'd sub nom, Farmer v. Kansas State Univ., 918 F. 3d 1094 (10th Cir. 2019)
- Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138 (2d. Cir. 2002)
- Wellner v. Minnesota State Junior College Bd., 487 F.2d 153 (8th Cir. 1973)
- West Virginia v. EPA, 597 U.S. 697 (2022)
- Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ., 858 F.3d 1034 (7th Cir. 2017) abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker, 973 F.3d 760, 762 (7th Cir. 2020)
- White v. Gaston Cnty. Bd. of Educ., No. 16-552, 2018 WL 1652099 (W.D.N.C. Apr. 5, 2018)
- Whiteside v. Kay, 446 F. Supp. 716 (W.D. La. 1978)
- Williams v. Bd. of Regents of Univ. Sys. of Georgia, 477 F.3d 1282 (11th Cir. 2007)
- Williams v. Howell Cheney Technical High Sch., No. 12-00043, 2012 WL 5507259 (D. Conn. Nov. 14, 2012)
- Williams v. Indep. Sch. Dist. No. 5 of Tulsa Cty., No. 19-00499, 2021 WL 164523 (N.D. Ok. Apr. 27, 2021)
- Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022), cert. denied, 143 S. Ct. 2414 (June 30, 2023)
- Williams v. Port Huron Sch. Dist., 455 Fed. Appx. 612 (6th Cir. 2012)
- Williamson v. City of Houston, Tex., 148 F.3d 462 (5th Cir. 1998)
- Willingham v. Macon Tel. Pub. Co., 507 F.3d 1084 (5th Cir. 1975)
- Wilson v. Beaumont Ind. Sch. Dist., 144 F. Supp. 2d 690 (E.D. Tex. 2001)
- Winegar v. Des Moines Indep. Comm. Sch. Dist., 20 F.3d 895 (8th Cir. 1994)
- Winnick v. Manning, 460 F.2d 545 (2d Cir. 1972)
- Wisconsin v. Yoder, 406 U.S. 205 (1972)
- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626, 2021 WL 3932000 (N.D. Cali. Sept. 2, 2021)
- Woodby v. INS, 385 U.S. 37 (1966)
- Wooley v. Maynard, 430 U.S. 705 (1977)
- Wort v. Vierling, slip op. (C.D. Ill. Sept. 4, 1984), aff'd on other grounds, 778 F.2d 1233 (7th Cir.1985)
- Wyeth v. Levine, 555 U.S. 555 (2009)
- Wynne v. Tufts Univ. Sch. of Med. (Wynne I), 932 F.2d 19 (1st Cir. 1991)
- Wynne v. Tufts Univ. Sch. of Med. (Wynne II), 976 F.2d 791 (1st Cir. 1992)
- Xiaolu Peter Yu v. Vassar Coll., 97 F.Supp.3d 448 (S.D.N.Y. 2015)
- Yakus v. U.S., 321 U.S. 414 (1944)
- Yeager v. FirstEnergy Generation Corp., 777 F.3d 362 (6th Cir. 2015)
- Yeasin v. Univ. of Kansas, 360 P.3d 423 (Kan. App. 2015)
- Young v. United Parcel Service, Inc., 575 U.S. 206 (2015)
- Yu v. Univ. of La Verne, 196 Cal. App. 4th 779 (2011)
- Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655 (2d Cir. 2012)
- Zinermon v. Burch, 494 U.S. 113 (1990)
- Zukle v. Regents of Univ. of Calif., 166 F.3d 1041 (9th Cir. 1999)

**Federal Court Filings**

- Arnold v. Barbers Hill, No. 20-cv-01802 (S.D. Tex. July 23, 2021) - U.S. Statement of Interest

AR_280881

- Boyertown Area Sch. Dist. v. Doe, 897 F.3d 518 (No. 17-3113) - Amicus Curiae Brief of the National PTA, GLSEN, American School Counselor Assoc. National Assoc. of School Psychologists, Delaware PTA, New Jersey PTA, and Penn. PTA in Support of Appellees,
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Ed. Amicus Brief in Support of Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellant Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - App Response Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - NWLC Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - U.S. Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - App Response to U.S. Amicus Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Order Granting Rehearing En Banc
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Amicus Brief in Support of Reversal
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Response to Amicus Brief in Support of Reversal
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellant Supp Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Appellee Supp Brief
- Brown v. Ariz., No. 20-15568 (9th Cir. 2022) - Opinion
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Cmplt.
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - U.S. Statement of Interest
- B.P.J. v. W. Va. State Bd. of Educ., No. 23--1078 (4th Cir. Apr. 3, 2023) – U.S. Amicus Brief
- B.P.J. v. W. Va. State Bd. of Educ., No. 23--1078 (4th Cir. 2023) – Appellant Motion for Stay Pending Appeal
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Stark Dec.
- B.P.J. v. W. Va. State Bd. of Educ., No. 21--00316 (S.D. W.Va. 2021) - Memo in Support of Motion for PI
- Chicago Alliance Against Sex. Expl. v. Cardona, No. 21-1853 (1st Cir. 2022) - Appellant Response to Motion to Hold
- Czerwienski v. Harvard case. No. 22-10202 (D. Mass 2022) - U.S. Statement of Interest
- Doe nka ME v. Edgewood Indep. Sch. Dist., No. 16--01233 (2018) – Expert Report
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Cmplt.
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Def. MTD
- Equality Fla. v. DeSantis, No. 22-134 (N.D. Fla. 2022) - Order on MTD
- E.H. v. Valley Christian Acad., No. 21-07574 (C.D. Cal. 2021) - Order Granting in Part MTD and Judicial Notice
- Fairfax Cnty. Sch. Bd. v. Doe, No 21-968 (2022) - U.S. Amicus Brief
- Farmer v. Kansas State Univ., No. 16--02256 (D. Ka. 2016) – U.S. Statement of Interest
- G.G. v. Gloucester Cnty. Sch. Bd., No. 15-2056 (4th Cir. 2015) – U.S. Amicus Brief
- G.G. v. Gloucester Cnty. Sch. Bd., No. 15-2056 (4th Cir. 2015) – U.S. Statement of Interest
- Gloucester Cnty. Sch. Bd. v. G.G., No. 16-273 (2017) – Amicus Brief
- Grimm v. Gloucester Cnty. Sch. Bd., No. 19-1952 (4th Cir. Nov. 25, 2019) - InterAct Amicus Brief
- Grimm v. Gloucester Cnty. Sch. Bd., No. 19-1952 (4th Cir. Nov. 25, 2019) - Rehearing Amicus Brief of Sch. Administrators from Twenty-Nine States and the Dist. of Columbia in Support of Plaintiff-Appellee Gavin Grimm
- Harris v. Forklift Systems, No. 92-1168 (U.S. 1993) - Reply Brief of Petitioner
- Hecox v. Little, No. 20-35813, 35815 (10th Cir. 2020) - interAct Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - App. Opening Brief

[ PAGE  \* MERGEFORMAT ]

- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - Reply Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - App. Response Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - 2nd Supp. Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - SSA Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - ACLU Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - NASW Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - U.S. Amicus Brief
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - ADF Memo
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2023) - Opinion
- Kluge v. Brownsburg Cmty. Sch. Corp, No. 21-2475 (7th Cir. 2021) - Petition for Rehearing En Banc
- Kollaritsch v. Mich. State Univ. Bd. of Trustees (2020) - Petition for Cert
- L.C. v. Williamsburg Cnty. Sch. Dist., 2018-CP-45-00359 (S.C. Ct. Com. Pl. Aug. 14, 2018) - Compl.
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Petition for Cert
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Petitioner Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Opp'n Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 (2021) - Reply Petitioner Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255  (2021) - U.S. Amicus Brief
- Mahanoy Area Sch. Dist. v. B.L. by & through Levy, No. 20-255 141 S. Ct. 2038 (2021) - Sch. Bd. Amicus Brief
- Peltier v. Charter Day Sch., Inc., No. 20-1001(L), 20-1023 (4th Cir. Nov. 18, 2021) - Rehearing En Banc Brief for the U.S. as Amicus Curiae
- Peltier v. Charter Day Sch., Inc., No. 20-1001(L), 20-1023 (4th Cir. Nov. 18, 2021) - En Banc Opinion
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Appellants Opening Brief (May 4, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Opening and Response Brief of Plaintiffs-Appellees (Jul.6, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Appellants' Response and Reply Brief (Sept. 14, 2020)
- Peltier v. Charter Day School No. 20-1001 (4th Cir. 2020) Reply Brief of Plaintiffs-Appellees (Oct. 2, 2020)
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - Defs Suppl Br Opp. to PI
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - ED Mem Supp Defs Cross-MSJ
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - ED Opp'n to PI
- PA v. DeVos, No. 20--01468 (D. D.C. 2020) - Plf MSJ
- Sch. of the Ozarks, Inc. v. Biden, No. 21-2270 (8th Cir. 2021) – Appellees Brief
- Sch. of the Ozarks v. Biden, No. 21-3089 (W.D. Miss. 2021) - Defs Sugg. Opp'n Mot PI
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – U.S. Amicus Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – Appellant Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Response Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Third Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5104 (6th Cir. 2022) – App. Fourth Brief
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 22-5125 (6th Cir. 2022) - Opinion
- S.C. v. Metro. Gov. of Nashville and David. Cnty., Tn., No. 17-01098 (M.D. Tenn. 2022)

AR_280883

- *Soule v. Conn. Assoc. of Schools, Inc.* 90 F.4th 34, 2023 WL 3248356. En Banc Brief for States of New York, Hawai'i, California, Colorado, Delaware, Illinois, Maine, Massachusetts, Minnesota, Nevada, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia as Amici Curiae in Support of Appellees,
- Spaw v. Stepping Stone Sch., No. 20--00741 (W.D. Tx. 2020) – Amended Complaint
- Tedeschi v. Wagner College, 49 N.Y.2d 652 (1980)
- Texas v. U.S., No. 16--00054 (N.D. Tex. March 3, 2017) - Plf's Notice of Voluntary Dismissal
- Tx v. Cardona, No. 23- 00604 (N.D. Tex. Jun. 14, 2023) - Cmplt.
- Tn. v. U.S. Dep't of Educ., No. 22-5807 (6th Cir. 2022) - Amicus Brief of Amici Curiae of 19 states ISO neither party
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Defense of Freedom Inst. Amicus Br.
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - FML Amicus Brief
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Mountain States Legal Foundation Amicus Brief
- Tn. v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - NEA et al. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Reply in Support of Motion for Reconsideration
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Appellant Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Appellant Reply Brief
- TN v.  U.S. Dep't of Ed., No. 22-8507 (6th Cir.) - Brief of Intervenors-Appellees, Jan. 24, 2023
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Thomas More Soc, et al. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - Tx. Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - WLF Amicus Brief
- TN v. U.S. Dep't of Ed., No. 22-5807 (6th Cir. 2023) - LONANG Inst. Amicus Brief
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Cmplt.
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Intervenors-Plfs Proposed Verified Cmplt.
- TN v. ED, No. 21-00308 (E.D. Tn. 2021) - Motion to Request Ruling on Motion to InterveneTn. v. U.S. Dep't of Agr., No. 22-257 (E.D. Tn. 2023) - Opinion
- Tooley v. Van Buren Pub. Sch., No. 14--13466 (E.D. Mich. 2015) - U.S. Statement of Interest
- Thomas v. Bd. Of Regents of the Univ. of Neb., No. 20--0381 (D. Neb. June 11, 2021) - U.S. Statement of Interest
- Thomas v. Bd. Of Regents of the Univ. of Neb., No. 20--0381 (D. Neb. June 11, 2021) - Brief in Support of MTD
- U.S. v. Texas, No. 22-58 (2023) – Brief for Petitioners
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) - Def Opp'n to PI
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) - Def Pre-Trial Brief
- Victim Rights Law Center v. DeVos, No. 20--11104 (D. Mass. 2020) – FACE Amicus Brief
- Victim Rights Law Center v. Cardona, No. 20-11104 (D. Mass 2021) - Findings of Fact, Rulings of Law, and Order for Judgment (Jul. 28, 2021)
- Victim Rights Law Center v. Cardona, No. 20-11104 (D. Mass 2021) - Consent Motion to Hold Appeal in Abeyance
- Williams v. Kincaid, 45 F.4th 759 (4th Cir. 2022) - Appellees Pet for Rehearing En Banc
- W. Va. v. B.P.J., No. 22-800 (2023) - App. to Vacate Injunction
- W. Va. v. B.P.J., No. 22-800 (2023) - Amicus Brief in Support of Applicants

[ PAGE  \* MERGEFORMAT ]

- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626 (N.D. Cali. 2021) - Cmplt.
- Women's Student Union v. U.S. Dep't of Educ., No. 21-01626 (N.D. Cali. 2021) - Plfs' motion to stay appeal

**Federal Statues**

- 5 U.S.C. § 551
- 5 U.S.C. § 552
- 5 U.S.C. § 601
- 18 U.S.C. § 1591
- 20 U.S.C. § 407
- 20 U.S.C. § 1400 et seq
- 20 U.S.C. § 1070a
- 20 U.S.C. § 1092 - Institutional and Financial Assistance Information for Students
- 20 U.S.C. § 1138
- 20 U.S.C. § 1221 - Short Title; Applicability; Definitions
- 20 U.S.C. § 1221e-3 - General Authority of Secretary
- 20 U.S.C. § 1232 – Regulations
- 20 U.S.C. § 1401 – Definitions
- 20 U.S.C. § 1681 – Sex
- 20 U.S.C. § 1682 - Federal Administrative Enforcement; Report to Congressional Committees
- 20 U.S.C. § 1683 - Judicial Review
- 20 U.S.C. § 1684 - Blindness or Visual Impairment; Prohibition against Discrimination
- 20 U.S.C. § 1685 - Authority under other Laws Unaffected
- 20 U.S.C. § 1686 - Interpretation with Respect to Living Facilities
- 20 U.S.C. § 1687 - Interpretation of Program or Activity
- 20 U.S.C. § 1688 - Neutrality with Respect to Abortion
- 20 U.S.C. § 1689 - Task Force on Sexual Violence in Education
- 20 U.S.C. § 7111–7122
- 20 U.S.C. § 7271–7275
- 20 U.S.C. § 7281
- 20 U.S.C. § 3403
- 20 U.S.C. § 3474 - Rules and Regulations
- 20 U.S.C. § 7801 – Definitions
- 22 U.S.C. § 2151
- 26 U.S.C. § 501
- 29 U.S.C. § 151–169
- 29 U.S.C. § 201 et seq
- 29 U.S.C. § 207 - Maximum Hours
- 29 U.S.C. § 701 et seq
- 34 U.S.C. § 12291 – Definitions and Grant Provisions
- 42 U.S.C. § 2000bb et seq
- 42 U.S.C. § 2000d et seq
- 42 U.S.C. § 2000e et seq

[ PAGE   \* MERGEFORMAT ]

AR_280885

- 42 U.S.C. § 2000gg
- 42 U.S.C. § 6101 et seq
- 42 U.S.C. § 12101 et seq
- 42 U.S.C. § 12202
- 42 U.S.C. § 1320d et seq
- 42 U.S.C. § 19403
- 42 U.S.C. § 18001 et seq
- 42 U.S.C. § 18116

**Federal Regulations**

- 24 C.F.R. § 100.600 - Quid Pro Quo and Hostile Environment Harassment
- 26 C.F.R. § 38
- 28 C.F.R. Pt. 35, App. C
- 29 C.F.R. § 38.7 – Discrimination Prohibited Based on Sex
- 29 C.F.R. § 38.8 – Discrimination Prohibited Based on Pregnancy
- 34 C.F.R. § 86.31 – Education Programs or Activities
- 34 C.F.R. § 97.104
- 34 C.F.R. § 97.108
- 34 C.F.R. § 97.113
- 34 C.F.R. § 99.1 – To Which Educational Agencies or Institutions do these Regulations Apply
- 34 C.F.R. § 99.7
- 34 C.F.R. § 100.6 – Compliance Information
- 34 C.F.R. § 100.7 – Conduct of Investigations
- 34 C.F.R. § 100.8 – Procedure for Effecting Compliance
- 34 C.F.R. § 100.9 – Hearings
- 34 C.F.R. § 100.10 – Decisions and Notices
- 34 C.F.R. § 100.11 – Judicial Review
- 34 C.F.R. § 101.1 – Scope of Rules
- 34 C.F.R. § 104.33 – Free Appropriate Public Education
- 34 C.F.R. § 104.34 – Educational Setting
- 34 C.F.R. § 104.35 – Evaluation and Placement
- 34 C.F.R. § 104.36 – Procedural Safeguards
- 34 C.F.R. § 106.1 – Purpose and Effective Date
- 34 C.F.R. § 106.2 – Definitions
- 34 C.F.R. § 106.12-15
- 34 C.F.R. § 106.21
- 34 C.F.R. § 106.32
- 34 C.F.R. § 106.40
- 34 C.F.R. § 106.41
- 34 C.F.R. § 106.57
- 34 C.F.R. § 110.34 – Prohibition against Intimidation or Retaliation
- 34 C.F.R. § 270.7 – What Definitions Apply to this Program
- 34 C.F.R. § 300.17 – Free Appropriate Public Education

[ PAGE   \* MERGEFORMAT ]

- 34 C.F.R. § 300.300 – Parental Consent
- 34 C.F.R. § 300.301 – Initial Evaluations
- 34 C.F.R. § 300.302 – Screening for Instructional Purposes is not Evaluation
- 34 C.F.R. § 300.303 – Reevaluations
- 34 C.F.R. § 300.304 – Evaluation Procedures
- 34 C.F.R. § 300.305 – Additional Requirements for Evaluation and Reevaluations
- 34 C.F.R. § 300.306 – Determination of Eligibility
- 34 C.F.R. § 300.307 – Specific Learning Disabilities
- 34 C.F.R. § 300.308 – Additional Group Members
- 34 C.F.R. § 300.309 – Determining the Existence of a Specific Learning Disability
- 34 C.F.R. § 300.310 – Observation
- 34 C.F.R. § 300.311 – Specific Documentation for Eligibility Determination
- 34 C.F.R. § 300.320 – Definition of Individualized Education Program
- 34 C.F.R. § 300.321 – IEP Team
- 34 C.F.R. § 300.322 – Parent Participation
- 34 C.F.R. § 300.323 - When IEPs Must be in Effect
- 34 C.F.R. § 300.324 - Development, Review, and Revision of IEP
- 34 C.F.R. § 300.325 - Private Sch. Placements by Public Agencies
- 34 C.F.R. § 300.326 - [Reserved]
- 34 C.F.R. § 300.327 - Educational Placements
- 34 C.F.R. § 300.328 - Alternative Means of Meeting Participation
- 34 C.F.R. § 668, Subpart D, App. A
- 34 C.F.R. § 668.22
- 34 C.F.R. § 668.46 Institutional Security Policies and Crime Statistics
- 45 C.F.R. § 46.104
- 45 C.F.R. § 75.303
- 45 C.F.R. § 86
- 45 C.F.R. § 86.1 – Purpose and Effective Date
- 45 C.F.R. § 86.2
- 45 C.F.R. § 86.41 – Athletics
- 45 C.F.R. § 86.71 – Enforcement Procedures
- 24 C.F.R. § 5.2003
- 28 C.F.R. § 42.601
- 28 C.F.R. § 42.613
- 29 C.F.R. § 825.220
- 29 C.F.R. § 1691.1
- 29 C.F.R. § 1697.13
- 34 C.F.R. § 99.31
- 34 C.F.R. § 99.3
- 34 C.F.R. § 99.5
- 34 C.F.R. § 100.7
- 34 C.F.R. § 104.44
- 34 C.F.R. § 300.23

[ PAGE   \* MERGEFORMAT ]

- 45 C.F.R. § 668.46
- 39 Fed. Reg. 22228, 22235-36 (Jun. 20, 1974)
- 40 Fed. Reg. 24128, 24141-42 (Jun. 5, 1975)
- 40 Fed. Reg. 24128-34 (Jun. 4, 1975)
- 40 Fed. Reg. 52655-57 (Nov. 11, 1975)
- 44 Fed. Reg. 17168 (1979)
- 44 Fed. Reg. 71413-23 (Dec. 11, 1979)
- 45 Fed. Reg. 30803 (May 9, 1980)
- 45 Fed. Reg. 30955-65 (May 9, 1980)
- 47 Fed. Reg. 32526-57 (Jul. 28, 1982)
- 58 Fed. Reg. 51565 (Oct. 4, 1993)
- 59 Fed. Reg. 11448 (Mar. 10, 1994)
- 62 Fed. Reg. 12034 (Mar. 13, 1997)
- 65 Fed. Reg. 66092 (Nov. 2, 2000)
- 65 Fed. Reg. 68050 (Nov. 13, 2000)
- 66 Fed. Reg. 5512 (Jan. 19, 2001)
- 67 Fed. Reg. 41455 (June 18, 2002)
- 73 Fed. Reg. 74806, 74832–33 (Dec. 9, 2008)
- 79 Fed. Reg. 35418 (Jun. 20, 2014)
- 79 Fed. Reg. 62752, 62770-73 (Oct. 20, 2014)
- 81 Fed. Reg. 10968 (May 16, 2016)
- 81 Fed. Reg. 31439 (Dec. 29, 2016)
- 81 Fed. Reg. 46807 (July 18, 2016)
- 81 Fed. Reg. 87130 (Dec. 2, 2016)
- 83 Fed. Reg. 37242 (Jul. 31, 2018)
- 83 Fed. Reg. 47490 (Sept. 21, 2018)
- 83 Fed. Reg. 61462 (Nov. 29, 2018)
- 84 Fed. Reg. 31392 (Jul. 1, 2019)
- 84 Fed. Reg. 49540 (Sept. 20, 2019)
- 84 Fed. Reg. 49788 (Sept. 23, 2019)
- 85 Fed. Reg. 13934 (Jun. 26, 2020)
- 85 Fed. Reg. 30026 (May 19, 2020)
- 85 Fed. Reg. 30182 (May 19, 2020)
- 85 Fed. Reg. 37160, 37199 (June 19, 2020)
- 86 Fed. Reg. 27429 (May 20, 2021)
- 86 Fed. Reg. 32637 (Jun. 22, 2021)
- 87 Fed. Reg. 65426 (Oct. 28, 2022)
- 88 Fed. Reg. 32300 (May 19, 2023)
- 88 Fed. Reg. 43820 (Jul. 10, 2023)
- 88 Fed. Reg. 54714 (Aug. 11, 2023)
- 88 Fed. Reg. 67750 (Oct. 2, 2023)
- Fed. R. Evid. § 412

[ PAGE   \* MERGEFORMAT ]

**Executive Orders**

- Exec. Order No. 12212, 45 Fed. Reg. 29557 (May 2, 1980)
- Exec. Order No. 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993)
- Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999)
- Exec. Order No. 13152, 87 Fed. Reg. 26115 (May 2, 2000)
- Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011)
- Exec. Order No. 13988, 86 Fed. Reg. 7023 (Jan. 25, 2021)
- Exec. Order No. 14021, 86 Fed. Reg. 13803 (Mar. 11, 2021)
- Exec. Order No. 14076, 87 Fed. Reg. 42053 (Jul. 8, 2022)
- Exec. Order No. 14079, 87 Fed. Reg. 49505 (Aug. 3, 2022)

**Websites**

- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, Elementary/ Secondary Information System, [ HYPERLINK "http://nces.ed.gov/ccd/elsi/" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, Characteristics of Postsecondary Students (Aug. 2023), available at [ HYPERLINK "https://nces.ed.gov/programs/coe/indicator/csb/postsecondary-students" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, College Enrollment Rates (May 2023), available at [ HYPERLINK "https://nces.ed.gov/programs/coe/indicator/cpb/college-enrollment-rate" ]
- U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, IPEDS Data Center, available at [ HYPERLINK "https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx" ]
- U.S. Dep't of Educ., Office for Civil Rights, Case Resolutions Regarding Sex Discrimination, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html" ]
- U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017-2018 Sch. Year, available at [HYPERLINK "https://civilrightsdata.ed.gov/data"]U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2020-2021 Sch. Year, available at [HYPERLINK "https://civilrightsdata.ed.gov/data"] U.S. Dep't of Educ., Office of Civil Rights, Religious Exemptions Letters, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html" ]
- U.S. Dep't of Educ., Office of Civil Rights, Resolution Agreements, available at [ HYPERLINK "https://www2.ed.gov/about/offices/list/ocr/frontpage/caseresolutions/sex-cr.html" ]
- U.S. Dep't of Labor, Bureau of Labor Statistics, May 2022 National Industry-Specific Occupational Employment and Wage Estimates: Sector 61—Educational Services, available at [ HYPERLINK "https://www.bls.gov/oes/current/naics2_61.htm" ]
- U.S. Dep't of Justice, Reproductive Rights, available at [ HYPERLINK "https://www.justice.gov/reproductive-rights" ]
- Johns Hopkins Medicine, Menstrual Conditions, available at [ HYPERLINK "https://www.hopkinsmedicine.org/health/conditions-and-diseases/menstrual-conditions" ]
- U.S. Dep't. of Justice, Federal Bureau of Investigation, Crime in the United States: 1996 Uniform Crime Reports (1997), available at [ HYPERLINK "https://ucr.fbi.gov/crime-in-the-u.s/1997" ]

AR_280889

- North American Industry Classification System (NAICS), available at [ HYPERLINK "https://www.census.gov/naics/" ]

AR_280890

POLICY STATEMENT  Organizational Principles to Guide and Define the Child Health Care System and/or Improve the Health of all Children



## American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN™

**This Policy Statement was reaffirmed August 2023.**

# Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents

Jason Rafferty, MD, MPH, EdM, FAAP, COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, COMMITTEE ON ADOLESCENCE, SECTION ON LESBIAN, GAY, AND TRANSGENDER HEALTH AND WELLNESS

As a traditionally underserved population that faces numerous health disparities, youth who identify as transgender and gender diverse (TGD) and their families are increasingly presenting to pediatric providers for education, care, and referrals. The need for more formal training, standardized treatment, and research on safety and medical outcomes often leaves providers feeling ill equipped to support and care for patients that identify as TGD and families. In this policy statement, we review relevant concepts and challenges and provide suggestions for pediatric providers that are focused on promoting the health and positive development of youth that identify as TGD while eliminating discrimination and stigma.

abstract



Department of Pediatrics, Hasbro Children's Hospital, Providence, Rhode Island; Thundermist Health Centers, Providence, Rhode Island; and Department of Child Psychiatry, Emma Pendleton Bradley Hospital, East Providence, Rhode Island

Dr Rafferty conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work.

This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.

Policy statements from the American Academy of Pediatrics benefit from expertise and resources of liaisons and internal (AAP) and external reviewers. However, policy statements from the American Academy of Pediatrics may not reflect the views of the liaisons or the organizations or government agencies that they represent.

The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.

All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.

## INTRODUCTION

In its dedication to the health of all children, the American Academy of Pediatrics (AAP) strives to improve health care access and eliminate disparities for children and teenagers who identify as lesbian, gay, bisexual, transgender, or questioning (LGBTQ) of their sexual or gender identity.[1,2] Despite some advances in public awareness and legal protections, youth who identify as LGBTQ continue to face disparities that stem from multiple sources, including inequitable laws and policies, societal discrimination, and a lack of access to quality health care, including mental health care. Such challenges are often more intense for youth who do not conform to social expectations and norms regarding gender. Pediatric providers are increasingly encountering such youth and their families, who seek medical advice and interventions, yet they may lack the formal training to care for youth that identify as transgender and gender diverse (TGD) and their families.[3]

This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population, providing brief, relevant background on the basis of current available research

To cite: Rafferty J, AAP COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, AAP COMMITTEE ON ADOLESCENCE, AAP SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS. Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. Pediatrics. 2018;142(4): e20182162

**FROM THE AMERICAN ACADEMY OF PEDIATRICS**

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by National Library of Education user

AR_281253

TABLE 1 Relevant Terms and Definitions Related to Gender Care

| Term | Definition |
|------|-----------|
| Sex | An assignment that is made at birth, usually male or female, typically on the basis of external genital anatomy but sometimes on the basis of internal gonads, chromosomes, or hormone levels |
| Gender identity | A person's deep internal sense of being female, male, a combination of both, somewhere in between, or neither, resulting from a multifaceted interaction of biological traits, environmental factors, self-understanding, and cultural expectations |
| Gender expression | The external way a person expresses their gender, such as with clothing, hair, mannerisms, activities, or social roles |
| Gender perception | The way others interpret a person's gender expression |
| Gender diverse | A term that is used to describe people with gender behaviors, appearances, or identities that are incongruent with those culturally assigned to their birth sex; gender-diverse individuals may refer to themselves with many different terms, such as transgender, nonbinary, genderqueer,[?] gender fluid, gender creative, gender independent, or noncisgender. "Gender diverse" is used to acknowledge and include the vast diversity of gender identities that exists. It replaces the former term, "gender nonconforming," which has a negative and exclusionary connotation. |
| Transgender | A subset of gender-diverse youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time; the term "transgender" also encompasses many other labels individuals may use to refer to themselves. |
| Cisgender | A term that is used to describe a person who identifies and expresses a gender that is consistent with the culturally defined norms of the sex they were assigned at birth |
| Agender | A term that is used to describe a person who does not identify as having a particular gender |
| Affirmed gender | When a person's true gender identity, or concern about their gender identity, is communicated to and validated from others as authentic |
| MTF; affirmed female; trans female | Terms that are used to describe individuals who were assigned male sex at birth but who have a gender identity and/or expression that is asserted to be more feminine |
| FTM; affirmed male; trans male | Terms that are used to describe individuals who were assigned female sex at birth but who have a gender identity and/or expression that is asserted to be more masculine |
| Gender dysphoria | A clinical symptom that is characterized by a sense of alienation to some or all of the physical characteristics or social roles of one's assigned gender; also, gender dysphoria is the psychiatric diagnosis in the *DSM-5*, which has focus on the distress that stems from the incongruence between one's expressed or experienced (affirmed) gender and the gender assigned at birth |
| Gender identity disorder | A psychiatric diagnosis defined previously in the *DSM-IV* (changed to "gender dysphoria" in the *DSM-5*); the primary criteria include a strong, persistent cross-sex identification and significant distress and social impairment. This diagnosis is no longer appropriate for use and may lead to stigma, but the term may be found in older literature. |
| Sexual orientation | A person's sexual identity in relation to the gender(s) to which they are attracted; sexual orientation and gender identity develop separately. |

This list is not intended to be all inclusive. The pronouns "they" and "their" are used intentionally to be inclusive rather than the binary pronouns "he" and "she" and "his" and "her." Adapted from Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am.* 2015;52(4):1001–1016. Adapted from Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics.* 2014;134(6):1184–1192. DSM-5, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*; DSM-IV, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*; FTM, female to male; MTF, male to female.

and expert opinion from clinical and research leaders, which will serve as the basis for recommendations. It is not a comprehensive review of clinical approaches and nuances to pediatric care for children and youth that identify as TGD. Professional understanding of youth that identify as TGD is a rapidly evolving clinical field in which research on appropriate clinical management is limited by insufficient funding.[3,4]

## DEFINITIONS

To clarify recommendations and discussions in this policy statement, some definitions are provided. However, brief descriptions of human behavior or identities may not capture nuance in this evolving field.

"Sex," or "natal gender," is a label, generally "male" or "female," that is typically assigned at birth on the basis of genetic and anatomic characteristics, such as genital anatomy, chromosomes, and sex hormone levels. Meanwhile, "gender identity" is one's internal sense of who one is, which results from a multifaceted interaction of biological traits, developmental influences, and environmental conditions. It may be male, female, somewhere in between, a combination of both, or neither (ie, not conforming to a binary conceptualization of gender). Self-recognition of gender identity develops over time, much the same way as a child's physical body does. For some people, gender identity can be fluid, shifting in different contexts. "Gender expression" refers to the wide array of ways people display their gender through clothing, hair styles, mannerisms, or social roles. Exploring different ways of expressing gender is common for children and may challenge social expectations. The way others interpret this expression is referred to as "gender perception" (Table 1).[5,6]

These labels may or may not be congruent. The term "cisgender" is used if someone identifies and expresses a gender that is consistent with the culturally defined norms of the sex that was assigned at birth. "Gender diverse" is an umbrella term to describe an ever-evolving array of labels that people may apply when their gender identity, expression, or even perception does not conform

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by National Library of Education user

AR_281254

to the norms and stereotypes others expect of their assigned sex. "Transgender" is usually reserved for a subset of such youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time. These terms are not diagnoses; rather, they are personal and often dynamic ways of describing one's own gender experience.

Gender identity is not synonymous with "sexual orientation," which refers to a person's identity in relation to the gender(s) to which they are sexually and romantically attracted. Gender identity and sexual orientation are distinct but interrelated constructs.[8] Therefore, being transgender does not imply a sexual orientation, and people who identify as transgender still identify as straight, gay, bisexual, etc, on the basis of their attractions. (For more information, *The Gender Book*, found at www.thegenderbook.com, is a resource with illustrations that are used to highlight these core terms and concepts.)

## EPIDEMIOLOGY

In population-based surveys, questions related to gender identity are rarely asked, which makes it difficult to assess the size and characteristics of the population that is TGD. In the 2014 Behavioral Risk Factor Surveillance System of the Centers for Disease Control and Prevention, only 19 states elected to include optional questions on gender identity. Extrapolation from these data suggests that the US prevalence of adults who identify as transgender or "gender nonconforming" is 0.6% (1.4 million), ranging from 0.3% in North Dakota to 0.8% in Hawaii.[9] On the basis of these data, it has been estimated that 0.7% of youth ages 13 to 17 years (~150 000) identify as transgender.[10] This number is much higher than previous estimates, which were

extrapolated from individual states or specialty clinics, and is likely an underestimate given the stigma regarding those who openly identify as transgender and the difficulty in defining "transgender" in a way that is inclusive of all gender-diverse identities.[11]

There have been no large-scale prevalence studies among children and adolescents, and there is no evidence that adult statistics reflect young children or adolescents. In the 2014 Behavioral Risk Factor Surveillance System, those 18 to 24 years of age were more likely than older age groups to identify as transgender (0.7%).[9] Children report being aware of gender incongruence at young ages. Children who later identify as TGD report first having recognized their gender as "different" at an average age of 8.5 years; however, they did not disclose such feelings until an average of 10 years later.[12]

## MENTAL HEALTH IMPLICATIONS

Adolescents and adults who identify as transgender have high rates of depression, anxiety, eating disorders, self-harm, and suicide.[13–20] Evidence suggests that an identity of TGD has an increased prevalence among individuals with autism spectrum disorder, but this association is not yet well understood.[21,22] In 1 retrospective cohort study of 180 trans youth and matched cisgender peers, 56 youth who identified as transgender reported previous suicidal ideation, and 31 reported a previous suicide attempt, compared with 20 and 11 among matched youth who identified as cisgender, respectively.[13] Some youth who identify as TGD also experience gender dysphoria, which is a specific diagnosis given to those who experience impairment in peer and/or family relationships, school performance, or other aspects of their life as a consequence of the

incongruence between their assigned sex and their gender identity.[23]

There is no evidence that risk for mental illness is inherently attributable to one's identity of TGD. Rather, it is believed to be multifactorial, stemming from an internal conflict between one's appearance and identity, limited availability of mental health services, low access to health care providers with expertise in caring for youth who identify as TGD, discrimination, stigma, and social rejection.[24] This was affirmed by the American Psychological Association in 2008[25] (with practice guidelines released in 2015[8]) and the American Psychiatric Association, which made the following statement in 2012:

*Being transgender or gender variant implies no impairment in judgment, stability, reliability, or general social or vocational capabilities; however, these individuals often experience discrimination due to a lack of civil rights protections for their gender identity or expression.... [Such] discrimination and lack of equal civil rights is damaging to the mental health of transgender and gender variant individuals.*[26]

Youth who identify as TGD often confront stigma and discrimination, which contribute to feelings of rejection and isolation that can adversely affect physical and emotional well-being. For example, many youth believe that they must hide their gender identity and expression to avoid bullying, harassment, or victimization. Youth who identify as TGD experience disproportionately high rates of homelessness, physical violence (at home and in the community), substance abuse, and high-risk sexual behaviors.[5,6,12,27–31] Among the 3 million HIV testing events that were reported in 2015, the highest percentages of new infections were among women who identified as transgender[32] and were also at particular risk for not knowing their HIV status.[30]

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281225

## GENDER-AFFIRMATIVE CARE

In a gender-affirmative care model (GACM), pediatric providers offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience. A strong, nonjudgmental partnership with youth and their families can facilitate exploration of complicated emotions and gender-diverse expressions while allowing questions and concerns to be raised in a supportive environment.[5] In a GACM, the following messages are conveyed:

- transgender identities and diverse gender expressions do not constitute a mental disorder;
- variations in gender identity and expression are normal aspects of human diversity, and binary definitions of gender do not always reflect emerging gender identities;
- gender identity evolves as an interplay of biology, development, socialization, and culture; and
- if a mental health issue exists, it most often stems from stigma and negative experiences rather than being intrinsic to the child.[27,33]

The GACM is best facilitated through the integration of medical, mental health, and social services, including specific resources and supports for parents and families.[24] Providers work together to destigmatize gender variance, promote the child's self-worth, facilitate access to care, educate families, and advocate for safer community spaces where children are free to develop and explore their gender.[5] A specialized gender-affirmative therapist, when available, may be an asset in helping children and their families build skills for dealing with gender-based stigma, address symptoms of anxiety or depression, and reinforce the child's overall resiliency.[34,35] There is a limited but growing body

of evidence that suggests that using an integrated affirmative model results in young people having fewer mental health concerns whether they ultimately identify as transgender.[24,36,37]

In contrast, "conversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions. The Substance Abuse and Mental Health Services Administration has concluded that any therapeutic intervention with the goal of changing a youth's gender expression or identity is inappropriate.[33] Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39–42] The AAP described reparative approaches as "unfair and deceptive."[43] At the time of this writing,* conversion therapy was banned by executive regulation in New York and by legislative statutes in 9 other states as well as the District of Columbia.[44]

Pediatric providers have an essential role in assessing gender concerns and providing evidence-based information to assist youth and families in medical decision-making. Not doing so can prolong or exacerbate gender dysphoria and contribute to abuse and stigmatization.[35] If a pediatric provider does not feel prepared to address gender concerns when they occur, then referral to a pediatric or mental health provider with more expertise is appropriate. There is little research on communication and efficacy with transfers in care for youth who identify as TGD,

particularly from pediatric to adult providers.

## DEVELOPMENTAL CONSIDERATIONS

Acknowledging that the capacity for emerging abstract thinking in childhood is important to conceptualize and reflect on identity, gender-affirmation guidelines are being focused on individually tailored interventions on the basis of the physical and cognitive development of youth who identify as TGD.[45] Accordingly, research substantiates that children who are prepubertal and assert an identity of TGD know their gender as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance.[46] This developmental approach to gender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47] More robust and current research suggests that, rather than focusing on who a child will become, valuing them for who they are, even at a young age, fosters secure attachment and resilience, not only for the child but also for the whole family.[5,45,48,49]

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281256

## MEDICAL MANAGEMENT

Pediatric primary care providers are in a unique position to routinely inquire about gender development in children and adolescents as part of recommended well-child visits[50] and to be a reliable source of validation, support, and reassurance. They are often the first provider to be aware that a child may not identify as cisgender or that there may be distress related to a gender-diverse identity. The best way to approach gender with patients is to inquire directly and nonjudgmentally about their experience and feelings before applying any labels.[27,51]

Many medical interventions can be offered to youth who identify as TGD and their families. The decision of whether and when to initiate gender-affirmative treatment is personal and involves careful consideration of risks, benefits, and other issues unique to each patient and family. Many protocols suggest that clinical assessment of youth who identify as TGD is ideally conducted on an ongoing basis in the setting of a collaborative, multidisciplinary approach, which, in addition to the patient and family, may include the pediatric provider, a mental health provider (preferably with expertise in caring for youth who identify as TGD ), social and legal supports, and a pediatric endocrinologist or adolescent-medicine gender specialist, if available.[6,28] There is no prescribed path, sequence, or end point. Providers can make every effort to be aware of the influence of their own biases. The medical options also vary depending on pubertal and developmental progression.

### Clinical Setting

In the past year, 1 in 4 adults who identified as transgender avoided a necessary doctor's visit because of fear of being mistreated.[31] All clinical office staff have a role in affirming a patient's gender identity. Making flyers available or displaying posters related to LGBTQ health issues, including information for children who identify as TGD and families, reveals inclusivity and awareness. Generally, patients who identify as TGD feel most comfortable when they have access to a gender-neutral restroom. Diversity training that encompasses sensitivity when caring for youth who identify as TGD and their families can be helpful in educating clinical and administrative staff. A patient-asserted name and pronouns are used by staff and are ideally reflected in the electronic medical record without creating duplicate charts.[52,53] The US Centers for Medicare and Medicaid Services and the National Coordinator for Health Information Technology require all electronic health record systems certified under the Meaningful Use incentive program to have the capacity to confidentially collect information on gender identity.[54,55] Explaining and maintaining confidentiality procedures promotes openness and trust, particularly with youth who identify as LGBTQ.[1] Maintaining a safe clinical space can provide at least 1 consistent, protective refuge for patients and families, allowing authentic gender expression and exploration that builds resiliency.

### Pubertal Suppression

Gonadotropin-releasing hormones have been used to delay puberty since the 1980s for central precocious puberty.[56] These reversible treatments can also be used in adolescents who experience gender dysphoria to prevent development of secondary sex characteristics and provide time up until 16 years of age for the individual and the family to explore gender identity, access psychosocial supports, develop coping skills, and further define appropriate treatment goals. If pubertal suppression treatment is suspended, then endogenous puberty will resume.[20,57,58]

Often, pubertal suppression creates an opportunity to reduce distress that may occur with the development of secondary sexual characteristics and allow for gender-affirming care, including mental health support for the adolescent and the family. It reduces the need for later surgery because physical changes that are otherwise irreversible (protrusion of the Adam's apple, male pattern baldness, voice change, breast growth, etc) are prevented. The available data reveal that pubertal suppression in children who identify as TGD generally leads to improved psychological functioning in adolescence and young adulthood.[20,57–59]

Pubertal suppression is not without risks. Delaying puberty beyond one's peers can also be stressful and can lead to lower self-esteem and increased risk taking.[60] Some experts believe that genital underdevelopment may limit some potential reconstructive options.[61] Research on long-term risks, particularly in terms of bone metabolism[62] and fertility,[63] is currently limited and provides varied results.[57,64,65] Families often look to pediatric providers for help in considering whether pubertal suppression is indicated in the context of their child's overall well-being as gender diverse.

### Gender Affirmation

As youth who identify as TGD reflect on and evaluate their gender identity, various interventions may be considered to better align their gender expression with their underlying identity. This process of reflection, acceptance, and, for some, intervention is known as "gender affirmation." It was formerly referred to as "transitioning," but many view the process as an affirmation and acceptance of who they have always been rather than a transition

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281257

TABLE 2 The Process of Gender Affirmation May Include ≥1 of the Following Components

| Component | Definition | General Age Range[a] | Reversibility[a] |
|---|---|---|---|
| Social affirmation | Adopting gender-affirming hairstyles, clothing, name, gender pronouns, and restrooms and other facilities | Any | Reversible |
| Puberty blockers | Gonadotropin-releasing hormone analogues, such as leuprolide and nistrelin | During puberty (Tanner stage 2–5)[b] | Reversible[c] |
| Cross-sex hormone therapy | Testosterone (for those who were assigned female at birth and are masculinizing); estrogen plus androgen inhibitor (for those who were assigned male at birth and are feminizing) | Early adolescence onward | Partially reversible (skin texture, muscle mass, and fat deposition); irreversible once developed (testosterone: Adam's apple protrusion, voice changes, and male pattern baldness; estrogen: breast development); unknown reversibility (effect on fertility) |
| Gender-affirming surgeries | "Top" surgery (to create a male-typical chest shape or enhance breasts); "bottom" surgery (surgery on genitals or reproductive organs); facial feminization and other procedures | Typically adults (adolescents on case-by-case basis[d]) | Not reversible |
| Legal affirmation | Changing gender and name recorded on birth certificate, school records, and other documents | Any | Reversible |

[a] Note that the provided age range and reversibility is based on the little data that are currently available.

[b] There is limited benefit to starting gonadotropin-releasing hormone after Tanner stage 5 for pubertal suppression. However, when cross-sex hormones are initiated with a gradually increasing schedule, the initial levels are often not high enough to suppress endogenous sex hormone secretion. Therefore, gonadotropin-releasing hormone may be continued in accordance with the Endocrine Society Guidelines.[68]

[c] The effect of sustained puberty suppression on fertility is unknown. Pubertal suppression can be, and often is indicated to be, followed by cross-sex hormone treatment. However, when cross-sex hormones are initiated without endogenous hormones, then fertility may be decreased.[68]

[d] Eligibility criteria for gender-affirmative surgical interventions among adolescents are not clearly defined between established protocols and practice. When applicable, eligibility is usually determined on a case-by-case basis with the adolescent and the family along with input from medical, mental health, and surgical providers.[68–71]

from 1 gender identity to another. Accordingly, some people who have gone through the process prefer to call themselves "affirmed females, males, etc" (or just "females, males, etc"), rather than using the prefix "trans-." Gender affirmation is also used to acknowledge that some individuals who identify as TGD may feel affirmed in their gender without pursuing medical or surgical interventions.[7,66]

Supportive involvement of parents and family is associated with better mental and physical health outcomes.[67] Gender affirmation among adolescents with gender dysphoria often reduces the emphasis on gender in their lives, allowing them to attend to other developmental tasks, such as academic success, relationship building, and future-oriented planning.[64] Most protocols for gender-affirming interventions incorporate World Professional Association of Transgender Health[35] and Endocrine Society[68] recommendations and include ≥1 of the following elements (Table 2):

1. Social Affirmation: This is a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc. Children who identify as transgender and socially affirm and are supported in their asserted gender show no increase in depression and only minimal (clinically insignificant) increases in anxiety compared with age-matched averages.[48] Social affirmation can be complicated given the wide range of social interactions children have (eg, extended families, peers, school, community, etc). There is little guidance on the best approach (eg, all at once, gradual, creating new social networks, or affirming within existing networks, etc). Pediatric providers can best support families by anticipating and discussing such complexity proactively, either in their own practice or through enlisting a qualified mental health provider.

2. Legal Affirmation: Elements of a social affirmation, such as a name and gender marker, become official on legal documents, such as birth certificates, passports, identification cards, school documents, etc. The processes for making these changes depend on state laws and may require specific documentation from pediatric providers.

3. Medical Affirmation: This is the process of using cross-sex hormones to allow adolescents who have initiated puberty to develop secondary sex characteristics of the opposite biological sex. Some changes are partially reversible if hormones are stopped, but others become

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281258

irreversible once they are fully developed (Table 2).

4. Surgical Affirmation: Surgical approaches may be used to feminize or masculinize features, such as hair distribution, chest, or genitalia, and may include removal of internal organs, such as ovaries or the uterus (affecting fertility). These changes are irreversible. Although current protocols typically reserve surgical interventions for adults,[35,68] they are occasionally pursued during adolescence on a case-by-case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family.[69–71]

For some youth who identify as TGD whose natal gender is female, menstruation, breakthrough bleeding, and dysmenorrhea can lead to significant distress before or during gender affirmation. The American College of Obstetrics and Gynecology suggests that, although limited data are available to outline management, menstruation can be managed without exogenous estrogens by using a progesterone-only pill, a medroxyprogesterone acetate shot, or a progesterone-containing intrauterine or implantable device.[72] If estrogen can be tolerated, oral contraceptives that contain both progesterone and estrogen are more effective at suppressing menses.[73] The Endocrine Society guidelines also suggest that gonadotrophin-releasing hormones can be used for menstrual suppression before the anticipated initiation of testosterone or in combination with testosterone for breakthrough bleeding (enables phenotypic masculinization at a lower dose than if testosterone is used alone).[68] Masculinizing hormones in natal female patients may lead to a cessation of menses,

but unplanned pregnancies have been reported, which emphasizes the need for ongoing contraceptive counseling with youth who identify as TGD.[72]

## HEALTH DISPARITIES

In addition to societal challenges, youth who identify as TGD face several barriers within the health care system, especially regarding access to care. In 2015, a focus group of youth who identified as transgender in Seattle, Washington, revealed 4 problematic areas related to health care:

1. safety issues, including the lack of safe clinical environments and fear of discrimination by providers;

2. poor access to physical health services, including testing for sexually transmitted infections;

3. inadequate resources to address mental health concerns; and

4. lack of continuity with providers.[74]

This study reveals the obstacles many youth who identify as TGD face in accessing essential services, including the limited supply of appropriately trained medical and psychological providers, fertility options, and insurance coverage denials for gender-related treatments.[74]

Insurance denials for services related to the care of patients who identify as TGD are a significant barrier. Although the Office for Civil Rights of the US Department of Health and Human Services explicitly stated in 2012 that the nondiscrimination provision in the Patient Protection and Affordable Care Act includes people who identify as gender diverse,[75,76] insurance claims for gender affirmation, particularly among youth who identify as TGD, are frequently denied.[54,77] In 1 study, it was found that approximately 25% of individuals

who identified as transgender were denied insurance coverage because of being transgender.[31] The burden of covering medical expenses that are not covered by insurance can be financially devastating, and even when expenses are covered, families describe high levels of stress in navigating and submitting claims appropriately.[78] In 2012, a large gender center in Boston, Massachusetts, reported that most young patients who identified as transgender and were deemed appropriate candidates for recommended gender care were unable to obtain it because of such denials, which were based on the premise that gender dysphoria was a mental disorder, not a physical one, and that treatment was not medically or surgically necessary.[24] This practice not only contributes to stigma, prolonged gender dysphoria, and poor mental health outcomes,[77] but it may also lead patients to seek nonmedically supervised treatments that are potentially dangerous.[24] Furthermore, insurance denials can reinforce a socioeconomic divide between those who can finance the high costs of uncovered care and those who cannot.[24,77]

The transgender youth group in Seattle likely reflected the larger TGD population when they described how obstacles adversely affect self-esteem and contribute to the perception that they are undervalued by society and the health care system.[74,77] Professional medical associations, including the AAP, are increasingly calling for equity in health care provisions regardless of gender identity or expression.[1,8,23,72] There is a critical need for investments in research on the prevalence, disparities, biological underpinnings, and standards of care relating to gender-diverse populations. Pediatric providers who work with state government and insurance officials can play an essential role in advocating for

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281259

stronger nondiscrimination policies and improved coverage.

There is a lack of quality research on the experience of youth of color who identify as transgender. One theory suggests that the intersection of racism, transphobia, and sexism may result in the extreme marginalization that is experienced among many women of color who identify as transgender,[79] including rejection from their family and dropping out of school at younger ages (often in the setting of rigid religious beliefs regarding gender),[80] increased levels of violence and body objectification,[81] 3 times the risk of poverty compared with the general population,[31] and the highest prevalence of HIV compared with other risk groups (estimated as high as 56.3% in 1 meta-analysis).[30] One model suggests that pervasive stigma and oppression can be associated with psychological distress (anxiety, depression, and suicide) and adoption of risk behaviors by such youth to obtain a sense of validation toward their complex identities.[79]

## FAMILY ACCEPTANCE

Research increasingly suggests that familial acceptance or rejection ultimately has little influence on the gender identity of youth; however, it may profoundly affect young people's ability to openly discuss or disclose concerns about their identity. Suppressing such concerns can affect mental health.[82] Families often find it hard to understand and accept their child's gender-diverse traits because of personal beliefs, social pressure, and stigma.[49,83] Legitimate fears may exist for their child's welfare, safety, and acceptance that pediatric providers need to appreciate and address. Families can be encouraged to communicate their concerns and questions. Unacknowledged concerns can contribute to shame and hesitation in regard to offering support and understanding,[84]

which is essential for the child's self-esteem, social involvement, and overall health as TGD.[48,85–87] Some caution has been expressed that unquestioning acceptance per se may not best serve questioning youth or their families. Instead, psychological evidence suggests that the most benefit comes when family members and youth are supported and encouraged to engage in reflective perspective taking and validate their own and the other's thoughts and feelings despite divergent views.[49,82]

In this regard, suicide attempt rates among 433 adolescents in Ontario who identified as "trans" were 4% among those with strongly supportive parents and as high as 60% among those whose parents were not supportive.[85] Adolescents who identify as transgender and endorse at least 1 supportive person in their life report significantly less distress than those who only experience rejection. In communities with high levels of support, it was found that nonsupportive families tended to increase their support over time, leading to dramatic improvement in mental health outcomes among their children who identified as transgender.[88]

Pediatric providers can create a safe environment for parents and families to better understand and listen to the needs of their children while receiving reassurance and education.[83] It is often appropriate to assist the child in understanding the parents' concerns as well. Despite expectations by some youth with transgender identity for immediate acceptance after "coming out," family members often proceed through a process of becoming more comfortable and understanding of the youth's gender identity, thoughts, and feelings. One model suggests that the process resembles grieving, wherein the family separates from their expectations for their child to embrace a new reality. This process may proceed through stages of shock,

denial, anger, feelings of betrayal, fear, self-discovery, and pride.[89] The amount of time spent in any of these stages and the overall pace varies widely. Many family members also struggle as they are pushed to reflect on their own gender experience and assumptions throughout this process. In some situations, youth who identify as TGD may be at risk for internalizing the difficult emotions that family members may be experiencing. In these cases, individual and group therapy for the family members may be helpful.[49,78]

Family dynamics can be complex, involving disagreement among legal guardians or between guardians and their children, which may affect the ability to obtain consent for any medical management or interventions. Even in states where minors may access care without parental consent for mental health services, contraception, and sexually transmitted infections, parental or guardian consent is required for hormonal and surgical care of patients who identify as TGD.[72,90] Some families may take issue with providers who address gender concerns or offer gender-affirming care. In rare cases, a family may deny access to care that raises concerns about the youth's welfare and safety; in those cases, additional legal or ethical support may be useful to consider. In such rare situations, pediatric providers may want to familiarize themselves with relevant local consent laws and maintain their primary responsibility for the welfare of the child.

## SAFE SCHOOLS AND COMMUNITIES

Youth who identify as TGD are becoming more visible because gender-diverse expression is increasingly admissible in the media, on social media, and in schools and communities. Regardless of whether a youth with a gender-diverse

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by National Library of Education user

AR_281260

identity ultimately identifies as transgender, challenges exist in nearly every social context, from lack of understanding to outright rejection, isolation, discrimination, and victimization. In the US Transgender Survey of nearly 28 000 respondents, it was found that among those who were out as or perceived to be TGD between kindergarten and eighth grade, 54% were verbally harassed, 24% were physically assaulted, and 13% were sexually assaulted; 17% left school because of maltreatment.[31] Education and advocacy from the medical community on the importance of safe schools for youth who identify as TGD can have a significant effect.

At the time of this writing,[*] only 18 states and the District of Columbia had laws that prohibited discrimination based on gender expression when it comes to employment, housing, public accommodations, and insurance benefits. Over 200 US cities have such legislation. In addition to basic protections, many youth who identify as TGD also have to navigate legal obstacles when it comes to legally changing their name and/or gender marker.[54] In addition to advocating and working with policy makers to promote equal protections for youth who identify as TGD, pediatric providers can play an important role by developing a familiarity with local laws and organizations that provide social work and legal assistance to youth who identify as TGD and their families.

School environments play a significant role in the social and emotional development of children. Every child has a right to feel safe

and respected at school, but for youth who identify as TGD, this can be challenging. Nearly every aspect of school life may present safety concerns and require negotiations regarding their gender expression, including name/pronoun use, use of bathrooms and locker rooms, sports teams, dances and activities, overnight activities, and even peer groups. Conflicts in any of these areas can quickly escalate beyond the school's control to larger debates among the community and even on a national stage.

The formerly known Gay, Lesbian, and Straight Education Network (GLSEN), an advocacy organization for youth who identify as LGBTQ, conducts an annual national survey to measure LGBTQ well-being in US schools. In 2015, students who identified as LGBTQ reported high rates of being discouraged from participation in extracurricular activities. One in 5 students who identified as LGBTQ reported being hindered from forming or participating in a club to support lesbian, gay, bisexual, or transgender students (eg, a gay straight alliance, now often referred to as a genders and sexualities alliance) despite such clubs at schools being associated with decreased reports of negative remarks about sexual orientation or gender expression, increased feelings of safety and connectedness at school, and lower levels of victimization. In addition, >20% of students who identified as LGBTQ reported being blocked from writing about LGBTQ issues in school yearbooks or school newspapers or being prevented or discouraged by coaches and school staff from participating in sports because of their sexual orientation or gender expression.[91]

One strategy to prevent conflict is to proactively support policies and protections that promote inclusion and safety of all students. However, such policies are far from

consistent across districts. In 2015, GLSEN found that 43% of children who identified as LGBTQ reported feeling unsafe at school because of their gender expression, but only 6% reported that their school had official policies to support youth who identified as TGD, and only 11% reported that their school's antibullying policies had specific protections for gender expression.[91] Consequently, more than half of the students who identified as transgender in the study were prevented from using the bathroom, names, or pronouns that aligned with their asserted gender at school. A lack of explicit policies that protected youth who identified as TGD was associated with increased reported victimization, with more than half of students who identified as LGBTQ reporting verbal harassment because of their gender expression. Educators and school administrators play an essential role in advocating for and enforcing such policies. GLSEN found that when students recognized actions to reduce gender-based harassment, both students who identified as transgender and cisgender reported a greater connection to staff and feelings of safety.[91] In another study, schools were open to education regarding gender diversity and were willing to implement policies when they were supported by external agencies, such as medical professionals.[92]

Academic content plays an important role in building a safe school environment as well. The 2015 GLSEN survey revealed that when positive representations of people who identified as LGBTQ were included in the curriculum, students who identified as LGBTQ reported less hostile school environments, less victimization and greater feelings of safety, fewer school absences because of feeling unsafe, greater feelings of connectedness to their school

---

[*] For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@aap.org.

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281261

community, and an increased interest in high school graduation and postsecondary education.[91] At the time of this writing,* 8 states had laws that explicitly forbade teachers from even discussing LGBTQ issues.[54]

## MEDICAL EDUCATION

One of the most important ways to promote high-quality health care for youth who identify as TGD and their families is increasing the knowledge base and clinical experience of pediatric providers in providing culturally competent care to such populations, as recommended by the recently released guidelines by the Association of American Medical Colleges.[93] This begins with the medical school curriculum in areas such as human development, sexual health, endocrinology, pediatrics, and psychiatry. In a 2009–2010 survey of US medical schools, it was found that the median number of hours dedicated to LGBTQ health was 5, with one-third of US medical schools reporting no LGBTQ curriculum during the clinical years.[94]

During residency training, there is potential for gender diversity to be emphasized in core rotations, especially in pediatrics, psychiatry, family medicine, and obstetrics and gynecology. Awareness could be promoted through the inclusion of topics relevant to caring for children who identify as TGD in the list of core competencies published by the American Board of Pediatrics, certifying examinations, and relevant study materials. Continuing education and maintenance of certification activities can include topics relevant to TGD populations as well.

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@aap.org

## RECOMMENDATIONS

The AAP works toward all children and adolescents, regardless of gender identity or expression, receiving care to promote optimal physical, mental, and social well-being. Any discrimination based on gender identity or expression, real or perceived, is damaging to the socioemotional health of children, families, and society. In particular, the AAP recommends the following:

1. that youth who identify as TGD have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space;

2. that family-based therapy and support be available to recognize and respond to the emotional and mental health needs of parents, caregivers, and siblings of youth who identify as TGD;

3. that electronic health records, billing systems, patient-centered notification systems, and clinical research be designed to respect the asserted gender identity of each patient while maintaining confidentiality and avoiding duplicate charts;

4. that insurance plans offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for medical, psychological, and, when indicated, surgical gender-affirming interventions;

5. that provider education, including medical school, residency, and continuing education, integrate core competencies on the emotional and physical health needs and best practices for the care of youth who identify as TGD and their families;

6. that pediatricians have a role in advocating for, educating, and developing liaison relationships with school districts and other community organizations to promote acceptance and inclusion of all children without fear of harassment, exclusion, or bullying because of gender expression;

7. that pediatricians have a role in advocating for policies and laws that protect youth who identify as TGD from discrimination and violence;

8. that the health care workforce protects diversity by offering equal employment opportunities and workplace protections, regardless of gender identity or expression; and

9. that the medical field and federal government prioritize research that is dedicated to improving the quality of evidence-based care for youth who identify as TGD.

### LEAD AUTHOR

Jason Richard Rafferty, MD, MPH, EdM, FAAP

### CONTRIBUTOR

Robert Garofalo, MD, FAAP

### COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, 2017–2018

Michael Yogman, MD, FAAP, Chairperson
Rebecca Baum, MD, FAAP
Thresia B. Gambon, MD, FAAP
Arthur Lavin, MD, FAAP
Gerri Mattson, MD, FAAP
Lawrence Sagin Wissow, MD, MPH, FAAP

### LIAISONS

Sharon Berry, PhD, LP — Society of Pediatric Psychology
Ed Christophersen, PhD, FAAP — Society of Pediatric Psychology
Norah Johnson, PhD, RN, CPNP-BC — National Association of Pediatric Nurse Practitioners
Amy Starin, PhD, LCSW — National Association of Social Workers
Abigail Schlesinger, MD — American Academy of Child and Adolescent Psychiatry

### STAFF

Karen S. Smith
James Baumberger

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by National Library of Education user

AR_281262

**COMMITTEE ON ADOLESCENCE, 2017–2018**

Cora Breuner, MD, MPH, FAAP, Chairperson
Elizabeth M. Alderman, MD, FSAHM, FAAP
Laura K. Grubb, MD, MPH, FAAP
Makia E. Powers, MD, MPH, FAAP
Krishna Upadhya, MD, FAAP
Stephenie B. Wallace, MD, FAAP

**LIAISONS**

Laurie Hornberger, MD, MPH, FAAP – *Section on Adolescent Health*
Liwei L. Hua, MD, PhD – *American Academy of Child and Adolescent Psychiatry*
Margo A. Lane, MD, FRCPC, FAAP – *Canadian Paediatric Society*
Meredith Loveless, MD, FACOG – *American College of Obstetricians and Gynecologists*
Seema Menon, MD – *North American Society of Pediatric and Adolescent Gynecology*
CDR Lauren B. Zapata, PhD, MSPH – *Centers for Disease Control and Prevention*

**STAFF**

Karen Smith

**SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS EXECUTIVE COMMITTEE, 2016–2017**

Lynn Hunt, MD, FAAP, Chairperson
Anne Teresa Gearhart, MD, FAAP
Christopher Harris, MD, FAAP
Kathryn Melland Lowe, MD, FAAP
Chadwick Taylor Rodgers, MD, FAAP
Ilana Michelle Sherer, MD, FAAP

**FORMER EXECUTIVE COMMITTEE MEMBERS**

Ellen Perrin, MD, MA, FAAP

**LIAISON**

Joseph H. Waters, MD – *AAP Section on Pediatric Trainees*

**STAFF**

Renee Jarrett, MPH

**ACKNOWLEDGMENTS**

We thank Isaac Albanese, MPA, and Jayeson Watts, LICSW, for their thoughtful reviews and contributions.

**ABBREVIATIONS**

AAP: American Academy of Pediatrics
GACM: gender-affirmative care model
GLSEN: Gay, Lesbian, and Straight Education Network
LGBTQ: lesbian, gay, bisexual, transgender, or questioning
TGD: transgender and gender diverse

**DOI:** https://doi.org/10.1542/peds.2018-2162

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2018 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The author has indicated he has no financial relationships relevant to this article to disclose.

**FUNDING:** No external funding.

**POTENTIAL CONFLICT OF INTEREST:** The author has indicated he has no potential conflicts of interest to disclose.

**REFERENCES**

1. Levine DA; Committee on Adolescence. Office-based care for lesbian, gay, bisexual, transgender, and questioning youth. *Pediatrics*. 2013;132(1). Available at: www.pediatrics.org/cgi/content/full/132/1/e297

2. American Academy of Pediatrics Committee on Adolescence. Homosexuality and adolescence. *Pediatrics*. 1983;72(2):249–250

3. Institute of Medicine; Committee on Lesbian Gay Bisexual, and Transgender Health Issues and Research Gaps and Opportunities. *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* Washington, DC: National Academies Press; 2011. Available at: https://www.ncbi.nlm.nih.gov/books/NBK64806. Accessed May 19, 2017

4. Deutsch MB, Radix A, Reisner S. What's in a guideline? Developing collaborative and sound research designs that substantiate best practice recommendations for transgender health care. *AMA J Ethics.* 2016;18(11):1098–1106

5. Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am.* 2015;62(4):1001–1016

6. Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics.* 2014;134(6):1184–1192

7. Richards C, Bouman WP, Seal L, Barker MJ, Nieder TO, T'Sjoen G. Non-binary or genderqueer genders. *Int Rev Psychiatry.* 2016;28(1):95–102

8. American Psychological Association. Guidelines for psychological practice with transgender and gender nonconforming people. *Am Psychol.* 2015;70(9):832–864

9. Flores AR, Herman JL, Gates GJ, Brown TNT. *How Many Adults Identify as Transgender in the United States.* Los Angeles, CA: The Williams Institute; 2016

10. Herman JL, Flores AR, Brown TNT, Wilson BDM, Conron KJ. *Age of Individuals Who Identify as Transgender in the United States.* Los Angeles, CA: The Williams Institute; 2017

11. Gates GJ. *How Many People are Lesbian, Gay, Bisexual, and Transgender?* Los Angeles, CA: The Williams Institute; 2011

12. Olson J, Schrager SM, Belzer M, Simons LK, Clark LF. Baseline physiologic and psychosocial characteristics of transgender youth seeking care for gender dysphoria. *J Adolesc Health.* 2015;57(4):374–380

13. Reisner SL, Vetters R, Leclerc M, et al. Mental health of transgender youth in care

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281263

at an adolescent urban community health center: a matched retrospective cohort study. *J Adolesc Health.* 2015;56(3):274–279

14. Clements-Nolle K, Marx R, Katz M. Attempted suicide among transgender persons: the influence of gender-based discrimination and victimization. *J Homosex.* 2006;51(3):53–69

15. Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology.* 2014;39:65–73

16. Haas AP, Eliason M, Mays VM, et al. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: review and recommendations. *J Homosex.* 2011;58(1):10–51

17. Maguen S, Shipherd JC. Suicide risk among transgender individuals. *Psychol Sex.* 2010;1(1):34–43

18. Connolly MD, Zervos MJ, Barone CJ II, Johnson CC, Joseph CL. The mental health of transgender youth: advances in understanding. *J Adolesc Health.* 2016;59(5):489–495

19. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav.* 2007;37(5):527–537

20. Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3):418–425

21. van Schalkwyk GI, Klingensmith K, Volkmar FR. Gender identity and autism spectrum disorders. *Yale J Biol Med.* 2015;88(1):81–83

22. Jacobs LA, Rachlin K, Erickson-Schroth L, Janssen A. Gender dysphoria and co-occurring autism spectrum disorders: review, case examples, and treatment considerations. *LGBT Health.* 2014;1(4):277–282

23. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. Arlington, VA: American Psychiatric Association; 2013

24. Edwards-Leeper L, Spack NP. Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *J Homosex.* 2012;59(3):321–336

25. Anton BS. Proceedings of the American Psychological Association for the legislative year 2008: minutes of the annual meeting of the Council of Representatives, February 22–24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the Board of Directors. *Am Psychol.* 2009;64(5):372–453

26. Drescher J, Haller E; American Psychiatric Association Caucus of Lesbian, Gay and Bisexual Psychiatrists. *Position Statement on Discrimination Against Transgender and Gender Variant Individuals.* Washington, DC: American Psychiatric Association; 2012

27. Hidalgo MA, Ehrensaft D, Tishelman AC, et al. The gender affirmative model: what we know and what we aim to learn. *Hum Dev.* 2013;56(5):285–290

28. Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, Shumer DE, Spack NP. Serving transgender youth: challenges, dilemmas and clinical examples. *Prof Psychol Res Pr.* 2015;46(1):37–45

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974

30. Herbst JH, Jacobs ED, Finlayson TJ, McKleroy VS, Neumann MS, Crepaz N; HIV/AIDS Prevention Research Synthesis Team. Estimating HIV prevalence and risk behaviors of transgender persons in the United States: a systematic review. *AIDS Behav.* 2008;12(1):1–17

31. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality; 2016

32. Centers for Disease Control and Prevention. *CDC-Funded HIV Testing: United States, Puerto Rico, and the U.S. Virgin Islands.* Atlanta, GA: Centers for Disease Control and Prevention; 2015. Available at: https://www.cdc.gov/hiv/pdf/library/reports/cdc-hiv-funded-testing-us-puerto-rico-2015.pdf. Accessed August 2, 2018

33. Substance Abuse and Mental Health Services Administration. *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Rockville, MD: Substance Abuse and Mental Health Services Administration; 2015

34. Korell SC, Lorah P. An overview of affirmative psychotherapy and counseling with transgender clients. In: Bieschke KJ, Perez RM, DeBord KA, eds. *Handbook of Counseling and Psychotherapy With Lesbian, Gay, Bisexual, and Transgender Clients.* 2nd ed. Washington, DC: American Psychological Association; 2007:271–288

35. World Professional Association for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People.* 7th ed. Minneapolis, MN: World Professional Association for Transgender Health; 2011. Available at: https://www.wpath.org/publications/soc. Accessed April 15, 2018

36. Menville E. A comprehensive program for children with gender variant behaviors and gender identity disorders. *J Homosex.* 2012;59(3):357–368

37. Hill DB, Menvielle E, Sica KM, Johnson A. An affirmative intervention for families with gender variant children: parental ratings of child mental health and gender. *J Sex Marital Ther.* 2010;36(1):6–23

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221–227

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97–99

40. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281264

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy*. 2006;3(3):23–39

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement*. Minneapolis, MN: World Professional Association for Transgender Health; 2010. Available at: https://www.wpath.org/policies. Accessed April 16, 2017

43. American Academy of Pediatrics. AAP support letter conversion therapy ban [letter]. 2015. Available at: https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAPsupportletterconversiontherapyban.pdf. Accessed August 1, 2018

44. Movement Advancement Project. *LGBT Policy Spotlight: Conversion Therapy Bans*. Boulder, CO: Movement Advancement Project; 2017. Available at: http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-conversion-therapy-bans. Accessed August 6, 2017

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend*. 2018;19(2):251–268

46. Olson KR, Key AC, Eaton NR. Gender cognition in transgender children. *Psychol Sci*. 2015;26(4):467–474

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry*. 2016;55(3):155–156.e3

48. Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. *Pediatrics*. 2016;137(3):e20153223

49. Malpas J. Between pink and blue: a multi-dimensional family approach to gender nonconforming children and their families. *Fam Process*. 2011;50(4):453–470

50. Hagan JF Jr, Shaw JS, Duncan PM, eds. *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents*. 4th ed. Elk Grove, IL: American Academy of Pediatrics; 2016

51. Minter SP. Supporting transgender children: new legal, social, and medical approaches. *J Homosex*. 2012;59(3):422–433

52. AHIMA Work Group. Improved patient engagement for LGBT populations: addressing factors related to sexual orientation/gender identity for effective health information management. *J AHIMA*. 2017;88(3):34–39

53. Deutsch MB, Green J, Keatley J, Mayer G, Hastings J, Hall AM; World Professional Association for Transgender Health EMR Working Group. Electronic medical records and the transgender patient: recommendations from the World Professional Association for Transgender Health EMR Working Group. *J Am Med Inform Assoc*. 2013;20(4):700–703

54. Dowshen N, Meadows R, Byrnes M, Hawkins L, Eder J, Noonan K. Policy perspective: ensuring comprehensive care and support for gender nonconforming children and adolescents. *Transgend Health*. 2016;1(1):75–85

55. Cahill SR, Baker K, Deutsch MB, Keatley J, Makadon HJ. Inclusion of sexual orientation and gender identity in stage 3 meaningful use guidelines: a huge step forward for LGBT health. *LGBT Health*. 2016;3(2):100–102

56. Mansfield MJ, Beardsworth DE, Loughlin JS, et al. Long-term treatment of central precocious puberty with a long-acting analogue of luteinizing hormone-releasing hormone. Effects on somatic growth and skeletal maturation. *N Engl J Med*. 1983;309(21):1286–1290

57. Olson J, Garofalo R. The peripubertal gender-dysphoric child: puberty suppression and treatment paradigms. *Pediatr Ann*. 2014;43(6):e132–e137

58. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med*. 2011;8(8):2276–2283

59. Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. *J Am Acad Child Adolesc Psychiatry*. 2008;47(12):1413–1423

60. Waylen A, Wolke D. Sex 'n' drugs 'n' rock 'n' roll: the meaning and social consequences of pubertal timing. *Eur J Endocrinol*. 2004;151(suppl 3):U151–U159

61. de Vries AL, Klink D, Cohen-Kettenis PT. What the primary care pediatrician needs to know about gender incongruence and gender dysphoria in children and adolescents. *Pediatr Clin North Am*. 2016;63(6):1121–1135

62. Vlot MC, Klink DT, den Heijer M, Blankenstein MA, Rotteveel J, Heijboer AC. Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone*. 2017;95:11–19

63. Finlayson C, Johnson EK, Chen D, et al. Proceedings of the working group session on fertility preservation for individuals with gender and sex diversity. *Transgend Health*. 2016;1(1):99–107

64. Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. *Nat Rev Endocrinol*. 2011;7(8):466–472

65. Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. *J Clin Endocrinol Metab*. 2014;99(12):4379–4389

66. Fenway Health. *Glossary of Gender and Transgender Terms*. Boston, MA: Fenway Health; 2010. Available at: http://fenwayhealth.org/documents/the-fenway-institute/handouts/Handout_7-C_Glossary_of_Gender_and_Transgender_Terms__fi.pdf. Accessed August 16, 2017

67. de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;134(4):696–704

68. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869–3903

69. Milrod C, Karasic DH. Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281265

vaginoplasty in transgender females under 18 years of age in the United States. *J Sex Med.* 2017;14(4):624–634

70. Milrod C. How young is too young: ethical concerns in genital surgery of the transgender MTF adolescent. *J Sex Med.* 2014;11(2):338–346

71. Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest reconstruction and chest dysphoria in transmasculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. *JAMA Pediatr.* 2018;172(5):431–436

72. Committee on Adolescent Health Care. Committee opinion no. 685: care for transgender adolescents. *Obstet Gynecol.* 2017;129(1):e11–e16

73. Greydanus DE, Patel DR, Rimsza ME. Contraception in the adolescent: an update. *Pediatrics.* 2001;107(3):562–573

74. Gridley SJ, Crouch JM, Evans Y, et al. Youth and caregiver perspectives on barriers to gender-affirming health care for transgender youth. *J Adolesc Health.* 2016;59(3):254–261

75. Sanchez NF, Sanchez JP, Danoff A. Health care utilization, barriers to care, and hormone usage among male-to-female transgender persons in New York City. *Am J Public Health.* 2009;99(4):713–719

76. Transgender Law Center. *Affordable Care Act Fact Sheet.* Oakland, CA: Transgender Law Center; 2016. Available at: https://transgenderlawcenter.org/resources/health/aca-fact-sheet. Accessed August 8, 2016

77. Nahata L, Quinn GP, Caltabellotta NM, Tishelman AC. Mental health concerns and insurance denials among transgender adolescents. *LGBT Health.* 2017;4(3):188–193

78. Grant JM, Mottet LA, Tanis J, Harrison J, Herman JL, Keisling M. *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force; 2011 Available at: http://www.thetaskforce.org/static_

html/downloads/reports/reports/ntds_full.pdf. Accessed August 6, 2018

79. Sevelius JM. Gender affirmation: a framework for conceptualizing risk behavior among transgender women of color. *Sex Roles.* 2013;68(11–12):675–689

80. Koken JA, Bimbi DS, Parsons JT. Experiences of familial acceptance-rejection among transwomen of color. *J Fam Psychol.* 2009;23(6):853–860

81. Lombardi EL, Wilchins RA, Priesing D, Malouf D. Gender violence: transgender experiences with violence and discrimination. *J Homosex.* 2001;42(1):89–101

82. Wren B. 'I can accept my child is transsexual but if I ever see him in a dress I'll hit him': dilemmas in parenting a transgendered adolescent. *Clin Child Psychol Psychiatry.* 2002;7(3):377–397

83. Riley EA, Sitharthan G, Clemson L, Diamond M. The needs of gender-variant children and their parents: a parent survey. *Int J Sex Health.* 2011;23(3):181–195

84. Whitley CT. Trans-kin undoing and redoing gender: negotiating relational identity among friends and family of transgender persons. *Sociol Perspect.* 2013;56(4):597–621

85. Travers R, Bauer G, Pyne J, Bradley K, Gale L, Papadimitriou M; Trans PULSE; Children's Aid Society of Toronto; Delisle Youth Services. *Impacts of Strong Parental Support for Trans Youth: A Report Prepared for Children's Aid Society of Toronto and Delisle Youth Services.* Toronto, ON. Trans PULSE; 2012. Available at: http://transpulseproject.ca/wp-content/uploads/2012/10/Impacts-of-Strong-Parental-Support-for-Trans-Youth-vFINAL.pdf

86. Ryan C, Russell ST, Huebner D, Diaz R, Sanchez J. Family acceptance in adolescence and the health of LGBT young adults. *J Child Adolesc Psychiatr Nurs.* 2010;23(4):205–213

87. Grossman AH, D'augelli AR, Frank JA. Aspects of psychological resilience among transgender youth. *J LGBT Youth.* 2011;8(2):103–115

88. McConnell EA, Birkett M, Mustanski B. Families matter: social support and mental health trajectories among lesbian, gay, bisexual, and transgender youth. *J Adolesc Health.* 2016;59(6):674–680

89. Ellis KM, Eriksen K. Transsexual and transgenderist experiences and treatment options. *Fam J Alex Va.* 2002;10(3):289–299

90. Lamda Legal. *Transgender Rights Toolkit: A Legal Guide for Trans People and Their Advocates.* New York, NY: Lambda Legal, 2016 Available at: https://www.lambdalegal.org/publications/trans-toolkit. Accessed August 6, 2018

91. Kosciw JG, Greytak EA, Giga NM, Villenas C, Danischewski DJ. *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools.* New York, NY: GLSEN; 2016. Available at: https://www.glsen.org/article/2015-national-school-climate-survey. Accessed August 8, 2018

92. McGuire JK, Anderson CR, Toomey RB, Russell ST. School climate for transgender youth: a mixed method investigation of student experiences and school responses. *J Youth Adolesc.* 2010;39(10):1175–1188

93. Association of American Medical Colleges Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development. In: Hollenback AD, Eckstrand KL, Dreger A, eds. *Implementing Curricular and Institutional Climate Changes to Improve Health Care for Individuals Who Are LGBT, Gender Nonconforming, or Born With DSD: A Resource for Medical Educators.* Washington, DC: Association of American Medical Colleges; 2014. Available at: https://members.aamc.org/eweb/upload/Executive LGBT FINAL.pdf. Accessed August 8, 2018

94. Obedin-Maliver J, Goldsmith ES, Stewart L, et al. Lesbian, gay, bisexual, and transgender-related content in undergraduate medical education. *JAMA.* 2011;306(9):971–977

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by National Library of Education user

AR_281266

# UCLA
## Other Recent Work

### Title
Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

### Permalink
https://escholarship.org/uc/item/4rs4n6h0

### Authors
Hasenbush, Amira
Flores, Andrew R
Herman, Jody L

### Publication Date
2018-07-23

### DOI
10.1007/s13178-018-0335-z

### Data Availability
The data associated with this publication are not available for this reason: Licensing Restrictions

Peer reviewed

eScholarship.org                          Powered by the California Digital Library
                                                       University of California

AR_293039

# Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

Amira Hasenbush[1] & Andrew R. Flores[1,2] & Jody L. Herman[1]

## Introduction

North Carolina's Public Facilities Privacy & Security Act, also known as H.B. 2, introduced much of the United States to a debate regarding the use of public restrooms that had previously largely gone unnoticed. In an emergency session, the North Carolina legislature passed H.B. 2 in one day, legally requiring sex-segregated restrooms and changing facilities to be limited to use based on the sex on a person's birth certificate (Philipps, 2016). While this law would have no legal impact on restroom use among cisgender (i.e., nontransgender) people, it meant that transgender people who had transitioned from their sex assigned at birth to a different gender would be required to use the restroom of their sex assigned at birth unless they had legally changed their birth certificate. The new law also opened up the possibility of increased harassment and policing, both social and actual, of gender nonconforming people in public restrooms, whether they were transgender or not. H.B. 2 was passed as a direct reaction to a local nondiscrimination ordinance that the City of Charlotte passed that included gender identity as one of the protected classifications in public accommodations, legally codifying the rights of individuals to use the public restroom that corresponded to their gender identity, even if that did not match their sex assigned at birth (Philipps, 2016). The primary argument levied against the passage of public accommodations nondiscrimination policies that protect trans- gender people is that the policy creates a loophole for sexual predators to access women's public restrooms and locker rooms, thus decreasing women's and girls' safety and privacy in such spaces. For example, at a floor hearing on H.B. 2, Senator E. S. "Buck" Newton stated:

> [T]he City Council of Charlotte lost their mind, and decided to embark upon a very radical course … of radical political correctness. And in so doing, created a real public safety risk … would allow men into the locker rooms and the bathrooms of females − of our daughters, of our wives … And that common sense tells us that men don't belong in the ladies' bathroom. It's a matter of public safety. Under this ordinance that they've put forward, anyone, quite frankly, with − with that intent, could use this Charlotte ordinance as an excuse to be somewhere that we all know they don't belong." (House Bill 2: Senate Floor Session, 2016).

On the other hand, there were those who argued that such nondiscrimination laws had already been enacted in localities across the United States with no noticeable change in criminal activity in public accommodations. For example, Representative Rodney Moore stated in the H.B. 2 House floor debate:

> [W]hat you have here is − you have fear-stoking. The LGB − I've done the research. This ordinance is in over 200 cities, as it was referenced before, and there has not, to my knowledge, been any catastrophic incident of as- saults, of rapes in these bathrooms or anything, and so the argument that this is such a grave challenge or a grave issue of public safety, just doesn't − just doesn't mesh; doesn't − doesn't pan out based upon the data." (House Bill 2: House Floor Debate, 2016).

While H.B. 2 was partially repealed in 2017, the debates, legislation, and litigation about restroom access and safety continue. For example, the Commonwealth of Massachusetts is now facing a ballot measure in the 2018 elections asking its citizens to decide whether to repeal a recently passed statewide public accommodations nondiscrimination law that is inclusive of gender identity. It is important to evaluate the empirical validity of the underlying claims to assess whether nondiscrimination laws are actually related to privacy and safety in restrooms, evidence of which has yet to be provided. We sought to empirically assess such claims through the analysis of police records of safety and privacy crimes in public restrooms, locker rooms, and changing rooms.

---

[1] UCLA School of Law, The Williams Institute, Box 951476, Los Angeles, CA 90095-1476, USA

[2] Department of Public Policy & Political Science, Mills College, Oakland, CA, USA

AR_293040

## Legal Background

State and local employment and public accommodations non-discrimination statutes and ordinances have included gender identity for over 20 years. In 1993, Minnesota passed the first statewide nondiscrimination law that included gender identity (Minn. Stat., 1993). Currently, 20 states and over 200 towns, cities, boroughs, and counties have nondiscrimination laws and ordinances that are inclusive of gender identity (Movement Advancement Project, 2017; Human Rights Campaign, 2016). In theory, employment nondiscrimination laws that include gen- der identity would apply to restroom use in the workplace, and public accommodations nondiscrimination laws that include gender identity would apply to public restrooms; however, the specific language, interpretation, and implementation of such laws and ordinances have varied throughout the country.

There is no federal law that prohibits discrimination in employment or public accommodations based on gender identity. However, some federal agencies and courts[3] have interpreted laws that prohibit discrimination based on sex to include gender identity. For example, the Equal Employment Opportunity Commission held that Title VII's prohibition on sex discrimination in employment also prohibits discrimination based on gender identity in employment, including by requiring that employers allow employees to use restrooms in the workplace that are consistent with their gender identity (Lusardi v. Dep't of the Army, 2015). The Department of Housing and Urban Development has issued regulations to ensure equal access to shelter housing and restrooms without discrimination based on gender identity (Department of Housing and Urban Development, 2016),[4] and the Occupational Safety and Health Administration has issued guidance instructing employers to allow employees to have access to restrooms based on their gender identity (Occupational Safety and Health Administration, 2015). In 2016, the Civil Rights Divisions of the Department of Education and the Department of Justice issued guidance that students should have access to restrooms that correspond to students' self-identified gender identity (U.S. Department of Justice & U.S. Department of Education, 2016). That guidance was repealed less than a year later (U.S. Department of Justice & U.S. Department of Education, 2017). In June of 2017, an instructional letter was sent to Department of Education Civil Rights Office regional directors stating that sex discrimination complaints from transgender stu- dents should be evaluated based on Title IX and its implementing regulations, as interpreted in decisions of federal courts and other Office for Civil Rights guidance documents, but specifically excluding the repealed guidance (Jackson, 2017). By February of 2018, a Department of Education spokesperson asserted that the department would no longer accept discrimination complaints from transgender students who are blocked access to restrooms in accordance with their gender identity (Holden, 2018).

The 2015–2016 state legislative sessions across the country saw increases in proposed legislation seeking to prohibit access to public restrooms based on gender identity (Kralik, 2017). Some of these policies sought to roll back protections granted by municipal governments (Fausset, 2017; Kralik, 2017). In addition, some localities such as Anchorage, Alaska and Houston, Texas sought repeal of protective policies through public ballot measures (Fernandez & Smith, 2015; Kelly, 2016). Additionally, some states that did not have any statewide laws related to public accommodations access, such as North Carolina, sought to pro- actively prohibit any future enactment of gender identity nondiscrimination laws at the state or local level that would allow transgender people to access restrooms that correspond with their gender identity (Kralik, 2017).

At the same time, litigation across the country has sought to determine the extent of state, local, and federal powers to either prohibit or mandate restroom access based on gender identity. For example, after the Departments of Education and Justice issued the initial federal school bathroom guidance in 2016, states and representatives from Texas and 12 other states filed a lawsuit against the federal government. The District Court granted a preliminary injunction against implementation of the guidance in 2016, and in 2017, the federal government withdrew its initial appeal (Texas v. U.S., 2016, 2017). At the same time, a transgender student has been engaged in litigation against his local school board for access to school restrooms in accordance with his gender identity. That case had been accepted to be heard by the Supreme Court but was remanded to the Fourth Circuit Court for reevaluation in response to the repeal of the federal school restroom guidance (G. G. v. Gloucester County School Board, 2017). After the student graduated from high school with- out having a final court decision, he amended his complaint to request a declaration that the school board violated his rights under Title IX and the Equal Protection Clause and to allow him to use male restrooms when he returned to school grounds for alumni activities (American Civil Liberties Union, 2017). Nebraska and nine other states filed a case similar to the Texas case that was stayed pending a ruling in the G.G. case and later was voluntarily dismissed by the plaintiffs without prejudice, in other words, with the right to reinstate the case later (Nebraska v. U.S., 2016, 2017). Several other lawsuits specific to transgender student restroom access are currently winding their way through state and federal courts. Concerns about restroom privacy and/or safety have been considered in all of these cases (G.G. v. Gloucester County School Board, 2015; Nebraska v. U.S. First Amended Complaint, 2016; Texas v. U.S., 2016).

---

[3] See, e.g., EEOC v. Harris Funeral Homes, 2018, which affirmed the Sixth Circuit's previous holdings that discrimination against a transgender individual is illegal sex discrimination under Title VII. In that case, a funeral home director was fired after she told her employer that she was transgender and planned to transition and begin wearing women's work clothing on the job. The court also stated that religious beliefs and the Religious Freedom Restoration Act do not overrule the nondiscrimination requirements of Title VII. The last paragraph in this section discusses court cases that directly address sex discrimination as it applies to transgender individuals in the context of restroom access.

[4] The Department of Housing and Urban Development has slowed support for this Equal Access Rule in the last year. Online training materials meant to support homeless shelters in the implementation of the rule were ordered removed from the department's website (MacGillis, 2017).

AR_293041

## Literature Review

Using new policy proposals continues to be a central strategy between the LGBT rights social movement and countermovement. Stone (2012) describes different forms of tactical innovation the Religious Right has taken on sexual orientation and gender identity public policy. These innovations vary in terms of venue (e.g., local, statewide, or national), strategy (e.g., legislative, direct initiative, or referendum), and issue (e.g., gay teachers, same-sex marriage, transgender inclusion in public accommodations). As such, the Religious Right has played a large role in controlling the issue agenda of the LGBT rights movement (Fetner, 2008). The present case of carving out gender identity protections in public accommodations policies may be seen as another form of tactical innovation. As is the case of other issues of LGBT rights, many times these policies are seen as seeking solutions to problems that may not really exist, which may be linked to social perceptions of sexual and gender minorities as deviants (Fejes, 2008). For example, Anita Bryant's campaign and the Briggs Initiative to prohibit gay and lesbian school teachers are key moments when public policy and the general public were targeted for policy advancement against the rights of LGBT people.

The movement counter to the advancement of LGBT rights has increased its focus on transgender people (Andersen, 2017). The discursive strategy on transgender rights remains similar to gay rights discourses with a focus on the harms gender identity inclusive policies pose primarily to children. A social constructionist framework of social policy (Shneider and Ingram, 1993) would consider both the political power and social favorability of transgender people in the consideration of the types of policies getting passed. As Westbrook and Schilt (2014) identify, issues involving sex- segregated spaces become overly focused on biologic sex and anatomy, which increases the "gender panic" people experience relating to transgender people. By focusing on public accommodations, the discourses focus on sex-segregated spaces in ways that exacerbate "gender panics" which would further lower the social valence of transgender people (see also Miller et al., 2017). Thus, arguments against the inclusion of gender identity protections in such sex-segregated spaces are likely motivated by such social constructions of a politically powerless and negative valence group.

Critiques of anti-LGBT policies are abounding. Fogg Davis (2017), for example, argues for the abolishment of using sex as a criterion for separating facilities. In other LGBT policy areas, scholars have marshaled evidence that the claims made by those advocating against LGBT rights are unfounded in the arenas of marriage and family (Herek, 1991, 2006) and in employment (Badgett, 2001; Herek, 1991). The arguments used to justify anti-LGBT policies tend to be emotionally stirring, though of- ten lack empirical validity.

Given the recently targeted focus on transgender rights, it is important to understand and evaluate both the motivations for policy, as well as its negative externalities. The asserted motivations for proscribing transgender inclusion in public ac- commodations are the perceived negative externalities of in- creased harassment and victimization in public spaces such as bathrooms and locker rooms. The current project examines the policy motivation portion. In essence, we ask: "Are inclusive transgender public accommodations laws associated with these negative externalities?" If not, then public policy may be seeking a policy solution to solve a problem that does not exist or that would exist even if policies changed.

Some research has suggested that states with more supportive gay rights policies overall correlate with lower sexual orientation hate crimes and discrimination (Levy & Levy, 2017; Hasenbush, Flores, Kastanis, Sears, & Gates, 2014). Local gender identity accommodation protections may be one of many indicators that may, counter to arguments against such laws, reduce victimization rates with respect to sexual and gender minorities, which could make a discernable reduction in overall victimization rates. Given this research we propose three hypotheses:

H0: The passage of gender identity accommodations policies will have no effect on victimization rates.
H1: The passage of gender identity accommodations policies will reduce victimization rates.
H2: The passage of gender identity accommodations policies will increase victimization rates.

H0 is motivated both by previous scholarship dispelling myths in other areas of LGBT rights as well as the insufficiency of single policies to lead to vast changes in victimization. H1 is motivated by Levy and Levy (2017) who note that inclusive policies in localities indicate supportive environments where victimizations are lower. H3 is motivated by the standard arguments made by opponents to gender identity inclusive nondiscrimination policies.

## Methods

We sought to empirically assess whether reports of safety or privacy violations in public restrooms, locker rooms, and dressing rooms change in frequency in localities that have gender identity inclusive public accommodations nondiscrimination ordinances (GIPANDOs) as compared to matched localities without GIPANDOs. Massachusetts was selected as a case study for this analysis, because, for a period of time, Massachusetts had a statewide nondiscrimination law that was inclusive of gender identity in employment and housing, but not public accommodations. Thus, these conditions created an optimal context in which to compare rates of public restroom privacy and safety incidents in localities that had passed local GIPANDOs with matched localities that had not. All data col- lection, analysis, and results are inclusive of criminal incidents in public restrooms,

public locker rooms, and public changing rooms. For simplicity's sake, authors may refer to only "restrooms" when describing the results of this study.

Victimization rates can fluctuate both over time and place. Using matched pairs and difference-in-differences analysis allows a comparison between different locations over time in order to determine whether any changes can be attributed to normal fluctuations over time or whether the changes can be attributed to some distinct difference in one location versus the other (see e.g., Dimick & Ryan, 2014; Raifman, Moscoe, Austin, & McConnell, 2017). A difference-in-difference analysis was used in this study to compare similarly-situated localities in MA to determine whether differences in restroom crime rates over time can be attributed to the introduction of a GIPANDO.

Unlike some trends over time, crime rates do not consistently increase or decrease. Small fluctuations in crime rates over time may be based on random variability and may not be attributable to any one specific policy change. Using a matched pairs analysis allows timewise comparisons across policy con- texts to seek out differences that appear to be due to more than just small random fluctuations. The matched pairs analysis ensures that the localities being compared to each other in the difference-in-difference analysis are similar enough to make appropriate comparisons. For example, Fig. 1 shows the violent crime rates across five New England states as documented by the U.S. Department of Justice. The matched pairs design of this study accounts for such temporal instability in crime rates by finding localities that have the most similar trends. In Fig. 1, it would be more appropriate to draw comparisons between Massachusetts and Connecticut because they follow a similar trend, and it would be inappropriate to compare Massachusetts to New Hampshire because they do not. Likewise, the selection of comparison localities was designed in a way to minimize differences to draw accurate comparisons.

**Selection of Localities** The Commonwealth of Massachusetts has had a broad nondiscrimination policy protecting against sexual orientation discrimination since 1989 (Mass. Gen. Laws, 1989). Massachusetts also passed a law in November 2011 extending nondiscrimination protections for transgender people in employment, housing, credit, and services (Gender Identity Act, 2011). However, that extension of the law did not contain any explicit protections for transgender people in public accommodations. Some individual localities within Massachusetts expanded upon state law by incorporating explicit gender identity protections in public accommodations laws, which includes protections in public restrooms, locker rooms, and changing rooms. This allowed for a between- localities study, comparing localities that passed GIPANDOs with matched localities within the state that did not have GIPANDOs, but otherwise had gender identity nondiscrimination protections in employment, housing, credit, and services.[5] The matched pairs strategy means that the distinguishing factor between these localities is the existence or absence of a public accommodations-specific nondiscrimination law that applied to gender identity.

[5] Boston and Cambridge both had a GIPANDO prior to the 2011 state law. Neither locality is included in this analysis.

Fig. 1 Violent crime rate across New England states, 2005 to 2014. Source: Uniform Crime Reporting Statistics, FBI, U.S. Department of Justice



Table 1 reports the localities within Massachusetts that have ordinances that contain language that includes gender identity protections and the date when those ordinances went into effect. There were seven localities that had identifiable nondiscrimination ordinances relating to gender identity protections in public accommodations. Two other localities in close geographic proximity to the GIPANDO localities were also identified as having some gender identity protections, though their coverage was not as extensive as the seven other localities. Cambridge includes gender identity protections in public accommodations except for restroom access, which is of primary concern to this study. Brookline law contains a gender identity resolution, but it is unclear the extent to which this resolution resulted in actionable changes or any enforcement mechanism within the locality.

In October 2016, a new Massachusetts state law went into effect to provide for protection against discrimination in public accommodations based on gender identity (Transgender Anti- Discrimination Act, 2016). However, results of the public re- cords requests in this study did not overlap with the time that Massachusetts had this statewide gender identity inclusive public accommodations nondiscrimination law in effect, and thus, enable this study to focus on the period when localities introduced GIPANDOs in the absence of statewide protections.

Notably, after the law went into effect, enough signatures were gathered to put a repeal measure on the 2018 ballot to allow Massachusetts residents to vote on whether to repeal the non- discrimination law (Young, 2016).

**Matched Pairs Design** After identifying the localities with GIPANDOs, we used quantitative models to identify localities within Massachusetts to match for comparison. Matched localities were in the same geographic regions of Massachusetts as the GIPANDO localities and were matched on demographic and other characteristics that may relate to the likelihood that locations would pass a GIPANDO as well as characteristics that may be predictive of criminal incidents (or a lack thereof) in public restrooms. We started the matched pair locality selection by identifying a full list of localities within Massachusetts that did not have GIPANDOs and that were in the same regions of Massachusetts as the localities with GIPANDOs.[6] We then collected pre-policy introduction information about both the GIPANDO localities and the candidate pool of potential matched localities. These covariates included: population size, the percent of the population over the age of 65, the percent of population that is non-Hispanic white, the percent of population earning more than $200,000, median income, the percent of the population living below the poverty line, the percent of the population that identifies as Born Again, percentage of the vote for Barak Obama in the 2012 presidential election, and a composite crime score based on numerous indices.[7] Since all of the metrics of crime were highly intercorrelated, a composite score was created based on a factor analysis. The researchers then used a covariate balancing approach to create a propensity score to identify the most fitting matched localities for each of the GIPANDO localities (Imai & Ratkovic, 2014). The fitted propensity score was extracted and used in addition to the covariates in a genetic matching procedure (Diamond & Sekhon, 2013; Sekhon, 2011). The genetic matching procedure identifies appropriate comparison localities by examining the full distribution of covariates, which may improve the matching procedure that other matching processes may worsen.

---

[6] The initial design also planned to identify contiguous localities, treating boundary lines as regression discontinuities (Keele & Titiunik, 2015). However, since the occurrence of the crimes sought was rare, there was insufficient analytical power to utilize geographic variation to the full extent possible. Instead, the researchers opted for simpler analytical methods relying on data preprocessing and case selection to reduce analytical assumptions. However, the matched localities were limited to localities that had a shared boundary with at least one of the GIPANDO localities.

[7] The indices were: the Neighborhood Scout Crime Index (retrieved from https://www.neighborhoodscout.com/ma/crime/), violent crimes per 1000 residents and property crimes per 1000 residents, the USA.com Crime Index (retrieved from http://www.usa.com/massachusetts-state-crime-and-crimerate.htm), and the City Data.com 2012 Index (retrieved from http://www.city-data.com/crime/crime-Massachusetts.html).

Table 1 Localities within MA that contain GIPANDOs

| Locality | GIPANDO | Date in effect | Statute |
|---|---|---|---|
| Boston | Yes | October 30, 2002 | Bos., Mass., Code § 12-9.7 (2002). |
| Medford | Yes | December 16, 2014 | Medford, Mass., Rev. Ordinances part 1, ch. 50, div. 2, § 50-61 (2014). |
| Melrose | Yes | December 17, 2014 | Melrose, Mass., Code ch. 15, art. X, § 15-50 (2014). |
| Newton | Yes | October 14, 2014 | Newton, Mass., Ordinances ch. 12, art. V, § 12-50 (2014). |
| Salem | Yes | February 27, 2014 | Salem, Mass., Code part III, ch. 2, art. XVI, §2-2056 (2014). |
| Somerville | Yes | May 29, 2014 | Somerville, Mass., Code ch. 2, art. V, div. 6, § 2-237 (2014). |
| Swampscott | Yes[a] | February, 18, 2015 | Swampscott, Mass. Nondiscrimination Policy (Feb. 18, 2015). |
| Cambridge | Yes, but contains a restroom exception | February 24, 1997 | Cambridge, Mass., Code tit. 2, ch. 2.76, §§ 2.76.030; 2.76.120 (1997). |
| Brookline | Unclear, a gender identity resolution^ exists | November 18, 2014 | Brookline, Mass. Code, part III, art. 3.9 § 3.9.2 (2014). |

Note:

[a]Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because the Swampscott Police Department records division lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities (Marblehead and Milton)

While Cambridge and Brookline were categorized as limited GIPANDO localities and selected because of their geographic proximity to the clear GIPANDO localities, a few other localities in the state that were not in close geographic proximity to the clear GIPANDO localities also had gender identity ordinances that were unclear or limited as related to restroom access. These were: Northampton, Amherst, and Worcester, and they were not included in this analysis, since it was originally designed to include a boundary regression discontinuity that would have required localities to share physical borders. Northampton, Massachusetts has a Human Rights Commission with a voluntary advisory committee that does not have any investigative or enforcement authority. It is also unclear whether their Human Rights Commission prohibits discrimination based on gender identity (Simmons, 2015). Amherst, Massachusetts prohibits
the denial of "any rights" based on gender identity (Human Rights Bylaw, 2009). However, the town's director of human resources and human rights, who investigates complaints of discrimination, was unable to confirm whether such rights included access to public accommodations and/or public restrooms (Radway, 2015). Worcester, Massachusetts has a local ordinance that states that its policy is "to assure that every individual shall have equal access to and benefit from all public services, accommodations and employment opportunities to protect every individual ..." and that, "behavior which denies equal treatment to any of our citizens as a result of their ... gender identity ...undermines civil order and deprives persons of the benefits of a free and open society." (Worcester, Mass., Rev. Ordinances §9(c), 2014). However, the local human rights commission only has explicit authority to investigate complaints of discrimination "based on race, color, religious creed, national origin, gender, age, ancestry, marital status, parental status, sexual orientation, disability or source of income." (Worcester, Mass., Rev. Ordinances §18(c)(1), 2014). Matched localities were selected for all of the localities with clear GIPANDOs that applied to public restrooms. The final GIPANDO localities and their matched localities for two different analyses are listed in Table 2.

## Data

Public Record Requests Through a thorough reading of municipal ordinances and consultation with local human rights commissions, town and city clerks, and attorneys, we ascertained an exhaustive list of all of the localities in Massachusetts with GIPANDOs. Localities with GIPANDOs and matched localities received two sets of public records requests from the investigators. In July 2015, a first set of requests under the Massachusetts Public Records Law (M.G.L.A. c. 66, §10, 2016) was sent to target localities. These letters requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents ... that took place in a public bathroom, public restroom, public locker room, or public changing room."

Table 2 Localities with GIPANDOs and matched localities

| GIPANDO Locality | Matched locality (1) | Matched locality (2) |
|---|---|---|
| Boston | Cambridge[b] | Chelsea[c] |
| Medford | Beverly | Watertown |
| Melrose | Beverly | Beverly |
| Newton | Brookline | Arlington |
| Salem | Revere[b] | Waltham |
| Somerville | Cambridge[b] | Waltham |
| Swampscott[a] | Marblehead[a] | Milton[c] |
| Brookline (unclear enforceability) | | Arlington |
| Cambridge[b] (restroom exclusion) | | Everett |

Notes:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because they lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities

[b] Cambridge and Revere were unable to supply results of the public records requests after repeated attempts over the course of nine months. Therefore, data from their matched localities, Salem, Somerville, Boston, and Everett were excluded from analyses that required the missing data

[c] Chelsea's results were excluded due to an incomplete response to the request

The request covered a one- to two-year timespan before and after the gender identity inclusive public accommodations nondiscrimination law had gone into effect in the localities that had such an ordinance and the same time period for the localities that were matched localities. In some cases, the local ordinance had been passed less than one or two years prior to the public records request. In those instances, records were requested "through the present." If matched localities were matched to more than one GIPANDO locality, the matched locality records request would cover the matching timespan for both of the GIPANDO localities to which they were matched. The total timespan covered (either two or four years) was selected based on the size and crime rate of the locality; smaller localities or those likely to have fewer incidents were given longer timespans to search, and larger localities or those in which more incidents were likely to occur were given shorter timespans. The investigators requested information on the type of crime/incident alleged, the gender of the victim(s) and the perpetrator(s) (as applicable), the date of the incident, and the address of the public bathroom, restroom, locker room, or changing room in which the alleged incident took place.

After mailing public records requests, follow-up emails and phone calls were placed with all of the records custodians to facilitate the process of data collection. Some larger localities were able to comply with the requests relatively quickly and easily, while others did not have the tools necessary to perform a key word search that would make such a request possible or feasible. Several record clerks noted that the cost to pay for staff time to complete a search by hand would be prohibitively expensive. After assessing the initial completed responses, the investigators noted that the majority of incidents occurring in restrooms were not related to the types of crimes that are the subject of concern related to public accommodations nondiscrimination ordinances. In other words, the fears projected as potential problems related to such ordinances are related to violations of safety and privacy, but most incidents were related to vandalism and drug use in public restrooms and theft in locker rooms.

Given the mismatching scope between the search and the crimes of concern and the challenges for smaller localities to respond to the public records requests, the researchers completed a second round of public records requests with a narrower scope in February 2016. In the second round of requests, the investigators requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … involving conduct that took place in a public bathroom, public restroom, public locker room, or public changing room" regarding criminal codes related to: murder, manslaughter and attempts; assault or assault and battery and attempts; theft involving assault or battery and kidnap- ping; rape, stalking, harassment, indecent exposure, public sex and voyeurism; and solicitation. The individual Massachusetts General Law sections were cited in the request. The full updated request was sent to all police departments that had not fully responded to the first round of public records requests. For those who had responded, but for whom the timespan was still continuing until "the present," a modified request was sent for any new records that may have arisen since the first round of requests.

Follow-up phone calls and emails were again used to assist in the facilitation of data collection until all of the localities had either responded with the results of their search or made it clear that they were unable to complete the search. By the end of the second round of data collection, two localities were unable to complete the search at all, and one locality provided an incomplete response. Records were then organized and reviewed to ensure only inclusion of incidents under the narrower scope related to assault, sexual assault, rape, voyeur- ism, public sex (including sex work), lewd behavior, and in- decent exposure.

As a result of the data collection, we received public re- cords of incidents occurring within our selected municipalities. The unit of analysis in this collection is an incident. Consistent with previous research, we transformed these incidents to average annual incident rates per 100,000 individuals. This normalizes our measure accounting for varying size of municipalities and time period.

## Analysis and Results

The first round of analysis was a simple comparison of the average annual number of incidents before and after the pas- sage of GIPANDOs in the localities with such nondiscrimination ordinances and their comparable matched localities. This comparison was made to determine whether the rate of reported incidents in public restrooms and locker rooms over the timespan in which the GIPANDOs were passed was different between the places with the ordinances and their matched localities. Since we use matched pairs for our analyses, we did not employ additional controls, and since time frames were equal between the GIPANDO localities and their matched localities, time is also controlled by design. The results are shown in Table 3. When a matched locality had missing results, the GIPANDO locality's results were excluded from the count.

Table 3 provides a contingency table showing the average number of incidents per year. There were fewer average annual incidents in the localities with clear GIPANDOs when compared to their matched localities. The differences in incident rates over time (comparing before and after GIPANDO passage) were not statistically significant in the GIPANDO localities or among the matched localities. Most importantly, a Fisher's exact test of the difference in crime rates between places with and without GIPANDOs before and after GIPANDOs were passed indicates no statistically significant relationship (at a one-sided alpha level of 0.10) between GIPANDO policy passage and victimization. A comparison of the change in the number of criminal incidents after passage of public accommodations protections between GIPANDO localities and their matched localities also showed no statistically significant difference. In these comparisons, there does not appear to be a relationship between passage of GIPANDOs and criminal incidents in restrooms between localities.

A finding of no difference between the GIPANDO localities and the matched localities may be driven by the small number of localities included in the analysis. However, we are able to assess whether our finding of no difference was a result of our small sample size. A power analysis shows that we would likely still find no statistically significant difference between the GIPANDO localities and matched localities even with a larger sample size. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.108, suggesting that there is no difference between the GIPANDO localities and the matched localities. By increasing the number of matched pairs, the inference with the observed effect size would increase the probability that GIPANDO localities have *lower* annual crime rates than their matched localities, though this inference would barely satisfy less stringent accounts of statistical significance. Beyond before-and-after differences, we can also assess trends in crime rates in public bathrooms between these localities. This way, it can be assessed whether trends in crime rates increase in GIPANDO localities compared to their matched localities. Figure 2 provides the timeframe from 24 months before to 24 months after the passage of the local GIPANDOs. A 24-month window was chosen because all localities in this analysis were asked to provide incidents within a four-year timeframe. Unlike a change in the annual incident rate before and after the introduction of GIPANDOs, this model com- pared the change in the average monthly incident rates in GIPANDO and matched localities. If the argument about GIPANDOs negatively impacting safety and privacy in restrooms is correct, then an increase in reported incidents among localities with GIPANDOs, above and beyond any increase in localities without GIPANDOs, would be expected after the introduction of such policies.

In Fig. 2, the model included the difference between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities. As can be seen in the graph, the rates over time showed no significant increases in victimization rates in GIPANDO localities compared to matched localities. To the contrary, localities introducing GIPANDOs had slightly, yet significantly, lower rates of criminal incidents than their matched localities at the time these ordinances were introduced. About 10 to 20 months after GIPANDO passage, the difference appeared to increase; during that time, the average monthly proportion of criminal incidents remained rather stable in GIPANDO localities but slightly increased among matched pairs. By 24 months after GIPANDO passage, rates between the two sets of localities appeared to have little difference.

AR_293047

Table 3    Average number of incidents per year documented by police departments by localities with clear GIPANDOS and matched pairs before and after policy passage

| | Localities with clear GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|
| Before passage | 0 (0 per 100,000) [0 per 100,000, 0 per 100,000] | 3.5 (2.54 per 100,000) [2.53 per 100,000, 2.55 per 100,000] | − 2.54 per 100,000 [− 2.55 per 100,000, − 2.53 per 100,000] |
| After passage | 0.5 (0.62 per 100,000) [− 0.49 per 100,000, 1.73 per 100,000] | 5.5 (4.50 per 100,000) [1.22 per 100,00, 7.78 per 100,00] | − 3.88 per 100,00 [− 7.34 per 100,000, − 0.42 per 100,000] |
| Change per 100,000 (After − before) | 0.62 per 100,000 [− 0.49 per 100,00, 1.73 per 100,000] | 1.96 per 100,000 [− 1.32 per 100,000, 5.24 per 100,000] | − 1.35 per 100,000 [− 4.30 per 100,00, 1.60 per 100,000] |
| Total annual average | 0.25 (0.31 per 100,000) [− 0.25 per 100,000, 0.86 per 100,000] | 4.5 (3.52 per 100,000) [1.86 per 100,000, 5.19 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_1 = 0.62$; $p = 0.43$; Fisher's exact = 1.00; one-sided Fisher's exact = 0.632.; difference-in-difference = − 1.35 bootstrapped S.E. = 1.80, $p = 0.454$

# Discussion

Opponents of gender identity nondiscrimination laws and policies have cited fears of attacks and privacy violations against women and children in restrooms as one of their main reasons for resistance to these, while proponents have asserted that such laws are necessary to protect transgender people and cause no increase in these kinds of crimes. However, no study, to our knowledge, has examined crime report data to assess changes in rates of crime before and after the introduction of GIPANDOs. This is the first study to do so. While this analysis initially chose Massachusetts as a case study because of its unique legal paradigm, it has taken on more direct importance in that state, because over the course of the data collection and analysis, Massachusetts passed a statewide public accommodations law that includes gender identity and that law is now up for repeal on the November 2018 ballot. By using public records and statistical modeling, we found no evidence that privacy and safety in public restrooms change as a result of the passage of GIPANDOs. [8]

The inclusion of GIPANDOs may signal a more inclusive context and thus relate to lower victimization rates, which we propose in H1. Based on previous empirical work on dispel- ling the myths to oppose LGBT rights in marriage, family, and employment, we suspected in H0 that GIPANDOs would have no relationship with victimization rates. We find greater support for H0. The inclusion of GIPANDOs had little relationship with victimization rates. Complimentary to research on hate crimes policies, sometimes, policy-specific provisions have little relationship to victimization. The cumulative addition of legal inclusion of marginalized groups may, however, reduce victimization rates (Levy & Levy, 2017).

**Limitations** Limitations of this study include issues inherent with the data source. For example, the data used to represent safety and privacy violations in public restrooms were police records of criminal incidents. While these records should have a relatively high level of reliability in their objective accuracy in recording the existence of such incidents, they fail to include any incidents that were not reported to local law enforcement. For example, it is estimated that only 30 to 35% of rapes and sexual assaults are reported to the police (Truman & Langton, 2014). Nevertheless, by assessing trends over time and using a matched pairs analysis, the authors sought to control for any issues related to unreported incidents. There is no reason to assume that incidents are more or less likely to be reported in a locality with a GIPANDO than in a matched locality.

The crime reports also were not recorded in a way that allows a reviewer to distinguish between incidents involving cisgender people and transgender people. Police departments generally do not distinguish between sex assigned at birth and gender identity. Therefore, there is no way to identify if there were any incidents that involved transgender people being attacked in public restrooms because of their externally perceived gender. A 2008 survey of 93 transgender people in the Washington, DC metropolitan area found that 9% reported experiencing physical assault in a public restroom (Herman, 2013). There was also no way to identify if there were incidents of transgender people or people pretending to be transgender accessing restrooms with intent to harm others. Among the incidents that had notes attached providing more detail, there was no evidence of transgender people being either victims or perpetrators of crimes or of people pretending to be transgender in order to harm others in public restrooms.

---

[8] We conducted a second analysis using a matching procedure that included localities with clear GIPANDOs, localities with limited GIPANDOs, and matched localities that clearly did not have a GIPANDO. This second analysis found similar results to the analysis presented above. See Appendix for a description and results of this second analysis

Fig. 2 Difference in the average monthly rate of criminal incidents in public restrooms, locker rooms, and changing rooms between localities with clear GIPANDOs and matched localities. Note: Dashed lines represent 90% confidence intervals; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction



It is also important to note that violent and other privacy- related crimes in public restrooms, locker rooms, and changing rooms are exceedingly rare. As a point of comparison, our findings indicated that reports of privacy or safety violations in these public spaces occurred annually at most at a rate of 4.5 per 100,000 population in the jurisdictions we studied; in the Commonwealth of Massachusetts in 2015, violent crimes were reported at a rate of 390.1 per 100,000 population, and rapes were reported at a rate of 32.6 per 100,000 (Federal Bureau of Investigation, 2016). While this may be comforting to those who have safety and privacy related concerns about those spaces, the rarity of such incidents may act as a limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest number of restroom incidents was the locality in which the police department sent their full criminal logs to the researchers and allowed the researchers to review the records to find incidents that met their search criteria. The higher number of incidents might be more likely to indicate that the researchers performed a more detailed and exhaustive search than the other searches performed within police departments, rather than that there were actually more incidents in that locality. That locality was a matched pair locality, so this may have contributed to the greater number of incidents reported in matched pair localities, as compared to GIPANDO localities. However, the difference-in-difference approach would account for any such bias because we do not rely on the numbers of individual incidents reported for the analyses, but instead rely on the differences within jurisdictions before and after passage of GIPANDOs. We can assume that data collection efforts were consistent within each jurisdiction, and therefore, our calculations produce differences that are comparable across jurisdictions.

AR_293049

Table 4   Average number of incidents per year as documented by police departments by localities with clear GIPANDOs, limited GIPANDOs and matched localities before-and-after policy passage

| | Localities with clear GIPANDOs | Localities with limited GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|---|
| Before passage | 1.0 (0.26 per 100,000) [− 0.91 per 100,000, 1.44 per 100,000] | 1.5 (2.55 per 100,000) [− 0.07 per 100,000, 5.18 per 100,000] | 2.5 (1.07 per 100,000) [− 0.00 per 100,000, 2.15 per 100,000] | − 0.81 per 100,000 [−2.40 per 100,000, 0.78 per 100,000] |
| After passage | 1.5 (0.63 per 100,000) [− 0.54 per 100,000, 1.81 per 100,000] | 0.5 (0.85 per 100,000) [− 1.78 per 100,000, 3.48 per 100,000] | 3 (1.32 per 100,000) [0.24 per 100,000, 2.39 per 100,000] | − 0.68 per 100,000 [−2.27 per 100,000, 0.91 per 100,000] |
| Change per 100,000 (after−before) | 0.37 per 100,000 [− 1.29 per 100,000, 2.03 per 100,000] | − 1.70 per 100,00 [− 5.42 per 100,000, 2.01 per 100,000] | 0.24 per 100,000 [− 1.27 per 100,000, 1.76 per 100,000] | 0.13 per 100,000 [−2.12 per 100,000, 2.38 per 100,000] |
| Total annual average | 1.25 (0.45 per 100,000) [0.05 per 100,000, 0.85 per 100,000] | 1.0 (1.70 per 100,000) [0.24 per 100,000, 3.16 per 100,000] | 2.75 (1.19 per 100,000) [0.29 per 100,000, 2.10 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_2 ¼ 1{:}42$; $p ¼ 0{:}49$; Fisher's exact ¼ 0:658. Difference-in-difference = 0.41, bootstrapped S.E. = 1.05, $p = 0.699$

Finally, though all of the requests were worded and followed up upon in the same manner, the depth of the results may have varied. Three localities were unable to provide complete incident data, which may decrease the internal validity of the current study. Cases where there was missing data from a matched locality led to the exclusion of the locality with a GIPANDO from the analysis because of the lack of comparable data, which may impact the external validity of the current study.

Despite these limitations, this study is able to empirically assess the relationship between nondiscrimination laws that are inclusive of gender identity in public accommodations and safety and privacy in public restrooms. While criminal incidents do, in fact, rarely occur in such spaces, these findings suggest that concerns over the safety in those spaces should be more generally related to community safety and policing, and not related to nondiscrimination laws.

Fig. 3 Differences in the average monthly rate of criminal incidents in public restrooms, locker rooms and changing rooms among localities with clear GIPANDOs and limited GIPANDOs compared to matched localities without GIPANDOs. Notes: 90% confidence intervals represented by dashed lines; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction.



# Conclusion

Opponents of gender identity nondiscrimination laws in public accommodations have largely cited fear of safety and privacy violations in public restrooms, locker rooms, and changing rooms if such laws are passed, while proponents have argued that the laws do not increase danger or harm in such spaces. To date, no evidence has been gathered to empirically test the hypothesized effect of these laws. This is the first study to collect public records and analytically compare the safety of public restrooms, locker rooms, and changing rooms in localities that have gender identity inclusive nondiscrimination laws that apply to public restrooms and matched localities that do not have such laws. The results show that the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces. Additionally, the results show that reports of privacy and safe- ty violations in public restrooms, locker rooms, and changing rooms were exceedingly rare and much lower than statewide rates of reporting violent crimes more generally. This study provides evidence that fears of increased safety and privacy violations as a result of nondiscrimination laws are not empirically grounded.

**Acknowledgements** The authors would like to thank Kerith Conron and Brad Sears for their extensive feedback on analytical approaches and presentation of findings. The authors would also like to thank the records keepers at the police departments throughout Massachusetts who assisted in responding to the public records requests that were a necessary part of the data collection for this project. The authors would also like to thank Chrissy Reinard and Joseph Rocha, who provided assistance in executing one round of public records requests. Thanks also go to Taylor Brown, who provided research assistance on crime rates throughout New England, and Fernanda Miramontes, who copy edited this paper. Finally, thank you to the editor and anonymous reviewers for their feed- back and publication assistance.

## Compliance with Ethical Standards

**Ethical Approval** This article does not contain any studies with human participants or animals performed by any of the authors. An IRB exemption was obtained by the authors for use of de-identified criminal record data (IRB#15-001060).

**Conflict of Interest** Amira Hasenbush declares that she has no conflict of interest. Andrew Flores declares that he has no conflict of interest. Jody Herman declares that she has no conflict of interest.

# Appendix: Placebo Matched Pairs Analysis

The analysis was re-conducted using a second matching procedure. Localities with clear GIPANDOs were matched to localities that clearly did not have a GIPANDO, and localities with limited GIPANDOs (i.e., Brookline and Cambridge) were also matched to localities that clearly did not have a GIPANDO (see Table 2). The limited GIPANDOs offer a type of placebo comparison, where a policy was introduced but not clearly inclusive of the protections that are afforded in localities with clear GIPANDOs.

Table 4 provides a contingency table showing the average annual number of incidents, similar to the analysis in the re- port. For this analysis, there were three levels of treatment: a group of localities with clear GIPANDOs, a limited GIPANDO group that introduced a gender identity policy, but made exceptions or lacked clarity on restrooms, and the matched localities group without GIPANDOs. There were fewer overall incidents in the group with clear GIPANDOs when compared to the matched localities, but there were no apparent patterns of an increase in victimization in the timeframe after passage. These differences were also not significantly different from one another. A Fisher's exact test indicated that there was no significant relationship between GIPANDOs and restroom crimes. An estimate of the before- and-after changes between the localities with clear GIPANDOs and their matched pairs of the average proportion of monthly incidents in locations also showed no statistically significant difference. There does not appear to be a relation- ship between policy introduction and restroom incidents. Again, here, even if there were many more localities, a statistical power analysis found that it is unlikely that there would be a statistically significant difference between GIPANDO localities and matched localities. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.85, suggesting that the null hypothesis of no difference would also fail to be rejected with a greater number of matched pairs.

Similar to before, we assessed trends in crime rates be- tween these localities. This way, it could be assessed whether trends in crime rates increased in clear GIPANDO localities and limited GIPANDO localities, as compared to their matched localities. The figure limits the timeframe to 12 months before and 12 months after the passage of the local GIPANDOs. A 12-month window was chosen because some localities in this analysis were asked to provide incidents with- in a two-year timeframe, so we restrict the plot to the timeframe common to all localities.

In Fig. 3, the model included differences between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities (black line), and differences be- tween the limited GIPANDOs with unclear enforceability or restroom exceptions and their matched localities (gray line). The local regressions showed a lot of overlap between and across these three groups. As opposed to the analysis in the body of the report, which showed slightly lower crime rates in the GIPANDO localities as compared to their matched pairs after policy introduction, there was no statistically significant difference in the average monthly proportion of criminal incidents in restrooms both over time and across contexts.

These results indicate that changes in the average rate of criminal incidents are not related to the passage of GIPANDOs. The limited GIPANDOs provide another source of comparison, and these additional comparisons indicate that clear GIPANDOs are not uniquely related to increases in aver- age rates of criminal incidents.

# References

American Civil Liberties Union. (2017). G.G. v. Gloucester County School Board. Retrieved March 16, 2018, from https://www.aclu.org/cases/gg-v-gloucester-county-school-board.

Andersen, E. A. (2017). Transformative events in the LGBTQ rights movement. *Indiana Journal of Law and Social Equality, 5*(2), 441–475.

Badgett, M. V. L. (2001). *Money, myths and change: Economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Department of Housing and Urban Development (2016, September 20). HUD issues final rule to ensure equal access to housing and services regardless of gender identity. Retrieved May 25, 2017, from https:// portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2016/HUDNo_16-137

Diamond, A., & Sekhon, J. S. (2013). Genetic matching for estimating causal effects: A general multivariate matching method for achiev- ing balance in observational studies. *The Review of Economics and Statistics, 95*(3), 932–945.

Dimick, J. B., & Ryan, A. M. (2014). Methods for evaluating changes in health care policy: The difference-in-differences approach. *Journal of the American Medical Association, 312*(22), 2401–2402.

Equal Employment Opportunity Commission v. Harris Funeral Homes, 884 F.3d 560 (6th Cir. 2018)

Fausset, R. (2017, March 29). Retrieved May 2, 2017, from https://www. nytimes.com/2017/03/29/us/north-carolina-lawmakers-reach-deal- to-repeal-so-called-bathroom-bill.html.

Federal Bureau of Investigation. (2016). Crime in the United States by region, geographic division, and state, 2014–201. Retrieved February 2, 2017, from https://ucr.fbi.gov/crime-in-the-u.s/2015/ crime-in-the-u.s.-2015/tables/table-4.

Fejes, F. (2008). *Gay rights and moral panic: The origins of America's debate on homosexuality*. New York: Palgrave Macmillan.

Fernandez, M., & Smith, M. (2015, November 3). Retrieved May 2, 2017, from http://www.nytimes.com/2015/11/04/us/houston- voters-repeal-anti-bias-measure.html?_r=0.

Fetner, T. (2008). *How the religious right shaped lesbian and gay activism*. Minneapolis: University of Minnesota Press.

Fogg Davis, H. (2017). Why the ʙtransgenderˆ bathroom controversy should make us rethink sex-segregated public bathrooms. *Politics, Groups, and Identities*, 1–18. https://doi.org/10.1080/21565503. 2017.1338971.

G. G. v. Gloucester County School Board, 137 S. Ct. 1239 (2017).

G.G. v. Gloucester County School Board, 132 F. Supp. 3d 736, 750 (E.D. Va. 2015)

Gender Identity Act, H.B. 3810, 187th Gen. Court (Mass. 2011). Hasenbush, A., Flores, A. R., Kastanis, A., Sears, B., & Gates, G. J. (2014). The LGBT divide: A data portrait of LGBT people in the Midwestern, Mountain & Southern states. The Williams Institute. Available from https://williamsinstitute.law.ucla.edu/wp-content/ uploads/LGBT-divide-Dec-2014.pdf.

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law & Sexuality, 1*(133), 133–172.

Herek, G. M. (2006). Legal recognition of same-sex relationships in the United States: A social science perspective. *American Psychologist, 61*(6), 607–621.

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management and Social Policy*, 65–80.

Holden, D. (2018, February 12). Retrieved March 16, 2018, from https:// www.buzzfeed.com/dominicholden/edu-dept-trans-student-bathrooms?utm_term=.mvmwQx3mb#.bwlqp5QIV.

House Bill 2: House Floor Debate on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 43 (2016) (testimony of Rodney W. Moore).

House Bill 2: Senate Floor Session on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 14ʔ-16 (2016) (testimony of E. S. ʙBuckˆ Newton).

Human Rights Bylaw, Amherst, Mass., Gen. Bylaws Art. 1 (2009).

Human Rights Campaign. (2016). Cities and counties with non- discrimination ordinances that include gender identity. Retrieved May 24, 2017, from http://www.hrc.org/resources/cities-and- counties-with-non-discrimination-ordinances-that-include-gender.

Imai, K., & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, 76*(1), 243–263.

Jackson, C. (2017, June 6). *OCR instructions to the field re complaints involving transgender students [memorandum]*. Washington, DC: Office for Civil Rights, Department of Education Retrieved July 11, 2017, from https://assets.documentcloud.org/documents/ 3866816/OCR-Instructions-to-the-Field-Re-Transgender.pdf

Keele, L., & Titiunik, R. (2015). Geographic boundaries as regression discontinuities. *Political Analysis, 23*(1), 127–155.

Kelly, D. (2016, March 28). Anchorage LGBT rights law opponents seek amendments through initiative. Alaska Dispatch News. Retrieved May 2, 2017, from https://www.adn.com/alaska-news/article/ opponents-anchorage-equal-rights-law-seek-amendments/2016/03/29/.

Kralik, J. (2017, April 12). ʙBathroom billˆ legislative tracking. Retrieved May 2, 2017, from http://www.ncsl.org/research/ education/-bathroom-bill-legislative-tracking635951130.aspx.

Levy, B. L., & Levy, D. L. (2017). When love meets hate: The relation- ship between state policies on gay and lesbian rights and hate crime incidence. *Social Science Research, 61*, 142−159.

Lusardi v. Dep't of the Army, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Mar. 27, 2015).

MacGillis, A. (2017, August 22). Is anybody home at HUD? New York Magazine. Available from http://nymag.com/daily/intelligencer/2017/08/ben-carson-hud-secretary.html.

Mass. Gen. Laws ch. 151B § 4 (1989). Mass. Gen. Laws. ch. 66, §10 (2016).

Miller, P. R., Flores, A. R., Haider-Markel, D. P., Lewis, D. C., Tadlock, B. L., & Taylor, J. K. (2017). Transgender politics as body politics: Effects of disgust sensitivity and authoritarianism on transgender rights attitudes. *Politics, Groups, and Identities, 5*(1),4−24.

Minn. Stat. § 363A.11 (1993).

Movement Advancement Project. (2017). Non-discrimination laws. Retrieved May 24, 2017, from http://www.lgbtmap.org/equality-maps/non_discrimination_laws.

Nebraska v. U.S., No. 4:16-CV-03117, first amended complaint for de- claratory and injunctive relief (U.S.D. Neb. Oct. 21, 2016).

Nebraska v. U.S., No. 4:16-cv-03117-JMG-CRZ (U.S.D. Neb. Mar.16, 2017).

Nebraska v. U.S., No. 4:16CV3117 (U.S.D. Neb. Nov. 23, 2016).

Occupational Safety and Health Administration. (2015). Best practices: A guide to restroom access for transgender workers. Retrieved May 25, 2017, from https://www.osha.gov/Publications/ OSHA3795.pdf.

Philipps, D. (2016, March 23). Retrieved May 25, 2017, from https:// www.nytimes.com/2016/03/24/us/north-carolina-to-limit- bathroom-use-by-birth-gender.html.

Radway, D. B., Town of Amherst, Mass. Director of Human Resources & Human Rights. (2015 April 23). [E-mail correspondence]. On file with the author.

Raifman, J., Moscoe, E., Austin, S. B., & McConnell, M. (2017). Difference-in-differences analysis of the association between state same-sex marriage policies and adolescent suicide attempts. *Journal of the American Medical Association Pediatrics, 171*(4), 350−356.

Schneider, A., & Ingram, H. (1993). Social construction of target popu- lation: Implications for politics and policy. *American Political Science Review, 87*(2), 334−347.

Sekhon, J. S. (2011). Multivariate and propensity score matching soft- ware with automated balance optimization: The matching package for R. *Journal of Statistical Software, 42*(7), 1−52.

Simmons, L. N., Chief of Staff, City of Northampton, Mass. Office of the Mayor. (2015, April 23−May 12). [E-mail correspondence]. On file with the author.

Stone, A. L. (2012). *Gay rights at the ballot box*. Minneapolis: University of Minnesota Press.

Texas v. U.S., 201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016).

Texas v. U.S., No. 16-11534, defendants-aAppellants' nNotice of wWithdrawal of mMotion for pPartial sStay pPending aAppeal and jJoint mMotion to cCancel oOral aArgument (2017).

Transgender Anti-Discrimination Act, Mass. Gen. Laws ch. 272 §§92A, 98 (2016).

Truman, J. L., & Langton, L. (2014). Criminal victimization, 2013. Retrieved from Bureau of Justice Statistics website May 2, 2017, http://www.bjs.gov/content/pub/pdf/cv13.pdf.

U.S. Department of Justice & U.S. Department of Education. (2016). . Retrieved May 2, 2017, from http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

U.S. Department of Justice & U.S. Department of Education. (2017). . Retrieved May 2, 2017, from https://www.justice.gov/crt/page/file/942021/download.

Westbrook, L., & Schilt, K. (2014). Doing gender, determining gender: Transgender people, gender panics, and the maintenance of the sex/gender/sexuality system. *Gender and Society, 28*(1), 32−57.

Worcester, Mass., Rev. Ordinances part 2, art. 10 §18(c)(1) (2014). Worcester, Mass., Rev. Ordinances Part 2, art. 10 §9(c) (2014).

Young, C. A. (2016, October 11). Question to repeal transgender accom- modations law qualifies for 2018 ballot. Retrieved May 2, 2017, from http://www.wbur.org/news/2016/10/11/ballot-question- transgender-accommodations-law.

AR_293053

# Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives

Jody L. Herman
*The Williams Institute*
*UCLA School of Law*

The designers of our built environment have created public facilities that are segregated by gender, such as public restrooms, locker rooms, jails, and shelters. Reliance upon gender segregation in our public spaces harms transgender and gender non-conforming people. This paper employs a minority stress framework to discuss findings from an original survey of transgender and gender non-conforming people in Washington, DC about their experiences in gendered public restrooms. Seventy percent of survey respondents reported being denied access, verbally harassed, or physically assaulted in public restrooms. These experiences impacted respondents' education, employment, health, and participation in public life. This paper concludes with a discussion of how public policy and public administration can begin to address these problems by pointing to innovative regulatory language and implementation efforts in Washington, DC and suggests other policies informed by the survey findings.

The concept of two separate and opposing genders – men and women – is entrenched in our society and reflected in our built environment. Public spaces throughout the United States are constructed with gender-segregated facilities, which serve to determine who is and is not allowed to use a particular space. Gender segregation is commonly found in public restrooms, locker rooms, dressing rooms, homeless shelters, jails, and prisons and is intended to provide safety, order, modesty, and security in these facilities. However, the concept of gender that underlies the design of these facilities ignores people who do not fit into a binary gender scheme, particularly transgender and gender non-conforming people. Traditional beliefs about gender are being challenged now more than ever and we must address the inadequacies of our built environment to meet the needs of all people regardless of gender.[1]

Restrooms in particular are an integral and necessary part of the built environment for our daily lives. All people share the real human need for safe restroom facilities when we go to work, go to school, and participate in public life. Since the need is universal, one

---

[1] For the purposes of this paper, "transgender" and "gender non-conforming" describe people whose gender identity or expression is different from those traditionally associated with their assigned sex at birth.

AR_293089

would think that it would be a priority of our society to make sure restrooms are safe and available for all people. Yet, the way gendered public restrooms are designed and constructed harms transgender and gender non-conforming people, some of whom may not conform to reified expectations of how men and women will look and act.

One way to conceptualize this harm is through a minority stress model. Minority stress develops by experiencing major stressors, such as when one is fired from a job, but can also develop through everyday experiences of disrespect and disparate treatment (Meyer 2003). Research on minority stress has found that it negatively impacts the mental health and social well-being of lesbian, gay, and bisexual people (Meyer 1995; Meyer 2003; Kertzner et al. 2009). Furthermore, lesbian, gay, and bisexual people may suffer minority stress as the result of prejudice and discrimination based on their gender non-conformity in addition to their sexual orientation (Gordon and Meyer 2007). Though these studies did not include transgender-identified participants, the findings on minority stress related to gender non-conformity suggest that minority stress models are appropriate to measure the impacts of prejudice and stigma experienced by transgender and gender non-conforming people.

This paper will utilize a minority stress framework to describe the experiences of transgender and gender non-conforming people when accessing and using gendered public restrooms. Data for this paper come from an original survey of transgender and gender non-conforming residents of Washington, DC, conducted in 2008 and follow-up interviews with selected survey participants. This survey collected data from 93 respondents on their experiences in gendered public restrooms in the DC metropolitan area, including experiences of denial of access, verbal harassment, and physical assault, and how those experiences impacted their education, employment, health, and participation in public life. Analysis of the survey data also will outline differences in these experiences based on race, income, and gender. Public restrooms fall under the purview of public policies that govern their design, construction, maintenance, and use. Public policy and public administration, therefore, can address problems that gender segregation creates. This paper will conclude by pointing to innovative public policy and public administration solutions that have created and implemented protections for transgender and gender non-conforming people and by taking a forward look at the role of gender segregation in urban planning and the built environment.

## Gender Segregation and Minority Stress

Ilan Meyer (2003) outlined processes of minority stress as they relate to lesbian, gay, and bisexual (LGB) people. Meyer (2003) locates minority stressors on a range from distal to proximal. Distal minority stressors are those that are based on events external to the individual and unrelated to the individual's self-perception or identity. These could be acute events, such as experiencing an incident of violence or job loss due to being perceived as LGB, or chronic events, such as homelessness due to family rejection. Proximal minority stressors are those that are based in an individual's self-perception and identity. Meyer explains, "Minority identity is linked to a variety of stress processes; some LGB people, for example, may be vigilant in interactions with others (expectations of rejection), hide their identity for fear of harm (concealment), or internalize stigma (internalized homophobia)" (2003, 676).

Meyer has modeled and tested the relationship between these processes of minority stress and mental health outcomes for gay and bisexual people, finding that minority stress is associated with negative outcomes in social well-being and mental health (Meyer 1995; Meyer 2003; Kertzner, Meyer, Frost, and Stirratt 2009). Though Gordon and Meyer (2007)

AR_293090

*Journal of Public Management & Social Policy*                                                    *Spring 2013*

found that LGB people suffer from prejudice, discrimination, and violence due to gender non-conformity, very little research has applied minority stress models directly to the experiences and health outcomes of transgender individuals and none have focused on gender segregation as a cause of minority stress (see, for example, Effrig, Bieschke, and Locke 2011; Garofalo, Emerson, and Mustanski 2010; Vilain and Sanchez 2009; Kelleher 2009). Without question, transgender and gender non-conforming individuals experience violence, stigmatization, and discrimination (see, for example, Grant et al. 2011; Stotzer 2009, and Lombardi et al. 2001). In the largest survey of trans people to date, transgender and gender non-conforming people reported being fired due to anti-transgender bias (26%), being harassed (78%) and physically assaulted (35%) at school, suffering double the rate of unemployment, and attempting suicide at alarming rates (41%) (Grant et al. 2011). Transgender and gender non-conforming people across the United States certainly are suffering the negative impacts and consequences of distal and proximal minority stressors. Furthermore, as a matter of tradition and policy, we have built minority stressors for transgender and gender non-conforming people into our very environment due to our reliance on gender segregation in public facilities.

The impact of gender segregation in transgender and gender non-conforming people's lives has received little attention or study in scholarly research and, as of this writing, no studies have been published in the fields of Public Policy and Public Administration on this topic. However, research in Sociology and by transgender organizations has provided descriptions of the experiences of transgender and gender non-conforming people in public restrooms. In *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination*, sociologist Sheila Cavanagh presents findings from 100 interviews with lesbian, gay, bisexual, transgender, and intersex (LGBTI) people on their thoughts and experiences regarding public restrooms (2010). While Cavanagh's study is mainly a theoretical mapping of how public restrooms reinforce gender and sexuality norms and why LGBTI people are harmed in these spaces, she relates narratives from interview participants that describe instances of harassment, humiliation, arrest, and physical violence in public restrooms.

Organizations that serve the trans community have also conducted research on transgender and gender non-conforming people's experiences in public restrooms. The Transgender Law Center (TLC), in cooperation with the National Center for Lesbian Rights (NCLR), found in a survey of transgender people in San Francisco that 63 percent of 75 respondents to questions regarding experiences in public accommodations experienced denial of access and/or harassment at least once while using public restrooms (Minter and Daley 2003). In a separate, more qualitative survey of transgender people in San Francisco, Dylan Vade found that "out of 116 responses from those who did not identify as male or female, 48 people took the time to write out specific bathroom experiences, all negative. These experiences ranged from harassment to violence to getting fired" (Vade 2002, 2). Respondents reported being physically abused, verbally harassed, fired, arrested, and made ill from avoiding restrooms altogether. A 2007 study in Virginia found that public restroom facilities served as a barrier to health care for some respondents (Xavier, Honnold, and Bradford 2007). Out of the sample of 350 Virginians self-identified as transgender, 37 respondents (11 percent) reported that a "lack of appropriate restroom facilities" had prevented them from seeing a doctor or getting health care (Xavier, Honnold, and Bradford 2007, 17).

AR_293091

Original analysis of the two data sets from the San Francisco surveys revealed that respondents experienced problems differently and at differing rates based on race and ethnicity, gender identity, and income. People of color reported problems using restrooms at a much higher rate than white respondents.[2] People who were transitioning from female-to-male reported problems at a much higher rate than people who were transitioning from male-to-female. Lower income groups reported more restroom problems than higher income groups, though this difference was not significant when tested. These differences suggest that discrimination based on race and ethnicity, class, and gender is intertwined with and may exacerbate experiences of prejudice in gender-segregated spaces. The survey conducted for this study improves on these prior surveys by focusing specifically on gendered restrooms, collecting more detailed quantitative data on a wider range of experiences, while also providing a more nuanced understanding of the impact of problems in gendered restrooms though qualitative data collection.

**Survey Method and Analysis**

Washington, DC served as the site for this survey, which was targeted to transgender and gender non-conforming people who work, live, and/or attend school in the District.[3] As a "hard-to-reach" population, usual sampling techniques for randomization, such as random-digit dialing, were not feasible for this survey. This survey utilized a convenience sampling method designed to reach as many members of the target community as possible. The survey was open for four months beginning November 2008 and advertised and/or distributed directly through seven community organizations, one online community, and two local listserves, all of which serve the LGBT community in Washington, DC. Advertisements for the survey encouraged respondents to forward news of the survey on to others they think are part of the target respondent group. The survey was offered online, in print, and via one-on-one interview in order to be as accessible as possible for people without internet access or low literacy. An incentive to participate was included in the form of a lottery for one of four $50 cash prizes. Follow-up interviews were conducted with six survey participants: two young transgender men, one young and two older transgender women, and one male crossdresser.

Analysis of the survey data was conducted using descriptive statistics, cross tabulations, and where appropriate, Pearson's chi-square and Fisher's exact tests.[4] As noted above, prior research suggests that transgender and gender non-conforming people experience problems at different rates based on race, income, and gender, so analyses of those differences are presented. The survey contained open-ended questions that generated qualitative data, which, along with follow-up interview data, was coded and analyzed. Follow-up interviews conducted for this study offer more detailed qualitative data that

---

[2] Original analysis was conducted by the author. Pearson's chi-square tests were conducted in this prior research. Unless otherwise noted, the findings reported here were found to be significant ($p < 0.05$).

[3] Data collection activities were originally conducted for the author's doctoral dissertation in cooperation with the DC Trans Coalition and received final approval from the George Washington University Institutional Review Board under IRB #080708, and all approval memos and approved documents are on file with the GWU IRB and the author.

[4] Pearson's chi-square tests and Fisher's exact tests are only generalizable with random samples. With a non-random sample, not only is the test not generalizable, but the test's ability to find statistical significance may be limited. Yet the test can be used to crudely measure a statistical relationship between two variables within the sample and provide hypotheses for future research. Chi-square tests of independence were performed when the expected value of each cell was 5 or higher. The Fisher's exact test, a test designed for use with thin cells, was used when any cell had an expected value of 4 or below. Test statistics and p-values are reported and will indicate which test was used.

AR_293092

*Journal of Public Management & Social Policy*                                              *Spring 2013*

allowed for better understanding of how people's experiences have impacted their lives by tracing and linking specific events to any subsequent impacts.

**Survey Sample Demographics**

      The target population for the survey was transgender and gender non-conforming people who live, work, or have spent significant time in Washington, DC. Approximately 50 percent (n=47) of survey respondents lived in Washington, DC. DC-resident respondents came from all four quadrants of the city, with the majority living in the northwest quadrant. Only 3 of the 93 respondents lived in zip codes outside the Washington, DC metropolitan area, which includes northern Virginia and the Maryland suburbs.

      Table 1 shows the racial/ethnic and age composition of the full survey sample and how it compares to the District of Columbia. Though nearly half of the survey respondents reside outside of Washington, DC, in Virginia or Maryland, this comparison gives a rough idea of how the survey sample differs from the general DC population.[5]  In the survey sample, 67 percent of respondents identified as white only, 17 percent identified as Black or African American only, and 12 percent reported two or more races. This sample appears skewed in favor of white respondents. The survey sample is composed mainly of individuals 44 years old and younger. Compared to the DC population, the survey sample seems much younger overall.

**Table 1. Race and Age of the Survey Sample and the District of Columbia**

| | Survey Sample | | DC |
|---|---|---|---|
| Demographic | Frequency | Percent of Sample | Percent of Population |
| Race/Ethnicity (n=93) | | | |
| Black/African-American alone | 16 | 17% | 54% |
| Hispanic/Latin@ alone[6] | 2 | 2% | 9% |
| Native American/American Indian alone | 0 | 0% | <1% |
| Asian/Pacific Islander alone | 2 | 2% | 2% |
| White/Caucasian alone | 62 | 67% | 34% |
| Two or more races | 11 | 12% | 1% |
| Age (n=93) | | | |
| 18-24 | 34 | 37% | 14% |
| 25-34 | 30 | 32% | 24% |
| 35-44 | 15 | 16% | 18% |
| 45-54 | 8 | 9% | 16% |
| 55-64 | 5 | 5% | 14% |
| 65 and older | 1 | 1% | 14% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2008.*

---

[5] An analysis of just the DC-resident respondents did not show any impact on the trends observed in Table 1 except in the case of race. DC residents in the sample seemed slightly less skewed from the DC population than the sample as a whole: 60 percent identified as white only, 29 percent identified as Black or African American only, and 13 percent reported two or more races. Yet, regardless of the residency of the respondents, this sample appears skewed in favor of white respondents.

[6] The use of "@" in the word "Latin@" is sometimes used in written Spanish to make the word gender-neutral in a concise manner.

AR_293093

Table 2 presents the income and educational attainment of the survey sample and the District of Columbia. Nearly half of the survey sample and the population of the District of Columbia had annual individual incomes of $19,999 or less – 46 percent and 48 percent, respectively. While the third and fourth income quintiles seem slightly larger in the survey sample, DC appears to have a larger share in the highest income category, at 9 percent versus 5 percent in the survey sample. While there appears to not be a large difference in income, survey respondents in the survey sample report higher educational attainment than the DC population. The survey sample had fewer people in the three lowest categories of educational attainment, and markedly higher percentages for those who had some college (no degree) and those who completed a bachelor's degree.

**Table 2. Income and Educational Attainment of the Survey Sample and the District of Columbia**

| Demographic | Survey Sample | | DC |
|---|---|---|---|
| | Frequency | Percent of Sample | Percent of Population |
| Income (n=92) | | | |
| $0-$19,999 | 42 | 46% | 48% |
| $20,000-$39,999 | 17 | 18% | 20% |
| $40,000-$59,999 | 15 | 16% | 12% |
| $60,000-$99,999 | 13 | 14% | 11% |
| $100,000+ | 5 | 5% | 9% |
| Educational Attainment (n=93) | | | |
| 8th grade or less | 0 | 0% | 4% |
| Some high school (no diploma) | 6 | 6% | 9% |
| High school/GED | 9 | 10% | 18% |
| Some college (no degree) | 19 | 20% | 12% |
| Associate's degree | 4 | 4% | 3% |
| Bachelor's degree | 26 | 28% | 19% |
| Graduate/professional degree | 17 | 18% | 19% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2008. Percentages in each category may not add to 100% due to rounding.*

Table 3 describes the gender identity of the survey respondents in four categories, arranged by respondents' sex assigned at birth and gender identity today. Sixty respondents (65 percent) were assigned female at birth. Thirty-seven of those respondents identified as a man, transgender, transsexual, and/or female-to-male (FTM). Twenty-three respondents assigned female at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer. Thirty-three respondents (35 percent) were assigned male at birth. Twenty-nine of these respondents identified as a woman, transgender, transsexual, and/or male-to-female (MTF). Four respondents assigned male at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer.

AR_293094

*Journal of Public Management & Social Policy*                                                          *Spring 2013*

**Table 3. Self-Identified Gender and Transition Status of the Survey Sample**

| Gender Identity Today | Gender Identity (n=93) | | Has had any medical transition (n=49) | |
|---|---|---|---|---|
| | Frequency | % of Sample | Frequency | Row % |
| Assigned Female at Birth (n=60) | | | | |
| Man / Transgender / Transsexual / FTM | 37 | 40% | 24 | 65% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 23 | 25% | 0 | 0% |
| Assigned Male at Birth (n=33) | | | | |
| Woman / Transgender / Transsexual / MTF | 29 | 31% | 24 | 83% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 4 | 4% | 1 | 25% |

Table 3 above also shows medical transition status by each gender category. Overall, 49 respondents (53 percent) have had medical transition of some sort. Sixty-five percent of those transitioning from female-to-male (FTM) and 83 percent of those transitioning from male-to-female (MTF) have had some form of medical transition, which may include hormone treatment, surgery, and other medical treatments or procedures for purposes of gender transition. The most common medical treatment respondents reported was hormone treatment. Forty-five respondents reported having had hormone treatment; these 45 respondents comprise 48 percent of the sample and 92 percent of those who have had any medical transition.

**Survey Respondents' Experiences with Gendered Public Restrooms**

The survey assessed people's experiences accessing or using gender-segregated public restrooms by asking specifically about denial of access to facilities, verbal harassment, and physical assault. Overall, 65 respondents (70 percent) reported experiencing one or more of these problems. Eighteen percent of respondents have been denied access to a gender-segregated public restroom, while 68 percent have experienced some sort of verbal harassment and 9 percent have experienced some form of physical assault when accessing or using gender-segregated public restrooms. This section reviews the results of questions about denied access, verbal harassment, and physical assault provided through the survey and follow-up interviews and provides an analysis of each based on gender, race/ethnicity, and income.

*Denied Access*

Eighteen percent of respondents have been denied access to at least one gender-segregated public restroom in Washington, DC. Table 4 describes the income, race/ethnicity, and gender of those denied access to gender-segregated public bathrooms. Comparing the rates of those denied access in each of the lowest three income quintiles shows very little difference, at 21 percent, 24 percent, and 20 percent. Twenty-five percent of all Black or African American respondents were denied access to gendered public bathrooms, which is

AR_293095

slightly higher than the share of white respondents (18 percent) and respondents of two or more races (18 percent). Twenty-six percent of all female-to-genderqueer respondents were denied access, which is about 10 points higher than the other two gender categories reporting denied access. There appears to be no significant relationship between being denied access to public restrooms and income (*Fisher's exact* = 0.377), race/ethnicity ($\chi^2$ = 0.36, $p$ = 0.85), or gender ($\chi^2$ = 0.4073, $p$ = 0.816).

**Table 4. Denied Access to Gender-Segregated Public Restrooms by Income, Race/Ethnicity, and Gender**

| Demographic | Denied Access (n=17) | |
|---|---|---|
| | Frequency | % of row category |
| Income (n=92) | | |
| $0-$19,999 (n=42) | 9 | 21% |
| $20,000-$39,999 (n=17) | 4 | 24% |
| $40,000-$59,999 (n=15) | 3 | 20% |
| $60,000-$99,999 (n=13) | 1 | 8% |
| $100,000+ (n=5) | 0 | 0% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 4 | 25% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 11 | 18% |
| Two or more races (n=11) | 2 | 18% |
| Gender (n=93) | | |
| Transgender Female-to-Male (n=37) | 6 | 16% |
| Transgender Male-to-Female (n=29) | 5 | 17% |
| Female-to-Genderqueer (n=23) | 6 | 26% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

*Verbal Harassment*

Sixty-eight percent of respondents reported experiencing at least one instance of verbal harassment in gender-segregated public restrooms. For purposes of this survey, "verbal harassment" was defined very broadly. These experiences could include, but were not limited to, having been told they were in the wrong facility (n=39), told to leave the facility (n=12), questioned about their gender (n=34), ridiculed or made fun of (n=19), verbally threatened (n=8), and stared at or given strange looks (n=56). Respondents also reported in qualitative responses having had the police called, having been confronted while using urinals, and being followed after using a facility.

Table 5 describes respondents' verbal harassment experiences by income, race/ethnicity, and gender. Eighty-two percent of those in the second income quintile ($20,000-$39,000) have experienced verbal harassment, which is the highest rate by income category in this sample. Black or African-American respondents reported the second-highest rate of verbal harassment (87 percent) and 64 percent of those reporting two or more races experienced verbal harassment. The percent of those who identified as gender non-conforming or genderqueer who have experienced verbal harassment is 78 percent for those assigned female at birth and 75 percent for those assigned male at birth. The rate of verbal harassment is relatively lower for those who identify as transgender female-to-male (68 percent) or transgender male-to-female (59 percent).

AR_293096

*Journal of Public Management & Social Policy*                                         *Spring 2013*

**Table 5. Verbal Harassment in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Verbal Harassment (n=63) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| $0-$19,999 (n=42) | 29 | 69% |
| $20,000-$39,999 (n=17) | 14 | 82% |
| $40,000-$59,999 (n=15) | 11 | 73% |
| $60,000-$99,999 (n=13) | 7 | 54% |
| $100,000+ (n=5) | 1 | 20% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 14 | 87% |
| Hispanic/Latin@ alone (n=2) | 2 | 100% |
| Asian/Pacific Islander alone (n=2) | 1 | 50% |
| White/Caucasian alone (n=62) | 39 | 63% |
| Two or more races (n=11) | 7 | 64% |
| Gender (n=93) | | |
| Transgender Female-to-Male (n=37) | 25 | 68% |
| Transgender Male-to-Female (n=29) | 17 | 59% |
| Female-to-Genderqueer (n=23) | 18 | 78% |
| Male-to-Genderqueer (n=4) | 3 | 75% |

There seems to be no significant relationship between experiencing verbal harassment and one's race/ethnicity (*Fisher's exact* = 0.269) or gender (*Fisher's exact* = 0.517). However, experiencing verbal harassment is related to one's income ($\chi^2$ = 4.396, $p$ = 0.036). Survey respondents who made $49,999 or less annually are more likely to experience verbal harassment than survey respondents who made $50,000 or more annually.

*Physical Assault*

Eight respondents (9 percent) reported experiencing at least one instance of physical assault in gender-segregated public restrooms. Like the term "verbal harassment" discussed above, "physical assault" was defined very broadly in this survey to capture a range of experiences respondents had where an altercation involving physical contact with others occurred. These experiences could include, but were not limited to, having been physically removed from the facility (n=4), hit or kicked (n=2), physically intimidated and/or cornered (n=6), and slapped (n=1). One transgender male-to-female respondent reported having been sexually assaulted while using the men's room.

Table 6 describes the distribution of experiences of physical assault by income, race/ethnicity, and gender. In this sample, there is a marginal relationship between race/ethnicity and experiences of physical assault (*Fisher's exact* = 0.078). This suggests that people of color in this sample were more likely than white respondents to experience physical assault. There is also a marginal relationship between income and physical assault in this sample (*Fisher's exact* = 0.056). Respondents making less than $50,000 annually in this sample were more likely to experience physical assault than respondents making $50,000 or above. There seems to be no relationship between gender and physical assault in this sample (*Fisher's exact* = 0.530).

AR_293097

**Table 6 Physical Assault in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Physical Assault (n=8) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| 0 to $19,999 (n=42) | 5 | 12% |
| $20,000-$39,999 (n=17) | 2 | 12% |
| $40,000-$59,999 (n=15) | 1 | 7% |
| $60,000-$99,999 (n=13) | 0 | 0% |
| $100,000+ (n=5) | 0 | 0% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 3 | 19% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 3 | 5% |
| Two or more races (n=11) | 2 | 18% |
| Gender (n=93) | | |
| Female-to-Male (n=37) | 2 | 5% |
| Male-to-Female (n=29) | 4 | 14% |
| Female-to-Genderqueer (n=23) | 2 | 9% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

**Impact of Gendered Restrooms in Education, Employment, Health and Public Life**

A single experience of denied access, verbal harassment, or physical assault is certainly a problem in its own right. These experiences, however, can have far-reaching effects that impact people's lives. Experiences of discrimination can impact people's lives in many ways, even leading to poverty or to negative health consequences (Grant et al. 2011). This survey sought to assess the impact on people's lives in four areas: education, employment, health, and participation in public life.

*Education*

Thirty-one respondents currently attend or have attended school in Washington, DC. Forty-two percent of these respondents reported being denied access to and/or verbally harassed in restrooms at their school in DC. Ten percent of the 31 respondents reported that incidents of denied access to and/or verbal harassment in restrooms negatively impacted their education in some way. One respondent had excessive absences due to problems with using restroom facilities. Another respondent reported that problems with restrooms caused poor performance as well as excessive absences. One former DC student reported that she had performed poorly in school and had to change schools; she finally dropped out of school due to problems with restrooms.

Although other respondents reported that problems using these facilities at school did not affect their education, some reported that accessing and using restrooms was disruptive to their daily life at school. For example, students reported avoiding going to the restroom at school when they needed to or having to find restrooms that had very little traffic. In a follow-up interview, a young transgender man described the situation at his school where school administration required him to use the restroom in the guidance office instead of the regular men's restrooms. He explains:

> The ones in the guidance office are supposed to be unisex, but they're still marked men/women, so I don't feel comfortable using the one

AR_293098

*Journal of Public Management & Social Policy*                                    *Spring 2013*

> marked women and then I have to wait an hour before I can try going there again. . . There's not always a line, but we only have ten minutes between classes, so if the bathroom is occupied, I don't have any time to wait. It's also not easy to leave during class, which means I would have to go back at the end of class.

This situation distracted him in class both because of his need to remain continent in the face of physical discomfort and his anxiety about finding an available restroom at the end of the class period.

*Employment*

Sixty survey respondents have worked in Washington, DC. Twenty-seven percent of these respondents reported being denied access and/or verbally harassed while using restrooms at their place of employment in DC. Thirteen percent reported that problems of denied access to and/or verbal harassment in restrooms at work affected their employment in some way. Four of these respondents changed jobs or quit their job. Four respondents reported that problems using these facilities contributed to poor job performance, excessive absences, and excessive tardiness.

Other respondents discussed how problems with gender-segregated restrooms at work caused them other kinds of complications. One respondent described having to deal with co-worker resentment, "When I transitioned at work, some of the other women complained behind my back because they didn't want me to use the women's room along with them, and at least one of them started going to the women's room on a different floor of the building just to shun me." Another respondent explained how he carefully planned for restroom use:

> I felt forced to make sure I used the bathroom before I left the house and did not use the public restroom unless I was 100% [sure] there was no one in there or [I would] go to a different floor that I didn't work on where I was less likely to encounter the same jerks, or I waited until I got home to use the bathroom [because] I usually didn't feel safe at all using the restrooms in public.

Another respondent reported that problems using the restroom caused him to plan out what time he would use the restroom so he could avoid confrontations.

*Health*

Fifty-four percent of respondents reported having some sort of physical problem from trying to avoid using public bathrooms, all of whom reported that they "held it" to avoid public restrooms. Health problems that respondents reported due to avoiding using public bathrooms include: dehydration (n=9), urinary tract infections (n=7), kidney infection (n=2), and other kidney-related problems (n=2). Six percent of respondents have seen a doctor for health problems caused by avoiding public restrooms.

Respondents described additional health problems due to avoiding public restrooms. One respondent explained, "I had avoided using public bathrooms for so many years and would hold it when I needed to go that now my bladder is weaker." Another respondent described how excessive continence might aggravate an existing medical condition: "I have kidney problems already. I know it's not good for me to hold it, but the alternative could be much worse."

AR_293099

In addition to the physical problems caused by avoiding public restrooms, some respondents have avoided getting health care when they needed it. Nine percent of respondents have avoided going to a hospital, healthcare facility, or doctor's office because those facilities have gender-segregated restrooms. One respondent avoided going to the doctor when he got a urinary tract infection. He explained: "I knew when I had contracted an infection from holding it daily and [I] drank a lot of prune juice and used a friend's left over prescription to get rid of it. I didn't want to hear the lecture from a medical professional." The lecture he did not want to hear was instruction from a doctor not to avoid using the restroom when he needed to go.

*Participation in Public Life*

Problems or expectation of problems with gender-segregated public facilities can impact a person's participation in public life, causing him or her to refrain from going to public places or attending public events. Fifty-eight percent of respondents reported that they have avoided going out in public due to a lack of safe restroom facilities. Thirty percent of respondents reported not attending a specific event for a variety of reasons related to public restrooms. The most common reasons for avoiding an event were that the length of the event was too long to avoid using the restroom (n=20) and a lack a familiarity with the venue where the event was being held (n=18). Respondents also reported avoiding events because the event was not important enough to risk problems with restrooms (n=17), restrooms at the event seemed unsafe (n=15), and there would be no friends or people the respondent knew at the event who could help navigate the restroom (n=14).

Thirty-eight percent of respondents reported avoiding particular public places because they only have gender-segregated facilities available. The places respondents most frequently avoided include shopping malls, retail stores, restaurants, gyms, and bars, including gay bars. Conversely, 49 percent reported that they will plan their route through certain areas of the city or will go to a specific place because they know there are safe restrooms there to use. One respondent described a similar strategy she used as follows:

> Given that the anti-androgen most MTF [transsexual] folks have to take, Spiro, causes frequent urination, I quickly learned where all the safe bathrooms were when having to go into Washington, DC. Once I found safe places, I plotted my travel routes to be near them, and I avoided going very much beyond those set routes.

Respondents offered other strategies they use to navigate gendered public restrooms. Common strategies involved finding gender-neutral restrooms, having a friend along for a trip to the restroom, using the restroom at home before going out in public, and if necessary, swinging by a nearby friend's house to use the restroom. Other suggestions respondents offered include using the restroom during "off peak" hours when traffic is low and avoiding places where one has previously had problems using the restroom. One respondent uses a strategy that combines several elements: "Stay out in DC for short periods of time. Scout bathroom options. If men's and women's entrances are very close and the bathrooms are not currently in use, I will use them. If there is a line to use the restrooms, I will not. Standing in line usually always results in verbal abuse or denial of access."

Respondents also noted that the ability to "pass" in restrooms is important in avoiding problems when using them. As one respondent put it, "There are tricks to passing in the bathroom. I have never been 'caught.'" One respondent, who self-identified as a butch lesbian, described a strategy that involves singing: "I sing and/or talk to people and feminize my walk every time I enter a public bathroom. I do this to help clue people in to

AR_293100

*Journal of Public Management & Social Policy*                                    *Spring 2013*

the fact that I am a woman without announcing it. It works under 50% of the time. I am often still read as a man."

**Gender Segregation as a Cause of Minority Stress**
        Minority stressors created by gender segregation range from the distal to the proximal. Seventy percent of survey respondents experienced denied access, verbal harassment, and/or physical assault when trying to access or while using gendered public restrooms. Respondents experienced these problems in public places, at work, and at school. These experiences of distal stressors created expectations of problems in these spaces, causing some to hide from public life. These more proximal stressors that survey participants reported included absences from work and school, poor performance at work or school, choosing to not participate in public life, avoiding particular places or events, and having to develop strategies to navigate gendered restrooms. While some specific negative impacts on physical health were discussed through the survey, such as bladder infections and distress, it is reasonable to assume there is an impact on the mental health of those who suffer this type of minority stress (see, for example, Lombardi and Bettcher 2005).
        This survey was not designed to measure mental health outcomes based on the minority stress study participants experienced, but many offered narratives that describe possible impacts on mental health. Experiencing consistent problems in gender-segregated public restrooms can contribute to a sense of stigmatization and ubiquitous discrimination. In a follow-up interview, a participant discussed the dangers of constant harassment:

> There have been plenty of times where, for example, in the women's bathrooms when women say mean things about me to their friends but not to my face, that's really emotionally damaging, and that, to me, that's dangerous. . . . I mean, we are talking about someone's gender identity, which is something that is so fundamental to who people are. People questioning that, and having that questioned on a daily basis can and does lead to self-harm and even suicide and all sorts of things. Verbal harassment and even non-verbal harassment, people just staring at you, can be dangerous.

No survey respondents reported that problems navigating gendered public facilities directly contributed to any self-harm, but several respondents expressed dismay or sadness due to other people consistently challenging their gender identity. One respondent remarked, "It's depressing to have to often explain my gender identity when others don't have to." Another respondent explained, "I just hope I never have to experience these negative experiences, though it appears this it is all very possible based upon past happenings. I am sad, about all this stuff." One respondent predicted a future threshold where consistent glares would finally cause her to avoid using public restrooms altogether. She stated, "I do not really avoid any place because I am at the moment not at a limit with the uncomfortable stares and glares I get." One respondent offered an apt summary statement to the complexities of problems restrooms create when she stated, "Subtlety is the key to cruelty."
        The survey findings presented above describe the minority stressors that result from our reliance on gender segregation in our built environment. Certainly individual actors who would deny access, harass, or physically assault anyone in public spaces are responsible for their actions in those instances, but gender segregation immediately creates a system of surveillance and policing of public spaces based on subjective assessments of a person's gender and gender expression (Cavanagh 2010). Transgender and gender non-conforming

AR_293101

people must navigate a public world organized around gender and be subject to this type of surveillance when using gendered spaces. Minority stress for these groups of people is literally built into our environment. Further research is needed to better understand the mental health impacts of gender segregation for transgender and gender non-conforming people.

## Limitations

This study should be viewed as an exploratory study, which provides a definition of the problems that gender segregation creates for transgender and gender non-conforming people and seeks to establish this problem as one that public policy and public administration should address. Continued research on this subject is warranted, both to further establish an understanding of the problems related to minority stress for transgender and gender non-conforming people, particularly as it pertains to gender segregation, and the solutions that public policy and public administration can offer. Future research endeavors similar to this study would benefit from improved sampling methods that allow for greater generalizability, better representation of the demographics of the underlying population, and a more sophisticated accounting of gender transition. In over-representing white respondents, the results of this survey are likely biased toward finding fewer reported incidents in gender-segregated restrooms, particularly in the area of physical assault. Since this survey limited responses to experiences in Washington, DC, rather than over the lifetime of the respondents, results may be biased toward fewer reported incidents. Several survey respondents remarked that they had moved to Washington, DC after they transitioned gender and experienced much fewer problems after having transitioned. Researchers would improve upon this study by better accounting for the temporal nature of gender for study participants who have transitioned or will transition gender.

## Conclusion

Transgender and gender non-conforming people can find themselves in danger in the gendered spaces in our built environment. Until public policy and public administration can meet the challenge to address this problem and rethink our reliance on gender segregation in our built environment, the onus will always be on the individual to try to navigate these spaces safely. In considering the role gender segregation plays in our environment, we should consider whether gender segregation is necessary to organize our public spaces. This is something that many legislators, public officials, and administrators are currently grappling with as transgender and gender non-conforming people have increased their visibility, formed political coalitions in the United States, and organized to make known the issues and problems they encounter in our society. While some jurisdictions have responded to the call to make changes to their policies and public spaces, many have not yet taken on this challenge but undoubtedly must face it in the future.

There are some models of public policy and public administration initiatives that have begun to address the problems gender segregation creates in public restrooms. For instance, statutory language that gives transgender and gender non-conforming people legal protections in restrooms have been adopted in the state of New Jersey, the cities of Oakland, Boston, Denver, and Boulder, and several jurisdictions within the state of Oregon. Enforcement regulations, which are drafted and implemented by government agencies, provide restroom protections in the cities of San Francisco, New York, and Washington, DC. Washington, DC's enforcement regulations contain the strongest language in the

AR_293102

*Journal of Public Management & Social Policy*                                                    *Spring 2013*

country in regard to gender-segregated public facilities and serve as a good model for creation of public policy and implementation to address this problem.

In 2005, the DC Human Rights Act was amended to include "gender identity or expression," and enforcement regulations for this amendment were adopted in 2006 that cover gender-segregated public facilities. These enforcement regulations for the DC Human Rights Act not only protect the rights of people to use the public facility consistent with their gender identity, but also mandate the creation of more gender-neutral restrooms in the District. Single-occupancy public restrooms in DC are now required to be gender-neutral. This requirement makes the enforcement regulations in DC the strongest in the country as of this writing. Implementation of the regulations is ongoing, with the DC Office of Human Rights working in conjunction with local advocacy groups, like the DC Trans Coalition and the DC Center, to identify and educate businesses that are out of compliance.

In addition to adopting legal protections for transgender and gender non-conforming people and creating more gender-neutral restrooms, transition-related health care coverage for transgender individuals must be considered as part of any public policy solution to the problems transgender people experience in gendered spaces. Participants in the survey for this paper suggested that medical gender transition decreases instances of denied access, harassment, and physical assault. Indeed in this sample, people who had any medical treatments or procedures to transition were less likely to experience harassment than those who had not transitioned ($\chi^2 = 5.0107$, $p = 0.025$). People assigned male at birth who had undergone electrolysis or laser hair removal for facial hair were less likely to experience verbal harassment than those assigned male at birth who had not ($\chi^2 = 11.2108$, $p = 0.001$). Significant barriers exist to getting medical transition treatments and procedures for those who need them. Fifty-two respondents said they wanted to have some (or more) transition-related medical treatments or procedures, but 63 percent said they cannot afford it. Eighty-five percent of these respondents said they would be more likely to get the medical treatments or procedures they want if they had insurance that covered them. Expanding access to transition-related health care for transgender people would be an important part any public policy initiative to address the problems created by gender segregation.

**Acknowledgements:** The author wishes to thank the DC Trans Coalition for their collaboration in the research for this paper. The author also wishes to thank Ilan Meyer and Brad Sears for their thoughtful reviews.

**Jody L. Herman** holds a Ph.D. in Public Policy and Public Administration from The George Washington University. She currently serves as the Peter J. Cooper Public Policy Fellow and Manager of Transgender Research at the Williams Institute, UCLA School of Law. Before joining the Williams Institute, she served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her main research interests are the impacts of gender identity-based discrimination and issues related to gender regulation in public space and the built environment. Email: hermanj@law.ucla.edu.

AR_293103

**References**

Cavanagh, Sheila L. 2010. *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination*. Toronto: University of Toronto Press.

Effrig, Jessica C., Kathleen J. Bieschke, and Benjamin D. Locke. 2011. Examining victimization and psychological distress in transgender college students. *Journal of College Counseling,* 14 (2): 143-157.

Gordon, Allegra R. and Ilan H. Meyer. 2007. Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. *Journal of LGBT Health Research,* 3(3): 55-71.

Grant, Jaime M., Lisa A. Mottet, Justin Tanis, Jack Harrison, Jody L. Herman, and Mara Keisling. 2011. *Injustice at Every Turn: A report of the National Transgender Discrimination Survey*. Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

Kelleher, Cathy. 2009. Minority stress and health: Implications for lesbian, gay, bisexual, transgender, and questioning (LGBTQ) young people. *Counselling Psychology Quarterly,* 22(4): 373-379.

Kertzner, Robert M., Ilan H. Meyer, David M. Frost, and Michael J. Stirratt. 2009. Social and psychological well-being in lesbians, gay men, and bisexuals: the effects of race, gender, age, and sexual identity. *The American Journal of Orthopsychiatry,* 79(4): 500-510.

Lombardi, Emilia and Talia Bettcher. 2005. Lesbian, Gay, Bisexual, and Transgender/Transsexual Individuals. In Barry S. Levy and Victor W. Sidel (Eds.), 130-144. *Social Injustice and Public Health*, New York: Oxford University Press.

Lombardi, Emilia L., Riki A. Wilchins, Dana Priesing, and Diana Malouf. 2001. Gender Violence: Transgender Experiences with Violence and Discrimination. *Journal of Homosexuality* 42(1):89-101.

Meyer, Ilan H. 1995. Minority stress and mental health in gay men. *Journal of Health and Social Behavior,* 36:38-56.

Meyer, Ilan H. 2003. Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological Bulletin,* 129(5): 674-697.

Minter, S., & Daley, C. 2003. *Trans Realities: A Legal Needs Assessment of San Francisco's Transgender Communities.* San Francisco: National Center for Lesbian Rights and Transgender Law Center.

Mustanski, Brian S., Robert Garofalo, and Erin M. Emerson. 2010. Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health,* 100(12): 2426-2432.

Sánchez, Francisco J. and Eric Vilain. 2009. Collective self-esteem as a coping resource for male-to-female transsexuals. *Journal of Counseling Psychology* 56(1): 202-209

Stotzer, Rebecca L. 2009. Violence against transgender people: A review of United States data. *Aggression and Violent Behavior,* 14: 170–179.

Vade, Dylan. 2002. *Gender Neutral Bathroom Survey.* Unpublished report on file with author. Factsheet Accessed August 29, 2012 at http://archive.srlp.org/files/documents/toolkit/gnb_survey.pdf

Xavier, Jessica, Julie A. Honnold, and Judith Bradford. 2007. *The Health, Health-related Needs, and Lifecourse Experiences of Transgender Virginians.* Virginia: Virginia HIV Community Planning Committee and Virginia Department of Health.

AR_293104

## Children's Legal Rights Journal

Volume 36 | Issue 2                                                                    Article 9

2016

# Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity

Katherine Szczerbinski

Follow this and additional works at: https://lawecommons.luc.edu/clrj

 Part of the Family Law Commons, and the Juvenile Law Commons

**Recommended Citation**
Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 CHILD. LEGAL RTS. J. 153 (2020).
Available at: https://lawecommons.luc.edu/clrj/vol36/iss2/9

This Article is brought to you for free and open access by LAW eCommons. It has been accepted for inclusion in Children's Legal Rights Journal by an authorized editor of LAW eCommons. For more information, please contact law-library@luc.edu.

*Education Connection:*
## The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity
*By: Katherine Szczerbinski*

Transgender children have recently become more visible and outspoken, which has led to a general trend of support in the education system. Calling the child by their preferred name and letting them join the sports team of their identified gender have become more common practices. Unfortunately, there is still a major issue for schools that is the subject of great controversy: whether students should use the bathrooms and locker rooms reflecting their gender identity. The split in viewpoints presents a significant issue in schools and in the courts as equal protection and privacy concerns are considered. Restricting students from using the bathroom reflective of their gender identity can produce negative social consequences, and schools should adjust their policies to better serve their children.

Contemporary media readily discusses transgender issues, and most of this attention has been positive. Children can easily find transgender people, both young and old, on social media and in popular culture. The Internet is filled with "Tumblrs" and YouTube videos chronicling gender transitions, television programs such as "Glee" feature transgender youth, and books such as *Parrotfish* by Ellen Wittlinger are available. The heightened frequency of conversation about the transgender community has affected policies and guidelines, leading to a search for the best practices for interactions with transgender persons.

With the media spotlight on transgender issues, schools have been working to establish best practices for their transgender students. Some districts have aimed to support their transgender students, believing that restricting full access to the facilities of their choosing is denying these children fair and equal treatment. Further, studies have shown that without proper caregiving structures and support, transgender children have a clinically significant increased risk of anxiety, depression, suicidal ideations, and suicide. A school district that supports its transgender students not only attempts to give all students fair and equal treatment, but also supports the mental health of these students.

Some schools have attempted to achieve a solution by giving transgender students access to separate bathrooms or spaces for their private use. Although helpful to students who want such treatment, having separate facilities deprives and further stigmatizes students who want to be in the same facilities as their classmates, ultimately leading to their isolation from their peers.

In Illinois, Barrington Community Unit School District 220 has its officials working with transgender students and their families to ensure an inclusive environment for these students. For example, where a particular transgender middle school student

153

AR_293106

*Education Connection*                                                    154

required use of the locker room, that student was given full access to the locker room requested, and further provided a student aide to accompany the student and observe in case issues or questions arise. Illinois' largest school district, Chicago Public Schools, has yet to adopt a comprehensive solution to this issue, instead adopting guidelines for a case-by-case determination of locker room and bathroom use. Neither Chicago nor Barrington has reported an issue.

Although Barrington and Chicago schools have found ways to accommodate transgender students, other school districts, including Township High School District 211 in Illinois ("District 211"), claim they cannot allow full access of facilities reflective of transgender students' gender identity due to privacy concerns. District 211's policy allows transgender students to play on sports teams of their gender and use the bathrooms of that gender, but remains firm that offering these students a private place to change is a proper accommodation. When schools have not been as accommodating, students have found ways to adapt. A student at Lake Forest High School, also in Illinois, was told to use faculty bathrooms that were out of the way, so she chose to use the girls' bathroom stalls to change for physical education.

A fear raised by those wanting students to use the facility of their gender at birth is that allowing students to decide based on their gender identity will lead to children pretending to be transgender to allow them unfettered access to the bathroom of their choosing. This access will result in the opportunity for those pretending to be transgender to commit nefarious acts and that sexual assaults in these places will increase. However, the actual numbers show that this fear is unfounded. As of publication of this article, there has been only one reported instance of a person abusing this access: this instance occurred in Canada, where an already storied sexual predator pretended to be a woman in order to have access to female-only spaces.

This unfounded concern hurts both transgender students and cisgender students (*i.e.*, students who identify with their biological sex). These arguments fail to rely on actual data, instead relying on unsubstantiated fears that portray transgender people as sexual predators and deviants. Gender-nonconforming students are at risk of being removed from bathrooms when their gender expression differs from societal standards. These consequences can weigh heavily on these students and not only isolate them from their peers, but also be harmful to their mental health.

Title IX and its application have a significant impact in regards to transgender students' use of bathrooms and locker rooms. The application of Title IX in cases such as *Grimm v. Gloucester County School Board* and *Johnston v. University of Pittsburgh* held that Title IX does not mandate public schools to allow access for transgender students to the bathroom or locker room of their preference. This interpretation still stands, shifting advocates' focus to determining what mechanisms can be utilized to provide transgender

AR_293107

students access to bathrooms and locker rooms of their preference. One potential solution is to withhold federal funding until public schools comply with this emerging standard.

Schools need to make a shift towards better practices that give transgender students the same access as their peers to facilities. The social and mental negative consequences of restricting these students are too great to ignore and demand change. Being able to support transgender students can help break stigmas regarding the transgender community and empower children to better accept their peers.

**Sources**

Brynn Tannehill, *Debunking Bathroom Myths*, Huff. Post (Nov. 28, 2015), http://www.huffingtonpost.com/brynn-tannehill/debunking-bathroom-myths_b_8670438.html.

Duaa Eldeib & Robert McCoppin, *Feds Reject School District's Plan for Transgender Student, Locker Room*, Chi. Tribune (Oct. 13, 2015), http://www.chicagotribune.com/news/local/breaking/ct-transgender-student-locker-room-palatine-met-20151012-story.html.

Eliana T. Baer, *Navigating the Murky Waters of Best Interests with a Transgender Child*, New Jersey L.J., (June 5, 2014), http://www.foxrothschild.com/publications/navigating-the-murky-waters-of-best-interests-with-a-transgender-child/.

Eric Peterson, *Law Professor: Title IX Not Relevant in Dist. 211 Transgender Case*, Daily Herald (Oct. 26, 2015), http://www.dailyherald.com/article/20151026/news/151029160/.

G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., No. 4:15CV54, 2015 WL 5560190 (E.D. Va. Sept. 17, 2015).

Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ., 97 F. Supp. 3d 657 (W.D. Pa. 2015).

Julie Bosman & Motoko Rich, *As Transgender Students Make Gains, Schools Hesitate at Bathrooms*, N.Y. Times (Nov. 3, 2015), http://www.nytimes.com/2015/11/04/us/as-transgender-students-make-gains-schools-hesitate-at-bathrooms.html?_r=0.

Margaret Talbot, *About a Boy: Transgender Surgery at Sixteen*, New Yorker (Mar. 18, 2013), http://www.newyorker.com/magazine/2013/03/18/about-a-boy-2.

AR_293108

# Examples of Policies and Emerging Practices for Supporting Transgender Students



U.S. Department of Education

Office of Elementary and Secondary Education

Office of Safe and Healthy Students

May 2016

AR_293260

U.S. Department of Education
Office of Elementary and Secondary Education
Office of Safe and Healthy Students

Ann Whalen
*Senior Advisor to the Secretary, Delegated the Duties of the Assistant Secretary, Office of Elementary and Secondary Education*

David Esquith
*Director, Office of Safe and Healthy Students*

May 2016
This resource is in the public domain. Authorization to reproduce it in whole or in part is granted. The guide's citation should be:
U.S. Department of Education, Office of Elementary and Secondary Education, Office of Safe and Healthy Students, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016).

This guide is also available on the Office of Safe and Healthy Students website at www.ed.gov/oese/oshs/emergingpractices.pdf. Any updates to this guide will be available at this website.

If you need technical assistance, please contact the Office of Safe and Healthy Students at:
OESE.Info.SupportingTransgenderStudents@ed.gov

**Availability of Alternate Formats**
Requests for documents in alternate formats such as Braille or large print should be submitted to the Alternate Format Center by calling 202-260-0852 or by contacting the 504 coordinator via e-mail at om_eeos@ed.gov.

**Notice to Limited English Proficient Persons**
If you have difficulty understanding English you may request language assistance services for Department information that is available to the public. These language assistance services are available free of charge. If you need more information about interpretation or translation services, please call 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-437-0833), or e-mail us at ED.Language.Assistance@ed.gov. Or write to U.S. Department of Education, Information Resource Center, LBJ Education Building, 400 Maryland Ave. SW, Washington, DC 20202.

**Examples of Policies and Emerging Practices for Supporting Transgender Students**

The U.S. Department of Education ("ED") is committed to providing schools with the information they need to provide a safe, supportive, and nondiscriminatory learning environment for all students.  It has come to ED's attention that many transgender students (*i.e.*, students whose gender identity is different from the sex they were assigned at birth) report feeling unsafe and experiencing verbal and physical harassment or assault in school, and that these students may perform worse academically when they are harassed.  School administrators, educators, students, and parents are asking questions about how to support transgender students and have requested clarity from ED.  In response, ED developed two documents:

- ED's Office for Civil Rights and the U.S. Department of Justice's Civil Rights Division jointly issued a Dear Colleague Letter ("DCL") about transgender students' rights and schools' legal obligations under Title IX of the Education Amendments of 1972.[1]  Any school that has questions related to transgender students or wants to be prepared to address such issues if they arise should review the DCL.

- ED's Office of Elementary and Secondary Education compiled the attached examples of policies[2] and emerging practices[3] that some schools are already using to support transgender students.  We share some common questions on topics such as school records, privacy, and terminology, and then explain how some state and school district policies have answered these questions.  We present this information to illustrate how states and school districts are supporting transgender students.  We also provide information about and links to those policies at the end of the document, along with other resources that may be helpful as educators develop policies and practices for their own schools.

---

[1] 20 U.S.C. §§ 1681-1688; Dear Colleague Letter: Transgender Students (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[2] In this document, the term *policy* or *policies* refers generally to policies, guidance, guidelines, procedures, regulations, and resource guides issued by schools, school districts, and state educational agencies.

[3] ED considers *emerging practices* to be operational activities or initiatives that contribute to successful outcomes or enhance agency performance capabilities.  Emerging practices are those that have been successfully implemented and demonstrate the potential for replication by other agencies.  Emerging practices typically have not been rigorously evaluated, but still offer ideas that work in specific situations.

AR_293262

Each person is unique, so the needs of individual transgender students vary.  But a school policy setting forth general principles for supporting transgender students can help set clear expectations for students and staff and avoid unnecessary confusion, invasions of privacy, and other harms.  The education community continues to develop and revise policies and practices to address the rights of transgender students and reflect our evolving understanding and the individualized nature of transgender students' needs.

This document contains information from some schools, school districts, and state and federal agencies.  Inclusion of this information does not constitute an endorsement by ED of any policy or practice, educational product, service, curriculum or pedagogy.  In addition, this document references websites that provide information created and maintained by other entities.  These references are for the reader's convenience.  ED does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information.  This document does not constitute legal advice, create legal obligations, or impose new requirements.

AR_293263

## Table of Contents

**Student Transitions** ................................................................................................... 1

   1.  How do schools find out that a student will transition? ................................. 1

   2.  How do schools confirm a student's gender identity? .................................... 1

   3.  How do schools communicate with the parents of younger students compared to older transgender students? ........................................................................ 2

**Privacy, Confidentiality, and Student Records** ........................................................ 4

   4.  How do schools protect a transgender student's privacy regarding the student's transgender status? ........................................................................................ 4

   5.  How do schools ensure that a transgender student is called by the appropriate name and pronouns? ......................................................................................... 5

   6.  How do schools handle requests to change the name or sex designation on a student's records? ........................................................................................... 6

**Sex-Segregated Activities and Facilities** ................................................................. 7

   7.  How do schools ensure transgender students have access to facilities consistent with their gender identity? ......................................................................... 7

   8.  How do schools protect the privacy rights of all students in restrooms or locker rooms? ............................................................................................................ 7

   9.  How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity? ...................... 8

   10.  How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations? ................................. 9

**Additional Practices to Support Transgender Students** ......................................... 10

   11.  What can schools do to make transgender students comfortable in the classroom?.. 10

   12.  How do school dress codes apply to transgender students? ....................... 10

   13.  How do schools address bullying and harassment of transgender students? ............. 11

   14.  How do school psychologists, school counselors, school nurses, and school social workers support transgender students? ....................................................... 11

   15.  How do schools foster respect for transgender students among members of the broader school community? ......................................................................... 12

   16.  What topics do schools address when training staff on issues related to transgender students? ..................................................................................................... 12

   17.  How do schools respond to complaints about the way transgender students are treated? ......................................................................................................... 13

AR_293264

**Terminology** ....................................................................................................... **14**

18.   What terms are defined in current school policies on transgender students? ............ 14

19.   How do schools account for individual preferences and the diverse ways that students describe and express their gender? ................................................................................. 15

**Cited Policies on Transgender Students** ................................................................ **16**

**Select Federal Resources on Transgender Students** ............................................ **18**

iv

AR_293265

**<u>Student Transitions</u>**

1.  **How do schools find out that a student will transition?**

Typically, the student or the student's parent or guardian will tell the school and ask that the school start treating the student in a manner consistent with the student's gender identity. Some students transition over a school break, such as summer break.  Other students may undergo a gender transition during the school year, and may ask (or their parents may ask on their behalf) teachers and other school employees to respect their identity as they begin expressing their gender identity, which may include changes to their dress and appearance. Some school district or state policies address how a student or parent might provide the relevant notice to the school.

- Alaska's Matanuska-Susitna Borough School District issued guidelines ("Mat-Su Borough Guidelines") advising  that transgender students or their parents or guardians should contact the building administrator or the student's guidance counselor to schedule a meeting to develop a plan to address the student's particular circumstances and needs.

- The guidelines issued by Washington's Superintendent of Public Instruction ("Washington State Guidelines") offer an example of a student who first attended school as a boy and, about midway through a school year, she and her family decided that she would transition and begin presenting as a girl.  She prefers to dress in stereotypically feminine attire such as dresses and skirts.  Although she is growing her hair out and consistently presents as female at school, her hair is still in a rather short, typically boyish haircut.  The student, her parents, and school administrators asked her friends and teachers to use female pronouns to address her.

2.  **How do schools confirm a student's gender identity?**

Schools generally rely on students' (or in the case of younger students, their parents' or guardians') expression of their gender identity.  Although schools sometimes request some form of confirmation, they generally accept the student's asserted gender identity.  Some schools offer additional guidance on this issue.

- Los Angeles Unified School District issued a policy ("LAUSD Policy") noting that "[t]here is no medical or mental health diagnosis or treatment threshold that

1

students must meet in order to have their gender identity recognized and respected" and that evidence may include an expressed desire to be consistently recognized by their gender identity.

- The New York State Education Department issued guidance ("NYSED Guidance") recommending that "schools accept a student's assertion of his/her/their own gender identity" and provides examples of ways to confirm the assertion, such as a statement from the student or a letter from an adult familiar with the student's situation.  The same guidance also offers the following example:  "In one middle school, a student explained to her guidance counselor that she was a transgender girl who had heretofore only been able to express her female gender identity while at home.  The stress associated with having to hide her female gender identity by presenting as male at school was having a negative impact on her mental health, as well as on her academic performance.  The student and her parents asked if it would be okay if she expressed her female gender identity at school.  The guidance counselor responded favorably to the request.  The fact that the student presented no documentation to support her gender identity was not a concern since the school had no reason to believe the request was based on anything other than a sincerely held belief that she had a female gender identity."

- Alaska's Anchorage School District developed administrative guidelines ("Anchorage Administrative Guidelines") noting that being transgender "involves more than a casual declaration of gender identity or expression but does not require proof of a formal evaluation and diagnosis.  Since individual circumstances, needs, programs, facilities and resources may differ; administrators and school staff are expected to consider the needs of the individual on a case-by-case basis."

### 3.  How do schools communicate with the parents of younger students compared to older transgender students?

Parents are often the first to initiate a conversation with the school when their child is transgender, particularly when younger children are involved.  Parents may play less of a role in an older student's transition.  Some school policies recommend, with regard to an older student, that school staff consult with the student before reaching out to the student's parents.

- The District of Columbia Public Schools issued guidance ("DCPS Guidance") noting that "students may choose to have their parents participate in the transition process, but parental participation is not required."  The guidance further

2

recommends different developmentally appropriate protocols depending on grade level.  The DCPS Guidance suggests that the school work with a young student's family to identify appropriate steps to support the student, but recommends working closely with older students prior to notification of family.  The guidance also provides a model planning document with key issues to discuss with the student or the student's family.

- Similarly, the Massachusetts Department of Elementary and Secondary Education issued guidance ("Massachusetts Guidance") that notes:  "Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance.  School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian.  For the same reasons, school personnel should discuss with the student how the school should refer to the student, *e.g.,* appropriate pronoun use, in written communication to the student's parent or guardian."

- Chicago Public Schools' guidelines ("Chicago Guidelines") provide:  "When speaking with other staff members, parents, guardians, or third parties, school staff should not disclose a student's preferred name, pronoun, or other confidential information pertaining to the student's transgender or gender nonconforming status without the student's permission, unless authorized to do so by the Law Department."

- Oregon's Department of Education issued guidance stating, "In a case where a student is not yet able to self-advocate, the request to respect and affirm a student's identity will likely come from the student's parent. However, in other cases, transgender students may not want their parents to know about their transgender identity. These situations should be addressed on a case-by-case basis and school districts should balance the goal of supporting the student with the requirement that parents be kept informed about their children. The paramount consideration in such situations should be the health and safety of the student, while also making sure that the student's gender identity is affirmed in a manner that maintains privacy and confidentiality."

AR_293268

**Privacy, Confidentiality, and Student Records**

4. **How do schools protect a transgender student's privacy regarding the student's transgender status?**

There are a number of ways schools protect transgender students' interests in keeping their transgender status private, including taking steps to prepare staff to consistently use the appropriate name and pronouns.  Using transgender students' birth names or pronouns that do not match their gender identity risks disclosing a student's transgender status.  Some state and school district policies also address how federal and state privacy laws apply to transgender students and how to keep information about a student's transgender status confidential.

- California's El Rancho Unified School District issued a regulation ("El Rancho Regulation") that provides that students have the right to openly discuss and express their gender identity, but also reminds school personnel to be "mindful of the confidentiality and privacy rights of [transgender] students when contacting parents/legal guardians so as not to reveal, imply, or refer to a student's actual or perceived sexual orientation, gender identity, or gender expression."

- The Chicago Guidelines provide that the school should convene an administrative support team to work with transgender students and/or their parents or guardians to address each student's individual needs and supports.  To protect the student's privacy, this team is limited to "the school principal, the student, individuals the student identifies as trusted adults, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student."

- The Mat-Su Borough Guidelines state:  "In some cases, a student may want school staff and students to know, and in other cases the student may not want this information to be widely known.  School staff should take care to follow the student's plan and not to inadvertently disclose information that is intended to be kept private or that is protected from disclosure (such as confidential medical information)."

- The Massachusetts Guidance advises schools "to collect or maintain information about students' gender only when necessary" and offers an example:  "One school reviewed the documentation requests it sent out to families and noticed that field trip permission forms included a line to fill in indicating the student's gender.  Upon consideration, the school determined that the requested information was irrelevant to the field trip activities and deleted the line with the gender marker request."

4

5. **How do schools ensure that a transgender student is called by the appropriate name and pronouns?**

One of the first issues that school officials may address when a student notifies them of a gender transition is determining which name and pronouns the student prefers.  Some schools have adopted policies to prepare all school staff and students to use a student's newly adopted name, if any, and pronouns that are consistent with a student's gender identity.

- A regulation issued by Nevada's Washoe County School District ("Washoe County Regulation") provides that: "Students have the right to be addressed by the names and pronouns that correspond to their gender identity.  Using the student's preferred name and pronoun promotes the safety and wellbeing of the student.  When possible, the requested name shall be included in the District's electronic database in addition to the student's legal name, in order to inform faculty and staff of the name and pronoun to use when addressing the student."

- A procedure issued by Kansas City Public Schools in Missouri ("Kansas City Procedure") notes that:  "The intentional or persistent refusal to respect the gender identity of an employee or student after notification of the preferred pronoun/name used by the employee or student is a violation of this procedure."

- The NYSED Guidance provides:  "As with most other issues involved with creating a safe and supportive environment for transgender students, the best course is to engage the student, and possibly the parent, with respect to name and pronoun use, and agree on a plan to reflect the individual needs of each student to initiate that name and pronoun use within the school.  The plan also could include when and how this is communicated to students and their parents."

- The DCPS Guidance includes a school planning guide for principals to review with transgender students as they plan how to ensure the school environment is safe and supportive.  The school planning guide allows the student to identify the student's gender identity and preferred name, key contacts at home and at school, as well as develop plans for access to restrooms, locker rooms, and other school activities.

5

6. **How do schools handle requests to change the name or sex designation on a student's records?**

Some transgender students may legally change their names. However, transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to financial limitations or legal restrictions imposed by state or local law). Some school district policies specify that they will use the name a student identifies as consistent with the student's gender identity regardless of whether the student has completed a legal name change.

- The NYSED Guidance provides that school records, including attendance records, transcripts, and Individualized Education Programs, be updated with the student's chosen name and offers an example: "One school administrator dealt with information in the student's file by starting a new file with the student's chosen name, entered previous academic records under the student's chosen name, and created a separate, confidential folder that contained the student's past information and birth name."

- The DCPS Guidance notes: "A court-ordered name or gender change is not required, and the student does not need to change their official records. If a student wishes to go by another name, the school's registrar can enter that name into the 'Preferred First' name field of [the school's] database."

- The Kansas City Procedure recognizes that there are certain situations where school staff or administrators may need to report a transgender student's legal name or gender. The procedure notes that in these situations, "school staff and administrators shall adopt practices to avoid the inadvertent disclosure of such confidential information."

- The Chicago Guidelines state: "Students are not required to obtain a court order and/or gender change or to change their official records as a prerequisite to being addressed by the name and pronoun that corresponds to their gender identity."

- The Massachusetts Guidance also addresses requests to amend records after graduation: "Transgender students who transition after having completed high school may ask their previous schools to amend school records or a diploma or transcript that include the student's birth name and gender. When requested, and when satisfied with the gender identity information provided, schools should amend the student's record."

6

**Sex-Segregated Activities and Facilities**

7. **How do schools ensure transgender students have access to facilities consistent with their gender identity?**

Schools often segregate restrooms and locker rooms by sex, but some schools have policies that students must be permitted to access facilities consistent with their gender identity and not be required to use facilities inconsistent with their gender identity or alternative facilities.

- The Washington State Guidelines provide:  "School districts should allow students to use the restroom that is consistent with their gender identity consistently asserted at school."  In addition, no student "should be required to use an alternative restroom because they are transgender or gender nonconforming."

- The Washoe County Regulation provides:  "Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the student's records, including but not limited to locker rooms."

- The Anchorage Administrative Guidelines emphasize the following provision:  "However, staff should not require a transgender or gender nonconforming student/employee to use a separate, nonintegrated space unless requested by the individual student/employee."

8. **How do schools protect the privacy rights of all students in restrooms or locker rooms?**

Many students seek additional privacy in school restrooms and locker rooms.  Some schools have provided students increased privacy by making adjustments to sex-segregated facilities or providing all students with access to alternative facilities.

- The Washington State Guidelines provide that any student who wants increased privacy should be provided access to an alternative restroom or changing area.  The guidelines explain:  "This allows students who may feel uncomfortable sharing the facility with the transgender student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student."

7

- The NYSED Guidance gives an example of accommodating all students' interest in privacy: "In one high school, a transgender female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility."

- Atherton High School, in Jefferson County, Kentucky, issued a policy that offers examples of accommodations to address any student's request for increased privacy: "use of a private area within the public area of the locker room facility (e.g. nearby restroom stall with a door or an area separated by a curtain); use of a nearby private area (e.g. nearby restroom); or a separate changing schedule."

- The DCPS Guidance recommends talking to students to come up with an acceptable solution: "Ultimately, if a student expresses discomfort to any member of the school staff, that staff member should review these options with the student and ask the student permission to engage the school LGBTQ liaison or another designated ally in the building."

9. **How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity?**

Some school policies explain the procedures for establishing transgender students' eligibility to participate in athletics consistent with their gender identity. Many of those policies refer to procedures established by state athletics leagues or associations.

- The NYSED Guidance explains that "physical education is a required part of the curriculum and an important part of many students' lives. Most physical education classes in New York's schools are coed, so the gender identity of students should not be an issue with respect to these classes. Where there are sex-segregated classes, students should be allowed to participate in a manner consistent with their gender identity."

- The LAUSD Policy provides that "participation in competitive athletics, intramural sports, athletic teams, competitions, and contact sports shall be facilitated in a

8

manner consistent with the student's gender identity asserted at school and in accordance with the California Interscholastic Federation bylaws." The California Interscholastic Federation establishes a panel of professionals, including at least one person with training or expertise in gender identity health care or advocacy, to make eligibility decisions.

- The Rhode Island Interscholastic League's policy states that all students should have the opportunity to participate in athletics consistent with their gender identity, regardless of the gender listed on school records. The policy provides that the league will base its eligibility determination on the student's current transcript and school registration information, documentation of the student's consistent gender identification (*e.g.*, affirmed written statements from student, parent/guardian, or health care provider), and any other pertinent information.

### 10. How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations?

Schools often separate students by sex when providing overnight accommodations. Some school policies provide that students must be treated consistent with their gender identity in making such assignments.

- Colorado's Boulder Valley School District issued guidelines ("Boulder Valley Guidelines") providing that when a school plans overnight accommodations for a transgender student, it should consider "the goals of maximizing the student's social integration and equal opportunity to participate in overnight activity and athletic trips, ensuring the [transgender] student's safety and comfort, and minimizing stigmatization of the student."

- The Chicago Guidelines remind school staff: "In no case should a transgender student be denied the right to participate in an overnight field trip because of the student's transgender status."

AR_293274

**Additional Practices to Support Transgender Students**

### 11. What can schools do to make transgender students comfortable in the classroom?

Classroom practices that do not distinguish or differentiate students based on their gender are the most inclusive for all students, including transgender students.

- The DCPS Guidance suggests that "[w]herever arbitrary gender dividers can be avoided, they should be eliminated."

- The Massachusetts Guidance states that "[a]s a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose."

- Minneapolis Public Schools issued a policy providing that students generally should not be grouped on the basis of sex for the purpose of instruction or study, but rather on bases such as student proficiency in the area of study, student interests, or educational needs for acceleration or enrichment.

- The Maryland State Department of Education issued guidelines that include an example of eliminating gender-based sorting of students: "Old Practice: boys line up over here." New Practice: birthdays between January and June; everybody who is wearing something green, etc."

### 12. How do school dress codes apply to transgender students?

Dress codes that apply the same requirements regardless of gender are the most inclusive for all students and avoid unnecessarily reinforcing sex stereotypes.  To the extent a school has a dress code that applies different standards to male and female students, some schools have policies that allow transgender students to dress consistent with their gender identity.

- Wisconsin's Shorewood School District issued guidelines ("Shorewood Guidelines") that allow students to dress in accordance with their gender identity and remind school personnel that they must not enforce a dress code more strictly against transgender and gender nonconforming students than other students.

- The Washington State Guidelines encourage school districts to adopt gender-neutral dress codes that do not restrict a student's clothing choices on the basis of gender: "Dress codes should be based on educationally relevant considerations, apply

10

AR_293275

consistently to all students, include consistent discipline for violations, and make reasonable accommodations when the situation requires an exception."

**13. How do schools address bullying and harassment of transgender students?**

Unfortunately, bullying and harassment continue to be a problem facing many students, and transgender students are no exception.  Some schools make clear in their nondiscrimination statements that prohibited sex discrimination includes discrimination based on gender identity and expression.  Their policies also address this issue.

- The NYSED Guidance stresses the importance of protecting students from bullying and harassment because "[the] high rates experienced by transgender students correspond to adverse health and educational consequences," including higher rates of absenteeism, lower academic achievement, and stunted educational aspirations.

- The Shorewood Guidelines specify that harassment based on a student's actual or perceived transgender status or gender nonconformity is prohibited and notes that these complaints are to be handled in the same manner as other discrimination, harassment, and bullying complaints.

- The DCPS Guidance provides examples of prohibited harassment that transgender students sometimes experience, including misusing an individual's preferred name or pronouns on purpose, asking personal questions about a person's body or gender transition, and disclosing private information.

**14. How do school psychologists, school counselors, school nurses, and school social workers support transgender students?**

School counselors can help transgender students who may experience mental health disorders such as depression, anxiety, and posttraumatic stress.  Mental health staff may also consult with school administrators to create inclusive policies, programs, and practices that prevent bullying and harassment and ensure classrooms and schools are safe, healthy, and supportive places where all students, including transgender students, are respected and can express themselves. Schools will be in a better position to support transgender students if they communicate to all students that resources are available, and that they are competent to provide support and services to any student who has questions related to gender identity.

AR_293276

- The NYSED Guidance suggests that counselors can serve as a point of contact for transgender students who seek to take initial steps to assert their gender identity in school.

- The Chicago Guidelines convene a student administrative support team to determine the appropriate supports for transgender students.  The team consists of the school principal, the student, adults that the student trusts, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student.

### 15. How do schools foster respect for transgender students among members of the broader school community?

Developing a clear policy explaining how to support transgender students can help communicate the importance the school places on creating a safe, healthy, and nondiscriminatory school climate for all students.  Schools can do this by providing educational programs aimed at staff, students, families, and other community members.

- The Massachusetts Guidance informs superintendents and principals that they "need to review existing policies, handbooks, and other written materials to ensure they are updated to reflect the inclusion of gender identity in the student antidiscrimination law, and may wish to inform all members of the school community, including school personnel, students, and families of the recent change to state law and its implications for school policy and practice.  This could take the form of a letter that states the school's commitment to being a supportive, inclusive environment for all students."

- The NYSED Guidance states that "school districts are encouraged to provide this guidance document and other resources, such as trainings and information sessions, to the school community including, but not limited to, parents, students, staff and residents."

### 16. What topics do schools address when training staff on issues related to transgender students?

Schools can reinforce commitments to providing safe, healthy, and nondiscriminatory school climates by training all school personnel about appropriate and respectful treatment of all students, including transgender students.

AR_293277

- The Massachusetts Guidance suggests including the following topics in faculty and staff training "key terms related to gender identity and expression; the development of gender identity; the experiences of transgender and other gender nonconforming students; risks and resilience data regarding transgender and gender nonconforming students; ways to support transgender students and to improve school climate for gender nonconforming students; [and] gender-neutral language and practices."

- The El Rancho Regulation states that the superintendent or designee "shall provide to employees, volunteers, and parents/guardians training and information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, harassment, intimidation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include guidelines for addressing issues related to transgender and gender-nonconforming students."

### 17. How do schools respond to complaints about the way transgender students are treated?

School policies often provide that complaints from transgender students be handled under the same policy used to resolve other complaints of discrimination or harassment.

- The Boulder Valley Guidelines provide that "complaints alleging discrimination or harassment based on a person's actual or perceived transgender status or gender nonconformity are to be handled in the same manner as other discrimination or harassment complaints."

- The Anchorage Administrative Guidelines provide that "students may also use the Student Grievance Process to address any civil rights issue, including transgender issues at school."

AR_293278

**Terminology**

**18. What terms are defined in current school policies on transgender students?**

Understanding the needs of transgender students includes understanding relevant terminology. Most school policies define commonly used terms to assist schools in understanding key concepts relevant to transgender students.  The list below is not exhaustive, and only includes examples of some of the most common terms that school policies define.

- *Gender identity* refers to a person's deeply felt internal sense of being male or female, regardless of their sex assigned at birth.  (Washington State Guidelines)

- *Sex assigned at birth* refers to the sex designation, usually "male" or "female," assigned to a person when they are born.  (NYSED Guidance)

- *Gender expression* refers to the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice or mannerisms.  (Washoe County Regulation)

- *Transgender* or *trans* describes a person whose gender identity does not correspond to their assigned sex at birth.  (Massachusetts Guidance)

- *Gender transition* refers to the process in which a person goes from living and identifying as one gender to living and identifying as another.  (Washoe County Regulation)

- *Cisgender* describes a person whose gender identity corresponds to their assigned sex at birth.  (NYSED Guidance)

- *Gender nonconforming* describes people whose gender expression differs from stereotypic expectations.  The terms *gender variant* or *gender atypical* are also used. Gender nonconforming individuals may identify as male, female, some combination of both, or neither.  (NYSED Guidance)

- *Intersex* describes individuals born with chromosomes, hormones, genitalia and/or other sex characteristics that are not exclusively male or female as defined by the medical establishment in our society.  (DCPS Guidance)

- *LGBTQ* is an acronym that stands for "lesbian, gay, bisexual, transgender, and queer/questioning."  (LAUSD Policy)

14

- *Sexual orientation* refers to a person's emotional and sexual attraction to another person based on the gender of the other person.  Common terms used to describe sexual orientation include, but are not limited to, heterosexual, lesbian, gay, and bisexual.  Sexual orientation and gender identity are different.  (LAUSD Policy)

### 19. How do schools account for individual preferences and the diverse ways that students describe and express their gender?

Some students may use different terms to identify themselves or describe their situations.  For example, a transgender male student may identify simply as male, consistent with his gender identity.  The same principles apply even if students use different terms.  Some school policies directly address this question and provide additional guidance.

- The Washington State Guidelines recognize how "terminology can differ based on religion, language, race, ethnicity, age, culture and many other factors."

- Washington's Federal Way School District issued a resource guide that states:  "Keep in mind that the meaning of gender conformity can vary from culture to culture, so these may not translate exactly to Western ideas of what it means to be transgender. Some of these identities include Hijra (South Asia), Fa'afafine (Samoa), Kathoey (Thailand), Travesti (South America), and Two-Spirit (Native American/First Nations)."

- The Washoe County Regulation, responding to cultural diversity within the state, offers examples of "ways in which transgender and gender nonconforming youth describe their lives and gendered experiences:  trans, transsexual, transgender, male-to-female (MTF), female-to-male (FTM), bi-gender, two-spirit, trans man, and trans woman."

- The DCPS Guidance provides this advice to staff:  "If you are unsure about a student's preferred name or pronouns, it is appropriate to privately and tactfully ask the student what they prefer to be called.  Additionally, when speaking about a student it is rarely necessary to label them as being transgender, as they should be treated the same as the rest of their peers."

AR_293280

**Cited Policies on Transgender Students**

- Anchorage School District (AK): *Administrative Guidelines: Working with Transgender and Gender Nonconforming Students and Employees* (2015) (on file with ED)

- Atherton High School, Jefferson County School District (KY), *Policy on School Space* (2014), www.jefferson.k12.ky.us/schools/high/atherton/SBDMDocuments/Policy%20500%20Draft -%20Los%20Angeles%20Unified%20School%20District%20Revised%20Model.pdf

- Boulder Valley School District (CO), Guidelines Regarding the Support of Students and Staff Who Are Transgender and/or Gender Nonconforming (2016), http://www.bvsd.org/policies/Policies/AC-E3.pdf

- California Interscholastic Federation, *Guidelines for Gender Identity Participation* (2015), http://static.psbin.com/m/5/0ndq7wwfgh2em9/Guidelines_for_Gender_Identity_Participa tion.pdf

- Chicago Public Schools (IL), *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students* (2016), cps.edu/SiteCollectionDocuments/TL_TransGenderNonconformingStudents_Guidelines.pd f

- District of Columbia Public Schools, *Transgender and Gender-Nonconforming Policy Guidance* (2015), dcps.dc.gov/publication/dcps-transgender-and-gender-non-conforming-policy-guidance

- El Rancho Unified School District, *Transgender and Gender-Nonconforming Students* (AR 5145.3) (2014), www.erusd.org/pdf/board_policies/5145_3.pdf

- Federal Way Public Schools (WA), *Working with Transgender and Gender-Nonconforming Students and Staff* (2014-2015), www.fwps.net/districtresources/wp-content/uploads/sites/32/2013/12/FWPS_Transgender3.pdf?7a385a

- Kansas City 33 School District (MO), *Prohibition Against Discrimination, Harassment and Retaliation (Transgender and Gender Nonconforming Employee and Students)* (2013), eboard.eboardsolutions.com/ePolicy/policy.aspx?PC=AC-AP(1)&Sch=228&S=228&RevNo=1.01&C=A&Z=R

- Los Angeles Unified School District (CA), *Transgender Students – Ensuring Equity and Nondiscrimination* (2014), notebook.lausd.net/pls/ptl/docs/PAGE/CA_LAUSD/FLDR_ORGANIZATIONS/FLDR_GENERAL _COUNSEL/BUL-6224.1%20TRANSGENDER%20POLICY,%2008-15-14%20-%20ADDED%20ED%20CODE%20221%205.PDF

16

- Maryland State Department of Education, *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (2015), marylandpublicschools.org/MSDE/divisions/studentschoolsvcs/student_services_alt/docs/ ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf

- Massachusetts Department of Elementary and Secondary Education, *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment Nondiscrimination on the Basis of Gender Identity* (2014), www.doe.mass.edu/ssce/GenderIdentity.pdf

- Matanuska-Susitna Borough School District (AK), *Transgender Student Guidelines* (2015), www.matsuk12.us/site/handlers/filedownload.ashx?moduleinstanceid=10846&dataid=41 646&FileName=Title IX--Transgender Students Guidelines.pdf

- Minneapolis Public Schools (MN), *Permissible Grouping Principles* (2014), policy.mpls.k12.mn.us/uploads/regulation_6135_a.pdf

- New York State Education Department, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (2015), www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf

- Oregon Department of Education, *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (2016), www.ode.state.or.us/groups/supportstaff/hklb/schoolnurses/transgenderstudentguidance .pdf.

- Rhode Island Interscholastic League, *Rules & Regulations* (Article I, Section 22 – Gender Identity),  www.riil.org/files/8214/3861/6354/ARTICLE_1_ORGANIZATION_2015.pdf

- Shorewood School District (WI), *Nondiscrimination Guidelines Related to Students Who Are Transgender and Students Nonconforming to Gender Role Stereotypes* (2014), www.shorewood.k12.wi.us/uploaded/Board_Documents/Policies/411_Guidelines_and_Ex hibit.pdf?1393865642372

- Washington Office of State Superintendent of Public Instruction, *Prohibiting Discrimination in Washington Public Schools* (2012), www.k12.wa.us/Equity/pubdocs/ProhibitingDiscriminationInPublicSchools.pdf

- Washoe County School District (NV), *Gender Identity and Gender Non-Conformity – Students* (2015), washoecountyschools.net/csi/pdf_files/5161%20Reg%20- %20Gender%20Identity%20v1.pdf

AR_293282

**Select Federal Resources on Transgender Students**

- U.S. Department of Education

  - Office for Civil Rights and U.S. Department of Justice's Civil Rights Division, *Dear Colleague Letter: Transgender Students* (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf

  - Office for Civil Rights, *Resources for Transgender and Gender-Nonconforming Students*, www.ed.gov/ocr/lgbt.html

  - Office for Civil Rights, *Publications on Title IX*, www.ed.gov/about/offices/list/ocr/publications.html#TitleIX

  - Office for Civil Rights, *How to File a Discrimination Complaint*, www.ed.gov/about/offices/list/ocr/docs/howto.html

  - National Center on Safe Supportive Learning Environments, safesupportivelearning.ed.gov

- U.S. Department of Health and Human Services

  - Administration for Children and Families, *Resources for Serving Lesbian, Gay, Bisexual and Transgender Youth*, http://ncfy.acf.hhs.gov/features/serving-lesbian-gay-bisexual-transgender-and-questioning-youth-open-arms/resources-serving

  - Centers for Disease Control and Prevention, *LGBT Youth Resources*, www.cdc.gov/lgbthealth/youth-resources.htm

  - Homelessness Resource Center, *Homeless Populations: LGBTQI2-S Youth*, http://homeless.samhsa.gov/Channel/LGBTQ-153.aspx

  - Stopbullying.gov, *Bullying and LGBT Youth*, http://www.stopbullying.gov/at-risk/groups/lgbt

- U.S. Department of Housing and Urban Development

  - *Community-Wide Prevention of LGBTQ Youth Homelessness* (June 2015), https://www.hudexchange.info/resources/documents/LGBTQ-Youth-Homelessness-Prevention-Initiative-Overview.pdf

18

AR_293283

- U.S. Department of Labor

  - Office of Job Corps, *Directive: Job Corps Program Instruction Notice No. 14-31* (May 1, 2015), https://supportservices.jobcorps.gov/Program Instruction Notices/pi_14_31.pdf

19

# Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth

Thea A. Schlieben

Numerous studies (Craig & Pepler, 2003; Goldblum, Testa, Pflum, Hendricks, Bradford & Bongar, 2012; Mustanski & Liu, 2013) have found that lesbian, gay, bisexual, and transgender youth are at high risk for depression, anxiety, suicidal ideation, and suicide attempts. It is the view of the current author and others  (McCarthy, 2003) that sexual and gender minority students, lesbian, gay, bisexual, and transgender persons (LGBTQ) are too often considered as a single group or entity. As a result, when addressing discrimination and the community needs for LGBTQ persons, the differences between sexual orientation and transgender issues may be ignored. By not having specific discussions about transgender issues, it may be assumed that transgender students have the same needs as lesbian, gay, and bisexual students (McCarthy, 2003). Even when teachers and researchers recognize inequality in sexual orientation, gender variance is an often-overlooked form of diversity (McCarthy, 2003).

Transgender students are those whose gender expression does not conform to societal expectations and/or whose gender identity does not align entirely with the sex they were assigned at birth. In this context, transgender is used as an umbrella term that may include those who identify as transgender, gender non-conforming, genderqueer, agender, non-binary, queer, and any other non-cisgender individual. Cisgender refers to people whose gender identity aligns with the sex they were assigned at birth.

Almost forty-five percent of transgender or gender non-conforming students report victimization in their schools from peers and teachers, versus 19.9 percent of the general population of students (Goldblum, et al., 2012). Gender minorities are even more likely to experience victimization

AR_293382

in schools than cisgender (non-transgender) sexual minorities. Seventy-six percent of transgender students reported feeling unsafe in their schools because of their sexual or gender orientation as compared to the 52.9 percent of lesbian, gay, and bisexual students who reported the same feeling (Goldblum, et. al. 2012). If classrooms are going to be fully inclusive, they must allow for a range of gender identities and expressions.

In February 2016, the South Dakota Senate passed a measure that would force schools to make students use bathrooms and locker rooms according to their chromosomes and anatomy (Steinmetz, 2016). The supporters of sex-segregated bathroom bills argue if people are allowed to use a bathroom according to their gender identity, instead of the sex they were assigned at birth, it will increase sexual harassment and voyeurism, especially in women's bathrooms. There is no evidence to support this claim. Those in opposition to this legislation do so with the concern that such laws will encourage further hostility, abuse, and aggression toward transgender people. This form of discrimination has been shown to negatively affect mental health (Wang, Solomoan, Durso, McBride & Cahill, 2016). In fact, it is this adverse impact on the mental health of young persons that makes sex-segregated bathrooms an important social work issue. Protecting and serving vulnerable populations, such as transgender and gender variant youth, are central to the core values and ethics of social work.

**REVIEW OF LITERATURE**

The freedom to access public bathrooms is a basic necessity for all people, and mandatory for equal access to education and employment (Wang, Solomon, Durso, McBride, & Cahill, 2016). When faced with consistent problems using gender segregated bathrooms, transgender people may experience a greater sense of stigmatization and discrimination (Herman, 2013). The federal Occupational Safety and Health Administration (2015) released guidelines identifying the risk of marginalization that can occur if transgender employees are forced to use separate bathroom facilities, or facilities inconsistent with their gender identity. Forcing people to use bathrooms inconsistent with their gender identity or separate from their peer group creates a negative environment, whether in the workplace or an educational setting.

**Unequal access.** Anti-transgender bathroom bills, or laws that force people to use public bathrooms according to the gender they were assigned at birth, are written with the intention of increasing public safety.

AR_293383

Wang, et al. (2016) claim that rather than increasing public safety, these laws increase the risk of harassment and hostility toward transgender people. In 2015, Texas, Kentucky, Florida, Minnesota, and Missouri were considering bills that would regulate transgender and gender non-conforming people's access to public bathrooms and locker rooms. The laws proposed in Minnesota and Kentucky were a reaction to schools in those states that had created transgender inclusive bathroom policies. Even though the bills in those two states were defeated, other states have similar legislation moving through their governing bodies (Wang, et.al, 2016). The legislation passed by South Dakota, similar to the bills in Minnesota and Kentucky, include an exception for gender non-conforming students. It states that if a student cannot use the facilities aligning with the sex they were assigned at birth, and they obtain parental consent, "reasonable accommodations" will be made. Those accommodations are restricted to single occupancy, unisex facilities, or faculty bathrooms (Wang, et al., 2016). Wang, et al. (2016) argue that rather than being an acceptable compromise, this rule requires the student to disclose their transgender status to people who may not be supportive of their gender identity. Furthermore, if the child had begun transitioning before they enrolled in school, they also would be forced to reveal their assigned sex to the school community. This type of forced disclosure leaves gender non-conforming and transgender students vulnerable to bullying and victimization by peers and faculty.

**Negative school environment, bullying and victimization.** Studies have shown that improving the culture in schools around accepting and supporting LGBTQ students reduces both victimization and suicide attempts (DeCamp & Bakken, 2016). In turn, this finding suggests that a school environment that is not supportive of sexual and gender minority students increases the likelihood of victimization and suicidal behavior.

Educational systems in this country have not made significant progress in exploring and meeting the needs of their LGBTQ students (Little, 2001). Data presented by Riley, Sitharthan, Clemson, and Diamond (2013) suggests that even when children try to adhere to stereotyped gender roles, they are often targeted as "the other" by those seeking to marginalize and victimize them. The surveyed parents of LGBTQ children spoke of having to watch their children struggle socially. One-third of parents reported that their children were sad, depressed,

AR_293384

or suicidal (Riley, Sitharthan, Clemson, & Diamond, 2013).

Victimization of LGBTQ students is widespread and comes from both peers and teachers (Russell, Ryan, Toomey, & Sanchez, 2011). As noted above (Goldblum et.al), nearly 49 percent of transgender students participating in a 2012 study reported having been subject to hostility or insensitivity due to their gender expression. Russell, et al. (2011) showed that even small successes in reducing LGBTQ victimization in middle and high school could significantly improve the long-term health of students. It is thought that the mental health consequences of bullying increase when the victimization is based on these factors (Russell, Ryan, Toomey, & Sanchez, 2011). Participants who reported victimization based on gender were four times as likely to have attempted suicide as those who did not, and 28.5 percent of all respondents reported past suicide attempts (Goldblum, et al., 2012). The findings of this study reinforce the need to promote safer school environments for transgender and gender non-conforming students.

Craig and Pepler (2003) found children were most likely to be bullied at school, especially in areas that are not well supervised, such as school buses, playgrounds, hallways, bathrooms, and locker rooms. In recent years, the problem of school bullying appears to have intensified in severity and prevalence, and behaviors of students towards their peers have become more vicious. On a more hopeful note, more attention is being paid to the bullying of LGBTQ young people who are at a high risk of suicide (Russell, Ryan, Toomey, & Sanchez, 2011).

**Depression, anxiety, isolation, and hopelessness.** There is recognition in the literature that pressuring children to conform to gender roles and stereotypes creates damage and suffering that persists through adolescence and adulthood (Riley, Sitharthan, Clemson, & Diamond, 2013).

When young people are victimized, they report increased levels of anxiety and somatization, as well as problems with forming and maintaining good relationships (Craig & Pepler, 2003). Isolation for LGBTQ youth can be fatal. When isolated, LGBTQ young people are less likely to seek support for fear of rejection (Little, 2001).

Children suffering from depression and anxiety are at increased risk of being victimized (Craig & Pepler, 2003). Forty-one percent of the respondents in the National Transgender Discrimination Survey reported having attempted suicide, compared to 4.6 percent of the general population and 10.2 percent of lesbian, gay, and bisexual identified people. Among the group

AR_293385

of transgender respondents with histories of suicide attempts, several factors contributed to higher suicide rates: a previous attempted suicide, lower levels of education, and having experienced harassment or bullying at school.

Mustanski and Liu (2013) found that hopelessness and depression are determinants of suicidal behavior. LGBTQ youth are not only more likely to attempt suicide, they also are more likely to succeed in their attempts (Little, 2001). Increased rates of depression, sadness, and hopelessness have a significant effect on self-injury and suicidal ideation in all young people, regardless of gender identity or sexual orientation (DeCamp & Bakken, 2016). However, there also are factors specific to LGBTQ youth that may account for higher rates of suicidal behavior in this population (Mustanski & Liu, 2013).

In a longitudinal study examining the predictors of suicide attempts in LGBTQ youth, Mustanski and Liu (2013) found that when they examined suicide attempts by gender, transgender youth had the highest reported rates of hopelessness, victimization, and childhood gender non-conformity. These three elements represent significant risk factors for suicidality. Transgender youth also had the highest rate of suicide attempts (Mustanski & Liu, 2013). The findings of this study also support the belief that thwarted belongingness and isolation are risk factors for suicidality.

While some studies have found that concealing one's sexual orientation is detrimental to mental health for lesbian, gay, and bisexual people, the findings of the National Transgender Discrimination Survey, as reported by Haas, Rogers and Herman (2014), suggest that disclosing gender identity does not have the same effect for transgender people. The findings suggest that it serves as a protective factor and it is safer to be recognized as gender conforming. One-half of the respondents with a history of suicide attempts had previously disclosed their gender identity (Haas, Rodgers, & Herman, 2014).

**CONCLUSION**

Sex-segregated school bathroom laws impact transgender students and the entire school community negatively. The literature, reviewed in this paper, shows that sex-segregated bathrooms increase the likelihood of transgender students becoming depressed, anxious, isolated, and hopeless. They also establish a school environment that stigmatizes transgender students as "different" and "unusual," ultimately leading to social dynamics of being shamed and bullied. As the above literature demonstrates,

AR_293386

elevated levels of depression and hopelessness may lead to suicidal ideation and attempts.

Laws that require public schools to institute rules that all students must use the bathroom, shower, and locker room in accordance with their biological sex as determined at birth are unjust and discriminatory. Instead of focusing on sex-segregated bathrooms, students, parents, teachers, school administrators, and the entire school community are best served by tolerance and acceptance. Educators and mental health professionals must begin to teach about and fight against gender oppression in the same way they confront racial discrimination and have begun to normalize the conversation around homophobia (McCarthy, 2003).

# References

Craig, W. M., & Pepler, D. J. (2003). Identifying and targeting risk for involvement in bullying and victimization. *Canadian Journal of Psychiatry, 48*(9), 577-582.

DeCamp, W., & Bakken, N. W. (2016). Self-injury, suicide ideation, and sexual orientation: differences in causes and correlates among high school students. *Journal of Injury & Violence Research, 8*(1), 15-24.

Goldblum, P., Testa, R. J., Pflum, S., Hendricks, M. L., Bradford, J., & Bongar, B. (2012). The relationship between gender-based victimization and suicide attempts in transgender people. *Professional Psychology: Research and Practice, 43*, 468-475.

Haas, A., Rodgers, P., & Herman, J. (2014). Suicide attempts among transgender and gender non-conforming adults: Findings of the national transgender discrimination survey. American Foundation for Suicide Prevention and The Williams Institute, UCLA School of Law. Retrieved from http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf

AR_293387

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy*, 65-80.

Little, J. N. (2001). Embracing gay, lesbian, bisexual and transgendered youth in school-based settings. *Child & Youth Care Forum, 30*(2), 99-110.

Mustanski, B., & Liu, R. T. (2013). A longitudinal study of predictors of suicide attempts among lesbian, gay, bisexual and transgender youth. *Archives of Sexual Behavior, 42*, 437-448.

Occupational Safety and Health Administration (2015). OSHA Trade Release. Retrieved from https://www.osha.gov/news/ newsreleases/trade/06012015

Riley, E. A., Sitharthan, G., Clemson, L., & Diamond, M. (2013). Recognising the needs of gender-varient children and their parents. *Sex Education, 13*(6), 644-659.

Rogers, A., Rebbe, R., Gardella, C., Worlein, M., & Chamberlin, M. (2013, August). Older LGBT Adult Training Panels: An Opportunity to Educate About Issues Faced by the Older LGBT Community. *Journal of Gerontological Social Work*, 580-595.

Russell, S. T., Ryan, C., Toomey, R. B., & Sanchez, J. (2011, May). Lesbian, gay, bisexual, and transgender adolescent school victimization: Implications for young adult health and adjustment. *Journal of School Health, 81*(5), 223-230.

Wang, T., Solomon, D., Durso, L. E., McBride, S., & Cahill, S. (2016). State anti-transgender bathroom bills threaten transgender people's health and participation in public life [PDF file]. Policy Brief, Fenway Institute and Center for American Progress. Retrieved from http://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-Transgender-Bathroom-Bill-Brief_v8-pages.pdf

AR_293388

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63, No 10



**Journal of Homosexuality**
Volume 63, 2016 - Issue 10

18,530 Views | 111 CrossRef citations to date | 402 Altmetric
Articles

# Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality

Kristie L. Seelman ☐ , PhD, MSW

Pages 1378-1399 | Published online: 12 Apr 2016

☐ Cite this article | ☐ https://doi.org/10.1080/00918369.2016.1157998

☐ Full Article | ☐ Figures & data | ☐ References | ☐ Citations | ☐ Metrics | ☐ Reprints & Permissions | Read this article

## ABSTRACT

Transgender and gender non-conforming people frequently experience discrimination, harassment, and marginalization across college and university campuses (Bilodeau, 2007; Finger, 2010; Rankin et al., 2010; Seelman et al., 2012). The minority stress model (Meyer, 2007) posits that experiences of discrimination often negatively impact the psychological wellbeing of minority groups. However, few scholars have examined whether college institutional climate factors—such as being denied access to bathrooms or gender-appropriate campus housing—are significantly associated with detrimental psychological outcomes for transgender people. Using the National Transgender Discrimination Survey, this study analyzes whether being denied access to these spaces is associated with lifetime suicide attempts, after controlling for interpersonal victimization by students or teachers. Findings from

AR_293395

sequential logistic regression ($N$ = 2,316) indicate that denial of access to either space had a significant relationship to suicidality, even after controlling for interpersonal victimization. This article discusses implications for higher education professionals and researchers.

☐ KEYWORDS: Bathrooms · campus housing · harassment · higher education · minority stress model · suicidality · transgender

## Acknowledgments

Thanks to Dr. K. Jurée Capers for reviewing a draft of this article and offering constructive feedback.

The author acknowledges the National LGBTQ Task Force and the National Center for Transgender Equality conducted the National Transgender Discrimination Survey, which generated the data analyzed within this study. Their report on the survey data is available at http://www.thetaskforce.org.

## Notes

[1.] Within the present study, *transgender* encompasses those whose gender identity differs from predominant cultural expectations for their sex assigned at birth. This includes people who undergo medical treatment to transition from one gender to another, as well as those who have not or will not undergo such treatment, and is meant to match the definition used by the organizations that conducted the National Transgender Discrimination Survey (Grant et al., 2011). I will often use the term *trans\** to denote inclusion of a broader range of gender non-conforming identities, including those who may not use the term *transgender* for themselves.

[2.] This statistic was calculated using the inverse odds ratio: 1 / 0.69 = 1.45.

☐ Previous article    **View issue table of contents**    Next article ☐

## Log in via your institution

☐ Access through your institution

## Log in to Taylor & Francis Online

☐ Log in

## Restore content access

☐ Restore content access for purchases made as guest

## Purchase options * Save for later

**PDF download + Online access**
- 48 hours access to article PDF & online version
- Article PDF can be downloaded
- Article PDF can be printed

**USD 53.00**

☐ Add to cart

**Issue Purchase**

- 30 days online access to complete issue
- Article PDFs can be downloaded
- Article PDFs can be printed

**USD 412.00**

🛒 Add to cart

* Local tax will be added as applicable

Related Research



People also read | Recommended articles | Cited by 111

AR_293397

| Information for | | Open access | |
| --- | --- | --- | --- |
| Authors | | Overview | |
| R&D professionals | | Open journals | |

AR_293398

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63, No 10

Case 5:24-cv-04041-JWB-ADM   Document 91-1   Filed 09/26/24   Page 117 of 117

Editors

Librarians

Societies

## Opportunities

Reprints and e-prints

Advertising solutions

Accelerated publication

Corporate access solutions

Open Select

Dove Medical Press

F1000Research

## Help and information

Help and contact

Newsroom

All journals

Books

## Keep up to date

Register to receive personalised research and resources by email

Sign me up

Copyright © 2024   **Informa UK Limited**   Privacy policy   Cookies   Terms & conditions   Accessibility

Taylor & Francis Group
an **informa** business

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

AR_293399